

DET061740

AO 241
(Rev. 10/07)

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSO~~N~~

| United States District Court | |
|---|---|

Case:2:13-cv-14764
Judge: Steeh, George Caram
MJ: Majzoub, Mona K.
Filed: 11-18-2013 At 03:26 PM
HC DANTZLER V CURTIN (EB)

Name (under which you were convicted):

Samuel Dantzler

| Place of Confinement : | Prisoner No.: |
|---|---|
| Oaks Corr. Fac | 518107 |

Petitioner (include the name under which you were convicted)      Respondent (authorized person having custody of petitioner)

v.

Samuel Dantzler          Cindi Curtin

The Attorney General of the State of

## PETITION

1.   (a) Name and location of court that entered the judgment of conviction you are challenging:

    Third Circuit Court for Wayne County

  (b) Criminal docket or case number (if you know):   10-003521-01-FC

2.   (a) Date of the judgment of conviction (if you know): 12-22-2010

  (b) Date of sentencing:   1-20-2011

3.   Length of sentence:   Life

4.   In this case, were you convicted on more than one count or of more than one crime? ☐ Yes ☒ No

5.   Identify all crimes of which you were convicted and sentenced in this case:

    First Degree Felony Murder

6.   (a) What was your plea? (Check one)

    ☒ (1) Not guilty      ☐ (3) Nolo contendere (no contest)

    ☐ (2) Guilty         ☐ (4) Insanity plea

241
(Rev. 10/07)

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? _____

_____

_____

_____

_____

_____

(c) If you went to trial, what kind of trial did you have? (Check one)

    ☒ Jury    ☐ Judge only

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

    ☒ Yes    ☐ No

8. Did you appeal from the judgment of conviction?

    ☒ Yes    ☐ No

9. If you did appeal, answer the following:

(a) Name of court: __Wayne Circuit Court__

(b) Docket or case number (if you know): __303252__

(c) Result: __Conviction affirmed__

(d) Date of result (if you know): __June 19, 2012__

(e) Citation to the case (if you know): __Unpublished__

(f) Grounds raised: __1 Trial Courts modification to jury instruction violated petitioners constitutional rights. 2. Insufficient Evidence to support conviction. 3 Trial courts denial of funding for independent DNA expert violated petitioners constitutional rights.__

_____

(g) Did you seek further review by a higher state court? ☒ Yes   ☐ No

If yes, answer the following:

(1) Name of court: __Michigan Supreme Court__

(2) Docket or case number (if you know): __145738__

(3) Result: __denied review__

(4) Date of result (if you know): __12-26-2012__

AO 241
(Rev. 10/07)

(5) Citation to the case (if you know): _____

(6) Grounds raised: _1 Trial courts modification to jury instruction_
_violated petitioners constitutional rights 2 Insufficient evidence to_
_support conviction. 3 Trial courts denial of funds for independent_
_expert_

(h) Did you file a petition for certiorari in the United States Supreme Court?  ☐ Yes  ☒ No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?  ☒ Yes  ☐ No

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: _Michigan Supreme Court_

(2) Docket or case number (if you know): _145738_

(3) Date of filing (if you know): _12-17-12_

(4) Nature of the proceeding: _Motion to amend application for leave to appeal_

(5) Grounds raised: _request to allow submission of exhibit "People_
_v Davarro Deonta Webb, for consideration regarding argument_
_III of leave to appeal_

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?  ☐ Yes  ☒ No

(7) Result: _____

(8) Date of result (if you know): _____

AO 241
(Rev. 10/07)

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: Wayne Circuit Court of Appeals

(2) Docket or case number (if you know): 303252

(3) Date of filing (if you know): 6-27-12

(4) Nature of the proceeding: Motion for Re-consideration

(5) Grounds raised: ineffective assistance of counsel on direct

appeal

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes    ☒ No

(7) Result: Denied

(8) Date of result (if you know): Aug 04 2012

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: Wayne Circuit Court of Appeals

(2) Docket or case number (if you know): 303252

(3) Date of filing (if you know): 4-10-12

(4) Nature of the proceeding: Motion for Extension of Time for Reply Brief

(5) Grounds raised: Appellate attorney failed to forward prosecutor's

response brief to defendant in a timely manner, making

him unable to reply under the time restriction of MCR

7.212 (G)

AO 241
(Rev. 10/07)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☒ No

(7) Result: _Denied_

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:   ☒ Yes   ☐ No

(2) Second petition:   ☒ Yes   ☐ No

(3) Third petition:   ☒ Yes   ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

12.   For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

**GROUND ONE:** _My constitutional rights to a fair trial by a properly-instructed jury, 5,6th Amend. right of confrontation, and Fourteenth Amend. due process rights were violated_

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_My lawyer asked for instruction CJI 2d 5.12. The judge so instructed, but changed the word 'infer' to 'consider', thereby changing the meaning of the instruction._

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground One, explain why: _____

_____

_____

_____

AO 241
(Rev 10/07)

(c)     **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?          ☒ Yes          ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes          ☒ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?                    ☐ Yes          ☐ No

(4) Did you appeal from the denial of your motion or petition?              ☐ Yes          ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☐ Yes          ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

AO 241
(Rev. 10/07)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One: _____

_____

_____

**GROUND TWO:** _Insufficient evidence to prove charge, violating my_ _due process gaurantees under the Fourteenth Amendment._

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_There was no actual proof that I committed the crime I was_ _convicted of._

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

(c)  **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?  ☒ Yes   ☐ No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

_____

_____

(d)  **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes   ☒ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

AO 241
(Rev 10/07)

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion or petition?  ☐ Yes  ☐ No

(4) Did you appeal from the denial of your motion or petition?  ☐ Yes  ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  ☐ Yes  ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you :

have used to exhaust your state remedies on Ground Two _____

_____

_____

**GROUND THREE:** Trial court denied funds for independent DNA expert to review evidence, thereby denying me due process rights guaranteed by the Fourteenth Amendment

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

The Court agreed to pay for an independent DNA expert, then decided the cost was too steep and refused to pay for him to review samples.

_____

_____

_____

AO 241
(Rev. 10/07)

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

(c)     **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☒ Yes    ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)     **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes    ☒ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion or petition?    ☐ Yes    ☐ No

(4) Did you appeal from the denial of your motion or petition?    ☐ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☐ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

AO 241
(Rev. 10/07)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Three: _____

_____

_____

**GROUND FOUR:**   Appellate council was ineffective

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Council did not appear for oral arguments and failed to
forward a response brief to defendant in a timely manner, thereby
leaving him unable to meet deadline for a reply

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why:   This violation occured
during appellate process, rendering it ripe for Habeas review

_____

_____

(c)    **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?   ☐ Yes   ☒ No

(2) If you did not raise this issue in your direct appeal, explain why:   Violation occurred during
appellate process

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes   ☒ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

AO 241
(Rev. 10/07)

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?              ☐ Yes      ☐ No

(4) Did you appeal from the denial of your motion or petition?         ☐ Yes      ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☐ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four: _____

_____

_____

_____

_____

AO 241
(Rev. 10/07)

13.　Please answer these additional questions about the petition you are filing:

(a)　Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?　☒ Yes　☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: _____

_____

_____

_____

(b)　Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

_____ No _____

_____

_____

14.　Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?　☐ Yes　☒ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available. _____

_____

_____

_____

_____

_____

15.　Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?　☐ Yes　☒ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _____

_____

_____

_____

AO 241
(Rev. 10/07)

16.   Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: _____

_____

(b) At arraignment and plea: _____

_____

(c) At trial: _____Robert   Kenney_____

(d) At sentencing: _____Robert   Kenney_____

(e) On appeal: _____Neil  J  Leithauser  P-33976   101 W  Big Beaver

Rd.,  14th Floor,  Troy,  MI  48084

(f) In any post-conviction proceeding: _____

_____

(g) On appeal from any ruling against you in a post-conviction proceeding: _____

_____

17.   Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?       ☐ Yes   ☒ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

_____

_____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?       ☐ Yes   ☐ No

AO 241
(Rev. 10/07)

Therefore, petitioner asks that the Court grant the following relief:  _Reverse my Conviction_

_____

or any other relief to which petitioner may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for

Writ of Habeas Corpus was placed in the prison mailing system on  _____  (month, date, year).

Executed (signed) on  _11-14-13_  (date).

_____
Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

_____

_____

_____

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

+ + + + + + +

SAMUEL DANTZLER,

     Petitioner,                 Case No. _____

v

CINDY CURTIN, WARDEN,          Hon. _____

     Respondent.

---

Samuel Dantzler  518107            Bill Schuette, Attorney General
Petitioner In Pro Per                Attorney for Respondent
Oaks Correctional Facility                P O Box 30212
1500 Caberfae Highway                  Lansing MI  48909
Manistee MI  49660-9200

---

BRIEF IN SUPPORT OF

PETITION FOR WRIT OF HABEAS CORPUS

TABLE OF AUTHORITIES .......................................... iv

TABLE OF EXHIBITS ............................................. vii

STATEMENT OF QUESTIONS PRESENTED ............................. viii

STATEMENT OF FACTS ............................................ 1
    Background .................................................. 1
    Pre-Trial Proceedings ...................................... 1
    Trial ...................................................... 1
    Instructions ............................................... 8
    Verdict .................................................... 9
    Post-Verdict ............................................... 9

GROUND ONE ................................................... 10

THE TRIAL COURT'S SUA SPONTE MODIFICATION TO A
REQUESTED ADVERSE-INFERENCE INSTRUCTION FOLLOWING
DESTRUCTION OF MATERIAL EVIDENCE DENIED MR. DANTZLER
HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR
TRIAL BY A PROPERLY-INSTRUCTED JURY, SIXTH AMENDMENT
RIGHT OF CONFRONTATION, AND FOURTEENTH AMENDMENT DUE
PROCESS RIGHT TO DEFEND AGAINST THE CHARGES.

    Summary of Argument ....................................... 10
    Clearly Established Law ................................... 11
    Relief Requested ......................................... 12

GROUND TWO ................................................... 14

THE PROSECUTION FAILED TO PROVIDE CONSTITUTIONALLY
SUFFICIENT EVIDENCE TO PROVE THAT MR. DANTZLER
PARTICIPATED IN THE CRIME, AS A PRINCIPAL OR AIDER AND
ABETTOR, AND THE RESULTING CONVICTION VIOLATES HIS DUE
PROCESS GUARANTEES UNDER THE FOURTEENTH AMENDMENT AND
MICH. CONST. 1963, art. 1, § 17.

    Summary of Argument ....................................... 14
    Clearly Established Law ................................... 15
    Relief Requested ......................................... 18

GROUND THREE ................................................. 19

THE TRIAL COURT'S DENIAL OF NECESSARY FUNDS FOR AN
INDEPENDENT EXPERT TO REVIEW THE DNA EVIDENCE DENIED
MR. DANTZLER DUE PROCESS GUARANTEES UNDER THE
FOURTEENTH AMENDMENT AND MICH. CONST. 1963, art. 1,
§ 17.

    Amplified Statement of Facts .............................. 19
    Summary of Argument ....................................... 21
    Clearly Established Law ................................... 23
    Relief Requested ......................................... 25

GROUND FOUR                                          26

APPELLANT COUNSEL WAS DEFICIENT FOR FAILING TO
PRESERVE OPPORTUNITY FOR ORAL ARGUMENTS, FOR FAILING
TO FORWARD RESPONSE BRIEF TO MR. DANTZLER IN A TIMELY
MANNER, AND FOR FAILURE TO RAISE A REVERSIBLE ISSUE ON
APPEAL

Summary of Argument                            26
Clearly Established Law                      28
Relief Requested                               30

Signature Page                                             31

TABLE OF AUTHORITIES

CONSTITUTIONS

U.S. Const. Amend. V ..................................................... 11, 13, 23

U.S. Const. Amend. VI ............................... 10, 11, 13, 23, 29, 30

U.S. Const. Amend. XIV ...................... 10, 11, 13, 14, 13, 23, 29, 30


Mich. Const. 1963 art 1 § 15 .............................................. 23

Mich. Const. 1963 art 1 § 17 ........................................ 11, 14, 19

Mich. Const. 1963 art 1 § 20 .................................... 11, 14, 23, 29

FEDERAL CASES

Agard v Portuondo, 117 F3d 696 (2nd Cir 1997) ......................... 24

Britt v North Carolina, 404 US 226 (1971) ............................... 23

Carter v Bowersox, 265 F3d 705 (8th Cir 2001) .......................... 29

Davis v United States, 160 US 469 (1895) ................................ 16

California v Trombetta, 467 US 479 (1964) ............................... 13

Chambers v Mississippi, 410 US 284 (1973) .......................... 13, 23

Evitts v Lucey, 469 US 387 (1985) ...................................... 29

Ferensic v Birkett, 501 F3d 469 (6th Cir ED Mich 2007) .................. 25

Gideon v Wainwright, 372 US 335 (1963) ................................. 23

Goff v Bagley, 601 F3d 445 (6th Cir 2010) .............................. 28

Griffin v Illinois, 351 US 12 (1956) ................................... 23

Hanna v Riveland, 87 F3d 1034 (9th Cir 1996) ........................... 12

Hannah v Book, 447 F Supp 2d 788 (ED Mich 2006) ........................ 29

Harris v Pooker, 2008 US Dist LEXIS 68473 (ED Mich 2008) ................ 28

Howard v Walker, 406 F3d 114 (2nd Cir WDNY 2005) ....................... 23

In re Winship, 397 US 358 (1970) ....................................... 17

Jackson v Virginia, 443 US 307 (1979)                                    16, 25

Koon v United States, 518 US 81 (1996)                                       11

McCambridge v Hall, 94 F Supp 2d 146 (D Mass 2000)                           11

Murray v Carrier, 477 US 478 (1986)                                          25

O'Neal v McAninch, 513 US 432 (1995)                                         25

Powell v Alabama, 287 US 45 (1932)                                           27

Strickland v Washington, 466 US 668 (1984)                                   28

Taylor v Illinois, 484 US 400 (1987)                                         23

Turner v Bagley, 401 F3d 718 (2005)                                          23

United States v Agurs, 427 US 97 (1976)                                      24

United States v Javino, 960 F2d 1137 (2nd Cir 1992)                          16

United States v Leos-Quijada, 107 F3d 786 (10th Cir 1997)                 17-18

United States v Nixon, 418 US 683 (1974)                                     23

United States v Ruiz, 107 F3d 1492 (1st Cir 1997)                            17

Victor v Nebraska, 511 US 1 (1994)                                           16

Washington v Schriver, 255 F3d 45 (2nd Cir 2001)                            23

Williams v McCoy, 7 F Supp 2d 214 (EDNY 1998)                                11


                                STATE CASES

People v Bass (On Reh), 223 Mich App 241 (1997)                             29

People v Stanaway, 446 Mich 643 (1994)                                      23

People v Webb, MCOA No. 305017 (unpub Aug 16, 2012)                         24

RR Imp Ass'n v Thomas, 374 Mich 175 (1965)                                  24

Stanford v Stewart, 274 Ga 468 (2001)                                    28-29

COURT RULES

FRE 706                                                              25

MCR 7.212(A)(4)                                                      26

MRE 706                                                              25


STATE STATUTES

MCLA 600.2164                                                        25

MCL  775.15                                                          25


JURY INSTRUCTIONS

CJI 2d 5.12                                                          10


OTHER

American Bar Association Standard for Criminal Justice,
     The Defense Function (2nd ed 1980), 4.1-1 to 4-7.6             28

Merriam-Webster College Dictionary (c2001 10th ed)                  11

Michigan Appellate Assigned Counsel System
     Minimum Standard 6                                          26, 28

TABLE OF EXHIBITS

EX # EXHIBIT DESCRIPTION

1    People v Dentezler, 19 June 2012 Unpublished Opinion.

2    AFFIDAVIT FOR STEPHEN DEMMINGS

3    Wayne County Prosecutor Office 25 April 2012 letter to Appellate Counsel
     Neil J. Leithauser

4    ORDER FOR AN APPOINTMENT OF AN INDEPENDENT DNA EXPERT, 24 November 2010,
     Hon. Gregory D. Bill

5    Ann E. Chamberlain, M.S., FEES FOR EXPERT SERVICES

6    Jenninghs, Jackie Email to/from Ms. Chamberlain, 4/6 September 2013

7    People v Davarrio Deonte Webb, Michigan Court of Appeals Docket
     No. 306017, Unpublished Opinion 16 August 2012

8    Michigan Appellate Assigned Counsel System 3 August 2013 to Mr. Neil
     Leithauser

STATEMENT OF QUESTIONS PRESENTED

I. DID THE TRIAL COURT'S SUA SPONTE MODIFICATION TO
A REQUESTED ADVERSE-INFERENCE INSTRUCTION
FOLLOWING DESTRUCTION OF MATERIAL EVIDENCE DENY
MR. DANTZLER HIS STATE AND FEDERAL CONSTITUTIONAL
RIGHTS TO A FAIR TRIAL BY A PROPERLY-INSTRUCTED
JURY, SIXTH AMENDMENT RIGHT OF CONFRONTATION, AND
FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO DEFEND
AGAINST THE CHARGES?

II. WAS THE EVIDENCE INSUFFICIENT TO PROVE MR.
DANTZLER PARTICIPATED IN THE CRIME, AS A
PRINCIPAL OR AIDER AND ABETTOR, AND DOES THE
RESULTING CONVICTION VIOLATE HIS DUE PROCESS
GUARANTEES UNDER THE FOURTEENTH AMENDMENT AND
MICH. CONST. 1963, art. 1, § 17?

III. DID THE TRIAL COURT'S DENIAL OF NECESSARY FUNDS
FOR AN INDEPENDENT EXPERT TO REVIEW THE DNA
EVIDENCE DENY MR. DANTZLER DUE PROCESS GUARANTEES
UNDER THE FOURTEENTH AMENDMENT AND MICH. CONST.
1963, art. 1, § 17?

IV. WAS APPELLANT COUNSEL DEFICIENT FOR FAILING TO
PRESERVE OPPORTUNITY FOR ORAL ARGUMENTS, FOR
FAILING TO FORWARD RESPONSE BRIEF TO MR. DANTZLER
IN A TIMELY MANNER, AND FOR FAILURE TO RAISE A
REVERSIBLE ISSUE ON APPEAL?

STATEMENT OF FACTS

BACKGROUND.

Petitioner Samuel Dantzler was tried by a jury and found guilty of first-degree felony murder, MCL 750.316(1)(b), in the Wayne County Circuit Court (Trial Transcript [TT], verdict, 12/22/2010, 40). Mr. Dantzler was sentenced by Wayne County Circuit Judge Gregory Bill to the mandatory life in prison sentence without the possibility of parole (Sentence Transcript, 1/20/2011, 9).

PRE-TRIAL PROCEEDINGS.

The trial court entered orders approving the defense to obtain its own independent DNA expert. Something also explored during two pretrial proceedings held on September 9th and 17th, 2010.

TRIAL.

The charge arose following events occurring on January 16, 2006, at and in the area of an apartment at 20415 West Seven Mile Road in Detroit. Twenty-two year-old Bernard Hill was shot and died from a single gunshot wound to the head; the bullet was recovered (TT, 12/15/2010, 63, 70-71), testimony of Deputy Chief Medical Examiner Cheryl Loewe). Mr. Hill also suffered some blunt force injuries, a laceration and abrasions (Id. at 64-65). Fingernail clippings were taken at autopsy and held for police (Id. at 81).

The prosecution theory was that Mr. Hill was beaten and killed by family members of Quiana Turner, after Hill had beaten Turner, who was hospitalized, and that Mr. Dantzler aided and abetted in the crime. The defense theory was that Mr. Dantzler was not present, did not participate, was elsewhere at the time of the incident, and the prosecution proofs were insufficient to prove

1

Mr. Dantzler guilty of the offense.

The morning of trial, December 14, 2010, the defense preserved on the record that the court reversed its decision for independent DNA testing on the black hat purely for economical reasons. TT 12/14/2010, 6-9.

Janet Burt testified that she was the mother of Mr. Hill (TT, 12/16/2010, 66). Her son had been a boyfriend of Quiana Turner, who, Ms. Burt, said, was like a daughter to her, and who had lived with Ms. Burt since Turner was fourteen years-old, after it was discovered that Ms. Turner had a child by Mr. Hill (Id. at 66). Ms. Turner lived with Ms. Burt for at least three years (Id. at 68). By the year 2006, Hill and Turner had broken up, and Hill had a new girlfriend, Nikitte McKenzie (Id. at 71).

Over the years, Ms. Burt had met some of Ms. Turner's relatives, including her brother, Rodney Turner, her uncle, Mr. Dantzler, and her cousin Samuel Lamare Dantzler, Mr. Dantzler's son, who was a friend of Mr. Hill (Id. at 69-70).

In the evening of January 16, 2006, Ms. Burt said she was at home. Ms. Turner came by at about 10:30 or 11:00 p.m., to drop off the baby; Mr. Hill was also at Burt's house (Id. at 71). Ms. Turner subsequently left, and Hill left about twenty minutes later. Ms. Burt later learned that her son had "jumped on" and beaten Ms. Turner (Id. at 72-73). She tried calling Hill, but he would not accept her calls; she was very angry. She did reach him via a three-way call with Hill's father, but Bernard Hill hung up on her (Id. at 73). Mr. Hill had jumped on Ms. Turner in the past (Id. at 97).

At about 12:30 - 1:00 a.m. she heard a pounding at her door. She looked through the peephole and saw Rodney Turner (Ms. Turner's brother) and Samuel Lamare Turner (Ms. Turner's counsin) outside; she did not open the door and the two subsequently left. Ms. Burt said the two got into a gold-colored car,

which she said was a gold-colored car belonging to Mr. Dantzler. Although she could see other people in the car, she could not identify who they were (Id. at 74-77, 77-78). She did not see Mr. Dantzler (Id. at 82).

Ms. Burt said she had seen Mr. Dantzler drive that car in the past, and had never seen anyone else drive it. Mr. Dantzler had, more than five or six months previously, brought Ms. Turner and the baby to Ms. Burt's house in that car (Id. at 85-86).

Sometime after the two men left, Ms. Turner's mother, Ruth, came to Ms. Burt's house to pick up the baby (Id. at 80, 105-106). About fifteen minutes after Ruth Turner left, Ms. McKenzie called Ms. Burt, at about 1:30 to 1:45 a.m., and told her that Hill had been killed (Id. at 80-81, 106).

Ms. McKenzie testified that she and Mr. Hill were a couple in January, 2006 (Id. at 157). She lived in apartment 302 in the apartment building on West Seven Mile. Mr. Hill brought a friend over in the evening of January 15, 2006; they hung out. Mr. Hill brought up the incident with Ms. Turner, and he seemed upset about it. The friend left at about 12:45 a.m., and Ms. McKenzie and Mr. Hill got ready for bed. Hill was pacing and acting "pretty nervous" (Id. at 159-160, 161-162). At one point he came into the bedroom and told her he saw shadows by the front door; Hill then hid in the bedroom closet (Id. at 162). Ms. McKenzie went into the living room and about six males, all dressed in black, one armed with a gun and others with golf clubs, broke into the apartment asking, "Where's Bernard?" Ms. McKenzie told them he was not there, but Hill came out of the bedroom. The men started fighting and Ms. McKenzie went to the bathroom with her phone; she could hear fighting and tussling, and things getting knocked over (Id. at 163, 165-166). At one point she heard Hill scream, and then heard gunshots. When the apartment was quiet she peaked out and saw someone come back into the apartment and do something to the

3

stereo boombox; the person then left. Ms. McKenzie saw blood outside and followed it downstairs where she saw Hill''s body (Id. at 166-167).

She was unable to make any identification of the perpetrators (Id. at 167). She saw a black knit cap on the floor of the apartment, which she said did not belong to Hill (Id. at 171).

Police found two fired .380 caliber shell-casings at the scene; one was on the third-floor walkway just outside the apartment entrance, the other was down further in the stairwell. Mr. Hill's body was at the bottom of the stairwell near the front door of the 22-unit apartment building (Id. at 7, 9-10, 36, testimony of Detroit Police evidence technician William Niarhos). The outer door of the apartment was damaged and the outer glass door was broken. There was broken and overturned furniture in the apartment, and the TV was broken. A head and other pieces from a golf club were found. A black knit cap was on the floor near the TV (Id. at 13-14, 16; TT, 12/15/2010, 113-114). A blood trail existed from outside the apartment down the stairwell to where Mr. Hill's body was found (TT, 12/15/2010, 113; TT, 12/15/2010, 54). Officer did not attempt to lift any fingerprints from the apartment, and, specifically, not from the stereo boombox (TT, 12/16/2010, 38, 41). A different evidence technician was sent to the scene two days later to process the boombox for fingerprints; latent prints were lifted, but were not connected to any individual (TT, 12/16/2010, 60-61; TT, 12/21/2010, 6-7, stipulation concerning the findings of latent print expert Marcia McCleary).

Detroit Police Homicide Investigator Dwight Pearson testified that he went to the scene, saw Mr. Hill's body, saw the damage to the front door of the apartment, saw a black knit cap on the floor, and spoke with Ms. McKenzie. The area was canvassed, but there were no other witnesses with information. Pearson had Mr. Hill's hands bagged to preserve evidence (TT,

12/16/2010, 193-194, 197-198).

Christopher Steary testified that in 2006 he was a civilian forensic scientist with the Detroit Police (Id. at 110-111). He took a cutting from the interior rim of the black hat and stored the sample in February, 2007 (Id. at 117-118, 122, 130). There did not appear to be any blood on the hat (Id. at 127). He also looked and then stored a buccal swab of a suspect, Patrick Grunewald, and a sample of Mr. Hill's blood (Id. at 112, 114).

Jeffrey Nye testified that he was the DNA tech leader and biology program coordinator for the Michigan State Police Forensic Science Division (Id. at 134). The DNA profile from the black hat was input into the CODIS database, and an association was found in January 2010, that it was consistent with Mr. Dantzler (Id. at 148). When such an association is found, then the procedure is that another DNA sample of the suspect be obtained for testing (Id. at 149).

Before jury trial proceedings resumed December 20, 2010, defendant expressed his frustration over not being able to have the black hat tested by his own independent DNA expert. TT 12/20/2010 2-3.

Rebecca Preston testified that she was a DNA Analyst with Bode Technology, a firm in Virginia that did contract work for the Michigan State Police and Detroit Police Department. She received the black hat and took three new cuttings, or scrapings, and processed the results, generating three DNA profiles; she also received buccal swab samples, from which she generated DNA profiles (TT, 12/20/2010, 13, 34-35, 37, 78).

Ms. Preston said the first cutting [processed earlier by another] yielded a mixture of at least two individuals, including a major male donor, which was Mr. Dantzler, with a statistical probability of 1 in 2 quadrillion in the African American population (Id. at 37, 45-47). From her three

cuttings, she found a partial DNA profile in her first cutting, which showed the results were consistent with a mixture of at least two individuals, and including a major male donor (Id. at 37-39). Mr. Hill could not be excluded from that partial profile, and Mr. Dantzler could not be included or excluded (Id. at 49-50, 102).

Her second cutting from the hat yielded a DNA profile, consistent with a mixture of at least two individuals, including at least one male donor (Id. at 37-38, 51). Neither Mr. Hill nor Mr. Dantzler could be excluded (Id. at 51, 103-104). Her third cutting yielded a partial DNA profile showing it was consistent with at least two individuals, neither Mr. Hill nor Mr. Dantzler could be included or excluded (Id. at 37-38, 52, 80-81, 105).

Ms. Preston could not say if anyone else's DNA was on the hat (Id. at 82). She said that if the fingernail clippings had been properly preserved, and had DNA to begin with, then she would expect testing to yield results (Id. at 89-90). For the three cuttings and her analysis Bode Technology was paid $ 3,972.75 (Id. at 71, 74, 90-91).

Nicole Kaye testified that she was a DNA analyst with the D.C. Metropolitan Police, but in 2007 she worked at Bode Technology (Id. at 116, 120). In June, 2007, she received from the Michigan State Police a cutting from the black hat and obtained a mixture DNA profile; Mr. Hill could not be excluded, but Patrick Grunewald could be excluded (Id. at 125, 128).

Detroit Police Sergeant Charles Clark testified that in 2007 Detroit Police received a federal grant to create a cold case unit (TT, 12/21/2010, 13-14). The Cold Case Squad was created in 2009, when the current aspect of this investigation began (Id. at 14-15). In the fall of 2009, buccal swabs were obtained from Omar Dantzler, Michael Dantzler, Samuel Lamarr Dantzler, Mr. Dantzler, and Grunewald (Id. at 19, 37). Following the CODIS association

6

to Mr. Dantzler in 2010, a warrant was obtained in March, 2010 (Id. at 20-21).

Sgt. Clark said that in 2006 he worked at Homicide in Squad 2, and he and others who worked the case in 2006 were still with the investigation (Id. at 30). The protocol for bagging the victim's hands was followed in January, 2006, and fingernail clippings were taken and preserved during autopsy) Id. at 24, 27). In 2007, Mr. Hill's blood sample was obtained from the Medical Examiner''s Office and DNA testing was done on the blood (Id. at 25). The fingernail clippings were not retrieved from the morgue, and Sgt. Clark said a request for that evidence was not made to the Medical Examiner's Officer until November or December 2009, when he learned that the morgue had destroyed the evidence on October 19, 2009 (Id. at 20, 27, 48-49).

Marie Simpson testified that she knew, and was a friend of, Mr. Dantzler, and he was the father of her daughter (Id. at 57-58). She remembered January 15, 2006, because she had been at work from 9:00 am to 9:00 pm in a manager training program, and Mr. Dantzler had watched the child that day, and was to spend the night with Ms. Simpson that night and watch the child the next day (Id. at 58-59, 60). She picked up Mr. Dantzler and her daughter at about 9:00 pm - 10:00 pm, and took them to her home, where Mr. Dantzler remained through the night (Id. at 59-60).

Ms. Simpson had never seen Mr. Dantzler drive a gold-colored car, nor had she seen him wear a black stocking cap; she said he usually wore caps with brims (Id. at 85, 93-94). She had visited Mr. Dantzler every couple of weeks at the jail, between 5-6, or closer to twenty times total, since his arrest in March, 2010 (Id. at 68-69, 72, 74).

Mr. Dantzler testified that he was 45 years-old and that Ms. Turner was his niece, his sister's daughter (Id. at 96-97, 100). He knew, and was a

friend of, Mr. Hill (Id. at 97). On January 16, 2006, someone -- he thought his sister -- told him that Hill had jumped on Ms. Turner; Hill had done that in the past, possibly at least eight times (Id. at 98, 126). Mr. Dantzler never confronted Hill and did not do anything about it (Id. at 98-99). About two days later, he learned that Hill had been killed (Id. at 102).

In the evening of January 15, 2006, Mr. Dantzler waited for Ms. Simpson to pick him up. She arrived and picked him and their daughter up and drove them to her house sometime between 10:00 pm and 11:00 pm (Id. at 103, 107).


INSTRUCTIONS.

The defense requested a missing-evidence instruction (patterned after CJI2d 5.12). The trial court agreed, noting that the fingernail evidence should have been preserved, but the court decided to change the wording of the instruction, removing "infer" and replacing it with "consider," as shown by the following:

> THE COURT: I don't like the language as it's is (sic),
> Mr. Kinney. I would consider -- I'm only considering
> changing one word. And that's instead of infer,
> consider. And perhaps I would have said, you may
> consider whether this evidence would have been
> unfavorable to the Prosecution's case and favorable to
> the Defendant's case ... I think that's fair and I
> think that evidence could have been preserved --
> should have been. I'm going to change the may to
> consider. You may consider whether this evidence would
> have been unfavorable to the Prosecution's case and
> favorable to the Defendant's case. (TT, 12/22/2010,
> 11-12).

VERDICT.

Mr. Dantlzer was convicted as charged of felony murder (TT, 12/22/2010, verdict, 40).

POST-VERDICT.

Mr. Dantzler appealed as of right to the Michigan Court of Appeals where court-appointed appellate counsel raised three (3) issues, namely: 1) the trial court should not have modified the jury instruction, 2) that there was insufficient evidence to convict Mr. Dantzler of the crime, and 3) the trial court should have provided the funds necessary to pay for an independent DNA expert to test the evidence after having entered an order allowing the defense to secure an independent DNA expert.

The Court of Appeals denied relief. See EXHIBIT 1.

Mr. Dantzler then pursued a motion for reconsideration in the Michigan Court of Appeals, arguing that his appellate counsel was ineffective by forfeiting the right to oral argument by not filing defendant's brief in a timely manner, not providing defendant with a copy of the appellee's response brief so that he could have filed a timely reply to it, and the failure to raise an issue that would have netted a reversible error. Again, the appellate court denied relief.

Defendant then pursued an application for leave to appeal to the Michigan Supreme Court; raising the above four (4) issues. The Justices were not persuaded that the questions raised should be reviewed and denied relief.

Defendant/Petitioner now seeks habeas corpus review in this Honorable Court.

GROUND ONE

THE TRIAL COURT'S SUA SPONTE MODIFICATION TO A
REQUESTED ADVERSE-INFERENCE INSTRUCTION FOLLOWING
DESTRUCTION OF MATERIAL EVIDENCE DENIED MR. DANTZLER
HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR
TRIAL BY A PROPERLY-INSTRUCTED JURY, SIXTH AMENDMENT
RIGHT OF CONFRONTATION, AND FOURTEENTH AMENDMENT DUE
PROCESS RIGHT TO DEFEND AGAINST THE CHARGES.

SUMMARY OF ARGUMENT

Petitioner was entitled, as requested to an adverse-inference
instruction, CJI 2d 5.12. The trial court granted the request, but sua sponte
modified the instruction to read "consider" rather than the standard "infer."
Thus, the trial court instructed the jury that it could 'consider' whether,
rather than 'infer' that, the evidence would have exonerated defendant. This
denied Petitioner of his constitutional rights as outlined by the United
States Constitution, and Supreme Court precedent. The State Court decided to
pass on the constitutional violations. The issue is now before this Honorable
Court for federal habeas review.

Fingernail clippings were taken from the victim, however, these
clippings were not available for testing before trial. DNA samples from these
clippings would likely point to the actual assailant(s) in the crime. If Mr.
Dantzler's DNA was not found on these samples it would make it unlikely that
he was the one wearing the black cap which contained multiple DNA profiles
including Mr. Dantzler's found at the scene of the crime. Thus, the missing
evidence could have had a devastating effect on the prosecution's case since
the DNA on the black cap was the only physical evidence the prosecution used
to link Mr. Dantzler to the scene of the crime.

The trial court agreed to a missing evidence instruction, noting that
the fingernail clippings should have been preserved, but changed a key word,

drastically altering the meaning of the instruction. Consider the difference in the meaning of the two words from the Merriam-Webster's Collegiate Dictionary (c 2001, 10th ed), 596-597 and 246, respectively.

> INFER: to derive as a conclusion from facts or premises; to point out; arriving at a conclusion by reasoning from evidence.
>
> CONSIDER: to think about carefully; to think of especially with regard to taking some action; to take into account; to regard or treat in a kindly way; to gaze on steadily or reflectively; to come to judge or classify; giving thought to in order to arrive at a judgment or decision.

The difference is a wide one and the damage done in Petitioner's case as a result is clear.


## CLEARLY ESTABLISHED LAW

A trial court "by definition abuses its discretion when it makes an error of law." Koon v United States, 518 US 81, 100, 116 S Ct 2035 (1996). Under either standard, whether it be harmless error or abuse of discretion, the trial court reversibly erred in altering the jury instruction. The failure to give the correct instruction denied Petitioner his rights to a properly-instructed jury, due process, and a fair trial. U.S. Const., Am. V, VI, XIV; Mich. Const. 1963, art 1 §§ 17, 20.

Jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law. Williams v McCoy, 7 F Supp 2d 214, 221 (EDNY 1998). The immense difference in the meaning between the words 'infer' and 'consider' make it impossible for the jury not to have been misled as to the correct standard behind the instruction. "Resolution of challenge to potentially erroneous instruction depends upon how a reasonable juror could have interpreted the instruction." McCambridge v Halls, 94 F Supp 2d 146, 154 (D Mass 2000).

The words 'infer' and 'inference' are recognized as having a strong influence on juries. See Hanna v Riveland, 87 F3d 1034 (9th Cir 1996), in which the court ruled that a contested permissive inference instruction that allowed the jury to infer recklessness from mere fact of speeding was not harmless error in a vehicular homicide case.

Instead of allowing the jury to 'infer' that the missing evidence was unfavorable to the prosecution and favorable to the defense, the jury was instead allowed only to 'consider' whether it was unfavorable to the prosecution and favorable to the defense. If the jury is not allowed to use the missing fingernail clippings evidence as a tool (which the modified instruction precluded), then the jury lacks all the requisite tools necessary to render a reliable and constitutional verdict, and the defendant has been unfairly "short-changed" in the trial proceeding.

If the jury were permitted to infer the missing fingernail clipping evidence was unfavorable to the prosecution and favorable to the defense, particularly in so key a piece of evidence which likely could most definitively lead to a suspect (in contrast to the DNA from the hat which included multiple male profiles), the jury could then have used that inference to conclude that Mr. Dantzler was not the person who left the cap on the floor of the apartment. Given the lack of other incriminating evidence, such a conclusion by the jury would very likely have resulted in a different verdict.

Petitioner was obviously harmed by the trial judge's error in sua sponte modifying the jury instruction under the standard for either constitutional or non-constitutional error, the judge's error unfairly prejudiced Petitioner and could not have been harmless.

Although Petitioner has no proof that the prosecution purposely

destroyed the missing fingernail clipping evidence which could have been instrumental in proving the Petitioner's innocence, "the government violates a defendant's due process rights where material exculpatory evidence is not preserved regardless of the government's lack of bad faith." California v Trombetta, 467 US 479 (1984).

The due process right ensures a defendant be given a "fair opportunity" to defend against the charges, and a failure to allow a fair opportunity calls into question the ultimate integrity of the fact finding process. Chambers v Mississippi, 410 US 284, 295 (1973). The missing evidence deprived Petitioner of fair opportunity to confront the case against him, the trial court's sua sponte modification of the jury instruction denied him due process of law and a fair trial by a properly-instructed jury.

This error unfairly prejudiced Petitioner and could not have been harmless, and therefore violated Petitioner's Fifth, Sixth and Fourteenth Amendments of the United States Constitution. As a result of these constitutional violations, Petitioner has been imprisoned for three and one-half ($3\frac{1}{2}$) years for a crime that he did not committ.


## RELIEF REQUESTED

Issue a conditional writ of habeas corpus reversing Petitioner's conviction and sentence and ordering a new trial within 90 days, or the release of Petitioner, or grant any and all other relief that this Honorable Court deems fair and/or just, necessary and appropriate.

GROUND TWO

THE PROSECUTION FAILED TO PROVIDE CONSTITUTIONALLY
SUFFICIENT EVIDENCE TO PROVE THAT MR. DANTZLER
PARTICIPATED IN THE CRIME, AS A PRINCIPAL OR AIDER AND
ABETTOR, AND THE RESULTING CONVICTION VIOLATES HIS DUE
PROCESS GUARANTEES UNDER THE FOURTEENTH AMENDMENT AND
MICH. CONST. 1963, art. 1, § 17.

SUMMARY OF ARGUMENT

The prosecution's circumstantial case against Mr. Dantzler was primarily
based upon: 1) Ms. Burt's testimony that a gold-colored car she claims to
have seen Mr. Dantzler drive six months previously came to her house on
January 15, 2005, but she did not see Mr. Dantzler in the car at that time,
2) the fact that Mr. Dantzler was related to Ms. Turner, and 3) the existence
of multiple DNA profiles on a black hat found in the apartment where the
crime occurred.

The gold-colored car that Ms. Burt claims to have seen six (6) months
before January 15, 2005, and on the night of January 15, 2005, was sold two
(2) years before that date. See EXHIBIT 2. No one, not even Ms. Burt,
testified to seeing Mr. Dantzler at the seen of the crime on January 15,
2005. Conversely, Ms. Simpson testified that Mr. Dantzler was with her on
January 15, 2005.

Just because defendant knew Ms. Turner is not a sufficient basis on
which to substantiate a murder charge against him. Nor was there any
testimony of animosity between Mr. Dantzler and Mr. Hill even though Mr. Hill
previously beat up Ms. Turner numerous times before January 2005.

The prosecution's DNA expert testified that there was a mixture of at
least two (2) individuals in each of the four (4) samples taken from a black
hat found at the crime scene. Only one (1) sample associated that Mr.
Dantzler's DNA was on the black cap, as well as the victim's DNA.

14

There is no proof that Mr. Dantzler drove a gold-colored car to Ms. Burt's house. No proof that Mr. Dantzler was at the scene of the crime. The only shaky inference is that at some point Mr. Dantzler wore or handled a black hat, yet so did the victim himself. There is no proof whatsoever that Mr. Dantzler shared or knew of any intent of the perpetrators to kill Mr. Hill.

The DNA evidence on the black hat is the only evidence linking Mr. Dantzler to the scene and therefore the crime. From the very beginning this evidence was tainted.

For instance, a former police officer was buccal swabbed in relation to this case to be tested against DNA found on the black hat because he advised the prosecution that he physically handled the black hat and likely placed his DNA on it (TT 12/16/2010 19-25). Any evidence taken from an item which was handled without gloves and without following all the proper protocols must certainly be considered suspect.

Two (2) years after Mr. Dantzler's conviction, his attorney received a letter from the Wayne County Prosecutor's Office stating that his case was reviewed due to the many violations which occurred within the former Detroit Police Laboratory. See EXHIBIT 3.

The prosecution's statement about taking no further action because the evidence was not tested in the Detroit Police Laboratory is self-serving. Fact remains that the mishandled black hat evidence was stored at the Detroit Police Laboratory, as well as the fingernail clippings which came up missing. The prosecution also used Detroit Police Laboratory Technicians testimony in its case-in-chief. TT 12/16/2010, 110-130.

The DNA evidence was mishandled and tainted in a police lab which was later shut-down due to its rampant procedural errors which eventually led to

numerous cases being overturned.

Even if taken at face value, the sole DNA sample associating Mr. Dantzler with the black hat only indicates that at some point or time Mr. Dantzler wore or handled that hat. However, that DNA testing could not ascertain whether Mr. Dantzler was wearing the hat at the time of the crime. TT 12/16/2010, 125.

Because there was evidence of other DNA profiles on the hat, and the fact that the great majority of the hat was not tested and could have contained even more DNA profiles (TT 12/16/2010 128) it could have been anyone wearing the hat at the time of the crime.

The only witness testimony as to Mr. Dantzler's whereabouts at the time of the offense came as alibi testimony provided by one Marie Simpson, who testified that Mr. Dantzler was with her the entire evening when the crime occurred.

The evidence of Mr. Dantzler's involvement in this case falls far short from the prosecution meeting its heavy burden of guilty beyond a reasonable doubt. Hence, the prosecution did not meet its burden of proof in this case.

### CLEARLY ESTABLISHED LAW

A claim that there was insufficient evidence for a conviction is cognizable on habeas corpus review. Jackson v Virginie, 443 US 307 (1979).

In criminal prosecutions, government bears a burden of proving beyond a reasonable doubt every fact necessary to the constitute crime with which defendant is charged. United States v Javino, 960 F2d 1137 (2nd Cir 1992); Davis v United States, 160 US 469, 487 (1895). Also "government must prove beyond a reasonable doubt every element of the charged offense." Victor v Nebraska, 511 US 1, 5 (1994).

16

It is clear that the prosecution did not meet its burden of proof. No proof of intent. No eyewitness to the crime. No fingerprints on a murder weapon. No confession. No blood found on Mr. Dantzler's clothing. Absolutely nothing that could be considered concrete evidence that Mr. Dantzler either committed or even had any knowledge of this crime.

The only possible links the prosecution suggested to tie Mr. Dantzler to the crime were the sighting of a car which resembled one Mr. Dantzler once owned but sold years before the crime occurred (see EXHIBIT 2), which carried persons searching for the victim earlier in the day. Mishandled and tainted DNA evidence on a black hat that showed Mr. Dantzler was one of multiple people who, at some point or time, had worn or handled the hat that was found at the scene of the crime. That Mr. Dantzler was related to a woman who had been assaulted by the victim at some point before the crime. Clearly not sufficient evidence to find Mr. Dantzler guilty of murder beyond a reasonable doubt.

When a defendant is convicted despite the evidence not proving his guilt beyond a reasonable doubt, his due process guarantees are violated. That renders his conviction constitutionally defective and reversal is required. In re Winship, 397 US 358 (1970).

While governmental proof may lay entirely in circumstantial evidence, the appellate court is loathe to stack inference upon inference in order to uphold a jury's verdict. United States v Ruiz, 105 F3d 1492 (1st Cir 1997).

Even if the DNA evidence was beyond dispute (which it was not), and even if Mr. Dantzler was the only DNA found on the black hat (which it was not), all that would prove is that Mr. Dantzler had been at the scene. "Evidence of defendant's proximity to illegal activity and other suspicious factors are insufficient to prove guilt beyond a reasonable doubt." United States v Leos-

Quijada, 107 F3d 786 (10th Cir 1997).

## RELIEF REQUESTED

Reversal of Mr. Dantzler's conviction and immediate unconditional release, or grant any other relief this Honorable Court deems fair and/or just, necessary and appropriate.

GROUND THREE

THE TRIAL COURT'S DENIAL OF NECESSARY FUNDS FOR AN
INDEPENDENT EXPERT TO REVIEW THE DNA EVIDENCE DENIED
MR. DANTZLER DUE PROCESS GUARANTEES UNDER THE
FOURTEENTH AMENDMENT AND MICH. CONST. 1963, art. 1,
§ 17.

AMPLIFIED STATEMENT OF FACTS

In addition to the above statement of facts, Petitioner states that
during the September 9, 2010, pretrial conference, defense counsel had Mr.
Dantzler appear before the court because the trial judge signed an order
appointing Cathy Carr to have DNA testing on a black hat and if there was not
a report by August 20, 2010, the court would consider suppressing that
evidence. PRETRIAL TRANSCRIPT 09.09.2010, 2.

Because the Detroit Police Crime Lab was backlogged, and the Michigan
State Police refused to do further DNA testing on the black hat, the
prosecution contracted with Bode Technology out of Lorton, Virginia
(id. 2-3). The prosecution was paying for that DNA testing to be done
(id. 3). Bode Technology charged $ 1,100 per cutting and the prosecutor's
office wanted three (3) additional cuttings done (id. 4).

The court complained how its docket is pushed out to February with the
prosecutor's homicides (id.).

The defense was promised to have an opportunity to conduct its own DNA
testing (id. 5). The black hat was Fed-Exed (id. 9), but would not give the
defense as much time as the prosecutor had for DNA testing (id. 10).

The court then complained, again, about its overwhelming homicide docket
(id. 11-12).

Defense counsel questioned whether the trial date would have to be
adjourned in order for the defense to have its own expert review the DNA

19

testing (id. 11). Petitioner agreed to the waiver of his 180-day rule for that purpose to wit the court hoped that the prosecution would be as cooperative to get the black hat out to be tested by defendant's expert (id. 13).

September 17, 2010, another pretrial hearing was held. Part of which involved a motions cut-off date. The court complained about its docket being "so over time standards." PRETRIAL TRANSCRIPT 09/17/2010, 4. The court interrupted defense counsel to reiterate consistency with his prior ruling because the case was "twice the time standards." Defense counsel requested their expert to look at the prosecution's DNA testing. Id. 9. The court observed that the prosecution's time-frame to allow the defense to do their DNA testing would not "give them time for their expert to analyze it;" and admitted that "the results could go either way for Mr. Dantzler." Id. 12, 13.

November 23, 2010, Wayne County Circuit Court Judge Gregory D. Bill signed a second ORDER FOR AN APPOINTMENT OF AN INDEPENDENT DNA EXPERT. This second order was necessitated because the initial independent DNA expert already done work for the prosecution in Mr. Dantzler's case. 12/14/2010 TRIAL TRANSCRIPT at 6. See also EXHIBIT 4.

The morning of trial, defense preserved on the record that "most of the arguments that [he] had with this Honorable Court was with respect to our own DNA expert." TT 12/14/2010, 6. At first, the court appointed Cathy Carr but she done work for the prosecutor in the case; so Ms. Carr referred defense counsel to Ann E. Chamberlain, who was willing to take a court-appointed case. Id. When Ms. Chamberlain submitted her FEES FOR EXPERT SERVICES (see EXHIBIT 5) they were denied by the court. Id. 7. The court did not have any problem with her hourly fee, but rather the retainer fee. Id. 7-8. Because the court refused to cover those expenses, Ms. Chamberlain was unable to

testify. Id. 8.

The defense clarified that Ms. Chamberlain was ready to do her own testing; the court claimed that it did not preclude that witness from testifying because it signed an order appointing an expert. Id. 9. The court again complained about the alleged extraordinary fees. Id.

The morning of December 20, 2010, after a forensic scientist and a DNA expert testified for the prosecution, namely Christopher Steary and Jeffrey May, and before the prosecution's second DNA expert testified, being Rebecca Preston, defense counsel moved the court to allow Petitioner Dantzler to complain to the court about his lack of an independent DNA expert because he was "just going by the word of the prosecution that my DNA is inside this hat and also it could be more people's inside this hat other than me." TT 12/20/2010, 2. The court responded by stating that it appointed an expert, and tried to assist the defense whenever possible. Id. 3.

Trial testimony resumed with the prosecution's second DNA expert, Rebecca Preston, DNA Analyst with Bode Technology, who done contract work for the Michigan State Police and the Detroit Police Department; which cost $ 3,972.75.

At no time did the court attempt to negotiate the fees for services by Ms. Chamberlain, or allow the defense to explain the fees charged, or to compare those fair market prices on the record.

Post-trial, in an email to Petitioner's sister, Ms. Chamberlain wrote that "it is possible that I was contacted and then not approved. That happened often in Wayne Co. around that time period." See EXHIBIT 6.


## SUMMARY OF ARGUMENT

The DNA evidence procured from the black hat was the sole physical

evidence in the prosecution's case. The prosecution was allowed two (2) DNA experts -- the Michigan State Police and Bode Technology -- to conduct their independent testing of the black hat. However, Petitioner was denied any independent DNA testing of that evidence. For all we know, dozens of people may have, at some point in time, touched that black hat and left their DNA on it. In fact, an officer admitted to handling it without gloves and was later buccal swabbed himself. TRIAL TRANS 12/16/2010 at 19-25.

The only other shreds of "evidence" was testimony about a particular gold-colored car observed searching for the victim earlier in the day; that Petitioner once owned such a car but sold it two (2) years previously; that Petitioner was not seen to have been in the car earlier that day when searching for the victim; and, that Petitioner happened to be related to Ms. Turner whom was assaulted by the victim.

When adding the approximate cost for the initial cutting by the Michigan State Police to what the prosecution paid Bode Technology, the prosecution presumably paid well over $ 5,700.00 to have its DNA testing done. Subsequent results of which were inconclusive. Yet, the court balked at accommodating Ms. Chamberlein's fees.

Given the court's complaints about the case being "so over time standards," it appears that the court was more concerned about clearing its docket rather than ensuring that Petitioner received a fair trial.

Moreover, the trial court waited until the morning before trial began to inform the defense that it would not approve the cost for the defense's independent DNA testing.

In sum, the prosecution was allowed its turn to play DNA ball but when it came to the defense the court took that ball away.

CLEARLY ESTABLISHED LAW

An accused's state and federal rights of due process of law are violated when the ability of the accused to present a defense is undermined by his poverty. U.S. Const. Am. V, XIV; Const 1963 art 1, §§ 15, 20; Gideon v Wainwright, 372 US 335 (1963); Powell v Alabama, 287 US 45 (1932). An indigent defendant is constitutionally entitled to "the basic tools of an adequate defense when those tools are available for a price to other prisoners." Britt v North Carolina, 404 US 226, 227 (1971), citing Griffin v Illinois, 351 US 12 (1956). See also Howard v Walker, 406 F3d 114 (2nd Cir WDNY 2005) (trial court's exclusion of defense expert violated Sixth Amendment right to compulsory process).

The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. Washington v Schriver, 255 F3d 45, 56 (2nd Cir 2001) (citing Supreme Court cases). Few rights are more fundamental than that of an accused to present witnesses in his own defense. Taylor v Illinois, 484 US 400, 408 (1987). This right protects, among other things, the truth-finding process. "The ends of criminal justice would be defeated if judgment were to be founded on a partial or speculative presentation of the facts." United States v Nixon, 418 US 683, 709 (1974). To those ends, "the right to confront and cross-examine witnesses and to call witnesses in one's own behalf has long been recognized as essential to due process." Chambers v Mississippi, 410 US 284, 294 (1973).

When considering whether a trial court's exclusion of expert witness testimony violated a criminal defendant's right to Compulsory Process, a two-

step analysis is appropriate. First, a habeas court considers the trial court's reasons for excluding the evidence. Second, the strength of the prosecution's case as a whole. Agard v Portuondo, 117 F3d 696, 705-707 (2nd Cir 1997) (citing United States v Agurs, 427 US 97 (1976)), rev'd on other grounds 529 US 61 (2000).

The reason for denying Petitioner Dantzler's independent DNA expert was allegedly on the grounds of cost. However, the prosecution expended approximately double the amount that the trial court may have approved for Petitioner's independent DNA expert. By the trial court's many references to the instant case being out of time standards, it could also be said that the trial court wanted to move its docket along. While admirable, the trial court's desire to move its docket along cannot come at the expense of denying Petitioner his full day in court. RE Imo Ass'n v Thomas, 374 Mich 175, 187 (1965) (each litigant entitled to full day in court even though courts are overburden).

The prosecution's case as a whole was very weak. Mainly inferences upon inferences, and with no eyewitness accounts that Petitioner was at the scene of the crime or participated in it. While the initial DNA cutting allegedly matched Petitioner's DNA, three additional cuttings performed by the prosecution were inconclusive. Because Petitioner's independent DNA expert was not allowed to test the initial DNA sample, justice was denied to verify whether Petitioner's DNA was actually on that initial cutting or not.

About two (2) months after the Court of Appeals denied Petitioner's appeal as of right, a panel thereof found that a trial court abused its discretion in denying a defendant's request for an expert witness. People v Davarrio Deonte Webb, Docket No. 305017 (unpub Aug 16, 2012), attached herewith as EXHIBIT 7.

In Michigan, expert witnesses are governed by MCLA 600.2164; MRE 706. See also MCL 775.15. Like with FRE 706(c), MRE 706(b) provides that an expert is entitled to a reasonable compensation as set by the court. There was no legitimate reason for the trial court in this case to deny Petitioner Dantzler his request for an independent DNA expert, especially in light of the trial court's own admission that such defense independent DNA testing "results could go either way for Mr. Dantzler." PTRTRL TRANS 09/17/2010 at 12.

In Jackson v Virginia, 443 US 307, 320 (1979), the Supreme Court expressly considered and rejected the notion that the existence of any evidence to support a conviction would satisfy due process.

"When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had a substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless. And, the petitioner must win." Fargusic v Birkett, 501 F3d 469, 401 (6th Cir ED Mich 2007); O'Neal v McAninch, 513 US 432, 436 (1995).

RELIEF REQUESTED

Issue a conditional writ of habeas corpus reversing Petitioner's conviction and sentence and ordering a new trial within 90 days, or the release of Petitioner, or grant any and all other relief this Honorable Court deems fair and/or just, necessary and appropriate.

25

GROUND FOUR

APPELLANT COUNSEL WAS DEFICIENT FOR FAILING TO
PRESERVE OPPORTUNITY FOR ORAL ARGUMENTS, FOR FAILING
TO FORWARD RESPONSE BRIEF TO MR. DANTZLER IN A TIMELY
MANNER, AND FOR FAILURE TO RAISE A REVERSIBLE ISSUE ON
APPEAL

SUMMARY OF ARGUMENT

First, appellate counsel failed to represent Petitioner at a crucial point in the proceedings by failing to file the Petitioner's brief in a timely manner which forfeited Petitioner's right to oral argument.

MCR 7.212(A)(4) provides that "any party failing to timely file and serve a brief required by this rule forfeits the right to oral argument."

Mr. Neil Leithauser was appointed to represent Petitioner on April 7, 2011. On or about October 6, 2011, Mr. Leithauser filed a stipulation to extend the time within which to file Petitioner's brief, which the appellate court granted until December 1, 2011. Thereafter the appellate court issued an Involuntary Dismissal Warning Letter to Mr. Leithauser on December 6, 2011, informing him that he forfeited oral argument and faced costs and possible dismissal of Petitioner's appeal as of right.

The Michigan Appellate Assigned Counsel System, which appointed Mr. Leithauser to represent Petitioner, conducted an investigation into this matter and found that appellate counsel was in violation of MAACS' Minimum Standard 6, which provides that "counsel should request oral argument and preserve the right to oral argument by timely filing defendant's brief on appeal." See EXHIBIT B.

Oral argument is a very important part of the appeals process because it provides counsel the opportunity to present recent cases to the court, respond to the prosecutor's argument, and to answer the appellate panel's

26

questions about the case. Oral argument further offers one final opportunity to persuade the appellate court of the merits of the appeal and the 'correctness' of the appellant's position.

Counsel failed to preserve the right to oral arguments and this prejudiced Petitioner's chances for a successful appeal as of right.

Second, appellate counsel failed to forward a copy of the prosecutor's brief in opposition of the appeal in a timely manner, leaving Petitioner with insufficient time to prepare a reply.

Petitioner's attorney received a copy of the prosecutor's opposition brief on March 30, 2012. Petitioner received a copy through appellate counsel on April 9, 2012. The reply brief was due on April 19, 2012. Clearly not enough time to prepare a reply. Petitioner filed a motion for extension of time with which to reply to the prosecutor's opposition brief but was denied.

Appellate counsel's deficiency in this matter cost Petitioner his chance to rebut the prosecutor's argument, a crucial step in the appellate process. The prejudice here is strong and clear.

Third, appellate counsel failed to raise ineffective assistance of trial counsel as an issue in the appellate court despite the fact that appellate counsel raised the issue of a modified jury instruction having violated Petitioner's Sixth and Fourteenth Amendment rights when said modification had not been objected to and hence properly preserved by trial counsel.

As related in GROUND ONE of this brief, trial counsel asked for and was granted an adverse-inference jury instruction due to the state's destruction of crucial evidence. The court, however, sua sponte modified, and therefore changed the meaning of said instruction. Instead of objecting to the modification, trial counsel thanked the judge.

The amendment to the jury instruction was incorrect. The modification

was prejudicial and should have been objected to at trial. Appellate counsel was ineffective for not raising this issue in Petitioner's appeal as of right.

## CLEARLY ESTABLISHED LAW

The United States Constitution and the Michigan constitution guarantee a criminal defendant's right to effective assistance of counsel. U.S. Const Am VI, XIV; Mich Const 1963, art 1 § 20.

In Murray v Carrier, 477 US 478, 488 (1986), the Supreme Court stated that the Sixth Amendment right to counsel extends to the effective assistance of appellate counsel. Also, in Evitts v Lucey, 469 US 387 (1985), the Supreme Court held that under the Due Process Clause of the Fourteenth Amendment, a criminal defendant is entitled to the effective assistance of appellate counsel in his appeal as of right. See also Goff v Bagley, 601 F3d 445, 462 (6th Cir 2010).

The exhaustion requirement can be excused regarding appellate attorney's ineffectiveness. Harris v Booker, 2008 US District LEXIS 99478 (ED Mich 2008), citing Turner v Bagley, 401 F3d 718 (2005).

In an almost identical situation to the one mentioned in the third argument of this issue, the Georgia Supreme Court ruled that appellate counsel acted ineffectively when he failed to raise the claim of trial counsel's ineffectiveness for failure to object to an erroneous (and prejudicial) trial instruction because appellate counsel mistakenly thought trial counsel had in fact preserved the issue for appeal (which he had argued without the ineffectiveness argument). The court concluded that "no reasonably effective appellate counsel would have failed to recognize that the charging error was not preserved for review." Moreover, the court

continued, "the prejudice to defendant is obvious ... as the error, if

preserved, would have mandated a new trial." Stanford v Stewart, 274 Ga 468,

493. Also consider Carter v Bowersox, 265 F2d 705 (9th Cir 2031), in which

the Eighth Circuit ruled that appellate counsel rendered constitutionally

deficient assistance by failing to raise an instructed error.

The test for determining ineffective assistance is two-fold; whether

counsel's performance was deficient, and whether his deficient performance

prejudiced the defense. Strickland v Washington, 466 US 668, 687 (1984). The

Supreme Court further noted that

> In any case presenting an ineffectiveness claim, the
> performance inquiry must be whether counsel's
> assistance was reasonable considering all the
> circumstances. Prevailing norms of practice as
> reflected in the American Bar Association standards
> and the like, e.g., ABA Standards For Criminal Justice
> 4-1.1 to 4-9.6 (2d ed 1980) ("The Defense Function"),
> are guides to determining what is reasonable, but they
> are only guides.

Strickland, 466 US at 422. See, also, People v Pass (On Reh), 223 Mich App

241 (1997) (the Michigan Legislature established the Appellate Defender

Commission and assigned it the responsibilities of developing a system of

indigent appellate defense services; Minimum Standard 6 to which appellate

counsel was found to have violated, EXHIBIT 8). Counsel's performance is

deficient if it falls "below an objective or reasonableness under prevailing

professional norms." People v Stanaway, 446 Mich 643, 687 (1994). The

defendant is prejudiced where "there is a reasonable probability that, but

for counsel's error, the result of the proceeding would have been different."

Hannah v Bock, 447 F Supp 2d 793, 812 (ED Mich 2006); Stanaway at 687-392.

Both prongs are met here. First, counsel performed deficiently by not

preserving oral arguments, by costing Petitioner his ability to reply to the

prosecutor's opposition brief, and by failing to raise a claim of ineffective assistance of trial counsel.

The second prong is also met. By costing Petitioner his chances at oral arguments and a reply brief, appellate counsel deprived him of rebutting the prosecutor's arguments and advancing his own case, crucial elements to the appellate process, and by raising an issue which was not preserved instead of properly raising it as an ineffective assistance of trial counsel issue, appellate counsel denied Petitioner the chance at overturning his conviction at the state appellate level. The prejudice here is obvious.

Furthermore, it could be said that Mr. Webb obtained a reversal and remand because the trial court abused it's discretion in denying his motion for an expert witness (see EXHIBIT 7) merely because Mr. Webb was represented by effective assistance of appellate counsel whereas Petitioner Dantzler was not.

Because of this ineffectiveness of appellate counsel at critical stages of the proceedings, Petitioner was denied his fundamental right to the effective assistance of counsel under the Sixth Amendment of the United States Constitution and, as such, his fundamental right to fair appellate under the Due Process Clause Fourteenth Amendment was also violated.


RELIEF REQUESTED

Issue a conditional writ of habeas corpus reversing Petitioner's conviction and sentence, ordering a new trial within 90 days, or the release of Petitioner, or grant any and all other relief this Honorable Court deems fair and/or just, which Petitioner may be entitled to.

* * *

30

Respectfully submitted

_Samuel Dantzler_

Samuel Dantzler, Sr.
In Pro Per
Oaks Correctional Facility
1500 CaberFee Highway
Manistee  MI  48660

14  November 2013

EXHIBIT 1

People v Dantzler, 17 June 2012 Unpublished Opinion.

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

SAMUEL LEE DANTZLER,

Defendant-Appellant.

UNPUBLISHED
June 19, 2012

No. 303252
Wayne Circuit Court
LC No. 10-003521-FC

Before: GLEICHER, P.J., and M. J. KELLY and BOONSTRA, JJ.

PER CURIAM.

Defendant Samuel Lee Dantzler appeals by right his jury conviction of first-degree felony murder. MCL 750.316(1)(b). The trial court sentenced defendant to life imprisonment without the possibility of parole. Because we conclude that there were no errors warranting relief, we affirm.

This case arises from the January 2006, savage beating and murder of Bernard Hill. That night, Hill "jumped on" his ex-girlfriend, Quiana Turner, with whom he had a child. After assaulting Turner, Hill went to Nikitta McKenzie's apartment; McKenzie was Hill's current girlfriend. Sometime after 12:45 a.m., Hill looked out a window and saw shadows moving about. He hid in the living room closet and someone kicked in the front door. Six black men wearing black clothing, including black hats, rushed into McKenzie's apartment. One of the men shoved a gun in McKenzie's face and demanded to know if Hill lived there. McKenzie told the men that Hill lived in the apartment, but was not home. The man with the gun again demanded to know if Hill lived there and she repeated her response. Hill then emerged from the closet. McKenzie retreated to the bathroom and waited for the men to leave. She heard loud crashes, furniture falling, and the men fighting. Finally, she heard Hill scream, followed by gunshots. The room fell silent. She discovered Hill's body nearby; he died from a single gunshot wound to the back of his head. A jury convicted defendant of first-degree felony murder on the theory that he either killed Hill or aided and abetted in Hill's murder while participating in breaking and entering McKenzie's apartment.

-1-

Defendant first argues that the trial court denied him his due process rights by refusing to instruct the jury that is could infer that missing fingernail evidence would have exonerated him. At trial, defendant's lawyer successfully argued—over the prosecutor's objection—that the trial court should give the jury an adverse inference instruction with regard to missing fingernail evidence. The trial court agreed to give the instruction, but decided to alter the standard instruction by changing the word "infer" to "consider." Thus, the trial court instructed the jury that it could consider whether, rather than infer that, the evidence would have exonerated defendant. Defendant's trial lawyer thanked the court for the instruction and later expressed agreement with the instruction. By affirmatively approving the instruction, defendant's lawyer waived any claim that the instruction was erroneous. *People v Carter*, 462 Mich 206, 215-216; 612 NW2d 144 (2000). Hence, there is no error to review. *Id.* at 216.

Even if defendant's trial lawyer had not waived this claim of error, we would nevertheless conclude that the trial court did not plainly err in giving this instruction. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Under the plain error rule, the defendant must show that (1) error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected defendant's substantial rights. *Id.* To establish the third element, the defendant must generally show that the error affected the outcome of the lower court proceeding. *Id.*

In general, a defendant is not entitled to an adverse jury instruction unless he can demonstrate that the police destroyed evidence in bad faith. *People v Davis*, 199 Mich App 502, 515; 503 NW2d 457 (1993). Defendant failed to introduce any evidence of bad faith, and the prosecution offered evidence indicating that the destruction resulted from a mishap or standard procedures for discarding evidence in unsolved cases, rather than bad faith. The medical examiner maintained the evidence for over three years before its inadvertent destruction, and defendant failed to show any indication that the medical examiner colluded with police to destroy the evidence. The law did not require the trial court to grant defendant any instruction regarding the fingernails, and because defendant benefited from the instruction, the trial court's refusal to include the defendant's preferred language did not amount to error, let alone error that affected the outcome. *Carines*, 460 Mich at 763.

Defendant next argues that the prosecution presented insufficient evidence to sustain the jury's verdict. When reviewing a challenge to the sufficiency of the evidence, this Court "reviews the record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Roper*, 286 Mich App 77, 83; 777 NW2d 483 (2009).

In order to convict defendant of felony murder, the prosecution had to prove that defendant killed Hill, that when he did so he had the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], and did so while committing, attempting to commit, or assisting in the commission of (in relevant part) breaking and entering. See *People v Smith*, 478 Mich 292, 318-319; 733 NW2d 351 (2007) (stating the elements of felony murder); MCL 750.316(1)(b). The prosecution could also convict defendant under the theory that he aided and abetted another in committing felony-murder; to meet its burden under this theory, the prosecution had to present evidence that "(1) the crime charged was committed by the defendant

or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement." *Carines*, 460 Mich at 757 (quotation marks and citation omitted).

Defendant does not argue that the prosecution failed to present sufficient evidence establishing that the assailants committed a felony when they broke and entered into the apartment. Additionally, defendant does not dispute that the men intentionally killed Hill during the commission of that felony. Defendant's sole argument is that the prosecutor presented insufficient evidence for a reasonable jury to conclude, beyond a reasonable doubt, that he participated in the breaking and entering and murder.

Identity is an element of every crime. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). Thus, the prosecution must prove, beyond a reasonable doubt, that defendant committed or aided and abetted the acts in question. *Id.* However, the prosecution may meet its burden to prove identity by presenting either direct or circumstantial evidence. *Carines*, 460 Mich at 757.

The prosecution presented sufficient circumstantial evidence for a reasonable jury to conclude that defendant participated in the breaking and entering and Hill's murder. Most telling, the prosecution presented DNA evidence from the black knit cap found at the scene of the murder, showing that defendant wore the hat. The hat also contained DNA from Hill. From this evidence, a jury could rationally find that defendant was present at McKenzie's apartment on the night in question and that he physically participated in the attack on Hill, which ultimately ended with Hill's murder. Defendant's explanation that another person placed his DNA in the hat was implausible and the jury was free to reject that testimony as incredible. See *Roper*, 286 Mich App at 88.

The prosecution also presented other strong circumstantial evidence that defendant participated in Hill's murder. The prosecution established that Hill had beaten Turner the night of his murder. Hill's mother testified that two of defendant's relatives visited her house looking for Hill, and that they arrived in defendant's car. When she did not answer the door, the men left in defendant's car, which was full of men. Thereafter, a group of men broke down McKenzie's front door before beating and murdering Hill. Although Hill's mother and Turner had agreed that Hill's mother would watch Turner's baby for the remainder of the weekend, Turner's cousin picked her up later that morning after Hill's murder but before Hill's mother learned of her son's death. Based on these facts, the jury could rationally infer that Turner's relatives, including defendant, were the men that killed Hill. In his defense, defendant stated that he and Hill remained friendly despite the fact that Hill had beaten Turner several times in the past. But the jury was free to disregard that testimony.

The prosecution presented sufficient evidence to sustain defendant's conviction.

Defendant finally argues that the trial court denied him his due process rights by refusing to pay an expert to independently analyze the DNA evidence. "This Court reviews a trial court's decision whether to grant an indigent defendant's motion for the appointment of an expert for an abuse of discretion." *People v Tanner*, 469 Mich 437, 442; 671 NW2d 728 (2003). A trial court

abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Roper*, 286 Mich App at 84.

Generally, equal protection requires that the state afford an indigent defendant an expert witness when the witness remains important to the defendant's preparation of a defense. *People v Stone*, 195 Mich App 600, 605; 491 NW2d 628 (1992). However, this requirement does not allow the defendant to hire an expert of his choosing, and the state may satisfy this requirement by providing defendant access to any competent expert. *Id* at 606.

The trial court entered an order in which it agreed to pay for an expert to analyze the DNA evidence on defendant's behalf. The trial court agreed to pay the expert's hourly fee and expenses. Defendant then attempted to hire two experts. The first could not work for defendant because he previously worked on this case for the prosecution. The second would not work on the case without a retainer fee, which the trial court refused to authorize, because it deemed the $2,500 fee exorbitant. The trial court consulted the court's chief judge, who agreed that the fee amounted to an extraordinary cost that the court should not pay. Defendant did not seek another expert and did not enter any evidence to establish that other experts were unavailable. Because the trial court agreed to pay for an expert on defendant's behalf, the state satisfied its obligation to provide defendant with the means to prepare his defense. Defendant's unilateral decision not to take advantage of the opportunity did not amount to a violation of his right to equal protection. And the trial court did not abuse its discretion in refusing to pay the expert's retainer fee.

There were no errors warranting relief.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Michael J. Kelly
/s/ Mark T. Boonstra

EXHIBIT 2

AFFIDAVIT FOR STEPHEN JENNINGS

9-11-2012

## AFFIDAVIT FOR STEPHEN JENNINGS

1. I Stephen Jennings hereby states as follow:

2. That my birthday is October 3. 1970

3. That I am 41 years old

4. That I am currently unemployed

5. That I resides at 15462 Muirland St, Detroit, MI 48238, Wayne County

6. That I purchased from Samuel Dantzler Sr a 1974 Chrysler Newport, 4 door, yellow gold AKA banana boat in September 2003

7. That I sold the 1974 Chrysler Newport AKA banana boat in August 2004 to Antwan Smith currently resides at 9617 Braile, Detroit, MI 48228

Stephen Jennings

SAMIR A. KONJA
Notary Public, State of Michigan
County of Oakland
My Commission Expires December 1, 2017
Acting in the County of Wayne

EXHIBIT 3

Wayne County Prosecutor Office 25 April 2012 letter

to Appellate Counsel Neil J. Leithauser



**KYM L. WORTHY**
PROSECUTING ATTORNEY

**RICHARD F. HATHAWAY**
CHIEF ASSISTANT

**DONN FRESARD**
CHIEF OF STAFF

COUNTY OF WAYNE
OFFICE OF THE PROSECUTING ATTORNEY
DETROIT, MICHIGAN

1441 FRANK MURPHY HALL OF JUSTICE
1441 ST. ANTOINE STREET
DETROIT, MICHIGAN 48226-2529

TEL: (313) 224-5777
FAX: (313) 224-0974

April 25, 2012

Mr. Neil J. Leithauser
101 W. Big Beaver Rd Fl 14
Troy, MI 48084

Re: People v Samuel Dantzler, 10-003521

Dear Mr. Leithauser:

As a result of the closure of the former Detroit Police Lab, the Prosecutor's Office has initiated a case review of certain convictions involving forensic evidence.  This case has been reviewed and we have determined that no further action is necessary.  There was no forensic evidence tested by the Detroit Police Lab.

We are notifying you regarding this matter because you are listed as the defendant's last attorney of record.  The State Appellate Defender Office has a unit specifically designed to work on these issues.  Should you or the defendant wish their assistance, please contact Jonathan Sacks, Suite 3300 Penobscot Building, 645 Griswold, Detroit, MI 48226.

Sincerely,

KYM L. WORTHY
Prosecuting Attorney
County of Wayne

Pat Muscat
Director
Conviction Integrity Unit
Wayne County Prosecutor's Office

APA Matthew Forrest
Conviction Integrity Unit
Wayne County Prosecutor's Office
1441 St. Antoine
Detroit, MI 48226

CC: Samuel Dantzler

PRINTED ON
RECYCLED PAPER

EXHIBIT 4

ORDER FOR AN APPOINTMENT OF AN INDEPENDENT DNA EXPERT,

24 November 2010, Hon. Gregory D. Hill

STATE OF MICHIGAN
### THIRD CIRCUIT COURT CRIMINAL DIVISION
### COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff,

-vs-
                              Case #:  10-3521-01
                              Hon. GREGORY D. BILL

SAMUEL DANTZLER,

        Defendant.

---

AUGUSTUS S. HUTTING (P24839)
Wayne County Prosecuting Attorney
1441 St. Antoine, 12th Floor
Detroit, MI 48226
(313) 224-5807

ROBERT F. KINNEY (P35842)
Attorney for Defendant
615 Griswold St., Suite 1300
Detroit, MI  48226
(313) 963-5310

---

## ORDER FOR AN APPOINTMENT OF AN INDEPENDENT DNA EXPERT

    At a session held in the Wayne County Circuit Court, County of Wayne, State of Michigan on: _____ NOV 2 4 2010 _____

PRESENT: HON. _____ HON. GREGORY D. BILL _____
                HON. GREGORY D. BILL,
             Wayne County Circuit Court Judge

    A request is being made by Counsel for the Defendant to have ANN E. CHAMBERLAIN, an independent DNA expert appointed regarding the above captioned case, and the Court being fully advised in the premises:

    IT IS HEREBY ORDERED that ANN E. CHAMBERLAIN, an independent DNA expert, shall be appointed in the above captioned case.

    IT IS FURTHER ORDERED that ANN E. CHAMBERLAIN, the Independent DNA expert shall be compensated by the State as per their fee schedule for such expert services due to the defendant's indigence.

                        _____
              HON. GREGORY D. BILL
              WAYNE COUNTY CIRCUIT COURT JUDGE

EXHIBIT 5

Ann E. Chamberlain, M.S., FEES FOR EXPERT SERVICES



# ANN E. CHAMBERLAIN, M.S.

*Independent Forensic Consultant*
*Medical Examiner Investigator*

## Fees for Expert Services

| | |
|---|---|
| $1,500.00 | retainer fee |
| $250.00 | billable hourly rate |
| $2,500.00 | deposition or court testimony (per day) |
| Current govt. rate | mileage |
| Current govt. rate | per diem and hotel as needed for travel |

SEROLOGIST        DNA CONSULTANT        BLOODSTAIN PATTERN ANALYST        CRIME SCENE RECONSTRUCTIONIST

EXHIBIT 6

Jennings, Jackie Email to/from Ms. Chamberlain, 4/6 September 2013

**Jennings, Jackie**

| | |
|---|---|
| **From:** | anniechamberlain73@gmail.com on behalf of Ann Chamberlain [meichamberlain@live.com] |
| **Sent:** | Friday, September 06, 2013 7:12 PM |
| **To:** | Jennings, Jackie |
| **Subject:** | RE: Information needed |

Ms. Jennings,
It is possible that I was contacted and then not approved.  That happened often in Wayne Co. around that time period. Hope that helps.
Sincerely,
Ann Chamberlain
Forensic Consultant

On Sep 4, 2013 9:56 AM, "Jennings, Jackie" <Jackie.Jennings@omnicare.com> wrote:

> Hi Ms Chamberlain,
>
>
>
> Ms Chamberlain I am writing you on behalf of my brother Samuel Dantzler Sr in regards to his case in December 2010 at Frank Murphy Hall of Justice in Detroit, MI.  His attorney listed you as a DNA Specialist  to testify on his behalf.  The courts approved him for a specialist but then denied him at trial in December 2010 stating your fees was too high therefore he had no one to speak on his behalf and was sentenced to life in prison.  My brother is innocent and serving a life sentence for a crime he did not commit.
>
>
> I/we need to know if you can help him by telling us in 2010 (2009 or 2011) if you were hired by any public state attorney for any case and if you were notified by the courts that your fees was too high and your service was not needed. for his case or if you were notified at all to testify on his behalf?
>
>
> Please respond soon his appeal deadline is next week.
>
>
> Thanking you in advance
>
> Jackie Jennings

-- NOTICE -- The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error please contact the sender and destroy the materials contained in this message.

10/2/2013

EXHIBIT 7

People v Devarrio Deonta Webb, Michigan Court of Appeals

Docket No. 305817, Unpublished Opinion 16 August 2012

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAVARRIO DEONTE WEBB,

        Defendant-Appellant.

UNPUBLISHED
August 16, 2012

No. 305017
Saginaw Circuit Court
LC No. 10-034573-FC

Before: TALBOT, P.J., AND WILDER AND RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree home invasion, MCL 750.110a(2), two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, safe breaking, MCL 750.531, and felon in possession of a firearm, MCL 750.224f. Defendant was sentenced to 10 to 20 years for first-degree home invasion, two years for each count of felony-firearm, 10 to 20 years for safe breaking, and 10 to 20 years for felon in possession of a firearm.[1] We reverse and remand for further proceedings.

## I. FACTUAL BACKGROUND

Richard Schomaker returned home in Saginaw Township after an evening away. Upon entering his house, Schomaker immediately noticed that it had been ransacked, there were blood drops on the floor, a living room window broken, and the safe had been pried open. The safe's entire contents of a wedding ring set, five long guns, and $1,600 cash were missing. Schomaker called the police who arrived and collected a sample of the blood from the kitchen floor. The blood sample was then run through CODIS, the nationwide law enforcement DNA database, and resulted in a match to defendant's DNA profile that was in the system for an unrelated matter.

Pursuant to a search warrant, the police collected another DNA sample from defendant, which corroborated the first DNA test. The DNA expert testified that there were astronomical odds that the blood from the kitchen floor would have come from anyone other than defendant.

---

[1] Defendant's sentences for the two counts of felony-firearm run consecutively.

The DNA evidence was the only evidence linking defendant to the crime. Before trial, defendant requested the appointment of a DNA expert witnessed, which the trial court denied. The jury found defendant guilty of first-degree home invasion, safe breaking, felon in possession of a firearm, and two counts of felony-firearm. Defendant now appeals.

## II. STANDARD OF REVIEW

"We review the decision whether to appoint an expert for an abuse of discretion." *People v Lueth*, 253 Mich App 670, 689; 660 NW2d 322 (2002). "[A]n abuse of discretion occurs when the decision results in an outcome falling outside the principled range of outcomes." *People v Carnicom*, 272 Mich App 614, 617; 727 NW2d 399 (2006) (internal quotations and citation omitted).

## III. ANALYSIS

"Under the Due Process Clause, states may not condition the exercise of basic trial and appeal rights on a defendant's ability to pay for such rights." *People v Leonard*, 224 Mich App 569, 580; 569 NW2d 663 (1997). MCL 775.15 provides that an indigent defendant may request that the judge, "in his discretion[,] . . . make an order that a subpoena be issued" for a material witness favorable to defendant "without whose testimony [defendant] cannot safely proceed to a trial[.]" As reflected in this permissive language, it is a discretionary decision and "a trial court is not compelled to provide funds for the appointment of an expert on demand." *People v Tanner*, 469 Mich 437, 442; 671 NW2d 728 (2003). "[A] defendant must show a nexus between the facts of the case and the need for an expert." *Leonard*, 224 Mich App at 582. Also, "[i]t is not enough for the defendant to show a mere possibility of assistance from the requested expert. Without an indication that expert testimony would likely benefit the defense, a trial court does not abuse its discretion in denying a defendant's motion for appointment of an expert witness." *Tanner*, 469 Mich at 443 (internal quotations and citation omitted).

The trial court abused its discretion in denying defendant's request for an expert witness. The only evidence linking defendant to the crime was the DNA evidence. Thus, there was a nexus between the facts of the case and the need for a DNA expert, *Leonard*, 224 Mich App at 582, as the DNA evidence was the only evidence the prosecutor presented that defendant was guilty of the charged crime. Without the ability to have an independent DNA expert examine the blood samples, defendant was deprived of an opportunity to present a defense to the charged crimes. "[F]undamental fairness requires that the state not deny [indigents] an adequate opportunity to present their claims fairly within the adversary system." *Leonard*, 224 Mich App at 580 (internal quotations and citation omitted). In spite of this concern for fundamental fairness, the trial court failed to articulate any reasons justifying the denial of defendant's request for an independent DNA expert. Therefore, we find that the trial court abused its discretion in denying defendant's request for a DNA expert.

## IV.  CONCLUSION

The trial court abused its discretion in denying defendant's motion for an expert witness. We reverse and remand for further proceedings.  We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Kurtis T. Wilder
/s/ Michael J. Riordan

EXHIBIT P

Michigan Appellate Assigned Counsel System

3 August 2013 to Mr. Neil Leithauser

# MICHIGAN APPELLATE ASSIGNED COUNSEL SYSTEM

**THOMAS M. HARP**
ADMINISTRATOR



**LYLE N. MARSHALL**
DEPUTY ADMINISTRATOR

August 3, 2012

Mr. Neil Leithauser
Attorney at Law
101 W. Big Beaver Road    14th Floor
Troy, MI   48084

RE:   *People v Samuel Dantzler*
       Court of Appeals No. 303252
       Wayne Circuit Court No. 10-3521-01

Dear Mr. Leithauser,

Thank you for your July 28, 2012 response letter to my letter to you dated July 17, 2012. In my letter to you I informed you that your client in the above-captioned case, Samuel Dantzler, wrote to this office complaining about the representation he said you were affording him. He wrote that he "was denied counsel in a critical stage of my proceeding of my appeal due to the deficient performance of my assigned counsel." He said that you did not appear for oral argument. He requested that this office investigate his allegation.

I told you in my letter that it is the responsibility of this office to investigate inquiries from clients about the representation being afforded them by MAACS roster attorneys. I wrote that the Court of Appeals record indicated that you requested oral argument when you filed Mr. Dantzler's brief on appeal, but you did not timely file the brief. I informed you that MAACS Minimum Standard 6 requires that counsel "preserve the right to oral argument by timely filing the defendant's brief on appeal," and I reminded you that MCR 7.212(A)(4) provides that "[a]ny party failing to timely file and serve a brief required by this rule forfeits the right to oral argument." I determined, based on Mr. Dantzler's allegation and the Court's record that a violation of Minimum Standard 6 was implicated. I requested a written response that addressed the alleged violation of the Minimum Standards. I invited you to provide any information or documentation you felt necessary to convey a fair and accurate picture of your representation of Mr. Dantzler.

In your July 28th reply you wrote that drafting a brief in Mr. Dantzler's appeal that included the best substantive issues proved to take much longer than you had hoped. You said you faced a "Hobson's Choice" between preserving the right to oral argument by filing the brief timely or taking more time and completing it in as full a form as you thought was required and appropriate. You wrote that even though a motion for oral argument could have been filed, you felt confident that you had prepared the issues for review.

Mr. Dantzler was convicted on December 22, 2010 by a Wayne County jury of first degree murder. On January 20, 2011 he was sentenced to life in prison without parole. Mr. Dantzler

Mr. Neil Leithauser                                                          Page 2
August 3, 2012

requested appointment of appellate counsel on January 20, 2011. On April 7, 2011, in an amended order, you were appointed to represent Mr. Dantzler on appeal. On about October 6, 2011, you filed a stipulation to extend the time within which to file the appellant's brief. On November 11, 2011 you filed a motion to extend the time within which to file the appellant's brief, which the Court granted until December 1, 2011. The Court of Appeals issued an Involuntary Dismissal Warning Letter to you on December 6, 2011. The Court informed you that its "records indicate that you filed an appeal in this matter but you have failed to perfect the appeal by timely filing appellant's brief. The appeal is now eligible for INVOLUNTARY DISMISSAL or other action under MCR 7.217. You must file appellant's brief within 21 days from the date of this letter to avoid the assessment of $250 costs and the possible dismissal of the appeal. Filings received after the 21st day may be accepted if the matter has not yet been submitted to the Court for dismissal, but costs will be assessed. Because the due date for appellant's brief has passed, briefs filed within 21 days will not be considered timely for purposes of oral argument." You filed the Brief on Appeal on December 27, 2011. The prosecution filed a brief on March 30, 2012. On June 19, 2012, the Court of Appeals issued an unpublished opinion per curiam affirming Mr. Dantzler's conviction and sentence.

Again, according to Section 2(5) of the MAACS Regulations, it is the responsibility of this office to "investigate allegations of noncompliance by roster attorneys with the Minimum Standards for Indigent Criminal Appellate Defense Services and take appropriate action." My review of Mr. Dantzler's letter, the Court of Appeals record, and your letter to me implicate a violation of Minimum Standard 6. Minimum Standard 6 provides that "[c]ounsel should request oral argument, and preserve the right to oral argument by timely filing the defendant's brief on appeal. Oral argument may be waived if counsel subsequently concludes that the defendant's rights will be adequately protected by submission of the appeal on the briefs alone."

The Court of Appeals web site docket entries reveal that Mr. Dantzler's brief on appeal was not timely filed. In your July 28th letter to me you acknowledged that you did not timely file Mr. Dantzler's brief. Standard 6 "emphasizes the need for counsel to request oral argument, and preserve the right to oral argument by timely filing the defendant's brief on appeal." Oral argument, as the MAACS Comment stresses, is important because it provides counsel the opportunity to present recent cases to the Court, respond to the prosecution's argument, and to answer the Court's questions about the case. Oral argument further offers one final opportunity to persuade the Court of the merits of the appeal and the "correctness" of the appellant's position.

MAACS is not unsympathetic to the "Hobson's Choice" with which you said you were faced, and as much as this office appreciates your efforts and the fine quality of briefs that result, the Minimum Standards do not provide for the choice you described. Not unlike MCR 7.214(A), which in part provides that "failure of a party to properly request oral argument or to timely file and serve a brief waives the right to oral argument," Minimum Standard 6 requires timely filing of the brief on appeal.

You also explained in your letter that your "choice, or decision," allowed for filing a motion for oral argument if it appeared necessary. You said that you felt confident that you had prepared the issues for review without the need for oral argument. But again, the Minimum Standards do not

Mr. Neil Leithauser
August 3, 2012

Page 3

provide for such a contingency or "choice." Timely filing of the brief is required to preserve oral argument. Only after timely filing the brief, may "[o]ral argument [] be waived if counsel subsequently concludes that the defendant's rights will be adequately protected by submission of the appeal on the briefs alone." According to your letter, you chose to file untimely, then chose not to file a motion for oral argument. Again, the Standard does not provide for that choice.

You did not timely file Mr. Dantzler's brief. The important purposes supporting Minimum Standard 6 went unfulfilled, and Mr. Dantzler's appellate rights went unprotected. Consequently, you failed to fulfill the requirements of Minimum Standard 6. Accordingly, MAACS finds that you violated Minimum Standard 6 in this matter.

Mr. Dantzler also complained in his June 25th letter to MAACS, and in a subsequent letter to this office dated July 23, 2012, that you did not timely forward to him a copy of the prosecutor's brief, resulting in Mr. Dantzler's inability to respond to the prosecutor's arguments. You wrote in your July 28th letter to me that the prosecutor's brief was filed in the Court of Appeals on March 30, 2012, and you forwarded a copy to Mr. Dantzler on April 7, 2012. The Court of Appeals web site indicates that the prosecutor's brief was filed on March 30, 2012. Mr. Dantzler provided this office with a copy of "(Exhibit A) Stamped envelope from attorney Neil J. Leithauser," which is an appendix to his *pro per* "Motion For Extension To Reply To Plaintiff-Appellee's Brief On Appeal." The photostatic copy of the stamped envelope Mr. Dantzler provided MAACS shows your return address, a post mark of Saturday, April 7, 2012, and an "ECF MAILROOM" stamp indicating it was received on April 9, 2012. The record indicates that you timely forwarded a copy of the prosecutor's brief to Mr. Dantzler, and Oaks Correctional Facility received it two days after you mailed it.

Mr. Dantzler's complaint, and the implication of a Minimum Standard violation, has been resolved informally with this letter instead of with a formal Complaint Determination. The violation of Minimum Standard 6 in this matter, although serious and of concern to this office, would not have resulted, standing alone, in your removal from the MAACS roster. It is MAACS's responsibility to establish and maintain records of roster attorney performance. A record of these findings will be maintained in your file with this office for use in any future evaluation of your eligibility for MAACS roster membership. In addition to fulfilling this purpose, I hope this letter is of use to you and will inform your MAACS practice. Do not hesitate to contact me if you have any questions or concerns about this matter.

Sincerely,

Lyle N. Marshall
Deputy Administrator

LNM/mle
c: Samuel Dantzler, #518107
E:\Lyle\COMPLAINT DETERMINATIONS\2012\Leithauser_Dantzler_RA6.wpd

Samuel Dantzler 628107
OAKS Corr. FAC. 1w1
1500 Cabestre Hwy
Manistee MI 49660

USPS TRACKING #

9114 9011 5981 8813 5955 34

Office of the MARSHALS
United States District Court
231 W. LAFAYETTE Boulevard, Fifth FL
U.S.
Det. MI 48226

## CIVIL COVER SHEET FOR PRISONER CASES

| | | |
|---|---|---|
| **Case No.** 13-14764 | **Judge:** George Caram Steeh | **Magistrate Judge:** Mona K. Majzoub |

| | |
|---|---|
| **Name of 1ˢᵗ Listed Plaintiff/Petitioner:**<br><br>SAMUEL DANTZLER | **Name of 1ˢᵗ Listed Defendant/Respondent:**<br><br>CINDI CURTIN |
| **Inmate Number:** 518107 | **Additional Information:** |
| **Plaintiff/Petitioner's Attorney and Address Information:** | |
| **Correctional Facility:**<br>Oaks Correctional Facility<br><br>1500 Caberfae Highway<br>Manistee, MI 49660<br>MANISTEE COUNTY | |

**BASIS OF JURISDICTION**
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question

**NATURE OF SUIT**
- ☒ 530 Habeas Corpus
- ☐ 540 Mandamus
- ☐ 550 Civil Rights
- ☐ 555 Prison Conditions

**ORIGIN**
- ☒ 1 Original Proceeding
- ☐ 5 Transferred from Another District Court
- ☐ Other:

**FEE STATUS**
- ☐ IFP *In Forma Pauperis*
- ☒ PD Paid

---

**PURSUANT TO LOCAL RULE 83.11**

1. **Is this a case that has been previously dismissed?**
   ☐ Yes   ☒ No
   ➢ **If yes, give the following information:**

   Court: _____

   Case No: _____

   Judge: _____

2. **Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)**
   ☐ Yes   ☒ No
   ➢ **If yes, give the following information:**

   Court: _____

   Case No: _____

   Judge: _____