```
 1                     STATE OF MICHIGAN

 2           THIRD JUDICIAL CIRCUIT COURT - WAYNE COUNTY

 3

 4    THE PEOPLE OF THE STATE OF MICHIGAN,

 5

 6    vs.                            Case No. 10-3521

 7

 8    SAMUEL LEE DANTZLER,

 9                Defendant.

10                                        /

11

12                        JURY TRIAL

13       BEFORE THE HONORABLE GREGORY D. BILL, CIRCUIT JUDGE

14       701 Frank Murphy Hall of Justice, 1441 St. Antoine,

15            Detroit, Michigan - December 15, 2010

16    APPEARANCES:

17    For the People:        MR. AUGUSTUS W. HUTTING   P24839
                             MS. ANDREA LYNN HUTTING   P68606
18                           Wayne County Prosecutors Office
                             1441 St. Antoine
19                           Detroit, MI  48226
                             (313) 224-5777
20
      For the Defendant:     MR. ROBERT F. KINNEY, III  P35842
21                           MS. ALANNA P. O'ROURKE  P74210
                             Attorney at Law
22                           645 Griswold, Suite 1220
                             Detroit, MI  48226
23                           (313) 963-5310

24    REPORTED BY:           Becky L. Bauer (CSR-3326)
                             Certified Shorthand Reporter
25                           (313) 967-6928
```

```
 1        COMPUTER GENERATED INDEX AT THE END OF TRANSCRIPT

 2                  Detroit, Michigan

 3                  December 15, 2010

 4                  At or about 11:41 a.m.

 5                  (Court, Counsel and Defendants present.)

 6                           *     *     *

 7                  COURT CLERK:  People versus Samuel Lee Dantzler,

 8        Circuit Court docket number 10-3521, jury trial in

 9        progress.

10                  MR. HUTTING:  Good morning, your Honor.  Auggie

11        Hutting on behalf of the People.

12                  MR. KINNEY:  Good morning, your Honor, Robert

13        Kinney appearing on behalf of Mr. Dantzler.

14                  THE COURT:  We had an issue yesterday about

15        whether Mr. King was eligible or qualified to be a juror

16        in light of past criminality.

17                  MR. HUTTING:  Right.  I've done a couple of

18        things, Judge.  First of all, I continue to maintain my

19        position that if you are a person who has been convicted

20        of a felony, you're not --

21                  THE COURT:  Qualified to serve.  But did we

22        establish --

23                  MR. HUTTING:  -- qualified under MCLA

24        600.1307(a).

25                  But we took the information that your clerk
```

1    supplied us last night as to Mr. King's date of birth, and

2    he has kind of an unusual name, it's -- the first name is

3    Lora, I forget what the middle name is, but there's, you

4    know -- and I took that upstairs and I ran a -- had one of

5    my investigators attempt to run a CCH on him, because if

6    he has a prior felony conviction, we should find that in a

7    CCH.  And it does not come back with anything.

8                    THE COURT:  All right.

9                    MR. HUTTING:  So I don't know exactly what

10   happened, if he got -- if this was a misdemeanor and a

11   fine and kicked out, but he does not appear to have a

12   felony conviction, so I don't think that that -- so my

13   objection to him being a juror for cause, I'm withdrawing

14   that.  I will --

15                   THE COURT:  Good enough.

16                   MR. HUTTING:  -- move on.

17                   THE COURT:  All right.

18                   MR. HUTTING:  Okay.

19                   THE COURT:  Anything you want to say, Mr.

20   Kinney?

21                   MR. KINNEY:  No, your Honor.

22                   THE COURT:  Okay.  Are we ready for the jury

23   then?

24                   MR. HUTTING:  I do have one other issue that I

25   just want to put on the Record.  There is, on our final

 1        witness list, a witness whose name has been checked.  Her
 2        name is Quiana Turner.  She was the former girlfriend of
 3        our decedent, Bernard Hill.  She and Bernard Hill actually
 4        had a child together, I think, a little girl by the name
 5        of Mikayla (phonetic).  And it was Quiana Turner that was
 6        beaten up by Bernard Hill that got all of this started,
 7        okay.

 8               She's endorsed on the witness list.  And
 9        Sergeant Clark got a call either this morning or last
10        night from the mother of Bernard Hill indicating that she
11        had heard that Quiana Turner had been kidnapped by members
12        of the Dantzler family.  Sergeant Clark also got a second
13        call from a person closely associated with Quiana Turner,
14        who has gone on to go into another relationship and have,
15        I think, a couple of other children.  That a person from
16        the Dantzler family, Mr. Michael Dantzler, who is one of
17        the identified suspects, showed up at Quiana Turner's home
18        last night and took her and the three children to a place
19        that we're not -- we don't know, so -- But I just wanted
20        to put that on the Record that -- that that has occurred.

21               THE COURT:  Response?

22               MR. KINNEY:  Mr. -- My client is incarcerated
23        and I don't think that -- I've never had an opportunity to
24        talk to Ms. Turner.  I think that what Mr. Hill did to her
25        is valuable for the Defense with respect to this case.  I

                                     4

 1    expected to cross examine her.  And one of the problems

 2    here is that what Mr. Hutting just -- what I think that he

 3    was -- he didn't leave a name here of the call -- the

 4    second caller.  I don't know if that's for security

 5    reasons, but I don't think the record is clear without us

 6    knowing.

 7              THE COURT:  Well, all right.  You both heard the

 8    concern of the People and what action was taken.

 9              MR. KINNEY:  This other name, is that for

10    security purposes or can that --

11              MR. HUTTING:  This person is deathly afraid, at

12    this point in time, absolutely.

13              MR. KINNEY:  And is this person a member of the

14    Dantzler family?

15              MR. HUTTING:  No.

16              MR. KINNEY:  Is this person connected with this

17    case, other than --

18              MR. HUTTING:  No.  He's -- that person is

19    connected with Quiana Turner.

20              MR. KINNEY:  Okay.

21              THE COURT:  Ready to proceed with jury

22    selection?

23              MR. KINNEY:  Yes, your Honor.

24              THE COURT:  Hopefully, gentlemen, we'll have a

25    jury in the near future?

```
 1                    MR. HUTTING:  I would hope so.

 2                    MR. KINNEY:  Yes, your Honor.

 3                    THE COURT:  Okay.  Thanks.  Jurors, please.

 4                    DEPUTY SHERIFF:  All rise for the jury.

 5                    (At about 11:46 a.m., prospective jurors

 6                    seated.)

 7                    DEPUTY SHERIFF:  Please be seated.

 8                    THE COURT:  Good morning, ladies and gentlemen.

 9                    PROSPECTIVE JURY PANEL:  Good morning.

10                    THE COURT:  I thank you for your patience.  As

11          of two minutes ago, we finally concluded the matter that

12          we were working on last night.  It required some more work

13          by the attorneys and I, and it's just been resolved.

14                    Is that correct, gentlemen?

15                    MR. HUTTING:  That's correct.

16                    MR. KINNEY:  Yes, your Honor.

17                    THE COURT:  All right.  We're ready to proceed?

18                    MR. KINNEY:  Yes, your Honor.

19                    MR. HUTTING:  Yes, your Honor.

20                    THE COURT:  Okay.  Who was in the process of

21          talking with the jurors, or did we just bring in new

22          jurors?  Where were we?

23                    MR. KINNEY:  Mr. Hutting.

24                    MR. HUTTING:  I think that I had completed the

25          questions that I had for the two, I believe, two jurors
```

6

```
 1        that were seated, Juror Number 7 and Juror Number 12.  I
 2        had completed my questioning.
 3                  THE COURT:  All right.  And had you, Mr. Kinney?
 4                  MR. KINNEY:  Yes, I had, your Honor.
 5                  THE COURT:  Okay.  Challenges at this point for
 6        cause?
 7                  MR. HUTTING:  No challenges for cause.
 8                  THE COURT:  For cause, Mr. Kinney?
 9                  MR. KINNEY:  None, your Honor.
10                  THE COURT:  Peremptories, Mr. Hutting?
11                  MR. HUTTING:  Yes, your Honor.  We would ask the
12        Court to please thank and excuse the juror seated in seat
13        number 7, Mr. King.
14                  THE COURT:  Anyone else at this time?
15                  MR. HUTTING:  No one else at this time.  Thank
16        you.
17                  THE COURT:  Mr. King, remain seated for just a
18        moment, please.
19                  JUROR NO. 7:  Oh, I'm sorry.
20                  THE COURT:  Any peremptories, Mr. Kinney?
21                  MR. KINNEY:  Yes, your Honor.  I'd ask the Court
22        to thank and excuse the jurors seated in seats number 2
23        and 3.
24                  THE COURT:  That's Mr. Alvarado and Mr.
25        Ketvirtis.
```

7

1            MR. KINNEY:  Yes, your Honor.

2            JUROR NO. 3:  Yes, you got it.

3            THE COURT:  All right.  Mr. Alvarado, Mr.

4      Ketvirtis, Mr. King, it was a pleasure meeting you.  Thank

5      you for serving.  Would you visit with one of our deputies

6      at the door, please?

7            JUROR NO. 3:  Thank you, your Honor.

8            THE COURT:  Have great holidays.

9            JUROR NO. 2:  Same to you.

10           THE COURT:  Thanks.

11           COURT CLERK:  For seat number 2, Herbert Elijah

12     Mann.

13           For seat number 3, Stephen James McLean.

14           Seat number 7, Nazek Guilloz.  You handwrote in

15     your name, so I can't read it.

16           THE COURT:  Spell the last name, please.

17           COURT CLERK:  G-U-I-L-L-O-Z.

18           What was your previous last name?

19           JUROR NO. 7:  Ellis-Ahani (phonetic).

20           THE COURT:  Everyone on board?

21           MR. KINNEY:  Yes.

22           MR. HUTTING:  Yes, sir.

23           THE COURT:  Good morning.

24           PROSPECTIVE JURY PANEL:  Good morning.

25           THE COURT:  Mr. Mann, where you from, sir?

```
1                    JUROR NO. 2:  Livonia, Michigan.

2                    THE COURT:  Are you employed?

3                    JUROR NO. 2:  Yes, sir.

4                    THE COURT:  As?

5                    JUROR NO. 2:  Systems engineer.

6                    THE COURT:  Thank you.  Anyone in your family

7        with law enforcement?

8                    JUROR NO. 2:  No, sir.

9                    THE COURT:  Ever been a juror?

10                   JUROR NO. 2:  No, sir.

11                   THE COURT:  Any contacts with the criminal

12       justice system we should know about where you were a

13       defendant, witness or victim?

14                   JUROR NO. 2:  No, sir.

15                   THE COURT:  Thank you.

16                   Is it Mr. McLean?

17                   JUROR NO. 3:  Yes.

18                   THE COURT:  Good morning.

19                   JUROR NO. 3:  Good morning.

20                   THE COURT:  Where you from, sir?

21                   JUROR NO. 3:  I'm from Plymouth Township.

22                   THE COURT:  Are you employed?

23                   JUROR NO. 3:  No, I'm retired.

24                   THE COURT:  What did you do?

25                   JUROR NO. 3:  I worked at Detroit Diesel.
```

9

1                    THE COURT:  Is that on Telegraph and Plymouth

2        Road?

3                    JUROR NO. 3:  Yes.  I do work three days a week

4        now, American Legion, bartending, but part time.

5                    THE COURT:  All right.  Is anyone in your

6        household employed by law enforcement?

7                    JUROR NO. 3:  Not now.  But my brother, back in

8        the '70s, was a Detroit police officer.

9                    THE COURT:  Have you ever served as a juror?

10                   JUROR NO. 3:  Twice.

11                   THE COURT:  And where was that at, sir?

12                   JUROR NO. 3:  I served here in a civil case in

13       '85, and I served Traffic.  They took us from here, a

14       group, they took us over by bus, and I served on the

15       Traffic.

16                   THE COURT:  Okay.  Thank you very much.  Have

17       you ever been a defendant, a witness or a victim regarding

18       a criminal prosecution?

19                   JUROR NO. 3:  Not criminal; vehicular

20       manslaughter.

21                   THE COURT:  What happened in that case?

22                   JUROR NO. 3:  That was back in '61.

23                   THE COURT:  All right.

24                   JUROR NO. 3:  I was -- I saw the accident after

25       it happened.

```
 1                    THE COURT:  You were a witness?

 2                    JUROR NO. 3:  Yes, a witness.  Right.

 3                    THE COURT:  Thank you very much.

 4                    All right.  Juror Number 7, good morning.

 5                    JUROR NO. 7:  Good morning.

 6                    THE COURT:  How do you pronounce your last name?

 7                    JUROR NO. 7:  Guilloz.

 8                    THE COURT:  Where you from, ma'am?

 9                    JUROR NO. 7:  Wyandotte.

10                    THE COURT:  Are you employed?

11                    JUROR NO. 7:  Yes, I am.

12                    THE COURT:  What do you do?

13                    JUROR NO. 7:  Registered dietician.

14                    THE COURT:  Okay.  Anyone in your family

15       employed by law enforcement?

16                    JUROR NO. 7:  No.

17                    THE COURT:  Have you ever been a defendant, a

18       witness or a victim regarding a criminal prosecution?

19                    JUROR NO. 7:  No.

20                    THE COURT:  Okay.  And, I'm sorry, were you ever

21       a juror?

22                    JUROR NO. 7:  No.

23                    THE COURT:  Okay.  Thanks.

24                    Mr. Hutting.

25                    MR. HUTTING:  Yes, your Honor.  Thank you.
```

```
 1              Good morning to the three of you.

 2              JUROR NO. 7:  Good morning.

 3              JUROR NO. 3:  Good morning.

 4              JUROR NO. 2:  Good morning.

 5              MR. HUTTING:  Mr. Mann --

 6              JUROR NO. 2:  Yes, sir.

 7              MR. HUTTING:  Any of the questions that I asked

 8      yesterday about the legal concepts, did you have any

 9      disagreements with any of those?

10              JUROR NO. 2:  No, sir.

11              MR. HUTTING:  Mr. McLean?

12              JUROR NO. 3:  No.

13              MR. HUTTING:  Okay.  And Ms. Guilloz.

14              JUROR NO. 7:  No.

15              MR. HUTTING:  Any disagreements about that?

16              JUROR NO. 7:  No.

17              MR. HUTTING:  Okay.  I asked a few other

18      questions, some individually, some generally, any of those

19      questions at all apply to you, Mr. Mann?

20              JUROR NO. 2:  I don't remember your questions

21      from yesterday in general, but I did not agree with any of

22      the questions you had previously.

23              MR. HUTTING:  You didn't agree or --

24              JUROR NO. 2:  I don't remember your questions,

25      so I can't say one way or the other.
```

```
 1                    MR. HUTTING:  I had asked like, have you been a
 2         witness before in a case?
 3                    JUROR NO. 2:  I have not.
 4                    MR. HUTTING:  None of that?
 5                    JUROR NO. 2:  No.
 6                    MR. HUTTING:  So it didn't ring a bell with you?
 7                    JUROR NO. 2:  No.
 8                    MR. HUTTING:  How about you, Mr. McLean?
 9                    JUROR NO. 3:  Yes, I remember and I agree,
10         basically.
11                    MR. HUTTING:  All right.  And how about you,
12         ma'am?
13                    JUROR NO. 7:  No.
14                    MR. HUTTING:  All right.  Mr. Mann, do you have
15         any problems if we asked you for the next couple, three
16         days to be here with a fair and open mind, give both sides
17         a fair trial?
18                    JUROR NO. 2:  I have no problem to be here.
19                    MR. HUTTING:  Mr. McLean?
20                    JUROR NO. 3:  No problem.
21                    MR. HUTTING:  And you, ma'am?
22                    JUROR NO. 7:  No.
23                    MR. HUTTING:  You could do that for us?
24                    JUROR NO. 7:  Um-hmm.
25                    MR. HUTTING:  Thank you very much.
```

13

```
 1                    Nothing further.

 2                    THE COURT:  Thank you.

 3                    Mr. Kinney.

 4                    MR. KINNEY:  Thank you, your Honor.

 5                    First of all, good morning, everybody.

 6                    PROSPECTIVE JURY PANEL:  Good morning.

 7                    MR. KINNEY:  Mr. Mann, you know I was talking a

 8          lot about credibility.

 9                    JUROR NO. 2:  Yes, sir.

10                    MR. KINNEY:  You remember that?

11                    JUROR NO. 2:  Yes.

12                    MR. KINNEY:  Do you agree that if you're going

13          to be a juror, that's going to be your job?

14                    JUROR NO. 2:  Yes, sir.

15                    MR. KINNEY:  You can do it?

16                    JUROR NO. 2:  Yes, sir.

17                    MR. KINNEY:  Mr. Dantzler, right now, if you had

18          to give a verdict, what would it be?

19                    JUROR NO. 2:  Not guilty.

20                    MR. KINNEY:  Mr. McLean, am I pronouncing it

21          right?

22                    JUROR NO. 3:  Yes.

23                    MR. KINNEY:  Okay.  All right.  And you said

24          that you were a witness?

25                    JUROR NO. 3:  Vehicular manslaughter back in
```

1      1961.

2              MR. KINNEY:  Okay.  And you've never been a

3      defendant?

4              JUROR NO. 3:  No.

5              MR. KINNEY:  Never been a defendant before?

6              Were you ever a juror before?

7              JUROR NO. 3:  Twice.

8              MR. KINNEY:  Okay.  And, Mr. Mann, do you have

9      any personal knowledge of DNA, how DNA works?  Did you

10     study anything like that?

11             JUROR NO. 2:  Not studied DNA.

12             MR. KINNEY:  Okay.  And is it Ms. Guilloz?

13             JUROR NO. 7:  Yes.

14             MR. KINNEY:  Am I saying it right?

15             JUROR NO. 7:  Um-hmm.

16             MR. KINNEY:  Are you a student now?

17             JUROR NO. 7:  No, I graduated.

18             MR. KINNEY:  You graduated.  Okay.

19     Congratulations.  You a doctor?

20             JUROR NO. 7:  I wish.

21             MR. KINNEY:  And your knowledge of DNA is what?

22             JUROR NO. 7:  I did not study it.

23             MR. KINNEY:  Okay.  We're going to hear from

24     some experts with regard to DNA.  As a juror, you're

25     supposed to take everything they say as true.

15

```
1                    Would you believe -- What I'm asking you is,
2        would you believe this doctor just because he's going to
3        say that he's an expert?
4                    JUROR NO. 7:  No.
5                    MR. KINNEY:  So, then, we're still talking about
6        credibility; right?
7                    JUROR NO. 7:  Um-hmm.
8                    MR. KINNEY:  So just because he's a doctor,
9        you're still going to listen to what he says; correct?
10                   JUROR NO. 7:  Um-hmm.
11                   THE COURT:  Okay.  Mrs. Bauer, for those of you
12       that are seated as prospective jurors, cannot record
13       sounds.  We need a yes or a no so the record is clear;
14       okay?
15                   MR. KINNEY:  Can't shake your head either now.
16       Come on.  Got to say yes, Ms. Guilloz.
17                   JUROR NO. 7:  Okay.
18                   MR. KINNEY:  Okay.  Nothing further, your Honor.
19                   THE COURT:  Okay.  Challenges for cause, Mr.
20       Kinney?
21                   MR. KINNEY:  None.
22                   THE COURT:  For cause, Mr. Hutting?
23                   MR. HUTTING:  None.
24                   THE COURT:  Peremptories, Mr. Kinney?
25                   MR. KINNEY:  Can I have just a -- At this
```

16

1        particular time, we've asked the Court to thank and excuse

2        Mr. McLean.

3                THE COURT:  In seat number 3?

4                MR. KINNEY:  In seat number 3.

5                THE COURT:  Remain seated, please.

6                Anyone else, Mr. Kinney?

7                MR. KINNEY:  No, your Honor, not at this time.

8                THE COURT:  Mr. Hutting -- Mr. McLean.

9                JUROR NO. 3:  Huh?  Oh, I thought --

10               THE COURT:  Mr. Hutting, any peremptories?

11               MR. HUTTING:  No, sir.

12               THE COURT:  Okay.  Mr. McLean, we're done now.

13       Thank you.

14               JUROR NO. 3:  Oh, okay.  I thought he said

15       excused, that's why I --

16               THE COURT:  That's okay.  You can visit with our

17       corporal at the door.  Okay.  Thank you much.  Have great

18       holidays; okay?

19               JUROR NO. 3:  All right.

20               THE COURT:  We're just calling one name.

21               COURT CLERK:  Yes.  For seat number 3, Mary

22       Elizabeth Smykowski.

23               THE COURT:  Good morning.

24               JUROR NO. 3:  Good morning.

25               THE COURT:  Or good afternoon.  Where you from?

1                    JUROR NO. 3:  Northville.

2                    THE COURT:  Okay.  You in the city or the

3          township?

4                    JUROR NO. 3:  Township.

5                    THE COURT:  Township, okay.

6                    And are you employed?

7                    JUROR NO. 3:  Yes, I am.

8                    THE COURT:  How do you pronounce your last name?

9                    JUROR NO. 3:  Smykowski.

10                   THE COURT:  What do you do for a living?

11                   JUROR NO. 3:  Risk manager.

12                   THE COURT:  Anyone in your family employed with

13         law enforcement?

14                   JUROR NO. 3:  No.

15                   THE COURT:  Have you ever been a juror?

16                   JUROR NO. 3:  Yes, I was.

17                   THE COURT:  Where was that at?

18                   JUROR NO. 3:  Here.

19                   THE COURT:  Was a verdict reached?

20                   JUROR NO. 3:  Yes.

21                   THE COURT:  Were you the foreperson?

22                   JUROR NO. 3:  No.

23                   THE COURT:  And have you had any contacts with

24         the criminal justice system where you were a defendant,

25         witness or victim?

```
1                    JUROR NO. 3:  No.

2                    THE COURT:  All right.  Thank you much.

3                    Mr. Hutting.

4                    MR. HUTTING:  Thank you, your Honor.

5                    THE COURT:  You're welcome.

6                    MR. HUTTING:  Good afternoon.

7                    JUROR NO. 3:  Afternoon.

8                    MR. HUTTING:  How long ago was your jury service

9       here?

10                   JUROR NO. 3:  2003.

11                   MR. HUTTING:  Seven years.

12                   JUROR NO. 3:  Seven years ago.

13                   MR. HUTTING:  Do you remember the nature of the

14      charge?

15                   JUROR NO. 3:  Yes.

16                   MR. HUTTING:  What was it, please?

17                   JUROR NO. 3:  It was a carjacking with a

18      firearm.

19                   MR. HUTTING:  Okay.  All right.  And the jury

20      was able to reach a verdict?

21                   JUROR NO. 3:  Yes.

22                   MR. HUTTING:  Was there anything about that past

23      jury experience that would make you unable to sit with a

24      fair and open mind here today?

25                   JUROR NO. 3:  No.
```

1              MR. HUTTING:  Any of the questions that I asked

2       yesterday about the various concepts, cardinal principles

3       of law, did you have any disagreements or objections to

4       them?

5              JUROR NO. 3:  No.

6              MR. HUTTING:  You could follow the cardinal

7       principles of law?

8              JUROR NO. 3:  Yes.

9              MR. HUTTING:  Okay.  You understand, ultimately,

10      that the law is given by Judge Bill?

11             JUROR NO. 3:  Yes.

12             MR. HUTTING:  He's the boss or the supreme in

13      the area of law.  So if I say something about the law

14      that's different than what the Judge says -- I hope I

15      won't, but if I do -- you'll follow his instruction, not

16      mine?

17             JUROR NO. 3:  Yes.

18             MR. HUTTING:  Okay.  All right.  Do you feel

19      that you could sit with a fair and open mind for the next

20      few days and give both sides a fair trial?

21             JUROR NO. 3:  Yes.

22             MR. HUTTING:  Thank you.

23             THE COURT:  Thank you, Mr. Hutting.

24             Mr. Kinney.

25             MR. KINNEY:  Good morning, ma'am.

1              JUROR NO. 3:  Good morning.

2              MR. KINNEY:  I guess I can ask the same thing.

3        You heard everything I said yesterday?

4              JUROR NO. 3:  Yes.

5              MR. KINNEY:  Want me to repeat it?

6              JUROR NO. 3:  No.

7              MR. KINNEY:  If you had to give a verdict right

8        now with respect to Mr. Dantzler, what would it be?

9              JUROR NO. 3:  Not guilty.

10             MR. KINNEY:  And the reason for that is because

11       we haven't heard any evidence?

12             JUROR NO. 3:  Correct.

13             MR. KINNEY:  So do you remember, I think Judge

14       Bill had actually defined for you all the presumption of

15       innocence.

16             JUROR NO. 3:  Yes.

17             MR. KINNEY:  You understand that?

18             JUROR NO. 3:  Yes.

19             MR. KINNEY:  You can abide by that?

20             JUROR NO. 3:  Yes.

21             MR. KINNEY:  If you start deliberating with your

22       fellow jurors, and you're going to talk to them?

23             JUROR NO. 3:  Yes.

24             MR. KINNEY:  You going to agree with somebody

25       else just because they look better than me or something?

```
1                    JUROR NO. 3:  No.

2                    MR. KINNEY:  Nothing like that; right?

3                    JUROR NO. 3:  No.

4                    MR. KINNEY:  And you're going to make up your

5       own mind?

6                    JUROR NO. 3:  Yes.

7                    MR. KINNEY:  Nothing further.

8                    THE COURT:  Challenges for cause?

9                    MR. KINNEY:  None.

10                   MR. HUTTING:  None.

11                   THE COURT:  Peremptories, Mr. Hutting?

12                   MR. HUTTING:  Satisfied.

13                   THE COURT:  Mr. Kinney?

14                   MR. KINNEY:  None, your Honor.

15                   THE COURT:  Are you both satisfied?

16                   MR. KINNEY:  Yes, your Honor.

17                   MR. HUTTING:  Yes, your Honor.

18                   THE COURT:  Ladies and gentlemen of the jury,

19      you have been chosen to decide a criminal charge made by

20      the State of Michigan against one of your fellow citizens.

21                   I will now ask you to stand and swear to perform

22      your duty to try the case justly and to reach a true

23      verdict.  If you have religious beliefs that do not permit

24      you to take an oath, you may instead affirm to try the

25      case justly and reach a true verdict.
```

1                    Here is your oath.

2              COURT CLERK:  Raise your right hands, please?

3              Do you swear or affirm that you will truthfully

4        deliberate this case according to the evidence, the

5        instructions of this Court, and the laws of this state?

6              JURY PANEL:  Yes.

7              COURT CLERK:  Thank you.  You may be seated.

8              (At about 12:03 p.m., jurors impaneled.)

9              THE COURT:  All right.  Thank you.  For those of

10       you that remain in the courtroom as prospective jurors, it

11       was great spending time with all of you.  I'm disappointed

12       we're not spending more time together, as I'm sure you

13       are.  So I wish you all happy holidays and be safe.  I'll

14       have you visit with Corporal Jerome Jenkins at the door,

15       please.

16              On the back of your notepad, there's a number,

17       make sure it corresponds to your seat in the jury box.

18       And does everyone's pen write?  Okay.

19              I will now explain some of the legal principles

20       that you will need to know and the procedure that we will

21       adhere to or follow in this trial.  A trial follows this

22       procedure:

23              First, Mr. Hutting, the Prosecutor, makes an

24       opening statement where he gives his theories about the

25       case.  The Defendant's lawyer, Mr. Kinney, does not have

1    to make an opening statement but may make an opening

2    statement after Mr. Hutting makes his, or he may wait

3    until later.  These statements are not evidence, they're

4    only meant to help you understand how each side views the

5    case.

6           Next, the Prosecutor presents his evidence.  The

7    Prosecutor may call witnesses to testify and may show you

8    exhibits like documents or objects.  The Defendant's

9    lawyer has the right to cross examine the Prosecutor's

10   witnesses.  After the Prosecutor has presented all of his

11   evidence, the Defendant's attorney may also offer

12   evidence, but does not have to.

13          By law, the Defendant does not have to prove his

14   innocence or produce any evidence.  If the Defense does

15   call any witnesses, the Prosecutor has the right to cross

16   examine them.  The Prosecutor may also call witnesses to

17   contradict the testimony of the Defense witnesses.

18          After all of the evidence has been presented,

19   the Prosecutor and the Defendant's lawyer will make their

20   closing arguments.  Like the opening statements, they are

21   not evidence; they're only meant to help you understand

22   the evidence and the way each side sees the case.  You

23   must base your verdict only on the evidence.

24          My responsibilities as the judge in this trial

25   are to make sure that the trial is run fairly and

24

1        efficiently, to make decisions about evidence and to

2        instruct you about the law that applies to this case.  You

3        must take the law as I give it to you.  Nothing I say is

4        meant to reflect my own opinions about the facts of this

5        case.  As jurors, you are the ones who will decide this

6        case.

7                Your responsibility as jurors is to decide what

8        the facts of this case are.  This is your job, and no one

9        else's.  You must think about all of the evidence and all

10       of the testimony and then decide what each piece of

11       evidence means and how important you think it is.  This

12       includes how much you believe what each of the witnesses

13       said.  What you decide about any fact in this case is

14       final.

15               When it is time for you to decide the case,

16       you're only allowed to consider the evidence that was

17       admitted in this case.  Evidence includes only the sworn

18       testimony of the witnesses, the exhibits admitted into

19       evidence and anything else I tell you to consider as

20       evidence.

21               It is your job to decide what the facts of this

22       case are.  You must decide which witnesses that you

23       believe and how important you think their testimony is.

24       You do not have to accept or reject everything a witness

25       says.  You are free to believe all, none or part of any

1        person's testimony.

2              In deciding which testimony that you believe,

3        you should rely on your own common sense and everyday

4        experience; however, in deciding whether you believe a

5        witness's testimony, you must set aside any bias or

6        prejudice you may have based on the race, the gender or

7        the national origin of the witness.

8              There is no fixed set of rules for judging

9        whether you believe a witness, but it may help if you

10       think about some of these questions:

11             Was the witness able to see or hear clearly?

12             How long was the witness watching or listening?

13             Was anything else going on that might have

14       distracted the witness?

15             Does the witness seem to have a good memory?

16             How does the witness look and act while

17       testifying?

18             Does the witness seem to be making an honest

19       effort to tell the truth, or does the witness seem to

20       evade the questions or argue with the lawyers?

21             Does the witness's age or maturity affect how

22       you judge his or her testimony?

23             Does the witness have any bias or prejudice or

24       personal interest in how this case is decided?

25             Have there been any promises, threats,

1      suggestions or other influences that affect how the

2      witness testifies?

3              In general, does the witness have any special

4      reason to tell the truth or any special reason to lie?

5              All in all, how reasonable does the witness's

6      testimony seem when you think about all of the other

7      evidence in the case?

8              Now the questions the lawyers ask the witnesses

9      are not evidence, only the answers are evidence.  You

10     should not think that something is true just because one

11     of the lawyers asks questions that assume or suggest that

12     it is.  I may ask some of the witnesses questions myself.

13     These questions are not meant to reflect my opinion about

14     the evidence.  If I ask questions, my only reason would be

15     to ask about things that may not have been fully explored.

16             Now during the trial, the lawyers may object to

17     certain questions or statements made by the other lawyer

18     or witnesses.  I will rule on these objections according

19     to the law.  My rulings for or against one side or the

20     other are not meant to reflect my opinions about the facts

21     of this case.

22             Sometimes, the lawyers and I may have

23     discussions out of your hearing.  Also, while you're in

24     the jury room, I may have to take care of other matters

25     that have nothing to do with this case.  Please pay no

1          attention to those interruptions.

2                    You must not discuss the case with anyone,

3          including your families or your friends.  You must not

4          even discuss it with the other jurors until the time comes

5          for you to decide the case.  When it is time for you to

6          decide the case, I'll send you to the jury room for that

7          purpose.  Then you should discuss the case among

8          yourselves, but only in the jury room and only when all

9          jurors are present.  When the trial is over, you may, if

10         you wish, discuss the case with anyone.

11                   If I call for a recess during the trial, I will

12         either send you back to the jury room, allow you to leave

13         the courtroom on your own and go about your business, but

14         you must not discuss the case with anyone or let anyone

15         discuss it with you or in your presence.  If someone tries

16         to do that, tell him or her to stop and explain that, as a

17         juror, you are not allowed to discuss the case.  If he or

18         she continues, leave and report the incident to me as soon

19         as you return to the courtroom.

20                   You must not talk to the Defendant, the lawyers,

21         or the witnesses about anything at all, even if it has

22         nothing to do with this case.  It is very important that

23         you only get information about this case in court when you

24         are acting as the jury and when the Defendant, lawyers and

25         I are all here.

1          Do not go to the scene of the alleged crime.  If

2     it's necessary for you to view the scene, you'll be taken

3     there as a group under my supervision.  Do not investigate

4     anything about this case on your own or make any

5     experiments.

6          You may take notes during this trial if you

7     wish, but, of course, you do not have to.  If you do take

8     notes, you should be careful that it does not distract you

9     from paying attention to all the evidence.

10          When you go to the jury room to decide on your

11     verdict, you may use your notes to help you remember what

12     happened in the courtroom.  If you take notes, do not let

13     anyone, except the other jurors, see them.  You'll leave

14     your notepads and pens in the jury room when you leave for

15     the evening.  Is that understood?  You don't take those

16     with you.

17          You can see that we have chosen a jury of 14.

18     After you've heard all of the evidence and my

19     instructions, we will draw lots to decide which two of you

20     will be dismissed as alternate jurors in order to form a

21     jury of 12.

22          Possible penalty should not influence your

23     decision.  It is the duty of the judge to fix the penalty

24     within the limits provided by law.

25          Now, I may give you more instructions during the

29

1     trial.  At the end of the trial, I will give you detailed

2     instructions about the law in this case.  You should

3     consider all of my instructions as a connected series.

4     Taken all together, they are the law that you must follow.

5              After all of the evidence has been presented and

6     the lawyers have given their arguments, I will give you

7     detailed instructions about the rules of law that apply to

8     this case.  Then, you will go to the jury room to decide

9     on your verdict.

10             A verdict must be unanimous.  That means that

11    every juror must agree on it, and it must reflect the

12    individual decision of each juror.  It is important for

13    you to keep an open mind and not make a decision about

14    anything in this case until you go to the jury room to

15    decide the case.

16             Satisfied with the presentation of instructions,

17    gentlemen?

18             MR. HUTTING:  Yes, your Honor.

19             MR. KINNEY:  Yes, your Honor.

20             THE COURT:  All right.

21             MR. KINNEY:  Can we approach, your Honor?

22             THE COURT:  Yes.

23             (At about 12:15 p.m., brief sidebar.)

24             (At about 12:15 p.m., back on the Record.)

25             THE COURT:  Ladies and gentlemen, I'm going to

1       talk to the lawyers about a couple of issues that will

2       streamline the process.  There will be no rush to judgment

3       in this trial; the consequences are too important to Mr.

4       Dantzler, to the People, to everyone involved in this

5       case, okay, so we'll take as much time as necessary.

6            At this time, it's prudent to efficiently use

7       our time by letting you go to lunch at this point and we

8       will pick it up at 1:30.  It's now 12:20.  At 1:30.  I'd

9       like you outside the door at 1:25 or so.  Okay.  So have a

10      good lunch.  See you at 1:30.  Don't discuss the case.

11           DEPUTY SHERIFF:  All rise for the jury.

12           (At about 12:15 p.m., jury panel excused.)

13           DEPUTY SHERIFF:  Please be seated.

14           THE COURT:  All right.  The jurors have left for

15      lunch.  Is there anything else before we go to lunch,

16      gentlemen?

17           MR. KINNEY:  Yes, your Honor.  I wanted to

18      indicate for the Record that I -- Mr. Michael Dantzler is

19      out in the hallway.  That's what we were talking about.

20      He's been -- I'd like to have an opportunity to talk to

21      him.  I don't know if the Prosecution's intent is to

22      arrest him or something, but I want to talk to him.

23           MR. HUTTING:  I don't arrest anyone.

24           MR. KINNEY:  Or have him arrested.  That's what

25      I meant.

```
1              MR. HUTTING:  Okay.  I'm sure that I'd like for

2        him to stick around till 1:30 when my officer gets back

3        here, and I'm sure my officer would like to talk to him.

4              MR. KINNEY:  I think that if an officer is going

5        to talk to him, you know, if I talk to him, I'm getting

6        ready to indicate to him what his rights are and that he

7        should have a lawyer so --

8              THE COURT:  See you at 1:30, gentlemen.

9              MR. KINNEY:  Thank you.

10             (At about 12:18 p.m., lunch recess;

11             At about 1:37 p.m., back on the Record.)

12             COURT CLERK:  Recalling docket 10-3521, People

13        versus Samuel Lee Dantzler, jury trial in progress.

14             MR. HUTTING:  Auggie Hutting for the People.

15        We're ready to proceed.

16             MR. KINNEY:  Robert Kinney on behalf of Mr.

17        Dantzler.  I've had a conversation with Mr. Dantzler

18        regarding lesser included's in this case.  I'm just -- I

19        think that I should put it on the Record.

20             THE COURT:  You can do that later; can't you?

21             MR. KINNEY:  Okay.

22             THE COURT:  Are we ready for the jury?

23             MR. HUTTING:  Yes, sir.

24             MR. KINNEY:  Sure.

25             DEPUTY SHERIFF:  All rise for the jury.
```

1          (At about 1:39 p.m., jury panel seated.)

2          DEPUTY SHERIFF:  Please be seated.

3          THE COURT:  Mr. Hutting.

4          MR. HUTTING:  Thank you, your Honor.

5          Good afternoon, ladies and gentlemen.

6          JURY PANEL:  Good afternoon.

7          MR. HUTTING:  We have reached the point in the

8     trial that's called opening statement.  And on behalf of

9     the People, I'm going to address you and hopefully give

10    you an outline or an overview of the case.  That's how I

11    view an opening statement.

12          At the conclusion of my opening statement, Mr.

13    Kinney, on behalf of the Defense, has got some options.

14    One of the options, and the option that I think -- I could

15    be wrong -- that he will exercise is, he can make an

16    opening statement right behind me.  But, of course, since

17    the Defense does not have anything to prove, they also

18    have the option of reserving their opening statement; that

19    is, waiting until I complete my case in chief and then

20    make an opening statement at that point in time before

21    they put on a case.  They also have another option, and

22    that option is to not make an opening statement at any

23    time.  But anyway that's the procedure.

24          Let me remind you about something that we will

25    tell you now and again.  Opening statements are not

1    evidence; it's only the attorney's belief of what they

2    think the evidence will, in fact, show.

3          Evidence is the testimony that comes from that

4    witness stand or any exhibits that are introduced in this

5    case.  That's the evidence.  So if an opening statement,

6    whether given by the Prosecution or the Defense, comes in

7    differently than the testimony or the exhibits, it's the

8    testimony or the exhibits that control.  Okay?

9          As I said, I believe an opening statement is

10   kind of like an outline or an overview.  In this

11   particular case, I believe that you will hear from

12   somewhere between nine to twelve live witnesses.  That's

13   about all.

14         And some of these witnesses, most of these

15   witnesses, will not know one another.  Some witnesses will

16   only know themselves and will only know what they did or

17   what role they played in the case.  A couple of the

18   witnesses may know one or two other parties.  So, by

19   giving you this outline or overview, when the individual

20   witness testifies, you have some idea where he or she fits

21   in, in the case, and you don't have to try to figure it

22   out like a jigsaw puzzle as the witnesses get called in

23   order.  So that's what I hope to do.  Okay?

24         So with that in mind, let's start, because we're

25   going to be going back in time, ladies and gentlemen, back

1      in time to almost five years ago, all right, almost five

2      years ago.  Back in time to a Monday morning, January the

3      16th of 2006, in the City of Detroit, County of Wayne.

4      And the actual incident, I believe, took place somewhere

5      around two o'clock that Monday morning.

6              It may have started, okay, and the thing that

7      precipitated this incident started on Sunday night,

8      January the 15th, in the evening hours when an assault

9      occurred; okay?  And that's what got this incident going.

10     And I'll talk about that in a minute.  But the actual

11     beating and killing of the deceased, Bernard Hill, took

12     place on January the 16th, 2006, around 2:00 a.m.

13             Where did it occur?  It occurred in an

14     apartment; okay?  I believe that that apartment complex

15     that it occurred in is known as the Royal Capri

16     Apartments.  The Royal Capri Apartments are located at

17     20415 West Seven Mile, and we're going to be dealing in

18     that apartment complex with apartment number 302, which I

19     believe is up on the second floor in that complex.

20             Where is the Royal Capri Apartments?  They're on

21     West Seven Mile over in the northwest portion of the City

22     of Detroit, Seven Mile, an east/west street.  There's two

23     big north/south streets that maybe you've heard of.  One

24     is called Evergreen and another is called Burt Road, and

25     that apartment complex is on Seven Mile between Evergreen

1    and Burt Road, about halfway between those two big north/
2    south streets.  That apartment there in apartment 302 was
3    the apartment of a lady by the name of the Nikitta
4    McKenzie and her boyfriend who is the deceased in this
5    matter, and his name is Bernard Hill.
6          So let's talk about Bernard Hill because you
7    won't meet him and you won't see from him and you won't
8    hear from him.  At the time of his death, Bernard Hill was
9    22 years of age.  He was five-feet-eight-inches tall and
10   he weighed 172 pounds.  All right?  He had been, okay, for
11   some time previous, the boyfriend of a lady by the name of
12   Quiana Turner; all right?  They have known each other for
13   a long time.
14         As a matter of fact, Bernard Hill's mother had
15   helped raise Quiana Turner.  He became her boyfriend and
16   ultimately they even had a child together.  That child's
17   name is Mikayla.  Bernard Hill and Quiana Turner were
18   boyfriend/girlfriend.  But at the time of this incident,
19   they were no longer boyfriend/girlfriend.  And ultimately
20   what happened that Sunday night is that Bernard Hill
21   became angry, for whatever reason, with Quiana Turner and
22   he assaulted her.  He beat her up, he cut her lip.  She
23   needed to go to the emergency room; ultimately, I think,
24   got a couple of stitches and was ultimately released from
25   the emergency room that night.

36

1              They had an argument.  They had a fight.  He

2      beat her up.  And that then caused this incident to

3      happen.

4              Because what you will find out is that this man

5      right here, Mr. Sam Dantzler, also known as Samuel Lee

6      Dantzler, he's also known as Big Sam, all right, Big Sam

7      is Quiana Turner's uncle.  And the other parties involved

8      in this incident are going to be people who are related to

9      Quiana Turner.  You will find or hear the name of another

10     person by the name of Samuel Lamare Dantzler, he's known

11     as Little Sam.  He's Samuel Lee Dantzler's son.

12             I think you will also hear the name of Rodney

13     Turner.  Rodney Turner is Quiana Turner's older brother,

14     just a couple years older than her, Samuel Dantzler's

15     nephew and Little Sam's cousin.

16             You will also probably hear the names of Omar

17     Dantzler, who is another relative, another cousin.  And

18     Michael Dantzler, another cousin.

19             Because what happened is Quiana Turner reported

20     what happened to her, and her family and her relatives

21     decided to form what I call "the posse".  They formed a

22     posse that night, a posse that was out to execute

23     vigilante justice.

24             They got together after Quiana was beaten up and

25     got in cars and one of the places, the first place, that

1    they went to look for Bernard Hill was over to Bernard

2    Hill's mother's home, over to Janet Burt's home.  They

3    went over there to Janet Burt's home, and the car that

4    they went in was Big Sam Dantzler's car.

5            Rodney Turner, I believe, and Little Sam went up

6    on the porch and were pounding on the door, wanting to see

7    Bernard and wanted to talk to Bernard.  Of course, Bernard

8    was not there.  Mrs. Burt was, in fact, home.

9            By this time, it's about one o'clock in the

10   morning.  Mrs. Burt knew what had happened between her

11   son, Bernard, and Quiana.  She was not at all happy or

12   pleased about that.  She was very upset with Bernard.  She

13   had talked to him once on the phone, tried to talk to him

14   about that, he hung up the phone on her.  She had tried to

15   call him back a number of times, but he wouldn't answer.

16   She knew when they came over there and wanted Bernard,

17   what they were there for.  She told them, at that point in

18   time -- well, she did not answer the door, and eventually

19   they went away, got in the car and drove off.

20           And what you will find out is that, when this

21   posse went looking for Bernard, they just didn't go with

22   their hands and their fists, they went with weapons.  One

23   of the persons in that posse had a gun.  And I'll tell you

24   why we know that in just a minute.  And at least two

25   others, at least two others in this five-, six-man posse

1      had golf clubs, took golf clubs.

2              Ultimately, about two o'clock in the morning,

3      the posse was able to figure out Bernard Hill was over at

4      this apartment on West Seven Mile and they went over there

5      to that apartment.  And what you will find out is that

6      Nikitta McKenzie and Bernard Hill were there inside the

7      apartment.  I think that they were actually just getting

8      ready to go to bed at that point in time.  They were the

9      only two people there in the apartment.  The apartment

10     door was locked.

11             And what you will find out is that, just as they

12     were getting ready to go in, Mr. Hill thought he saw maybe

13     some shadows out in front of the window or out in front of

14     the door, and he became concerned, obviously.  And then he

15     went back into the back bedroom.  All of a sudden, Nikitta

16     McKenzie will tell you that her door was kicked open, the

17     apartment door was actually physically kicked open.  And

18     you'll see pictures of that.  And into that apartment came

19     charging five, six black men.

20             She won't be able to identify any of these men;

21     all right?  It was nighttime, it was in her apartment and

22     what happened was very scary.  Well, what she will tell

23     you is that one of the men had a gun and pointed it at her

24     face.  She will also, I think, be able to tell you that

25     she saw other men with something in their hands, which are

```
 1    going to turn out to be a golf club, golf clubs, and she
 2    will also tell you that one of the people in that posse
 3    had on a black skull cap, a black skull cap.
 4         The man with the gun pointed the gun at her face
 5    and demanded Bernard, where is Bernard?  We want to know
 6    where Bernard is, we think he's here, get him out.  At
 7    that point in time, she told them he's not here.  What
 8    then happened, though, is that the bedroom door opened and
 9    Bernard did come out.
10         What you'll find is that when Bernard came out,
11    the only thing he was dressed in was his undershirt since
12    he was getting ready to go to bed.  As soon as Bernard
13    came out, one of the men grabbed Nikitta McKenzie, pushed
14    her into the bathroom, locked the door, left her in there,
15    pushed her in there.  And then what she well tell you is
16    that out there in the main place in the apartment, in the
17    main room, it wasn't a big apartment, just a one bedroom,
18    she heard a melee, lots of yelling, lots of screaming.
19    And the apartment basically got trashed as this fight went
20    on, as these men began to pummel and beat Bernard Hill.
21         You will find out that he has a number of
22    injuries in addition, ultimately, to the gunshot wound
23    that killed him, okay, that ultimately killed him, which
24    was the coup de grace.  He has a significant amount of
25    injuries on his head, on his face, and on his arms and on
```

1     his body.  So Bernard Hill was beaten.

2              And ultimately I think what you're going to find

3     out is that he tried to flee that apartment, tried to get

4     out of there, and it was five to six against one.  He

5     didn't have any kind of a weapon; they did.  One of the

6     parties may have even had a knife or got a knife because

7     he's got an incised cut on his body.  And they hit him so

8     hard that they broke the golf clubs.  You will find the

9     shafts got left there at the apartment complex or outside,

10    in the hallway outside of the apartment complex.

11             But Bernard Hill tried to flee.  He went and

12    started to head down the stairway.  As he headed down the

13    stairway, someone put a bullet in his head, shot him in

14    the back of the head, the bullet going down.  He fell down

15    the last few steps and laid there dying, and he died very

16    quickly, and the posse left.

17             Why do we say Big Sam Dantzler was one of those

18    people in the posse?  Because he had a motive.  His car

19    was there at Janet Burt's home, his son was involved in

20    this, and ultimately what you're going to find out is that

21    the hat that was worn by that person that was part of that

22    posse, had this man's DNA on it.  Had this man's DNA on

23    it, in terms of one to 2.3 quadrillion, that's how strong

24    the DNA is on that hat ultimately.

25             But that's what happened.  The police were

41

1      called, came out, started their investigation.  Of course,

2      Nikitta McKenzie can't identify anybody.  But the police

3      did their work.  We had some fingerprints that were there

4      at the scene or we had a fingerprint that was at the scene

5      that was on Nikitta McKenzie's television set.  Ultimately

6      the police found what we believe to be the motive in this

7      case pretty quickly, and they started looking at the

8      Dantzlers.  They started putting their fingerprints,

9      checking their fingerprints against that, against the

10     fingerprint that we had on the TV with the hopes that that

11     would maybe give us a lead.  That didn't work.  Those

12     prints did not come back to anybody that we checked them

13     against.

14           We also even took the golf clubs, the shafts on

15     the golf clubs, and we submitted that over to our crime

16     lab at the time, and they did what's known as supergluing

17     or super fuming on that, which is another way of trying to

18     get up fingerprints off of items that are hard to get

19     fingerprints off of, and that wasn't successful.  So there

20     were, in essence, no forensic leads at that point in time.

21           So ultimately the case was investigated, but no

22     one was arrested at that point in time, no one was

23     charged.  And ultimately the case just basically kind of

24     got put on a shelf as other cases replaced them.  And

25     that's the way it stayed, basically, until late in 2009

1       and towards the beginning of 2010.

2               And then ultimately what happened is that the

3       Detroit Police Department got a grant and they formed a

4       Cold Case Squad, which started with Charles Clark, who's

5       my officer in charge is a member of.  And that Cold Case

6       Squad began to go back and look at old cases that we

7       had -- old, unsolved cases.  And this turned out to be one

8       of the old, unsolved cases that they began to look at.

9               And they began to analyze the evidence that they

10      had in this particular case.  And one of the things that

11      they took a look at was the hat.  Now, we had had the hat

12      and we had done some work on that hat.  A little piece had

13      been cut for DNA.  That was done by Chris Steary.  And

14      you'll hear him testify that had been sent to Bode

15      Technology.  It had been compared against Bernard Hill's

16      DNA and against the DNA of another person by the name of

17      Patrick Grunewald and even Omar Dantzler.  But it had all

18      come up negative on that.

19              Ultimately though what the Detroit Police

20      Department wanted to do, and they talked to the State

21      Police about this, and the State Police eventually agreed

22      to do this, was to submit the DNA extract; all right?  The

23      DNA extract that had been from that cutting that Chris

24      Steary had done was to submit that information to what's

25      known as a CODIS database.  I think it's C-O-D-I-S, it's

                                    43

1      called CODIS, I think that's how it's spelled, anyhow --
2      the letters, I don't know exactly, combined, something or
3      other.  And that database has a number of databases in it.
4              People have information that is there in that
5      database.  There's an offender database in there.  And
6      what can happen if the State Police agree, because you
7      can't submit everything, you have to reach a standard or a
8      hurdle.  And that hurdle is that an item has to be -- one
9      of the hurdles is the item has to be something that was
10     left at a crime scene and the State Police have to have
11     reasonable assurances, all right, based on the information
12     that they have that it was left by one of the perpetrators
13     or the perpetrator at that crime scene.  And if we reach
14     that hurdle, and that's what the Cold Case Squad did, then
15     that information can be submitted to the CODIS database.
16             And that information, in 2010, early 2010, was,
17     in fact, submitted to the CODIS database.  And after it
18     was submitted, we got a reply back, and that reply said
19     this item that you have submitted matches a person that we
20     have in the database whose name is Samuel Lee Dantzler,
21     this man right here.  So we got what's known as a CODIS
22     hit.  A CODIS hit is what we call presumptive or probable
23     cause; okay?
24             Ultimately then what the police department has
25     to do, okay, is they have to go out and get either a

1    search warrant or an arrest warrant and they have to get

2    Samuel Lee Dantzler.  And then they have to take what's

3    known as a buccal swab.  That comes from the inside of

4    your mouth.  It's like a little Q-tip we stick on the

5    inside of your mouth and we rummage it around or stir it

6    around there.  And what happens is the cells that are

7    there on the inside attach to the buccal swab.  And then

8    that buccal swab, it's packaged up and it gets sent -- in

9    this case, it gets sent to Bode Technology out of Lorton,

10   Virginia.  And then Bode Technology takes that absolute

11   known buccal swab and compares it against the DNA that

12   they have from the cut that Chris Steary made in that hat.

13          And that came back, all right, that came back to

14   Mr. Dantzler, all right, and it came back one in 2.3

15   quadrillion.  And after that, we did some more work on the

16   case, okay, we did some more work on the case, once we had

17   done that.  Ultimately, we took the golf clubs and

18   submitted those back to Bode Technology for DNA work.  But

19   we didn't take the actual golf clubs, but we took the DNA

20   extract from those golf clubs and submitted those to Bode

21   Technology.  See what you can tell us about DNA there on

22   those golf clubs.  And what you'll find out basically is

23   that Bode sent us a report, said the blood on the golf

24   clubs, okay, that we have here comes back to Bernard Hill,

25   the deceased.

1           We also did three more cuts on the hat.  We did

2      three more cuts on the hat, because people come in and

3      say, well, you got one cut, you know, but who says this

4      hat wasn't passed around and maybe there's other people's

5      DNA on the hat.  So we did three more cuts.  What those

6      cuts came back, basically, is none of them exclude Mr.

7      Dantzler.  There was DNA on all the cuts.  Some of it is

8      not so strong, but none of it -- none of those three cuts

9      excluded Mr. Dantzler, because that can happen when you do

10     that.  He's not excluded on any of those cuts.  He's in

11     the category inclusion, but it's not overwhelmingly

12     strong.

13          But on one of the cuts, one of the cuts on that

14     hat came back to Bernard Hill.  Now it's not the one in

15     2.3 quadrillion, but it's there and it's fairly strong.

16     And how did that happen?  Because Bernard Hill struggled

17     that night, he fought for his life.  And when he fought,

18     one of the persons that you will conclude that he fought

19     with was Samuel Lee Dantzler.  That hat came off during

20     the course of that melee that night.  Bernard Hill's DNA

21     got on that hat during the course of that fight.  And Bode

22     will report that to you, also.

23          And ultimately what happened in this case

24     through the investigation is that Mr. Dantzler

25     ultimately -- Mr. Samuel Lee Dantzler being charged in

1          this case and you'll ultimately also find out that another

2          person by the name of Samuel Lamare Dantzler, Little Sam,

3          was ultimately also charged in this case.  And we're here

4          today in the trial of Samuel Lee Dantzler.

5                    Okay.  So that's the outline of the case.  How

6          are we going to prove all this stuff to you?  What method

7          are we going to use to do that?  First thing I'm going to

8          do when I -- after we start in the testimony is I'm going

9          to call a lady to the witness stand by the name of Doctor

10         Cheryl Loewe.  She's the deputy chief medical examiner for

11         the County of Wayne, a very knowledgeable lady and I think

12         a very -- a lady that will educate you, not only give you

13         some testimony but maybe some education, too.

14                   All right.  Doctor Loewe is the deputy chief.

15         She's going to tell you about the autopsy on Bernard Hill.

16         She's going to tell you about all the blunt force trauma

17         that Mr. Hill had.  It's a significant amount.  And that's

18         the term that they use, blunt force trauma.  She will also

19         tell you about the one incised wound that he had on one of

20         his arms.  And she will tell you that, ultimately, the

21         cause of death, though, the ultimate cause of death was a

22         single gunshot wound to the back of the head, that pretty

23         much goes straight down in the head.  So that's Doctor

24         Loewe.

25                   After Doctor Loewe, we're going to call another

1     very, very important witness, and his name is Bill

2     Niarhos.  He's been a police officer for the City of

3     Detroit for 25, maybe 30, years.  He's an evidence tech.

4     He's the evidence tech that was called to this apartment

5     that night to process it.  He took photographs of that

6     apartment.  Ultimately, a diagram of that apartment was

7     drawn by Officer Niarhos that documents where he found

8     everything.

9           We're going to introduce that in evidence.

10    You'll see the blowup of that.  He'll talk about that.  I

11    have individual ones for you so that you can hopefully be

12    able to follow along as he tells us about that.

13          And then he will tell you about the evidence

14    that he collected there that night:  Two broken golf club

15    shafts; at least one head from a golf club; I think that

16    he got a casing.  He will also -- maybe two casings.  I

17    think he found two casings actually, two casings from a

18    380 semi-automatic, and the hat.  He took the hat into

19    evidence.  So he's the man that did all of that.  That's

20    going to take some time.  Bear with me as we go through

21    it.  But ultimately, hopefully, you will understand the

22    scene.

23          After that, we're going to call Janet Burt.

24    That's the mother of Bernard Hill.  After Janet Burt,

25    we're going to go to Nikitta McKenzie and she will tell

48

1     you what happened there that night.  And then after

2     Nikitta McKenzie, we're going to start to turn our

3     attention to the DNA people, first to Chris Steary, who is

4     the person that took the initial cut of the hat, and he'll

5     tell you how he looks at a hat, all right, because the

6     object, when you're looking for DNA, one of the best

7     things is what we call sweat; okay?  Body sweat; okay?

8     You're exuding DNA.  When you wear a hat, obviously when

9     you wear a baseball cap, it's easy because then you look

10    for the sweat band.  But when you wear a skull cap, you

11    take a look around and you still try to find what might be

12    the front or where the person might deposit the most DNA

13    of sweat.  And Chris Steary did that, and he made the

14    original cut.  All right?  And that's the original cut.

15    It comes back to this man, one in 2.3 quadrillion.

16           And after that, we're going to call Jeff Nye.

17    He works for the Michigan State Police, and he's the

18    person or one of the persons that makes the call about

19    whether or not an item can be submitted to CODIS.  He was

20    the person who ultimately approved the submitting of this

21    item to CODIS, which got us a CODIS database hit on Samuel

22    Dantzler.

23           Then we're going to call two DNA people.

24    They're not doctors, they're DNA analysts.  One is Nicole

25    Yannacone Kaye, K-A-Y-E.  She did the first initial work

1        of the DNA.  Because you're going to find out that the DNA

2        that we found there is a mixture.  And I'm not a big DNA

3        expert myself, okay; we're going to try to kind of keep it

4        as simple as we can, DNA 101, probably for me more than

5        for maybe some of you who might understand it.  But

6        there's a mixture there and she will explain that.

7               And then we're going to call Rebecca Preston who

8        works for Bode who did all of the work on the case after

9        Nicole Kaye did her work.  And then we'll finally call

10       Sergeant Clark, who will kind of put everything together,

11       we hope, in terms of that.

12              What I also hope to do to move the case along is

13       reach some stipulations.  Those are agreements with the

14       defense, okay, where instead of calling in three or four

15       witnesses, we either submit their report or give you a

16       summary of their report.  And hopefully that will be done

17       when it comes to the fingerprints that we tried to get

18       through comparison, and when it comes to the fingerprints

19       that we tried to raise through working though supergluing;

20       and also when it comes to the firearms, because the two

21       casings that were found at the scene and the bullet that

22       was removed from the head of the body of Bernard Hill were

23       submitted to MSP and, basically, they turned out -- the

24       casings turned out to be 380, that comes from a

25       semi-automatic, came from the same gun, the bullet is

1     consistent with being a 380.  And hopefully we'll reach

2     some stipulations in regard to that.

3          I ask you to please keep an open mind to all of

4     this case.  And we submit to you, ladies and gentlemen,

5     that on the morning of January the 16th, 2006, that Mr.

6     Samuel Lee Dantzler, this man right here, was part of that

7     posse.  Most of the other men with him were younger than

8     him, younger than him, but he was part of that posse, the

9     uncle of Quiana Turner, part of the posse, that went

10    looking for Bernard Hill, found Bernard Hill, over on West

11    Seven Mile, beat up Bernard Hill.  And someone in that

12    group, we can't tell you who, shot and killed Bernard, and

13    then they all fled.  We'll prove that to you.

14          That's going to be felony murder.  The felony is

15    kicking in the door and coming into that apartment when

16    you didn't have the right to do it.  And then the murder

17    occurs during the course of that.  We'll prove that to you

18    beyond a reasonable doubt.

19          Thank you, ladies and gentlemen.

20          THE COURT:  All right.  Thank you, Mr. Hutting.

21          Mr. Kinney.

22          MR. KINNEY:  Thank you, your Honor.

23          THE COURT:  You're welcome.

24          MR. KINNEY:  Good afternoon, ladies and

25    gentlemen.

1            A lot of what you hear from lawyers is arguing.

2    We do that a lot.  But at this particular time, what I'm

3    asking you all to do is listen to the evidence as intently

4    as you can.  And at the end, I believe that the evidence

5    is going to prove to you that Mr. Dantzler is not guilty.

6            You're not going to hear Nikitta McKenzie say

7    that she saw Mr. Dantzler that night.  You're not going to

8    hear Nikitta McKenzie say that she knows Mr. Dantzler,

9    ever talked to Mr. Dantzler.  You're not going to hear

10   that.  You're not going to hear anybody say that they saw

11   Mr. Dantzler that night at that apartment.

12           You're not going to hear anybody say that Mr.

13   Dantzler had a conversation with Mr. Hill at any point

14   about the beating that Mr. Hill gave to Quiana Turner.

15   You're not going to hear any of that.

16           You're not going to find Mr. Dantzler's

17   fingerprints.  You're not going to hear any evidence that

18   Mr. Dantzler's fingerprints are on the golf club.  You're

19   not going to hear any evidence that Mr. Dantzler's

20   fingerprints were found on the TV set.  You're not going

21   to hear that Mr. Dantzler -- except for one witness.

22           I don't know if the Prosecution may call him or

23   not, but there is a gentleman named Patrick Grunewald

24   who's been listed on the Prosecution's witness list.  This

25   gentleman, back at that time, indicates that he overheard

1          Mr. Dantzler talking about this beating.  You're going to

2          hear him say that, I believe, if he testifies.

3                  But at the same time, you're going to hear this

4          gentleman made several statements that cannot be

5          consistent with each other.  You're going to hear what he

6          told the police that, at one time, he was a lookout at the

7          house, that he was there.  Evidently, even the police

8          didn't believe him.  None of these statements can be

9          consistent.  His credibility is not going to be one that

10         we can believe beyond a reasonable doubt that he knows

11         what he's talking about, at all.  That's the only person

12         that you could possibly hear say that they heard Mr.

13         Dantzler say anything about this case, the only thing.

14                 You're going to hear that the evidence techs --

15         I think they did a good job -- you're going to hear that

16         they looked for evidence at that apartment, they did what

17         they had to do inside and out.  And the only thing that

18         they had that says Mr. Dantzler -- and I'm going to refer

19         to him as Mr. Dantzler, you're not going to hear me refer

20         to him as Big Sam, you're not going to hear me refer to

21         six -- six -- five or six people as a posse.  These were

22         five or six family members who have been accused of

23         something.

24                 I only represent Mr. Dantzler.  Mr. Dantzler is

25         the only one that's here.  There's not going to be enough

1      evidence here to say Mr. Dantzler did anything, said

2      anything.  Ms. Burt, I don't know if she's going to say

3      that this is Mr. Dantzler's car, but I know she's not

4      going to say that Mr. Dantzler is who she talked to that

5      night.  I know she's not going to say that Mr. Dantzler is

6      the one that approached her or the one that was in the

7      car.  You're not going to hear that.

8              And it's going to be true that these individuals

9      are much younger than Mr. Dantzler.  I expect that these

10     witnesses are not going to be able to say that these

11     individuals, members of Mr. Dantzler's family, are

12     somebody that Mr. Dantzler hangs out with.  They're family

13     members, they come to family gatherings, not that Mr.

14     Dantzler has this ongoing relationship where we're hanging

15     out and forming some posse.  That's not going to be the

16     testimony.

17             The evidence tech and the DNA experts should be

18     working together.  The Michigan State Police who did the

19     CODIS hit and found that Mr. Dantzler's DNA was on this

20     hat, we're going to find out that the Prosecution sent

21     this evidence to Bode Technology, and not only is Mr.

22     Dantzler's DNA on this hat but so is Mr. Hill.

23             Why is that important?  Because Mr. Hill was

24     part of this family.  Mr. Hill saw Ms. Turner just prior

25     to that beating.  This all happened in a matter of two

1      days.  They have a child together.  Ms. Turner was

2      supposed to be taking the child over so that he could

3      visit with Mr. Hill, Mr. Hill's family, Ms. Burt.  There

4      was no agreement between them, but Mr. Dantzler wasn't

5      there.

6              There was a beating after that, but Mr. Dantzler

7      wasn't there.  It's just that they believe that certain

8      things happened.  But proving that this -- that he had

9      anything to do with anything, you're not going to hear.

10             You're going to hear, also, that there was

11     somebody's fingerprint on one of these golf clubs.  But at

12     the same time, you're going to hear that it's the

13     Prosecution's belief that this particular person is

14     somebody named Henderson.  Couldn't have done it, couldn't

15     have been there, because he was in prison in another

16     state.

17             So if a fingerprint can be on a golf club that

18     was used in a murder, DNA can be left on hats and other

19     places than at the scene of the murder.  That's the

20     important thing.  Is there enough evidence here to believe

21     that Mr. Dantzler did anything?

22             The Prosecution has -- Mr. Hutting has just

23     indicated to you that because Mr. Bernard Hill's DNA is on

24     this hat, that means that Mr. Bernard Hill placed his DNA

25     on that hat during the struggle at that house, and that's

1       going to come to you from one of the DNA experts.  I don't

2       think so.

3               What's interesting is, is that I don't believe

4       that these DNA experts are going to say that there was

5       blood which comes from being shot in the back of the head

6       on the hat.  I don't believe that any of these DNA experts

7       are going to say -- is it sweat or is it skin cells or is

8       it blood?  DNA can come from several different things,

9       several different things from your body, and that's going

10      to be important in this case.

11              We want to know from the DNA experts what are

12      they going to say about that?  How can they pinpoint to

13      say that that DNA came on that hat, that night?  They're

14      not going to be able to say that.

15              So in the end, whether you call this family a

16      posse, whether you want us to believe that there was some

17      vigilante going there, nothing says Mr. Dantzler was

18      there.  Nothing says that Mr. Dantzler has a motive

19      because of some anger that he had to go out and attack Ms.

20      Turner.

21              And I do believe that if Ms. Turner testifies

22      here, this is not the first time that Mr. Hill has been

23      violent towards her.  What happened the first time?

24      That's interesting.  What kind of relationship did Mr.

25      Hill have with Mr. Dantzler?  Is anybody going to testify

```
 1          about that?  We want to know.  What kind of conversations
 2          did they have with Mr. Dantzler after this happened?
 3          None.
 4                   For those reasons, I'm going to ask you all at
 5          the end, I'm going to get up and talk to you again about
 6          what you heard, and I'm going to be confident in asking
 7          you then to find Mr. Dantzler not guilty.
 8                   THE COURT:  Thank you, Mr. Kinney.
 9                   Mr. Hutting.
10                   COURT CLERK:  Please raise your right hand.
11                   Do you swear or affirm that the testimony you're
12          about to give in the matter now pending before this Court
13          will be the truth, so help you, God?
14                   WITNESS LOEWE:  Yes, I do.
15                   COURT CLERK:  You may be seated.
16                               CHERYL LOEWE,
17          called as a witness at 2:20 p.m., having first been duly
18          sworn by the Clerk of the Court, was examined and
19          testified on her oath as follows:
20                   THE COURT:  Good afternoon.
21                   WITNESS LOEWE:  Good afternoon.
22                   THE COURT:  Make yourself comfortable, pull the
23          microphone close to your mouth, and please speak loudly
24          and clearly for this jury; okay?
25                   WITNESS LOEWE:  Okay, your Honor.
```

```
 1                    THE COURT:  Thank you.

 2                    Mr. Hutting.

 3                    MR. HUTTING:  Thank you, your Honor.

 4

 5    DIRECT EXAMINATION BY MR. HUTTING:

 6    Q.   For the Record, could you please tell this jury your name,

 7         your profession, and where it is that you practice your

 8         profession?

 9    A.   Good afternoon.  I'm Doctor Cheryl Loewe and I'm the

10         deputy chief medical examiner for the Office of the Wayne

11         County Medical Examiner in Detroit, Michigan.  And I've

12         worked there about 15 years and I'm essentially the

13         second-in-charge of the office.

14    Q.   How long have you been deputy chief?

15    A.   About six or seven years now.

16    Q.   And the office is headed by whom?

17    A.   Doctor Carl Schmidt, who, by the way, did the autopsy in

18         question today, who is my boss, and is on vacation.  And

19         so it's also my duty to cover for other doctors that are

20         away.

21    Q.   Okay.  How big is the medical examiner's office for the

22         County of Wayne?

23    A.   Well, it used to be an office of about 50 people and, with

24         budget cuts and position cuts, we're down to about 30.  We

25         have eight physicians, a team of investigators, chemists,
```

58

```
 1        clerical people, and our average caseload is about 10 to

 2        12 bodies a day or 2800 autopsies a year.

 3   Q.   Okay.  Doctor Loewe, did you bring with you today an

 4        autopsy report from the Wayne County Medical Examiner's

 5        Office that is designated medical examiner case number

 6        06-00473?

 7   A.   Yes, I did.

 8   Q.   What does that mean?  How does a case get that kind of a

 9        number?

10   A.   It's a -- not necessarily sequential, because not every

11        case that gets a number will come into the office.  But it

12        is a number assigned according to some type of organized

13        sequence by you given -- assigned a certain case number.

14        "06", meaning the year 2006, and then a number.

15   Q.   Okay.  And does that case involve the autopsy and the

16        records of that autopsy performed on a person by the name

17        of Bernard Allen Hill?

18   A.   Yes, it does.

19   Q.   Okay.  And did Bernard Allen Hill appear to be a black

20        male consistent with the age of approximately 22 years of

21        age?

22             MR. KINNEY:  Judge, can we approach the bench

23        for a second, please?

24             THE COURT:  Yes.

25             (At about 2:22 p.m., brief sidebar;
```

59

1              At about 2:24 p.m., back on the Record.)

2    BY MR. HUTTING:

3    Q.   This case involved the autopsy of whom?

4    A.   The deceased gentleman by the name of Bernard Allen Hill,

5         who was a 22-year-old black male.

6    Q.   Okay.  All right.  Doctor Loewe, what kind of training and

7         background do you have that qualifies you to do the job

8         that you do at the Medical Examiner's Office?

9    A.   First, I obtained a degree, a Bachelor of Science from

10        Oakland University.  Then I pursued med school and became

11        a medical doctor in 1990.  Following that, I did five

12        years of training in pathology and anatomic and clinical

13        pathology at St. John's Hospital in Detroit --

14              THE COURT:  Mr. Kinney?

15              MR. KINNEY:  Your Honor, if it will speed things

16        up, I know Doctor Loewe, I'm not questioning her

17        qualifications.

18              MR. HUTTING:  I'm not going to go extensively

19        into them, but I just do want them to -- I do want Doctor

20        Loewe to lay out briefly what qualifies her to be a

21        medical examiner and what qualifies her to render a

22        medical opinion here on this particular case.

23              THE COURT:  Well, the Defense has stipulated to

24        her qualifications, he's familiar with the witness, as is

25        the Court.  You can briefly get into it if you want to,

1          Mr. Hutting, but we'd like to move the trial along.

2                    MR. HUTTING:  Sure.  I understand that, Judge.

3                    THE COURT:  Thank you, Mr. Kinney.

4                    MR. KINNEY:  Yes, sir.

5     BY MR. HUTTING:

6     Q.   Please continue, Doctor.

7     A.   I'll be brief.  Five years of training in pathology at St.

8          John's in Detroit.  And then we do a year of training in

9          the actual morgue for a year as a fellow, where we focus

10         on the forensic cases.

11                   Following that, I was hired as an assistant

12         medical examiner and I've worked at the morgue ever since.

13         In addition to having a medical license, I'm also board

14         certified by the American Board of Pathology in anatomic,

15         clinical and forensic pathology, the three areas in

16         pathology in which I trained.

17    Q.   Okay.  Now -- And you've come to court before to testify?

18    A.   Yes.

19    Q.   Okay.  Any time that you've ever come to court and your

20         qualifications haven't been accepted?

21    A.   No, sir.

22    Q.   Okay.  Have you reviewed the autopsy report and the

23         medical records that you have concerning this autopsy?

24    A.   There were no medical records, as I believe the decedent

25         was found dead.

1   Q.   Okay.  But you reviewed the medical -- you reviewed the

2        medical examiner's report in this case?

3   A.   Yes.

4   Q.   Okay.  Based on that review, along with your training and

5        education, are you able, ultimately, to testify here today

6        and render expert opinions about cause of death and about

7        the injuries that Mr. Hill suffered?

8   A.   Yes, sir.

9   Q.   Okay.  All right.  With that, let's move.  Tell the jury

10       what an autopsy is and for lack of a better term what

11       parts an autopsy is divided up into.

12  A.   An autopsy is also referred to as a post-mortem

13       examination; that is to say an examination of the human

14       body after death.  And there are two main parts:

15            First of all, an external survey of the body

16       from head to toe, front to back, in which we document and

17       sketch and photograph any injuries present to the body.

18       And then the body is opened, all the internal organs are

19       removed, weighed and examined for either disease or injury

20       and evidence.  As it relates to this case, a bullet is

21       recovered from the body.  And then a conclusion is drawn

22       and a death certificate is filled out and then a report is

23       authored by the doctor that did the procedure.

24  Q.   Okay.  With that in mind, can you tell us what the height

25       and weight of Bernard Hill was?

```
 1   A.   Yes.  If I could refer to my notes, please?

 2   Q.   Sure.

 3   A.   His -- Mr. Hill's weight was recorded as 172 pounds and

 4        his height was five-feet-eight inches.

 5   Q.   Okay.  Was an external exam done?

 6   A.   Yes.

 7   Q.   Okay.  Can you detail for us, Doctor, one at a time, the

 8        results of the external exam on the body of Mr. Hill?

 9   A.   Yes.  We have a variety of different types of injuries to

10        the body of Mr. Hill.  The most immediately life-

11        threatening injury that immediately resulted in his death

12        was the presence of a single gunshot entrance wound to the

13        back of his head.  And it was on the back of the head,

14        just slightly left of the center of midline.  And this

15        bullet passed into the skull, brain, spine and even the

16        brain stem which controls our vital drive to breathe.  And

17        a bullet was recovered in that location.  And the skull

18        had fractured and there was bleeding over the brain as a

19        result of that penetrating injury.

20             In addition to that, there were blunt force

21        injuries to his body and they included --

22   Q.   Okay.  Let me just stop you there.

23             Using your head, could you point to the

24        approximate location of the entrance of that gunshot

25        wound, Doctor Loewe?
```

```
1    A.    Yes.  Again, it's on the back of the head, not quite in

2          the center, but just left of the midline.

3    Q.    Okay.  All right.  And that direction of that bullet went

4          where?

5    A.    It was back-to-front and recorded as going slightly

6          downward towards where the spine is.

7    Q.    Okay.  All right.  You also said that there were other

8          injuries to the body.

9    A.    Yes.

10   Q.    Okay.  Tell us about those, please.

11   A.    We have a blunt force trauma.  That's a typical trauma

12         received during a beating, if you will, or some type of

13         force, blunt force.  And there are three hallmark types of

14         injuries to blunt force trauma:  The laceration, which is

15         a skin tear; a bruise, which is also called a contusion;

16         and an abrasion, which is a scrape.  And we've got all

17         three of these types of blunt force injuries.

18                On the, both of the back surfaces of the forearm

19         of Mr. Hill, there were abrasions.  There were two present

20         on the back of the left forearm and one broad abrasion on

21         the back of the right forearm.

22                We have a bruise or a contusion present on the

23         right hip.  And there is a contusion or a bruise or a

24         black eye, if you will, surrounding the right eye socket.

25                There's also a bruise on the top of the head,
```

64

1    which has a pattern, if you will; in other words, an

2    imprint of the object that created that bruise.  And it's

3    described by Dr. Schmidt as being diamond-shaped.  It's

4    actually a pair of diamonds, so it took on the impression

5    of whatever object was inflicted when Mr. Hill was struck

6    on the top of his head.

7              Right next to that set of diamonds or that

8    imprint was a large laceration or tear in the scalp, and

9    this was literally on the top of the head.  It measured

10   three inches in length and penetrated into the skull.  It

11   was deep enough to actually create a defect in what's

12   called the outer table of the skull.  The skull is quite

13   thick and you have an outer table and an inner lining

14   table.  Whatever struck the top of his head was forceful

15   enough to actually create a divot in the skull bone.

16 Q.   Okay.  What else?

17 A.   And then the other type of injury is a sharp force injury,

18   something created by a sharp object.  In this case, we

19   have a single incised wound or a cut to the back of his

20   left forearm.  It was on the dorsal or back surface, here

21   on the left side, next to the set of two abrasions, and it

22   was described as being two-and-a-half inches in length.

23 Q.   Incised wound?  What kind of instrument can make an

24   incised wound like that?

25 A.   An incised wound is different from blunt force trauma in

```
 1         that it's inflicted with a sharp object, could be a knife,

 2         could be broken glass, something to that effect.

 3    Q.   Okay.  All right.  Any other injuries that you noted to

 4         Mr. Hill's body or noted in the autopsy of Mr. Hill's

 5         body, or does that complete --

 6    A.   That completes all of the injuries externally and

 7         internally.

 8              MR. HUTTING:  Okay.  I'm going to have a couple

 9         of things marked here.  I'm going to mark them as proposed

10         Exhibits 24, 25 and 26, Madam Court Reporter, please.

11              PEOPLE'S EXHIBITS 24, 25, AND 26 MARKED

12              FOR IDENTIFICATION

13    BY MR. HUTTING:

14    Q.   Doctor Loewe, I'm going to show you People's proposed

15         Exhibits 24 and 25, and ask you if you can identify them?

16    A.   Yes.  These are copies of Dr. Schmidt's body diagram

17         depicting all of the injuries that we talked about, the

18         gunshot wound, the blunt force injury, as well as the

19         sharp force injury.

20              One of the diagrams is a full body, and the

21         other is limited to the head.

22    Q.   Okay.  24 then shows?

23    A.   The head.

24    Q.   The head?  Okay.  All right.  And it's actually, there's

25         -- Are they fair and accurate diagrams of the injuries as
```

66

 1          described by Dr. Schmidt and drawn by Dr. Schmidt?

 2     A.   Yes.  They're just different views of the head.  One is

 3          the back of the head, the top of the head, and then the

 4          skull of the head.

 5               MR. HUTTING:  Okay.  Move to admit People's

 6          proposed 24 and 25.

 7               MR. KINNEY:  Your Honor, per our sidebar, can we

 8          talk about that later, just let them be proposed at this

 9          particular time?

10               THE COURT:  I'll reserve a ruling.

11               MR. HUTTING:  All right.

12     BY MR. HUTTING:

13     Q.   Showing you People's 24, what do we have here in People's

14          24?

15     A.   The diagram to the far left is the gunshot wound to the

16          back left of the head.  Dr. Schmidt likes to do these

17          fancy computer diagrams and he actually shows the location

18          of where the bullet was, that is to say the cervical neck/

19          brain stem region.  So again the direction of fire was

20          back-to-front and then just slightly downward where that

21          bullet is.

22     Q.   Okay.

23     A.   And then we're looking at the aerial or top view of the

24          head there.  There's a bruise on the left frontal scalp

25          region.

                                  67

```
 1   Q.   This one?

 2   A.   Yes.  There is that diamond or double-diamond-patterned

 3        abrasion present to the top of the head.  And adjacent or

 4        next to that is the three-inch long laceration or tear of

 5        the scalp, again both blunt force injuries.

 6   Q.   Okay.  And what do we have here, then, in 25?

 7   A.   The shaded areas represent the abrasions present on the

 8        forearms, back of the forearms, two on the left, one on

 9        the right.

10   Q.   That would be these that I'm pointing to now?

11   A.   Yes, sir.

12   Q.   Okay.

13   A.   And then the contusions or bruises, instead of seeing

14        multiple lines, they're shaded areas that include the

15        right eye, the back of the left head, just behind the left

16        ear.  I think I may have forgotten to mention that

17        earlier, I apologize.  And then the right hip region,

18        there's a broader area of bruising.

19   Q.   Okay.  And then down here on the back of that arm?

20   A.   Yes.  This is the two-and-a-half-inch long cut or incised

21        wound due to some sharp object.

22   Q.   Okay.  All right.  Are you familiar with the term in your

23        field called "signs of struggle"?

24   A.   Yes.

25   Q.   Okay.  Did Mr. Hill's body, in your expert opinion,
```

68

```
 1        viewing the autopsy records and reports, show signs of
 2        struggle?
 3   A.   Whenever an individual is trying to defend himself or
 4        herself against either some blunt or sharp object, there's
 5        a natural tendency to want to flex the arms to protect
 6        oneself or perhaps make an attempt to grab that object.
 7        And so the classic location in which we see injury, sharp
 8        force or blunt force injuries, such as abrasions or
 9        bruises, is indeed the back surfaces of the forearms, as
10        in this case.  So, yes, it's consistent with some type of
11        physical struggle or defense wound.
12   Q.   All right.  Was anything removed from the body of Mr. Hill
13        and turned over to the police?
14   A.   A bullet was recovered and retained through a proper chain
15        of custody.
16   Q.   Okay.  I'm going to show you an item that we've had the
17        court reporter mark as People's proposed Exhibit Number
18        26.  I'll get it open here in a minute.
19             THE COURT:  Do you require gloves, Mr. Hutting?
20             MR. HUTTING:  No.
21   BY MR. HUTTING:
22   Q.   Okay.  Opened up People's proposed 26.  There's a smaller
23        envelope inside of it.
24             Are you familiar with this type of envelope?
25   A.   I'm familiar with Dr. Schmidt's sloppy handwriting, as
```

1        well as the envelope.

2   Q.   Okay.

3   A.   And it is labeled as being a projectile recovered from the

4        deceased, Bernard Hill, and the case number 473-06.  It's

5        signed by Dr. Schmidt, the date of autopsy.  And the part

6        or organ of the body from which the bullet was recovered

7        is labeled as "the neck".

8   Q.   Okay.  And it is standard protocol for the Medical

9        Examiner's Office when they recover a bullet like this

10       from the body to place it in an envelope like this and put

11       those markings on it?

12  A.   Yes.  In fact, at the very end of the report, you can see

13       the actual computerized chain of custody that said it went

14       from Dr. Schmidt's hands to our investigator, to the store

15       room, to our investigator, and then Sergeant Moore from

16       DPD Homicide retrieved the bullet and took it to the crime

17       lab.

18  Q.   Okay.  All right.

19            MR. HUTTING:  Move to admit People's proposed

20       26.

21            MR. KINNEY:  I'm still asking you to reserve,

22       your Honor.

23            THE COURT:  I'll reserve.

24  BY MR. HUTTING:

25  Q.   What's that, Doctor Loewe?

70

```
 1   A.   I would classify this as a large caliber bullet that's

 2        jacketed; in other words, got a coating, usually copper,

 3        that improves aerodynamic stability to the bullet.  Its

 4        exact caliber is not up to me, it's up to the firearms

 5        expert.

 6   Q.   Okay.  That's the spent bullet that Dr. Schmidt removed

 7        from the decedent's head?

 8   A.   Yes.

 9   Q.   Okay, Doctor Loewe, based on your experience and training,

10        based on your review of the records here, can you tell

11        this jury with reasonable expert certainty what the cause

12        of death of Mr. Bernard Hill was?

13   A.   Mr. Bernard Hill, a 22-year-old black male, died of a

14        single gunshot wound to the back of the head.

15   Q.   And can you tell this jury what the manner of death was?

16   A.   The manner of death is homicide.

17   Q.   And what do we mean by homicide?

18   A.   The medical examiner's definition of homicide is the

19        killing of one person based on the actions of another

20        individual.

21   Q.   Thank you, Doctor.

22             MR. HUTTING:  Nothing further.

23             WITNESS LOEWE:  You're welcome.

24             MR. HUTTING:  Submit for cross.

25             THE COURT:  Mr. Kinney.
```

```
 1                    MR. KINNEY:  Thank you, your Honor.

 2                    THE COURT:  You're welcome.

 3

 4    CROSS-EXAMINATION BY MR. KINNEY:

 5    Q.   Good afternoon, Doctor.

 6    A.   Good afternoon.

 7    Q.   I think I'd be correct in saying you worked for the

 8         Medical Examiner's Office in 2006?

 9    A.   Yes.

10    Q.   Okay.  And, in fact, January the 16th, 2006, is when this

11         particular autopsy was done?

12    A.   Correct.

13    Q.   And you were -- you were assistant chief then; am I

14         correct?

15    A.   No, I would have still have been deputy chief, as opposed

16         to an assistant medical examiner.

17    Q.   Okay.  I'm sorry.

18    A.   No problem.

19    Q.   You were deputy chief, January 16th, 2006?

20    A.   Yes.

21    Q.   Okay.  And did you aid Dr. Schmidt in this particular

22         autopsy?

23    A.   No.  He's my superior, he doesn't need my help.

24    Q.   I didn't ask you that.  I'm asking you, did you?

25    A.   I don't even recall if I saw the body on this particular
```

```
 1        day.  We're a high-volume office.  We make every attempt
 2        to participate, but I don't recall.
 3   Q.   Okay.  And the first time that you saw this report was
 4        when?
 5   A.   Dr. Schmidt informed me that he would be on vacation this
 6        week --
 7   Q.   Excuse me.
 8   A.   -- and asked me to review the file.
 9             MR. KINNEY:  Your Honor, I'm going to ask you to
10        ask the Doctor to answer the questions that I'm asking.
11        She seems to be narrating.
12             MR. HUTTING:  Judge, I object.  You know, he
13        asked the question, the Doctor is responding to the
14        question.  If he doesn't like the answer, he can't cut her
15        off.  She's responding to his question.
16             THE COURT:  Doctor Loewe, I need you to answer
17        only the questions being asked of you by either of the
18        lawyers; okay?
19             WITNESS LOEWE:  Absolutely, your Honor.
20             THE COURT:  Thank you.
21             Satisfied, Mr. Kinney?
22             MR. KINNEY:  Yes, your Honor.  Thank you.
23   BY MR. KINNEY:
24   Q.   Doctor Loewe, did you have an opportunity to speak with --
25        When was the first -- My question was, when was the first
```

```
 1        time that you saw this particular report?
 2   A.   The day that I was asked to cover for Dr. Schmidt --
 3   Q.   What day?
 4   A.   -- and then today I reviewed it again.
 5   Q.   And what day was that?
 6   A.   I don't recall what day he told me he was going to be
 7        gone, to be honest with you.
 8   Q.   Okay.  Dr. Schmidt left for vacation on what day?
 9   A.   I don't -- He just notified me he would be off this week.
10        I don't recall what day he said I need you to cover this
11        case in court, to be honest with you.
12   Q.   Okay.  But you -- That means that sometime last week was
13        the first time that you saw this particular file?
14   A.   And then re-reviewed it today.
15   Q.   And re-reviewed it today?
16   A.   Yes.
17   Q.   Okay.  And when you saw the file last week was Dr. Schmidt
18        in your presence?
19   A.   Yes.
20   Q.   Okay.  So you reviewed the file with Dr. Schmidt sometime
21        last week?
22   A.   No.  I was in the elevator on the way out the door and he
23        said I need you to go to court.  And I said have a great
24        vacation.
25   Q.   My question was did you review the file with Dr. Schmidt?
```

```
 1   A.   No, I reviewed it on my own.

 2   Q.   Okay.  All right.

 3             And does that mean, correct me if I'm wrong, did

 4        you have an opportunity to discuss this particular file

 5        with Dr. Schmidt?

 6   A.   No.  Everything was straightforward, there was no need for

 7        that.

 8   Q.   Did you have an opportunity to discuss this file with Dr.

 9        Schmidt?

10   A.   No.

11   Q.   All right.  The other wounds, in your opinion, besides the

12        gunshot wound, were not life-threatening?

13   A.   Correct.

14   Q.   Okay.  So the diamond-shaped bruise that you said that was

15        what Dr. Schmidt called it; correct?

16   A.   Yes.

17   Q.   And you said that that particular wound did something to

18        the outer table of the skull?

19   A.   No.  You're confusing that with the laceration, sir.

20   Q.   Okay.  So there was -- just to the right of the

21        diamond-shape bruise, there was a deep three-inch long

22        laceration with indentation of the outer table of the

23        skull?

24   A.   That's correct.

25   Q.   That was not caused by the diamond-shaped bruise?
```

75

```
 1   A.   Correct.

 2   Q.   Okay.  What was that caused by?

 3   A.   Some blunt force object.

 4   Q.   All right.  And it did have an indentation in the outer

 5        table of the skull?

 6   A.   Correct.

 7   Q.   That's not life-threatening?

 8   A.   No.  It may have stunned, you know, Mr. Hill, but not

 9        caused death.

10   Q.   Okay.  Where was Mr. Hill's body found?

11   A.   If I can refer to my notes, please, my file?

12   Q.   Dr. Schmidt's notes?

13   A.   Well, it would actually be a report generated by our

14        investigator, sir.

15   Q.   It's not Dr. Schmidt's notes?

16   A.   No, he's not an investigator, he's the chief medical

17        examiner.

18   Q.   We know that.

19             It's not Dr. Schmidt's notes?

20             MR. HUTTING:  Objection.  I'm going to object to

21        that comment, Judge.  That's a comment.

22             THE COURT:  Well, listen, we're going to

23        start -- from this point, gentlemen, we'll refrain from

24        any foreign commentary.  Let's just, for the sake of this

25        jury that's trying to take notes and pay attention, let's
```

```
 1            just adhere to a question and answer format.

 2                    Go ahead, Mr. Kinney.

 3     BY MR. KINNEY:

 4     Q.   Okay.  Dr. Schmidt is not an investigator?

 5     A.   Correct.

 6     Q.   Who is the investigator?

 7     A.   In this particular case, sir, our investigator, Richard

 8          Ivy, took information from Officer Garcia, who reported

 9          the death to our office.  And the body of Mr. Hill was

10          found deceased, located at the entrance to an apartment

11          complex located on Seven Mile Road, near apartment 302, in

12          Detroit.

13     Q.   Okay.  It was found near the apartment or down at the

14          bottom of the stairs?

15     A.   He was lying -- it was reported he was lying on the floor

16          at the entrance to the apartment complex, and this is the

17          complex where he resided.

18     Q.   All right.  And do you have an investigator named Geary

19          (phonetic)?

20     A.   Yes, sir.

21     Q.   Was it Investigator Geary or Investigator Ivy?

22     A.   According to my report it says Investigator Ivy.

23     Q.   Okay.  So you're indicating that Investigator Ivy is the

24          one who went and picked up the body?

25     A.   If I'm allowed to explain?
```

77

1   Q.   Did Investigator Ivy pick up Mr. Hill?

2   A.   No.

3   Q.   Did Investigator Geary pick up Mr. Hill?

4   A.   No.

5   Q.   Someone from your office picked up Mr. Hill?

6   A.   No.

7   Q.   Okay.  Do you have an identification form in your file?

8   A.   Yes, sir.

9   Q.   Okay.  And does your -- the file from your office indicate

10       who picked up Mr. Hill?

11  A.   No.

12  Q.   It does not?

13  A.   No.

14  Q.   Okay.  Do you have anything in your files that indicate

15       who picked up Mr. Hill?

16  A.   No.

17  Q.   So you don't know who picked up Mr. Hill?

18  A.   If I'm allowed to explain?

19  Q.   So you don't know who picked up Mr. Hill?

20  A.   No, I don't.

21  Q.   Okay.  In terms of the -- And you called it signs of

22       struggle?

23  A.   Yes.

24  Q.   And are you saying that's a theory?

25  A.   Based on my training and experience and the location and

78

```
 1        nature of the wounds, that's why I opined what I did.
 2   Q.   Okay.  And when you're doing an autopsy, are you actually
 3        looking for signs of struggle?
 4   A.   We're looking for any type of trauma.
 5   Q.   Okay.
 6   A.   Classifying it and recording the location and the nature
 7        of the wound.
 8   Q.   And you actually retained the bullet so that it could be
 9        sent to the lab?
10   A.   No.
11   Q.   Why didn't you retain the bullet?
12   A.   Because I didn't do the case.
13   Q.   Okay.  You didn't retain the bullet because you didn't do
14        the case.
15   A.   Correct.
16   Q.   All right.  So now, your office's policy, or Doctor
17        Schmidt, would Dr. Schmidt do anything that you wouldn't
18        do?  Generally, is there some kind of protocol that you
19        all have?
20   A.   Yes.
21   Q.   Okay.  You think Dr. Schmidt would follow the protocol?
22   A.   Yes, as documented in the report, sir, the chain of
23        custody.
24   Q.   So normally would you all collect the bullet?
25   A.   Yes.
```

1  Q.   And it was done in this case by Dr. Schmidt?

2  A.   Yes.

3  Q.   And that's according to the report; correct?

4  A.   Yes.

5  Q.   What purpose would you retain the bullet for?

6  A.   For purposes of analyzing the evidence and to ensure that

7       a record log is kept relative to the transfer of that

8       evidence.

9  Q.   And when you say analyzing evidence, that evidence would

10      be the bullet?

11 A.   Yes.

12 Q.   So it would be analyzed -- You would expect it to be

13      analyzed by the lab?

14 A.   Correct.

15 Q.   Okay.  And it was taken to a lab in this case?

16 A.   Yes.

17 Q.   What lab was it taken to, or do you know?

18           MR. HUTTING:  Well, you know, Judge, that's

19      beyond her knowledge, beyond any doctor's knowledge.

20           THE COURT:  Well, I think it's a fair question.

21      And I indicated at the outset, I'd give you both wide

22      latitude.  The objection is overruled.  Go ahead.  If she

23      knows.

24 BY MR. KINNEY:

25 Q.   Only if you know.

80

```
 1   A.   Projectiles are taken to the Michigan State Police.

 2   Q.   Okay.  And is it possible to collect DNA samples?

 3   A.   Yes.

 4   Q.   From Mr. Hill?

 5   A.   Yes.

 6   Q.   Okay.  And does the record says that any attempt was made?

 7   A.   If I can look at my notes?

 8   Q.   I don't have any objection.

 9   A.   It's recorded here that fingernail clippings were the only

10        evidence collected.

11   Q.   So fingernail clippings were collected?

12   A.   Yes, sir.

13   Q.   When you collect fingernail clippings would that -- does

14        it say anything about scraping underneath the fingernails

15        to try to collect whatever might be underneath the

16        fingernails?

17   A.   Yes.  We look for any tissue, blood that simply collects

18        in the nails.

19   Q.   Was the nail -- I mean, because, let me ask you this:  In

20        terms of the sign of struggle, the first thing I thought

21        about when you said defensive wound was maybe he was

22        fighting with whoever attacked him, and scratches or

23        collecting some kind of skin or blood from his attacker

24        would be under his nails; is that a possibility?

25   A.   Yes.
```

1    Q.    Is that why you collect the nails?

2    A.    Yes.

3    Q.    Okay.  And they were placed in an evidence tag?

4    A.    Yes.

5    Q.    And they were sent to the lab, as well?

6    A.    Yes.

7    Q.    Okay.  Now the results still come to your office; don't

8          they?

9    A.    Correct.

10   Q.    But you're confident that your office collected, when they

11         were collecting these fingernail clippings, was doing

12         everything possible to collect whatever signs of struggle

13         that may have been under those nails along with the

14         fingernail?

15   A.    Yes, sir.

16   Q.    What about the lacerations on the arms?  I think you

17         indicated that there was a laceration on the back of an

18         arm, back of the left arm; am I correct?

19   A.    No, sir.  We have abrasions and a cut on an incised wound.

20   Q.    An abrasion, and then you said a cut?

21   A.    Yes.

22   Q.    That's what I was asking about, a cut.  Was I saying

23         something --

24   A.    Not the same thing as a laceration, sir.

25   Q.    Okay.  All right.  What's a laceration?

 1   A.   Laceration, I -- as I mentioned, is one of three hallmark
 2        injuries associated with blunt force trauma.  A cut is
 3        sharp force injury.
 4   Q.   Right.  Is there bleeding or anything like that generally
 5        from a laceration?  That means you can have a laceration
 6        that's not bleeding?
 7   A.   For the most part, a laceration is from crushing and
 8        shearing with the soft tissue.  So usually there's some
 9        blood because it's an open wound.
10   Q.   Okay.  And then there's also a -- definitely an open wound
11        from a cut?
12   A.   Yes.
13   Q.   Okay.  These open wounds, was there any attempt to find
14        DNA?  Or do you think that would even help, finding DNA
15        from these open wounds?
16   A.   No.
17   Q.   It wouldn't help?
18   A.   No.
19   Q.   Okay.  The blood itself, was there any indication that
20        there was blood on his hands?
21   A.   No.
22   Q.   Okay.  And we're certain that Mr. Hill's body didn't go to
23        a hospital first where they might, you know, clean his
24        body up in terms of trying to save his life, you know,
25        swab him down or anything like that?  He came directly to

1     your office; am I correct?

2  A.  He was found dead at the scene, correct.

3  Q.  He was found dead at the scene.

4  A.  Yes.

5  Q.  And that means I'm correct in saying that his body went

6     from the scene to your office?

7  A.  Yes.

8  Q.  Okay.  And -- Okay.  I don't know if I -- if you answered

9     my question about the blood on the hands.

10        Was there any blood or anything like that on his

11     hands?

12  A.  Nothing is reported in the report, sir.

13  Q.  Nothing's -- That means we don't know, or that means that

14     more than likely if Dr. Schmidt didn't put it in there,

15     there's no blood on his hands?

16  A.  Correct, I would agree with the latter.

17  Q.  With the latter.  Okay.

18        Because, Dr. Schmidt, if there was blood on his

19     hands, he would have recorded that?

20  A.  Yes.

21  Q.  I can't hear you.

22  A.  Yes, sir.

23  Q.  Okay.  There were pictures taken; am I correct?

24  A.  Yes.

25  Q.  All right.  And either -- either -- I don't know if it's

84

 1          in the picture or just in the report itself, but what I'm

 2          asking about is, it seems to be a cut on the inside --

 3                  MR. HUTTING:  Objection.  If Mr. Kinney is going

 4          to refer to pictures, then I think these pictures need to

 5          come into evidence, Judge.  I have copies of them here --

 6                  MR. KINNEY:  I'm sorry, your Honor, but Mr.

 7          Hutting is going to have an opportunity in a minute --

 8                  THE COURT:  Well, let's stop right now,

 9          gentlemen.  Only one of you can speak at a time for Mrs.

10          Bauer's benefit.

11                  MR. KINNEY:  I apologize.

12                  THE COURT:  As talented as she is, she can only

13          accurately record one voice at a time.  It also is

14          confusing for the jury when there are multiple people

15          speaking.  You both have been here before.  We're going to

16          take our time.  I don't cut anyone short.  I just have to

17          insist that it be done in an orderly fashion; okay?

18                  MR. KINNEY:  Yes, sir.

19                  THE COURT:  Okay.  Where were we?

20                  MR. HUTTING:  My objection is that if Mr. Kinney

21          is going to refer to pictures and start asking the Doctor

22          about pictures, we have the pictures, the pictures need to

23          be marked and they need to be entered into evidence.

24                  THE COURT:  Response?

25                  MR. KINNEY:  I'm -- Unless the Court is

1          indicating that my cross-examination is improper, I'm

2          going to finish my cross-examination and let Mr. Hutting

3          does what he want to do.

4                    THE COURT:  Go ahead.

5                    MR. KINNEY:  Thank you, your Honor.

6                    THE COURT:  You can both try your own cases.  Go

7          ahead.

8                    MR. KINNEY:  Thank you, your Honor.

9    BY MR. KINNEY:

10   Q.   Doctor Loewe?

11   A.   Yes.

12   Q.   Is there an indication that there is a cut on the inside

13        of one of his arms?  And I'm speaking of Mr. Hill.

14                  I'll tell you what, it seems to have a number

15        underneath it.  Would that -- If I give you that number --

16   A.   Yes.  I see it.

17   Q.   06-00473F-011.

18   A.   Yes.

19   Q.   You see that picture?

20   A.   Yes, sir.

21   Q.   Am I correct in saying that that seems to be a cut there?

22   A.   Yes.  Actually that's on the inner aspect of the left

23        wrist.

24   Q.   An inner aspect?

25   A.   And not the outer aspect, as depicted on the diagram.

86

1   Q.   Okay.

2   A.   Yes.

3   Q.   And am I correct in saying that the diagram is incorrect?

4   A.   Correct.

5   Q.   And that the picture, it speaks better than the diagram?

6   A.   Yes, sir.

7   Q.   Okay.  Is there any indication, other than the diagram,

8        that there is a cut on the back of -- Does that -- I'm

9        going to stay right on there.  Yes.  The diagram shows it

10       on the back of the wrist; am I correct?

11  A.   Yes.

12  Q.   And is it possible that he has a cut on the back and the

13       front of the wrist, or are we clear that the diagram is

14       incorrect?

15  A.   The diagram is incorrect.

16  Q.   Okay.

17  A.   Because it has left -- back of his left hand is in the

18       next picture.

19  Q.   All right.  So that's the same hand?

20  A.   Yes.

21  Q.   Okay.  And there's no cut on the back of that hand?

22  A.   Correct.

23  Q.   Now the picture that you have, is that the original

24       picture or is it a clear picture or is it --

25  A.   Yes, they're very nice.  They're from our former

1    photographer.

2  Q.   All right.  And is there any indication that there's any

3       abrasions or cuts on Mr. Hill's knuckles on the picture of

4       the back of his wrist.  Do you see his knuckles here?

5       Because I have a copy.  What I have is a copy, but I can't

6       tell.

7            You say you have the originals?

8  A.   Yes.

9  Q.   Do you see what I'm talking about?

10 A.   No.

11 Q.   Okay.

12          MR. KINNEY:  Your Honor, can I approach?

13          THE COURT:  Throughout the trial, you can both

14      approach witnesses.

15          MR. KINNEY:  Thank you.

16          THE COURT:  You're welcome.

17 BY MR. KINNEY:

18 Q.   Is there anything, or is that just something dark there?

19 A.   This small, minute thing here, sir?

20 Q.   Yes.

21 A.   It's hard to say it's so small.  I don't know.

22 Q.   Does it seem to be a cut?

23 A.   Maybe a small abrasion.

24 Q.   All right.

25 A.   This is just fingerprint ink.

1    Q.    Fingerprint ink, okay.

2    A.    Yes.

3    Q.    Okay.  Fingerprint ink on the back of his hand?

4    A.    No, on his fingers.  He was fingerprinted for ID purposes

5          or elimination prints.  They tend to get the ink all over

6          the hand, sir.

7    Q.    Okay.  So even though the fingerprints were -- for the

8          fingerprints, it could be some ink on the back of the

9          hands?

10   A.    Yes.

11   Q.    And that's what you believe that is?

12   A.    Yes.

13               MR. KINNEY:  Okay.  No further questions, your

14         Honor.

15               THE COURT:  Mr. Hutting.

16               MR. HUTTING:  Yes, your Honor.

17

18   RE-DIRECT EXAMINATION BY MR. HUTTING:

19   Q.    When you were on cross-examination, Mr. Kinney was asking

20         you some questions about how the body gets picked up and

21         the procedure that's used for that.  And you wanted to

22         explain.  Can you explain that for the jury, please?

23   A.    Yes.  Our investigators do not pick up the body, but we

24         subcontract a professional body removal service that

25         transports the body from the scene to the Medical

```
 1        Examiner's Office.  They are not our employees or our
 2        investigators.
 3   Q.   Okay.  And Investigator Ivy, the -- How -- Can you explain
 4        how he took down the information that he imparted to the
 5        file?
 6   A.   Yes.  He gets the call from Officer Garcia, responds to
 7        the scene, gathers information, and then makes a report,
 8        may take his own photographs.  And then after all the
 9        evidence is collected and the information is shared, then
10        they give the green light to the professional removal
11        service, whose only job is to essentially transport the
12        body.
13   Q.   Okay.  A person by the name of Bobby Geary, does he work
14        for your office?
15   A.   He's currently retired, but he was an investigator.
16   Q.   He retired?
17   A.   Yes.
18   Q.   All right.  Got two retirements then.
19             All right.  Go ahead?
20   A.   Investigator Ivy also works for our office.
21   Q.   Okay.  Bodies are identified in your office; is that
22        correct?
23   A.   Yes.  Yes.
24   Q.   Is a form filled out when a body is identified?
25   A.   Yes, sir.
```

1    Q.    Okay.  And who is the investigator that handled the

2          identification procedure in this case?

3    A.    That was our investigator, Bobby Geary.

4    Q.    Okay.  Now when bullets are removed from the body, like

5          they are here today, the Wayne County Medical Examiner's

6          Office doesn't keep them in their office forever; is that

7          correct?

8    A.    Well, they are kept in a storeroom, sir, until they are

9          retrieved by Homicide.

10   Q.    Okay.  And then they are turned over to DP -- in this

11         case, since it was a Detroit case, it would be turned over

12         to DPD Homicide?

13   A.    Correct.

14   Q.    And then it's DPD homicide's job to send that item for

15         analysis to whoever they think needs to do an analysis?

16   A.    Correct.

17   Q.    Okay.  All right.  You mentioned fingerprints.  Tell the

18         jury, with every homicide that occurs in the City of

19         Detroit, what the Detroit Police Department does while --

20         with every body that they have that comes to the morgue in

21         the City of Detroit, what's done with that body in terms

22         of fingerprinting?

23   A.    An individual may be fingerprinted for one of two reasons,

24         either to establish or an attempt to establish

25         identification if a body is, say, burned, decomposed and

 1          not identifiable by just a visual look at the face.

 2                  The second reason is, in all homicide victims,

 3          the body is fingerprinted again in an attempt to identify

 4          the victim and also if that person's fingerprints are

 5          already in a computerized system called AFIS, once a

 6          person is declared deceased, then this allows their

 7          fingerprints to be removed from the AFIS data collection

 8          system.

 9     Q.   So if I understand your answer correctly, every homicide

10          that occurs in the City of Detroit --

11     A.   Yes.

12     Q.   -- that person gets fingerprinted?

13     A.   Yes.

14     Q.   Okay.  One other question.  Let me just show you this item

15          here for a second.

16     A.   Okay.

17     Q.   Okay.  Is it the policy, if you know, of the Medical

18          Examiner's Office, to take blood from the decedent so that

19          that can be also used for different forensic analysis?

20     A.   Yes.

21     Q.   Okay.  All right.  And does it indicate that that was done

22          to the decedent in this particular case?

23     A.   Yes.

24     Q.   Okay.  Finally, let's get marked a photograph.  Let me

25          show you what I have here.

```
 1                    Are these the photographs that you were looking
 2           at?
 3   A.      Yes, sir.
 4                    MR. HUTTING:  Okay.  Let's get them marked.  27
 5           and 28, please.
 6                    Is yours better than this one?
 7                    WITNESS LOEWE:  No, they're about the same
 8           quality, sure.
 9                    MR. KINNEY:  Well, what I would ask is if they
10           are the same quality is that the ones that you brought be
11           marked instead of the ones that Mr. Hutting has, if it's
12           okay?
13                    MR. HUTTING:  Sure.  I'll trade you.
14                    MR. KINNEY:  Thank you.
15                    PEOPLE'S EXHIBITS 27 AND 28 MARKED
16                    FOR IDENTIFICATION
17   BY MR. HUTTING:
18   Q.      People's proposed Exhibits 27 and 28 are what, please,
19           Doctor?
20   A.      They're composite photos of all of the injuries to Mr.
21           Hill's body, including his head, extremities.
22   Q.      All right.  Okay.  Fair and accurate photographs of those
23           injuries?
24   A.      Well, there was one discrepancy, as we alluded to earlier,
25           and that is that the cut was on the inner aspect of the
```

93

```
 1          left forearm and not the outer aspect, as depicted in this
 2          diagram; otherwise, they're all accurate, sir.
 3   Q.     Okay, all right.  Starting here, up at the top, as the
 4          jury would look at it, would be the top right.  Yep, okay.
 5               What do we have in this picture here up at the
 6          top right?
 7   A.     A bruise --
 8   Q.     Go ahead.
 9               MR. KINNEY:  Can we approach for a second, your
10          Honor?
11               (At about 3:12 p.m., brief sidebar;
12               At about 5:13 p.m., back on the Record.)
13               MR. HUTTING:  I'm sorry, your Honor, I'd move to
14          admit People's proposed Exhibits 27 and 28.
15               MR. KINNEY:  No objections.
16               THE COURT:  Offered and received.
17               PEOPLE'S EXHIBITS 27, 28 ADMITTED
18               INTO EVIDENCE
19   BY MR. HUTTING:
20   Q.     Let's start here, as I look at it, it's at the top right,
21          this one right here.  Can you tell the jury what we have
22          there in that photograph and what's of significance in
23          that photograph of Mr. Hill?
24   A.     The face of Mr. Hill is depicted, as well as the swelling
25          and bruising of the right eye.
```

94

```
 1    Q.    Okay.  All right.  In the middle picture, across the top
 2          of the head, on the top line here, what do we have there?
 3    A.    This is the laceration to the top of his head measuring
 4          three inches.
 5    Q.    Okay.  At the top line, the far picture there would be on
 6          the top left, as you look at it, what do we have there?
 7    A.    This is the gunshot entrance wound to the left side of the
 8          back of the head.  And as a routine, we shave the scalp
 9          here surrounding the wound, so that's why the hair is
10          absent.
11    Q.    Okay.  Obviously there was no exit wound; is that correct?
12    A.    Correct.
13    Q.    Also, though, how do you know it's an entrance wound?
14    A.    Well, first of all, it's the only hole.  And second of
15          all, the entrance wound takes on certain characteristics;
16          that is to say, it's a circular punched-out looking defect
17          with a rim of abrasion or scraping of the skin surrounding
18          the hole.
19    Q.    Does an exit wound look different than an entrance wound?
20    A.    An exit wound, as opposed to being circular, looks more
21          slit-like.  There's no scraping of the skin and the
22          margins of the wound can be put back together.  There's no
23          missing punched-out piece of tissue.
24    Q.    Did this have the classic signs of an entrance wound?
25    A.    Yes.
```

95

1   Q.   Okay.  Moving down just below that, do we have, I take it,

2        a close-up of that entrance wound?

3   A.   Yes, sir.

4   Q.   Okay.  Moving to the middle, in the second row across,

5        what do we have there?

6   A.   Can I see?

7   Q.   Okay.  This one.

8   A.   That is the laceration to the scalp.  And adjacent to that

9        or next to that, you can see that set of diamond-patterned

10       contusion right next to the laceration.

11  Q.   Okay.  Then the one where we have the close-up of the

12       bottom lip of the decedent, what's that taken for and the

13       significance of that?

14  A.   Mostly ID purposes.  It looks like there may be some

15       drying and maybe even a very small tear in the lining of

16       the lip.

17  Q.   Okay.  All right.  Moving down, we have this cut right

18       here.

19  A.   Yes, the cut present on the inner aspect of the left

20       forearm.

21  Q.   Okay.  Then the next two are -- moving across that line

22       would be the head and the eye again?

23  A.   Yes.

24  Q.   All right.  Then let's go down here to this arm, along the

25       bottom, what do we have here?

96

1    A.    Just a very minute, maybe, abrasion, it's hard to say, and

2          some tattoo marks.

3    Q.    Okay.  All right.  How about this one over here?  It's at

4          the bottom where I have my finger, Doctor.

5    A.    Yes.  As we referred to on the body diagram, there was a

6          broad contusion or bruise on the hip, I think the right

7          hip.

8    Q.    All right.  And finally we have one final picture taken on

9          the second page here.

10   A.    Yes.

11   Q.    28.

12   A.    Looks like some abrasions and lacerations on the right

13         hand.

14   Q.    Okay.  All right.  So in terms of the diagram that we

15         have, 24 is correct?

16   A.    Yes.

17   Q.    Okay.  On 25, the mistake is what?

18   A.    The cut should be on the inner aspect, not the outer

19         aspect of the left forearm.

20   Q.    Okay.  So this --

21   A.    Yes.

22   Q.    -- this cut that we have here should be on the other side?

23   A.    Yes.

24   Q.    Okay.  All right.

25               MR. HUTTING:  Thank you very much.

                                    97

```
 1                    WITNESS LOEWE:  You're welcome.

 2                    THE COURT:  Mr. Kinney.

 3                    MR. KINNEY:  Thank you, your Honor.

 4

 5    RECROSS EXAMINATION BY MR. KINNEY:

 6    Q.   Doctor, just concerning the questions that I was asking

 7         you about the fingerprints and the nails, and then you

 8         indicated that what I thought may have been some kind of

 9         wound on the back of the hands was probably

10         fingerprinting; is that right?

11    A.   Fingerprint ink, yes.

12    Q.   Okay.  That seems to suggest that the pictures were taken

13         after he was fingerprinted?

14    A.   Yes.

15    Q.   All right.  Correct me if I'm wrong, you're the expert,

16         but were there any fingerprints taken of how his body

17         looked at the time of death, you know, before you put the

18         fingerprint ink on there?  Am I correct that that ink

19         would hide if there was any bruising on his hand?

20    A.   Well, when the officer comes in to fingerprint a decedent,

21         they have to get an okay by the doctor.

22    Q.   Okay.

23    A.   In other words, we would take the nails first --

24    Q.   That's what I'm asking.

25    A.   -- examine the hands for any wounds, and then say, okay,
```

```
 1           it's all clear, you can print.
 2    Q.    Okay.  So even though you didn't do this autopsy, you're
 3           certain that these fingerprints -- the fingerprint
 4           process -- Well, first of all, the fingerprinting process
 5           would taint any evidence that you would find?
 6    A.    Yes.
 7    Q.    All right.  So and that's the reason for trying to find
 8           the evidence before you fingerprint the body?
 9    A.    Yes, sir.
10    Q.    Okay.  So you're confident, even though you're indicating
11           that the pictures were taken -- and the pictures are in
12           evidence; correct?
13    A.    Yes.
14    Q.    And they were taken after the fingerprinting?  The taking
15           of the fingernail clips and whatever was underneath those
16           fingerprints, you're certain that that was done before any
17           fingerprinting was done?
18    A.    Yes, that's our protocol.
19    Q.    Okay.  Well, why weren't -- Are you saying that there were
20           no pictures taken of these areas of the body before the
21           fingerprinting was done?
22    A.    Right.  Just after the printing, the hands were
23           photographed.
24    Q.    Just after, not before?
25    A.    Right.
```

1    Q.   And that's part of your alls protocol, too?

2    A.   Well, the morgue is busy.  We may have 12 bodies.  We have

3         evidence -- or we have fingerprinting, we have photography

4         going on.  We have autopsies going on.  And so we triage

5         every case.  And quite often it's busy.  And once things

6         need to be done in a proper sequence, we're done.

7    Q.   Okay.  So this particular case, it's not your protocol,

8         you would have preferred that the pictures be taken before

9         the fingerprints?

10   A.   Right.  But if you have, say, five or six homicides in a

11        busy day, sometimes people are photographed with

12        fingerprint ink.

13   Q.   Okay.  So that was a mistake?

14   A.   Not really.  There were no injuries masked because the

15        hands were first examined by the pathologist.

16   Q.   And what does the pathologist say about the hands?

17   A.   That there were no injuries discernable.

18   Q.   Where is that in there?

19   A.   Well, they're not mentioned under "evidence of injury".

20   Q.   They're not mentioned?

21   A.   Right.

22   Q.   Okay.  But you indicated that there was some kind of

23        abrasion on the back of one of his hands, just now.

24   A.   The wrist area, sir.

25   Q.   Is that in the report?  That's something that you found

100

1      today.

2   A.   That's what it appears to be in the photograph.

3   Q.   Something you found today, not something that was in Dr.

4      Schmidt's report?

5   A.   It's difficult to say.  It could even be a healing ulcer

6      or some kind of skin lesion.  I can't say from the

7      photograph.

8   Q.   Whatever that is, it's not in Dr. Schmidt's report; you

9      found it today?

10   A.   Right.  It also appears that there are other skin lesions

11      further up on the wrist area and then some tattoos.  So it

12      may not even be a wound.  It may be a healing ulcer, a

13      skin lesion.  It's hard to say.

14   Q.   Dr. Schmidt didn't talk about that?

15   A.   Right.

16   Q.   Is there an evidence tag number for the fingerprint

17      evidence -- I mean, not the fingerprint, the fingernails

18      and whatever was underneath the fingernails?  That was put

19      in some kind of a bag; am I correct?

20   A.   We would have a chain of custody relative to that

21      evidence.

22   Q.   Can you tell us --

23   A.   Regarding how it's tagged, that would be up to --

24   Q.   That would be just like what you testified to about the

25      bullet?

1    A.    Right.

2    Q.    Okay.  So now when you testified about the bullet, you

3          said there was a proper chain of custody in the removal

4          and retention of the bullet?

5    A.    Right.

6    Q.    Correct?

7    A.    Um-hmm, yes.

8    Q.    And you told us who removed it.

9    A.    Yes, Dr. Schmidt.

10   Q.    And it went from Dr. Schmidt to who?

11   A.    To Investigator Hewlett.

12   Q.    That's the bullet; right?

13   A.    Yes.  Yes, Mark Hewlett.  It's on page seven, sir.

14   Q.    Okay.  And it went from -- page seven?

15   A.    Yes.

16   Q.    Okay.  Mark Hewlett.  Then it goes to the storeroom?

17   A.    Correct.

18   Q.    And then it goes to the Detroit Police Homicide?

19   A.    Well, it goes back to Mark Hewlett once Officer Moore

20         requests it.

21   Q.    Okay.  That's the bullet, slash, neck?

22   A.    Yes.

23   Q.    And that was because it was removed from the neck;

24         correct?

25   A.    Yes.

1    Q.    And that's only talking about the bullet?

2    A.    Yes.

3    Q.    Okay.  Now the fingerprint -- I mean the fingernail

4          clippings, do we have that -- are you confident in

5          saying -- telling us that it was removed by Dr. Schmidt

6          and it was given to someone; can you do that?  Show me

7          where that is.

8    A.    There is an evidence chain of custody record with Bernard

9          Hill in the case number indicating that fingernail

10         clippings were removed by David.  He's one of our autopsy

11         technicians.

12   Q.    Can you tell me what page that is?

13   A.    It's a -- I don't -- It's not part of the computer-

14         generated report, it's a separate document.

15   Q.    So that's a document that we don't have?

16   A.    Right.

17   Q.    Okay.  Can I see that document?

18   A.    Yes.

19   Q.    Okay.  Now that particular document says that there were

20         finger -- finger -- fingernails?

21   A.    Yes.

22   Q.    Fingernail clippings.  Not the whole fingernail, just

23         clippings from the fingernail?

24   A.    Yes.

25   Q.    And they were taken by who?

1   A.   David Howell.

2   Q.   And David Howell is what to your office?

3   A.   An autopsy technician.

4   Q.   Okay.  So what is an autopsy technician's job?

5   A.   They are responsible for undressing the bodies,

6        photographing the body for visual ID purposes,

7        eviscerating or gutting the body.

8   Q.   Wait.  Photographing the body for?

9   A.   Just visual purposes, not for evidence.

10  Q.   So there are photographs of Mr. Hill -- there should be

11       photographs of Mr. Hill's body before any fingerprinting

12       then?

13  A.   No, sir.  Most individuals in the morgue are identified

14       visually; in other words, the face is wiped from

15       secretions.  We take a clean, white sheet and wrap it

16       around the face, capture the face on video screen, so when

17       the next of kin comes into the morgue, they're taken into

18       a private room in the lobby, shown that face on a video

19       screen to make it as pleasant as possible, and say yes or

20       no, this is Mr. Bernard Hill.

21  Q.   I see.  So that's not for evidence?

22  A.   Right.

23  Q.   So there's no -- Okay, I got you.

24            What happened to the fingernails?  They were

25       taken by, you said, Mr. Howell?

```
1    A.   Yes.

2    Q.   And Mr. Howell did what with them?

3    A.   Retained them as evidence, put them in a storage facility,

4         refrigerator 175.

5    Q.   And then what happened to them?

6    A.   At the bottom of the document, it indicates that the

7         evidence was destroyed on 10/19/09, presumably because it

8         was never picked up.

9    Q.   Presumably because it was never --

10   A.   Yes.  We only retain evidence for so long.  If it's not

11        picked up, it's destroyed.

12   Q.   That's the same as, I'm guessing that it was destroyed

13        because nobody picked it up?

14   A.   Correct.

15   Q.   You don't have any evidence that nobody came to get that?

16   A.   I do, because it's -- there's no signature for who it was

17        transferred to.

18   Q.   Okay.  Is that the only copy of that you have?

19   A.   Yes.

20   Q.   Okay.  I need to see it.

21   A.   No problem.

22             MR. KINNEY:  I'd like to have this marked then.

23             MR. HUTTING:  Can we have that xeroxed so the

24   Doctor can have that back and mark the xerox?

25             MR. KINNEY:  I have no objection to that, Judge.
```

```
1                    THE COURT:  You know, while this is being done,
2         I'm going to let the jury have their afternoon break,
3         we're running late on that, because we're going to
4         continue on for a few minutes.
5                    Ladies and gentlemen, this will be your
6         afternoon break.
7                    Witness, you can step down, Doctor Loewe.
8                    See you in a few minutes, don't discuss the
9         case.  I'll see you in ten minutes sharp.
10                   DEPUTY SHERIFF:  All rise.
11                   (At about 3:28 p.m., jury panel excused.)
12                   THE COURT:  We'll see you in ten minutes.  We'll
13        try to finish this witness.
14                   (At about 3:28 p.m., brief recess;
15                   At about 3:42 p.m., back on the Record.)
16                   THE COURT:  I was going to invite the jurors
17        back, but there's something that we need to discuss before
18        the jury returns?  I was hoping to get through this
19        witness today.
20                   MR. KINNEY:  Let's do the witness.
21                   THE COURT:  Finish the witness?
22                   MR. KINNEY:  Yes.
23                   THE COURT:  Something we can deal with after?
24                   MR. KINNEY:  Yes, sir.
25                   THE COURT:  Okay.  Bring in the jury, please.
```

```
1                    DEPUTY SHERIFF:  All rise for the jury.

2                    (At about 3:42 p.m., jury panel seated.)

3                    DEPUTY SHERIFF:  Please be seated.

4                    THE COURT:  Mr. Kinney.

5                    MR. KINNEY:  Yes, your Honor, thank you.

6                    THE COURT:  You're welcome.

7                    MR. KINNEY:  At this particular time, your

8        Honor, I would move for admission of Defendant's Exhibit

9        A.

10                   THE COURT:  Has it been marked now?

11                   MR. KINNEY:  Yes, it has been marked.

12                   MR. HUTTING:  No objection.

13                   MR. KINNEY:  Thank you.

14                   THE COURT:  Defense Exhibit A is offered and

15       received into evidence without objection.  And just for

16       the Record, that is the what, Mr. Kinney?

17                   MR. KINNEY:  This is the evidence chain of

18       custody record for fingernail clippings that was taken

19       from Bernard Hill dated 01/16/06, and it says that it was

20       destroyed October the 19th of '09.

21                   Is that correct, Doctor?

22                   WITNESS LOEWE:  Yes, sir.

23                   THE COURT:  And that's Defense Exhibit A?

24                   MR. KINNEY:  Yes, sir.

25                   THE COURT:  Offered and received --
```

```
1                    MR. KINNEY:  Thank you.

2                    THE COURT:  -- into evidence without objection.

3                    DEFENSE EXHIBIT A ADMITTED

4                    INTO EVIDENCE

5    BY MR. KINNEY:

6    Q.   Is there -- Doctor, is there any -- it doesn't indicate

7         who destroyed the evidence; does it?

8    A.   No.

9    Q.   Okay.  Do you know, is there any kind of protocol that

10        says who is supposed to destroy it?

11   A.   Yes.  One of our supervisors in the investigative

12        department, Val Knight, is responsible for that.

13   Q.   All right.  And Investigator Ivy and Investigator Knight,

14        they were Homicide detectives at one time?

15   A.   Yes.  I know Knight was.  I'm not sure about Rick Ivy.

16   Q.   Well, he was a Detroit police officer anyway?

17   A.   Yes, he was.

18   Q.   Okay.  And so with that kind of training, that kind of

19        background, being in Homicide, is it part of the protocol

20        before they destroy these fingernail clippings, they would

21        have contacted Homicide to make sure they don't need them?

22   A.   I don't know for sure, but that makes reasonable sense to

23        me, but I really don't know what the protocol is.

24                   MR. KINNEY:  Okay.  Thank you.

25                   WITNESS LOEWE:  You're welcome.
```

```
 1                      THE COURT:  May the witness step down and be

 2         excused?

 3                      MR. HUTTING:  I have a couple questions.

 4                      THE COURT:  We've covered, according to my

 5         notes, direct, redirect, cross, recross; am I correct?

 6                      MR. HUTTING:  We have.  And there's an area that

 7         I forgot.

 8                      THE COURT:  I'm sorry.

 9                      MR. HUTTING:  I thought we had wide open here,

10         Judge.

11                      THE COURT:  We do, but we've covered direct,

12         redirect, cross, recross.  The witness is excused.  Thank

13         you.  You may step down.

14                      WITNESS LOEWE:  Thank you, your Honor.

15                      THE COURT:  You're welcome.

16                      MR. HUTTING:  Thank you, Doctor.

17                      THE COURT:  Is there another witness?

18                      MR. HUTTING:  We do, and he's coming right out.

19                      THE COURT:  Raise your right hand.  Identify

20         yourself by your full name, please?

21                      WITNESS NIARHOS:  William James Niarhos.

22                      THE COURT:  Do you solemnly swear or affirm that

23         any testimony that you give regarding this matter will be

24         the truth?

25                      WITNESS NIARHOS:  I do.
```

```
 1                        WILLIAM JAMES NIARHOS,

 2          called as a witness at 3:46 p.m., having first been duly

 3          sworn by the Court, was examined and testified on his oath

 4          as follows:

 5                        THE COURT:  All right.  Please have a seat, make

 6          yourself comfortable, pull the microphone close to your

 7          mouth and speak loudly and clearly for our jury.

 8                        WITNESS NIARHOS:  Yes, sir.

 9                        THE COURT:  Thank you, Mr. Niarhos.

10                        Mr. Hutting.

11                        MR. HUTTING:  Thank you.

12                        THE COURT:  You're welcome.

13

14     DIRECT EXAMINATION BY MR. HUTTING:

15     Q.   I know that you've given your name to the Court for the

16          Record, but we need your name.

17     A.   William James Niarhos.

18     Q.   Place of employment?

19     A.   Detroit Police Department.

20     Q.   How long?

21     A.   Thirty-three years.

22     Q.   Thirty-three?

23     A.   Yes, sir.

24     Q.   What do you do for the Detroit Police Department?

25     A.   I'm assigned to the Evidence Tech Unit.
```

1   Q.   How long assigned?

2   A.   Since 1997.

3   Q.   Thirteen years?

4   A.   Thirteen years.

5   Q.   Okay.  What do you do as an evidence tech?

6   A.   As an evidence tech, we're responsible for scene

7        documentation.

8   Q.   What does that mean?

9   A.   Means we respond to a priority one run, usually over the

10       radio.  We meet with an officer in charge, we receive

11       preliminary information on what the scene entails, which

12       is normally photographs, search and collection of

13       evidence, we do fingerprints, we do DNA, a number of

14       things.

15  Q.   Okay.  What percentage of your work, if you can tell us,

16       involves homicide scenes?

17  A.   Over the course of a year?

18  Q.   Yes, sir.

19  A.   I would say probably about 70 -- 75 to 80 percent.

20  Q.   Okay.  Officer Niarhos, let's go back to the early morning

21       hours in January of 2006.  Were you working and on duty?

22  A.   Yes, sir, I was.

23  Q.   Okay.  And did you have occasion during those early

24       morning hours to go to a location at 20415 West Seven

25       Mile, in the City of Detroit?

111

```
 1  A.   I believe that was the address.

 2            May I look at my report?

 3  Q.   Sure.

 4  A.   20415 West Seven Mile?

 5  Q.   Yes, sir.

 6  A.   That's correct.

 7  Q.   Okay.  What's located there at that address?

 8  A.   Twenty-two unit apartment building.

 9  Q.   Okay.  And what kind of a run was this?

10  A.   It was regarding a fatal shooting.

11  Q.   All right.  And did you meet with an officer in charge?

12  A.   I first met with a scout car crew, Northwest 53.

13  Q.   Okay.

14  A.   Shortly thereafter, the Homicide section arrived.

15  Q.   Okay.

16  A.   Which was Sergeant Walton and Investigator Pearson.

17  Q.   All right.  And what -- Were you by yourself or did you

18       have a partner that day?

19  A.   I had a partner.

20  Q.   What was his or her name?

21  A.   Her name was -- is Latrelle McNairy, M-C-N-A-I-R-Y.

22  Q.   All right.  What did you and Officer McNairy do as you

23       processed the scene that morning?

24  A.   It was my responsibility that night to document the scene

25       with evidence collection and a report and a sketch.  It
```

1       was her responsibility to photograph the scene and assist

2       me.

3   Q.   Okay.  All right.  And basically overall what did the

4       scene consist of?

5   A.   The decedent was still on the scene.

6   Q.   Okay.

7   A.   He was on the first floor of the building, and it appeared

8       the scene began on the third floor, in apartment 302.

9           Do you want a description of the scene?

10   Q.   Just briefly.

11   A.   The scene was on the first floor.  Climbing the stairway

12       to the second floor was a suspected blood trail.  On the

13       second floor landing was a casing.  On the third floor,

14       again, was a blood trail that led through another set of

15       doors into apartment 302.  Outside of the apartment is a

16       landing.  There was another casing on the landing, there

17       was a golf club shaft.

18           I then entered the apartment itself, 302.  It

19       had an outer storm door with a glass insert.  That glass

20       was shattered and it was on the floor, both inside and

21       outside of the apartment.  The door itself had been

22       forced, causing damage to the locking mechanism and the

23       door frame.

24           Inside the apartment, it appeared that a

25       struggle occurred.  There was broken furniture, kitchen

```
 1          furniture in one corner.  Among the furniture was a golf

 2          club head, itself, a phone, a knit cap.  The knit cap was

 3          by the television and it looked like the face of it was

 4          smashed inward.  Basically that's what entailed the scene.

 5   Q.    Okay.  All right.  So the scene was documented by both

 6          diagram and photographs?

 7   A.    And the report, yes, sir.

 8   Q.    And the report.  Okay.

 9                I'm going to show you an item that I'm going to

10          ask the court reporter to mark as People's proposed

11          Exhibit 1-A.

12                     PEOPLE'S EXHIBIT 1-A MARKED

13                     FOR IDENTIFICATION

14   BY MR. HUTTING:

15   Q.    Officer Niarhos, showing you People's proposed Exhibit

16          1-A, do you recognize People's proposed Exhibit 1-A?

17   A.    Yes, sir.

18   Q.    Tell the jury what it is.

19   A.    It's a blown-up version of the sketch that I generated

20          regarding that scene.

21   Q.    You have the absolute original sketch with you today?

22   A.    I do.

23   Q.    All right.  Is this a fair and accurate diagram of the

24          scene as you saw it and as you found it that morning?

25   A.    Yes, sir.
```

114

1    Q.   Okay.  All right.

2              MR. HUTTING:  Move to admit People's proposed

3         Exhibit 1-A.

4              MR. KINNEY:  No objection.

5              THE COURT:  Offered and received.

6              MR. HUTTING:  Thank you, your Honor.

7              THE COURT:  You're welcome.

8              PEOPLE'S EXHIBIT 1-A ADMITTED

9              INTO EVIDENCE

10             MR. HUTTING:  I also have another request, your

11        Honor.  I have, so that the jury can follow along, copies

12        of People's 1A.

13             THE COURT:  Does Mr. Kinney have one, as well?

14             MR. HUTTING:  He most certainly can.  I have one

15        for the Court, also.

16   BY MR. HUTTING:

17   Q.   And what I would ask is that I'm going to have Officer

18        Niarhos and I go through the question and answer form and

19        explain the diagram.

20             THE COURT:  Mr. Kinney, you may reposition

21        yourself at any time.

22             The same applies to you, Mr. Hutting.

23             MR. HUTTING:  Thank you.

24             MR. KINNEY:  I was going to ask, if everyone is

25        going to have a copy, the instrument be placed so that Mr.

115

```
 1        Dantzler can see it, as well, if we're going to do the

 2        copy.

 3                MR. HUTTING:  Well, I got one for Mr. Dantzler,

 4        too, Judge.  But I think it's going to be kind of far away

 5        for everybody to see and for him --

 6                THE COURT:  Mr. Kinney is satisfied if there's a

 7        copy for Mr. Dantzler.

 8                MR. HUTTING:  Okay.

 9                THE COURT:  Is that correct, Mr. Kinney?

10                MR. KINNEY:  That's correct, Judge.

11                MR. HUTTING:  So we'll bring it over here closer

12        then.

13    BY MR. HUTTING:

14    Q.   All right.  Officer Niarhos, looking at the diagram, do we

15         have a directional on the diagram?

16    A.   Sure.  Our typical DPD sketches, north is always on top of

17         the sheet, top of the sketch, so we're looking in a

18         northerly direction.

19    Q.   Okay.

20    A.   Which would be towards Seven Mile.

21    Q.   All right.  And let's start over here on the bottom right

22         corner of the diagram, as you look at it.  You have items

23         listed A through I.  What do those stand for?

24    A.   Different pieces of evidence that was collected.

25    Q.   Okay.  So if we go to the body of the diagram, we have
```

```
 1            different items here that are marked A through I; is that
 2            correct?
 3    A.      Except for C.
 4    Q.      Okay.  All right.  And the legend, then, tells us what
 5            those are?
 6    A.      Yes, sir.
 7    Q.      All right.  Let's start at the bottom and kind of work our
 8            way up.
 9                    What is this area right here where D and E are
10            marked?  What are those, please?
11    A.      That's a north/south walkway, would be to the west of the
12            apartments on that side of the building.
13    Q.      Okay.  All right.  And on the original that we have here,
14            or the blow-up, okay, there are red markings on there;
15            what are those things, please?
16    A.      It was suspected blood at the scene.  To me, it was a
17            blood trail leaving the apartment in a northerly
18            direction.
19    Q.      Okay.  All right.  Where is apartment 302 then?
20    A.      It's this apartment right here.
21    Q.      Okay.
22    A.      It's marked 302 in this area right here.
23    Q.      All right.  What do we have here at the entrance to 302,
24            and what does that signify?
25    A.      The little asterisk on the floor is shattered glass from
```

117

1          this outer storm door.

2     Q.   Okay.

3     A.   This straight line here going in a northeast direction was

4          the inner door, which has been forced.  It damaged the

5          locking mechanism in the door frame.

6     Q.   Okay.  All right.  What do we have when we go into this

7          apartment?

8     A.   Okay.  Well, we'll go with number A, first.  This is a

9          television and a TV set in this corner right here.  On the

10         floor beneath it was a knit cap that I collected.

11    Q.   Okay.

12    A.   Over in this direction --

13    Q.   And the knit cap, you marked as A?

14    A.   Yes, I'm sorry, A.

15    Q.   Designated as A?

16    A.   Yes.  B was in this area here.  Among the broken kitchen

17         furniture was a golf club, the head of a golf club.

18    Q.   Okay.

19    A.   C was a cell phone that -- I was advised later by Homicide

20         that we didn't need.  So it's here, but it's not here.

21    Q.   Okay.

22    A.   And now we're out in the -- Well --

23    Q.   What are H and I?

24    A.   H is an answering machine.  Machine is spelled wrong by

25         me.  And I is a cell phone.

1    Q.   Okay.

2    A.   That's what's inside of here.

3    Q.   All right.  Okay.  Right here at the front of the

4         apartment, what does that stand for?

5    A.   That's a window.

6    Q.   Okay.  All right.  How big was this apartment, as you

7         recall?

8    A.   Well --

9    Q.   I mean how many bedrooms are we talking about?

10   A.   It's a one-bedroom apartment.  It had a bathroom, small

11        kitchen, and the living room, which actually you could use

12        as a living room and a dining room, if you so choose.

13   Q.   All right.  What happens as we go out here on the walkway?

14   A.   Okay.  I'm exiting the door.  To the south of the door,

15        marked with a letter D is a golf club shaft, the head is

16        missing.

17   Q.   Okay.

18   A.   Above the door, north of the door on the walkway is a 380

19        caliber casing.

20   Q.   Okay.  All right.  What do we have over here that's marked

21        F?

22   A.   Okay.  If you walk south to the back wall of this hallway,

23        there's a series of steps that go down to a courtyard and

24        a parking area, but on the steps in this location right

25        here, marked F, is another golf club shaft, also missing

119

1         the head.

2    Q.   Okay.  Where was the decedent?  You said there was a

3         decedent at the scene, where would he be?

4    A.   I have a -- I don't know if -- there's another sketch

5         that's showing his positioning at the bottom of the -- You

6         have to walk this way north.  There's a door here that

7         leads to a landing.  Then there's a series of steps that

8         go down to the first floor.

9    Q.   Okay.

10   A.   And as you get to the first floor, at the bottom of the

11        stairs is where the decedent was found.

12   Q.   Okay.  All right.  Very good.  Over here now, I noticed

13        that there are, at least on the original, or on Exhibit

14        1-A, there are two corrections; is that correct?

15   A.   Yes.

16   Q.   Okay.  Who made those?

17   A.   I did.

18   Q.   Okay.  You made the first one to B; is that correct?

19   A.   Yes.

20   Q.   Okay.  So B, which is here inside the apartment, initially

21        it said "golf club shaft"?

22   A.   Yes.

23   Q.   Okay.  But it's not a shaft?

24   A.   It was the head.

25   Q.   It was the head of a golf club?

120

1   A.   Yes.

2   Q.   All right.  Are you a golfer?

3   A.   Miniature.

4   Q.   All right.  And I noticed also on F, at least on 1-A,

5       you've also made a correction; is that correct?

6   A.   Yes.  Yes.  That was a shaft and not the club, yes.

7   Q.   So F over here is a shaft?

8   A.   Yes, sir.

9   Q.   Okay.  All right.

10          MR. HUTTING:  With that in mind, let me get

11   these photographs marked, 1 through whatever.

12          THE COURT:  May I see the lawyers, briefly?

13          (At about 4:01 p.m., brief sidebar;

14          At about 4:04 p.m., back on the Record.)

15          THE COURT:  Ladies and gentlemen, we've

16   concluded for today, we've gone a few minutes past four

17   o'clock, and we'll pick it up tomorrow morning.

18          Were you all on time this morning?  Okay.

19   Tomorrow morning, we're going to arrive a little earlier

20   because I'd like to start this trial at nine o'clock

21   sharp; okay?  Matter of fact -- Wait a second.

22          Brenda, do you have --

23          All right.  Gentlemen, today you had

24   commitments.  Tomorrow I have a -- probably a 45-minute

25   obligation, something that was scheduled a long time

1     ago --

2             MR. HUTTING:  Sure.

3             THE COURT:  -- that I have to deal with outside

4     of this trial.

5             MR. HUTTING:  Sure.

6             THE COURT:  So I'm going to do that first thing

7     in the morning.  I'm going to have the jurors come in

8     tomorrow morning at -- I'll see you tomorrow morning at

9     8:45; okay?  We're going to get going at 8:45.

10            The other matter, I'm going to try to put to

11    another time.  So please be on time tomorrow.

12            Now the hour you're arriving tomorrow morning,

13    traffic is much more congested, parking space to find is

14    much more competitive, lines to gain entry into the

15    building are longer.  Then you get to compete for precious

16    elevator space.  This is an older building.  Trust me, not

17    all of the elevators are always operational; am I correct,

18    gentlemen?

19            MR. KINNEY:  Yes, you're correct.

20            MR. HUTTING:  Right.

21            THE COURT:  If you aim for about 8:00 -- Mr.

22    Kinney?

23            MR. KINNEY:  If I may, your Honor, can we

24    approach?

25            (At about 4:06 p.m., brief sidebar;

```
1              At about 4:08 p.m., back on the Record.)

2              THE COURT:  Ladies and gentlemen, see you

3    tomorrow morning at 8:45.  I expect someone's going to be

4    late tomorrow, in light of what I just shared with you.

5    If you aim for 8:30, you'll make it about 8:45, 8:50.

6    Believe me, there will be a fender-bender or something

7    that's going to tie you up.  We can't start till everybody

8    is here.

9              What happens if you're not here all on time?

10   Some lawyers come in and start groveling, please, do my

11   matter, I've got to be in Pontiac, I've got to be in here,

12   and then you do it for one and the next one comes in as

13   you're concluding, please, you did it for this lawyer,

14   please do it for me.  So please be on time, if you can,

15   tomorrow.

16             I talked to the lawyers realistically about

17   their estimate for this trial.  I don't think this trial

18   is going to conclude tomorrow.

19             Am I safe in telling them that?

20             MR. HUTTING:  I believe you're correct.

21             MR. KINNEY:  Yes, your Honor.

22             THE COURT:  So we don't meet on Friday, because

23   you're not going to be in deliberations.  We will resume

24   on Monday, just so you know, you can make your plans;

25   okay?  So leave your pads in here.  Don't discuss the case
```

123

```
 1      with anyone.  And I'll see you tomorrow morning at 8:45 to
 2      nine o'clock; okay?
 3               DEPUTY SHERIFF:  All rise for the jury.
 4               THE COURT:  Don't discuss the case with anyone.
 5      Wear your badges.
 6               (At about 4:11 p.m., jury panel excused.)
 7               DEPUTY SHERIFF:  Please be seated.
 8               THE COURT:  All right.  The jurors have exited
 9      the courtroom.  Is there something else we wanted to talk
10      about, gentlemen?
11               MR. KINNEY:  Your Honor, I was going to object
12      to the introduction of the ME's report because Doctor
13      Schmidt was not here.  But I've had an opportunity to talk
14      that over with Mr. Dantzler and we don't have any
15      objections to it.
16               THE COURT:  All right.
17               MR. HUTTING:  Nothing on behalf of the People.
18               THE COURT:  Okay.  We'll pick it up tomorrow
19      morning.  Please be on time, I think you generally are.
20      I'd like to start at 9:00 sharp.
21               MR. HUTTING:  Sure, I'll be here.
22               THE COURT:  Mr. Hutting?
23               MR. HUTTING:  Yes, sir.
24               THE COURT:  We're all aware of what you went
25      through personally.  If you wear down or you need a break,
```

1    like I told the jurors, please let me know.

2              MR. HUTTING:  I will.  I feel pretty good this

3    week, though, Judge.

4              THE COURT:  Okay.  Well, you look great and so

5    does Mr. Kinney.  So do your assistants.  Okay?

6              MR. HUTTING:  Okay.

7              THE COURT:  So I'll see you tomorrow morning and

8    we'll get going.  But I didn't think there was any chance,

9    any chance that we were going to finish this case

10   tomorrow.

11             MR. KINNEY:  We're trying, Judge.

12             THE COURT:  Between instructions, closing

13   arguments and everything else, this is not going to be

14   finished tomorrow.  So I thought rather than rush it,

15   we'll proceed on track and plan on going at least through

16   Monday.

17             MR. KINNEY:  Yes.

18             THE COURT:  All right.  Thank you.

19             MR. KINNEY:  Thank you, your Honor.

20             (At about 4:12 p.m., proceedings concluded.)

21                         *      *      *

22

23

24

25

125

```
 1                          C E R to I F I C A to E

 2

 3       STATE OF MICHIGAN)

 4                         )

 5       COUNTY OF WAYNE  )

 6

 7

 8            I, Becky L. Bauer, Certified Court Reporter of the

 9       Third Judicial Circuit Court, Criminal Division, Wayne

10       County, State of Michigan, do hereby certify that the

11       foregoing 128 pages comprise a full, true and correct

12       transcript of the proceedings and testimony taken in the

13       matter of the People of the State of Michigan versus

14       SAMUEL LEE DANTZLER, on December 15, 2010.

15

16

17

18                         _____

19                         Becky L. Bauer, CSR-3326

20                         Official Court Reporter

21

22

23       Date: _____

24

25
```

126

1

2                        INDEX TO EXAMINATIONS

3

4   Witness                                        Page

5

6      JURORS IMPANELED                            23

7      OPENING STATEMENT BY MR. HUTTING:           33

8      OPENING STATEMENT BY MR. KINNEY:            51

9      DOCTOR CHERYL LOEWE

10     DIRECT EXAMINATION BY MR. HUTTING:          58

11     CROSS-EXAMINATION BY MR. KINNEY:            72

12     RE-DIRECT EXAMINATION BY MR. HUTTING:       89

13     RECROSS EXAMINATION BY MR. KINNEY:          98

14     WILLIAM JAMES NIARHOS

15     DIRECT EXAMINATION BY MR. HUTTING:          110

16

17

18

19

20

21

22

23

24              (Index continued on Page 128.)

25

```
 1

 2                          INDEX TO EXHIBITS

 3

 4   Exhibit                                    Page

 5

 6      PEOPLE'S EXHIBITS 24, 25, AND 26 MARKED    66

 7      PEOPLE'S EXHIBITS 27 AND 28 MARKED         93

 8      PEOPLE'S EXHIBITS 27, 28 ADMITTED          94

 9      DEFENSE EXHIBIT A ADMITTED                 108

10      PEOPLE'S EXHIBIT 1-A MARKED                114

11      PEOPLE'S EXHIBIT 1-A ADMITTED              115

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```