```
 1                        STATE OF MICHIGAN

 2            THIRD JUDICIAL CIRCUIT COURT - WAYNE COUNTY

 3

 4    THE PEOPLE OF THE STATE OF MICHIGAN,

 5

 6    vs.                              Case No. 10-3521

 7

 8    SAMUEL LEE DANTZLER,

 9                 Defendant.

10                                         /

11

12                          JURY TRIAL

13        BEFORE THE HONORABLE GREGORY D. BILL, CIRCUIT JUDGE

14        701 Frank Murphy Hall of Justice, 1441 St. Antoine,

15            Detroit, Michigan - December 16, 2010

16    APPEARANCES:

17    For the People:         MR. AUGUSTUS W. HUTTING  P24839
                              MS. ANDREA LYNN HUTTING  P68606
18                            Wayne County Prosecutors Office
                              1441 St. Antoine
19                            Detroit, MI  48226
                              (313) 224-5777
20
      For the Defendant:      MR. ROBERT F. KINNEY, III  P35842
21                            MS. ALANNA P. O'ROURKE  P74210
                              Attorney at Law
22                            645 Griswold, Suite 1220
                              Detroit, MI  48226
23                            (313) 963-5310

24    REPORTED BY:            Becky L. Bauer (CSR-3326)
                              Certified Shorthand Reporter
25                            (313) 967-6928
```

1

```
 1        COMPUTER GENERATED INDEX AT THE END OF TRANSCRIPT

 2                  Detroit, Michigan

 3                  December 16, 2010

 4                  At or about 9:17 a.m.

 5                  (Court, Counsel and Defendants present.)

 6                          *       *       *

 7                  COURT CLERK:  People versus Samuel Lee Dantzler,

 8        circuit court docket number 10-3521, jury trial in

 9        progress.

10                  MR. HUTTING:  Auggie Hutting for the People.  We

11        are ready and prepared to proceed.

12                  MR. KINNEY:  Ready to proceed.  Good morning,

13        your Honor.  Robert Kinney appearing on behalf of Mr.

14        Dantzler.

15                  THE COURT:  Good morning.  Jury, please.

16                  DEPUTY SHERIFF:  Please come out and take your

17        seats.

18                  (At about 9:18 a.m., jury panel seated.)

19                  DEPUTY SHERIFF:  Please be seated.

20                  THE COURT:  Mr. Niarhos, good morning.

21                  WITNESS NIARHOS:  Good morning, sir.  How are

22        you?

23                  THE COURT:  I'm fine.

24                       WILLIAM JAMES NIARHOS,

25        re-called as a witness at 9:18 a.m., having previously
```

2

1        been duly sworn by the Court, was examined and testified

2        on his oath as follows:

3                THE COURT:  You remain under oath.  Pull the

4        microphone close to your mouth and please speak loudly and

5        clearly for the jury.

6                WITNESS NIARHOS:  Yes, sir.

7    DIRECT EXAMINATION BY MR. HUTTING (Continued):

8    Q.   Good morning, Officer Niarhos.

9    A.   Good morning, sir.

10   Q.   I think yesterday when we finished for the day, we had

11       basically just concluded you describing various things

12       that were here on the diagram.  What I want to do this

13       morning now is turn my attention to what I call the

14       photographs.  I'm going to show you what the court

15       reporter has marked as People's proposed Exhibits, I

16       think, 1 through 19, okay, and ask you to take a look at

17       those.  Tell me when you're done.

18   A.   Okay, sir.

19   Q.   Do you recognize those?

20   A.   Yes.

21   Q.   Can you tell the jury what they are?

22   A.   They're scene photographs.

23   Q.   Okay.  Taken that morning at the apartment and outside the

24       apartment over on West Seven Mile?

25   A.   Yes, sir.

1   Q.   Okay.  Are they fair and accurate photographs of the scene

2        as you and Officer McNairy saw it and found it that

3        morning?

4   A.   Yes, sir.

5   Q.   Okay.  Now I want to show you these things right here and

6        ask you if you recognize those?

7   A.   Yes, sir.

8   Q.   And can you tell the jury what those are?

9   A.   They're stickers that I made out at your office last week

10       regarding the photographs.

11  Q.   Okay.  And each of the photographs have a number on them

12       on the back that you put on?

13  A.   Yes, sir.

14  Q.   Okay.  Do each of the stickers also have a number?

15  A.   They do.

16  Q.   Do the sticker numbers correspond to the photograph

17       numbers?

18  A.   They should.

19  Q.   Okay.  And does what's written there by you on the

20       stickers accurately reflect what's in each individual

21       photograph?

22  A.   Yes, sir.

23  Q.   Okay.  So if somebody wanted to come back to the

24       photograph later at the end of this trial and look and if

25       there was a dispute as to what's in the photograph, the

```
1          sticker should be able to assist them in telling them
2          that; is that correct?
3    A.    Yes, sir.
4    Q.    Okay.  All right.
5                MR. HUTTING:  With that in mind, your Honor, I
6          would formally move to introduce the photographs and the
7          stickers that go along with the photographs.
8                THE COURT:  Have you seen these, Mr. Kinney?
9                MR. KINNEY:  Yes, I've seen these, your Honor.
10               THE COURT:  And these depict the scene?
11               MR. HUTTING:  Yes, your Honor.
12               MR. KINNEY:  No objection.
13               THE COURT:  Offered and received.
14               MR. HUTTING:  Thank you.
15               PEOPLE'S EXHIBITS 1 THROUGH 19 ADMITTED
16               INTO EVIDENCE
17   BY MR. HUTTING:
18   Q.    I'm going to take the photographs and I'm going to leave
19         you with the stickers, okay.  And I'm going to show you,
20         first of all, what's been marked here as People's Exhibit
21         Number 1 and entered as People's Exhibit Number 1.
22               Can you tell the jury what we have here in
23         People's Exhibit Number 1?
24   A.    Sure.  That's a view of the front of the building, 20415
25         West Seven Mile Road.  That was taken shortly after we
```

1        arrived on the scene.

2    Q.   All right.  So you're on the outside kind of looking

3         towards the building; is that correct?

4    A.   Right, that would be looking in the south direction.

5    Q.   Okay.  And where would the decedent be in relation to this

6         photograph?

7    A.   Looking at that front door, the decedent would be inside

8         that second door and to the left.

9    Q.   Okay.  All right.  What label did you make for Exhibit

10        Number 1, your number 1?

11   A.   I have photo 1 is camera facing south showing the front

12        entrance to 20415 West Seven Mile Road.

13   Q.   Okay.  Put that on there.

14   A.   Yes, sir.

15   Q.   All right.  I'll show you Exhibit Number 2 and show it to

16        Counsel also, Exhibit Number 2 here in my left hand, and

17        what do we have here in Exhibit Number 2, sir?

18   A.   That is a photograph of the decedent as he was when we

19        arrived.  He's at the base of the stairway, partially

20        against the -- it would be the east and the south -- and

21        the north wall.  The camera is looking south down the

22        stairway.

23   Q.   What's that covering him there?

24   A.   Pardon me?

25   Q.   There's something covering him.

```
 1   A.   Blue plastic sheets.  EMS usually leaves that at the

 2        scene.

 3   Q.   Okay.  All right.  And he would be -- There's a door that

 4        can be seen there at the bottom of Exhibit Number 2.  Is

 5        that the same door that we have here in Exhibit Number 1?

 6   A.   Yes, sir.

 7   Q.   Okay.  How was the deceased dressed, Officer Niarhos?

 8   A.   He only had a pair of shorts on, underwear shorts.

 9   Q.   No shoes?

10   A.   No shoes, no socks.

11   Q.   No shirt?

12   A.   No shirt.

13   Q.   Okay.  Just underwear?

14   A.   Yes.

15   Q.   All right.  What label did you make for Number 2?

16   A.   Number 2, I wrote:  Camera is facing north looking down

17        the landing, with overview of the complainant.

18   Q.   Okay.  Let's do Number 3, Exhibit 3, which is going to be

19        your label 3.

20   A.   Yes, sir.

21   Q.   Okay.  What do we have here in Exhibit Number 3?

22   A.   We have a placard G, which represents the casing in that

23        picture.  It's a 380 auto.

24   Q.   So this is a spent casing?

25   A.   Yes, sir.
```

1    Q.    Okay.  Tell the jury what a spent casing is, Officer

2          Niarhos, please.

3    A.    Well, a casing is part of the bullet.  That's the part of

4          the bullet that has the primer on the end.  It, at one

5          time, contained the gunpowder.  The projectile or the

6          bullet is pressed into that.  Once that primer is struck,

7          it causes an explosion where the bullet naturally leaves

8          the barrel.  The casing in a semi-automatic is normally

9          ejected to the right out of the weapon.

10   Q.    Okay.  How about in a revolver, what happens to the

11         casing?

12   A.    The casing stays in the revolver.

13   Q.    Okay.  Now this is G.  Is that on our diagram here?

14   A.    No.  No, it's not.

15   Q.    Okay.  Where is G going to be?

16   A.    Between the floors on the second floor landing.

17   Q.    All right.  What label did you make for G?

18   A.    G, I have:  Picture of casing, 380 auto, on the second

19         landing to the third floor.

20   Q.    Okay.  All right.  Let me show you -- Next, it's going to

21         be Exhibit Number 4.  It's going to be your label 4; okay?

22   A.    Yes, sir.

23   Q.    All right.  What do we have here in Exhibit Number 4, your

24         label number 4?

25   A.    In that photograph, we're on the third floor looking

```
 1           north.  There's a set of doors that divides two apartments
 2           to the back four apartments.  There's a door in between
 3           it.  That's the door.  You can see the landing going
 4           downward.  And there's also a light in the picture.
 5   Q.      Okay.  All right.
 6   A.      That's mainly, like, the lobby area.
 7   Q.      Is that drawn on this diagram at all?
 8   A.      It is.
 9   Q.      Where is that?  Use that little device.
10   A.      Okay.  It's this door right here.
11   Q.      Okay.
12   A.      There's an apartment to the east and there's an apartment
13           to the west.  You come through this door, takes you to the
14           back two apartments to the west and the scene apartment
15           and the rear apartment.
16   Q.      Okay.  So it's there where that, the marks of suspected
17           blood are?
18   A.      Yes, sir.
19   Q.      All right.  What label do you make for Number 4, sir?
20   A.      Number 4 is the camera is facing north, a view of the
21           third floor access door to Apartment 302, and showing the
22           stairway down to the main door.
23   Q.      Okay.  We're going to go with number -- Exhibit Number 5
24           next.
25   A.      Number 5 is placard number E, and shows a second 380 --
```

9

```
 1   Q.   Okay.  Hang on.

 2   A.   I'm sorry.

 3   Q.   So what do we have here in Number 5?

 4   A.   Placard E, which is another 380 auto casing.  That's on

 5        the walkway to the north of the front door of Apartment

 6        302.

 7   Q.   Okay.  That would be where on our diagram?

 8   A.   That would be right here, the letter E.

 9   Q.   Okay.  So just before the entrance to the Apartment 302?

10   A.   Yes.

11   Q.   Okay.  And it's another 380.

12             How do you know it's a 380?  Let me ask you

13        that.

14   A.   It's stamped on the end, the primer side of the casing.

15   Q.   Okay.  What label do you make for Number 5?

16   A.   Number 5 is the camera's facing south down the walkway

17        showing the 380 casing, which would be north of Apartment

18        302, placard E.

19   Q.   Okay.  And I think we're going to do the next two

20        together; okay?  It's going to be Exhibit 6, which is your

21        label 6 in my left hand?

22   A.   Yes, sir.

23   Q.   Okay.  And then Exhibit 7, which is going to be your label

24        7 here in my right hand?

25   A.   Okay.
```

1    Q.    Okay.  Let's talk about Exhibit Number 6 first.

2          Approximately where was Officer McNairy and where was she

3          photographing when she took Exhibit Number 6 here?

4    A.    That's a -- Well, the camera is looking south towards the

5          back of the building.  It's a medium range view of the

6          golf club shaft that's on the hallway, marked -- I believe

7          that's D.

8    Q.    Okay.

9    A.    Which would be right in this area right here.

10   Q.    Okay.  So the photograph, then, would be taken kind of in

11         this area?

12   A.    Correct.

13   Q.    Okay.  And you can see the golf club in the back?

14   A.    Yes, the golf club shaft.

15   Q.    Shaft in the distance.

16               And what do we have here then in 7?

17   A.    That's a close-up again showing the placard and the golf

18         club shaft.

19   Q.    So kind of one far away, and then she moves in and takes a

20         close-up?

21   A.    Correct.

22   Q.    All right.  What label did you make for Number 6, please?

23   A.    Number 6, camera facing south showing -- well, actually

24         that's a two-part picture.

25   Q.    Okay.  What else is in here?

1   A.   It's showing forced -- it's showing the access door and an

2        outer storm door to that apartment being forced.  There's

3        glass on the ground.

4   Q.   Okay.  All right.  And which -- Is that the door to which

5        apartment?

6   A.   Apartment 302.

7   Q.   Okay.  And would it be where I have my finger right there?

8        Is that the door to Apartment 302?

9   A.   Yes, sir.

10  Q.   Okay.  What's this -- Do you know what this is here on the

11       ground?

12  A.   I believe that's a part of the framing of the door.

13  Q.   Okay.  All right.  So what label do you make for Number 6?

14  A.   The camera's facing south, showing forced door to

15       Apartment 302, shattered glass from the outer storm door,

16       and the golf club shaft, placard D.

17  Q.   Okay.  Put that on there.  And what label do you make for

18       number 7 here?

19  A.   Number 7, just a close-up of the golf club shaft, placard

20       D.

21  Q.   Okay.  Let's go now to Exhibit 8, your label number 8.

22  A.   Okay.

23  Q.   And I'm going to keep Exhibit 6 in my left hand.

24            What do we have here in Exhibit Number 8,

25       Officer Niarhos?

 1   A.   The main focus of that photograph is to show the damage to
 2        the inner door, showing that it was forced.
 3   Q.   This would be the inner door to Apartment 302?
 4   A.   Yes, sir.
 5   Q.   Okay.  This apartment right here?
 6   A.   Yes.
 7   Q.   Okay.  Right where it says:  Door kicked in?
 8   A.   Yes.
 9   Q.   Okay.  What label do you make for Number 8 then?
10   A.   I have a photograph from inside Apartment 302 looking west
11        towards the broken glass from the storm door, damage from
12        the inner door being forced.
13   Q.   Okay.  I'm going to show you the next exhibit -- Well, I'm
14        going to do two of them together here.  I'm going to do 9
15        in my left hand and we're going to do 10 in my right hand;
16        okay?
17   A.   Okay.
18   Q.   Okay.  In Exhibit Number 9, using that laser and the
19        diagram, where are we focusing in, in Exhibit Number 9?
20   A.   We're focusing in this area right here.  There's damage to
21        what I call the dining room furniture.
22   Q.   Okay.  So it's in the diagram on Exhibit 1-A where it
23        says:  Broken dining room table --
24   A.   Yes, sir.
25   Q.   -- broken chair, overturned chair, and then there's three

13

```
 1        more letters there; right?
 2   A.   Yes, sir.
 3   Q.   Okay.  All right.
 4   A.   There's also an indention into the wall.  Something
 5        impacted the wall.
 6   Q.   Okay.  And where would that be in that photograph?
 7   A.   It's right here.
 8   Q.   Okay.  All right.  Right there.  That's where there's
 9        drywall; right?
10   A.   Yes.
11   Q.   Okay.  What label do you make for number 9, Officer
12        Niarhos?
13   A.   Number 9, I have photo looking north in the living room,
14        showing broken furniture, damage to the west wall and the
15        golf club head, placard B.
16   Q.   Placard B.
17   A.   Yes, sir.
18   Q.   Okay.  All right.  And number 10, what was the purpose of
19        taking number 10 and what does number 10 show?
20   A.   10, I have as close-up of the damage near the northwest
21        corner of the living room -- or actually it's the dining
22        room.  And again showing placard B in the damage, the golf
23        club head.
24   Q.   Okay.  Let's do 11 quickly.  What do we have here in 11,
25        and can it also be seen in 10?
```

14

1   A.   I'm sorry?

2   Q.   Here's 11.  Can it also be seen in 10 or not?

3   A.   Yes, sir.

4   Q.   Okay.  All right.  So what do we have in 11?

5   A.   I just have a close-up of the answering machine collected,

6        placard H in the sketch.

7   Q.   Okay.  All right.  Next, let me go to Exhibit Number 12,

8        your label 12.

9   A.   12 is a picture of a --

10  Q.   Okay.  Hang on a second.

11  A.   I'm sorry, pardon me.

12  Q.   What do we have in 12?

13  A.   12 is a picture of a television that's in this area right

14       here on the sketch.

15  Q.   Where it says TV there?

16  A.   Where it says TV.

17  Q.   Okay.

18  A.   The focus was the damage to the face of it.

19  Q.   Okay.  Broken?

20  A.   Yes, it's broken.

21  Q.   Okay.  All right.  What label do you make for number 12?

22  A.   Damage to the television in the living room.

23  Q.   All right.  Let's do 13 next.

24  A.   Okay.

25  Q.   What do we have here in Exhibit Number 13, Officer

```
 1        Niarhos?
 2   A.   We have a black knit cap that was on the floor near the
 3        television, a little bit west of the television.
 4   Q.   Okay.  All right.  Where is that on the diagram?
 5   A.   It would be this area right here.
 6   Q.   Okay.  And is the knit cap shown there on the diagram?
 7   A.   Yes, sir.
 8   Q.   With what placard?
 9   A.   That would be placard A.
10   Q.   Okay.  So that's where that cap was found?
11   A.   Yes, sir.
12   Q.   All right.  Ultimately was it placed on evidence?
13   A.   It was.
14   Q.   Okay.  What label do you make for 13?
15   A.   13, cap on the floor below the television.
16   Q.   Okay.  14 -- Actually we'll do -- Let's do 14 and 15
17        together.
18   A.   Okay.
19   Q.   What do we have in 14 and 15?
20   A.   Just a general photograph looking north towards the half
21        wall in the kitchen.  The main focus was letter C, which
22        was a cell phone which was -- the investigator just turned
23        that over to a resident of that apartment.  It wasn't
24        placed on evidence.
25   Q.   Okay.  And what label do you make for 14?
```

16

```
 1   A.   Camera showing half wall between the living room and the
 2        kitchen, placard C.
 3   Q.   Okay.  And C, what label do you make for 15?
 4   A.   Is a close-up of the cell phone, placard C.
 5   Q.   Let's do number 16 and 17 together.
 6   A.   17 appears to be a -- Gone.
 7   Q.   It fell off?
 8   A.   Yeah, it must have fell off.
 9   Q.   Okay.  Well, we'll get you to describe it.
10   A.   Sure.
11   Q.   Hang on here just a second.
12                  16 is what?
13   A.   Close-up of the kitchen, just a general photo.
14   Q.   17 is what?
15   A.   Can I see 17 again?
16   Q.   Sure can.
17   A.   17 is a picture of the bathroom.  And there is a sticker.
18        I just got the wrong number on it.
19   Q.   Okay.  All right.
20   A.   May I change it?
21   Q.   Sure.
22   A.   Okay.
23   Q.   All right.  Let's put the 16 label on.
24   A.   16 is the kitchen.
25   Q.   Let's put the 17 label on.
```

17

```
 1                    Okay.  Let's do 18 next, okay, which is going to
 2          be your label 19, actually, but --
 3     A.   Yes.  I'll change this to the 18.
 4     Q.   Okay.
 5     A.   That's a photo of the rear access door.  That door leads
 6          to a landing and the stairway that goes down to a
 7          courtyard.  And then to the south of the courtyard is a
 8          parking area for the complex.
 9     Q.   And where would the -- Is it on the diagram here or not?
10     A.   Yes, sir.
11     Q.   Where would it be on the diagram?
12     A.   That would be -- Well, it's kind of -- kind of -- you can
13          see the F.  It's right here on the background.
14     Q.   Okay.  So just below where the F is there?
15     A.   Yes.
16     Q.   Okay.  All right.  And finally we have Exhibit 19; okay?
17     A.   Okay.
18     Q.   All right.
19     A.   That's a close-up of the golf club shaft marked with
20          placard F.
21     Q.   Okay.  Which would be where on our diagram?
22     A.   In this area right here.
23     Q.   Okay.  So in essence then, we had how many shafts?
24     A.   Two.
25     Q.   All right.  Both not having any golf club head or iron on
```

18

1       them?

2   A.   Yes, sir.

3   Q.   Okay.  And we also found a head of a golf club; is that

4        correct?

5   A.   Yes, sir.

6   Q.   All right.  What label do you make for 19?

7   A.   19, I have --

8   Q.   Well, 19 or 20.

9   A.   I have:  Close-up of golf club shaft on the rear landing.

10  Q.   Okay.  Thank you very much.

11               Do you take into evidence things that are there?

12  A.   Yes, sir.

13  Q.   Okay.  Let me show you next, if I can, what's been marked

14       as People's proposed Exhibit Number 20, and it's on

15       Detroit Police Department evidence property tag E16225904.

16               Did you and Officer McNairy utilize that

17       evidence property tag that night?

18  A.   I'm sorry.  The tag, could I see the tag?

19  Q.   Sure.  Well, let me just -- the tag ends in 5904.

20  A.   Okay.

21  Q.   Did you utilize that tag?

22  A.   Yes, sir.

23  Q.   And what did you put on that tag?

24  A.   An RP 380 auto casing.

25  Q.   And where did that come from?

1    A.    That was on the landing to the north of the front door of

2          Apartment 302.

3    Q.    Okay.  And did that --

4    A.    I misspoke, I'm sorry.

5    Q.    All right.  Go ahead.

6    A.    That was the casing that was on the landing out -- the

7          landing going down to the main floor.  I misspoke on that.

8    Q.    All right.  And what placard letter did you give it?

9    A.    G, as in George.

10   Q.    G, as in George, okay.

11               Showing you this, is that the evidence tag?

12   A.    It is.

13   Q.    Okay.  Is that the envelope, the big envelope, that you

14         placed it in?

15   A.    Yes.

16   Q.    Okay.  Now when you placed it in there, did it have all

17         this other kind of tape on it?

18   A.    No.  The only tape that we place on it is the blue tape.

19   Q.    Okay.  Is this stuff sent anywhere for analysis?

20   A.    Yes.

21   Q.    Okay.  To what kind of a unit does it go for analysis?

22   A.    Those would have went to the firearm unit.

23   Q.    Okay.  All right.  And I notice also can it be maybe even

24         fumed or worked on for prints?

25   A.    Yes.

1   Q.   Okay.  How would that be done?

2   A.   That is sent out for that analysis, also.

3   Q.   Okay.  All right.  And do you know what kind of technique

4        they use for that?

5   A.   Laser.

6   Q.   Okay.  All right.  And DPD had a laser lab at the time?

7   A.   At the time we did, yes, sir.

8   Q.   Do you know a lady by the name of Mary Gross?

9   A.   Yes.

10  Q.   Who is Mary Gross?

11  A.   She's an evidence tech.  She was assigned to the laser

12       unit at that time.

13  Q.   Okay.  All right.  So other people work on this then?

14  A.   Yes.

15  Q.   Okay.  All right.  And then it gets tagged back up like

16       this?

17  A.   Yes.

18  Q.   Okay.  All right.  Get it open.  Kind of like breaking

19       into Fort Knox here.

20  A.   That's kind of the object.

21  Q.   What do we have here?

22  A.   This is the envelope that we use at the scene.  We will

23       put our evidence in this envelope and we mark it with the

24       letter G, 380 auto with the RP brand.

25  Q.   Okay.  All right.  I notice there's additional writing on

21

```
 1          there.  Do you put that stuff on there?
 2   A.    No, sir.
 3   Q.    Okay.  Other people who may come across it and do work on
 4          it put their letters or their numbers or case numbers on
 5          it?
 6   A.    Yes, sir.
 7   Q.    Okay.  So we have theirs.
 8   A.    May I show it to the jury?
 9   Q.    Move to -- Is that the 380 auto casing that you guys
10          picked up?
11   A.    It is.
12   Q.    Okay.
13               MR. HUTTING:  Move to admit People's proposed
14          Exhibit Number 20.
15               MR. KINNEY:  No objection.
16               THE COURT:  Offered and received.
17               PEOPLE'S EXHIBIT 20 ADMITTED
18               INTO EVIDENCE
19   BY MR. HUTTING:
20   Q.    Okay.  Show it to the jury.
21   A.    This is the casing, 380, the part that the projectile was
22          in, in the gunpowder.  And this is the primer, that's been
23          struck naturally, and it has the brand and caliber on it
24          stamped.
25   Q.    Okay.  All right.  Let me show you next People's proposed
```

22

1          21.  It's on evidence tag E16225704.

2                    Did you guys utilize that evidence property tag

3          that night?

4      A.   Yes, sir.

5      Q.   Okay.  What did you put on that?

6      A.   A 380 RP casing.

7      Q.   Okay.  And which one would that be?

8      A.   That is the casing that was on the walkway to the north of

9          the front door of 302.

10     Q.   Okay.  It's going to be E then?

11     A.   Yes.

12     Q.   Okay.  All right.  And if I went through all the gyrations

13         of opening this up, would I find in there the same kind of

14         envelope marked with an E on it?

15     A.   You should.

16     Q.   Okay.  All right.

17                   MR. HUTTING:  You know, Judge, I'm just going to

18         move to admit this, as opposed to -- you know, it's going

19         to take forever to open these things up.  But to move it

20         along, we can do it that way.

21                   MR. KINNEY:  I'm sorry?

22                   MR. HUTTING:  Move to admit it, you know, and it

23         can be an exhibit.  Or if you want, I can open it up.

24                   MR. KINNEY:  I don't have any objection.

25                   THE COURT:  What number is that?

23

1              MR. HUTTING:  That's Exhibit Number 21.

2              THE COURT:  And that is?

3              MR. HUTTING:  A 380 auto casing.  It's E on the

4        diagram.

5              THE COURT:  Offered and received without

6        objection?

7              MR. KINNEY:  No objection, your Honor.

8              THE COURT:  Thank you, Mr. Kinney.  Thank you,

9        Mr. Hutting.

10             PEOPLE'S EXHIBIT 21 ADMITTED

11             INTO EVIDENCE

12   BY MR. HUTTING:

13   Q.   Did you utilize evidence tag E16225404?

14   A.   Yes, sir.

15   Q.   What did you put on that evidence property tag?

16   A.   A black knit cap.

17   Q.   Okay.  And is that A on the diagram?

18   A.   Yes, sir.

19   Q.   Okay.  All right.  Showing you proposed 22.

20             Is that the evidence property tag?

21   A.   Yes, sir.

22   Q.   Whose handwriting is on there?

23   A.   It's in my handwriting.

24   Q.   Okay.  All right.  When you put it in there did it have

25        all this tape on it?

```
1    A.   Just the blue tape.

2    Q.   Just the blue tape across.  Okay.  All right.

3              So the stuff that says Bode Technology and stuff

4         like that, that wasn't on there at the time you did your

5         work?

6    A.   Correct.

7    Q.   Okay.  All right.  Get this thing open.  This thing on it,

8         is that your work or no?

9    A.   No.

10   Q.   No?

11   A.   No, sir.

12   Q.   Okay.  All right.  Fair enough.  Put that in there.

13             Okay.  And do you recognize this, sir?

14   A.   That's the hat I collected.

15   Q.   That's the hat you collected.  That's A on the diagram and

16        in that picture; is that correct?

17   A.   Yes, sir.

18             MR. HUTTING:  Move to admit People's proposed

19        22.

20             MR. KINNEY:  No objection.

21             THE COURT:  Offered and received.

22             MR. HUTTING:  Okay.  Minus, of course, this.  I

23        don't know exactly what this is; we'll have to get this

24        identified later by others; okay?

25             MR. KINNEY:  No objection.
```

25

```
 1                    MR. HUTTING:  All right.

 2                    PEOPLE'S EXHIBIT 22 ADMITTED

 3                    INTO EVIDENCE

 4                    MR. KINNEY:  Before you put it back in, Mr.

 5          Hutting, I'd like to just take a look at it.

 6                    MR. HUTTING:  Sure.

 7                    MR. KINNEY:  Thank you.

 8   BY MR. HUTTING:

 9   Q.    Did you utilize evidence property tag number E16225504?

10   A.    25504?

11   Q.    Yes, sir.

12   A.    Yes, sir.

13   Q.    Okay.  What did you put on there?

14   A.    Could I see that for a second?

15   Q.    Sure.

16   A.    Doesn't seem to --

17   Q.    Maybe I read the number wrong.

18   A.    That's the golf club head.

19   Q.    Okay.

20   A.    But it's D.  It says:  Golf club head --

21   Q.    Does it feel like it?

22   A.    No.  Unless they opened it up or something.  Well, I guess

23         it could be.  It could be split.  Maybe we should open

24         this one.

25   Q.    Well, is the evidence tag wrong or what's up?
```

1   A.   I have 16225504 is a golf club shaft.

2   Q.   Okay.

3   A.   And on here it says:  Golf club head.

4   Q.   Okay.  All right.  So could you have mixed up the head and

5        the shaft?

6   A.   Do you have 258 available?

7             THE COURT:  We may have to open this one.

8             MR. KINNEY:  No objection.

9   BY MR. HUTTING:

10  Q.   Open her up, see what you got there.

11  A.   Doesn't have our blue tape on it.

12            MR. KINNEY:  I couldn't hear you.

13            WITNESS NIARHOS:  This doesn't have our blue

14       tape on it.

15  BY MR. HUTTING:

16  Q.   Do you recognize the evidence tag number?

17  A.   Yeah.  The evidence tag --

18            THE COURT:  Do you have some scissors for him?

19            MR. HUTTING:  Yes, I do.

20  BY MR. HUTTING:

21  Q.   Who is the evidence tag made out by?

22  A.   Officer McNairy.

23  Q.   She was your partner that night?

24  A.   Yes, sir.

25  Q.   You guys worked together to do this?

27

1   A.   Yes.

2   Q.   Here, do you need that?

3            THE COURT:  That's good practice, if you

4        celebrate Christmas.

5            WITNESS NIARHOS:  Yes, I hope to.

6   A.   Okay.  This is --

7   BY MR. HUTTING:

8   Q.   That's your envelope?

9   A.   That's our envelope, this is the head.

10  Q.   Okay.  Take it out.

11  A.   The tape is too good.  It's the head.

12  Q.   Okay.  All right.  And that is --

13  A.   Should be --

14  Q.   -- F on the diagram?

15  A.   No.

16  Q.   No?

17  A.   No.  It should be -- Let me see my sketch.

18  Q.   It's B on the diagram?

19  A.   I believe so.  Yes.

20  Q.   Okay.

21           MR. HUTTING:  Move to admit People's proposed

22       Number 23.

23           MR. KINNEY:  Your Honor, I'm just not sure.  I

24       want my numbers to be right.  What's the evidence tag

25       number again?

```
 1                    MR. HUTTING:  Evidence tag number that is
 2          attached to this exhibit is E16225504.  Okay?
 3                    MR. KINNEY:  25504.
 4                    MR. HUTTING:  Yeah, E16225504.
 5                    MR. KINNEY:  And that's B in the sketch?
 6                    MR. HUTTING:  Yes.
 7                    MR. KINNEY:  No objections, your Honor.
 8                    THE COURT:  And that's the golf club head;
 9          correct?
10                    MR. HUTTING:  Yes.
11     A.   The tag, if I may speak?
12     BY MR. HUTTING:
13     Q.   Yes, sir.
14     A.   The tags are -- We have the right evidence, but they
15          appear to be on the wrong tag numbers.
16     Q.   Okay.  All right.
17                    MR. KINNEY:  You have the right evidence?
18     A.   The golf club head, that's marked "shaft", and it should
19          be the head.
20     BY MR. HUTTING:
21     Q.   Okay.  All right.  But on here, it's marked "head"?
22     A.   Yes.
23     Q.   Okay.  All right.  So when you made the report out, the
24          report was incorrect?
25     A.   Yes.
```

```
 1   Q.   Okay.  All right.  So you made a mistake in the report?

 2   A.   Yes.

 3   Q.   Did you write the report?

 4   A.   I wrote the report.

 5   Q.   Okay.  All right.  Did you do that intentionally?

 6   A.   No.

 7   Q.   Okay.  All right.

 8   A.   It's rather embarrassing.

 9   Q.   Is it all in that plastic when you guys took care of it?

10   A.   No.

11   Q.   Okay.  So you just put it in there; right?

12   A.   This was placed in the plastic by someone else.

13   Q.   Okay.  All right.

14   A.   Yeah, I just should have wrote -- everything else is the

15        same under that tag, except that I have shaft instead of

16        head.

17   Q.   All right.

18                  THE COURT:  Did you offer 23?

19                  MR. HUTTING:  Yes, I did.  I believe I did.  If

20        I didn't, I move to offer it, though.

21                  MR. KINNEY:  No objection.

22                  THE COURT:  All right.  Offered and received.

23                  MR. HUTTING:  Thank you, your Honor.

24                  PEOPLE'S EXHIBIT 23 ADMITTED

25                  INTO EVIDENCE
```

```
 1   BY MR. HUTTING:

 2   Q.   Okay.  Finally, let's go to this item right here, evidence

 3        tag number E16225804.  Did you use that tag that night?

 4   A.   Yes.

 5   Q.   Okay.  What did you put on that tag?

 6   A.   Metal golf club head.  I did metal golf club head.  That's

 7        the one that's interchanged with the one we spoke of, they

 8        should be just reversed.

 9   Q.   So this should be shaft?

10   A.   Yes.

11   Q.   Okay.  And does it say shaft on here?

12   A.   Yes.

13   Q.   Thank you.

14                THE COURT:  What was that?

15                MR. HUTTING:  It was my phone.  I'm sorry, your

16        Honor.

17                THE COURT:  Just chimes?

18                MR. HUTTING:  Yes, but it's on vibrate now, as

19        it should be.

20   BY MR. HUTTING:

21   Q.   Okay.  So you put the shaft -- and what shaft is on this

22        one?

23   A.   That should be D.

24   Q.   Okay.  All right.  Was it all circled up like this?

25   A.   It was wrapped.  Is there any blue tape on that?  I
```

31

 1      believe it's -- No, I believe it was repackaged.
 2  Q.  Okay.  So other people who did work on it repackaged it in
 3      that way?
 4  A.  Well, the blue tape is missing, but here's my writing on
 5      it; so we did package it, but the blue tape went missing,
 6      must have been taken it off or it's underneath this end
 7      piece.
 8  Q.  All right.  Fair enough.  And did you utilize evidence
 9      property tag E16225604 that night?
10  A.  Yes.
11  Q.  And what did you put on that?
12  A.  Golf club shaft.
13  Q.  Okay.  All right.
14  A.  That is correct.
15  Q.  Okay.  And what shaft is that?
16  A.  That's the one that was on the rear landing, the letter F
17      in the sketch.
18  Q.  Okay.  All right.  Fair enough.  And that's marked here as
19      People's proposed Exhibit Number 29.  Is it all done up
20      like this?
21  A.  No.
22  Q.  All right.  So other people who did work on it, put these
23      things on here?
24  A.  They kind of modified it, yes.
25  Q.  Okay.  All right.  And the prior exhibit was marked as

```
 1         People's proposed Exhibit Number 30; is that correct?
 2   A.    Yes, sir.
 3                MR. HUTTING:  Okay.  At this point, Judge, I'm
 4         just going to move for admission of these exhibits.
 5                THE COURT:  Both golf club shafts?
 6                MR. HUTTING:  Yes, both shafts, 29 and 30.
 7                MR. KINNEY:  No objection.
 8                THE COURT:  Offered and received.
 9                MR. HUTTING:  Okay.
10                PEOPLE'S EXHIBITS 29 AND 30 ADMITTED
11                INTO EVIDENCE
12   BY MR. HUTTING:
13   Q.    Let me ask you just one more question.
14                I noticed up in the top corner of Exhibit 1-A,
15         it has a date of 1/17/06.  Is that date correct?
16   A.    No.
17   Q.    Okay.  What should the date be?
18   A.    1/16.
19   Q.    Okay.  So you were out there the day before, not 1/17?
20   A.    Yes, sir.
21   Q.    Okay.
22   A.    It's also on the face of the report as one -- as the date
23         of the occurrence is 1/16.  And then the box where it says
24         date received, I also put 1/17, by mistake.
25   Q.    Okay.  So how long did you spend at this scene that night?
```

33

1   A.    Probably a couple hours.

2   Q.    Okay.  All right.  So that's just a typo?

3   A.    Yes, sir.

4   Q.    Okay.  All right.  Okay.

5              MR. HUTTING:  I have nothing further of Officer

6        Niarhos.  I would submit him for cross-examination by Mr.

7        Kinney.

8              THE COURT:  Mr. Kinney, cross-examination.

9              MR. KINNEY:  Thank you, your Honor.

10             THE COURT:  You're welcome.

11

12  CROSS-EXAMINATION BY MR. KINNEY:

13  Q.    Good morning, Officer Niarhos.

14  A.    Good morning, sir, how are you?

15  Q.    All right.  First --

16             MR. HUTTING:  I'll take this down or do you want

17       me to leave it up there?

18             MR. KINNEY:  That's fine.

19             MR. HUTTING:  All right.

20             MR. KINNEY:  Thank you.

21  BY MR. KINNEY:

22  Q.    Investigator Niarhos, first of all, you've been an officer

23       for 30, 40 years?

24  A.    Forty?  No.  Thirty-three.

25  Q.    Thirty-three?

1   A.   Yes, sir.

2   Q.   All right.  And at least ten, 13, 14 years as an evidence

3        tech?

4   A.   Thirteen, yes, sir.

5   Q.   And so when you go to a scene, you're not dressed as you

6        are now?

7   A.   Correct.

8   Q.   And part of that is not to taint things?

9   A.   Yes.

10  Q.   You don't touch anything with your bare hands?

11  A.   That's correct.

12  Q.   You're doing everything you can to keep your DNA --

13  A.   Yes, sir.

14  Q.   -- or your fingerprints off the victim?

15  A.   Yes, sir.

16  Q.   And Investigator McNairy, she's got to be dressed the same

17       way you are?

18  A.   Yes.

19  Q.   All right.  And you all got -- This incident happened on

20       -- in the morning hours or -- of the 16th?

21  A.   Yes, sir.

22  Q.   Okay.  So when you got there, were there any other

23       officers on the scene, or you were the first officer?

24  A.   When we arrived, I only recall Northwest 53 being there, a

25       scout car crew.

1    Q.   Okay.

2    A.   And then shortly after, a crew from Homicide arrived.

3    Q.   And that was Investigator Pearson?

4    A.   Investigator Pearson and Sergeant Walton.

5    Q.   Sergeant Walton, okay.

6              Some of -- This is an apartment building?

7    A.   Yes, sir.

8    Q.   And it's got three floors?

9    A.   Yes, sir.

10   Q.   And how many apartments?

11   A.   I believe there's 22 all together.

12   Q.   Twenty-two apartments.

13             And this -- Mr. Hill's body was in the doorway?

14   A.   To the east of the doorway.

15   Q.   As you approach the stairs to get to the apartments?

16   A.   Yes.

17   Q.   Okay.  And I assume that the police officers that were

18        there roped off the scene?

19   A.   It was secured, yes, sir.

20   Q.   To make sure nobody is tainting with any of the evidence?

21   A.   Yes, sir.

22   Q.   Okay.  And there should be officers that are canvassing at

23        least that apartment building if nothing else?

24   A.   I would assume so.

25   Q.   And with everything that you have to do, you wouldn't have

```
 1        been one of the officers to talk to any of the other
 2        residents in the apartment building?
 3   A.   That's correct.
 4   Q.   Okay.  And do you recall or do your notes indicate that
 5        anyone was talked to in your presence?
 6   A.   I don't think my notes reflect that, but I don't recall --
 7        I don't recall any citizens being around.
 8   Q.   Okay.  Do you recall a Nikitta McKenzie or anyone --
 9   A.   No.
10   Q.   -- that was supposed to have been a resident of the
11        apartment, a young lady that should have been a resident
12        of the apartment being there?
13   A.   I don't recall her being there or somebody by that name.
14   Q.   Okay.  Well, to your knowledge, were you and Officer
15        McNairy the only evidence techs at that location?
16   A.   Yes, sir.
17   Q.   Did you return to that location at a later time?
18   A.   I don't believe so.
19   Q.   Did you get any information regarding a boom box, that one
20        of the perpetrators may have picked up a boom box?
21   A.   No, sir.
22   Q.   Okay.  And part of your job was taking -- trying to take
23        as many fingerprints -- lift as many fingerprints as
24        possible?
25   A.   Well, we -- we checked the scene to see if there was
```

```
 1         anything that would be conducive to fingerprinting in the
 2         immediate area where, like, the damage was.  Didn't see
 3         anything that was conducive to take fingerprints from.
 4    Q.   Okay.  So you and Officer McNairy did not lift any prints
 5         from Apartment 302?
 6    A.   That's correct.
 7    Q.   Didn't attempt to lift any?
 8    A.   That's correct.
 9    Q.   Okay.  And was there a boom box there?
10    A.   I don't recall one.  I don't know for sure unless it's in
11         the picture someplace.
12    Q.   On your sketch, you have something in the living
13         room/dining room, it says radio --
14              THE COURT:  Excuse me, Mr. Kinney.
15              Ma'am, if you have to talk, I'd ask that you
16         remove yourself from the courtroom.  It's distracting to
17         the jury, to the lawyers, to the witness, to the staff;
18         okay?  Do you know who I'm talking to?
19              Okay.  I encourage you to stay, all of you, but
20         I ask that you refrain from talking and gestures because
21         it's distracting.  If you have to talk, communicate,
22         please just take it outside and return after you've
23         concluded your conversations; okay?
24              Okay.  Thank you, everyone.
25              I'm sorry, Mr. Kinney, for the interruption.
```

```
 1           You had your back to the audience.

 2                  MR. KINNEY:  Thank you, your Honor.

 3                  THE COURT:  You're welcome.

 4   BY MR. KINNEY:

 5   Q.   Officer Niarhos, you've got the sketch?

 6   A.   Yes.

 7   Q.   You see where A is on the living room/dinning room?

 8   A.   Yes, sir.

 9   Q.   And you've got something written there:  Radio speak --

10   A.   Speaker.

11   Q.   Speaker?

12   A.   Yes, sir.

13   Q.   So that was -- Could it be that what you're calling a

14        speaker is actually an entire boom box, you know, a radio

15        with the speakers in the radio, or are you saying that's

16        just the speaker?

17   A.   I got the radio speaker on the floor.  I would assume that

18        I meant a speaker, but do we have a picture?  We should

19        have a picture of it.

20   Q.   Okay.  Okay, Number 14.  Exhibit 14 is a photograph of

21        that living room.  Well, Officer Niarhos, just -- You take

22        a look.

23   A.   Sure.

24   Q.   These were the ones that were admitted.  Exhibit 14, it

25        says that it's of the living room/dining room, but it's
```

39

1        not of the floor area; am I correct?

2    A.   That's correct.  There is not a picture showing that area.

3    Q.   There's not a picture showing that?

4    A.   No, sir.

5    Q.   Okay.  So there's no picture of the floor area --

6    A.   No, sir.

7    Q.   -- in the dining room?

8    A.   Of the living room?

9    Q.   Well, yeah, living room and dining room.

10   A.   It's kind of the same room, but where the speaker is would

11        be farther to the east, to the south of the television.

12   Q.   Okay.  And Officer Pearson -- What time did you arrive

13        there?

14   A.   3:30 a.m.

15   Q.   3:30 a.m.  So if you were there for a couple of hours,

16        then you were there at least until 5:00, 5:30; correct?

17   A.   More than likely, yes, sir.

18   Q.   All right.  And in your presence, Investigator Pearson was

19        there?

20   A.   Yes.

21   Q.   Okay.  And he was there the entire time you were?

22   A.   I believe he was.

23   Q.   Okay.  And part of what you do, you talk to the Homicide

24        detectives to make sure that you got a feel for what they

25        want at the same time; correct?  I know you know what your

40

1       job is, but they do have some input?

2   A.  Oh, sure.  Sure.

3   Q.  Because they may be talking to witnesses and they might

4       find something and say something to you.

5   A.  Sure.  Exactly.

6   Q.  Okay.  Do you remember, and I know this was 2006, but do

7       you remember, do you recall, is there anything in your

8       notes that indicate that Officer Pearson indicated

9       anything to you about a statement that was taken from Ms.

10      McKenzie?

11  A.  I know something like that is not in my notes.  I don't

12      recall that.

13  Q.  So you don't recall Officer Pearson ever indicating that

14      there might be some fingerprints on a boom box in the

15      living room/dining room area?

16  A.  No.  The only conversation I remember is that -- is about

17      that cell phone, placard C.  He was going to return that

18      phone to a resident.  But that's all I know.

19  Q.  Okay.  And that was found inside the apartment?

20  A.  Yes.

21  Q.  And he didn't indicate to you what resident he was going

22      to give that phone to?

23  A.  If he did, I don't recall.

24  Q.  Okay.  And your -- In your experience, do you think you

25      can get or would you try to get fingerprints off of a cell

                                41

```
 1      phone?

 2  A.  It has been done.

 3  Q.  It has been?

 4  A.  We've gotten fingerprints off of cell phones before, yes,

 5      on occasion.

 6  Q.  Okay.  How about the casings that you found?  Have there

 7      been occasions to get fingerprints off of --

 8  A.  They are rare.

 9  Q.  They are rare.

10  A.  They are rare because usually casings have an oily

11      substance around it that, because of the gun, because of

12      the mechanism, and it's --

13  Q.  Especially after it's been fired?

14  A.  Yes, it gets awful hot.  It's very rare, but it has been

15      done.

16  Q.  Okay.  How about the door?  The door is a wooden door?

17  A.  Yes, sir.

18  Q.  Is that a surface that you generally could get

19      fingerprints off of?

20  A.  If the door was freshly painted and it had a gloss to it,

21      we can get fingerprints.  I looked at the door, it wasn't

22      like that.

23  Q.  It's not freshly painted?

24  A.  No.  And it wasn't clean.

25  Q.  What?
```

```
 1   A.   I'm sorry.  And it wasn't clean.

 2   Q.   Okay.  I noticed that you had indicated -- you and Mr.

 3        Hutting were indicating that the door was kicked in?

 4   A.   Yes, sir.

 5   Q.   Is that just the terminology that the door was busted in

 6        or did you see any evidence of someone kicking that door,

 7        like a footprint?

 8   A.   I don't believe I saw a footprint.  It just -- the way the

 9        damage -- the door was forced inward.

10   Q.   Yes.

11   A.   And maybe kicked isn't the proper word, but I've kind of

12        used that in the past.  The door was -- somehow it was

13        forced inward.

14   Q.   I'm sure you've had cases where there was a footprint on

15        the door?

16   A.   Yes, sir.

17   Q.   But nothing like that here?

18   A.   No.

19   Q.   So you didn't see any possibility of getting any

20        fingerprints, footprints or anything like that off of the

21        door?

22   A.   No, sir.

23   Q.   Okay.  This was in January.

24   A.   Yes.

25   Q.   Cold outside?
```

1  A.  Yes.

2  Q.  Okay.  And you usually give us some kind of idea of what

3      the weather was like, what the lighting was like?

4  A.  Yes, sir.

5  Q.  Okay.  And was there a lot of snow outside or not?

6  A.  I don't recall.  It should show in, I believe, the first

7      photograph if there was.

8  Q.  Okay.  And this could refresh your recollection; right?

9  A.  Yes, sir.

10 Q.  All right.  Here's number 1.  Is that it?

11 A.  Yes, sir.  I would say there was no snow on the ground.

12 Q.  No snow on the ground.

13 A.  I marked on the report that the weather was clear and cold

14     outside.

15 Q.  All right.  So no snow, no rain.  Shouldn't have been any

16     foot traffic, you know, wet foot traffic in the carpet

17     area or anything like that; correct?

18 A.  No, sir.

19 Q.  And by the same token, the weather itself wouldn't affect

20     your ability to get fingerprints, DNA samples?

21 A.  The weather?

22 Q.  Yeah.  The weather wouldn't have affected you because it

23     was --

24 A.  Well, you're talking about inside?

25 Q.  Well, you know, outside, too; right?

44

1    A.    No.  The weather does affect fingerprints.

2    Q.    Cold weather.  I mean at this particular time, I'm

3          specifically talking about the weather that we had that

4          night.  It was dry.  It was clear.

5    A.    Yes.

6    Q.    So it shouldn't have had any affect from the weather from

7          your ability to gather evidence outside?

8    A.    You say outside, though.

9    Q.    Well, it didn't affect inside, for sure.

10   A.    No.  Exactly.  But outside, the weather does affect

11         fingerprints outside.

12   Q.    Do you say that the weather that we had January 16th would

13         have affected your ability to gather evidence outside?

14   A.    Fingerprints?

15   Q.    Yes.

16   A.    Yes, sir.

17   Q.    Because?

18   A.    Well, the cold weather -- to get fingerprints, you have to

19         be a secretor, which most of the population is.  But the

20         cold weather kind of limits the secretions and most people

21         are wearing gloves in the wintertime.

22   Q.    Okay.  The golf club and the golf head.

23   A.    Yes, sir.

24   Q.    I understand that you're saying that that was your

25         mistake, but --

```
1   A.   I'm not saying it was my mistake.  I'm saying I was the

2        senior person and I should have caught that, so it is my

3        mistake.

4   Q.   I got you.  You had a partner?

5   A.   Yes, sir.

6   Q.   What I'm getting to is that other authority figures, you

7        know, the lab, handle this evidence after you all handle

8        it?

9   A.   Yes, sir.

10  Q.   Is there a possibility that these were put in the wrong

11       packaging, because it seems like they tried to use the

12       same packaging?  I mean from your testimony, you did this

13       part?

14  A.   Yes.

15  Q.   Okay.  And you didn't do that part?

16  A.   No.

17  Q.   So is it possible, or do you know, I don't want you to

18       speculate, but from your experience, that the lab just

19       tore off the top, took it out, and put this back on there?

20  A.   That's what it appears to me.

21  Q.   Okay.  But you wasn't there, you don't know?

22  A.   Correct.

23  Q.   But your experience tells you that?

24  A.   Yes.

25  Q.   Okay.  Could they have put the wrong tag?
```

46

 1   A.   No.

 2   Q.   Okay.  So it wasn't their fault?

 3   A.   No, it wasn't their fault; it was our fault.

 4   Q.   Okay.  And in 2006, did the Detroit Police Department have

 5        their own lab at that time?

 6   A.   Yes, sir.

 7   Q.   And we know you don't have one now.

 8   A.   That's correct.

 9   Q.   Were you part of that lab?  I mean --

10   A.   At that time, it was part of our division.  We're separate

11        from it, but yet we're under the same heading, if that

12        makes any sense.

13   Q.   Is it your responsibility to deliver the evidence to the

14        lab?

15   A.   No, sir.

16   Q.   Was this evidence, in your opinion or in your knowledge,

17        did the Detroit lab have anything to do with this

18        evidence?

19   A.   I don't know.

20   Q.   You don't know.

21   A.   I don't know.

22   Q.   Okay.  The pictures of the bathroom, and that is -- I'm

23        going to leave these pictures with you.

24             Now the pictures of the bathroom is Exhibit

25        Number 16.

```
 1   A.   17.

 2   Q.   I'm sorry?

 3   A.   I'm sorry, you're right.  It's Exhibit Number 17.

 4   Q.   Okay.  And that depicts the way the bathroom was when you

 5        got there?

 6   A.   Yes.

 7   Q.   Okay.  And was there anything in that bathroom that you

 8        collected or thought that you should collect?

 9   A.   No, sir.

10   Q.   No.  Okay.  And what does the photo show that's in there?

11   A.   Well, it shows -- the first thing it shows is the sink.

12        There's a hair dryer, a hair curler on the towel rack.

13        Shows the toilet, shows a shower, the shower door and a

14        towel.

15   Q.   Okay.

16   A.   Just a general photograph.

17   Q.   Just a general photograph.  There's nothing significant

18        about the bathroom to you?

19   A.   No, sir.

20   Q.   And back into the -- Most of the damage was in that living

21        room/dining room area?

22   A.   Yes.

23   Q.   All right.  And in the kitchen, you didn't see any damage?

24   A.   No.

25   Q.   In the bedroom, did you see any evidence of a struggle?
```

```
 1   A.   Well, the bedroom was cluttered, but it didn't appear to
 2        be, you know.
 3   Q.   Well, unfortunately my bedroom is cluttered, but was there
 4        a fight?
 5   A.   Didn't look like it to me.
 6   Q.   Didn't look like it to you.  Didn't look like any
 7        intruders were in the bedroom?
 8   A.   I can't say for sure on that.  I don't know who was in the
 9        bedroom.
10   Q.   I know you can't.  But all you can -- All we can ask for
11        now is your experience.  And you went into the bedroom?
12   A.   I took a look in the bedroom, yes.
13   Q.   Okay.  So your experience said, there's no need to be
14        trying to collect any evidence from this room?
15   A.   Correct.
16   Q.   Okay.  So all the damage in that apartment was in that
17        living room/dining room area?
18   A.   Yes.
19   Q.   And so for purposes of collecting evidence in that
20        apartment, you concentrated on that living room/dining
21        room area?
22   A.   Yes, sir.
23   Q.   Okay.  There's a computer there?
24   A.   Yes.
25   Q.   And that would have been the opposite side of -- I guess
```

49

1       that would have been the north side of the room -- or

2       actually it's the opposite side of the door, the entrance

3       door?

4    A. Yes.  It would be against the east wall of the apartment.

5    Q. Okay.  Was there -- Was it kicked over?  Any damage to it?

6       Seem like it had been handled by someone who was being

7       aggressive and didn't like it, like the television?  The

8       television had a hole in it, in the screen; right?

9    A. Yes.

10   Q. Anything like that to that computer?

11   A. I don't recall.

12   Q. The chair for the computer right in front of the computer,

13      was there any damage there?

14   A. I don't recall, sir.

15   Q. Is there a picture of that room that shows the computer

16      and the chair?

17   A. I don't believe one was taken.

18   Q. Okay.  Do you know if you or Officer McNairy investigated

19      the computer and chair to see if there was any way of

20      taking any fingerprints, any kind of evidence from that?

21   A. Computer is not a good surface for fingerprints.  It's

22      textured.  It's like a VCR or DVD player.  It's textured

23      for the reason -- the manufacturer has it like that so you

24      don't leave fingerprints so it doesn't look dirty, collect

25      dirt.  So it makes it a tough surface to get a print off

50

```
 1         of it.

 2    Q.   Okay.  Was the computer on or off; do you know?

 3    A.   I don't recall.

 4    Q.   Do you know if the computer had -- you know, some of these

 5         computers have the ability to have a monitor, you know,

 6         where it's actually taping what's going on in the room.

 7              Was there anything like that on this computer,

 8         or just a regular computer?

 9    A.   I don't recall, sir.

10    Q.   There's a coffee table.  Is there a picture of the coffee

11         table?  Is that a coffee table that had, you know, a glass

12         top on it or anything like that?

13    A.   There was a coffee table in front of the couch.

14    Q.   Yes.  Do you recall that coffee table, was it moved,

15         damaged, something that we could get fingerprints off of,

16         you know, a glass top, anything like that?

17    A.   I don't believe so.

18    Q.   Was there any blood in that area?

19    A.   No.

20    Q.   Okay.  The couch itself, what kind of couch was that?  Is

21         this a leather couch or --

22    A.   I don't recall.

23    Q.   Okay.  And it looks like there's something like maybe a

24         chandelier or something over top of --

25    A.   The three circles on it?
```

1   Q.   Yes.

2   A.   Yeah, it was a strange kind of a lamp that was over the

3        couch, it had three lights.

4   Q.   Okay.  Lights on?

5   A.   Lights were on.

6   Q.   When you got there.  All right.  The damage is on the

7        other side and right in front where this radio speaker

8        was.  Do you remember if the speaker was damaged at all?

9   A.   I don't believe it was.

10  Q.   Okay.  The TV was -- it's on a stand?

11  A.   Yes.

12  Q.   Is that a heavy TV or a --

13  A.   It was a portable TV.

14  Q.   Portable TV.

15  A.   Maybe a 26-inch, 27-inch.

16  Q.   And it was busted in?

17  A.   Yes.

18  Q.   All right.  And the knit cap was in front of the table

19        next to the TV table?

20  A.   Yes, sir.

21  Q.   And was it under the table or just in front of it?

22  A.   Just in front on the floor.

23  Q.   All right.  Glass from the TV on the floor, was it in the

24        cap?

25  A.   Most of it was inside of the TV, I believe.  The damage

1        was kind of forced inward.

2   Q.   Okay.  So you don't recall glass being on the floor near

3        the cap, anything like that?

4   A.   No.

5   Q.   Okay.  The broken chairs, broken dining room table, was

6        that all wood?

7   A.   Yes.

8   Q.   Okay.  And the chair that was overturned, was there any

9        evidence that that chair was used as a weapon?

10  A.   I don't know.

11  Q.   Blood on the chair?

12  A.   I didn't see any.

13  Q.   Blood on the table?

14  A.   There was blood on the carpet.

15  Q.   But not on the chair, not on the table.  You're certain of

16       that?

17  A.   Give me one second.

18  Q.   Yes, sir.

19  A.   I don't recall any blood on the broken furniture.

20  Q.   Okay.  So going from your sketch, I don't see where you're

21       indicating that there's any blood, except right at the

22       door.

23  A.   Yes.

24  Q.   From the apartment building.

25  A.   Yes.

1    Q.    Not the apartment building, but from the apartment itself?

2    A.    Yes.  Yes, sir.

3    Q.    And this trail starts at the door?

4    A.    Yes.

5    Q.    Okay.  And there is a -- the first D is -- D is a golf

6          club shaft.  So D is a golf club shaft?

7    A.    It is.

8    Q.    And that was just outside of the door?

9    A.    Outside of the door and to the south of the door.

10   Q.    All right.  Do you recall recognizing whether there was

11         blood on this shaft right there?

12   A.    I don't recall seeing any.

13   Q.    Okay.  And the blood trail then leads towards the stairs?

14   A.    Yes, leads north from the apartment.

15   Q.    All right.  And the very last shell that you picked up --

16         I don't know if it's the last shell, but following this

17         trail down to the end of the stairs.

18   A.    Yes, sir.

19   Q.    You started from the stairs upward, or did you start from

20         the apartment building and go down -- I mean Apartment

21         302, in picking up evidence?

22   A.    No, we started from the apartment.

23   Q.    From the apartment?

24   A.    Yes, sir.

25   Q.    So that would have been Exhibit 20?  And this is the

54

```
 1        evidence tag that ends in 5904.  It was an automatic

 2        casing from the landing going down to the main floor.

 3   A.   I'm sorry, sir, what number did you say, the last four?

 4   Q.   5904.

 5   A.   Yes, that's the casing that was on the landing between the

 6        third and the first floor.

 7   Q.   That would have been the casing that was closest to Mr.

 8        Hill's body?

 9   A.   Yes, it would.

10   Q.   Okay.  And was there, in this trail of blood, was there

11        any area going towards where Mr. Hill's body was found

12        that would have indicated that there was -- he stopped?

13        You know, where there was a puddle of blood or anything

14        like that before you get to where his body was found?

15   A.   I don't recall a puddle.  It was just a -- one trail that

16        started at that front door of 302 and ended at the

17        deceased.

18   Q.   Okay.  And in terms of what you do, is there anything that

19        you do that involves Mr. Hill's body?  Did you take any

20        evidence from his body?

21   A.   No, sir.

22   Q.   All right.  And, like, anything from his hands?  Anything

23        like that?

24   A.   Did I take any evidence from his hands?

25   Q.   Yes.
```

```
 1   A.   No, sir.

 2   Q.   All right.  And that means that you wouldn't have touched

 3        his body at all?

 4   A.   No.  No.

 5   Q.   Okay.  And the only thing that you actually -- actually

 6        did -- Did either you or Officer McNairy take pictures?

 7   A.   Officer McNairy did, yes, sir.

 8   Q.   Okay.  You indicated that that sheet, that blue sheet,

 9        that's directly from EMS technicians?  You all don't do

10        that?

11   A.   I assume it is.  They were gone by the time we got there,

12        but that's been their -- kind of their protocol; if

13        there's a body in the public view, they usually cover it.

14   Q.   Okay.  And when you got there, police officers had secured

15        the scene?  So I know when something this traumatic

16        happens, people gather.

17   A.   Sure.

18   Q.   All right.  So it's clear that officers were keeping the

19        public away from this area?

20   A.   Yes, sir.

21   Q.   All right.  And the protocol is that if the EMS come, they

22        don't leave that -- a body there unless officers are there

23        to relieve them?

24   A.   I don't think I understand that question.

25   Q.   Well, I'm hoping that if the EMS came before some police
```

56

1    officers came, found out that Mr. Hill had expired, and

2    they don't take Mr. Hill's body, they just drive off, and

3    there's no police officers there to secure the scene

4    before they drive off, that's not the way it's supposed to

5    go; is it?

6  A.  I don't know.  I don't know if they -- I guess I still

7    don't understand the question.  You're saying EMS

8    arrived --

9  Q.  Do you know whether the EMS arrived first or that police

10    officers arrived first?

11  A.  I don't know.

12  Q.  All right.  In your experience, would an EMS technician

13    come and then leave the area unsecured before an officer

14    reaches the scene?

15  A.  I don't know.  I don't think I can answer that question,

16    sir.

17  Q.  Okay.  And you don't' know if it happened in this

18    particular situation?

19  A.  No, I don't.

20  Q.  Okay.  Was there anyone there from the Medical Examiner's

21    Office while you were there?

22  A.  Later, yes, sir.

23  Q.  And they took Mr. Hill's body away from the scene while

24    you were there?

25  A.  Yes, sir.

1  Q.   And I'm sure you looked under where Mr. Hill's body was

2       laying?

3  A.   That's correct.

4  Q.   All right.  And there was no evidence that you thought was

5       worth picking up?

6  A.   No, sir.

7            MR. KINNEY:  Thank you, your Honor.

8            THE COURT:  Mr. Hutting.

9

10 REDIRECT EXAMINATION BY MR. HUTTING:

11 Q.   Are there more photographs of Mr. Hill other than the one

12      that we have here?

13 A.   There's quite a few more.

14 Q.   Okay.  All right.  Those are all kind of close-ups of him

15      laying there on the ground; is that correct?

16 A.   Yes, sir.

17 Q.   All right.  Are they pretty bloody or gruesome?

18 A.   Yes, they're pretty bad.

19 Q.   Okay.  All right.

20            MR. HUTTING:  I have nothing further.  I would

21      though reserve the right to recall Officer Niarhos.

22            MR. KINNEY:  I have nothing further at this

23      time.

24            THE COURT:  All right.  Subject to recall, Mr.

25      Niarhos may step down and be excused?

1                    MR. KINNEY:  Yes, sir.

2                    MR. HUTTING:  He can be excused, but subject to

3        recall.

4                    WITNESS NIARHOS:  What does that mean?

5                    THE COURT:  That means you're excused for now.

6                    WITNESS NIARHOS:  I can leave the building or --

7                    MR. HUTTING:  Yes.  We've got your phone number.

8        We can get ahold of you.

9                    WITNESS NIARHOS:  That's what I'm afraid of.

10                   MR. HUTTING:  You're not going out of town?

11                   WITNESS NIARHOS:  No, I'll be around.

12                   MR. HUTTING:  All right.

13                   THE COURT:  I'm going to give the jury their

14       break at this time, their morning break.

15                   MR. KINNEY:  Yes, your Honor.  Thank you.

16                   THE COURT:  Time for your morning break.  See

17       you in few minutes.  Don't discuss the case, wear your

18       badges.

19                   DEPUTY SHERIFF:  All rise for the jury.

20                   (At about 10:39 a.m., jury panel excused.)

21                   THE COURT:  Okay.  See you around five to.

22                   MR. HUTTING:  Sure.

23                   MR. KINNEY:  That's like ten minutes?

24                   THE COURT:  No.  Like 15.

25                   MR. KINNEY:  Okay.  Do I have permission to go

59

1          to Judge Annette Berry's courtroom?

2                    THE COURT:  If you're back by eleven o'clock.

3                    MR. KINNEY:  Well, you know, I have another

4          Judge.

5                    THE COURT:  If you're back by eleven o'clock,

6          you can go.

7                    MR. KINNEY:  Can we tell Judge Berry?

8                    THE COURT:  I'm just telling you.  I've just

9          extended it another five minutes because you're going to

10         Judge Berry's.

11                   (At about 10:40 a.m., brief recess;

12                   At about 11:13 a.m., back on the Record.)

13                   COURT CLERK:  Recalling docket 10-3521, People

14         versus Samuel Lee Dantzler, jury trial in progress.

15                   MR. HUTTING:  Auggie Hutting for the People.

16                   MR. KINNEY:  Robert Kinney appearing on behalf

17         of Mr. Dantzler, your Honor.

18                   THE COURT:  Ready to proceed?

19                   MR. KINNEY:  Yes.  Judge, for the Record, your

20         Honor, I know, because of the questions that we -- that we

21         were asking Officer Niarhos, I had conversations with Mr.

22         Hutting at the time we were asking the questions and

23         there's an evidence tech report by an Officer Stinson,

24         which we just received, but it's, like, my understanding

25         is that both I and Mr. Hutting just received this; is that

1     correct?

2          MR. HUTTING:  Yes, I just got it.  I didn't

3     realize that it was in existence.  When the issue came --

4     When the issue -- I know that there were fingerprints in

5     this case because I have reports from officer -- well,

6     from Marcia McCleary at Latent Prints.  And what I assumed

7     incorrectly is that the prints had been collected by

8     Officer Niarhos and Officer McNairy when they did their

9     initial work.  That was my incorrect assumption.  I

10    thought that there was something about it in their report,

11    there wasn't.  And I just figured that out this morning.

12         Apparently what happened is, Deborah Stinson

13    who's another evidence tech, was called back out to the

14    apartment two days later on the 18th, and was told

15    specifically to dust the boom box that was there on the

16    floor that Officer Niarhos talked about.  She dusted the

17    boom box, she lifted at least two fingerprints off of it,

18    there was two lift cards, those were the cards that were

19    sent to Officer McNairy.

20         So we're probably going to need Deborah Stinson

21    to testify here to say that, so that we can get -- you

22    know, so that the jury understands where the fingerprints

23    came from; okay?  Even though they're all negative.  But

24    right now, they have no idea where the fingerprints came

25    from.

1                    THE COURT:  Have you thought of entering into a

2          stipulation or is that not an option?

3                    MR. KINNEY:  Not with -- not with Officer

4          Stinson, but she will be short, your Honor.

5                    THE COURT:  Okay.  Fine.

6                    MR. KINNEY:  I also received two laboratory

7          reports.  I don't expect that we're going to --

8                    MR. HUTTING:  I think it's just one; isn't it?

9                    MR. KINNEY:  I got two copies of one, but I

10         don't think that we're going to get to that witness until

11         later on in the day, so I'll have a chance to take a look

12         at it.

13                   THE COURT:  All right.  If you need additional

14         time or need the Court's assistance in anything, let me

15         know, Mr. Kinney.

16                   MR. KINNEY:  Thank you.

17                   THE COURT:  And I'll give you as much time as

18         you and Mr. Dantzler need to digest this discovery that's

19         just been provided.

20                   MR. HUTTING:  But the other problem that is

21         going to crop up here, I guess, is that I was trying to

22         try this case as streamlined as I could, I mean -- so I've

23         endorsed on my witness list, the first officers who were

24         at the scene, who came there and were there -- they were

25         the first responding officers.  They obviously froze the

1      scene, they were there when EMS came; all right?  I didn't

2      think that we were going to need them.

3              But now, based on cross-exam, and Mr. Kinney's

4      done, the jury is going to want to know that, you know,

5      EMS didn't come there, throw a blanket on the guy and take

6      off.  So that's a problem.

7              The other problem is there was nobody else that

8      saw this event.  We have a statement from a neighbor who

9      was in the apartment next door.  All he says is that he

10     heard loud commotion and that he heard a gunshot or two.

11     He saw nothing; okay?  Nobody -- And that's all that we

12     have from the apartment complex.  So but now I'm going to

13     have to call the team-assigned guy.

14             MR. KINNEY:  I couldn't hear.  The who?

15             MR. HUTTING:  Now I'm going to have to call

16     Dwight Pearson or Steve Walton, the two team-assigned guys

17     who I, you know, didn't think that would be an issue to

18     say --

19             THE COURT:  Is it an issue, Mr. Kinney?

20             MR. HUTTING:  I mean if he wants to stipulate

21     that, you know, the apartment was -- that apartment

22     complex was canvassed, a statement was taken from the

23     neighbor but the neighbor saw nothing and no one in the

24     apartment complex saw anything, okay, the neighbor heard

25     some things, but he didn't see anything.

```
 1                    THE COURT:  Mr. Kinney?

 2                    MR. KINNEY:  Your Honor, I'm confident by the

 3          end of the day, we'll have that worked out.

 4                    THE COURT:  Fair enough.  Okay.  Are we ready

 5          for the jury?

 6                    MR. HUTTING:  Yes, we are.

 7                    THE COURT:  Jury, please.

 8                    DEPUTY SHERIFF:  All rise for the jury.  Please

 9          come out and take your seats.

10                    (At about 11:18 a.m., jury panel seated.)

11                    DEPUTY SHERIFF:  Please be seated.

12                    THE COURT:  Ladies and gentlemen, while you were

13          on break, I'm going to explain, briefly, a couple things

14          to you.  We don't sit here and eat cake and play cards.

15          What we do is we deal with other cases that we have on the

16          docket.

17                    Sometimes the lawyers are allowed, as was the

18          case here, to go to other courtrooms where they have

19          things to do, because all of us schedule things at the

20          same time and so we try to accommodate one another.  So

21          what happens while you're on break is we continue to work

22          on other cases.  And in this case we resolved a number of

23          issues that arose in this case on top of going to other

24          courtrooms, et cetera; okay?

25                    So that's what transpired.  Additionally, while
```

64

1          the lawyers attended to other responsibilities, my staff

2          and I cleared our docket with all the other foreign

3          matters that we had so we can go without interruption

4          between now and lunch and in the afternoon.

5                    So that's what transpires while you're in the

6          jury room; okay?  That's why some breaks are longer and

7          some are shorter.  So I hope that helps you to understand

8          the process a little bit.

9                    Mr.  Hutting.

10                   MR. HUTTING:  We call Janet Burt.

11                   COURT CLERK:  Raise your right hand, please.

12                   Do you swear or affirm that the testimony you

13         are about to give in the matter now pending before this

14         Court will be the truth, so help you, God?

15                   WITNESS BURT:  Yes.

16                   COURT CLERK:  You may be seated.

17                             JANET BURT,

18         called as a witness at 11:20 a.m., having first been duly

19         sworn by the Clerk of the Court, was examined and

20         testified on her oath as follows:

21                   THE COURT:  Good morning, ma'am.

22                   WITNESS BURT:  Good morning.

23                   THE COURT:  Pull the microphone close to your

24         mouth and speak loudly and clearly for our jury; okay?

25                   WITNESS BURT:  Sure.

```
 1                    THE COURT:  Thank you very much.
 2                    Mr. Hutting.
 3                    MR. HUTTING:  Thank you, your Honor.
 4
 5   DIRECT EXAMINATION BY MR. HUTTING:
 6   Q.   I know that you've given your name to the court reporter,
 7        but for the Record, one more time, we need your name,
 8        please.
 9   A.   Janet Burt.
10   Q.   That's B-U-R-T?
11   A.   Correct.
12   Q.   Okay.  Ms. Burt, what city do you live in?
13   A.   Detroit, Michigan.
14   Q.   How long have you lived in Detroit?
15   A.   Practically all my life.
16   Q.   Okay.  Ms. Burt, during your lifetime, did you know a
17        person by the name of Bernard Hill?
18   A.   That was my son.
19   Q.   Okay.  How old was Bernard at the time that he was killed?
20   A.   Twenty-two.
21   Q.   Okay.  And who is Bernard's father?
22   A.   Bernard Wesley.
23   Q.   Okay.  All right.  Now did Bernard, when he was growing
24        up, live with you?
25   A.   Yes.
```

1  Q.   Okay.  Do you also know a person by the name of Quiana

2       Turner?

3  A.   Correct.

4  Q.   Who is Quiana Turner?

5  A.   Quiana Turner was like a daughter to me.  She lived with

6       me, also.

7  Q.   She lived with you, also?

8  A.   Correct.

9  Q.   How old was she when she first came to live with you?

10 A.   Fourteen.

11 Q.   Was she related to you by blood?

12 A.   No.

13 Q.   Was she related to you by marriage?

14 A.   No.

15 Q.   How did it happen that Quiana came to live with you?

16 A.   We discovered she had a child by my son.  For a year, we

17      didn't know she had a child by him.  And that child turned

18      out to be Mikayla Turner.

19 Q.   Okay, all right.  So you kept Quiana to live with you?

20      Allowed Quiana to live with you?

21 A.   Well, yeah, she was in foster care and she kept running

22      away from the people that she was staying with because she

23      didn't want to be there and she didn't want her child to

24      be in foster care --

25                MR. KINNEY:  Excuse me, your Honor.  I would

```
 1        just object to what she deems another person's ideas are.

 2        She wants to testify about something that's in someone

 3        else's mind.

 4                  MR. HUTTING:  It's hearsay.

 5                  THE COURT:  Response?

 6   BY MR. HUTTING:

 7   Q.   How do you know --

 8                  MR. HUTTING:  Well, let me --

 9                  THE COURT:  Well, no.  Objection's sustained.

10        If there's no response, objection is sustained.  Thank

11        you.  Go ahead, Mr. Hutting.

12   BY MR. HUTTING:

13   Q.   All right.  So Quiana began to live with you?

14   A.   Correct.

15   Q.   For how many years did Quiana Turner begin to live with

16        you?

17   A.   Several years, at least three.

18   Q.   Okay.  All right.  Now did you ever meet Quiana's mother?

19   A.   Yes.

20   Q.   What was her name?

21   A.   Ruth.

22   Q.   Okay.  Did you ever meet Quiana's father?

23   A.   No.

24   Q.   Just the mother?

25   A.   Correct.
```

```
 1   Q.   Okay.  Now did you ever meet any other of Quiana's
 2        relatives?
 3   A.   Yes.
 4   Q.   What relatives of Quiana did you meet?
 5   A.   Her brother, her uncle.
 6   Q.   What was her brother's name?
 7   A.   Rodney Turner.
 8   Q.   What was her uncle's name?
 9   A.   Samuel, Sam.  We called him Sam.
10   Q.   Okay.  The Uncle Sam, the uncle of Quiana Turner that you
11        met, do you see that uncle present here in court today?
12   A.   Yes, I do, he's sitting in front of me.
13   Q.   Okay.  He's the gentleman over at the table to my right
14        with the, like, olive-colored shirt on?
15   A.   Correct.
16             MR. HUTTING:  Indicating for the Record the
17        Defendant here is Samuel Dantzler.
18             THE COURT:  So noted.
19   BY MR. HUTTING:
20   Q.   Did you ever meet anyone else related to Quiana, besides
21        Samuel Dantzler?
22   A.   Her cousin.
23   Q.   What cousin?
24   A.   Tasha.
25   Q.   Tasha.  Anyone else?
```

1   A.   Not really.

2   Q.   Okay.

3   A.   Not really.

4   Q.   Do you know if Mr. Dantzler has a son?

5   A.   Yes, I do.

6   Q.   Okay.  What's his name?

7   A.   Also Sam.

8   Q.   Also Sam.  Did you ever meet him?

9   A.   I seen him before.

10  Q.   Okay.  You've seen him before?

11  A.   Yes, with Bernard.

12  Q.   With Bernard?

13  A.   Correct.

14  Q.   Okay.  All right.  So he and Bernard knew one another?

15  A.   Correct.

16  Q.   Okay.  Let's go back to January of 2006.  Were -- Did you

17       know a person by the name of Nikitta McKenzie?

18  A.   Yes, I did.

19  Q.   Who was Nikitta McKenzie?

20  A.   Bernard's girlfriend.

21  Q.   Was she Bernard's current girlfriend in 2006?

22  A.   Correct.

23  Q.   Were Bernard and Quiana broken up by that time?

24  A.   They were so off and on, yes, yes.

25  Q.   All right.  How old was Mikayla at that time?

```
 1   A.   Mikayla was four-and-a-half, maybe five.

 2   Q.   Okay.  And did you ever take care of Mikayla?

 3   A.   Yes.

 4   Q.   Okay.  Let's go to Sunday night, January the 15th of 2006,

 5        were you home that Sunday night?

 6   A.   Yes, I was.

 7   Q.   Was Bernard also there at your home with you?

 8   A.   Earlier that evening, yes, he was.

 9   Q.   Okay.  Was Quiana there?

10   A.   She came by with the baby, to drop the baby off.

11   Q.   Okay.  About what time did she do that?  If you can tell

12        me.

13   A.   About 10:30 and eleven o'clock, somewhere in there,

14        between 10:00 and -- it was pretty late.

15   Q.   Okay.  All right.  Was Bernard still there?

16   A.   Yes, he was.

17   Q.   How did Quiana get to the house?

18   A.   She drove.

19   Q.   Okay.  Anybody else with her?

20   A.   Yes.  From what she told me, it was a cousin --

21   Q.   Don't tell me what she told you.

22   A.   Okay.  Yes, she had someone else in the car with her.

23   Q.   In the car.  Did that person come in?

24   A.   No.

25   Q.   Do you know if it was a man or a woman?
```

1   A.   It was a man.

2   Q.   And Bernard was there?

3   A.   Correct.

4   Q.   Okay.  She dropped the baby off?

5   A.   She stayed for a few minutes, yes.

6   Q.   And then dropped the baby off?

7   A.   Correct.

8   Q.   How long were you to keep Mikayla?

9   A.   Over the weekend or -- I'm not sure whether she was in

10       school at the time.  She stayed weeks to days on with me.

11  Q.   Okay.  All right.  But was Quiana living with you at the

12       time?

13  A.   No.

14  Q.   Okay.  Did Quiana then leave?

15  A.   Yes.

16  Q.   Okay.  Now was there anything wrong with Quiana when she

17       was there at your apartment?

18  A.   No.

19  Q.   Okay.  Was Bernard there when Quiana left?

20  A.   Yes.

21  Q.   Okay.  After Quiana left, did Bernard leave?

22  A.   About 20 minutes later, yes.

23  Q.   Okay.  All right.  After Bernard left, did there come a

24       time when you found out that something had happened to

25       Quiana?

1    A.    Yes.

2    Q.    Okay.  How did you find that out?

3    A.    Quiana's cousin, Angela, called.

4    Q.    Okay.  And she talked to you?

5    A.    Correct.

6    Q.    Okay.  Ultimately what did you find out had happened to

7          Quiana?

8    A.    Bernard had jumped on Quiana.

9    Q.    Okay.  Did you agree with that?

10   A.    Oh, no.  No.

11   Q.    Okay.  When you found out that Bernard had jumped on

12         Quiana, what did you do?

13   A.    I called his father immediately.

14   Q.    Okay.  Spoke to his dad?

15   A.    Correct.

16   Q.    Okay.  Were you ever able to talk to Bernard?

17   A.    Once.

18   Q.    Okay.  Tell us how that happened.

19   A.    His dad called him on the three-way.  He wouldn't accept

20         my calls because he knew I was very, very angry.

21   Q.    Okay.  He being Bernard?

22   A.    Little Bernard.

23   Q.    Okay.  Would not accept your call?

24   A.    Right.

25   Q.    But your dad got it -- your --

```
 1   A.   His dad.

 2   Q.   His dad got him on a three-way?

 3   A.   Correct.

 4   Q.   Okay.  Did you talk to him?

 5   A.   Yes, I did.

 6   Q.   Did you express your displeasure at what had happened?

 7   A.   Yes, I did.

 8   Q.   Okay.  Did you try to talk to him some more?

 9   A.   I certainly did and he -- he hung up on me.

10   Q.   Okay.  Did you call back some more?

11   A.   Yes.

12   Q.   Would he take your call?

13   A.   No.  And I left a message.

14   Q.   Okay.  All right.  Did you remain at home at your house?

15   A.   Yes, I did.

16   Q.   Okay.  Did Bernard come back to your home?

17   A.   No, he didn't.

18   Q.   Okay.  All right.  While you were there at your home did

19        somebody come to your house?

20   A.   Yes, they did.

21   Q.   Can you tell the jury about what time it was that somebody

22        came to your house?

23   A.   About one -- between 12:30 and one o'clock.

24   Q.   And how did you know that somebody was at your house

25        between 12:30 and 1:00?
```

```
 1   A.   I peeked out my -- I have a peephole.  And I -- They were
 2        banging on the door and trying to ring the doorbell.  The
 3        doorbell doesn't work, never has.  And I peeked out my
 4        peephole and seen that's what they were doing.  Well,
 5        that's what the particular person was doing.
 6   Q.   When they were banging on the door, were they saying
 7        anything?
 8   A.   No.
 9   Q.   Okay.  Just banging?
10   A.   Yes.
11   Q.   Pretty loudly?
12   A.   Yes.
13   Q.   Okay.  So you went to the peephole?  To the door?
14   A.   Correct.
15   Q.   And you looked out your peephole?
16   A.   Correct.
17   Q.   What did you see when you looked out your peephole?
18   A.   Rodney and Little Sam.  Rodney was on my porch and Little
19        Sam was standing on the steps.
20   Q.   By Rodney, do you mean Rodney Turner?
21   A.   Correct.
22   Q.   Quiana's brother?
23   A.   Correct.
24   Q.   By Little Sam, do you mean some --
25             MR. KINNEY:  I'm going to object.  I'm objecting
```

```
 1        to the leading nature of these questions.
 2                  MR. HUTTING:  Well, it can be answered yes or
 3        no.  It can be answered yes or no.
 4                  MR. KINNEY:  That's the problem with the leading
 5        nature.
 6                  MR. HUTTING:  No, that's not leading.  A leading
 7        question would be was that Little Sam, his son?  Isn't it
 8        true it was Little Sam, his son?  That's the leading form
 9        of it.  When it can be answered yes or no, it's not
10        leading.
11                  THE COURT:  Response?
12                  MR. KINNEY:  I think everybody in the courtroom
13        knows that Mr. Hutting wants it to be Little Sam, his son,
14        and that's what the objection is about.  If Ms. Burt
15        knows, I would prefer that the evidence come from Ms.
16        Burt.
17                  MR. HUTTING:  That's not --
18                  THE COURT:  Gentlemen, I'm going to ask you,
19        you're both seasoned veterans here, I would ask that you
20        -- that your questions are framed in such a manner that
21        they comply with the rules of evidence; okay?  Go ahead.
22  BY MR. HUTTING:
23  Q.    By Little Sam, who do you mean?
24  A.    Little Sam, Sam's son.
25  Q.    This man's son?
```

76

```
 1   A.   Correct.

 2   Q.   Okay.  All right.  Did you talk to them?

 3   A.   No, I had my granddaughters with me.

 4   Q.   Okay.  Did they say anything while you were looking out

 5        the peephole there when they were on the other side

 6        banging on the door?

 7   A.   No.  I heard something but I couldn't make out what it

 8        was.  There was a gesture made, like, towards my vehicle.

 9   Q.   Okay.  All right.

10   A.   But I'm not sure who, you know, what it was about.  Like I

11        said, I had my granddaughters, I was more concerned for

12        them.

13   Q.   Okay.  Why were you concerned for them?

14   A.   Because I know what had just happened to my son, that he

15        had just jumped on Quiana.  So for them to come to my

16        door, they're looking for him, is what I assumed.

17   Q.   Okay.  All right.  So you did not open the door?

18   A.   No.

19   Q.   Okay.  Did you see any vehicle or vehicles anywhere?

20   A.   Yes.

21   Q.   Tell us about that.

22   A.   Samuel has a gold, long car, and that was --

23   Q.   By Samuel, you're pointing to Mr. Dantzler?

24   A.   Mr. Dantzler, yes.

25   Q.   You're familiar with his car?
```

```
 1   A.   Yes, it's been to my house several times.

 2   Q.   Okay.  Did you -- Tell me what you saw when you looked out

 3        your peephole that night.

 4   A.   When they went back to the car, there was several heads in

 5        the car.  As they opened the door, you could see there was

 6        several people, other people, in the car.

 7   Q.   Could you tell us who it was that was in the car?

 8   A.   No.  No, I couldn't do that.

 9   Q.   Whose car was it?

10   A.   It was Samuel Dantzler's car.

11   Q.   Any doubt in your mind that it was Samuel Dantzler's car?

12   A.   Same car pulled up on me when I was dropping off Quiana --

13        not Quiana -- Kietta (phonetic), who was with Bernard that

14        night.

15   Q.   Okay.  How do you find out that something had happened to

16        your son?

17   A.   Nikitta called me.

18   Q.   Who called you?

19   A.   Kitta called me --

20   Q.   Is that Nikitta McKenzie?

21   A.   -- screaming -- Correct.

22             MR. KINNEY:  Your Honor --

23   A.   -- that Bernard was dead.

24             THE COURT:  Just a moment, ma'am.  While the

25        lawyers are talking, don't answer; okay?
```

```
 1                Mr. Kinney.

 2                MR. KINNEY:  I'm not certain, but it sounds like

 3        hearsay.  If there's an exception to something else, but

 4        it just sounds like hearsay at this particular time.

 5                MR. HUTTING:  I don't think it sounds like

 6        hearsay.  I asked her how she found out, and she told us

 7        how she found out.  Nikitta called her.  That's not

 8        hearsay.

 9                THE COURT:  No.  But she was starting to answer

10        further and say what she was told and that would be

11        hearsay.  So why don't you proceed at this point?

12                MR. HUTTING:  All right.

13   BY MR. HUTTING:

14   Q.   Okay.  You got a call from Nikitta?

15   A.   Correct.

16   Q.   Can you tell me about what time you got that call, Ms.

17        Burt, or not?

18   A.   It was about quarter to 2:00, 1:30, somewhere in there.

19   Q.   Okay.  Some time after the men had left?

20   A.   Correct.

21   Q.   Okay.  All right.  So you never, after Bernard left your

22        house that night, you never saw him alive again; is that

23        correct?

24   A.   No.

25   Q.   Okay.  And you were only able to talk to him one time when
```

79

```
 1        your -- when his dad hooked you up; right?

 2   A.   Correct.

 3   Q.   Okay.  All right.  Did anything else happen at your house

 4        that night, or was that it?

 5   A.   No.  Something strange, something else did happen.

 6   Q.   What else happened?

 7   A.   They came to pick Mikayla up.

 8   Q.   Who did?

 9   A.   Her grandmother and Tasha.

10   Q.   Her grandmother being Quiana's mother?

11   A.   Ruth Turner.

12   Q.   Did that happen before you got the call from Nikitta or

13        after?

14   A.   After.

15   Q.   After, okay.  So they picked --

16   A.   Excuse me.  Before I got the call from Nikitta, they came

17        to pick Mikayla up.

18   Q.   And that was strange?

19   A.   Correct.

20   Q.   Tell us why.

21   A.   She was supposed to spend the weekend with me.

22   Q.   Okay.  But they came and picked her up?

23   A.   Correct.

24   Q.   And then shortly thereafter, you got the call from

25        Nikitta; is that correct?
```

1    A.   Correct.

2    Q.   Okay.  Was a funeral held for Bernard?

3    A.   Yes.

4    Q.   Was there a viewing?

5    A.   Yes.

6    Q.   Okay.  Did Mr. Dantzler come to that?

7    A.   No.

8    Q.   How about Little Sam, did he show up?

9    A.   No.

10   Q.   How about Rodney Turner, did he show up?

11   A.   No.

12   Q.   Little Sam and Rodney both knew Bernard?

13   A.   Correct.

14   Q.   As did Mr. Dantzler?

15   A.   Correct.

16   Q.   Thank you, ma'am.

17                MR. HUTTING:  Cross-examination.

18                MR. KINNEY:  Thank you.  May I, your Honor?

19                THE COURT:  Yes.

20

21   CROSS-EXAMINATION BY MR. KINNEY:

22   Q.   Good morning, Ms. Burt.

23   A.   Good morning.

24   Q.   My name is Robert Kinney, I'm a lawyer, and I represent

25        Mr. Dantzler.  I want to ask you, did you talk to -- The

```
1          events that you're talking about happened on what day?

2     A.   On Sunday.

3     Q.   And that was?

4     A.   September the 15th.

5     Q.   Well, back in --

6     A.   I mean, I'm sorry, January.

7     Q.   Yes, January 15th?

8     A.   Correct.

9     Q.   Okay.  And on that day did you talk to Mr. Dantzler?

10    A.   No.

11    Q.   On that day did you see Mr. Dantzler?

12    A.   No.

13    Q.   When -- Am I pronouncing it right, Quiana; is that it?

14    A.   Correct.

15    Q.   When Quiana first came to your house with -- is it

16         Mikayla?

17    A.   Correct.

18    Q.   That's your grandchild?

19    A.   Correct.

20    Q.   Granddaughter?

21    A.   You're correct.

22    Q.   Okay.  And your granddaughter is still in your life?

23    A.   Yes, she is.

24    Q.   Okay.  And none of the Dantzlers have tried to keep her

25         out of your life?
```

1    A.    Why would they -- You're saying that's possible?

2    Q.    Is that yes or no?  Has anyone tried?

3    A.    Not that I know of.

4    Q.    Okay.

5    A.    I see Mikayla.

6    Q.    Okay.  When you want to; correct?

7    A.    When she's -- Yeah, when she's available to me.

8    Q.    And Quiana still brings her over?

9    A.    I go and pick her up, yes.

10   Q.    Okay.  And on that particular night now, Quiana came over

11         to your house to leave Mikayla with you?

12   A.    Correct.

13   Q.    And this was one of your visiting times; correct?

14   A.    Yes.

15   Q.    Okay.  And when she came, you said that there was a man in

16         the car with her?

17   A.    Yes.

18   Q.    Okay.  And that man was definitely not Mr. Dantzler?

19   A.    I'm -- To tell you the truth, she said it wasn't, she said

20         it was her cousin.

21   Q.    I'm not --

22   A.    So you're telling me from what I seen, was it Mr.

23         Dantzler?

24   Q.    Ms. Burt, I'm doing what I can to ask you about what you

25         saw, and not what you heard somebody else say.

1   A.   Okay.

2   Q.   Okay.  Was there any indication from what you saw --

3        because you already testified that you know Mr. Dantzler;

4        correct?

5   A.   Correct.

6   Q.   And how long have you known him?

7   A.   Quite a few years.

8   Q.   Okay.

9   A.   I mean he used to pick Quiana up from my house.

10  Q.   So you know him when you see him; correct?

11  A.   Correct.

12  Q.   You've identified him today; correct?

13  A.   Correct.

14  Q.   Was he the other gentleman that was in the car?

15  A.   No.

16  Q.   Okay.  And you know that from your -- from your knowledge

17       of Mr. Dantzler, not from what anybody told you; correct?

18  A.   Correct.

19  Q.   Okay.  And it would have been unlike Mr. Dantzler not to

20       get out and speak to you; correct?

21  A.   Yes.

22  Q.   Okay.

23  A.   Well, I can't say that's right, no.

24  Q.   Well, Mr. Dantzler ever threatened you?

25  A.   No, he hasn't.

1    Q.   Okay.  Has Mr. Dantzler ever threatened any of your

2         children?

3    A.   I wouldn't know.

4    Q.   Well, in your presence?

5    A.   No.

6    Q.   Has Mr. Dantzler ever threatened any of your

7         grandchildren?

8    A.   Like you said, not in my presence, no.

9    Q.   Okay.  All right.  And actually you know that Quiana is

10        his niece?

11   A.   Correct.

12   Q.   Okay.  And you know that Mikayla would be his great-niece?

13   A.   Correct.

14   Q.   Okay.  And you said that he has brought Mikayla to your

15        house?

16   A.   And Quiana, yes.

17   Q.   And he's picked them up?

18   A.   Correct.

19   Q.   Now this big, long yellow car that you're talking about,

20        is that the color?

21   A.   Gold, yes.

22   Q.   Gold?  Okay.  Back in 2006, other people were driving that

23        car at that time?

24   A.   No.

25             MR. HUTTING:  Objection, unless she knows,

1       Judge.

2                   MR. KINNEY:  Okay.  I should say unless she

3       knows.

4   BY MR. KINNEY:

5   Q.  I'm only asking you what you know.  That's what I had

6       prefaced before.

7                   Do you know that other people had been driving

8       that car?

9   A.  No, I don't.

10  Q.  You don't.  Did the last time -- Do you recall the last

11      time that Mr. Dantzler had been to your house prior to the

12      15th?

13  A.  Yes, I do.

14  Q.  And approximately how long was that?  How much time span

15      was it between the last time that Mr. Dantzler had been --

16  A.  Five to six months.

17  Q.  Five to six months, okay.  So that means that it was at

18      least five to six months that you had not seen Mr.

19      Dantzler driving that gold car?

20  A.  Yeah, correct.

21  Q.  Okay.  Had you seen anybody else drive that gold car,

22      besides Mr. Dantzler?

23  A.  No.

24  Q.  Never?

25  A.  Never.

```
 1   Q.   Did you see that gold car over to your house within those
 2        -- that five-month period.
 3   A.   No.
 4   Q.   Okay.  When Quiana was at your house with Mikayla,
 5        dropping her off, this is before anything happened to your
 6        son, Mr. Hill?  He was at your house at the time that
 7        Quiana got picked up?
 8   A.   I'm not sure.  Are you talking of the night that this
 9        happened or --
10   Q.   Yes, the night that this happened.  Well, you said this
11        was Sunday the 15th; correct?
12   A.   January 15th, yes.
13   Q.   Yes.  And this wasn't nighttime.  Did she drop Mikayla off
14        earlier in the day?
15   A.   No, this is nighttime.
16   Q.   About what time did she drop Mikayla off?
17   A.   It was between, like I said, ten and eleven o'clock.  I
18        think it was 10:30.
19   Q.   10:30 at night?
20   A.   Yes, it was at night.
21   Q.   Okay.  So --
22   A.   It was late.
23   Q.   All right.  And do you remember what kind of car she was
24        driving?
25   A.   She was driving her car.
```

1   Q.   Describe her car for us.

2   A.   She had a green -- It's a Chrysler.

3   Q.   Okay, a green Chrysler.  Small?

4   A.   No, I can't think of the name of it.

5   Q.   But you know it was a Chrysler and it was green?

6   A.   It's green.

7   Q.   Okay.  And that was her car?

8   A.   Yes.

9   Q.   Okay.  And when she dropped Mikayla off, that was around

10       10:30, you said?

11  A.   Yes.

12  Q.   Was Mr. Hill at your house when she got there or he came

13       later?

14  A.   He was there.

15  Q.   He was there, okay.  And without telling us what was said,

16       was there a conversation between Mr. Hill and Ms. Turner?

17  A.   Yes, they talked on the phone.

18  Q.   I'm sorry?

19  A.   They talked on the phone before she came.

20  Q.   After she got there.

21  A.   They had a slight little conversation.

22  Q.   Was that in your --

23  A.   In my presence, yes.

24  Q.   And emotionally speaking, was anybody angry after that

25       conversation?

88

```
 1   A.   No.

 2   Q.   Nobody was angry?

 3   A.   No.

 4   Q.   Okay.  And Mikayla had a conversation with --

 5   A.   Her dad.

 6   Q.   Her dad; correct?

 7   A.   Correct.

 8   Q.   And as a result of that conversation, was anybody angry?

 9   A.   Not to my knowledge, it didn't seem to -- appear to be.

10   Q.   Didn't seem to appear to be.  Do you recall telling your

11        son to just leave that alone?

12   A.   I did say that, because he brought the conversation to me

13        and he brought Mikayla to me.

14   Q.   And he wasn't angry about it?

15   A.   No.

16   Q.   Disturbed?

17   A.   Then I would have to go on my intuition as a mother, I

18        would say it disturbed him, but he didn't manifest it in

19        my presence.

20   Q.   Okay.  But you know your son.

21   A.   Yes, I do.

22   Q.   All right.  And for you to say just leave that alone,

23        would I be correct in saying you were concerned?

24   A.   Yeah, what she said to him --

25   Q.   About how he felt about it?
```

89

1  A.   Yes.

2  Q.   Would I -- and only if you know -- Was there any violent

3       confrontations between Quiana and your son before?

4  A.   Yes --

5              MR. HUTTING:  Objection.  Objection, relevancy.

6              MR. KINNEY:  This is past conduct of the

7       complainant, your Honor.

8              MR. HUTTING:  From what?

9              MR. KINNEY:  With respect to this particular

10      case.

11             MR. HUTTING:  How is it relevant to this

12      particular incident?

13             MR. KINNEY:  I will -- the next question I'm

14      going to be asking is in regards to whatever Mr. Dantzler

15      had to say about any of the past conversations.  That

16      would make it relevant.

17             MR. HUTTING:  How do we know that Mr. Dantzler

18      knew about any of that?  Judge, there's no foundation for

19      any of that.

20             THE COURT:  Read back the last question and

21      answer of the witness.  I'm not sure the lawyers heard her

22      response before they started their argument; okay, Mrs.

23      Bauer?  Thank you.

24             (At about 11:46 a.m., following record read:

25             "Q.  Would I -- and only if you know -- Was

                              90

1                    there any violent confrontations between

2                    Quiana and your son before?

3         A.  Yes.")

4         MR. HUTTING:  And I objected to that.

5         THE COURT:  Had you both completed your

6    argument?

7         MR. HUTTING:  Yes, sir.

8         MR. KINNEY:  We have.

9         All of these -- this is -- The incident here,

10   okay, it's that the Prosecutor's theory that Mr. Dantzler

11   was angry and that had something to do with what happened

12   to Mr. Hill because of a violent confrontation --

13        THE COURT:  Should we be excusing the jury for

14   this argument or not?

15        MR. KINNEY:  Yes, your Honor.  Thank you.

16        THE COURT:  Would you go to the jury room,

17   please?  Don't discuss the case.

18        Should the witness step down and be excused?

19        MR. KINNEY:  Yes, your Honor.  Thank you.

20        DEPUTY SHERIFF:  All rise for the jury.

21        (At about 11:47 a.m., jury panel excused.)

22        DEPUTY SHERIFF:  Please be seated.

23        MR. KINNEY:  We have to take every witness as

24   the witness comes.  I don't know whether Mr. Dantzler

25   intends to testify or not, but it's already out there that

91

1          Mr. Dantzler took offense to what Mr. Hill did and

2     responded by being a part of certain family members that

3     are alleged to have killed Mr. Hill.

4               So now if Mr. -- If she had any conversations

5     with Mr. Dantzler, if she knows about prior incidents and

6     then whatever Mr. Dantzler did.  And I believe that she's

7     going to say that he didn't do anything.  And that's where

8     she said he did this time so far.  But I think that that's

9     important to Mr. Dantzler's defense.

10              THE COURT:  Mr. Hutting?

11              MR. HUTTING:  Well, you know, Judge, first of

12    all, if, if, if.  That's if this, if this, if that; okay?

13    How do we know that Mr. Dantzler ever knew about any of

14    that; okay?  About these prior confrontations, if there

15    were?  How are the prior confrontations relevant?

16              Obviously, we know that this night, about a

17    couple hours -- or within four hours after Quiana Turner

18    gets jumped on by Bernard Hill, that two people, Rodney

19    Turner and his son, show up at this woman's house pounding

20    on the door.  She won't open the door.  She also sees that

21    there's Mr. Dantzler's car in the driveway and that there

22    are other people in the car.

23              The car leaves.  And about an hour later,

24    Bernard Hill is killed by people busting into the

25    apartment where he was staying that night, pummeling him,

1       and then somebody shooting him.

2              And the connection that ties Mr. Dantzler to

3       that is the hat that we have that was found on the floor

4       in that apartment that comes back with his DNA on that

5       hat.  How all of these other things are relevant, this is

6       not a self-defense case, the past actions of the

7       complainant.

8              You know, if this was a self-defense case, then,

9       they might be relevant.  But this is not a self-defense

10      case.  This is a case where he's saying, I didn't do

11      anything, I didn't have anything to do with it.  So I

12      really don't see how all of this is relevant.

13             MR. KINNEY:  The jury instruction, your Honor,

14      7.23, past violence of the complainant or decedent.  It

15      does not indicate that the only time that you can use this

16      evidence is when you are alleging self-defense, first.

17             And in this particular case, we have a -- we

18      have a witness that's on this stand that says, at this

19      particular time, she didn't hear from Mr. Dantzler.  And I

20      think it's relevant that if his actions were as consistent

21      this time with Mr. -- with Ms. Burt as they were in prior

22      -- past violence of the decedent towards Ms. Turner, it's

23      relevant and it's part of his right to present a defense

24      in that this is his -- this is his behavior in the past

25      and this would be his behavior this time, too.

93

1              MR. HUTTING:  Nobody killed Bernard in the past.

2       Somebody killed Bernard this night, Judge.  Somebody

3       killed Bernard this night about two hours after he jumped

4       on Quiana Turner, about an hour after this man's son, this

5       man's nephew, and his car, with other people in it, show

6       up at the house.

7              What they did in the past is not relevant to

8       what they did that night, because it's obvious what they

9       did that night, that they decided to do something that

10      night, and they did something that night.  There's no

11      argument about that.

12             And these instructions, past violence of the

13      complainant, those go to self-defense.  Those are --

14      That's in the defense area for self-defense instructions

15      and that's not a defense here.

16             MR. KINNEY:  That's the problem here, your

17      Honor.  He is using the term "they".  He's including Mr.

18      Dantzler when the witnesses are not.  And I'm just trying

19      to show consistent behavior of Mr. Dantzler.  It is

20      definitely relevant.

21             An issue -- a material issue fact that may lend

22      some type of consideration as to Mr. Dantzler's defense:

23      I did nothing.  And for -- and what really makes it

24      relevant is the fact that he's -- in his opening argument

25      and all of the questioning, it's they were a posse.  He's

1          there because the rest of them are there.

2                  And I'm only concerned with Mr. Dantzler, and

3          I'm only asking her questions about Mr. Dantzler, not the

4          rest of them.  I have to distinguish him from the

5          individuals that she identified as banging on the door,

6          where she assumed that they were looking for Mr. Hill.  I

7          need to be able to distinguish him from them.

8                  MR. HUTTING:  You can't lay a foundation -- I

9          mean maybe he can lay the foundation that she knew that

10         Mr. Dantzler knew that Bernard had jumped on Quiana

11         before.  How's he going to lay that foundation?  He's

12         going to just try to, you know, put all this bad stuff in

13         about Bernard Hill and move on.  That's what it is, it's

14         an attempt to smear the complainant.

15                 There has to be a foundation, first of all, that

16         this person, this witness, knew that Bernard Hill jumped

17         on Quiana.  The only way that she would know that, okay,

18         the only way that she would know that that's admissible is

19         if he had talked about that before to her, okay, or if he

20         -- she was present when -- that they were all present when

21         that happened.  Otherwise, it's just all hearsay.  It's

22         all hearsay, it's all rank hearsay.

23                 THE COURT:  Mr. Kinney, final response?

24                 MR. KINNEY:  I don't think that I have to lay a

25         foundation that she knows anything about what he knows.

1       All she's going to be able to testify to is what she

2       knows.  And if she knew that there was prior past conduct

3       of the complainant against Quiana Turner where my client

4       is accused of doing this, what -- I already asked her

5       questions about what Mr. Dantzler did on that fateful

6       night, and I think that I have a right to ask her

7       questions about what Mr. Dantzler did in prior violent

8       contacts between Ms. Turner and Mr. Hill.  That will show

9       some consistency on Mr. Dantzler's part.

10              THE COURT:  Anything else, Mr. Hutting?

11              MR. HUTTING:  No.  No foundation.  No

12      foundation.

13              THE COURT:  I'm going to give you some latitude

14      under 401:  Relevant evidence means evidence having any

15      tendency to make the existence of any fact that is of

16      consequence to the determination of the action more

17      probable or less probable than it would be without the

18      evidence.

19              And Michigan Rule of Evidence 102:  The purpose

20      of these rules are intended to secure fairness in

21      administration, elimination of unjustifiable expense and

22      delay, and promotion of growth and development of the law

23      of evidence to the end that the truth may be ascertained

24      and proceedings justly determined.

25              MR. KINNEY:  Thank you, your Honor.

```
 1                    THE COURT:  Invite the jury in, please.

 2                    DEPUTY SHERIFF:  All rise for the jury.

 3                    Please come out and take your seats.

 4                    (At about 11:56 a.m., jury panel seated.)

 5                    DEPUTY SHERIFF:  Please be seated.

 6                    THE COURT:  Mr. Kinney, you may proceed.

 7   BY MR. KINNEY:

 8   Q.   Ms. Burt, you okay?

 9   A.   Yes, I'm fine.

10   Q.   Ms. Burt, I think when we left off, I had asked you if you

11        knew about any past violent behavior, violent contacts

12        between your son and Ms. Turner.

13   A.   Yes.

14   Q.   Okay.  And would I be correct in saying that, using your

15        terms, did your son jump on Ms. Turner in the past?

16   A.   Correct.

17   Q.   Okay.  Now when that happened did Mr. Dantzler threaten

18        you?

19   A.   Threaten me?

20   Q.   Yes.

21   A.   No.

22   Q.   Did Mr. Dantzler threaten --

23                    MR. HUTTING:  Judge, I'm going to object unless

24        he can lay a foundation that Mr. Dantzler knew about these

25        things.  And I don't think he can lay that foundation.
```

```
1                    THE COURT:  Mr. Kinney?

2                    MR. KINNEY:  I'm only asking questions that I

3          indicated to the Court prior that I would ask.  I thought

4          you indicated I could.

5                    THE COURT:  Why don't you both approach?

6                    (At about 11:58 a.m., brief sidebar;

7                    At about 12:01 p.m., back on the Record.)

8    BY MR. KINNEY:

9    Q.    Ms. Burt, did Mr. Dantzler contact you about prior

10         incidents when they happened?  These prior -- the prior

11         times that Mr. Hill jumped on Quiana, did Mr. Dantzler

12         contact you about them?

13   A.    No.

14   Q.    Okay.  And you've already said that this particular time

15         on the 15th, Mr. Dantzler did not contact you about it?

16   A.    No.

17   Q.    Okay.  Thank you.  You indicated that it was Mr.

18         Dantzler's son and Quiana Turner's brother that were

19         standing on your porch?

20   A.    Correct.

21   Q.    Did you see a weapon in either one of them's hand?

22   A.    No.

23   Q.    And you already indicated that neither one of them --

24         Well, you didn't hear anything?  You didn't hear any

25         statements at all?
```

1    A.    No.

2    Q.    You just heard the bamming on the door?

3    A.    Correct.

4    Q.    Okay.  And you indicated that you had felt that your

5          grand-baby's security was in jeopardy by the bamming on

6          the door?

7    A.    I had both my granddaughters, yes, I did.

8    Q.    Okay.  But Mr. Dantzler never threatened your

9          granddaughter?

10             MR. HUTTING:  Well, Judge, she didn't see Mr.

11         Dantzler there that night outside her door, so it would be

12         impossible, for that to happen.

13             THE COURT:  Response?

14             MR. KINNEY:  Does that mean I can't ask the

15         question?  I want it into evidence that it's impossible

16         that that happened.  I want it into evidence.  I have to

17         ask the question to make it evidence.  We need the answer.

18             THE COURT:  Go ahead and ask that question.

19   BY MR. KINNEY:

20   Q.    Mr. Dantzler was not there; correct?

21   A.    Not on my porch, no.

22   Q.    All right.  And Mr. Dantzler didn't threaten anyone?

23   A.    No.

24   Q.    Correct?  And you didn't hear any threatening responses

25         from anybody?

```
 1   A.   No.  Just the cousin that made the call.

 2   Q.   Angela?

 3   A.   Correct.

 4   Q.   Okay.  She just -- she called, and that's how you found

 5        out what happened; correct?

 6   A.   Correct.

 7   Q.   Okay.  And even though you felt that there was -- Well,

 8        you felt that there was a problem because you knew what

 9        your son had done?  You didn't like what your son had

10        done?

11   A.   Correct.

12   Q.   Okay.  All right.  And so that's why you thought it may be

13        a problem?  Because you knew what your son had done is why

14        you thought there may by a problem; correct?

15   A.   When they showed up at my house, correct.

16   Q.   Yeah, okay.  But they didn't kick down your door?

17   A.   No.

18   Q.   Okay.  And you didn't see any weapons?

19   A.   No.

20   Q.   And did you call the police?

21   A.   Yes.

22   Q.   Right after they left?

23   A.   Yes.

24   Q.   Okay.  Now you did make a statement back in 2006; correct?

25   A.   Yes.
```

1    Q.   You remember making that statement?

2    A.   Yes.

3              MR. KINNEY:  Mr. Hutting, do you have it?

4              MR. HUTTING:  No, I don't.

5    BY MR. KINNEY:

6    Q.   Would you do me a favor, Ms. Burt, and take a look at that

7         for me?  And read it to yourself first.  Let us know when

8         you've had enough opportunity to take a look at it and

9         read it to your satisfaction.

10             MR. HUTTING:  First of all, Judge, I'm really

11        not sure that he's laid a foundation for this witness

12        to -- she hasn't indicated a need to refresh her

13        recollection.

14             MR. KINNEY:  That's not what I'm doing, your

15        Honor.  Can we approach?

16             (At about 12:06 p.m., brief sidebar;

17             At about 12:08 p.m., back on the Record.)

18             THE COURT:  Mr. Kinney.

19   BY MR. KINNEY:

20   Q.   Are you ready, Ms. Burt?

21   A.   Yes.

22   Q.   First of all, Ms. Burt, do you recognize that document?

23   A.   Yes.

24   Q.   Okay.  Can you tell us what it is?

25   A.   This is a statement the police officers took from me when

101

1       they came to my home.

2   Q.   All right.  And would you adopt that as being your

3       statement?

4   A.   Correct.

5   Q.   And did you have an opportunity to read the statement?  I

6       assume what you're indicating is that you didn't write

7       this statement out?

8   A.   Correct.

9   Q.   Okay.  But you signed it?

10   A.   Correct.

11   Q.   You signed all three -- it's three pages; correct?

12   A.   Yes.

13   Q.   You signed all three pages?

14   A.   Yes.

15   Q.   You had an opportunity to read what was on those pages

16       before you signed them?

17   A.   Yes.

18   Q.   Okay.  And you've had an opportunity to see these -- this

19       statement since January the 18th of '06?

20   A.   Yeah.

21   Q.   And as a matter of fact, would I be correct in saying that

22       you had to take a look at it to prepare for your testimony

23       today?

24   A.   No.

25   Q.   You didn't look at it?

```
 1   A.   It hurts too much, really it does.

 2   Q.   Yes, ma'am.  Okay.  Well, I want to ask you about when you

 3        called the police.  And I want you to take a look at the

 4        third page of your statement.

 5   A.   I'm looking at it.

 6   Q.   The very first answer that you gave on that -- on that

 7        page, the officer asked you the same question I did:  Did

 8        you call the police?

 9   A.   Um-hmm.

10   Q.   Remember that?

11   A.   Yes.

12   Q.   Okay.  And would I be correct in saying that you said:

13        Yes, I called 911 the second time I heard a knock when

14        Ruth and -- Is that her niece?

15   A.   Yes.

16   Q.   -- came to pick up Mikayla.

17   A.   Correct.

18   Q.   That's there; right?

19   A.   Um-hmm.

20   Q.   Do you agree with that today?

21   A.   You know, I want to agree with it because, like I said,

22        that was the end, and I'm sure that's what happened.  I

23        felt threatened the whole night so I'm -- I want to say

24        that's what happened.

25   Q.   Okay.  All right.  So then you didn't call the police
```

```
 1        when -- You only called the police one time; am I correct?
 2   A.   Well, here it says the second time so, obviously, I must
 3        have done it twice, I'm thinking.
 4   Q.   All right.  Well, let me read it:  I called 911 the second
 5        time I heard a knock when Ruth and her niece came to pick
 6        up Mikayla.
 7   A.   Right, the second time.
 8   Q.   So when you called the police was the second time you
 9        heard a knock.  You heard the knock twice?
10   A.   Okay.  I'm assuming this is saying -- you're assuming that
11        it's saying the second time I heard the knock.  I'm
12        thinking I'm telling them exactly that this is the second
13        time because this now is the grandmother -- it's a knock
14        -- it's a knock again.  I had the police on the phone when
15        they came in my door once again.
16   Q.   Once again.  So they came in --
17   A.   Because I thought it was them coming back.
18   Q.   They came to your door before?
19   A.   Who did?
20   Q.   Ruth and her niece?
21   A.   No.
22   Q.   Okay.  Well, let me read the rest of it:  They were
23        banging on the door --
24   A.   Like the police.
25   Q.   -- like they were the police.  I went to the door with 911
```

```
 1        on the phone.  Correct?

 2   A.   Correct.

 3   Q.   I let them in.

 4   A.   Correct.

 5   Q.   So they didn't force their way in, you let them in?

 6   A.   I let them in, yes.

 7   Q.   And you had -- and you had the police on the phone when

 8        they came in?

 9   A.   Correct.

10   Q.   And at that time, you beckoned them to come on in?

11   A.   Correct.

12   Q.   Okay.  You all had a conversation.  Without telling us

13        that you all had a conversation, you had a conversation;

14        correct?

15   A.   Yes, we did.  I did.

16   Q.   Okay.  And Mr. Dantzler was not there; correct?

17   A.   Not to my knowledge, no.  Not in my house.

18   Q.   All right.  Did you see Mr. Dantzler there?

19   A.   No, I did not.

20   Q.   Did you hear from Mr. Dantzler while they were there?

21   A.   No, I did not.

22   Q.   You did not talk to Mr. Dantzler when Ruth and her niece

23        came?

24   A.   No.

25   Q.   And you did not talk to Mr. Dantzler when Mr. Dantzler's
```

1      son came?

2   A.   No.

3   Q.   You did not see Mr. Dantzler when his son came?

4   A.   No.

5         MR. HUTTING:  Objection.  Asked and answered.

6         MR. KINNEY:  Okay.

7  BY MR. KINNEY:

8   Q.   You did not see Mr. Dantzler when Ruth was there?

9   A.   No, I did not.

10  Q.   Okay.  When you say it was Ruth and her niece, was that

11     Quiana?

12  A.   No.

13  Q.   Okay.  So that was another niece?

14  A.   Tasha.

15  Q.   Tasha, okay.  And did Ruth or Tasha have a weapon?

16  A.   No.

17  Q.   Okay.

18  A.   Not to my knowledge.

19  Q.   Which means you didn't see one?

20  A.   Correct.

21  Q.   And how long was it after that that you heard from Nikitta

22     about your son, about your son's death?

23  A.   How long was it?

24  Q.   Yes, approximately.  I know it was in '06, but --

25  A.   Had to be about, like, 15 -- 10, 15 minutes, somewhere in

```
 1      there.

 2  Q.  Okay.  Now during your son's life, you'd have birthday

 3      parties, go to church together, family functions?

 4  A.  Correct.

 5  Q.  Did he graduate from high school?

 6  A.  No, he didn't.

 7  Q.  Okay.  Well, in these birthday parties, was Mr. Dantzler

 8      one that comes to your son's birthday parties?

 9  A.  No.

10  Q.  Okay.  And your son is not -- is definitely not in the

11      same age bracket as Mr. Dantzler?

12  A.  Correct.

13  Q.  Okay.  And when your son went to family functions, was Mr.

14      Dantzler there?

15  A.  No, not to my knowledge.

16  Q.  Okay.

17              MR. KINNEY:  And I've got nothing further.

18      Thank you, your Honor.

19              THE COURT:  Mr. Hutting.

20

21  REDIRECT EXAMINATION BY MR. HUTTING:

22  Q.  Initially there was this banging on the door?

23  A.  Correct.

24  Q.  Okay.  And that's when you saw Rodney and Little Sam?

25  A.  Correct.
```

107

```
 1   Q.   Okay.  In the car, in the driveway -- Mr. Dantzler's car

 2        in the driveway and other people in the car?

 3   A.   Correct.

 4   Q.   Okay.  Are you able to identify who the other people were

 5        in the car?

 6   A.   No.

 7   Q.   Okay.  And then some time later, there's a second banging

 8        on your door; is that correct?

 9   A.   Correct.

10   Q.   When you heard that second banging, your initial thought

11        was what?

12   A.   Call the police.

13   Q.   Call the police.

14             Who did you think was at the door?

15   A.   Them again.

16             MR. KINNEY:  Objection to them.  I'm here

17        representing Mr. Dantzler so --

18   A.   Okay.  Well, Rodney and Samuel, Sam again.

19   BY MR. HUTTING:

20   Q.   Okay.  But when you went to the door, you found out it was

21        Ruth and Tasha?

22   A.   Correct.

23   Q.   Okay.  And ultimately you let them in?

24   A.   Correct.

25   Q.   And that's when they got the baby?
```

```
1    A.   Well, yes.

2    Q.   Okay.  They left with the baby?

3    A.   Correct.

4    Q.   About 15 minutes later, you get the phone call from

5         Nikitta finding out that your son's dead?

6    A.   It seemed to be 15 minutes, yes.

7    Q.   Okay.  You said you felt threatened?

8    A.   Yes, I did.

9              MR. HUTTING:  Thank you.  Nothing further.

10             MR. KINNEY:  Nothing further, your Honor.  Thank

11        you.

12             THE COURT:  May the witness step down and be

13        excused?

14             MR. HUTTING:  Yes.

15             MR. KINNEY:  Yes, your Honor.

16             THE COURT:  Thank you, Ms. Burt.

17             MR. HUTTING:  Would you like to hear from

18        another witness?

19             THE COURT:  Absolutely.

20             COURT CLERK:  Raise your right hand, please.

21             Do you swear or affirm that the testimony you're

22        about to give in the matter now pending before this Court

23        will be the truth, so help you, God?

24             WITNESS STEARY:  I do.

25             COURT CLERK:  You may be seated.
```

```
 1                      CHRISTOPHER STEARY,

 2       called as a witness at 12:18 p.m., having first been duly

 3       sworn by the Clerk of the Court, was examined and

 4       testified on his oath as follows:

 5                   THE COURT:  Good afternoon.  Make yourself

 6       comfortable.  Pull the microphone close to your mouth and

 7       speak loudly and clearly for our jurors; okay?

 8                   Mr. Hutting.

 9                   MR. HUTTING:  Thank you, your Honor.

10

11   DIRECT EXAMINATION BY MR. HUTTING:

12   Q.  Please tell this jury your name, sir.

13   A.  Christopher Steary.

14   Q.  Please tell this jury where you worked back in 2006?

15   A.  I was a forensic biologist for the City of Detroit Police

16       Department Crime Lab.

17   Q.  Okay.  And for how long did you work for the City of

18       Detroit in its police department crime lab as a forensic

19       biologist?

20   A.  I started in October of 2002.

21   Q.  Okay.  And are you still there today?

22   A.  No, I'm not.

23   Q.  When did you stop being a forensic biologist for the

24       Detroit Police Department and its crime lab?

25   A.  2008, April.
```

1  Q.  Okay.  All right.  Can you tell us about some of the

2      training that you had to do your job?

3  A.  2002, I was hired as an assistant forensic biologist where

4      I started the DNA training program.  And about the next

5      two years, I learned the different aspects related to

6      forensic biology, DNA analysis and biological examination

7      for evidence.

8  Q.  Okay.  All right.  Did you ever come to court ultimately

9      to testify about your work?

10  A.  Yes, I have.

11  Q.  Okay.  How many times would you say you've testified about

12      your work?

13  A.  About 39 times.

14  Q.  Okay.  What were some of the things that you used to do as

15      a forensic biologist?

16  A.  Blood analysis for DNA, sexual assault kit examinations,

17      B and E, property crime, anything where evidence was left

18      behind where biology would have been left on the evidence.

19  Q.  Okay.  All right.  Did you, in this particular case that

20      you're here to testify about, do some work?

21  A.  Yes, I did.

22  Q.  Okay.  And ultimately what did that work consist of?

23  A.  There was an examination of evidence, just a cursory

24      examination where it was packaged and ultimately sent to a

25      vendor laboratory for DNA analysis.

111

1    Q.    So in this particular case, the Detroit Police Crime Lab

2          or Michigan State Police did not do the analysis?

3    A.    That's correct.

4    Q.    So it was sent out to like a -- Are you familiar with a

5          company called Bode Technology?

6    A.    Yes, I am.

7    Q.    What's Bode Technology?

8    A.    Bode Technology was a laboratory who the State of Michigan

9          contracted with in order to process our backlog DNA

10         evidence.

11   Q.    Okay.  And what did you do in this particular case, Mr.

12         Steary?

13   A.    In this case, I looked at three items:  A hat, a buccal

14         swab from a suspect, and a blood sample from the deceased

15         victim.

16   Q.    Okay.  All right.  Let's talk about the blood sample from

17         the victim.  Would that be Mr. Bernard Hill?

18   A.    That's correct.

19   Q.    Where did you get that blood sample from?

20   A.    I can read directly from my report.

21   Q.    Sure.

22   A.    Reading from my report prepared for laboratory number

23         B060247, regarding the fatal shooting of Bernard Hill, an

24         item was received --

25               MR. KINNEY:  Well, objection.  Objection to him

                                  112

1    reading his report into the record.  I thought he was

2    refreshing his recollection, but I'm objecting to him

3    reading the report.

4   BY MR. HUTTING:

5   Q.   If you read that report or that portion of the report

6        over, would you be able to tell us where you got the blood

7        sample?

8   A.   Yeah, I can put it in my own words.

9   Q.   Go ahead.

10  A.   Sergeant David Moore delivered a tube of blood to the

11       crime lab which was taken from the morgue when the autopsy

12       was performed.  That tube of blood was delivered to the

13       crime lab and a blood stain card was prepared.  I took a

14       cutting of the blood stain card after the blood was drying

15       on it and stored that cutting in a centrifuge tube, a

16       plastic tube for further DNA analysis.

17  Q.   Okay.  First of all, how do we get the -- Did you do the

18       card?

19  A.   No, I did not.

20  Q.   Okay.  How does a card get prepared?

21  A.   A tube of liquid blood needs to be dry -- the sample of it

22       needs to be dry so it can stay viable.  The DNA won't

23       degrade over time.  A dry blood stain needs to be

24       prepared.  So the liquid blood is spotted onto a piece of

25       fabric, which is stapled to a card.  The card is allowed

1          to dry, the blood allowed to dry.  And then we seal it in

2          plastic and store it in a freezer for long-term storage.

3    Q.    Okay.  And then how do you do the cut, tell us about the

4          cut that you did.

5    A.    The blood stain card, the plastic is unsealed, and we just

6          simply use a scalpel and cut off a small section, like a

7          five millimeters by five millimeters section and store

8          that small cutting into a centrifuge tube.  The centrifuge

9          tube is stored separately.  The blood stained card is

10         resealed and stored in a freezer.

11   Q.    Okay.  And then ultimately can that blood stained card or

12         the cut that you took from that blood stained card, can

13         that be sent to somebody like Bode Technology so that they

14         can then develop a DNA profile from that blood stained

15         card?

16   A.    Yes, sir.

17   Q.    Okay.  All right.  Did you ever -- you said that you got

18         something from a person, from a potential suspect?

19   A.    Yes, sir.

20   Q.    Who -- Was it identified in any way?  What was it?

21   A.    If I can refer to my report?

22   Q.    Sure.

23   A.    The person that was identified is a Patrick Grunewald.

24   Q.    What did you get from Mr. Grunewald?

25   A.    A buccal swab.

114

1   Q.   What's a buccal swab?

2   A.   A buccal swab is a swab that is rubbed on the interior of

3        the cheek where there was a lot of cells that will slough

4        off onto the swab in order to get a DNA profile of that

5        person, which that sample can then be dried and stored for

6        long-term storage.

7   Q.   Okay.  So with the buccal swab, then can a DNA profile be

8        developed from a buccal swab?

9   A.   Yes, sir.

10  Q.   Okay.  And that was done with Mr. Grunewald?

11  A.   Yes, sir.

12  Q.   Okay.  Now you also said you got a third item.  What was

13       that, please?

14  A.   That third item was a black knit cap.

15  Q.   Okay.  And what were you asked to do with the black knit

16       cap?

17  A.   Actually I was just asked to take a look at it to see what

18       I could see.  And barring that, to take a cutting to try

19       to determine who was wearing that hat last.

20  Q.   Okay.

21  A.   What DNA could I find on the hat.

22  Q.   Was that black knit hat that you got on an evidence tag,

23       sir?

24  A.   Yes, it was.

25  Q.   What evidence tag was it on?

115

1  A.  Referring back to my report, the evidence tag number was

2      E16225404.

3  Q.  Okay.  Let me show you what's been marked and entered here

4      as People's Exhibit Number 22.  Do you recognize People's

5      Exhibit Number 22?

6  A.  Yes, I do.

7  Q.  Okay.  Is that the evidence property tag and the evidence

8      property tag folder that that hat was in?

9  A.  Yes, it is.

10 Q.  Okay.  Let's take out the exhibit.  And we're going to --

11     As a matter of fact, do you even see your lab number on

12     this hat?

13 A.  Yes, I do.

14 Q.  Okay.  Was it your practice when you worked on something

15     to then, if it had an evidence tag on it, to put a lab

16     number on it?

17 A.  Yes, it was.

18 Q.  Okay.  All right.  Let's take out this, show it to you and

19     ask you if you recognize it?

20 A.  This does appear to be the hat that I examined for this

21     case.

22 Q.  Okay.  Now what kind of -- What are you trying to get off

23     of that hat ultimately if you -- You looked it over, first

24     of all?

25 A.  Correct.

116

1   Q.   Okay.  All right.  You said that you took a cutting from

2        it?

3   A.   That's correct.

4   Q.   Okay.  I want you to tell the jury how -- can you find the

5        cutting that you took from that hat?

6   A.   Yes, I can.  The cutting is right here on the interior rim

7        of the hat.

8   Q.   Okay.  That's the cutting that you did.

9             Okay.  What do you do with this cutting, Mr.

10       Steary, after you take the cutting from the hat?

11  A.   I take the cutting and put it into a small plastic tube, a

12       micro centrifuge tube, and then store it for DNA analysis.

13  Q.   Okay.  So is that ultimately then, the cutting that gets

14       sent to some lab or to whoever is going to do the DNA

15       analysis?

16  A.   That's correct.

17  Q.   Okay.  So they then take that cutting and do whatever work

18       that they can do from that?

19  A.   Correct.

20  Q.   Okay.  Now, can you tell this jury why you took the

21       cutting from this particular place in the hat?

22  A.   This is a location where I expect the person to be wearing

23       as the front of the head, or the brow of the head, would

24       be in contact with the hat.  There's a tag that marks the

25       back of the hat inside the hat which indicates the back so

                              117

```
 1          I know where to look for the front of the hat.  So that's
 2          where I target the front of the hat, where I expected
 3          somebody to rub off cells from their forehead and be left
 4          behind on the hat.
 5     Q.   Okay.  So on our forehead, we have cells?
 6     A.   Yes, skin cells.
 7     Q.   Okay.  If we wear something and we -- like a hat, can we
 8          transfer skin cells from that -- from ourself to that hat?
 9     A.   That's correct.
10     Q.   Okay.  Like, if you had a baseball cap -- Are you familiar
11          with what a baseball cap looks like?
12     A.   Yes, sir.
13     Q.   Have you ever worked on baseball caps?
14     A.   Absolutely.
15     Q.   Okay.  Where is the area that you target on baseball caps?
16     A.   Usually a baseball cap has got a fabric rim on the inside
17          to make it comfortable to wear, and that was the location
18          that we usually cut, right behind the brim of the hat.
19     Q.   Okay.  So in this case, what you targeted was what you
20          thought would be the front of the hat that would come in
21          contact with the forehead?
22     A.   That's correct.
23     Q.   Okay.  All right.  Does that complete the work that you
24          did in this case, Mr. Steary?
25     A.   Yes, it does.
```

118

```
 1                    MR. HUTTING:  Okay.  Thank you very much, sir.
 2          Submit him for cross.
 3                    THE COURT:  We'll do that after lunch.
 4                    MR. KINNEY:  Yes, your Honor.  Thank you.
 5                    THE COURT:  Okay.  Jurors, Witness, you may step
 6          down.  Ladies and gentlemen, it's time for your lunch
 7          break.  It's 12:35.  I'd like you to return at 1:45, okay,
 8          about an hour and ten minutes, hour and 14 minutes or so.
 9          Thank you.
10                    Don't discuss the case, wear your badges, leave
11          your notes and pens in the jury room.
12                    DEPUTY SHERIFF:  All rise for the jury.
13                    (At about 12:31 p.m., jury panel excused.)
14                    DEPUTY SHERIFF:  Please be seated.
15                    THE COURT:  Have a good lunch.  See you at 1:45,
16          gentlemen.
17                    MR. KINNEY:  Yes.
18                    MR. HUTTING:  Thank you, your Honor.
19                    (At about 12:31 p.m., lunch recess;
20                    At about 1:46 p.m., back on the Record.)
21                    COURT CLERK:  Recalling docket 10-3521, People
22          versus Samuel Lee Dantzler, jury trial in progress.
23                    MR. HUTTING:  Auggie Hutting for the People.
24                    MR. KINNEY:  Robert Kinney appearing on behalf
25          of Mr. Dantzler, along with Alanna O'Rourke.
```

```
 1                    THE COURT:  Jury, please.

 2                    DEPUTY SHERIFF:  All rise for the jury.

 3                    Please come out and take your seats.

 4                    (At about 1:47 p.m., jury panel seated.)

 5                    DEPUTY SHERIFF:  Please be seated.

 6                    THE COURT:  Cross-examination, Mr. Kinney.

 7                    MR. KINNEY:  Thank you, your Honor.

 8                    THE COURT:  You're welcome.

 9

10   CROSS-EXAMINATION BY MR. KINNEY:

11   Q.   Good afternoon.  Is it Doctor Steary?

12   A.   No.  Just Mr. Steary.

13   Q.   Mr. Steary.  So that means it's not Officer Steary?

14   A.   No, sir.

15   Q.   Have you ever been an officer?

16   A.   No, sir.

17   Q.   Okay.  So you were a civilian employee for the Detroit

18        Police Crime Lab?

19   A.   Correct.

20   Q.   Okay.  And as a civilian employee, you were a forensic

21        biologist?

22   A.   Correct.

23   Q.   You went to school to be a biologist?

24   A.   Biochemist, but yes.

25   Q.   Biochemist.  So they don't call biochemists doctors?
```

1    A.    Four more years of school.

2    Q.    Okay.  So you got your bachelor's?

3    A.    Bachelor of Science, yes.

4    Q.    Bachelor's of Science, okay.

5                  And you went directly to -- your first

6          employment as a biologist was with the Detroit Crime Lab?

7    A.    No, sir.

8    Q.    No.  You were employed elsewhere?

9    A.    Yes.

10   Q.    Where?

11   A.    I did a stint at Footlocker after graduating.

12   Q.    Well, as a --

13   A.    Then I went on to work in an environmental testing

14         laboratory.  I did that for a year or two.  And then I

15         went on to a pharmaceutical research and design company,

16         did some work on drug delivery systems, and then I moved

17         to the Detroit Police Crime Lab.

18   Q.    Okay.  And while you were at the Detroit Police Crime

19         Lab -- You indicated that you started in '02 and you left

20         in '08.

21   A.    I misspoke the year.  It was really 2007.

22   Q.    Okay.  Because the Detroit -- They didn't have a crime lab

23         in 2008?

24   A.    Correct.

25   Q.    And is the reason for your leaving the crime lab is

```
 1        because the crime lab was closed?

 2   A.   No, sir.

 3   Q.   Okay.  So you left before the crime lab was closed?

 4   A.   Yes, sir.

 5   Q.   All right.  That was for other employment?

 6   A.   Yes.

 7   Q.   Okay.  And in this particular case, this was back in '06,

 8        and it seems that from your report -- And you still have

 9        your report in your hand?

10   A.   Yes, I do.

11   Q.   Correct me if I'm wrong, you started your work February

12        27th of '07?

13   A.   Yes, sir.

14   Q.   And that was the date you completed your work?

15   A.   Yes, sir.

16   Q.   Okay.  Have you had any more related activity in this

17        particular case other than that day?

18   A.   I don't have the file jacket in front of me, but I would

19        have to wager that I have had other activity.  The process

20        of sending the evidence to Bode was primarily my

21        responsibility, so I was probably the person who packed up

22        the evidence and shipped it to the vendor laboratory for

23        the DNA analysis.

24   Q.   Okay.  And you -- Was it protocol to have some kind of

25        report of what you've done and what you haven't done?
```

1   A.   Can you be more specific?

2   Q.   If you packaged it up on the 28th and mailed it to Bode

3        Technology, would you have written some kind of report to

4        say this is what I did on that day, put it in a computer

5        system or something?

6   A.   For all the evidence, there is a chain of custody document

7        within the case jacket, and that information would be

8        recorded.  But no report would have been generated.

9   Q.   Okay.  But there would have been something in the package

10        itself?

11  A.   Correct.

12  Q.   Okay.  Now, the first thing that bothered me about the

13        direct examination, and I want you to correct me if I'm

14        wrong --

15             MR. HUTTING:  Well, Judge, I'm going to object

16        to the characterization of bothered.

17             MR. KINNEY:  Whatever you want, you can do.

18             THE COURT:  We'll adhere to a question and

19        answer format, gentlemen.

20             Go ahead, Mr. Kinney.

21             MR. KINNEY:  Okay.

22  BY MR. KINNEY:

23  Q.   I want you to tell me if you actually said this.  You were

24        asked to try to find out who was wearing that knit cap

25        last.

```
 1   A.   I believe that's a correct summary of what I was intending

 2        to do, yes.

 3   Q.   And are you indicating that what you were doing is trying

 4        to find DNA?

 5   A.   Correct.

 6   Q.   And you believe that by finding this DNA, you could

 7        determine who wore the cap last?

 8   A.   Can I answer more to the answer no?

 9   Q.   It's up to the Court.

10             THE COURT:  Answer the question to the best of

11        your ability.  Go ahead.

12   A.   It would lead to an investigative lead.  The DNA would

13        provide the investigators of the case with information

14        which may lead to the person who wore the hat last.  A

15        person closely associated with that piece of article would

16        most likely at least be able to identify who else was

17        wearing that particular piece of clothing.

18   BY MR. KINNEY:

19   Q.   Okay.  So the DNA would determine who else was wearing

20        that particular clothing?

21   A.   Correct.

22   Q.   You're not saying that -- Well, this is my hat; okay?

23   A.   Yes, sir.

24   Q.   My DNA should be on this hat?

25   A.   It should be.
```

```
 1   Q.   Okay.  But for the fact that you just saw me put this hat

 2        on and take it off, could just the fact that my DNA is on

 3        this hat tell you that I was the last person to wear this

 4        hat?

 5   A.   No, sir.

 6   Q.   Okay.  Was there anything else that you did in the

 7        performance of your duty that could have actually told us

 8        who was the last person to wear that hat before the police

 9        department confiscated it?

10   A.   No, sir.

11             MR. KINNEY:  For the Record, I'm going to put my

12        hat back in my pocket.

13             THE COURT:  Any objection?

14             MR. HUTTING:  No, your Honor.

15             THE COURT:  So noted.

16   BY MR. KINNEY:

17   Q.   This is Exhibit 22.  And you've had an opportunity to take

18        a look at it?

19   A.   Yes, I have.

20   Q.   Can you pull it out again for me and take a look at it?  I

21        want to ask you a couple of questions.  Because I know,

22        just like you saw me put my hat on a few minutes ago,

23        until you told me about the little tag on the inside that

24        lets you know which is the front of the skull cap and

25        which is the back of the skull cap, I just put the skull
```

```
1        cap on.  Is that normal for you or you --

2   A.   Personally for me, myself?  No, I wear mine with the tag

3        in the back.

4   Q.   You always wear yours with the tag in the back?

5   A.   Yeah, they're usually shaped just a little different front

6        to back.

7   Q.   Skull cap?

8   A.   Well, I'm going to say a knit cap, a tuque.

9   Q.   Oh, okay.  You don't call it a skull cap?

10  A.   I'm originally from Canada.  It's a tuque.

11  Q.   Okay.  A tuque.  And then you mentioned the baseball caps

12       with the brim?

13  A.   Yes, sir.

14  Q.   Even in Canada, sometimes, they turn it around?

15  A.   Yes, sir.

16  Q.   So that means that the DNA evidence that you -- correct me

17       if I'm wrong -- the DNA evidence that you were talking

18       about, the skin samples, it actually could be on the front

19       of the cap or the back of the cap?

20  A.   That's correct.

21  Q.   Okay.  And there could be other samples besides skin

22       samples that could -- you could generate DNA from?

23  A.   Yes, sir.

24  Q.   Okay.  Can you generate DNA from blood?

25  A.   Yes, sir.
```

```
1    Q.    In your capacity as a forensic biologist, could you tell

2          what is blood and what is not blood?

3    A.    Our laboratory performed certain test procedures.  We did

4          not have a confirmatory test for blood, we had a

5          presumptive test for blood.  We can tell you it's probably

6          blood in our laboratory at that time.

7    Q.    Did you perform that kind of test on that knit cap?

8    A.    No, we did not.

9    Q.    So were you not interested in whether there was any blood

10         on that cap?

11   A.    After visually examining the hat, I did not believe there

12         was any blood on the hat to be found.

13   Q.    Okay.  So you -- It was your expert opinion --

14   A.    Yes, sir.

15   Q.    -- no blood on the hat?

16   A.    Yes, sir.

17   Q.    Okay.  And I want to ask you about the cutting of the hat.

18              Is there any scientific way of just determining

19         how much DNA is on that hat without cutting it?

20   A.    No.  No, sir.

21   Q.    So you can't, you know, just take a look at the hat and

22         say, oh, there's some DNA right here, and this belongs to

23         somebody other than this DNA on the front of this hat?

24   A.    Can you be more specific in your question?

25   Q.    Well, hypothetical.  You took a small cut from that hat
```

127

1       and determined there was DNA on that cut; correct?

2  A.   I did not make any determinations on what was on that

3       cutting.

4  Q.   You took a small cutting from that hat for the purposes of

5       someone else determining what DNA was on that hat?

6  A.   That's correct.

7  Q.   A lay person as myself would say, how can we tell that

8       there's nobody else's DNA on that hat, you just took a

9       small portion?

10  A.   Yes, sir.

11  Q.   Someone else's DNA could be on that hat in another

12       cutting.

13  A.   Is there a question, sir?

14  Q.   Am I right?

15  A.   I'm not sure what the question is.

16  Q.   There could be somebody else's DNA on the rest of the hat?

17  A.   Absolutely.

18  Q.   So in order to be sure that no one else's DNA is on that

19       hat, you'd have to test the entire hat?

20  A.   Yes, sir.

21  Q.   Piece by piece?

22  A.   Yes, sir.

23  Q.   Well, since you have the majority of the hat in your hand,

24       that wasn't done?

25  A.   It's just not practical, given the -- given the size of

```
 1        the hat and the number of samples and what would be
 2        involved in all of that.
 3   Q.   Are you saying it's too expensive?
 4   A.   It's definitely too expensive.
 5   Q.   In a murder case?
 6   A.   Definitely.
 7   Q.   In a murder case?
 8   A.   Given the resources at -- around the country, it is common
 9        practice for a case to decide that if information is found
10        and information could be used and further testing can be
11        applied at any time, if so warranted, and if evidence is
12        preserved, so that evidence can be retested in the future
13        if it needs to be.
14   Q.   Okay.  So it can be tested again, even now?
15   A.   Not now.
16   Q.   Because we've handled it?
17   A.   Yes, sir.
18   Q.   Okay.  But prior to that bag being opened, more testing
19        could have been done?
20   A.   Absolutely.
21   Q.   And it could have been done to the point of where some
22        expert, DNA expert, would have been able to testify as to
23        exactly whose DNA was on that hat, that's a possibility?
24        An expensive one, but a possibility?
25   A.   It's a little vague.  There's a lot of variables in there.
```

129

1          I can't answer that question yes or no.

2     Q.   Okay.  Can you determine from looking at that hat right

3          now how many cuttings were performed?

4     A.   Yes.  I could check to see how many pieces of material

5          were removed from the hat in different areas.

6     Q.   From that hat right now, you're capable of doing that?

7     A.   I would not feel comfortable doing that in this setting.

8     Q.   Okay.  You would have to be in a laboratory?

9     A.   I would prefer to do it under a more controlled situation

10         where the review of my work can be performed before any

11         conclusions would be rendered.

12    Q.   Yes.  Okay.  So that means you wouldn't want to do it

13         right here in front of all of us?

14    A.   That's correct.

15    Q.   Okay.  But it could be done?

16    A.   Yes, it could.

17    Q.   And you took that -- The sample that you took was so small

18         that you had to have tweezers or scissors?

19    A.   No.  The sample I took was pretty big.  It was a

20         half-an-inch by a half-an-inch.

21    Q.   A half-an-inch by a half-an-inch?

22    A.   Yes.

23    Q.   So there's a half-an-inch hole?

24    A.   It's a rough estimate of the size of it, yes.

25    Q.   Can you show at least the hole, one hole?

130

1   A.   Yes, sir.

2   Q.   Let me see, please.

3   A.   Yes, sir.  This is the hole.

4   Q.   Okay.  So it's been admitted into evidence.  Okay.

5             THE COURT:  What exhibit was that?

6             MR. KINNEY:  This is Exhibit -- 23?

7             WITNESS STEARY:  The envelope indicates 22.

8             MR. KINNEY:  Exhibit 22, your Honor.

9   BY MR. KINNEY:

10  Q.   And you're telling us that what I'm showing up to the jury

11       right now -- can everybody see? -- this is your cutting?

12  A.   Yes, sir.

13  Q.   Okay.  That right there is your cutting?

14  A.   Yes, sir.

15  Q.   And can you tell me, as I'm turning this around and

16       showing it to you, do you see another cutting that large

17       anywhere?

18  A.   I do not see a cutting that penetrates the fabric as mine

19       does.

20  Q.   Okay.  Did you take any buccal swabs from anybody else?

21  A.   Did I receive any?  No, I did not.

22  Q.   Okay.  So you didn't take the buccal swab from Mr.

23       Grunewald?

24  A.   No, I did not.

25  Q.   You received it from somewhere else?

1    A.    That's correct.

2    Q.    You never talked to Mr. Grunewald?

3    A.    No, sir.

4    Q.    You were never in his presence at all?

5    A.    No, sir.

6          MR. KINNEY:  Okay.  I've got nothing further,

7          your Honor.  Thank you.

8          THE COURT:  Mr. Hutting.

9

10   RE-DIRECT EXAMINATION BY MR. HUTTING:

11   Q.    I mean this was the cutting that you took from the hat?

12   A.    Yes, sir.

13   Q.    Okay.  Based on what you felt was most the likely place

14         where somebody would be wearing the hat on the forehead

15         where sweat and an accumulation of DNA might occur onto

16         the hat?

17   A.    Yes, sir.

18   Q.    Okay.  Now in order to do what Mr. Kinney said, what you'd

19         have to do is take a cut all the way around or bits -- you

20         know, whatever it took, 70 cuts to go all the way around

21         to do the whole round of the hat; is that correct?

22   A.    Yes.  But it's more complicated than that.

23   Q.    Okay.

24   A.    Because how small would the cutting have to be in order to

25         get a unique DNA profile that may not be a mixture of

132

```
 1        somebody?  You can keep making the cut small enough so
 2        you're only getting a single cell, you're going to have to
 3        make trillions of cuts in order to get enough DNA from a
 4        single person or every individual who possibly could have
 5        worn that.  It's -- scientifically it's really not
 6        possible.
 7   Q.   So you took the cut, made it as large as you felt it could
 8        be made, and you took the cut in the place where you
 9        thought it was most likely to get DNA from the person who
10        was wearing the hat?
11   A.   That's correct.
12   Q.   Okay.  Thank you, sir.
13             MR. HUTTING:  Nothing further.
14             MR. KINNEY:  Nothing further, your Honor.
15             THE COURT:  All right.  May Mr. Steary step down
16        and be excused?
17             MR. KINNEY:  No objection.
18             MR. HUTTING:  No objection.
19             THE COURT:  Mr. Steary, just so you know, Mrs.
20        Bauer is Canadian, too.
21             Thank you much.
22             (At about 2:05 p.m., witness excused.)
23             COURT CLERK:  Do you swear or affirm that the
24        testimony you're about to give in the matter now pending
25        before this Court will be the truth, so help you, God?
```

```
 1                    WITNESS NYE:  Yes, I do.

 2                    THE COURT:  You may be seated.

 3

 4                          JEFFREY NYE,

 5       called as a witness at 2:06 p.m., having first been duly

 6       sworn by the Clerk of the Court, was examined and

 7       testified on his oath as follows:

 8

 9   DIRECT EXAMINATION BY MR. HUTTING:

10   Q.  I know that you've given your name to the court reporter,

11       but one more time for the Record we need your name,

12       please, sir.

13   A.  Yes.  It's Jeffrey Nye.  The last name is spelled N-Y-E.

14   Q.  Can you tell the jury, sir, where it is that you work and

15       what your area of expertise and specialty is there?

16   A.  Yes.  I work for the Michigan State Police Forensic

17       Science Division, at the Lansing Laboratory.  I've been

18       employed there for about 15 years.  Started out as a

19       forensic DNA scientist and currently serve as the DNA

20       technical leader and biology program coordinator.

21              So my role is to validate new techniques, new

22       technology, train individuals, hire them, procedures, much

23       more administrative now than previously as a case-working

24       scientist.

25   Q.  So at one time you were, in fact, a case-working
```

```
 1        scientist?

 2   A.   Yes.  I did that for about 12 of my 15 years there, yes.

 3   Q.   So now you're in more of an administrative post?

 4   A.   That's correct, yes.

 5   Q.   All right.  So I take it then that you've testified at

 6        some time in the past as an expert in DNA work?

 7   A.   Yes, I have.

 8   Q.   About how many times in the past have you testified as an

 9        expert in DNA work?

10   A.   In excess of a hundred times.

11   Q.   Okay.  Do you still come to court now as an administrator

12        or a person who's assigned to administrative duties?

13   A.   Yes, I do.  I still get in and do a little bit of casework

14        because that's a very small portion of what I do.  But,

15        yes, I still come out and testify quite a bit.

16   Q.   Okay.  All right.  Mr. Nye, in your work, are you familiar

17        with something that is called CODIS?

18   A.   Yes, I am.

19   Q.   How is that spelled?

20   A.   C-O-D-I-S.  It's another governmental acronym.

21   Q.   What's it stand for?

22   A.   CODIS stands for the Combined DNA Index System.

23   Q.   And where is CODIS located?

24   A.   CODIS is a database of DNA profiles.  It's a database

25        developed by the FBI.  And CODIS is located in
```

135

```
 1        governmental laboratories across the U.S. and some U.S.

 2        territories that meet certain guidelines or requirements

 3        that the FBI mandates.  So it is located here in Michigan

 4        at three of our DNA laboratories, which is in Northville,

 5        Lansing, and Grand Rapids.

 6   Q.   And you said it's a DNA database.  Can you explain that a

 7        little bit further?

 8   A.   Sure, absolutely.  DNA, there's several small databases

 9        within the larger CODIS database.  There's a database of

10        DNA profiles from --

11                MR. KINNEY:  Your Honor, at this point can we

12        approach for just one second before he answers that

13        question?

14                (At about 2:09 p.m., brief sidebar;

15                At about 2:11 p.m., back on the Record.)

16                THE COURT:  I'm going to excuse the jurors.

17        Jurors, I'm going to excuse you.

18                Witness, you may step down.

19                DEPUTY SHERIFF:  All rise for the jury.

20                (At about 2:11 p.m., jury panel excused.)

21                DEPUTY SHERIFF:  Please be seated.

22                THE COURT:  Let the Record reflect the witness

23        has also exited the courtroom, as has the jury.

24                Gentlemen, there was a sidebar conference.  I

25        prefer to put it on the Record.
```

136

```
 1                MR. KINNEY:  Your Honor, I'm objecting to Mr.

 2     Hutting -- it seems that what he's trying to get out is

 3     this CODIS databank, part of it, the majority of it is a

 4     sample which our state, I don't know about others, but I

 5     know our state requires every person who is convicted of a

 6     felony to give a buccal swab right downstairs in our

 7     basement.  We know that Mr. Dantzler has a prior

 8     conviction; that conviction is possession of less than 25

 9     grams of cocaine.  That's how they got his DNA in the

10     CODIS system.

11                I don't think it should be before the jury that

12     part of the CODIS databank is supposedly for criminal

13     defendants.  All that's doing is indicating Mr. Dantzler

14     has a prior record, a prior record that wouldn't come in

15     even if Mr. Dantzler took the stand.

16                So I don't see how it's relevant at this point

17     to suggest to the jury that his data -- his DNA data is in

18     this CODIS databank because he's a criminal defendant.

19                MR. HUTTING:  That's exactly what it's relevant

20     for, that's how we got this hit; otherwise, we'd have

21     never known whose DNA was on that hat.  What happened here

22     is that the Detroit Police Department, all right, not

23     everything -- not everything can be submitted to CODIS,

24     okay, and Mr. Nye will explain that.

25                What gets ultimately submitted to CODIS is that
```

137

1        the police department that wants an item submitted to

2        CODIS has to convince, in this particular case, the

3        Michigan State Police, that the item that they want

4        submitted to CODIS was left at the scene most likely by a

5        perpetrator or one of the perpetrators.  If they meet that

6        hurdle, then the State Police will take the cutting, okay,

7        will take the DNA cutting, and submit that to CODIS to see

8        if we can get any kind of a hit out of the CODIS database.

9        And that's what happened in this case.

10               The Detroit Police Department met the threshold,

11       Mr. Nye approved it, Mr. Nye had it submitted to CODIS,

12       and we got this hit saying that -- that presumptively, all

13       right, the cutting and the DNA extract from that hat

14       belongs to Samuel Lee Dantzler; okay?  And that's what

15       ultimately made Mr. Samuel Lee -- that's what began to

16       make the case -- that made the case against Mr. Dantzler.

17               What we then had to do is get Mr. Dantzler in

18       and take a buccal swab from him, another buccal swab from

19       him, all right, and then send that -- send that buccal

20       swab to Bode so that it could be analyzed by Bode.  But

21       without the DNA CODIS database hit, without that

22       happening, we would have never known who the DNA on that

23       hat belonged to.  And --

24               THE COURT:  Well, you can accomplish what you

25       want to accomplish, Mr. Hutting, without making reference

1        to the fact that he has a criminal history.

2                  MR. HUTTING:  He's not going to say he's got a

3        criminal history, but he's going to say, you know, there's

4        a number of different databases in there, one of which --

5        the way he's going to refer to it is as an offender

6        database.

7                  MR. KINNEY:  That's -- that's --

8                  THE COURT:  Well, that has the same effect.

9                  MR. HUTTING:  Well, you know, Judge, you can't

10       sanitize the whole case.  You can't.  I mean that's the

11       problem --

12                 THE COURT:  No.  But I can adhere to the rules.

13       And you know, Mr. Hutting, from day one, I think I've been

14       more than fair in my rulings in this case, pretrial

15       rulings, et cetera, and I've tried to do what the law

16       requires and what I think is fair.  There's another way

17       that you can probably handle this --

18                 MR. HUTTING:  How --

19                 THE COURT:  -- without making reference to the

20       fact that he's got a prior criminal history.

21                 MR. HUTTING:  How are you going to do that?

22       How?

23                 THE COURT:  I can't try your case for you but --

24                 MR. HUTTING:  Well, suggest to me.  I don't

25       think you can do that.  He's going to say -- He's going to

```
 1    tell me what the CODIS database is, and then I'm going to

 2    ask him some questions about whether or not he

 3    submitted -- you know, what can be submitted to CODIS,

 4    that everything can't go in CODIS, the police just can't

 5    put anything they want into CODIS, and what threshold the

 6    police met in this case and then what they did and what

 7    reply we got.

 8              MR. KINNEY:  If I may, your Honor?

 9              THE COURT:  Go ahead.

10              MR. KINNEY:  That's not an evidentiary

11    foundation; this is foundation that Mr. Hutting wants to

12    prove.  There's no objections here as to what he's already

13    said about the CODIS database.  It's an FBI investigative

14    tool, that's what's been said, and I think that's enough

15    for a foundation to be laid to go on and ask questions

16    without saying that this is a database of repeat offenders

17    or offenders or anyone with a felony criminal record.

18    That's what my objection is.

19              MR. HUTTING:  Well, I mean what's the jury

20    supposed to think about how we came back with Mr.

21    Dantzler's -- you know, I mean, how did his name get into

22    this database.  Is your name in there?  Is my name in

23    there?  No.

24              MR. KINNEY:  I don't see the relevancy of that,

25    especially when we have more witnesses to come in and
```

1    testify about DNA --

2            THE COURT:  Well, I told you sidebar, my ruling

3    is the same.  I've heard nothing to convince me otherwise.

4    I'm going to find that there can be no reference to the

5    fact -- Mr. Hutting, you're very artful in your

6    examination, you're very seasoned.  I don't know how you

7    want to proceed but there can be no reference, be mindful

8    of how you draft your questions, as to the fact that he's

9    got a prior criminal history.

10           MR. HUTTING:  Well, you'd better tell the

11   witness that.

12           THE COURT:  Well, he's your witness.  If you

13   want to confer with him, go ahead.  But that's my ruling.

14           MR. HUTTING:  I don't know how to do it

15   otherwise, Judge.  I mean it's a database that has Mr.

16   Dantzler's DNA in it.  I mean suggest to me -- I'm open to

17   any and every suggestion as to how we're going to

18   explain --

19           THE COURT:  Well, you know as well as anyone I

20   cannot do that.

21           MR. HUTTING:  Well, that's because, Judge, there

22   is no other way around it; okay?  He's known -- He has

23   known about Jeffrey Nye from the beginning.  Jeffrey Nye

24   testified at the preliminary examination.  He testified to

25   all of this stuff at the preliminary examination.  The

```
 1     transcript is there.  And he mentioned the CODIS database

 2     in there; all right?  And he mentioned that they have a

 3     presumptive hit.  So he's known that Mr. Nye is on the

 4     witness list.  He's got Mr. Nye's report.

 5              Now all of a sudden, Mr. Nye is up on the

 6     witness stand, oh, no, he can't testify to that.  He can't

 7     testify to that.  That was all testified to at the exam.

 8              MR. KINNEY:  I was not the lawyer at the exam or

 9     I would have objected then, too, but we're in front of a

10     jury.  At an exam, you have a judge who already knows

11     that.  There wouldn't be a reason to object when you're --

12     when the trier of fact for probable cause purposes is the

13     Judge.  We're in front of a jury and that shouldn't be in

14     front of the trier of fact, that's the jury, and knows

15     nothing about this.  That's my argument.

16              MR. HUTTING:  If he didn't want that coming in,

17     he should have filed a motion in limine pretrial, should

18     have filed a motion in limine pretrial saying you can't

19     mention this in front of the jury or I want a ruling from

20     the Judge that you can't mention this in front of the

21     jury.  Instead of popping up here in the middle of trial

22     with the jury sitting here and say, oh, no, no, no, no,

23     no, can't talk about CODIS.

24              MR. KINNEY:  According to the rules of evidence,

25     I think it should have been just the other way around when
```

1       we know that criminal histories are not to be before the

2       jury, and the fact that he has a criminal record should

3       not be before the jury, he had the obligation to come to

4       court and say I want to do this, not me.

5               THE COURT:  Is there any stipulation that the

6       two of you can enter into?

7               MR. KINNEY:  At this particular time, your

8       Honor, I believe that since we -- he has described what

9       CODIS is, and I don't think that I should have to answer

10      this question either, but the next question would be, did

11      you enter into this CODIS databank evidence that you had

12      in this particular case and what happened?  Did you find

13      anything?  That's the question.  It's not does CODIS have

14      anything to do with Defendants?  That's for a different

15      purpose than to find out what was found.

16              If what he wants to do is find out what was

17      found, there's different questions that can be asked than

18      is this a database that is for the purposes of creating a

19      database of people that have been convicted of a crime?

20      That's the only thing I'm objecting to.

21              THE COURT:  Thank you, Mr. Kinney.

22              Now will you answer my question, Mr. Hutting?

23      Is there a stipulation that the two of you can think of

24      that you could enter into so that we can proceed?

25              I appreciate both of your concerns here.  I just

143

```
 1          don't want -- Mr. Hutting, just so I'm clear, if you can

 2          steer clear of defendant or offender status, I think

 3          there's a way you can proceed.

 4                    MR. HUTTING:  I'll try, Judge.

 5                    THE COURT:  Mr. Kinney, it seems to be the

 6          thrust of your objection; correct?

 7                    MR. KINNEY:  Yes, your Honor, items of evidence.

 8                    THE COURT:  I don't think you want to enter into

 9          a stipulation that indicates he's got a prior conviction

10          for possession of marijuana, or whatever it was, of 25

11          grams or whatever it was.

12                    MR. KINNEY:  I think I would be ineffective in

13          doing that.  I cannot stipulate that he has a prior

14          record, but a stipulation that --

15                    THE COURT:  Mr. Hutting?

16                    MR. HUTTING:  Yes, sir.

17                    THE COURT:  Have you come up with anything?

18                    MR. HUTTING:  No.  I'm just trying -- I'll ask

19          Mr. Nye not to use the word offender database.  That's all

20          I can say.

21                    MR. KINNEY:  Thank you.

22                    THE COURT:  If you want a moment with him, go

23          ahead.

24                    MR. HUTTING:  Yeah, thank you.

25                    (At about 2:24 p.m., brief recess.)
```

144

1                    THE COURT:  Mr. Hutting, you've had occasion to

2        talk to Mr. Nye?

3                    MR. HUTTING:  I told Mr. Nye not to use the word

4        offender database and we'll talk about the fact that it is

5        a huge database as --

6                    THE COURT:  Without referencing the fact that he

7        has a prior criminal history or --

8                    MR. HUTTING:  Right.  Yes, your Honor.

9                    THE COURT:  -- has offender status.  All right.

10                   Ready to proceed?  Are you satisfied, Mr.

11       Kinney?

12                   MR. KINNEY:  That -- You're indicating that Mr.

13       Nye can't say that part of the CODIS databank is

14       offenders?

15                   THE COURT:  Correct.  He's going to steer clear

16       of that.

17                   WITNESS NYE:  So I can state that there are

18       people in the database, just not how they get -- what

19       qualifies them to be in the database?

20                   THE COURT:  We don't want you to make reference

21       to the fact that he has a prior criminal history.  Is that

22       clear?

23                   MR. KINNEY:  Or that that's what the database

24       includes, prior criminal defendants.

25                   THE COURT:  Are you clear, Mr. Nye?

                                    145

```
 1                    WITNESS NYE:  Includes individuals, just not how

 2         they got in there.

 3                    MR. KINNEY:  I'm satisfied with that.

 4                    THE COURT:  All right.  Mr. Hutting?

 5                    MR. HUTTING:  Yes, sir.

 6                    THE COURT:  All right.  Jury, please.

 7                    DEPUTY SHERIFF:  All rise for the jury.

 8                    (At about 2:25 p.m., jury panel seated.)

 9                    DEPUTY SHERIFF:  Please be seated.

10                    THE COURT:  Mr. Hutting?

11                    MR. HUTTING:  Thank you, your Honor.

12    BY MR. HUTTING:

13    Q.   So we have a CODIS database; is that correct?

14    A.   That's correct.

15    Q.   Okay.  And included in this database, is there DNA from

16         individuals whose buccal swabs have been submitted to the

17         CODIS database?

18    A.   Yes, there is.

19    Q.   Okay.  And is this a pretty large database?

20    A.   Yes, it is.

21    Q.   Okay.  All right.  Now if you have -- if the police

22         department had an item of evidence from a crime scene

23         where they have taken what they believe may be some DNA

24         from that item, can the police department, just on its own

25         or because it wants to, submit that to the CODIS database?
```

```
 1   A.   The only location that a DNA profile can be entered into

 2        the database is through our three DNA laboratories with

 3        the Michigan State Police here in Michigan.

 4   Q.   And are there some standards for entering information into

 5        or entering evidence into the CODIS database?

 6   A.   Yes, there are.

 7   Q.   Tell the jury what that is.

 8   A.   So items of evidence, so evidentiary items that were

 9        collected from a crime scene can be entered into the

10        database if they meet the requirement that they are left

11        behind by the possible perpetrator of a crime.  So it's an

12        effort to make sure that DNA profiles are not entered into

13        the database from people that did not commit the crime,

14        meaning victims and things of that nature.  So it's a

15        measure to make sure that those profiles stay out of the

16        database.

17   Q.   Okay.  In this particular case, was the Michigan State

18        Police approached by the Detroit Police Department with a

19        request to enter items -- an item into the database from a

20        crime scene over on West Seven Mile in the City of

21        Detroit?

22   A.   That is correct, yes.

23   Q.   Okay.  Did the request meet the hurdle or the guideline

24        that you have that it was left or could have been left by

25        one of the perpetrators at the crime scene?
```

147

1    A.    That's correct, yes, it did.

2    Q.    Okay.  Based on that did you submit information -- or

3          exactly what did you submit to the CODIS database?

4    A.    The DNA profile in question was a DNA profile which was

5          developed from a hat that was identified as being left

6          behind at the crime scene by one of the perpetrators of

7          the crime.  So that met the requirement that at that time

8          there was enough information to believe that it was from

9          the perpetrator of the crime that was entered into the

10         database at that point.

11   Q.    Okay.  Approximately when was that done, Mr. Nye?

12   A.    January 25th of 2010.

13   Q.    Okay.  And when it got entered into the CODIS database,

14         tell us what happened.

15   A.    A search of the database ensues, there's a schedule when

16         that database search occurs, and then there was an

17         association within the database.

18   Q.    Okay.  And was that association to a person by the name of

19         Samuel Lee Dantzler?

20   A.    Yes, it was.

21   Q.    Okay.  Now what do you mean by association?  Tell the jury

22         what you meant by association.

23   A.    What it means is that the DNA profile from the item of

24         evidence -- in this case, the hat -- was consistent with

25         the DNA profile from that individual.

148

1    Q.    That was in the CODIS database?

2    A.    That's correct, yes.

3    Q.    Okay.  All right.  Is that conclusive or probable cause or

4          what does it constitute?

5    A.    Probable cause is more of a legal term, I'll leave that to

6          you.

7    Q.    Okay.

8    A.    The reason that we use the word "association" is because

9          the DNA samples that are submitted to the database, the

10         individuals, the buccal swabs or mouth swabs from those

11         individuals, are not tracked as evidentiary items like we

12         would normally track evidentiary items.  They don't have a

13         real good solid chain of custody.  They don't have a very

14         good one.  But it's not the same legal standard that we

15         would expect.  So what we do is we say that there's an

16         association between those two samples, and then we request

17         another sample from that individual to confirm that

18         association.

19   Q.    So the police department has to find that individual, and

20         take a buccal swab from him, and then resubmit it back to

21         the Michigan State Police or to who is ever going to do

22         the ultimate work?

23   A.    That is correct, yes.

24   Q.    Okay.  All right.  And did you inform the Detroit Police

25         Department of the association?

149

```
 1   A.   Yes, we did.

 2   Q.   Okay.  And ultimately then it's their job to find Mr.

 3        Dantzler, Mr. Samuel Lee Dantzler, and get the buccal swab

 4        from him, and do the confirmatory work?

 5   A.   That's correct, yes.

 6   Q.   Okay.

 7             MR. HUTTING:  Thank you very much, sir.

 8             THE COURT:  Mr. Kinney, cross-examination.

 9             MR. KINNEY:  Thank you, your Honor.

10

11   CROSS-EXAMINATION BY MR. KINNEY:

12   Q.   Good afternoon, sir.

13   A.   Good afternoon.

14   Q.   And is this Doctor Nye?

15   A.   No, just Jeff.

16   Q.   Your professional title?

17   A.   I am the biology program coordinator, technical leader for

18        DNA, slash, biology for Forensic Science Division.

19   Q.   Forensic Science Division.

20             In this particular case what we're talking about

21        is a sample that was smaller than the size of a quarter?

22   A.   Potentially.  They come in all sizes.  But, yes.

23   Q.   In this particular case, do you remember how it -- was it

24        a small size?

25   A.   I didn't physically handle the evidence.
```

150

1    Q.   You didn't physically handle the evidence, okay.

2    A.   No.

3    Q.   Okay.  All right.  Mr. Nye, the first thing that I want to

4         do is indicate that -- and you tell me if I'm wrong -- I

5         believe you testified in this particular case before?

6    A.   Yes, I have.

7    Q.   And that was March 31st of 2010?

8    A.   I don't recall the exact month, but --

9    Q.   Okay.  But you remember testifying?

10   A.   Yes, I do.

11   Q.   And in that testimony on page 51, I understand what you're

12        saying now, but I think maybe the question I should have

13        asked you is what is it -- it probably was the size of a

14        quarter?

15   A.   Right.

16   Q.   Can you take a look here?

17   A.   Okay, yes.

18   Q.   So would I be correct in saying that, even if you didn't

19        handle it, it was probably no more bigger than a quarter?

20   A.   Right.

21   Q.   Okay.  And what you do is put it through your database,

22        and Mr. Dantzler's DNA came up; correct?

23   A.   Yes, it did.

24   Q.   All right.  Now when you were talking about the steps that

25        has to be taken before you could put it in the database,

151

```
 1          and you indicate that you first have to decide that this

 2          particular piece of evidence -- and we're talking about

 3          the knit hat --

 4     A.   Um-hmm.

 5     Q.   -- was worn by a perpetrator.

 6               Now are you saying that scientifically what you

 7          have done is excluded everyone but some perpetrators?

 8     A.   I guess I'm not following your question.

 9     Q.   Well, I was going by what -- you had indicated that the

10          first thing that you have to do is to decide that it was

11          worn by one of the perpetrators.

12     A.   Correct.

13     Q.   So did you exclude anybody else from that, from wearing

14          that hat, that it couldn't have been worn by the victim?

15     A.   Based on the information that was available to us, that

16          information was communicated that it was worn by the

17          perpetrator of the crime and that was based on their

18          investigation and their questioning of people that would

19          have that knowledge.

20     Q.   Okay.  So the police department believed that it was a

21          perpetrator?

22     A.   Based on their investigation, yes.

23     Q.   That's not saying to this jury that we can exclude

24          everyone but a perpetrator from this hat?

25     A.   No, that's a hurdle that needs to occur in order to get
```

152

```
 1          the DNA profile from that hat into the database.

 2    Q.    So all you're talking about is the investigation itself?

 3    A.    Correct.

 4    Q.    You're not testifying -- I'm sorry, I didn't mean to cut

 5          you off.

 6    A.    Having sufficient information to meet the eligibility

 7          requirement that it was from the -- and remember, I said

 8          the possible perpetrator of the crime?

 9    Q.    Okay.  A possible perpetrator?

10    A.    Yes.

11    Q.    It could have been anybody that wore this hat?

12    A.    Based on the information that was available to me at the

13          time, the investigator indicated that it was worn by the

14          possible perpetrator of the crime.

15    Q.    Okay.  So that means that you don't want to be wasting any

16          money?

17    A.    I'm sorry?

18    Q.    You wouldn't want to be wasting any money or any time

19          putting it through a database unless it could help the

20          investigation?

21    A.    No.  It's a measure to make sure that we're not putting

22          DNA profiles into the database that were from potential

23          victims or consequential types of situations.

24    Q.    Okay.  All right.  Now your research, does that mean that

25          nobody else could have worn this hat?
```

```
 1   A.    No, it does not mean that.

 2   Q.    Does that mean that Mr. Dantzler had to have worn that hat

 3         and had to have been in Apartment 302 on January the 16th

 4         of 2006?

 5               MR. HUTTING:  Well, Judge, I'm going to object

 6         to that.  That's speculation --

 7               THE COURT:  I'll sustain the objection.

 8   BY MR. KINNEY:

 9   Q.    Your research does not indicate who was wearing that hat

10         the night that Mr. Hill died?

11               MR. HUTTING:  Well, Judge, I'm going to object

12         because his research -- I mean, they didn't do any -- he

13         didn't do any research, he put the information into the

14         database.

15               MR. KINNEY:  I'll rephrase it again.

16               THE COURT:  Go ahead.

17   BY MR. KINNEY:

18   Q.    The database, the hit to Mr. Dantzler in the database,

19         does not mean that nobody else could have worn this hat?

20   A.    That's correct.  Would it --

21   Q.    And does not mean --

22               MR. HUTTING:  Can we let him finish the answer

23         to the question?

24   BY MR. KINNEY:

25   Q.    Did I cut you off?
```

1   A.   Yes.

2   Q.   I'm sorry.

3   A.   What it indicates is that the knit cap, the DNA profile

4        that was developed from the knit cap, matches that of Mr.

5        Dantzler.

6   Q.   That wasn't -- I'm not going to object to it but it wasn't

7        responsive to my question, but I'm not going to object at

8        this particular time.

9             But I just wanted to make sure that you're

10       saying that his -- that his DNA was in the hat?

11  A.   Correct.

12  Q.   You're not saying when it was placed in the hat?

13  A.   Correct.

14  Q.   You're not saying when he wore the hat?

15  A.   Correct.

16  Q.   And you're not saying that Mr. Dantzler was the last

17       person to have worn the hat?

18  A.   That's correct.

19             MR. KINNEY:  Okay.  Thank you.  Nothing further.

20             MR. HUTTING:  Nothing further.

21             THE COURT:  May Mr. Nye step down and be

22       excused?

23             MR. HUTTING:  Yes.

24             MR. KINNEY:  Yes, your Honor.

25             THE COURT:  Thank you very much.

```
 1                   (At about 2:39 p.m., witness excused.)

 2                   COURT CLERK:  Raise your right hand, please.

 3                   Do you swear or affirm that the testimony you

 4          are about to give in the matter now pending before this

 5          Court will be the truth, so help you, God?

 6                   WITNESS MCKENZIE:  Yes.

 7                            NIKITTA MCKENZIE,

 8          called as a witness at 2:39 p.m., having first been duly

 9          sworn by the Clerk of the Court, was examined and

10          testified on her oath as follows:

11                   COURT CLERK:  You may be seated.

12                   THE COURT:  Good afternoon, ma'am.

13                   WITNESS MCKENZIE:  Good afternoon.

14                   THE COURT:  Please pull the microphone close to

15          your mouth and speak loudly and clearly for the jury;

16          okay?

17                   WITNESS MCKENZIE:  All right.

18                   THE COURT:  Thank you.

19                   Mr. Hutting.

20                   MR. HUTTING:  Thank you, your Honor.

21                   THE COURT:  You're welcome.

22

23   DIRECT EXAMINATION BY MR. HUTTING:

24   Q.  I know that you've given your name to the court reporter,

25          but one more time for the Record, we need your name,
```

156

```
 1        please.

 2   A.   Nikitta McKenzie.

 3   Q.   Okay.  Ms. McKenzie, during this lifetime did you know a

 4        person by the name of Bernard Hill?

 5   A.   Yes.

 6   Q.   Okay.  For how long did you know Bernard Hill?

 7   A.   About four or five years.

 8   Q.   Okay.  Let's go back to January of 2006.

 9             What was your -- the nature of your relationship

10        with Bernard Hill?

11   A.   We were a couple.

12   Q.   Okay.  I want to take you to the evening of January the

13        15th of 2006, and then into the early morning hours of

14        Monday, January the 16th.

15             Can you tell this jury where you were living in

16        January of 2006?

17   A.   I was living in an apartment on Seven Mile.

18   Q.   Okay.  Do you remember the apartment number?

19   A.   302.

20   Q.   Okay.  Do you remember the name of the apartment complex?

21   A.   Capri, something like.

22   Q.   Okay.  All right.  I take it -- Do you still live there?

23   A.   No.

24   Q.   When did you move from there?

25   A.   The next day, after the incident occurred.
```

1    Q.   Okay.  How long did you live there before the incident

2         occurred?

3    A.   About six months.

4    Q.   Okay.  Let me show you a picture that's Exhibit Number 1,

5         for purposes of this record.  Do you see that?

6    A.   Yes.

7    Q.   Okay.  Do you recognize this?

8    A.   Yes.

9    Q.   Is this the apartment complex where you lived?

10   A.   Yes.

11   Q.   Okay.  Apartment 302, what floor was that on?

12   A.   The second floor.

13   Q.   Okay.  Now, did Bernard stay there with you at times?

14   A.   Yes.

15   Q.   Okay.  I want to go, if I could, to the evening of Sunday,

16        January the 15th.  Were you home that Sunday evening?

17   A.   Yes.

18   Q.   Did you see Bernard Hill that Sunday evening?

19   A.   Yes.

20   Q.   Do you remember about what -- Did he come to the apartment

21        or was he there?

22   A.   He came to the apartment.

23   Q.   Okay.  When he came to the apartment, did he come by

24        himself or with others?

25   A.   With others.

158

1    Q.   Who did he come with?

2    A.   A female.

3    Q.   Okay.  What was her name?

4    A.   Kenyatta (ph).

5    Q.   Do you know Kenyatta's last name?

6    A.   White.

7    Q.   Have you known Kenyatta for some time?

8    A.   Yes.

9    Q.   Was she a friend of yours?

10   A.   Yes.

11   Q.   Was she also a friend of Bernard's?

12   A.   Yes.

13   Q.   So the two of them came there together?

14   A.   Yes.

15   Q.   Okay.  After you got in the apartment, or after they got

16        there, what did you folks do?

17   A.   We were conversating and, you know, just hanging out.

18   Q.   Okay.  All right.  Now while you were there, and while he

19        was there, just yes or no to this, did you know -- Well,

20        let me ask you:  Did you know Quiana Turner?

21   A.   I knew of her.

22   Q.   Okay.  Did you know that she and Bernard had a child

23        together?

24   A.   Yes.

25   Q.   Okay.  And that they were, obviously at one time,

1        boyfriend and girlfriend?

2    A.   Yes.

3    Q.   Okay.  While you were there that night did you find out

4         that something had happened between Quiana Turner and

5         Bernard?

6    A.   Yes.

7    Q.   Okay.  And did you find that out from Bernard or from

8         somebody else?

9    A.   From Bernard.

10   Q.   Okay.  So he brought it up?

11   A.   Yes.

12   Q.   Okay.  And you talked about it?

13   A.   Yes.

14   Q.   Okay.  Now was he bragging about it?

15   A.   No.

16   Q.   Okay.  Was he upset about it?

17   A.   Yes.

18   Q.   Okay.  How long did Kenyatta stay there that night?

19   A.   Maybe an hour.

20   Q.   Okay.  Can you give me some idea of about what time it was

21        that she left?

22   A.   Maybe about 12:45.

23   Q.   Okay.  Was everything okay when she left?

24   A.   Yeah.

25   Q.   Okay.  So that leaves you and Bernard there at the

160

```
 1        apartment?

 2   A.   Yes.

 3   Q.   Okay.  Does anybody else come to the apartment?

 4   A.   No.

 5   Q.   How big is this apartment?

 6   A.   It's a one bedroom.

 7   Q.   One bedroom.  Okay.  So I take it it's on the smaller

 8        side?

 9   A.   Yes.

10   Q.   Okay.  Was there -- When Bernard came and Kenyatta left

11        was everything okay with your front door?

12   A.   Yes.

13   Q.   Okay.  Was there anything broken or amiss in the

14        apartment?

15   A.   No.

16   Q.   Was everything okay there?

17   A.   Yes.

18   Q.   All right.  Did there come a time when you and Bernard

19        were getting ready to go to bed for the evening?

20   A.   Yes.

21   Q.   Okay.  Can you tell the jury what happened as you were

22        getting ready to do this?

23   A.   Okay.  We were getting ready to lay down, we were in

24        bed -- Well, before we even got in bed, he was just

25        pacing.
```

161

1   Q.   He was --

2   A.   Yes.

3   Q.   Okay, pacing.  So was he nervous or what?

4   A.   Yes, he was acting pretty nervous.

5   Q.   Okay.  All right.

6   A.   And I just kept asking, like, why are you so nervous?

7        Because he told me that nobody knew --

8                  MR. KINNEY:  Objection.  Hearsay.

9   BY MR. HUTTING:

10  Q.   Okay.  Don't tell me what Bernard said, but you were

11       asking him about that?

12  A.   I was asking him why he was pacing and everything.  So I

13       just assumed that he was nervous about something.

14  Q.   All right.

15  A.   And we got ready for bed, we were in the bedroom, he got

16       up one last time and walked into the living room and then

17       he came back into the bedroom and got in his closet and

18       told me that he saw shadows outside of the door.

19  Q.   Okay.  Saw shadows outside the door?

20  A.   Yes.

21  Q.   Okay.  What happens next?

22  A.   I go into the living room, he's in the room in the closet.

23       I grabbed the cell phone before I ran into the living room

24       and then, as soon as I got into the living room, the door

25       was kicked in.

162

```
 1   Q.   Your front door was?

 2   A.   Yes.

 3   Q.   At the time it was kicked in, was the front door closed?

 4   A.   It was closed, locked and sealed.

 5   Q.   Okay.  All right.  Did you want anybody kicking in your

 6        front door?

 7   A.   No.

 8   Q.   Okay.  What happened after they kick in your front door?

 9   A.   About six guys, I'm assuming they're all guys, come into

10        the apartment and one of them is holding a gun at my face.

11   Q.   Okay.  So six guys come in?

12   A.   Yes.

13   Q.   Okay.  One's holding a gun at your face?

14   A.   Yes.

15   Q.   Okay.  What race were these guys?

16   A.   African-American.

17   Q.   Okay.  Was any of them white?

18   A.   No.

19   Q.   So they were all black?

20   A.   Yes.

21   Q.   Okay.  The guy who's holding the gun at your face, does he

22        say anything?

23   A.   Yes.  Where's Bernard?  Like, does Bernard live here?

24   Q.   Okay.  So he asks does Bernard live here --

25             MR. KINNEY:  I'm objecting to hearsay.
```

163

```
 1                      MR. HUTTING:  Judge, I don't believe --

 2                      MR. KINNEY:  I'm objecting to that because

 3            that's hearsay, and unless there's different foundations

 4            laid, your Honor, I'm going to object to him asking her

 5            what was said.

 6                      MR. HUTTING:  Well, Judge, this is during the

 7            res gestae of the crime:  Statements made by perpetrators

 8            during the course of res gestae of the crime are

 9            admissible against all perpetrators during the res gestae

10            of this crime, and that's what this is.

11                      MR. KINNEY:  And I represent Mr. Dantzler.  Mr.

12            Dantzler has not been identified by this particular

13            witness as being one of the ones that possibly said

14            anything, and he's asking her what was said.

15                      MR. HUTTING:  Statements made by conspirators

16            during the course and the furtherance of the conspiracy

17            are admissible.

18                      THE COURT:  I'm overruling the objection.

19   BY MR. HUTTING:

20   Q.     So the man says where is Bernard?  Or, does Bernard live

21          here?

22   A.     Yes.

23   Q.     Okay.  Do you see -- see this man with a gun?

24   A.     Yes.

25   Q.     Do you see any other weapons?
```

164

1    A.   Yes.

2    Q.   Tell us about that.

3    A.   I see golf clubs, a golf club.

4    Q.   How many golf clubs did you see, one or more than one?

5    A.   Just one.

6    Q.   Okay.  All right.  Do you notice anything about any of the

7         perpetrators in terms of what they were wearing?

8    A.   Yes.

9    Q.   Tell us about that, please.

10   A.   One or more of them were wearing a hat and they all were

11        dressed in black.

12   Q.   Okay.  All dressed in black.  At least one had a hat,

13        maybe more?

14   A.   Yes.

15   Q.   Okay.  The man says does Bernard live here.  What reply

16        did you give?

17   A.   I said he lives here, but he's not here.

18   Q.   Okay.  What happens next, Ms. McKenzie?

19   A.   He asked me the same question again, and I answered him

20        the same.  And then when I answered him the second time,

21        that's when Bernard came out of the room.

22   Q.   Okay.  Then what happens?

23   A.   They got into a fight in the living room and I ran into

24        the bathroom with the cell phone.

25   Q.   Okay.  What did you do when you got to the bathroom?

165

```
1    A.    I just stood in there quietly.

2    Q.    What did you hear going on outside in your main room of

3          your apartment?

4    A.    I heard yelling and tussling and, like, things like

5          getting knocked over and everything.

6    Q.    Okay.  Do you come out to look to see?

7    A.    No.

8    Q.    Okay.  What happens next?

9    A.    Well, I'm in the bathroom just waiting for a while until,

10         like, I don't hear anything so I can come out.  But while

11         I am in there, after the tussling, I hear -- I hear

12         someone scream, and then shortly after I hear gunshots.

13   Q.    Okay.  The person who screamed, did you recognize his

14         voice?

15   A.    Yes.

16   Q.    Okay.  Whose voice was it?

17   A.    Bernard.

18   Q.    Okay.  And shortly after that you hear gunshots?

19   A.    Yes.

20   Q.    Okay.  Do you come out to see -- Did you see who fired the

21         gunshots?

22   A.    No.

23   Q.    Did you come out to look to see who's got the gun?

24   A.    No.

25   Q.    Okay.  What happens next?
```

166

```
 1   A.   I stayed there for a little while longer.  And then I was

 2        slowly coming out of the bathroom, so I kind of peeked my

 3        head around first and I saw someone run back into the

 4        apartment and I heard them break something, and later I

 5        found out that it was the TV.  And then I also saw, before

 6        I heard the breaking sound, that he did something with my

 7        stereo.

 8   Q.   Okay.  Something was done with your stereo?

 9   A.   Yes.

10   Q.   Okay.  All right.  Then what did the person do?

11   A.   They dropped, like, the stereo and then they ran out.  And

12        then I came all the way out after I waited for a little

13        while longer just to make sure no one else was in there,

14        then I came all the way out.

15   Q.   Did you see how these five or six perpetrators left your

16        apartment?

17   A.   No.

18   Q.   Okay.  Did you see where they went when they left?

19   A.   No.

20   Q.   Are you able to identify any of them?

21   A.   No.

22   Q.   Tell the jury why not.

23   A.   Because it was dark and, like, they were all dressed in

24        black.  And everything was happening so fast.  And, plus,

25        I was in the bathroom, you know, so I didn't see anyone.
```

167

```
 1   Q.   Was this a pretty frightening event?

 2   A.   Yes.

 3   Q.   Have you ever been in a more frightening event in all of

 4        your life?

 5   A.   No.

 6   Q.   What happens, then, after you come out, after everything

 7        is quiet?

 8   A.   Everything is quiet.  I come out, everything is a mess.  I

 9        go onto the balcony, glass is everywhere.  I see this golf

10        club is still there.  I see a hat there.  I walk -- I see

11        droppings of blood on the balcony, so I walk out, you

12        know, following them, and I go to the entranceway and I go

13        down the stairs, and then I see Bernard laying there.

14   Q.   Where is Bernard?

15   A.   He's, like, at the front entrance laying there, just

16        bleeding and everything.

17   Q.   Was he able to talk to you?

18   A.   No.

19   Q.   Not able to say anything to you?

20   A.   No.

21   Q.   How is he dressed, do you remember?

22   A.   He just had on pajama pants, and that's it.

23   Q.   Okay.  All right.  Let me show you some pictures now --

24        Well, let me ask you this:  Do you know anybody by the

25        name of Dantzler?
```

168

1    A.    No.

2    Q.    All right.  Does the name Sam Dantzler -- either Sam

3          Dantzler, Senior, or Sam Dantzler, Junior; do you know

4          either one of those persons?

5    A.    I don't know them, but I've heard their name before, but

6          I've never seen or met them.

7    Q.    How about the name of Rodney Turner, do you know -- have

8          you heard that name before?

9    A.    I heard the last name, but not the first name.

10   Q.    Okay.  Have you ever met Rodney Turner?

11   A.    No.

12   Q.    Okay.  So as far as you know, you've never met anybody in

13         the Dantzler family or Rodney Turner?

14   A.    No.

15   Q.    Okay.  Let me show you, if I can, it's going to be Exhibit

16         Number 6.  Can you see Exhibit Number 6, Ms. McKenzie?

17   A.    Yes.

18   Q.    Okay.  Do you recognize what that is?

19   A.    Yes.

20   Q.    Tell the jury.

21   A.    That's my -- like, the balcony.

22   Q.    Okay.  There's some -- there's a golf club on that

23         balcony?

24   A.    Yes.

25   Q.    Okay.  Was that the golf club that you were referring to

169

1        that you saw?

2   A.   Yes.

3   Q.   If you look, can you see the door to your apartment?

4   A.   Yes.

5   Q.   Okay.  Show you another picture, it's Exhibit Number 8.

6        Can you see Exhibit 8?

7   A.   Yes.

8   Q.   Do you recognize what Exhibit 8 is, Ms. McKenzie?

9   A.   Yes.

10  Q.   Tell the jury.

11  A.   My front door, all busted up.

12  Q.   Okay.  And it wasn't like that before this event?

13  A.   No.

14  Q.   Let's go to Exhibit Number 9.  Do you see Exhibit Number

15       9?

16  A.   Yes.

17  Q.   Can you tell the jury what this is, please?

18  A.   That's my table and my living room.  It was just

19       destroyed.

20  Q.   Okay.  Was it like this before this event happened?

21  A.   No.

22  Q.   Let me show you Exhibit Number 12.  Do you recognize

23       what's shown here in Exhibit Number 12?

24  A.   Yes.

25  Q.   What is it, please?

1    A.   The TV.  It was busted.

2    Q.   Okay.  Was it like that before this event started?

3    A.   No.

4    Q.   Finally, let me show you Exhibit Number 13.  Do you see

5         Exhibit Number 13?

6    A.   Yes.

7    Q.   What's that, please?

8    A.   A hat.

9    Q.   Okay.  Is this your hat?

10   A.   No.

11   Q.   Is this Bernard's hat?

12   A.   No.

13   Q.   Is this Kenyatta's hat?

14   A.   No.

15   Q.   And can you tell me where this hat is?

16   A.   In the living room.

17   Q.   Of your apartment?

18   A.   Yes.

19   Q.   Was this hat in the living room of your apartment before

20        this event?

21   A.   No.

22   Q.   Was it there after this event was over?

23   A.   Yes.

24   Q.   Did you point that out to the police?

25   A.   Yes.

```
1    Q.    Did you also tell the police that at least one of the
2          perpetrators was wearing a hat like that?
3    A.    Yes.
4               MR. HUTTING:  Thank you very much.  Submit for
5          cross.
6               THE COURT:  Thank you, Mr. Hutting.
7               Mr. Kinney.
8               MR. KINNEY:  Thank you, your Honor.
9               THE COURT:  You're welcome.
10
11   CROSS-EXAMINATION BY MR. KINNEY:
12   Q.    Good afternoon, Ms. McKenzie.
13   A.    Good afternoon.
14   Q.    My name is Robert Kinney.  I'm a lawyer and I represent
15         Mr. Dantzler.
16              Now I gather by your testimony so far that you
17         never have been in Mr. Dantzler, Senior's presence before?
18   A.    No.
19   Q.    All right.  And you never talked to Mr. Dantzler, Senior,
20         on the phone?
21   A.    No.
22   Q.    Okay.  And no names, especially Mr. Dantzler, Senior, no
23         names were mentioned by any of the perpetrators in
24         addressing any other perpetrator?
25   A.    No.
```

172

1    Q.    I'm correct?

2    A.    Correct.

3    Q.    Okay.  And I notice that you said you went back into the

4          bathroom.  And I do remember reading at the preliminary

5          examination where you indicated you slipped into the

6          bathroom.  But you do remember giving a statement to the

7          police basically around four o'clock in the morning that

8          night?

9    A.    Yes.

10   Q.    Okay.  And do you remember indicating to the police that

11         night that the man with the gun told you to go into the

12         bathroom?

13   A.    No, I don't remember telling the officer that he told me

14         to go into the bathroom, because he didn't, that I recall.

15   Q.    Okay.  I'd like to show you something, okay, and I want

16         you to take a look at it yourself.  You're welcome to look

17         at -- there's three pages -- I'm sorry, there's three

18         pages.  I want you to look at as much as you want to.  But

19         I want you to concentrate on the lines that I have marked

20         and you let me know when you've looked at that document to

21         your satisfaction; okay?

22   A.    I'm satisfied.

23   Q.    You're satisfied?

24   A.    Yep.

25   Q.    Okay.  Tell me what document that is.

173

```
1    A.   It's a statement from me.

2    Q.   It's your statement?

3    A.   Yes.

4    Q.   Okay.  And that happened the night that Mr. Hill lost his

5         life?

6    A.   Yes.

7    Q.   Okay.  And that happened, if you look at the top, it says,

8         around four o'clock in the morning?

9    A.   Yes.

10   Q.   Okay.  And do you remember where that statement was taken?

11   A.   It was taken that night.

12   Q.   At your apartment, or did he take you to the police

13        station or --

14   A.   It was taken -- it was taken in my mom's house.

15   Q.   At your mom's, okay.  And I don't want you telling us

16        where anybody lives, but that was in our community?

17   A.   Yes.

18   Q.   Okay.  And I understand that you probably haven't been

19        that traumatized before?

20   A.   Never.

21   Q.   So that's not something that you would likely forget?

22   A.   No.

23   Q.   Unfortunately.

24             And I think that, would you agree with me, that

25        being that this is 2010, your ability to remember exactly
```

174

```
 1          what happened was better that night than today?

 2     A.   It's -- I'm going to say it's like about the same, because

 3          with me being in the state of mind that I was in that

 4          night and so traumatized, I wasn't thinking clearly.

 5     Q.   Okay.  You weren't trying to deceive the police at all?

 6     A.   No.

 7     Q.   Okay.  You were trying to tell them everything you knew?

 8     A.   Yes.

 9     Q.   Okay.  And I don't know whether you've had an opportunity

10          or you actually read the statement, but you did sign the

11          bottom of each page?

12     A.   I signed the bottom of each page, yes.

13     Q.   And the time that you signed it in the day was early?

14     A.   Um-hmm.

15     Q.   Am I correct in saying that that line that I marked down

16          says that the gun -- the guy with the gun told you to go

17          into the bathroom?

18     A.   That's what it says.

19     Q.   That's what it says?  Okay.  But you remember it

20          differently now?

21     A.   Yeah, that one -- I'm remembering that he was saying some

22          things, but he didn't tell me to go into the bathroom; I

23          went into the bathroom.  I don't even think he would have

24          even told me to go into the bathroom, he probably would

25          have shot me, too.
```

1   Q.   No bullets were fired at you?

2   A.   No.

3   Q.   Okay.  And the reason why I'm asking that question is that

4        you -- you said that they got into a fight.  But according

5        to this statement, you were in the bathroom before the

6        fighting happened.

7   A.   As I was slipping into the bathroom, they were fighting.

8        And if you hear commotions, you can put two and two

9        together.

10   Q.   Okay.  Well, that's different, putting two and two

11        together, as opposed to actually seeing what was going on.

12   A.   I saw some tussling as I was slipping into the bathroom.

13   Q.   That means you're disagreeing with the statement that you

14        gave; correct?

15   A.   I'm not disagreeing with the fact that that statement says

16        that he told me to go into the bathroom, but I'm going to

17        disagree that I didn't see any tussling, because I did.

18   Q.   You did tell the police about one of the guys picking up

19        your radio?

20   A.   Yes.

21   Q.   Like a boom box?

22   A.   Yes.

23   Q.   Okay.  And am I correct in that, when you were looking

24        out, you may have thought that this person looked at you

25        and then threw the radio down?

1    A.   I don't know if he looked at me or what.

2    Q.   But he threw the radio down and left?

3    A.   Yes.

4    Q.   Okay.  And as a matter of fact, I think it was the next

5         day or a couple of days later, the next day, they asked

6         you again about the boom box.  Do you remember that?

7    A.   I'm pretty sure it was in the questioning the next day.

8    Q.   Well, you remember being questioned the next day about

9         8:00 p.m.?  Shouldn't have been long, but do you remember

10        that?

11   A.   I remember being questioned a lot of times.  But after

12        something like this happens and you're not getting no

13        sleep, you know what I mean?

14   Q.   Yes.

15   A.   There's so much questions.  But, yeah, I signed it; so,

16        yeah, I remember it.

17   Q.   Okay.  And at that time, you were talking about the boom

18        box?

19   A.   Yes.

20   Q.   And the fact that one of the perpetrators had picked up

21        the boom box; correct?

22   A.   Yes.

23   Q.   Now you say that you were questioned more times than just

24        these two?

25   A.   Well, I was questioned that night.

1    Q.   Yes?

2    A.   You know, but I didn't sign anything at that time.  I

3         didn't sign anything until four o'clock.

4    Q.   Okay.  And then you signed this one here at 7:45?

5    A.   That next day, yes.

6    Q.   That next day, okay.

7              You mentioned that you saw the hat.  You didn't

8         touch it, though; did you?

9    A.   No.

10   Q.   And you saw the golf clubs?

11   A.   Yes.

12   Q.   You didn't touch them?

13   A.   No.

14   Q.   And when you had an opportunity, did you go all the way

15        down to where Mr. Hill was laying?

16   A.   Yes, and I touched him.

17   Q.   You touched him?

18   A.   Um-hmm.

19   Q.   But he didn't respond to you.  You didn't talk to him?

20   A.   No.

21   Q.   Okay.  And you didn't take anything from him?  You didn't

22        take anything from the scene at all?

23   A.   No.

24   Q.   All right.  And would I be correct in saying that, at some

25        point, a police officer returned a phone to you, a cell

1      phone?

2   A.   No.

3   Q.   So no officer ever returned a phone to you?

4   A.   No.

5            MR. KINNEY:  Okay.  Nothing further.

6            MR. HUTTING:  Nothing further.  Thank you very

7      much.

8            THE COURT:  May Ms. McKenzie step down and be

9      excused?

10           MR. KINNEY:  Yes, sir.

11           THE COURT:  Thank you, ma'am.

12           (At about 3:04 p.m., witness excused.)

13           THE COURT:  Jurors, are any of you in need of a

14     break?

15           Ladies and gentlemen, I'm going to give you your

16     afternoon break.  A couple of you raised your hands.  The

17     jurors would like a break.

18           MR. HUTTING:  Oh, okay.

19           THE COURT:  This will be a brief break.  See you

20     about 3:15.  It's now 3:07.  Thank you.

21           DEPUTY SHERIFF:  All rise for the jury.

22           (At about 3:05 p.m., jury panel excused.)

23           DEPUTY SHERIFF:  Please be seated.

24           THE COURT:  I'd like to pick it up and start at

25     3:20, and we'll go for a half an hour, until about ten

```
 1        minutes to 4:00, okay, if that works for everyone?

 2                 MR. HUTTING:  Okay, Judge.

 3                 MR. KINNEY:  Okay.

 4                 (At about 3:06 p.m., brief recess.)

 5                 (At about 3:23 p.m., back on the Record.)

 6                 THE COURT:  Back on the Record.

 7                 DEPUTY SHERIFF:  All rise for the jury.

 8                 (At about 3:24 p.m., jury panel seated.)

 9                 DEPUTY SHERIFF:  Be seated.

10                 THE COURT:  Back on the Record.  Next witness.

11        We have a note from the jury?

12                 JUROR NO. 12:  An individual, one of the jurors.

13                 THE COURT:  A note from Juror Number 12?

14                 JUROR NO. 12:  Yes.

15                 THE COURT:  Juror Number 12, let me share this

16        with the attorneys.

17                 (At about 3:25 p.m., brief sidebar.)

18                 THE COURT:  Let me indicate to the jurors that I

19        do not entertain questions from the jurors during the

20        course of the trial; it prolongs and convolutes the

21        process.  When you're in deliberations, if you have

22        questions that you want to ask the Court, I'll do it, but

23        it's way too early to be asking any questions.

24                 JUROR NO. 12:  I can wait for an answer.

25                 THE COURT:  So at this point, I'll hand the note
```

```
 1      to Brenda Moore for incorporation into the court file;

 2      okay?

 3              COURT CLERK:  Raise your right hand.

 4              Do you swear or affirm that the testimony you're

 5      about to give in the matter now pending before this Court

 6      will be the truth, so help you, God?

 7              WITNESS GARCIA:  Yes, I do.

 8              COURT CLERK:  You may be seated.

 9                   P.O. DAVID GARCIA,

10      called as a witness at 3:26 p.m., having first been duly

11      sworn by the Clerk of the Court, was examined and

12      testified on his oath as follows:

13              THE COURT:  Have a seat, make yourself

14      comfortable.  Please pull the microphone close to your

15      mouth and speak loudly and clearly for our jury; okay?

16      Thank you.

17              Mr. Hutting.

18              MR. HUTTING:  Thank you, your Honor.

19

20  DIRECT EXAMINATION BY MR. HUTTING:

21  Q.  May we please have your name for the Record, sir?

22  A.  David Garcia.

23  Q.  And even though it's obvious, your place of employment?

24  A.  City of Detroit police officer.

25  Q.  Okay.  How long have you been a police officer for the
```

```
 1          City of Detroit, Officer Garcia?

 2   A.     Just over ten years.

 3   Q.     Out of what precinct or bureau, or I guess it's district,

 4          do you work?

 5   A.     Well, it's the Sixth Precinct right now, yes.

 6   Q.     And that's on the west side of the city?

 7   A.     Yes.

 8   Q.     Okay.  Where is Number Six located?

 9   A.     Plymouth and Warwick.

10   Q.     All right.  Is the area of West Seven Mile and Evergreen

11          within the confines of the 6th Precinct?

12   A.     Actually, it's 8th Precinct right now; but at that time of

13          this incident, it was the Northwest District, yes.

14   Q.     Okay.  All right.  Let's go back to the early morning

15          hours of Monday, January 16th of 2006, around 2:15 in the

16          morning.  Were you working and on duty?

17   A.     Yes, I was.

18   Q.     Were you working by yourself or did you have a partner?

19   A.     With a partner.

20   Q.     Do you remember the name of your partner?

21   A.     Yes.

22   Q.     What was it?

23   A.     Kirk Williams.

24   Q.     Kirk Williams, okay.

25               Were you in uniform?
```

```
 1   A.   I can't recall exactly, but by looking at the car code, I

 2        believe we were in plain clothes at that time.

 3   Q.   All right.  Did you, on that morning, at about 2:15 a.m.,

 4        have occasion to respond to the Royal Capri Apartment

 5        Complex at 20415 West Seven Mile?

 6   A.   Yes, we did.

 7   Q.   Okay.  When you got there, were there other police

 8        officers there or were you the first -- were you and

 9        Officer Williams the first response team?

10   A.   We were the first ones to arrive.

11   Q.   Okay.  When you arrive there at the scene, do you see

12        somebody who is either injured or dead?

13   A.   Yes.

14   Q.   Okay.  Can you tell us where this person was, to the best

15        of your recollection?

16   A.   Just inside the main door, face down.

17   Q.   Okay.  All right.  And do you remember anything about how

18        he was dressed or not dressed?

19   A.   Just wearing a pair of underwear.

20   Q.   Okay.  Did he appear to you to be alive?

21   A.   No, he was motionless.

22   Q.   Okay.  So there's no other police officers there at this

23        point?

24   A.   No.

25   Q.   Okay.  Did you -- Did EMS arrive?
```

1   A.   Yes.

2   Q.   Okay.  What happens when EMS arrives?

3   A.   Whatever they do, they treated him.

4   Q.   Okay.  All right.  Ultimately did they declare him

5        deceased?

6   A.   Yes.

7   Q.   Okay.  And then they ultimately left?

8   A.   That is correct.

9   Q.   All right.  Showing you this photograph that we have here,

10       People's Exhibit Number 2, with the EMS blanket, is that

11       the decedent that we're talking about at the apartment

12       complex that you responded to?

13  A.   Yes, it is.

14  Q.   Okay.  Did you know this person?

15  A.   No.

16  Q.   Okay.  Ultimately while you were there that night, do you

17       come in contact with a lady who identifies herself as

18       Nikitta McKenzie, a resident of Apartment 302?

19  A.   Yes, I do.

20  Q.   Okay.  Did she give you a brief statement of what had

21       happened?

22  A.   Yes.

23  Q.   Okay.  Does -- Do people from the Homicide Section respond

24       to this -- Well, when you find somebody that's dead like

25       this at the scene, what is it -- do you make certain

```
 1        notifications?

 2   A.   Yes.

 3   Q.   Tell the jury how those notifications go.

 4   A.   We notify the precinct desk, we notify our investigation

 5        operations, call Homicide, we notify notification and

 6        control, and they order evidence techs to come.

 7   Q.   So Homicide ultimately responds to the scene?

 8   A.   Yes.

 9   Q.   Okay.  Are you there protecting the scene until Homicide

10        comes?

11   A.   Yes, we are.

12   Q.   Okay.  Once Homicide arrives at the scene, do they then

13        take charge of the scene?

14   A.   Yes.

15   Q.   Do you continue, along with Officer Williams, to stay

16        there to provide, you know, control of the scene?

17   A.   Yes, we do.

18   Q.   All right.  Ultimately do evidence techs respond?

19   A.   Yes.

20   Q.   Once Homicide responds to the scene, is it their job to

21        continue the investigation?

22   A.   Yes.

23   Q.   And you turn that over to them?

24   A.   Yes, we do.

25             MR. HUTTING:  Thank you, Officer Garcia.
```

```
 1                    THE COURT:  Cross-examination, Mr. Kinney.

 2                    MR. KINNEY:  Thank you.

 3

 4    CROSS-EXAMINATION BY MR. KINNEY:

 5    Q.   Good afternoon, Officer.

 6    A.   Good afternoon.

 7    Q.   Am I pronouncing it right, Garcia?

 8    A.   Yes.

 9    Q.   You said you've been an officer for ten years?

10    A.   Yes.

11    Q.   You knew what you were doing that night?

12    A.   Yes.

13    Q.   When you got to that scene, you wanted to make sure nobody

14         contaminated the scene --

15    A.   Yes.

16    Q.   -- correct?  So you went into the apartment?

17    A.   Yes.

18    Q.   When you went into the apartment, I assume that your

19         partner or -- was downstairs just to make sure nobody else

20         was contaminating the scene downstairs?

21    A.   Yes.

22    Q.   Okay.  And were you part of the investigation?  Or were

23         you just the responding officers to make sure nothing was

24         going on, there was nobody there to taint the scene?  Were

25         you part of the investigation, you know, like part of the
```

186

```
 1        evidence techs crew or --

 2   A.   No, just the responding officer.

 3   Q.   Okay.  You weren't told to canvass?  Because there's a lot

 4        of apartments in that building.  You weren't told to

 5        canvass any of the other apartments or anything like that?

 6   A.   No.

 7   Q.   Okay.  And Ms. McKenzie, did she tell you exactly how many

 8        perpetrators there was?

 9   A.   Six to seven, I believe it is.

10   Q.   She said six to seven?

11   A.   Yes.

12   Q.   And she said they were wearing dark clothes?

13   A.   Yes.

14   Q.   Did she mention that any of them were wearing any hats?

15   A.   I can't recall that.  I would have to look at the report

16        and see what I wrote down for description.

17   Q.   Okay.  I'm going to ask you first -- because these are new

18        CRISNETs, they are not like the preliminary complaint

19        reports -- is that yours?

20   A.   Yes.

21   Q.   Okay.  And you've got a copy of it in your hand?

22   A.   Yes, I do.

23   Q.   All right.  If that would refresh your recollection and

24        there's no objection, I don't have any objection to you

25        taking a look.
```

1    A.    Appears as though we have for attire is dark clothing on

2          all suspects.

3    Q.    Okay.  And you say she said six to seven?

4    A.    Yes.

5    Q.    Okay.

6                MR. KINNEY:  Nothing further.

7                MR. HUTTING:  Nothing further.

8                THE COURT:  May Officer Garcia step down and be

9          excused?

10               MR. HUTTING:  Yes, he may.

11               MR. KINNEY:  Yes, your Honor.

12               THE COURT:  Thank you, sir.

13               WITNESS GARCIA:  Thank you.

14               (At about 3:33 p.m., witness excused.)

15               COURT CLERK:  Do you swear or affirm that the

16         testimony you're about to give in the matter now pending

17         before this Court will be the truth, so help you, God?

18               WITNESS PEARSON:  I do.

19                    P.O. DWIGHT PEARSON,

20         called as a witness at 3:34 p.m., having first been duly

21         sworn by the Clerk of the Court, was examined and

22         testified on his oath as follows:

23               COURT CLERK:  You may be seated.

24               THE COURT:  Good afternoon.

25               WITNESS PEARSON:  Good afternoon, Judge.

```
 1                    THE COURT:  Make yourself comfortable.  Pull the

 2          microphone close to your mouth and speak loudly and

 3          clearly for us; okay?

 4                    WITNESS PEARSON:  Thank you.

 5

 6   DIRECT EXAMINATION BY MR. HUTTING:

 7   Q.    May we please have your name for the Record, sir?

 8   A.    Dwight Pearson.

 9   Q.    Okay.  May we please have your place of employment?

10   A.    City of Detroit Police Department, Homicide.

11   Q.    Okay.  How long have you been a Detroit police officer,

12          Officer Pearson?

13   A.    Since '94.

14   Q.    Okay.  Sixteen years, going on 17.

15                    How long have you been in Homicide?

16   A.    A little bit over 11 years.

17   Q.    Okay.  Officer Pearson, I want to take you back to the

18          early morning hours, a Monday, January the 16th of 2006,

19          around 2:15 in the morning, were you working that Monday

20          morning?

21   A.    Yes.

22   Q.    Okay.  Are you familiar with a term in Homicide that is

23          known as the "team assigned"?

24   A.    Yes.

25   Q.    Can you explain to this jury what team assigned means?
```

```
 1   A.   The team assigned is a -- like a report that we do, pretty
 2        much a summary or a narrative, let them know what we did
 3        at the scene, for what we get assigned on the case the
 4        following day.  This gives the officer in charge of the
 5        case an idea of what's going on, what direction he or she
 6        needs to go in and a little bit more informed so he know
 7        what he needs to do to get started.
 8   Q.   Okay.  When a homicide comes in to the Detroit Police
 9        Department -- or the Detroit Police Department Homicide
10        Section is notified that there's a homicide, do Homicide
11        officers respond to the scene?
12   A.   Yes.
13   Q.   Generally how many go?
14   A.   We usually have at least a minimum of two people that goes
15        out to a scene.  Sometimes there's only one, but usually
16        at least a minimum two people.
17   Q.   Okay.  Were you working the team assigned that night in
18        Homicide?
19   A.   Yes, I was.  I was the officer in charge of the scene that
20        night.
21   Q.   Okay.  So you went to the scene at 20415 West Seven Mile?
22   A.   Yes.
23   Q.   Okay.  Did you go -- if you recall, did you go by yourself
24        or did you go with another officer?
25   A.   I went with another person, a sergeant.
```

190

1   Q.   Who is that, if you recall?

2   A.   Well, it's Lieutenant Walton now.  But he's Sergeant

3        Walter now -- I mean then.

4   Q.   Okay.  You and Sergeant Steve Walton?

5   A.   That's correct.

6   Q.   Okay.  So when you get there, you guys are in charge of

7        the scene?

8   A.   Yes.

9   Q.   Okay.  Can you describe the scene for us?  Tell us what

10       you remember about it.

11  A.   I remember being on West Seven Mile in an apartment

12       complex, being between a car wash, which is on the -- that

13       was east of the apartment building, the store to the west

14       of it.

15  Q.   Okay.

16  A.   I remember a glass door being in the front and the

17       stairway going up.

18  Q.   Do you remember a decedent there at the scene?

19  A.   Yes.

20  Q.   And do you remember where he was?

21  A.   He was laying pretty much face down on the side, his head

22       down towards the lower level of the steps that leads up to

23       the upper apartment.

24  Q.   Okay.  Ultimately did you go up to Apartment 302?

25  A.   Yes.

1    Q.    Do you remember much about Apartment 302?

2    A.    No.

3    Q.    Okay.  Do you remember if there were any -- do you

4          remember if there were any signs of forced entry?

5    A.    Yes.

6    Q.    Okay.  What do you remember about that?

7    A.    The door being broken up and someone looking like they

8          made forced entry.

9    Q.    Okay.  And inside the apartment, was it nice and neat or

10         what do you remember about that?

11   A.    No, it wasn't nice and neat.  Looked like someone was

12         fighting in there.

13   Q.    Okay.  All right.  While you were there and doing your

14         work, do you remember any kind of a hat, sir?

15   A.    Yes.

16   Q.    Tell us about that.

17   A.    There was a black skull cap that was found during our

18         investigation, so I had it collected and processed out.

19         It was sent to the evidence techs so it could be processed

20         out.

21   Q.    For what purpose would you collect that skull cap?  What

22         kind of evidence would you like to get from that skull

23         cap?

24   A.    Well, I noted in my team assign for the officer in charge

25         that need to be processed, maybe checked for DNA.

1   Q.   All right.  So you -- Did you come in contact that night

2        with a lady by the name of Nikitta McKenzie?

3   A.   Yes.

4   Q.   Okay.  Did you actually even take a statement from her?

5   A.   Yes.

6   Q.   Okay.  While you and Officer Sergeant Walton were there

7        doing your work, do you do what's known as a canvass?

8   A.   Yes.

9   Q.   Can you explain to the jury what a canvass is?

10  A.   Pretty much what a canvass is, is that we go out trying to

11       find other witnesses that may have some information or

12       knowledge as to what happened at the time of that

13       incident.  So what we do, we go, like, in this case, it

14       was inside of an apartment complex, so Sergeant Walton,

15       which was sergeant at the time, I had him go and do a

16       canvass with probably an officer, I don't know who he had

17       with him, they knock on the door and ask if they see or

18       hear anything.  And if that's the case, then, we'll have a

19       statement taken from them.

20  Q.   That night when you did your canvass, did you find any

21       other eye-witnesses or any witnesses to this event, other

22       than Nikitta McKenzie?

23  A.   That was all we had after doing a canvass.  Some people

24       call it a survey.  No one -- Some people just didn't even

25       open the door or anything.  We knocked, no one even came

```
 1          to the door.  So we couldn't find any other witnesses at

 2          that point.

 3   Q.     So the only witness then that you had was Nikitta

 4          McKenzie?

 5   A.     That's correct.

 6   Q.     Ultimately do you write up your report?

 7   A.     Yes.

 8   Q.     Do you then turn that over to the Homicide desk so that

 9          whose ever is going to be assigned to further investigate

10          the case can work from your report and any other PCRs that

11          are generated?

12   A.     That is correct.

13   Q.     Okay.

14             MR. HUTTING:  Thank you very much, Officer

15          Pearson.

16             THE COURT:  Mr. Kinney.

17             MR. KINNEY:  Thank you, your Honor.

18

19   CROSS-EXAMINATION BY MR. KINNEY:

20   Q.     Good afternoon.

21   A.     Good afternoon.

22   Q.     Investigator Pearson; right?

23   A.     That's correct.

24   Q.     In terms of -- Let's start off with the canvassing.

25             You didn't participate in the canvassing?
```

194

```
 1   A.   No.  I was the officer in charge of the scene, I delegated
 2        and told Sergeant Walton to handle that aspect of it.
 3   Q.   All right.  And approximately 30 apartments, it was three
 4        floors?
 5   A.   Three different floors.  That will be something I would be
 6        guessing.  It was a lot of apartments, I can tell you that
 7        much.
 8   Q.   Okay.  And take a look at this, please, Investigator
 9        Pearson, and tell me if you can recognize what that is?
10   A.   This is what -- This is a survey, which is also named to
11        be a canvass.
12   Q.   Okay.  And how many residences -- when I say residences,
13        we're talking about apartments in the apartment building;
14        correct?
15   A.   That's correct.
16   Q.   Because logically, when you canvass a place like this and
17        if everything happened in the apartment building, what you
18        want to do is get to every apartment?
19   A.   Exactly.  As soon as -- As fast as we can.  We don't want
20        any witnesses to get away, if we could.
21   Q.   Okay.  How many apartments does it seem like were
22        approached by the officers?
23   A.   It looked like Sergeant Walton went to -- let's see --
24        ten.
25   Q.   Ten.  And there's more than ten apartments.  You said
```

```
 1        there was three floors, there's definitely more than ten
 2        apartments?
 3   A.   I said I'd be guessing, but I'm not for sure, but there
 4        was a nice amount of apartments.
 5   Q.   If I told you the evidence techs have indicated
 6        approximately 22.
 7   A.   Then there's probably 22.
 8   Q.   Okay.  And when it comes to talking to Ms. McKenzie, you
 9        indicated that -- All right.  Can you see what I'm showing
10        you from here?  Is that the Homicide scene investigation?
11   A.   This is the team assigned.  This is scene investigation,
12        that's correct.
13   Q.   I'm going to use one of the old terms.  Is that the
14        preliminary complaint report?  I know you don't do one,
15        but this is basically what you were doing that night, what
16        you were delegating to other people to do?
17   A.   No, that's what I did.  That's the team assign.  That's
18        the narrative I do for whoever is going to get the case.
19   Q.   That's to help them start the investigation?
20   A.   That's correct.
21   Q.   Okay.  Now, on page three -- you have a copy of that with
22        you?
23   A.   Yes.
24   Q.   All right.  On page three, it indicates that the writer
25        observed the black skull cap belonging to one of the
```

1       perpetrators.

2                 That's the last sentence in observations?

3   A.   Okay.  Let me look there.

4                 Yes, that's the last one.

5   Q.   All right.  That doesn't say that Ms. McKenzie indicated

6        to you that there is a skull cap here that belonged to one

7        of the perpetrators?

8   A.   No.

9   Q.   Is that because she did not indicate that to you?  I mean

10       you observed it?  It's not that she brought it to your

11       attention?

12  A.   No.  I can't recall myself whether she told me or it's

13       something that was out of place.  I just know that if it's

14       written, that's what it says.

15  Q.   And it says that the writer observed a black skull cap?

16  A.   That's correct.

17  Q.   All right.  Now I know with your experience, you probably

18       asked her?

19  A.   That's correct.

20  Q.   Okay.  And in terms of the evidence -- I know I'm looking

21       for it, I know I've heard you say it before, but in terms

22       of the evidence techs, when there's a body on the scene,

23       would you not have asked them to bag the hands of the

24       complainant?

25  A.   I did ask.

1    Q.   You did ask?

2    A.   Yes.

3    Q.   That's something you do all the time?

4    A.   Not all the time.  But when I see there's a scuffle, then,

5         I definitely want the hands bagged because there might be

6         DNA underneath the fingertips, underneath the nails.

7    Q.   That's the reason you bag them?

8    A.   That's correct.

9    Q.   And that's to make sure that there's no contamination of

10        what could possibly be evidence later on?

11   A.   No, that's for -- to check to make sure that that DNA

12        doesn't belong to one of the persons that he got into a --

13        looked like to be a fight.

14   Q.   Right.  Right.  So you don't want to contaminate it?

15   A.   Exactly, that's correct.

16             MR. KINNEY:  Thank you.  Nothing further, your

17        Honor.

18             THE COURT:  Mr. Hutting.

19

20   RE-CROSS EXAMINATION BY MR. HUTTING:

21   Q.   So in your initial report, you mention the skull cap.

22   A.   Yes.

23   Q.   You saw that skull cap there?

24   A.   Yes.

25   Q.   Okay.  I mean -- And logically would you have asked Ms.

1           McKenzie about that?

2    A.    Yes.

3    Q.    Okay.  And that's why you wrote:  Writer observes a black

4          skull cap belonging to one of the perps; right?

5    A.    That's correct.

6    Q.    If she had told you, oh, no, that's my skull cap; or, oh,

7          no, that's Bernard's skull cap; or, oh, no, that's the

8          skull cap that belongs to one of my friends who was here

9          and left it here, you would have put that in the report?

10   A.    And I would have left the hat behind.  I wouldn't have

11         needed it.

12                   MR. HUTTING:  Thank you.

13                   THE COURT:  Mr. Kinney.

14                   MR. KINNEY:  Nothing further.

15                   THE COURT:  May Investigator Pearson be excused?

16                   MR. HUTTING:  Yes.

17                   MR. KINNEY:  Yes, your Honor.

18                   THE COURT:  Thank you much.

19                   (At about 3:47 p.m., witness excused.)

20                   THE COURT:  Gentlemen, we've concluded for

21         today.  I'll have the jury return Monday at 8:50.

22                   Monday at 8:50; is that correct, gentlemen?

23                   MR. HUTTING:  Yes.

24                   MR. KINNEY:  Yes, your Honor.

25                   THE COURT:  Hoping to start at 9:00 a.m. sharp,

```
 1        Monday; correct, gentlemen?

 2              MR. HUTTING:  Yes, your Honor.

 3              MR. KINNEY:  Yes, your Honor.

 4              THE COURT:  Thank you.

 5              Don't discuss the case.  Leave your notes and

 6        pads in the jury room.  Have a nice weekend.  I'll see you

 7        Monday at 8:50.  I'll let you sleep in on Monday.

 8              DEPUTY SHERIFF:  All rise for the jury.

 9              (At about 3:47 p.m., jury panel excused.)

10              DEPUTY SHERIFF:  Please be seated.

11              THE COURT:  Gentlemen, how are we progressing?

12              MR. HUTTING:  I think we're going to finish

13        Monday, Judge.  The next witness I'm going to call is

14        Deborah Stinson.  She's the evidence tech that went back

15        to the scene on the 18th.  She dusted the boom box and

16        took two print lifts from the boom box.  That's where the

17        fingerprints came from.

18              THE COURT:  Who comes after that witness?

19              MR. HUTTING:  Okay.  After that, I think that

20        we're ready to go to the DNA people, who are going to be

21        coming in here from Bode, West Virginia -- or from

22        Virginia, okay, hopefully.

23              MR. KINNEY:  Can't get those two states mixed

24        up.

25              MR. HUTTING:  Okay.  All right.  But hopefully
```

1     they're going to fly out of Reagan around 6:00 a.m.

2           THE COURT: Why don't they come in Sunday night?

3           MR. HUTTING: I don't think they like to do

4     that, Judge. I don't think that they'll do that.

5           THE COURT: Do you have medical procedures next

6     week?

7           MR. HUTTING: Wednesday. Okay. But I -- I

8     intend to call two people. One is Nicole Clay -- or Kaye,

9     K-A-Y-E, she did the first DNA work. And she'll kind

10    of --

11          THE COURT: Well, I don't need to know what

12    their testimony is. I'm just trying to get a feel for

13    where we're at. Do you think were going to conclude

14    Monday?

15          MR. HUTTING: I do. I think I'm going to

16    conclude my case on Monday; okay? I really do.

17          THE COURT: By lunch time? No.

18          MR. HUTTING: Probably. Maybe, because I'm not

19    going to beat a dead horse on the DNA people; okay?

20          THE COURT: So we have Stinson, and then two DNA

21    people?

22          MR. HUTTING: And Charlie Clark. And then we've

23    got, I think, three stipulations. The fingerprint

24    stipulation, with the fingerprints reports --

25          MR. KINNEY: I and Mr. Hutting are going to get

```
1        together tomorrow to take care of them.

2                   THE COURT:  Are the jury instructions in order

3        and verdict forms?

4                   MR. HUTTING:  I don't have a verdict form yet.

5                   MR. KINNEY:  We need to have your say-so on

6        which ones actually are going to come in.

7                   THE COURT:  So it's not going to be very time

8        consuming.

9                   MR. KINNEY:  No.

10                   MR. HUTTING:  No.

11                   THE COURT:  Okay.  Have a nice weekend,

12       everyone.  And I'll see you on Monday.

13                   MR. HUTTING:  Okay.

14                   MR. KINNEY:  Thank you.

15                   (At about 3:51 p.m., proceedings concluded.)

16                            *      *      *

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3      STATE OF MICHIGAN)

 4                       )

 5      COUNTY OF WAYNE  )

 6

 7

 8           I, Becky L. Bauer, Certified Court Reporter of the

 9      Third Judicial Circuit Court, Criminal Division, Wayne

10      County, State of Michigan, do hereby certify that the

11      foregoing 205 pages comprise a full, true and correct

12      transcript of the proceedings and testimony taken in the

13      matter of the People of the State of Michigan versus

14      SAMUEL LEE DANTZLER, on December 16, 2010.

15

16

17

18                      _____

19                      Becky L. Bauer, CSR-3326

20                      Official Court Reporter

21

22

23      Date: _____

24

25

                              203
```

1                    INDEX TO EXAMINATIONS

2

3    Witness                                        Page

4

5    WILLIAM JAMES NIARHOS

6    DIRECT EXAMINATION BY MR. HUTTING

7    (Continued):                                    3

8    CROSS-EXAMINATION BY MR. KINNEY:               34

9    REDIRECT EXAMINATION BY MR. HUTTING:           58

10   JANET BURT

11   DIRECT EXAMINATION BY MR. HUTTING:             66

12   CROSS-EXAMINATION BY MR. KINNEY:               81

13   REDIRECT EXAMINATION BY MR. HUTTING:          107

14   CHRISTOPHER STEARY

15   DIRECT EXAMINATION BY MR. HUTTING:            110

16   CROSS-EXAMINATION BY MR. KINNEY:              120

17   RE-DIRECT EXAMINATION BY MR. HUTTING:         132

18   JEFFREY NYE

19   DIRECT EXAMINATION BY MR. HUTTING:            134

20   CROSS-EXAMINATION BY MR. KINNEY:              150

21   NIKITTA MCKENZIE

22   DIRECT EXAMINATION BY MR. HUTTING:            156

23   CROSS-EXAMINATION BY MR. KINNEY:              172

24

25                  (Index continued on Page 205.)

```
 1                    INDEX TO EXAMINATIONS

 2

 3    Witness                                  Page

 4

 5       P.O. DAVID GARCIA

 6       DIRECT EXAMINATION BY MR. HUTTING:      181

 7       CROSS-EXAMINATION BY MR. KINNEY:        186

 8       P.O. DWIGHT PEARSON

 9       DIRECT EXAMINATION BY MR. HUTTING:      189

10       CROSS-EXAMINATION BY MR. KINNEY:        194

11       RE-CROSS EXAMINATION BY MR. HUTTING:    198

12

13

14                      INDEX TO EXHIBITS

15

16    Exhibit                                  Page

17

18       PEOPLE'S EXHIBITS 1 THROUGH 19 ADMITTED    5

19       PEOPLE'S EXHIBIT 20 ADMITTED            22

20       PEOPLE'S EXHIBIT 21 ADMITTED            24

21       PEOPLE'S EXHIBIT 22 ADMITTED            26

22       PEOPLE'S EXHIBIT 23 ADMITTED            30

23       PEOPLE'S EXHIBITS 29 AND 30 ADMITTED    33

24

25
```