1                        STATE OF MICHIGAN

 2            THIRD JUDICIAL CIRCUIT COURT - WAYNE COUNTY

 3

 4    THE PEOPLE OF THE STATE OF MICHIGAN,

 5

 6    vs.                              Case No. 10-3521

 7

 8    SAMUEL LEE DANTZLER,

 9              Defendant.

10                                          /

11

12                          JURY TRIAL

13        BEFORE THE HONORABLE GREGORY D. BILL, CIRCUIT JUDGE

14        701 Frank Murphy Hall of Justice, 1441 St. Antoine,

15            Detroit, Michigan - December 20, 2010

16    APPEARANCES:

17    For the People:        MR. AUGUSTUS W. HUTTING   P24839
                             MS. ANDREA LYNN HUTTING   P68606
18                           Wayne County Prosecutors Office
                             1441 St. Antoine
19                           Detroit, MI  48226
                             (313) 224-5777
20
      For the Defendant:     MR. ROBERT F. KINNEY, III  P35842
21                           MS. ALANNA P. O'ROURKE  P74210
                             Attorney at Law
22                           645 Griswold, Suite 1220
                             Detroit, MI  48226
23                           (313) 963-5310

24    REPORTED BY:           Becky L. Bauer (CSR-3326)
                             Certified Shorthand Reporter
25                           (313) 967-6928

                               1

```
1        COMPUTER GENERATED INDEX AT THE END OF TRANSCRIPT

2                    Detroit, Michigan

3                    December 20, 2010

4                    At or about 9:20 a.m.

5                    (Court, Counsel and Defendants present.)

6                          *       *       *

7                    COURT CLERK:  Calling docket 10-3521, People

8        versus Samuel Lee Dantzler, circuit court docket, jury

9        trial in progress.

10                   MR. HUTTING:  Auggie Hutting for the People.

11                   MR. KINNEY:  Robert Kinney appearing on behalf

12       of Mr. Dantzler.  I had an opportunity to speak with Mr.

13       Dantzler over the weekend.  Mr. Dantzler has indicated

14       that I should --

15                   Mr. Dantzler, why don't you tell the Judge what

16       the issue is?

17                   DEFENDANT DANTZLER:  My issue is ever since I've

18       been locked up, I've been saying that I wanted this hat

19       tested by my -- you know, somebody for my side.  And, you

20       know, we done get this far and the hat still hasn't been

21       tested for me because I'm just going by the word of the

22       prosecution that my DNA is inside this hat and also it

23       could be more people's inside this hat other than me.  And

24       nobody said nothing about that.  And I wanted this hat

25       tested for my -- on my behalf, and I think I'm getting
```

2

1      balled in.

2              THE COURT:  Well, I've appointed an expert, I

3      tried to assist the defense wherever possible.  Sometimes

4      there's trial strategy and the Court certainly doesn't get

5      involved in the trial strategy of either side.  I sign

6      orders and try to assist both sides where I can.  I do

7      know that there was a sample taken based on the testimony,

8      but it's up to the jury.  I'll be giving an expert

9      instruction, they can give whatever weight they want to

10     any testimony of any witness; okay?  And as to in terms of

11     a sample that was taken, the sample can have many results,

12     it could have the results of many people inside or it

13     could have the results of one person or, et cetera, so --

14              DEFENDANT DANTZLER:  All I have -- I'm sorry.

15              THE COURT:  I'll defer to Mr. Kinney and his

16     trial strategy on your behalf, Mr. Dantzler.  He's very

17     seasoned, a very good person -- attorney and people take

18     as many samples as they're going to take, I guess, to

19     fulfill their responsibilities and their needs.  So I

20     don't know what more I can say.  We've heard from one or

21     two witnesses in that regard, and the case is far from

22     over at this point.

23              Anything else, Mr. Kinney, Mr. Dantzler, Mr.

24     Hutting?

25              MR. HUTTING:  Not on behalf of the People.

3

```
 1                    MR. KINNEY:  Not on behalf of Mr. Dantzler.

 2                    THE COURT:  We'll deal with the issue again, Mr.

 3      Kinney, at an appropriate time.  It doesn't impact on the

 4      next couple -- these jurors have been marched through the

 5      door, ready to go.  I allowed you both time to do whatever

 6      you wanted to do.  It's now 9:30.

 7                    MR. KINNEY:  Ready to proceed.

 8                    THE COURT:  If there's something you want to

 9      bring to the Court's attention, I'll deal with it.  Thank

10      you.

11                    DEPUTY SHERIFF:  All rise for the jury.

12                    (At about 9:26 a.m., jury panel seated.)

13                    DEPUTY SHERIFF:  You may be seated.

14                    THE COURT:  Good morning.

15                    JURY PANEL:  Good morning.

16                    THE COURT:  We've been dealing with an issue or

17      two.  May I have our deputies who are helping us today?

18      I'll have them introduce themselves to you.

19                    DEPUTY SHERIFF:  Officer Mark Driscoll.

20                    DEPUTY SHERIFF:  Corporal Martin Yount.

21                    THE COURT:  They both help me on occasion and we

22      appreciate them helping us.

23                    DEPUTY SHERIFF:  Thank you, Judge.

24                    THE COURT:  Are we ready to proceed?

25                    MR. HUTTING:  Yes, sir.
```

4

```
 1                COURT CLERK:  Raise your right hand.

 2                Do you swear or affirm that the testimony you're

 3       about to give in the matter now pending before this court

 4       will be the truth, so help you, God?

 5                WITNESS STINSON:  Yes.

 6                     P.O. DEBORAH STINSON,

 7       called as a witness at 9:27 a.m., having first been duly

 8       sworn by the Clerk of the Court, was examined and

 9       testified on her oath as follows:

10                COURT CLERK:  You may be seated.

11                THE COURT:  Good morning.  Make yourself

12       comfortable, pull the microphone close to your mouth and

13       please speak loudly and clearly for the jury.

14

15  DIRECT EXAMINATION BY MR. HUTTING:

16  Q.   Good morning.

17  A.   Good morning.

18  Q.   For the Record, we're going to need your name and, even

19       though it's obvious from your dress here in the courtroom,

20       we're going to need your place of employment?

21  A.   My name is Officer Deborah Stinson.  I work for the City

22       of Detroit as a police officer, crime scene investigation.

23  Q.   Okay.  Are you what's known as an evidence tech?

24  A.   Yes.

25  Q.   How long have you been an evidence tech for the City of
```

1          Detroit and its police department?

2     A.   Thirteen years.

3     Q.   Okay.  Officer Stinson, I'd like to take you back then to

4          the year of 2006, is it a fair and true statement that you

5          were an evidence tech back then?

6     A.   Yes.

7     Q.   Okay.  I'd like to take you back to the -- is it January

8          the 18th or January the 19th of 2006.

9     A.   The actual day, I believe, is January the 16th.

10    Q.   Okay.  That's the date of the incident?

11    A.   Yes.

12    Q.   But did you have occasion -- Here's my question:  Did you

13         have occasion to go to the location of 20415 West Seven

14         Mile, apartment number 302?

15    A.   Yes, I did.

16    Q.   What day did you go?

17    A.   The date -- Well, the incident occurred on the 16th and I

18         believe it was two days later.

19    Q.   So you went out there on the 18th?

20    A.   Yes.

21    Q.   Okay.  Were you sent out there?

22    A.   Yes, I was.

23    Q.   Were you sent out there with a specific request in mind?

24    A.   Yes.

25    Q.   And what was the specific request that you were sent out

1      to do?

2  A.   To photograph and to dust for prints.

3  Q.   Okay.  All right.  What happens when you get out to the

4       location, to Apartment 302?

5  A.   When I arrived out at the location, I met with -- I

6       believe it was Officer Knox at that time, and I was

7       directed to photograph the scene, and to dust for prints,

8       several items in the dwelling to be dusted.

9  Q.   Okay.  All right.  What items did you dust inside

10      Apartment 302 for prints?

11 A.   I dusted -- There was, I believe, like a boom box or

12      stereo system.  I dusted that item for prints.

13 Q.   Okay.  All right.  And where was that located inside the

14      apartment, if you recall?

15 A.   I can't recall exactly.  If I may refer to my report.

16 Q.   Sure.  Sure.

17           Okay.  Do you remember where it was located or

18      do you know where it was located?

19 A.   Yes, it was located on the floor which would be north of

20      the door, the far entrance door.

21 Q.   Okay, all right.  What were the results when you dusted

22      that item for prints?

23 A.   I dusted positive for prints and those prints was turned

24      over to latent prints to be further determined whether

25      they would be positive or negative.

1  Q.  How do you do this dusting?

2  A.  We use latex powder.  The powder is then -- the powder is

3      then placed on the item and dusted with the powder brush

4      and then we use what we call lifting tape, and that is

5      adhered to the print and we lift it and place it on a

6      lifter and then turns it over to latent prints.

7  Q.  Okay.  But you did get some positive results; is that

8      correct?

9  A.  That is correct.

10 Q.  Okay.  Do you put that on any kind of evidence property

11     tag, the print lifts that you take?

12 A.  Yes.

13 Q.  What evidence property tag did you put these print lifts

14     on?

15 A.  If I may refer to my report?

16 Q.  Sure.

17 A.  The fingerprint lift was placed on evidence tag 16229304.

18 Q.  Okay.  All right.  Are you the person that determines the

19     quality of the prints?

20 A.  No, I'm not.

21 Q.  Okay.  It's then sent to -- Where does it go first?

22 A.  It goes to latent prints.

23 Q.  Okay.  All right.  And then somebody there looks at that

24     print?

25 A.  That's correct.

1   Q.   And that's their job to testify or say anything about

2        that; is that correct?

3   A.   That's correct.

4   Q.   Okay.  Thank you, Officer.

5                THE COURT:  Mr. Kinney.

6                MR. KINNEY:  May I?

7

8   CROSS EXAMINATION BY MR. KINNEY:

9   Q.   Good morning, Officer Stinson.

10  A.   Good morning.

11  Q.   You went on the 18th.  Were you there on the 16th at all?

12  A.   No, sir.  I was not there on the date the incident

13       occurred.

14  Q.   Okay.  On the day that you went and did -- you got them,

15       was the scene still secured by police officers?

16  A.   When I arrived, there were police officers there, when I

17       arrived there.

18  Q.   What I'm asking you was the scene secured by police

19       officers, where nobody had been able to come in and taint

20       any of the scene at all between the 16th and the 18th?

21                MR. HUTTING:  Well, Judge, I'm going to object.

22       How would she know.  That would be speculation.

23                MR. KINNEY:  She's the officer.  I don't know if

24       she's speculating or not.

25                THE COURT:  Objection's overruled.

9

1  A.   I don't have any knowledge whether or not the scene was

2       secured or not.

3  BY MR. KINNEY:

4  Q.   Between the two days?

5  A.   That's correct.

6  Q.   And in your report, you have your report in your hand?

7  A.   Yes, I do.

8  Q.   On the very first page where it says information received,

9       it indicates upon arrival at the location, writer stood by

10      waiting for the occupants to collect evidence.  Why would

11      you be waiting on occupant?

12 A.   The -- When I arrived, I met with the homicide

13      investigating unit.  From my understanding, I guess the

14      person that lives there or someone that had entrance, the

15      keys or whatever --

16 Q.   So you couldn't get in unless the occupant came back and

17      let you in?

18 A.   I met with homicide there, that's correct.

19 Q.   Is it correct that you couldn't get in without the

20      occupant or not?

21 A.   That's correct, yes.

22 Q.   If you couldn't get in without the occupant, then the

23      scene must not have been secured by police officers?

24 A.   Well, I don't know -- excuse me.  Could you rephrase your

25      question?

```
 1   Q.   Okay.  If I have to be let in --

 2   A.   That's correct.

 3   Q.   -- then that means that the officers weren't in control of

 4        the scene, somebody else was.  If officers have to be let

 5        into the scene --

 6   A.   That's correct.  Yes, that is correct.

 7   Q.   Okay.  Thank you.

 8   A.   Yes.

 9

10   RE-DIRECT EXAMINATION BY MR. HUTTING:

11   Q.   Was somehow the door secured though that the occupant had

12        to let you and Officer Knox in to do your work or what do

13        you recall about that?

14   A.   When I got there, they were already inside.  They were

15        already there.

16   Q.   They were already in?

17   A.   Yes.

18                 THE COURT:  When you say they, who are you

19        referring to?

20                 WITNESS STINSON:  Homicide, the investigation.

21   BY MR. HUTTING:

22   Q.   And when did the occupant arrive?  Or was she there also

23        when you got there?

24   A.   I believe she was already there with homicide.

25   Q.   Okay.  So the two of them were there and then you got
```

                                   11

1          there and in you went?

2     A.   That's correct.

3     Q.   Okay.

4               THE COURT:  Mr. Kinney?

5               MR. KINNEY:  Nothing further, your Honor.

6               THE COURT:  May the witness step down and be

7          excused?

8               MR. KINNEY:  Yes, your Honor.

9               THE COURT:  Thank you very much.

10              WITNESS STINSON:  Okay, thank you.

11              (At about 9:35 a.m., witness excused.)

12              COURT CLERK:  Raise your right hand.  Do you

13         swear or affirm that the testimony you're about to give in

14         the matter now pending before this court will be the

15         truth, so help you, God?

16              WITNESS PRESTON:  I do.

17                       REBECCA PRESTON,

18         called as a witness at 9:36 a.m., having first been duly

19         sworn by the Clerk of the Court, was examined and

20         testified on her oath as follows:

21              COURT CLERK:  You may be seated.

22              THE COURT:  Good morning.

23              Have a seat.  Make yourself comfortable.  Pull

24         the microphone close to your mouth and speak loudly and

25         clearly for our jury.

1                    WITNESS PRESTON:   Thank you.

2                    THE COURT:   Thank you.

3

4     DIRECT EXAMINATION BY MR. HUTTING:

5     Q.   For the Record, may I please have your name, your

6          occupation and what area of expertise you have within that

7          occupation?

8     A.   My name is Rebecca Preston.   I'm a DNA analyst at Bode

9          Technology.

10    Q.   Okay.  And where is Bode Technology located?

11    A.   It's located in Lorton, Virginia.

12    Q.   And for those of us that are kind of, you know, Michigan-

13         bound approximately where is that in Virginia?

14    A.   It's about 30 miles south of Washington, D.C.

15    Q.   How long have you been working for Bode Technology?

16    A.   Since August of 2005.

17    Q.   Okay.  And does Bode Technology have contract with the

18         State of Michigan, specifically the Detroit Police

19         Department and the Michigan State Police, where work is

20         sent to you by these two organizations and Bode Technology

21         does the DNA work on items sent to them?

22    A.   Yes, we do.

23    Q.   Okay.  And for approximately how long has Bode had that

24         contract?

25    A.   To my knowledge, since at least 2007.

                              13

1  Q.   Okay.  All right.  Now --

2                MR. KINNEY:  I'm sorry, what contract?

3                MR. HUTTING:  The contract to do their work.

4  BY MR. HUTTING:

5  Q.   Is that correct?  If it's sent to Bode?

6  A.   Yes.  We've been doing work on and off for them since

7       2007.

8  Q.   Okay.  All right.  To the best of your knowledge?

9                MR. KINNEY:  Can we approach the bench?  I'm

10      sorry, but I didn't understand.  Who's this contract with?

11      Wayne County prosecutors office?

12               MR. HUTTING:  No, not with the prosecutors

13      office; it's with the Michigan State Police and it's also

14      with the Detroit Police Department.

15               MR. KINNEY:  Thank you.

16               MR. HUTTING:  Okay.

17  BY MR. HUTTING:

18  Q.   Okay.  How long have you personally been with Bode?

19  A.   Since August of 2005.

20  Q.   Okay.  Now can you tell us a little bit about your, first

21       of all, education and training that qualifies you to be a

22       DNA analyst?

23  A.   Yes, I have a Master's Degree in forensic science with a

24       concentration in forensic molecular biology from George

25       Washington University.  I also have a Bachelor's Degree in

```
 1        biology from Bellarmine University.
 2   Q.   Okay.  Where did you begin your work after you obtained,
 3        first of all, your Bachelor's Degree?
 4   A.   I -- All of my work in forensics has taken place at Bode
 5        Technology.  Like I said, I've been there since 2005.
 6        I've gone through an extensive analyst training program.
 7        This involved watching trained analysts perform all the
 8        techniques we used in the laboratory, as well as reading
 9        relevant scientific literature related to the forensics
10        field.  I also had to perform tests that's on samples
11        similar to those that I would find in my work, including a
12        competency exam, and I also had to pass a verbal
13        competency exam.
14   Q.   Okay.  Did you work at Bode while you were obtaining your
15        Master's Degree in -- what is it again?
16   A.   Forensic science.
17   Q.   Did you work there at Bode while you were obtaining your
18        Master's Degree?
19   A.   Yes, I was an intern for a year.
20   Q.   Okay, all right.  Tell us about your progression up the
21        ladder in Bode in the different jobs that you did as you
22        progressed to this DNA analyst job that you have now?
23   A.   I started as an intern and worked in that position for a
24        year assisting in laboratory techniques.  I then worked in
25        our data banking unit for about a year where I processed
```

```
 1        known reference samples.  I then moved over to our
 2        casework division where I processed at first the known
 3        reference samples that were submitted and then moved over
 4        to process actual casework samples.
 5   Q.   Okay.  And when did you actually start that work?
 6   A.   In 2008.
 7   Q.   Okay.  Now do you participate in your work with any kind
 8        of continuing education?
 9   A.   Yes, I attend a conference every year and I also
10        participate in quarterly journal readings.
11   Q.   Okay.  Do you belong to any professional organizations
12        within your field?
13   A.   Yes, I'm a member of the American Academy of Forensic
14        Sciences.
15   Q.   And can you tell us a little bit about that, what that
16        does?
17   A.   Yes, it helps me to stay involved with what is going on in
18        the field of forensic sciences and I'm a member of the
19        criminalistic section.
20   Q.   Okay.  Are you familiar in your field with what is known
21        as proficiency testing?
22   A.   Yes, proficiency testing is a quality assurance measure
23        used to monitor a lab's ability to perform forensic
24        testing.
25             THE COURT:  Well, I'm going to interrupt the
```

16

```
 1         witness and instruct her to only answer the question
 2         that's being asked of her; okay?
 3    A.   Can you repeat the question?
 4    BY MR. HUTTING:
 5    Q.   Are you familiar with proficiency testing?  What is
 6         proficiency testing?
 7              THE COURT:  Well, that's a different question.
 8         The question has been compounded; now you've combined it.
 9              MR. HUTTING:  I kind of thought that was the
10         thrust.
11    BY MR. HUTTING:
12    Q.   What is proficiency testing?
13    A.   Proficiency testing is a quality assurance measure used to
14         monitor a lab's ability to perform forensic testing.  We
15         are sent tests from an outside independent agency.  They
16         submit the tests to Bode.  I as an analyst process the
17         test as I would any other case that I was sent.  I then
18         submit my results back to that outside independent agency
19         where they review my results to ensure that they are
20         correct.
21    Q.   So even though once you obtain your level of degree that
22         you have as analysis, it's just not accepted; you have to
23         undergo this testing?
24    A.   Yes.
25    Q.   How often does this occur?
```

17

```
1    A.    That occurs twice a year.

2    Q.    Okay.  How have you done on proficiency tests?

3    A.    I've passed all of my proficiency tests.

4    Q.    Okay.  Can you give us some idea of the number of samples

5          that you analyzed for DNA and to do this DNA work that

6          you're going to testify about here today in the time that

7          you've been at Bode?

8    A.    I've processed a few thousand samples.

9    Q.    How many reports have you written like the report that

10         we're going to -- that you're going to testify about here

11         today?

12   A.    At least a few hundred.

13   Q.    Okay.  Each time that you write a report like this and

14         submit it to an organization or to a police department or

15         prosecutors office do you have to come in to testify about

16         that report or are your reports accepted by those

17         organizations?

18   A.    Sometimes we do go testify.

19   Q.    Okay.  But for the most part what happens?

20   A.    For the most part, they're sent back to the organization.

21   Q.    Okay.  And then that report is accepted?

22   A.    Yes.

23   Q.    Okay.

24               MR. KINNEY:  Judge, that report is accepted --

25         is it accepted by a jury or accepted by a police
```

18

```
 1    department?  I'm objecting to his accepted.

 2              MR. HUTTING:  Well, Judge, obviously if she

 3    doesn't have to come to court to testify about the report

 4    and the report is submitted, then obviously there was no

 5    trial; okay?

 6              MR. KINNEY:  We don't know that.  I don't know

 7    its relevance in this particular case, that some report

 8    was accepted in a case where somebody may have pled

 9    guilty.  That didn't happen here.

10              MR. HUTTING:  Well, you know, Judge, if you

11    write several hundred reports and you only have to testify

12    seven or eight times -- which is going to be the next

13    question.

14              MR. KINNEY:  All right.  Is Mr. Hutting

15    testifying now?

16              MR. HUTTING:  No.

17              THE COURT:  All right.  I'll give you some

18    latitude.  Go ahead, Mr. Hutting.  You want to lay more of

19    a foundation, go ahead.

20    BY MR. HUTTING:

21    Q.  How many times have you testified concerning -- in a court

22        like today, before either a judge or a jury -- how many

23        times have you testified under oath concerning the reports

24        that you have written?

25    A.  I have testified six times before.
```

1  Q.  Okay.  Have any of those been here in this state in the

2      State of Michigan?

3  A.  No, five times they have been in the State of Florida and

4      once in the state of California.

5  Q.  Okay.  Whereabouts in Florida have you -- Were you

6      accepted as an expert down there?

7  A.  Yes.

8  Q.  Okay.  All five times?

9  A.  Yes.

10 Q.  Or four times in Florida?

11 A.  Well, five times.

12 Q.  Five times in Florida.  What places, what cities, have you

13     testified in, in Florida, your five times?

14 A.  Once in West Palm Beach, Florida; once in Sarasota,

15     Florida; once in Jacksonville, Florida; and twice in

16     Bartow, Florida.

17 Q.  So basically pretty much around the State of Florida?

18 A.  Yes.

19 Q.  Okay.  Where was the time in California that you

20     testified?

21 A.  That was in Long Beach, California.

22 Q.  Okay.  So at the time that you testified in California,

23     were your qualifications accepted as an expert to testify?

24 A.  Yes, they were.

25 Q.  Has there ever been an occasion, Ms. Preston, when you

1        have offered your qualifications to a court and they have

2        not been accepted?

3    A.  No.

4    Q.  Okay.  This then would be your first time testifying here

5        in Michigan?

6    A.  Yes, it is.

7    Q.  Okay.  All right.  Did you also at my request submit to us

8        what's known as a curriculum vitae or CV?

9    A.  Yes.

10             MR. HUTTING:  Okay.  If we could have the court

11       reporter mark this please?

12             MR. KINNEY:  May we approach the bench, please?

13             THE COURT:  Yes, you may.

14             (At about 9:47 a.m., brief sidebar;

15             At about 9:49 a.m., back on the record.)

16             PEOPLE'S EXHIBIT 31 MARKED

17             FOR IDENTIFICATION

18   BY MR. HUTTING:

19   Q.  Let me show you what I've marked here, the court reporter

20       has marked, as People's proposed exhibit number 31.  It's

21       a 2-page document.  Ms. Preston, can you identify People's

22       proposed exhibit number 31?

23   A.  Yes, this is my CV.

24             MR. HUTTING:  Okay.  Your Honor, with that I'm

25       going to offer the witness to defense Counsel for voir

21

1      dire on her qualifications to testify here as an expert in

2      DNA.

3               THE COURT:  And that's marked as exhibit 31?

4               MR. HUTTING:  31.  And I'll offer that after --

5      I'll move for admission of that after Mr. Kinney completes

6      his voir dire.

7               THE COURT:  Mr. Kinney.

8               MR. KINNEY:  Thank you, your Honor.

9               THE COURT:  You're welcome.

10

11     VOIR DIRE EXAMINATION BY MR. KINNEY:

12     Q.  Good morning, Ms. Preston?

13     A.  Yes.

14     Q.  Okay.  Do you work for anyone other than Bode Technology?

15     A.  Not in the field of forensics, no.

16     Q.  Okay.  And you say that Bode Technology has a contract

17         with the Michigan State Police?

18     A.  We have -- We do -- Yes, we have.  I'm not sure if we're

19         currently doing contract work for them, but we have in the

20         past.

21     Q.  And do you have a contract with the Detroit Police

22         Department to do their DNA work?

23     A.  Myself?  Do you mean our lab?

24     Q.  Who you work for, yes?

25     A.  We have in the past, yes.

22

```
 1   Q.   You don't have any private contracts with anyone to do DNA
 2        work; do you?
 3   A.   Myself, as an individual?
 4   Q.   Yes.
 5   A.   No.
 6   Q.   Okay.  Does Bode Technology have any contracts with any
 7        defense organizations?
 8   A.   We have done work for defense organizations in the past,
 9        yes.
10   Q.   And what work have you done for criminal defenders in the
11        past?
12   A.   I know that we've done work for the Innocence Project in
13        the past, as well as --
14   Q.   I'm sorry?
15   A.   Sorry.
16   Q.   Do you have a contract with the Innocence Project now?
17   A.   I'm not sure about currently but I know that we have done
18        work for them in the past.
19   Q.   Do you know whether you have a contract with -- like the
20        Wayne County Bar Association, defense?
21   A.   I'm not sure about that.
22   Q.   Have you in your capacity as an employee of Bode worked
23        for the Wayne County Bar Association?
24   A.   No.
25   Q.   Have you in your capacity, your employment at Bode, worked
```

23

 1        for the Fort Meyers Bar Association in Fort Meyers,

 2        Florida?

 3    A.  No.

 4    Q.  Have you in your capacity at Bode went to any of the

 5        training programs that the Michigan State Police have here

 6        in the State of Michigan?

 7    A.  No.

 8    Q.  You know Bode has a conference every year; correct?

 9    A.  Yes.

10    Q.  And you mentioned that you've been to the Bode conference?

11    A.  Yes, I have.

12    Q.  All right.  So -- And you said you started working in 2005

13        for Bode?

14    A.  Yes.

15    Q.  In 2005, the Bode conference was in Duck Key, Florida; did

16        you attend that one?

17    A.  No, not in 2005.

18    Q.  In 2006, the Bode conference was in Captiva Island in

19        Florida; did you attend that one?

20    A.  No.

21    Q.  Do you know of an NIJ Grantees workshop out of Washington,

22        D.C.?

23    A.  Yes.

24    Q.  Did you attend that in the summer of '06?

25    A.  No.

1    Q.   They had -- What is the NIJ Grantees workshop?

2    A.   The NIJ conference, the one that I attended, is put on by

3         the National Institute of Justice and various people

4         present in the topics of forensics, the forensics field.

5    Q.   Okay.  And you know they had one in the summer of 2008 in

6         Washington, D.C.; did you attend that one?

7    A.   No, I did not.

8    Q.   How many of them have you attended?

9    A.   I attended the one in 2009.

10   Q.   Okay.  And that was in Washington, as well?

11   A.   It was in Arlington, Virginia, yes.

12   Q.   Okay.  Have you ever testified before -- Well, you said

13        you never testified in Wayne County before?

14   A.   No, I have not.

15   Q.   You haven't testified for the Michigan State Police

16        before?

17   A.   No.  No, I have not.

18   Q.   You haven't testified for the Wayne County prosecutors

19        office before?

20   A.   No.

21   Q.   And out of -- since 2005, that's like five years now,

22        you've worked for Bode?

23   A.   Yes, it is.

24   Q.   And your education started when you started at Bode, your

25        education when it comes to DNA, being a DNA expert?

```
 1   A.   I started graduate school in 2004.

 2   Q.   In 2004?

 3   A.   Yes.

 4   Q.   Okay.  And where was that at?

 5   A.   The George Washington University.

 6   Q.   George Washington University.  The continuing education

 7        that you've had, the last one was the 7th Annual Advanced

 8        DNA Technical Workshop in San Diego?

 9   A.   Yes.

10   Q.   Was what a one-day event?

11   A.   No, it was over the course of a few days.

12   Q.   How many?  A week?

13   A.   Yes, there were different programs throughout the week.

14   Q.   Okay.  And this -- I'm looking at your curriculum vitae --

15        it says eight hours.  Is that eight hours credit that you

16        got?

17   A.   That was the -- We were required to attend a minimum of

18        eight hours.  I attended various workshops throughout the

19        week.  So it exceeded the eight hours.

20   Q.   But on here, it has eight hours?

21   A.   That is a typo on my part.

22   Q.   On your part.  But you -- it says eight hours, that means

23        you worked for eight hours?  Your education was for eight

24        hours, but you're telling us it was more than eight hours?

25   A.   Correct.  We're required to attend a workshop for a
```

```
 1        minimum of eight hours a year as part of our continuing
 2        education.
 3   Q.   Can you tell us who requires that of you?  Is that Bode
 4        that requires it?
 5   A.   No, it's part of the FBI guidelines.
 6   Q.   FBI guidelines?
 7   A.   Yes, sir.
 8   Q.   Okay.  And you did the same thing in 2009?
 9   A.   Yes.  The one in 2009 was just a one-day workshop though.
10   Q.   And it says nine hours.  Is that a typo or --
11   A.   No, that is correct.
12   Q.   Okay.  So there were work more workshops that you could
13        do, but you're just required to do one?
14   A.   As part of the guidelines, we are required to do one and,
15        like I said, we do participate in other continuing
16        education such as reading journal articles.
17   Q.   Continuing education by reading a journal?  You mean an
18        article that somebody else wrote?
19   A.   Correct.
20   Q.   Okay.  That's not on here though.  It's not on your
21        curriculum vitae; right?
22   A.   No, it is not.
23   Q.   Basically what's on the Vitae is what you've done to reach
24        the minimum that's required in your field; correct?
25   A.   Yes, it's the set of the guidelines.
```

27

```
 1                    MR. KINNEY:  Okay.  Nothing further.

 2

 3   DIRECT EXAMINATION BY MR. HUTTING (Continued):

 4   Q.   Did you also attend the conference of the American Academy

 5        of Forensic Sciences in February of 2008?

 6   A.   Yes, I did.

 7   Q.   How long was that conference?

 8   A.   It was again over the course of a few days for 19 and a

 9        half hours.

10   Q.   So you got 19 and a half hours what we call continuing

11        education credit?

12   A.   Yes.

13   Q.   Okay.  How about in 2007, did you attend a conference?

14   A.   Yes, I did.

15   Q.   What did you attend in 2007?

16   A.   I again attended a DNA technical workshop in Captiva,

17        Florida.

18   Q.   Okay.  And how long was that and much credit did you get

19        for that?

20   A.   That was 24 hours.

21   Q.   So would it be a fair statement that each year from 2007

22        through 2010, you have attended conferences that meet or

23        exceed the continuing education requirements as required

24        by the FBI?

25   A.   Yes.
```

```
 1   Q.   Okay.  Do you have plans to attend one in 2011 or not?
 2   A.   Yes, I will.
 3   Q.   Do you know which one you're going to attend in 2011 or
 4        have you not made your schedule that far in advance?
 5   A.   I haven't made my schedule yet.
 6   Q.   Okay.  These journals, can you tell us about the journals
 7        that you do, what the journals are.
 8   A.   It's from the Journal of Forensic Science.  These are peer
 9        reviewed articles that are related to recent trends in the
10        forensics field.
11   Q.   Okay.  Many of them involve DNA?
12   A.   Yes.
13   Q.   Okay.  And you stay abreast in your field by reading those
14        articles?
15   A.   Yes.
16   Q.   Okay.
17             MR. HUTTING:  I would offer the witness for --
18        Well, see if Mr. Kinney has any recross on my redirect.
19             MR. KINNEY:  No, your Honor.
20             THE COURT:  Go ahead, Mr. Hutting.
21             MR. HUTTING:  Okay.  I would then, your Honor,
22        respectfully ask that this witness be declared an expert
23        in the field of DNA testing and DNA forensics as a DNA
24        specialist.
25             THE COURT:  Mr. Kinney?
```

29

```
 1                     MR. KINNEY:  I'll leave that up to the Court.
 2                     THE COURT:  Ma'am, when you've testified in the
 3          other states how are you qualified?
 4                     WITNESS PRESTON:  I've been qualified as a DNA
 5          expert.
 6                     THE COURT:  I'm going to qualify her as an
 7          expert pursuant to Michigan rule of evidence 702 as an
 8          expert in DNA testing and forensics and as a DNA analyst.
 9                     MR. HUTTING:  Thank you, your Honor.
10                     MR. KINNEY:  Leave it to the Court.
11   BY MR. HUTTING:
12   Q.    So how long has Bode Technology been around?
13   A.    Since 1995.
14   Q.    Okay.  And by whom is Bode accredited?
15   A.    We're accredited by both the American Society of Crime
16          Laboratory Directors, Laboratory Accreditation Board, as
17          well as Forensic Quality Services International.
18   Q.    Okay.  Does Bode have to undergo testing at their
19          laboratory?  Do people come in and tour Bode's
20          laboratories and qualify them every year to continue the
21          work that they do?
22   A.    Yes.  We're only required to be evaluated every five years
23          to meet these accreditations, but due to other policies,
24          we are accredited every year.
25   Q.    Okay.  Can you describe some of the quality assurance
```

```
 1            procedures used by Bode to insure reliable results of the
 2            testing that's done by the analysts?
 3    A.      Yes, we use many quality assurance procedures on a daily
 4            basis.  Just to name a few, in order to access our
 5            building, everyone has a special key card access; access
 6            to our lab is limited to those who are actually doing the
 7            testing; whenever we work in the laboratory, we wear
 8            personal protective equipment that involves a lab coat,
 9            goggles, gloves; all of the reagents that we use in our
10            lab go through quality control and quality assurance
11            procedures to insure their general quality; and like I
12            said, this is just a few of the procedures we use on a
13            daily basis.
14    Q.      Okay.  Now with that in mind can you tell us what is DNA?
15    A.      DNA is the basic building block of life.  Half of your DNA
16            comes from your mother and half of your DNA comes from
17            your father.  It codes for things such as hair color and
18            eye color.
19    Q.      Okay.  Is DNA different between humans and how different
20            is DNA?
21    A.      DNA is 99 percent the same in all humans.  Only one
22            percent is different.  And we, as forensic scientists,
23            test that one percent that is different.
24    Q.      Okay.  What is DNA typing and how is it used in forensic
25            casework?
```

31

```
 1   A.   DNA typing is the process by which we use molecular

 2        biology techniques to extract the DNA from the other part

 3        of the cell.  We then make copies of specific portions of

 4        the DNA in order to generate a genetic profile.

 5   Q.   So there's extraction and then copy; is that correct?

 6   A.   Correct.

 7   Q.   Those are the first two steps.  Describe extraction just a

 8        little bit more?

 9   A.   Extraction is DNA is just one part of the cells, so we use

10        chemicals and molecular biology techniques to actually

11        separate the DNA from the rest of the cells.

12   Q.   Okay.  And describe copy and why is copy done?

13   A.   Copying allows us to look at the specific portions of the

14        DNA that we're testing in order to generate a DNA profile.

15   Q.   Okay.  And what kind of bodily fluids -- Let me ask you

16        that.  What kind of bodily fluids leave DNA so that you

17        can do work?

18   A.   DNA comes from any part of your body, from blood, saliva,

19        skin cells, anything like that can leave DNA behind.

20   Q.   Okay, all right.  Now in DNA how many different locations

21        get tested or how many different locations are there in

22        DNA?

23   A.   For this case, we tested 13 different locations, as well

24        as a gender specific cite.

25   Q.   Okay.  So they're known as loci?
```

```
 1   A.   Yes.
 2   Q.   Okay.  What are STRs, or short tandem repeats, and explain
 3        that to the jury?
 4   A.   Short tandem repeats are -- they're just the number of
 5        repeats that those specific locations.  So when we're
 6        generating the DNA profile, we're basically counting the
 7        number of repeats that an individual has at each of those
 8        13 locations.
 9   Q.   Okay.  What is PCR?
10   A.   PCR stands for preliminary chain reaction.  It's the
11        process by which we're actually making copies of those
12        specific locations in order to determine the number of
13        repeats a person has.
14   Q.   That's in that second step then?
15   A.   Yes.
16   Q.   Okay.  Are there a third and then a fourth step in DNA in
17        the analysis that you do?
18   A.   Ones we make the copies of the DNA, we run it through a
19        machine in order to generate the data that we get which is
20        our DNA profile.
21   Q.   Okay.  And then what's the next step after you have the
22        profile?
23   A.   Once we have the profile, then we'll analyze the data.
24   Q.   Okay.  And then ultimately issue your report?
25   A.   Yes.
```

1   Q.   Okay.  Was PCR and STR used in this case that you're going

2        to testify about here today?

3   A.   Yes, it was.

4   Q.   Okay.  All right.  Now did you do some work shortly before

5        October the 19th of 2010 in this particular case?

6   A.   Yes, I did.

7   Q.   Okay.  And did you do some work on a cutting from a hat

8        rim or did you have a profile from a cutting on a hat rim?

9   A.   Yes.

10  Q.   Okay.  And did you also have a profile on the morgue blood

11       from a person by the name of Bernard Hill?

12  A.   Yes.

13  Q.   Okay.  And in addition to that, were specific items also

14       submitted to you for additional work or was a specific

15       item submitted to you for additional work?

16  A.   Yes.

17  Q.   What specific item was submitted to you for additional

18       work?

19  A.   I received a black knit hat.

20  Q.   Okay, all right.  I'm going to show you an item here.

21       It's People's exhibit number 22 for purposes of this

22       trial.  It's in this envelope and it's been admitted as

23       evidence, and I'm going to ask you if you have ever seen

24       this envelope before and did some work on the item

25       contained within that envelope?

1    A.    Yes, this is the black knit hat that I processed.  It has

2          the corresponding evidence item number and my initials and

3          the date written on the envelope.

4    Q.    Okay.  So you got that hat and you processed that hat; is

5          that correct?

6    A.    Yes.

7    Q.    Okay.  Now when you got that hat and you processed the

8          hat, had there been an initial cutting taken before you

9          did your work on that hat and did you -- did Bode have the

10         DNA profile generated by that initial cutting?

11   A.    Yes, when I received the hat, the initial -- that cutting

12         had already been taken from it.

13   Q.    Okay.  Did you though at the request of our office take

14         any additional cuttings from that hat or were they taken

15         from this hat?

16   A.    Yes, I processed three additional areas.

17   Q.    Okay.  And can those be seen here as you look at this hat?

18   A.    Yes, if I can reference my notes as well.

19   Q.    Sure.

20   A.    I processed one area which is this part right here was the

21         first area I tested.  I also scraped the interior of the

22         hat region using a razor blade to take the surface

23         material off.  And then I also tested this exterior area

24         of the hat as well, right out here.  I scraped along the

25         edge there as the third area that I tested.

1  Q.  Okay.  So you did three additional areas for DNA testing

2      along with the initial cutting that you had and the

3      initial profile that you had from the hat?

4  A.  Yes.

5  Q.  Okay all right.  And did you also have buccal swabs from

6      two different individuals?

7  A.  Yes.

8  Q.  Tell us first of all what a buccal swab is?

9  A.  A buccal swab is just a cotton swab that someone swabs the

10     interior of their mouth and it -- we use that to generate

11     known references.  So we know who the reference is coming

12     from.

13 Q.  Who did you have buccal swabs from that you did DNA

14     testing on?

15 A.  If I can reference my notes.

16 Q.  Sure.

17 A.  We had referenced a buccal swab from Samuel Dantzler,

18     Senior, as well as Gerald Stewart.

19 Q.  Okay.  All right.  So what did you do with the initial

20     cutting from the hat and the three additional cuttings

21     that you had?

22 A.  The initial cutting from the hat, a DNA profile had

23     already been generated from that, so I looked at that

24     data.  I also took the three additional areas and used the

25     techniques that I have previously discussed to extract the

1        DNA from the three additional areas that I tested, and

2        generated three different DNA profiles from those three

3        areas.

4    Q.  Okay.  Did you also test the buccal swabs that you had

5        from Samuel Dantzler, Senior and Gerald Stewart and

6        generate a DNA profile for each of those persons?

7    A.  Yes.

8    Q.  Okay.  All right.  What do you do then after you generate

9        this DNA profile?

10   A.  Once the DNA profiles are generated, I look at the data to

11       ensure that there are good results.

12   Q.  Okay.  All right.  And were you able to get -- Well, let's

13       talk about, first of all, the initial cutting and the DNA

14       profile that you had.  Were the results good in your

15       estimation at all the different loci?

16   A.  Yes, DNA profile was obtained from the initial cutting.

17       It was consistent with a mixture of two individuals and

18       including a major male contributor.

19   Q.  Okay.  How about the other three cuttings?  What can you

20       tell us about the other three cuttings that you took from

21       the hat?  What kind of profiles, if any, were developed

22       from those?

23   A.  From the first area that I tested of the hat, a partial

24       DNA profile was obtained from that area that was

25       consistent with a mixture of at least two individuals

37

```
 1            including a major male contributor.  From the second area
 2            of the hat that I tested, a DNA profile was obtained that
 3            was consistent with a mixture of at least two individuals,
 4            including at least one male contributor.  And from the
 5            third area, a partial DNA profile was obtained that was
 6            consistent with a mixture of at least two individuals,
 7            including at least one male contributor.
 8    Q.      What do you mean by a partial DNA profile as opposed to a
 9            complete DNA profile?
10    A.      Partial DNA profile is wording that we use when we aren't
11            able to get DNA results from all of the 13 locations that
12            we tested.
13    Q.      Then a complete one would be when you're able to get
14            results from all 13?
15    A.      Yes.
16    Q.      Okay.  All right.  Now at the end then do you write a
17            report stating your ultimate conclusions?
18    A.      Yes.
19    Q.      Okay.  Do you also develop and do during the course of
20            your work -- I guess the term that I would use is a graph.
21            Do you develop a graph or a diagram that people can look
22            at and hopefully with your help maybe understand it and
23            explain the diagram to us?
24    A.      We generate what's called a table which basically has a
25            number of representation of that DNA profile that was
```

```
 1        obtained from all the samples.
 2   Q.   Okay.  All right.  And are there like numbers used in this
 3        table?
 4   A.   Yes, and that's -- the numbers represent the number of
 5        repeats at each of the locations.
 6   Q.   Okay.  All right.  Did you do that in this particular
 7        occasion, Ms. Preston?
 8   A.   Yes, I did.
 9   Q.   Okay.  Let me show you -- I'm going to have the court
10        reporter mark as this item right here.
11             PEOPLE'S EXHIBIT 32 MARKED
12             FOR IDENTIFICATION
13             MR. HUTTING:  The court reporter has reminded me
14        that I did not offer People's proposed number 31 which is
15        the CV of Ms. Preston and I would so offer it now.
16             MR. KINNEY:  Wasn't there a correction that you
17        wanted to make.  It's not correct?  Is that --
18             MR. HUTTING:  She said that there was one typo
19        and she said that that eight hours should be more on the
20        last conference that she attended.
21             MR. KINNEY:  That's my point.  Do we have an
22        exact number as to -- Do we want it to be correct?
23   BY MR. HUTTING:
24   Q.   Do you remember what the exact number of hours was
25        approximately?
```

```
 1   A.     Approximately twenty hours.

 2                 MR. HUTTING:  Twenty hours.

 3                 MR. KINNEY:  I'll object as to approximately.

 4          But no objection.

 5                 THE COURT:  Okay.  Offered and received.

 6                 MR. HUTTING:  Thank you.

 7                 PEOPLE'S EXHIBIT 31 ADMITTED

 8                 INTO EVIDENCE

 9   BY MR. HUTTING:

10   Q.     What is People's proposed exhibit number 32, please?

11   A.     This is the table that I generated of the DNA profiles.

12   Q.     Okay.  Is it a fair and accurate representation of the

13          work that you did and the profiles that you generated that

14          you turned into this table?

15   A.     Yes.

16                 MR. HUTTING:  Okay.  Move to admit People's

17          proposed exhibit number 32?

18                 MR. KINNEY:  No objection.

19                 THE COURT:  Offered and received.

20                 PEOPLE'S EXHIBIT 32 ADMITTED

21                 INTO EVIDENCE

22                 MR. HUTTING:  And, Judge, what I have to assist

23          the Court and the jury is I have copies of this profile

24          and so that the jury can have their own copy as Ms.

25          Preston testifies about it and make whatever findings they
```

```
 1     want to.
 2              THE COURT:  And you want to tender a copy to the
 3     defense as well.
 4              MR. HUTTING:  Mr. Kinney also has a copy.  He
 5     has a copy of it because it's included in her report but I
 6     will tender him a copy to show what it is that I'm giving
 7     to the jury.
 8              THE COURT:  Okay.  He's acknowledged receipt as
 9     well.  That's fine.  Go ahead.  Thank you, Mr. Hutting.
10              MR. HUTTING:  Okay.  All right.  May I
11     distribute copies of People's 32 to them?
12              THE COURT:  And to the Court.
13              MR. HUTTING:  And to the Court.  First to the
14     Court.  It's one page for everybody.
15   BY MR. HUTTING:
16   Q.  All right.  I see that as we move across the top of
17       People's 32, going from left to right, there are some
18       numbers up here or identifying -- What do you call this,
19       let me ask you that, that I just pointed to?
20   A.  This is an evidence item number, so the EO1 just
21       represents that it was an evidence item number.
22   Q.  All right.  So EO1a1 represents what?
23   A.  It represents the initial cutting that was taken from the
24       hat.
25   Q.  Okay.  And that was the DNA profile that was developed
```

41

```
 1        from the initial cutting on the hat?

 2   A.   Yes.

 3   Q.   Okay.  All right.  So let's do the words initial cutting

 4        up here, above it.

 5             Okay.  Let's go with the next column.  What does

 6        this represent?

 7   A.   The EO1 major components represent the major profile that

 8        was obtained from the original cutting so it -- I look at

 9        the data and see and analyze to determine what DNA was

10        there at the largest amount and we're able to generate --

11        determine the major component profile of the profile of

12        the individual that contributed most to that profile.

13   Q.   So if I labeled it major component from initial cutting

14        would that be correct?

15   A.   Yes.

16   Q.   Okay.  The third column is what, even though it may speak

17        for itself?  Tell us about that.

18   A.   This is the reference profile that was obtained from the

19        sample submitted from Bernard Hill.

20   Q.   Okay.  And so that would be Bernard Hill's DNA profile?

21   A.   Yes, his known profile.

22   Q.   Okay.  The fourth column, where it has the bottom terms

23        E11a1, what does that stand for, please?

24   A.   This is the profile that I obtained from the first area of

25        the hat that I tested.
```

1   Q.   Okay.  So that would be Bode cut number one DNA profile?

2   A.   Yes.

3   Q.   Okay.  The next column which would be the column from the

4        left -- one, two, three, four, the fifth column down, what

5        would that be?

6   A.   That again is looking at the area one that I tested

7        determining the major contributor to that profile.

8   Q.   Okay.  From Bode cut number one?

9   A.   Yes.

10  Q.   So if I labeled it major contributor from Bode cut number

11       one would that be accurate?

12  A.   Yes.

13  Q.   Okay.  Let's go now, Ms. Preston, to the sixth column

14       down, moving from left to right, that is labeled E11a2.

15       What is that, please?

16  A.   That's the second area that I tested on the hat, the DNA

17       profile that was obtained from that area.

18  Q.   Okay.  So if I labeled it Bode cut number two DNA profile

19       would that be correct?

20  A.   Yes.

21  Q.   Okay.  Let's go to the seventh column that is labeled

22       E11a3?

23  A.   That's the DNA profile obtained from the third area that I

24       tested of the hat.

25  Q.   Okay.  So I should label it -- Would I be correct if I

43

1       labeled that Bode cut number three, DNA profile?

2   A.  Yes.

3   Q.  Okay.  We are now over to the eighth column, moving left

4       to right.  What is that?

5   A.  That's the DNA profile that was obtained from the buccal

6       swab from Samuel Dantzler, Senior.

7   Q.  So that would be the known DNA profile of Samuel Dantzler,

8       Senior?

9   A.  Yes.

10  Q.  Okay.  And finally the last or the eighth column, over on

11      the far right, what is that?

12  A.  That's the DNA profile that was obtained from the buccal

13      swab from Gerald Stewart.

14  Q.  So if I labeled it known DNA profile from Gerald Stewart

15      would that be a correct nomenclature?

16  A.  Yes.

17  Q.  Okay.  Now we've got them at least all labeled.  Let me

18      ask you this:  I notice with the known profile from the

19      initial cutting of hat, you broke out a major component

20      and I notice also with the Bode cut number one that you

21      did, you broke out a major component; is that correct?

22  A.  Yes.

23  Q.  Okay.  When we get over to cuts two and three, though,

24      there is no major component chart.  Can you tell us why

25      you did not do that?

44

```
 1   A.   When I look at the data, I determine if I am able to tell
 2        based on the data that I'm evaluating if certain -- at
 3        each location, if the DNA is there in greater amounts or
 4        if it's -- we are unable to tell if one area of DNA higher
 5        than the other and it's for those other cuttings, I wasn't
 6        able to pull out the major contributor at each of those
 7        locations.
 8   Q.   So sometimes the results that you get with one cut are
 9        weaker or stronger than results you get with another cut?
10   A.   Someone -- An individual's DNA maybe they're at varying
11        amounts.
12   Q.   Okay.  All right.  So if it's there in a very weak form
13        and you can't break out or have a major component chart
14        like you did for the initial cutting and your first
15        cutting; is that correct?
16   A.   We're not able to determine if one person's DNA is there
17        more than another person's.
18   Q.   Okay.  All right.  We're going to come back to the chart
19        in a minute.  I'm going to have you explain it.
20             But let me ask you this:  When you did the
21        initial comparison, when you took the initial cutting of
22        the hat, okay, I want to know -- and compared it against
23        all the things that you compared it against -- I want to
24        know what was your ultimate conclusion about the initial
25        cutting of the hat?  What ultimate conclusions did you
```

1       draw on the initial cutting of the hat?

2    A.  Again I concluded that it was consistent with a mixture of

3        at least two individuals including a major male

4        contributor and then the major male component's DNA

5        profile deduced from the initial cutting of the hat

6        matched the DNA profile obtained from Samuel Dantzler,

7        Senior.

8    Q.  Did it match it in all 13 loci?

9    A.  Yes, it did.

10   Q.  So on every loci that you tested, based on that initial

11       cutting that you had and the DNA profile that you had,

12       when you analyzed the buccal swab of Samuel Dantzler,

13       Senior, there was a match on all 13 loci; is that correct?

14   A.  Yes.

15   Q.  Okay.  Were you ultimately able to quantify that in terms

16       of population and can you explain that, please?

17   A.  So I then performed statistics on the evidence item.  We

18       perform statistics on the evidence items themselves to

19       determine the probability of that DNA profile occurring in

20       the population so it's the probability that the DNA

21       profile I obtained from evidence item one, if we were to

22       draw someone at random from the general population would

23       occur.

24   Q.  Okay.  What statistics did you come up with?

25   A.  The probability of randomly selecting an unrelated

```
 1        individual with this DNA profile at 13 of the 13 blocks I
 2        tested is one in 90 quadrillion in the U.S. Caucasian
 3        population, one in two quadrillion in the U.S. African
 4        American population, and one in 20 quadrillion in the U.S.
 5        Hispanic population.
 6    Q.  Okay.  One in two quadrillion in the U.S. African American
 7        population, how many people are there in the world?
 8    A.  There's six billion people in the word.
 9    Q.  Is quadrillion more than six billion?
10    A.  Yes.
11    Q.  So the likelihood would extend to far more than people
12        than we have in the whole word?
13    A.  Yes.  And again that's just if you were to randomly select
14        someone.
15    Q.  Okay.  Of another person having the same DNA profile?
16    A.  Yes.
17    Q.  How many zeros is quadrillion do you know?
18    A.  Quadrillion is fifteen zeros.
19    Q.  Okay.  All right.  Now did you draw any other conclusion
20        about the initial DNA cutting and any other sample
21        submitted to you?
22    A.  Yes, the DNA profile, the individual associated with the
23        DNA profile obtained from Gerald Stewart was excluded as a
24        possible contributor to the mixture DNA profile that was
25        obtained.
```

1    Q.    So one type of result is you can reach conclusions that

2          say, like you did -- like you've just testified to, that

3          it's Sam Dantzler's DNA on all 13 loci; right?

4    A.    Correct.

5    Q.    Okay.  Is another conclusion that you can say that it's

6          not somebody's DNA?

7    A.    We can conclude that their DNA is not present, so they did

8          not contribute to that profile.

9    Q.    So they get excluded?

10   A.    Yes.

11   Q.    And Gerald Stewart is excluded?

12   A.    Yes.

13   Q.    Okay.  Are there also other conclusions that you can draw

14         like not excluded or included?  Can you explain those?

15   A.    If someone -- We can also, depending on the DNA profile

16         that is obtained, someone may be included, they may be

17         excluded or we may not be able to determine due to the

18         quality if someone is there or not.

19   Q.    Okay.  All right.  Let's go, if we can, to new cut number

20         one, which would be, moving over here, four, would be the

21         fourth column, DNA new cut number one; okay?

22               What ultimate conclusions did you reach about

23         DNA new cut number one?

24   A.    Again it was a mixture of at least two individuals

25         including a major male contributor and the individual

48

1         associated with the reference sample from Bernard Hill
2         could not be excluded as a possible contributor to the
3         major component DNA profile obtained from that cutting.
4   Q.    You couldn't exclude Bernard Hill from the DNA cut number
5         one?
6   A.    Correct.
7   Q.    Did you find Bernard Hill's at any of these loci?
8   A.    He was consistent at certain locations, therefore he could
9         not be excluded.
10  Q.    Okay.  Did you reach any conclusions concerning that DNA
11        profile and Bernard Hill?
12  A.    Since he could not be excluded, again I'm doing statistics
13        on the evidence item that was received, so for the first
14        area that I tested, I pulled out the major component
15        profile and I'm determining the probability of randomly
16        selecting someone in the general population with that
17        profile.
18              So for E11a1, major component, I'm determining
19        the probability of picking someone at random with that
20        profile, and the probability of randomly selecting someone
21        is one in 23 million in the U.S. Caucasian population, one
22        in 2.1 million in the U.S. African American population,
23        and one in 20 million in the U.S. Hispanic population.
24  Q.    How many locations of the 13 did you have DNA consistent
25        with or that matched Bernard Hill's DNA profile?

49

```
 1   A.   Again we're -- I'm looking first at the evidence item, so
 2        I'm determining which of the locations are usable, where
 3        there's enough information to actually determine that all
 4        of the DNA is there.  So I'm looking at that information
 5        first before I make any comparisons.  So there were nine
 6        areas that were looked at and he was consistent at all of
 7        those nine areas.
 8   Q.   So in nine areas that you looked at in that new cutting,
 9        they all matched Bernard Hill's DNA profile that you have
10        there; is that correct?
11   A.   They were consistent.
12   Q.   Consistent with.  Okay, all right.  In new cutting number
13        one did you reach any conclusions, if at all, about the
14        DNA profile of Samuel Dantzler in new cutting number one?
15   A.   Due to the limited data obtained, the individual
16        associated with R12, Samuel Dantzler, Senior, could not be
17        included or excluded as a possible contributor to the
18        minor profile that was obtained from that sample.
19   Q.   So there was a minor profile and you can't exclude Mr.
20        Dantzler of that minor profile?
21   A.   There was not enough information on the minor levels that
22        were obtained to determine if he could be included or
23        excluded.
24   Q.   So you can't include or exclude him in that?
25   A.   Correct.
```

50

```
 1   Q.   Okay.  What about Gerald Stewart?  Did you reach any

 2        conclusions about him on DNA cut number one?

 3   A.   The individual associated with the sample obtained from

 4        Gerald Stewart was excluded as a possible contributor to

 5        the mixture profile obtained.

 6   Q.   Okay.  Let's go to new cut number two which would be the

 7        sixth column over here, the one labeled E11a2; is that

 8        correct?

 9   A.   Yes.

10   Q.   Okay.  What were the ultimate conclusions that you reached

11        concerning new cut number two?

12   A.   The DNA profile obtained from that cutting was consistent

13        with a mixture of at least two individuals including at

14        least one male contributory.

15   Q.   Okay.  And what conclusions do you reach about that?

16   A.   That the individuals associated with the samples from

17        Bernard Hill and Samuel Dantzler, Senior cannot be

18        excluded as possible contributors to the DNA profile

19        obtained from that sample.

20   Q.   So you can't exclude Mr. Dantzler from that sample either?

21   A.   No.

22   Q.   Okay.  Or the decedent in this case, Bernard Hill?

23   A.   Yes.

24   Q.   Did you reach some statistical analysis about that?

25   A.   Yes.  Again looking at the evidence item itself, since
```

51

```
 1            it's a mixture profile and I was not able to pull out a
 2            major component, I'm determining the number of individuals
 3            in the population that could be included as possible
 4            contributors.  So if you were to select someone at random
 5            what is the possibility that they could have contributed
 6            to that mixture profile that was obtained?  And the
 7            probability of that is one in 26 million in the U.S.
 8            Caucasian population, one in one million in the U.S.
 9            African American population, and one in 8.3 million in the
10            U.S. Hispanic population.
11   Q.    Okay.  And finally let's talk about DNA cut number three,
12            which I believe is going to be seventh column over here.
13                What conclusions do you reach about DNA, if any,
14            about DNA cut number three?
15   A.    The partial DNA profile obtained from the third cutting is
16            consistent with a mixture of at least two individuals
17            including at least one male contributor.
18   Q.    Okay.  And do you reach any conclusions about any of the
19            DNA profiles submitted to you on that?
20   A.    Yes, due to the fact that it was a partial profile and
21            only limited data was obtained, the individuals associated
22            with Bernard Hill, Samuel Dantzler, Senior and Gerald
23            Stewart could not be included or excluded as possible
24            contributors to the mixture profile obtained from that
25            sample.
```

1   Q.   Okay, all right.  Now let's talk about this table.  Let's

2        go back to --

3                 THE COURT:  Well, why don't we talk about it

4        after I give the jury their morning break here?

5                 MR. HUTTING:  Sure.  Absolutely.

6                 DEPUTY SHERIFF:  All rise for the jury.

7                 THE COURT:  The witness may step down.  Thank

8        you.

9                 Jurors, this will be your morning break.  Go to

10       the bathroom, get a drink of water.  I'll see you in a few

11       minutes.  Don't discuss the case.

12                (At about 10:44 a.m., jury panel excused.)

13                THE COURT:  May I see the lawyers briefly?

14                MR. HUTTING:  Sure.

15                (At about 10:44 a.m., brief recess;

16                At about 12:02 p.m., back on the record.)

17                DEPUTY SHERIFF:  You may be seated.

18                COURT CLERK:  Recalling docket 10-3521, People

19       versus Samuel Lee Dantzler, jury trial in progress.

20                MR. HUTTING:  Auggie Hutting for the People.

21       We're ready.

22                MR. KINNEY:  Robert Kinney appearing on behalf

23       of Mr. Dantzler.

24                Your Honor, I did convey Mr. Hutting's offer to

25       Mr. Dantzler and again he wants to continue to go to

53

```
 1        trial; is that correct, Mr. Dantzler?
 2                DEFENDANT DANTZLER:  Yes.
 3                THE COURT:  All right, thank you.
 4                Ready for the jury?
 5                MR. HUTTING:  Yes, sir.
 6                MR. KINNEY:  Yes, sir.
 7                DEPUTY SHERIFF:  All rise for the jury.
 8                (At about 12:04 p.m., jury panel seated.)
 9                DEPUTY SHERIFF:  You may be seated.
10                MR. HUTTING:  Thank you, your Honor.
11  BY MR. HUTTING:
12  Q.   Ms. Preston, when we broke earlier this morning, I was
13       kind of just getting ready to turn our attention here to
14       the board so you could explain these numbers a little bit
15       more.  But is there anything else that you wish to add or
16       state before we actually turn to doing the chart here that
17       you have?
18  A.   These numbers are representations of the number of repeats
19       at each location.  So if you look down the right-hand
20       side, those are the locations that we tested, the 13
21       different locations, and the amelogenin is the gender
22       specific site.  So when you see, for example, a fifteen,
23       that's the number of repeats at one of those locations, so
24       that's basically what those numbers mean.
25  Q.   Okay.  And when you ultimately draw your conclusions do
```

1     you use this chart that you developed as you look at all

2     those numbers and what all do you use when you ultimately

3     draw the conclusions that you've stated here?

4   A.   This chart is just a representation of the actual data.

5     So I look at the actual data when making the comparisons

6     to choose whether to include or exclude someone.  It's

7     based on actual data that I have, not just the chart here

8     that is represented.

9   Q.   Okay.  All right.  Let's start here.  We have -- Let's

10     take this first one.  I call it, for lack of a better

11     term, D3S.  And in that chart, in that box, under the

12     initial cutting, we have three numbers:  15, a comma, 16,

13     a comma, and then a parentheses with a 17 in it.  Can you

14     explain what the parentheses around 17 means?

15   A.   The parentheses around the 17 means that when I look again

16     at my data, it's at a lower level so it's a minor

17     component of the actual data that is generated at that

18     specific location.

19   Q.   Within the major component that's repeated, 15 and 16 are

20     the 15th and the 16th; is that correct?

21   A.   Yes.

22   Q.   Which is why they end up in the major component chart then

23     in the second column; is that correct?

24   A.   Yes.  Again I'm looking at the actual data itself, not

25     just the information that's on that chart.

1    Q.   Okay.  All right.  But then we go over to Samuel Dantzler,

2         Senior's DNA profile that you have developed here, on each

3         of the different 13 locations; is that correct?

4    A.   Yes.

5    Q.   Okay.  And on D3S what do we have there?

6    A.   He has also a 15 and 16.

7    Q.   So that matches the major component; is that correct?

8    A.   Yes.

9    Q.   Okay.  When we go to Gerald Stewart, what was the major

10        component of Gerald Stewart on his DNA profile that you

11        developed at that location, D3S?

12   A.   He is an 18, 19.

13   Q.   Okay.  So that's different from 15, 16; is that correct?

14   A.   Yes.

15   Q.   Okay.  Does that then go towards, or ultimately eliminate,

16        or was that one of the things that you said eliminated

17        Gerald Stewart from being a contributor to the major

18        component on the original cut?

19   A.   Yes.

20   Q.   Okay.  All right.  The next loci is vWA, as I call it.

21        You broke out the major component of 14, 19; is that

22        correct?

23   A.   Yes.

24   Q.   Okay.  When you go over to Sam Dantzler, Senior, what do

25        you have?

1   A.   He is a 14, 19 as well.

2   Q.   Okay.  All right.  If we go all the way down this chart,

3        FGA all the way to CSF1PO, using the major component and

4        then comparing it to the DNA profile that you have of Sam

5        Dantzler, Senior, what are we going to find?

6   A.   They match at all of the 13 locations tested.

7   Q.   So all 13 of the locations, which is the number of

8        locations that you test, the numbers match; is that

9        correct?

10  A.   Yes.

11  Q.   And for you to say that it's -- what conclusion did you

12       draw ultimately?

13  A.   In order to say that within a reasonable degree of

14       scientific certainty they matched, our statistics have to

15       be over a certain level.  So again I'm performing

16       statistics on the evidence sample itself, on the E11 -- or

17       the EO1a1, I'm performing statistics on that.  So when I

18       get the numbers that I was able to calculate and they're

19       above 300 billion, that's when we use the statement that

20       within a reasonable degree of scientific certainty it is

21       that person.

22  Q.   It matches on all 13 loci?

23  A.   Yes.

24  Q.   Okay.  Which is why you made the statement about Sam

25       Dantzler, Senior.

```
 1   A.   Yes.

 2   Q.   Okay.  Let's see if we can find another one where, okay,

 3        where you can show why you eliminated Mr. Steward again.

 4             Okay.  Down here at D21, do you see D21?

 5   A.   Yes.

 6   Q.   Okay.  The major component for D21 is 29, 29; is that

 7        correct?

 8   A.   Yes.

 9   Q.   Okay.  When you go over to Gerald Stewart, what do you

10        find?

11   A.   He is a 30, 30.

12   Q.   30, 30.  So again both totally different numbers, goes to

13        eliminate him; is that correct?

14   A.   Correct.  And again I'm not just looking at this, I'm

15        looking at actual raw data that's in front of me.

16   Q.   Okay.  All right.  Now what can you say about Bernard Hill

17        and the major component on the initial cutting?

18   A.   I didn't make any conclusions about that.

19   Q.   You did not?

20   A.   No.

21   Q.   Okay.  All right.  That was done by another analyst?

22   A.   Yes.

23   Q.   Okay.  All right.  We'll have her tell us about that.

24             Okay.  Let's go to cutting where -- new cut

25        number one.  New cut number one; all right?  Let's talk
```

```
 1        about new cut number one and Bernard -- the numbers that
 2        we have for Bernard Hill.
 3              What do you ultimately say about Bode new cut
 4        number one and the DNA profile that you have for Bernard
 5        Hill?
 6   A.   Again I looked at the data itself and was able to pull out
 7        a major contributor which is the E11a1 major contributor
 8        and then I looked and compared that to Mr. Hill and
 9        they -- he could not be excluded as a possible
10        contributor.
11   Q.   Okay.
12   A.   And again I'm performing statistics on the evidence
13        sample, not on the reference sample.  So the reason why he
14        is consistent with, but we're not -- I'm not using words
15        like within a reasonable degree of scientific certainty is
16        because the probability of that DNA profile that was
17        obtained from the E11a1 is one in 23 million in the U.S.
18        Caucasian population and then one in 2.1 million in the
19        U.S. African American population, and one in 20 million in
20        the U.S. Hispanic population.
21   Q.   So if we went around and picked out people randomly, we
22        had two million African American people in this big room,
23        one of them would have that same profile?  Is that it?
24   A.   If we were to draw at random, that is what we would
25        expect.
```

1   Q.   Okay.  All right.  But here, compared to Bernard Hill on

2        the chart, on the first loci, he matches, 16, 17?

3   A.   Yes, which is why he's not excluded.

4   Q.   Okay.  On the second loci, he also matches, 16, 17?

5   A.   Yes.

6   Q.   Okay.  On the third loci, Bernard Hill's chart says 22,

7        24, which is major component FGA, there's 22, with a

8        comma, and then what's that blank mean?

9   A.   The dashes basically mean that again I'm looking at my raw

10       data when I'm making that determination, so there's

11       additional -- we have a certain threshold that we evaluate

12       information at and so, if there's things below that

13       threshold, we use the dashes to represent that.

14  Q.   So you couldn't make a call on that second number then?

15  A.   Yes.

16  Q.   Okay.  The X, Y, is the sex chromosome.

17  A.   Yes.

18  Q.   Means it's a male?

19  A.   Yes.

20  Q.   Okay.  And we go down to the next one on D8, Mr. Hill is a

21       13, 14?

22  A.   Yes.

23  Q.   Okay.  And the major component is a 13, 14?

24  A.   Yes.

25  Q.   We go to D21S, major component is 29, 29.  Mr. Hill is a

```
1          29.  And then you couldn't get enough to make a second

2          call?

3    A.    Yes.  Again looking at my actual data, there was stuff

4          below the level that we evaluate at, so I could only have

5          the 29 there.

6    Q.    On the next one which is D5S -- or excuse me, D18S on the

7          major component, you got no results?

8    A.    Yes.  When we tested the evidence, I omit that specific

9          location due to the level of DNA that was there, we

10         weren't able to make copies of the DNA at that specific

11         location.

12   Q.    When we go to the next one which is D5S, Mr. Hill is a 12,

13         12.

14   A.    Yes.

15   Q.    And over here on the major component, it's a 12, 12?

16   A.    Yes.

17   Q.    The next two sites, D13 and D7S, no results; right?

18   A.    Yes.

19   Q.    Okay.  When you go down to the loci at D16S, Mr. Hill is a

20         9 -- 9, 12.  And you got the nine, but on the second one,

21         you weren't able to make a call?

22   A.    Yes.  Again there was information below the level that we

23         evaluate at.

24   Q.    Okay.  On the one, major component is 7, 8.  And Bernard

25         Hill is a 7, 9; is that right?
```

```
 1   A.   The reason why I chose to -- at that level, we only have
 2        the seven represented as a major is because again I'm
 3        looking at the data itself and the level that that nine is
 4        at.  And so we weren't able to say if it was from the
 5        major contributor or minor contributor, but we were able
 6        to determine -- I was able to determine that the 7 came
 7        from the major component.
 8   Q.   Okay.  All right.  That's correct.
 9             Okay.  So Bernard Hill, cell one is 7, 9 and
10        then over here, it's -- and then on the major component,
11        you got a 7, but you couldn't come up with a second one?
12   A.   Yes.
13   Q.   On this one, TPOX, as I call it, Bernard Hill is a 9, 9
14        and then when you go over to the major component, it's a
15        9, 9?
16   A.   Yes.
17   Q.   Okay.  And then on the last one, CSF1PO, no results?
18   A.   Yes.
19   Q.   Okay.  All right.  Now did you also in your work on this
20        case, issue a report back in June of 2010, concerning some
21        work that you did on swabs and DNA -- swabs and DNA
22        profiles submitted to you concerning blood stains and from
23        golf club shafts, swabs on a grip of two golf clubs, and a
24        comparison also against the known DNA profiles of a person
25        by the name of Michael Dantzler and another person by the
```

1      name of Samuel Lamare Dantzler?

2  A.  Yes, I did.

3  Q.  Okay.  All right.  And did you get an item that you

4      describe as a blood stain from shaft that you designated

5      as number two or parentheses two?

6  A.  Yes.

7  Q.  Okay.  All right.  What actually did you get and then tell

8      me what you did with that?

9  A.  For all of these items, we were -- the blood stain and the

10     swabs from the shaft were previously cut when they were

11     submitted to us, so they're in labeled tubes with the

12     swabs actually in there.

13          I didn't process the item evidence themselves.

14     They were submitted to us, per Michigan State Police.

15          And then I took those samples, compared the

16     numbers to ensure I had the proper labeling on each of the

17     tubes and then started with the extraction steps.

18 Q.  So you actually didn't get the full shaft; what you got

19     was the cut from the golf club?

20 A.  Correct.  The blood stain as they called it.

21 Q.  Okay, the blood stain.  And you got a blood stain cut from

22     shaft two.  You did the extraction there?

23 A.  Yes.

24 Q.  Okay.  And what result did you come up with when you did

25     that on that blood stain?

1   A.   The DNA profile obtained from the blood stain from the

2        shaft was consistent with a male contributor and it was a

3        partial profile.

4   Q.   Okay.  And were you ultimately able to reach any

5        conclusions about the people -- about the known DNA

6        samples of the people that you compared them against?

7   A.   The individual associated with Bernard Hill could not be

8        excluded as a contributor, to the partial profile obtained

9        from that sample.

10  Q.   Okay.  Were you able to exclude people?

11  A.   And the individuals associated with the samples obtained

12       from Patrick Grunewald, Omarrow Dantzler, Michael

13       Dantzler, and Samuel Lamare Dantzler were all excluded as

14       part -- as contributors to the partial DNA profile

15       obtained from that sample.

16  Q.   Okay.  All right.  Now that's Samuel Lamare Dantzler, not

17       Samuel Dantzler, Senior; is that correct?

18  A.   Correct.  I did not make any comparisons between Samuel

19       Dantzler, Senior and this item.

20  Q.   Okay.  Let's go to blood stain from a grip on shaft.

21            MR. KINNEY:  For the Record, your Honor, I don't

22       want anybody to be confused.  This is Samuel Dantzler,

23       Senior.

24            MR. HUTTING:  Right.

25  BY MR. HUTTING:

64

1   Q.   Let's go to a blood stain from the grip on shaft number

2        two?

3   A.   The DNA profile obtained from that sample matched the DNA

4        profile obtained from Bernard Hill.

5   Q.   Okay.  And what can you say about the blood stain from the

6        grip on shaft two in terms of that match?

7   A.   Again, I performed statistics based on the evidence item

8        itself that was received, so I obtained the DNA profile

9        that was consistent with a male contributor from the blood

10       stain of the grip on the shaft and performed statistics on

11       that evidence item and the probability of randomly

12       selecting an unrelated individual with that DNA profile at

13       the 13 core loci is one in 58 quadrillion in the U.S.

14       Caucasian population, one in 1.9 quadrillion in the U.S.

15       African American population, one in 2.3 quintillion in the

16       U.S. Southwest Hispanic population, and one in 52

17       quadrillion in the U.S. Southeast Hispanic population.

18            And again, looking at those numbers and their

19       values since they were so high, therefore within a

20       reasonable degree of scientific certainty, Bernard Hill

21       was the source of that DNA profile obtained from that

22       evidence item.

23   Q.   Which is a blood stain?

24   A.   Yes.

25   Q.   Okay.  Did you also get swabs of a grip on a shaft labeled

```
 1        number two or the DNA cutting from that?

 2   A.   Yes.

 3   Q.   And what were your conclusions about that?

 4   A.   No DNA profile was obtained from that sample.

 5   Q.   Okay.  Did you also get swabs of a grip on a shaft that

 6        was labeled number one?

 7   A.   Yes.

 8   Q.   Okay.  And what were your conclusions about that?

 9   A.   The partial DNA profile obtained from that sample was

10        consistent with a mixture of at least two individuals,

11        including at least one male contributor.

12   Q.   Okay.  And are you able to tell us any more about the

13        people that you compared it against?

14   A.   Again this was a low level sample, there wasn't much DNA

15        in the sample.  So due to the possibility of dropout, the

16        individuals associated with Patrick Grunewald, Bernard

17        Hill, Omarrow Dantzler, Michael Dantzler and Samuel Lamare

18        Dantzler could not be included or excluded as possible

19        contributors to that mixture.

20   Q.   Okay.  Can people when they grip a golf club with their

21        hands leave, you know, DNA samples on that golf club?

22   A.   Yes.

23   Q.   Okay.  It's a question of can you find it when you do or

24        is there something on the particular cut that's submitted

25        to you?
```

66

```
 1   A.   Yes.
 2   Q.   Okay.  All right.  Did also Bode receive a buccal swab
 3        from a person named Omarrow Dantzler?
 4   A.   From Omarrow Dantzler, yes.
 5   Q.   Okay.  And was he eliminated as a contributor to the major
 6        component on the hat or the major -- the initial cutting
 7        from the hat?
 8   A.   That was done by another analyst as well.
 9   Q.   Okay.  And did that eliminate Hill?
10   A.   I don't have that report in front of me.
11             MR. HUTTING:  Fine.  Nothing further.  Submit
12        for cross.
13             THE COURT:  Want to approach, gentlemen.
14             (At about 12:29 p.m., brief sidebar.)
15             THE COURT:  Ladies and gentlemen, I'm putting
16        the case back on track now.
17             The witness may step down.
18             Go to lunch.  Don't discuss the case.  Wear your
19        badges.  I'll see you at 1:40.  It's now 12:32; okay?
20        1:40.
21             DEPUTY SHERIFF:  All rise for the jury, please.
22             (At about 12:29 p.m., jury panel excused.)
23             THE COURT:  Ladies and gentlemen, I have a
24        doctor's appointment today.  I've seen five doctors in
25        five days and I'm going to have to leave about 3:30 today
```

67

1          or so, 3:20 or 3:30, so that's why I'm abbreviating the

2          lunch hour just a little bit; okay?  Thank you.

3                    Have a good lunch, everyone.

4                    (At about 12:31 p.m., lunch recess;

5                    At about 1:50 p.m., back on the record.)

6                    COURT CLERK:  Recalling docket 10-3521, People

7          versus Samuel Lee Dantzler, jury trial in progress.

8                    MR. KINNEY:  Robert Kinney appearing on behalf

9          of Mr. Dantzler.

10                   And as the Court knows, part of my cross

11         examination was going to be in terms of how much Bode was

12         being paid for this particular case.  Neither of those two

13         witnesses know what the contract was or what any overage

14         was that was paid by the Wayne County prosecutors office

15         or how much the contract was.

16                   THE COURT:  Mr. Hutting, do you know?

17                   MR. HUTTING:  I have no idea.  I mean they do

18         their work and get paid for whatever it is.  In terms of

19         what we did, I thought we paid about 35 hundred dollars,

20         somewhere between 35 and 39 hundred dollars.

21                   THE COURT:  Do you have a contract?

22                   MR. HUTTING:  I don't have -- No, I just got a

23         bill that was all.

24                   MR. KINNEY:  Well, whatever that bill is, I

25         think --

                                    68

```
 1              MR. HUTTING:  I don't have the bill.  I turned
 2    it in.  I do have it some place, but I don't know where it
 3    is.  I turned it in to be paid a while back.  Just a
 4    second here.
 5              THE COURT:  Can a call be made?
 6              MR. KINNEY:  Right now the regular court-
 7    appointed fees for experts is two hundred for evaluations,
 8    a hundred and fifty for testimony in court, unless we are
 9    permitted extraordinary fees.  Maybe we can, you know, at
10    a later date make a stipulation with respect to that, but
11    those are the reasons why --
12              THE COURT:  You have Co-Counsel, Mr. Hutting, is
13    your office able to locate something for Mr. Kinney?  Or
14    make a call?  Or call Bode or whoever is involved?
15    Perhaps your witnesses can provide a name and phone
16    number.
17              Is there any other assistance you're seeking
18    from the Court, Mr. Kinney?
19              MR. KINNEY:  No, your Honor.  It seems to think
20    it can be done.  I'm just --
21              THE COURT:  Well, I'm ready to bring the jury
22    in.  We'll deal with this as we can.  Mr. Hutting will
23    have his office look into this immediately.
24              MR. HUTTING:  What does he want?  All I have is
25    the last bill when we did the three extra cuts; okay?
```

69

```
 1              THE COURT:  What are you seeking, Mr. Kinney?
 2              MR. KINNEY:  Definitely I'm seeking that.  But
 3      she mentioned that there's a contract with Bode.  And I
 4      want to know what that contract is.
 5              MR. HUTTING:  That's with the Michigan State
 6      Police and the Detroit Police Department.  I don't have
 7      copies of that.  They contracted with them a long time
 8      ago.  Bode gets their fees, whatever their fees are.
 9              THE COURT:  That's what he wants to know.
10              MR. HUTTING:  He'll have to ask them.  I don't
11      know what those are.  We don't pay those.  That's all paid
12      under a grant; okay?  Wayne County prosecutors office
13      doesn't pay that fee.
14              THE COURT:  Mr. Hutting?
15              MR. HUTTING:  Yes, sir.
16              THE COURT:  I'm sorry, with all due respect, you
17      remind me of the end product manufacturers in some of my
18      litigation when I'd go in and seek information that they
19      had, or had access to, and were under a duty to turn
20      over --
21              MR. HUTTING:  I'm not under a duty to turn that
22      over.
23              THE COURT:  And their response would be, Judge,
24      if you want it, look in the warehouses.  It's here.  And
25      there'd be stacks of files all the way to the ceiling.
```

1      When the judge intervened, guess what?  Here it is.  One

2      file.  Here it is.  You're entitled to it.

3              MR. HUTTING:  I'm not under any duty to turn

4      that over.  This is the first -- Oh, this is the bill.

5              THE COURT:  Thank you.  All he's seeking is what

6      the compensation is.

7              MR. HUTTING:  The compensation for the three

8      extra cuts was 3,00020 -- to do the analysis of that was

9      $3,972.75.

10             THE COURT:  Is that what they were -- these

11     witnesses were paid and the compensation?

12             MR. HUTTING:  That's what Bode was paid to do,

13     to do three extra cuts and to do this analysis here, okay,

14     that Rebecca Preston has testified to on these major

15     components.  That cost $3,972.75.  What the other work

16     cost, I have no idea.  Okay.  I have no idea.

17             THE COURT:  I'm ordering you to do everything in

18     your power with your associates upstairs to ascertain what

19     the contract value was and to break that down in terms of

20     what they received in terms of compensation; okay?  I

21     think the defense is entitled to that.

22             MR. HUTTING:  Well, yeah, but they should have

23     asked for this a long time ago.  They knew Bode was going

24     to testify.  But in the middle of a trial when the witness

25     is up on the witness stand to say, well, we want this,

1    okay, we want this.

2              THE COURT:  Is there a discovery order, Mr.

3    Kinney.

4              MR. HUTTING:  No, he doesn't.

5              MR. KINNEY:  We -- I never had to have a

6    discovery order with Mr. Hutting and we've had several

7    trials together with respect to this.  I just asked him if

8    we had everything.  I was told I could ask.  I asked him.

9    They don't know.  So this is a situation here where the

10   witness testifying doesn't know the information that we're

11   seeking.

12             MR. HUTTING:  Because she's a worker.  She's

13   like me, she's a worker.

14             THE COURT:  Perhaps the witness, if she's asked,

15   can provide amplification so this information can be

16   procured.

17             MR. KINNEY:  Thank you, your Honor.

18             THE COURT:  Mr. Hutting, will you turn over what

19   you do have in this regard for Mr. Kinney?

20             MR. HUTTING:  If we want to make a copy of this

21   bill, this is the only copy that I have.

22             THE COURT:  Thank you.

23             MR. HUTTING:  I'd be more than happy to give him

24   a copy of that bill.

25             THE COURT:  Thank you.

1                    MR. HUTTING:  You know, the witness has to be

2          flown out here; okay?  There's, you know, the flight and

3          all of that stuff.

4                    THE COURT:  Sure.  No, I understand.

5                    MR. HUTTING:  And that all has to be paid; okay?

6          I mean this is an expensive trial.

7                    THE COURT:  Mr. Kinney, ask Mr. Hutting

8          specifically what you're asking.  He seems to be more than

9          cooperative to answer any inquiries that you have.

10                   MR. KINNEY:  That's what I was asking for.

11                   THE COURT:  We want to bring this jury back in

12         and they're doing a lot of waiting.

13                   MR. HUTTING:  But the reason why Bode was

14         contracted in the first place is because if we'd have left

15         it with the Detroit Police Department or the Michigan

16         State Police, we'd probably still be waiting, because of

17         the back log.  We'd still be waiting for these reports

18         because of their back log.

19                   THE COURT:  And the trial was delayed because of

20         the time it would take for the DNA; correct?

21                   MR. HUTTING:  For the new cut, to do the three

22         new cuts, yes.

23                   THE COURT:  And the requests of the People were

24         all granted in terms of seeking additional time so that

25         they could have this processed; correct?

```
1                    MR. HUTTING:  Right.

2                    THE COURT:  For the benefit of both sides.

3                    MR. HUTTING:  Right.

4                    THE COURT:  All right.  Thank you, Mr. Hutting.

5                    MR. HUTTING:  Now do you want the other amounts?

6                    MR. KINNEY:  Yes.

7                    THE COURT:  If it's -- if it's feasible, Mr.

8       Hutting.

9                    MR. HUTTING:  How is that relevant?

10                   THE COURT:  I understand.  I understand what

11      you're saying.

12                   MR. HUTTING:  But, see, how is that relevant

13      when --

14                   THE COURT:  Why don't we deal with that later?

15      Try to do what you can do to get the information.  Maybe

16      it's not even available.  If it is, then we can deal with

17      that later.  Let's finish up with this witness and bring

18      the jury back in; okay?

19                   MR. KINNEY:  I'm ready.

20                   DEPUTY SHERIFF:  Ladies and gentlemen, please

21      take your seats.

22                   DEPUTY SHERIFF:  All rise for the jury.

23                   (At about 1:59 p.m., jury panel seated.)

24                   DEPUTY SHERIFF:  You may be seated.

25                   THE COURT:  Good afternoon, ladies and
```

```
 1      gentlemen.

 2                  JURY PANEL:  Good afternoon.

 3                  THE COURT:  Ladies and gentlemen, there were

 4      some other issues that arose that we had to deal with

 5      before I invited you in.  Had I known we'd be confronted

 6      with these issues, I would have said take a little longer

 7      lunch, have dessert, and come at two o'clock.  So

 8      hopefully we're ready to proceed.

 9                  You remain under oath.  Thank you.

10                  WITNESS PRESTON:  Thank you.

11

12  CROSS EXAMINATION BY MR. KINNEY:

13  Q.  Good afternoon, Ms. Preston.

14  A.  Good afternoon.

15  Q.  I just want to make it clear.  Your -- what you call EO1a1

16      is a cutting that Bode Technology did not make; am I

17      correct?

18  A.  Correct, it was sent to us.

19  Q.  Okay.  And that means did you know that some other testing

20      had already been done on it?

21  A.  Prior to it's arrival at Bode?

22  Q.  Yes.

23  A.  No, I did not know.

24  Q.  All right.  Would that have made a difference?

25  A.  No.
```

75

```
 1                    MR. HUTTING:  Well, I'm going to object.  There
 2         was no other testing done on it before it was sent to
 3         Bode.  It was cut and it was sent to Bode ultimately.
 4         That assumes facts that are not in evidence.
 5                    THE COURT:  Response, Mr. Kinney?
 6                    MR. KINNEY:  I thought that Mr. Steary testified
 7         that he -- Is he the one that made the cut?
 8                    MR. HUTTING:  He made the cut.  He made the cut,
 9         prepared the stuff with the DNA, and it was put in a tube
10         and then ultimately that tube was sent to Bode.
11                    MR. KINNEY:  I'm referring to what I thought the
12         testimony was and I don't want to argue the facts of the
13         case right now but --
14                    MR. HUTTING:  But I'm going to object to that.
15         It assume facts that are not in evidence, that other
16         testing was done on that.  It was not, only the initial
17         cut.
18                    THE COURT:  Want to ask another question, Mr.
19         Kinney?
20                    MR. KINNEY:  Thank you.
21                    THE COURT:  Go ahead.
22    BY MR. KINNEY:
23    Q.   If it had been more testing done on any part of this hat
24         would it have affected what you did?
25    A.   No.
```

76

1    Q.    Okay.  Thank you.  You mentioned that you all have a

2          contract with DPD, Detroit Police Department?

3    A.    I know that at one time we did have a contract with them.

4    Q.    So you don't know if you have a contract with them now or

5          not?

6    A.    I know that we're currently still doing work for the

7          Michigan State Police.

8    Q.    That was going to be the next question.  So you have a

9          contract with the Michigan State Police right now?

10   A.    Yes, we are currently doing work for them.

11   Q.    And is that how Bode Technology is being paid for the work

12         that you're doing on this case?

13   A.    I'm not sure the breakdown of who paid for what, what's

14         the case.  Most times I'm given the work to do.  I don't

15         do anything with the contract we're given or anything like

16         that.

17   Q.    Okay.  You work for Bode Technology?

18   A.    Yes.

19   Q.    And you get a salary?

20   A.    Yes.

21   Q.    Okay.  And are you paid hourly or salary?

22   A.    I'm paid a salary.

23   Q.    Okay.  And that -- How did you get here?  Was it by

24         Greyhound or airplane?

25   A.    I flew here this morning.

1   Q.   Okay.  And Bode Technology paid for that?

2   A.   Yes, they did.

3   Q.   Okay.  And you don't know if they were reimbursed for the

4        plane flights or not by the County?

5   A.   They were not for this contract.  I know that Bode pays

6        for our travel.

7   Q.   Okay.  In talking -- In terms of the hat itself, I

8        understood that Mr. Hutting kept saying cuttings on this

9        hat.  You kept saying scrapings on this hat.  To me

10       there's a difference in cutting and scraping.  Were there

11       any more cuts made on this had?

12  A.   No, I scraped the three areas that I tested.  It's just we

13       have different sampling techniques that we use when

14       looking at an evidence item that may be worn.  Since

15       there's not a visible stain, I scraped it using a razor

16       blade to take the surface area off, where we've seen in

17       the past that if someone's worn an item, they may have

18       left DNA around a certain area.  So if we scrape the top

19       level in looking for wearer DNA.  That's typically how we

20       sample.

21  Q.   Okay.  So you did not take a cutting at all?

22  A.   No, I used a razor blade to scrape the top layer.

23  Q.   Okay.  In Bode one and Bode two, you see where it says

24       D18S?  The copy says locus, of your chart?

25  A.   Yes.

1    Q.    The D18S51, where it says Bode one, it says no result?

2    A.    For the E11?  I'm sorry, I'm not --

3    Q.    E11a1, yes.

4    A.    Yes.

5    Q.    Yes, I thought we wrote Bode one on top of there?

6    A.    Okay, yes, Bode --

7    Q.    That makes it easier for me.  E11a1?

8    A.    Okay.

9    Q.    What does the no result mean?

10   A.    Basically what that means is that at that specific

11         location, we were unable to generate a DNA profile at that

12         specific location.  So we were unable to make copies of

13         that location.

14   Q.    And that's location within a DNA --

15   A.    Yes.

16   Q.    -- sample?

17   A.    Yes.

18   Q.    It's not that location of the hat?

19   A.    Correct.

20   Q.    Okay.  It's just location of the DNA sample, you couldn't

21         find any results?

22   A.    Yes.

23   Q.    And that's the same thing for when it comes to major

24         component of E11a1 would be the same thing, no result;

25         right?

 1   A.   Yes.

 2   Q.   And then E11a3 which is -- that would be Bode's third

 3        sample?

 4   A.   Yes.

 5   Q.   It still says no results?

 6   A.   Yes.

 7   Q.   And you have no results several times there.  Is that

 8        on -- I'm saying different loci, but is that locus?

 9   A.   Yes.

10   Q.   Is that the same thing?

11   A.   Yes.

12   Q.   Okay.  So with that many no results -- you have one, two,

13        three, four, five, six, seven no results and 13

14        possibilities?

15   A.   For the E11 --

16   Q.   -- a3?

17   A.   Yes.  Yes.

18   Q.   And what does that tell you?

19   A.   For this specific sample, we begin looking at my data, and

20        the quantity of DNA that I obtained, we also quantify the

21        DNA in our processing in order to see how much that is

22        there.  When we go to make copies of it, we look to see

23        how much is there, so we know how much to target.  When I

24        looked at the quantity of DNA, there was not much there.

25        So that just tells me that there's not a lot of DNA there,

80

1       so that's why we were unable to make copies at that

2       specific location.

3   Q.  Okay.  So this third scraping that you did, there's -- out

4       of 13 different locations in the DNA itself, seven of

5       them, there's no results?

6   A.  Yes.

7   Q.  And in terms of saying whose DNA in that third location on

8       the hat, you're saying that Mr. Dantzler cannot be

9       included or excluded?

10  A.  Correct.

11  Q.  Is that really saying anything?  You can't be included,

12      you can't be excluded.  That's just -- Isn't that like I

13      don't know?

14  A.  That's saying there's not enough information there to make

15      a decision whether at that specific area he was there or

16      not there.

17  Q.  And it's the same thing for Mr. Hill?  You don't know?

18  A.  Not at that area that we tested.

19  Q.  So on that third area -- you know, I'm not trying to call

20      it hat.  Remember the sketch that I showed you; do you

21      still have that?

22  A.  Yes.

23  Q.  I called it hat three.  But you're still saying that Mr.

24      Dantzler Mr. Hill, there's not very much you can tell us

25      about that particular part of your testing?

1    A.    No, just because there was not enough DNA there.

2    Q.    But there's DNA there?

3    A.    Yes.

4    Q.    Okay.  Can you specifically tell us that nobody else's DNA

5          is in that hat?

6    A.    No.

7    Q.    At the time that you were testing can you tell us that no

8          one else's DNA is in that hat?

9    A.    No.

10   Q.    At the time that you were testing that hat, I know that as

11         a biologist, you know, when you see blood, you know what

12         blood is?

13   A.    Yes.

14   Q.    But there's certain tests that you probably would have to

15         do to determine whether there was any blood in the hat?

16   A.    Yes.

17   Q.    Did you by chance do any testing to determine whether the

18         DNA that you were taking a look at was a derivative of

19         someone's blood?

20   A.    No, we didn't do any serology testing.

21   Q.    Okay.  So I mean did you know that this was testing with

22         regards to a murder case?

23   A.    Yes, through the paperwork that was submitted.

24   Q.    You knew that?

25   A.    Yes.

82

```
 1    Q.   Did you know that -- Well, and there was no indication

 2         that we should know whether or not there was any blood in

 3         the hat?

 4    A.   No, I was asked to test the hat for wearer DNA.

 5    Q.   Okay.  For the second Bode test -- no, I'm sorry, the

 6         third Bode test here, you have a parentheses around the Y,

 7         known as the X, Y chromosome?

 8    A.   Yes.

 9    Q.   And you have parentheses around the Y.  What does the

10         parentheses mean?

11    A.   For this specific sample, since it's so low level, it just

12         means that we, when looking at the different numbers

13         basically at each of the locations, if they're not

14         balanced to a certain ratio, like their strength is not

15         equal, then we put a parentheses around it.

16    Q.   Okay.  You're still certain that the DNA that you were

17         looking at was male as opposed to female?

18    A.   Again my notes say there's at least one male there.  We

19         can't determine, based on the limited data obtained, the

20         ratio, if there's -- there's at least one male there.

21         There's more than one contributor.

22    Q.   Now tell me if I'm saying the same thing:  That means that

23         at least on that particular scraping, some of that DNA

24         could have been from a female?

25    A.   We cannot determine that.
```

1    Q.    You cannot determine that there was -- you know that

2          there's at least one male?

3    A.    Yes.

4    Q.    Correct?

5    A.    Yes.

6    Q.    And you don't know whether or not there was a female?

7    A.    Yes.

8    Q.    Am I correct?

9    A.    Correct.

10   Q.    Okay.  So not only are -- could there be some DNA that

11         belongs to Bernard Hill, and some DNA that belongs to

12         Samuel Dantzler, but there's some DNA there that could

13         belong to a female?

14               MR. HUTTING:  Objection, assume facts not in

15         evidence.  That calls for speculation.

16               THE COURT:  Response?

17               MR. KINNEY:  I'm asking her the results of her

18         test.  And I don't think that calls for speculation.

19         She's an expert, testifying about what DNA was left in

20         this hat.

21               THE COURT:  Go ahead.

22   BY MR. KINNEY:

23   Q.    Am I correct?  There could be some DNA there that belongs

24         to a female?

25   A.    There could, due to the -- We could not determine.  There

1          was not enough information at that area.

2     Q.   So that means there could?

3     A.   There could.

4               MR. HUTTING:  See, and that's speculation.  If

5          there wasn't enough, then the rest is speculation.

6               MR. KINNEY:  It's not speculation if she's

7          testifying about the results of her test.  That's not

8          speculation.

9               THE COURT:  Well, she's qualified as an expert

10         and she can give an opinion.

11              MR. KINNEY:  Yes.

12    BY MR. KINNEY:

13    Q.   And that is your opinion; right?

14    A.   That there's not enough information there?

15    Q.   To say --

16    A.   To say that there's not a female?

17    Q.   Yes.

18    A.   No, there's not enough information because there's not

19         enough DNA there.

20    Q.   Okay.  So to use your terminology, we're not excluding

21         females from this DNA sample?

22    A.   I would have to have a specific profile.

23    Q.   You would have to have a specific profile to exclude

24         someone?

25    A.   Yes.

1   Q.   Okay.  So -- And everybody has a profile?

2   A.   Yes.

3   Q.   So to exclude everybody, you would have to have

4        everybody's profile; is that what you're saying?

5   A.   Yes, in order to exclude someone, I would need their DNA

6        profile.

7   Q.   Okay.  So you cannot take this hat and tell us whose DNA

8        has been on that hat?  You can't tell us that?  You can't

9        take this hat here and determine for us whose DNA is

10       actually in the hat?  If everybody's DNA is in this hat,

11       you can't do that?

12  A.   Do you have a blanket -- Can you rephrase the question?

13  Q.   The testing is to determine whose DNA you have in the

14       sample that you took; correct?

15  A.   Yes.

16  Q.   And the sample is from this hat; correct?

17  A.   We tested different areas of the hat, yes.

18  Q.   Does that mean the sample is from the hat or it's not from

19       the hat?

20  A.   Yes, that is what it means.

21  Q.   Okay.  Well, now in doing that, can you tell us that

22       there's nobody else's DNA in the hat, except for the DNA

23       samples that you took?  There no other samples in this

24       hat?

25            MR. HUTTING:  Well, Judge, I'm going to object.

86

1      The only thing that she can tell us is what the results of

2      each of the samples showed or didn't show.  She can't say

3      what's in the other portions of the hat.  She can only

4      tell us what the results of the samples that she took say

5      or don't say.

6                    MR. KINNEY:  I think that if that's the case,

7      that testimony should come from Ms. Preston.  If that's

8      the case, then Ms. Preston can testify to it.

9                    THE COURT:  No, I agree.  She's been qualified

10     as an expert.  If she can answer the question, she can

11     answer it.  If she cannot, she should indicate so.

12                   WITNESS PRESTON:  Yes.

13                   THE COURT:  Ms. Preston, I need you to answer

14     truthfully and completely any and all questions asked by

15     the lawyers for either side; okay?

16                   WITNESS PRESTON:  Okay.

17                   THE COURT:  Thank you very much.  If you don't

18     understand a question, have him rephrase it, repeat it,

19     whatever's necessary; okay?

20                   WITNESS PRESTON:  Yes.

21                   THE COURT:  Thank you very much.

22     BY MR. KINNEY:

23     Q.   You cannot tell us that no one else's DNA is in this hat?

24     A.   I can only testify as to the areas that we tested whose

25          DNA is there.

87

1  Q.   So that we won't be confused by your answer, can you

2       answer my question yes or no?

3            MR. HUTTING:  Argumentative.  Argumentative.

4       Objection.

5            THE COURT:  Overruled.  Go ahead.

6  BY MR. KINNEY:

7  Q.   Yes or no?  Can you --

8  A.   Can you repeat it?  I'm sorry, I'm trying to understand.

9  Q.   Okay.  Can you tell us that no one else's DNA is in this

10      hat?

11 A.   No, I can only testify to the areas that I tested.

12 Q.   Okay.  Can you tell us who had control of this hat last?

13 A.   No.  I can only say, comparing the profiles and the areas

14      that I tested.

15 Q.   Can you tell us when Mr. Hill's DNA was placed in this

16      hat?

17 A.   No.

18 Q.   Can you tell us when Mr. Dantzler's DNA was placed in this

19      hat?

20 A.   No, I can't determine the time.

21 Q.   Can your testing -- Is there -- Does DNA over time

22      dissipate or, you know, can it be erased from -- I want to

23      qualify this.  Can it be erased from evidence?  You know,

24      it has been confiscated by an evidence technician, placed

25      in a -- because this was in 2006 when this incident

```
 1        occurred -- so an evidence technician took this hat in
 2        2006, placed it on evidence.  Just sitting there, being
 3        placed on evidence, could the DNA for some reason escape?
 4   A.   If the evidence is properly stored, we would expect to get
 5        the same results.
 6   Q.   No matter how long it takes?  Whether, you know, this is
 7        2006, this is 2010, it's at least four years ago?
 8   A.   In that amount of time, I would expect for it to still, if
 9        properly stored, we would still be able to get good
10        results.
11   Q.   All right.  What about fingernail clippings?  Is it
12        possible to get a good DNA sample from a fingernail
13        clipping?
14   A.   Yes, depending on what you were looking for.  If --
15   Q.   Looking for DNA?
16   A.   Yes, then -- From one individual?  Their own DNA?
17   Q.   Not only their own DNA, but if they were struggling with
18        another individual and something got under those
19        fingernails, scuffling with another individual, like blood
20        or skin or sweat, could you get the DNA out of it?
21   A.   Depending on when DNA is transferred, sometimes a lot is
22        left, sometimes not a lot is left.  It's hard to
23        determine.  Given the scenario, some may be left, yes, we
24        could get results.  If there was no DNA there, then we
25        would not be able to get results.
```

89

```
 1   Q.   Okay.  Well, that's in every case?

 2   A.   Yes.

 3   Q.   In every case, if the DNA is there, you can get results;

 4        if the DNA is not there, you cannot get results?  Correct?

 5   A.   Correct.

 6   Q.   Okay.  And if it's properly stored could you expect it to

 7        last the same way that you say it would last in the hat?

 8   A.   If there is DNA there, then yes.

 9   Q.   So if you got samples from fingernails if it's properly

10        stored, four years, five years later, you can still test

11        that hat and be -- I mean test those fingernails and be

12        confident in what you find?

13   A.   If there was DNA there, yes, to begin with, then we would

14        expect to.

15   Q.   Okay.  Do you see any of the bills or any contracts from

16        Bode Technology with anyone?  Are you -- Do you share --

17        Well, first of all, take a look at that for me and see if

18        you recognize that and can identify it in some way, as

19        something that you know about?

20   A.   Yes, this is an invoice from our company.

21   Q.   You do know about that?

22   A.   Yes.

23   Q.   Okay.  And describe for us what it is?

24   A.   This is an invoice for the work I did on the cuttings or

25        the testing of the hat.
```

1    Q.    And how much was that?

2    A.    It was for $3,972.75.

3    Q.    Okay.  So that's what Bode Technology was paid just for

4          the three cuttings; correct?  Your analysis on the three

5          cuttings, E11a1, a2 and a3?

6    A.    This is for, as well, the two reference samples.  That

7          includes not only my work, but also all the chemicals and

8          reagents and everything else that was done in the

9          processing.

10   Q.    All right.  And that is over and above whatever contract

11         Bode has with Michigan State Police and the Detroit Police

12         Department?

13   A.    Yes, this was sent to us separately.

14              MR. KINNEY:  Okay.  I would ask to have this

15         marked.  I think this would be Defense's B?

16              DEFENDANT'S EXHIBIT B MARKED

17              FOR IDENTIFICATION

18              MR. KINNEY:  At this time, I'd move for

19         admission of Defense B.

20              MR. HUTTING:  No objection.

21              THE COURT:  Offered and received.

22              MR. KINNEY:  Thank you.

23              DEFENDANT'S EXHIBIT B ADMITTED

24              INTO EVIDENCE

25   BY MR. KINNEY:

1    Q.   This is the bill for your work?

2    A.   It's for the work that was done, not on the entire case,

3         but just for anything that's labeled E11 as well as R12

4         and R13.

5    Q.   Okay.  R12 and R13 are the samples from Mr. Dantzler and

6         Mr. Stewart; correct?

7    A.   Yes.

8    Q.   Okay.  You also had something from Mr. Hill; correct?

9    A.   Correct.

10   Q.   Don't you have a sample from Mr. Hill?

11   A.   That was processed previously in 2007, yes.

12   Q.   Okay.  And the -- So you were working on -- So Bode has

13        been working on this case since 2007?

14   A.   Yes, we have.

15   Q.   And you received the blood sample from Mr. Hill in 2007?

16   A.   Yes, it was received too, but not me individually, but

17        yes.

18   Q.   When I say you, I mean who you work for?

19   A.   Yes.

20   Q.   Your professional level?

21   A.   Yes.

22   Q.   And so you all had done some testing with regards to the

23        blood in 2007?

24   A.   Yes.

25   Q.   This is another copy of that chart that I showed you.  I

92

```
 1          know that you had some qualifications to it; am I correct?
 2    A.    Yes.
 3    Q.    Okay.  And those qualifications have to deal with, I
 4          think, I may not be saying it exactly the way you say it,
 5          but to a scientific -- a reasonable scientific certainty
 6          is that how you --
 7    A.    Yes.
 8    Q.    Okay.  So in terms of -- you know, mainly, what I'm trying
 9          to get is who was excluded and who wasn't excluded on that
10          chart?  Is there something in terms of who was excluded
11          and who wasn't excluded that you disagree with on that
12          chart?
13    A.    Not in terms of who could be excluded, maybe in the way
14          that it's phrased, then yes.
15    Q.    Okay.  But this is -- Were you clear -- Okay.  Let's start
16          with --
17              MR. HUTTING:  You know, Judge, if we're going to
18          talk about this chart in front of the jury, then I think
19          it needs to get -- needs to get identified, it needs to
20          get admitted into evidence.
21              THE COURT:  Mr. Kinney.
22              MR. HUTTING:  If we're going to admit it into
23          evidence and he wants to talk about it in front of the
24          jury, I say let's make copies of it and give it to the
25          jurors so they can see it and follow along with it instead
```

93

1      of trying to imagine it in their minds.

2                   THE COURT:  Mr. Kinney, response?

3                   MR. KINNEY:  Does that mean there's no

4      objections to -- you have no objections to it being

5      admitted?

6                   MR. HUTTING:  What I'm saying is you have to lay

7      the proper foundation to see once that foundation is laid

8      properly, you know, what you have there.  I mean you guys

9      made this up.  She didn't make it up; okay?  So --

10                  MR. KINNEY:  May we approach the bench for a

11     second?

12                  THE COURT:  No, this is going to stay on the

13     record for this argument.

14                  MR. HUTTING:  If you get the foundation properly

15     laid, then I'm not going to object to it being admitted

16     and talked about in front of the jury.  But right now, I

17     don't think that that's been done.  You just brought this

18     up out of -- You brought this up and I don't think the

19     proper foundation has been laid.

20                  THE COURT:  Mr. Kinney?

21                  MR. KINNEY:  Your Honor, I'm doing my best to

22     try to understand.  I have copies here.  I don't like to

23     publish anything that's not evidence.  I'm asking her

24     questions about it, in terms of trying to lay a foundation

25     before I show it to anybody.  I thought the objection is

                               94

 1          that I need copies that I need to show them to them.  I

 2          can't show it to them before it's admitted so which way --

 3                   MR. HUTTING:  My objection is if he's trying to

 4          lay a foundation, that's one thing.  It sounds to me like

 5          he's trying to cross examine her on the content of what's

 6          in this chart that he's made up.  And I do have an

 7          objection to that until a foundation is laid.

 8                   MR. KINNEY:  And laying the foundation, I showed

 9          it to her --

10                   THE COURT:  All right.  You can approach at this

11          point.

12                   (At about 2:27 p.m., brief sidebar;

13                   At about 2:29 p.m., back on the record.)

14                   THE COURT:  Go ahead, Mr. Kinney.

15    BY MR. KINNEY:

16    Q.  Ms. Preston, what is it that I just handed you?  What's at

17        the top?

18    A.  You have titled it DNA summary chart.

19    Q.  Okay.  And is this the first time that you've seen it,

20        right now?

21    A.  No, you showed it to me previously.

22    Q.  Okay.  And when I showed it to you did I ask you not to

23        take a look at it and see if it was in agreement with your

24        chart as opposed to the evidence that you found?

25    A.  Yes, I told you that some of these statements, I felt,

```
 1        could not stand alone; but given the proper explanation,

 2        they needed some other wording with them.

 3   Q.   Needed some more wording?

 4   A.   Yes.

 5   Q.   Did you disagree with what was on here?

 6   A.   I did not -- The only thing that we discussed previously

 7        was the fact that the statistics were listed underneath

 8        reference items, where I felt that and stated that

 9        statistics are performed on evidence items that are

10        received.

11   Q.   And not on the individual?

12   A.   Correct.

13   Q.   All right.  And that had to do with like Sam D is for Sam

14        Dantzler; correct?

15   A.   Yes.

16   Q.   Okay.  I mean those statistics that I have here come from

17        your report.  Do they look the same as the statistics in

18        your report?

19   A.   My statistics are based on the hat rim cutting.

20   Q.   Yes, assuming we don't get -- I'm getting to that.  I

21        promise you that.

22             The first thing is the statistics itself, one in

23        two quadrillion is the statistic that's in your report;

24        correct?

25   A.   For one population, yes.
```

1    Q.   Okay.  And that had to do with the hat rim; correct?

2    A.   Yes.

3    Q.   Okay.  And the hat rim you call E what?  E101a?

4    A.   Yes.  E zero 1a, yes.

5    Q.   Okay.  And it is true that -- that your statistics when it

6         came to E101a was one in two quadrillion?

7    A.   Yes, for the African American population.

8    Q.   Okay.  What else did you not agree with?

9    A.   I was confused by the first column which we had discussed

10        which we -- you said that the two means that there's just

11        two contributors; correct?

12   Q.   That's what I got from what I was reading?

13   A.   Okay.

14   Q.   And is that correct?

15   A.   Yes.

16   Q.   It means that it was two contributors?

17   A.   At least two contributors, yes.

18   Q.   At least two contributors?

19   A.   Yes.

20   Q.   And at least one of the two contributors was named?

21   A.   Yes.

22   Q.   So you do agree with that?

23   A.   Yes.

24   Q.   Okay.  And do you agree with that when it comes to the hat

25        rim and you've got three scrapings and I've got the same

```
 1          thing under all three of them; at least two contributors,
 2          at least one of those two were men?
 3   A.     Yes.
 4   Q.     And with respect to Mr. Dantzler in E -- what is that?
 5          11a1?
 6                 MR. HUTTING:  Which Mr. Dantzler now?  The
 7          Defendant here?
 8                 MR. KINNEY:  Yeah, that's the one that I
 9          represent.
10                 MR. HUTTING:  Well, yeah, but I mean there's
11          other people listed on here though that are also named
12          Dantzler.
13                 THE COURT:  Response, Mr. Kinney?
14                 MR. KINNEY:  Samuel Dantzler, Samuel Lee
15          Dantzler.
16                 THE COURT:  The objection was sustained, Mr.
17          Hutting.
18                 MR. HUTTING:  Thank you, your Honor.
19   BY MR. KINNEY:
20   Q.     Is that correct, Ms. Preston?
21   A.     Can you -- I'm sorry, can you repeat the question?
22   Q.     Samuel D, who do you believe Samuel D is?
23   A.     Samuel Dantzler, Senior.
24   Q.     Okay.  That's right, Samuel Dantzler, Senior.
25   A.     Yes, sir.
```

```
 1   Q.   All right.  And with respect to hat number one, which is
 2        in your report, it's the first scraping, you have a
 3        number, E11a1?
 4   A.   Yes.
 5   Q.   Is that right?
 6   A.   Yes.
 7   Q.   Is it correct where it says he cannot be included,
 8        excluded, and this was taken on October the 19th of 2010?
 9   A.   Yes, due to the limited data obtained, he could not be
10        included or excluded as a possible contributor to the
11        minor DNA profile obtained.
12   Q.   All right.  And when I have NA, that's like there was no
13        testing done; right?
14   A.   There was no comparison made.
15   Q.   No comparison made, correct.  So for Pat G or Pat
16        Grunewald, there was no comparison made; am I correct?
17   A.   Correct.
18   Q.   And then Michael D on my chart, I have no comparison made;
19        is that correct?
20   A.   Correct.
21   Q.   Okay.  And when it comes to Samuel Lamare Dantzler, on my
22        chart, I've got no comparison made?
23             MR. HUTTING:  See again, objection.
24   BY MR. KINNEY:
25   Q.    Is that correct?
```

1              MR. HUTTING:  We're talking about the content of

2         the chart.  We're not laying a foundation for it; okay?

3         If we want to lay the foundation for it, then we can start

4         talking about the content and the results and get it

5         admitted and give it to the jury.  But he's not laying a

6         foundation.

7              THE COURT:  That's fair.  I don't want to

8         confuse the jury, gentlemen.  This is --

9              MR. KINNEY:  I'm not trying to confuse the jury.

10        We can -- You know, let me have the chart then.  Thank

11        you.

12             Okay.  Now that I have the chart, your Honor,

13        and I'm not asking about my chart, let's just ask about

14        her chart.

15   BY MR. KINNEY:

16   Q.   When it comes to Samuel Lamare Dantzler would it be

17        correct in saying that there was no comparison made?

18   A.   To the hat that I tested, no.

19   Q.   Am I still correct?  Now that you don't have my chart in

20        your hand am I still correct?

21   A.   Yes.

22   Q.   Okay.  When it comes to -- When it comes to Omarrow

23        Dantzler, was there no comparison made?

24   A.   Not to the hat, no.

25   Q.   Okay.  When it comes to Bernard Hill was there a

                              100

1  comparison made?

2 A. Yes.

3 Q. And we're talking about the hat and -- I didn't want to

4  use E11a1, but I wanted to -- this is the first sample

5  that you scraped off the hat; correct?

6 A. Yes.

7 Q. So instead of putting it in your terminology, I want to

8  talk about the hat itself; okay?  Where did this scraping

9  come off the hat?

10 A. The first --

11 Q. The first scraping?

12 A. -- was taken from an area I designated as one which was

13  from the interior of the hat as it was submitted to me.

14 Q. From the interior of the hat.  Wait a minute, you didn't

15  make the scraping?

16 A. Yes, I did.  From the hat one, as we're calling it, yes.

17 Q. You took the hat and the first scraping was from the

18  interior of the hat?

19 A. Yes.

20 Q. And then you made your comparisons on that particular

21  scraping?

22 A. Yes.

23 Q. Okay.  And when you come to the results of your

24  comparison, you did not make a -- and you didn't do any

25  comparison when it came to Pat Grunewald, Michael

```
 1        Dantzler, Samuel Lamare Dantzler, Omarrow Dantzler, you

 2        didn't even make a comparison; correct?

 3   A.   No, I did not.

 4   Q.   Okay.  But you did make a comparison with what you had

 5        with regard to Samuel Dantzler, Senior; am I correct?

 6   A.   Yes.

 7   Q.   And he couldn't be included or excluded; am I correct?

 8   A.   From the minor component, yes.

 9   Q.   From that particular scraping?

10   A.   Yes.

11   Q.   Am I correct?

12   A.   Correct.

13   Q.   Okay.  And when it comes to Mr. Hill, Mr. Bernard Hill, am

14        I correct in that he cannot be excluded?

15   A.   Correct.

16   Q.   So is that saying that he's included?

17   A.   Yes.

18   Q.   So out of that first scraping -- And Mr. Steward is

19        definitely excluded?

20   A.   Yes.

21   Q.   So out of that particular scraping, that first scraping of

22        the inside of the hat, you have included Mr. Hill -- his

23        DNA is there, is what we're saying; is that correct?

24   A.   DNA consistent with him is there, yes.

25   Q.   DNA consistent with him is there.  Okay.  But we can't say
```

102

```
 1        that about anybody else at this particular time?
 2   A.   Correct.
 3   Q.   Including Mr. Dantzler, Senior?
 4   A.   Correct.
 5   Q.   When it comes to the second scraping of the hat, first
 6        tell us where that scraping is from?
 7   A.   That scraping was from the interior rim of the hat as it
 8        was submitted.
 9   Q.   Okay.  Now the first scraping, you said, was from the
10        interior of the hat?
11   A.   Yes.
12   Q.   We're definitely in a different place than the interior
13        rim of the hat?
14   A.   Correct.  It was higher, more towards -- if you think
15        about the hat itself like this, it was more towards the
16        top where the interior rim was just -- as I received it,
17        it was folded over, so as it was received, the inside part
18        of the hat.
19   Q.   Okay.  Now that particular part of the hat, again Mr.
20        Grunewald, Michael Dantzler, Samuel Lamare Dantzler,
21        Omarrow Dantzler, there was no comparison made?
22   A.   No, there was not.
23   Q.   Okay.  And when it came to Mr. Samuel Dantzler, Senior, he
24        cannot be excluded?
25   A.   Correct.
```

1   Q.   So then he's included in that DNA, that's similar to the

2        DNA that you had for Mr. Dantzler, was in the hat?

3   A.   Yes.

4   Q.   Same thing for Bernard Hill?

5   A.   Yes.

6   Q.   Am I correct?

7   A.   You are correct.

8   Q.   For the third scraping of the hat, where did that scraping

9        come from?

10  A.   It came from the exterior rim of the hat, as it was

11       submitted.  So it was folded up and then that small piece

12       that was folded up and over, I scraped that part.

13  Q.   You say from the exterior of the hat?

14  A.   Correct.  So the piece that is folded over there, the

15       exterior, as it is folded up.

16  Q.   Okay.  At the bottom of the hat?

17  A.   Not the interior part, the exterior, outside.  I can point

18       and show you.  Yes.

19  Q.   Thank you.

20  A.   So area two was this interior section here and the

21       exterior area three is this exterior part here.

22  Q.   This is three?

23  A.   Yes.

24  Q.   And one is inside the hat, closer to the top?

25  A.   It's marked.

1   Q.   It's marked?

2   A.   I circled this area right here as area one.

3   Q.   That's area one?

4   A.   Yes.

5   Q.   All right.  And area two is inside of the rim?

6   A.   Yes.

7   Q.   And this is area three?

8   A.   Yes.

9   Q.   The outside of the rim?

10  A.   Yes.

11  Q.   Thank you.  And around area three you, your testing or

12       your comparison is there was no comparison with respect to

13       Pat Grunewald, Michael Dantzler, Samuel Lamare Dantzler,

14       Omarrow Dantzler, at all; am I correct?

15  A.   Correct.

16  Q.   Mr. Samuel Lee Dantzler, there's not much you could tell

17       us about Mr. Samuel Dantzler, Senior at all?  We can't

18       exclude him, can't include him, nothing we can do?

19  A.   Correct.

20  Q.   With respect to Mr. Hill and Mr. Gerald Stewart, we can't

21       include them, can't exclude them, nothing we can do?

22  A.   There's not enough information there to include or exclude

23       any other references we were given.

24  Q.   Okay.  So that means that with respect to that third

25       scraping, on the outside of the hat, can't tell us much

                                105

1          about that at all?

2     A.   No, there's not enough information.

3     Q.   With respect to the first scraping, when it comes to Mr.

4          Samuel Dantzler, Senior, not much you can tell us about

5          that either?

6     A.   No, he -- He could not be included or excluded as a

7          possible contributor to the minor profile obtained from

8          the first scraping.

9     Q.   Now with respect to what you call E05, but I call it

10         blood, that was found on the shaft of a golf club.  You

11         have your report on that?

12    A.   Yes.

13    Q.   All right.  With regard to Mr. Samuel Dantzler, Senior,

14         you didn't even make a comparison?

15    A.   No, at the time this report was issued, I made a

16         comparison to the reference samples that we had.

17    Q.   At the time that this report was made, you didn't have

18         Mr. -- a sample from Mr. Dantzler?

19    A.   Senior?

20    Q.   Yes.

21    A.   No.

22    Q.   Didn't have it?

23    A.   Not on the June 25th, 2010 report.

24    Q.   Okay.  But October the 19th, you were working on this case

25         again?

1   A.   Yes.

2   Q.   And you didn't -- you didn't think to go back and take a

3        look at this with regard to Mr. Dantzler at that point?

4   A.   The -- No, we were not asked to do that.

5   Q.   Okay.  So you don't have an opportunity to use your own

6        discretion as a chemical biologist?

7   A.   I do.  The individual associated with Bernard Hill could

8        not be excluded as a possible contributor to that profile

9        and again my statistics state the probability of that

10       profile being obtained.  So they were consistent with Mr.

11       Hill and he could not be excluded as the possible

12       contributor to that DNA profile.

13  Q.   Okay.  So your expert opinion would be that you weren't

14       going to find Mr. Dantzler's DNA there anyway?

15  A.   I did not make a comparison, no.

16  Q.   Because you didn't think it was necessary, you wouldn't

17       find Mr. Dantzler, Senior's DNA there?

18  A.   I was -- No, I didn't --

19            MR. HUTTING:  I'm going to object because at

20       that point in time in June, she did not have the buccal

21       swab from Mr. Samuel Dantzler, Senior so she couldn't make

22       any comparison.

23            THE COURT:  Response?

24            MR. KINNEY:  I thought I was talking to her

25       about October when she did have the sample and why didn't

```
 1      she make -- you know, go back and make a comparison when

 2      she got Mr. Sam Dantzler Senior's buccal swab.

 3             MR. HUTTING:  I don't think that's what that

 4      last question addressed to.

 5             MR. KINNEY:  I asked --

 6  BY MR. KINNEY:

 7  Q.  Did I not ask you, correct me if I'm wrong, but I thought

 8      that you indicated to us that when you did this particular

 9      test in June, you did not have Mr. Dantzler's DNA; is that

10      correct.

11  A.  Correct.

12  Q.  You told us that just a few minutes ago; right?

13  A.  Yes.

14  Q.  Then did I not ask you, you had it in October?

15  A.  Correct.

16  Q.  Why didn't you go back and make the comparison?  You

17      indicated that you weren't told to?

18  A.  Well, this DNA profile is consistent with Mr. Hill.

19  Q.  Okay.  And that was after I asked you did you have any

20      discretion yourself?

21  A.  Yes, I have discretion.

22  Q.  Okay.  And then you are indicating that the reason that

23      you did not go back and make the comparison is because in

24      laymen's terms you knew whose blood it was?

25  A.  It's consistent with him, yes.
```

1   Q.   It's consistent with Mr. Hill?

2   A.   Yes.

3   Q.   Okay.  So that's why you didn't make the comparison; is

4        that correct?

5   A.   Correct.

6   Q.   The blood on what you call E06?

7   A.   Yes.

8   Q.   Did you do that as well?

9   A.   Yes, I did.

10  Q.   And you didn't make a comparison with respect to Mr.

11       Samuel Dantzler, Senior?

12  A.   No, this DNA profile matches the DNA profile obtained from

13       Bernard Hill and the statistics were high enough to

14       support that, within a reasonable degree of scientific

15       certainty, it was Mr. Hill's DNA that was there.

16  Q.   In that blood?  It was his?

17  A.   Yes.

18  Q.   So you didn't see any reason to make any other comparison?

19  A.   Correct.

20  Q.   With regards to a grip swab that you received and you call

21       it E07?

22  A.   Yes.

23  Q.   Now do you -- Can you tell us exactly where that

24       particular swab came from?

25  A.   No, the swab was submitted to us, like I said before, it

```
 1        was submitted to us in a tube as a cutting.
 2   Q.   As a cutting?
 3   A.   Yes.
 4   Q.   A cutting from the grip?
 5   A.   Yes, that's what they -- the Michigan State Police
 6        described it as, swabs of a grip on the shaft.
 7   Q.   Of a golf club?
 8   A.   I wasn't for sure where it had come from.  It just said
 9        swabs on the grip on the shaft.
10   Q.   Okay.  That means that the golf club wasn't sent to your
11        office?
12   A.   No.
13   Q.   And you couldn't make your own samples?
14   A.   No, they submitted us a tube with cuttings in it.
15   Q.   So they submit it to you, samples that were taken here,
16        and it was mailed to you?
17   A.   Yes.
18   Q.   So the evidence wasn't mailed to you?
19   A.   Yes, we just received the swabs.
20   Q.   Okay.  And this particular comparison that you didn't have
21        any DNA sample or what purports to be the DNA of not too
22        many people at that time and that was in April and June of
23        this year; am I correct?
24   A.   We did not get a DNA profile from that sample?
25   Q.   In April?  Well, I'm asking you.
```

1    A.    From E07, no DNA profile was obtained.

2    Q.    Is that correct?

3    A.    Correct.

4    Q.    So does that mean that you made comparisons?

5    A.    To E07, no comparisons could be made because we were not

6          able to generate a DNA profile because there was no DNA

7          there.

8    Q.    Okay.  So what we're saying is that when you looked in

9          that particular swab that was sent to you, there was no

10         DNA in there?

11   A.    Correct.

12   Q.    Okay.  And then EQ3 -- EQ8, I'm sorry, or E08; is that --

13   A.    Zero.

14   Q.    E zero eight.  There was some DNA?

15   A.    Yes.

16   Q.    And it was at least two -- at least two different DNAs and

17         at lease one of those two was male?

18   A.    Correct.

19   Q.    Okay.  And once again, there was no comparison made with

20         respect to Samuel Dantzler, Senior?

21   A.    Correct.  There was not enough information there to make a

22         comparison with any of the samples that we had received.

23   Q.    Wait a minute.  In E08?

24   A.    Yes.  Due to the limited -- due to the possibility of

25         allelic dropout, there was not enough DNA there in that

1        sample to make a comparison.

2   Q.   The first thing that I'm going to ask you to do for me is

3        define allelic?

4             THE COURT:  And I'm going to first ask that she

5        spell allelic, A-L-L-E-L-I-C, for Mrs. Bauer.

6             WITNESS PRESTON:  Yes, A-L-L-E-L-I-C.

7   BY MR. KINNEY:

8   Q.   Now can you define it for us?

9   A.   Yes.  The -- Each number represents an allele.  So due to

10       the fact that there was not much DNA there, and there was

11       the possibility that DNA may have been there, it was just

12       below the level we could detect with our technology, no

13       comparison could be made between the alleles that we did

14       obtain, which are listed, as compared to the reference

15       samples.

16  Q.   Okay.  Well, did you not make a decision that with respect

17       to Pat Grunewald, Michael Dantzler, Sam Lamare Dantzler,

18       Omarrow Dantzler and Bernard Hill that they could not be

19       included or excluded?

20  A.   Correct.

21  Q.   You did make -- You did make that decision?

22  A.   Correct.

23  Q.   You can't include them and you can't exclude them?

24  A.   Correct.

25  Q.   But you didn't make a comparison at all with respect to

112

```
 1        Mr. Samuel Dantzler, Senior?

 2   A.   No, I did not make any comparisons.

 3   Q.   So once again now, out of all of the testing that was done

 4        by Bode Technology, that you did on behalf of Bode

 5        Technology, you can't tell us who had that hat on January

 6        the 16th of 2006?

 7   A.   No, I can't tell who had it on.  I can only test certain

 8        areas and generate DNA profiles from those areas.

 9             MR. KINNEY:  Thank you, Ms. Preston.

10             Thank you, your Honor.

11

12   RE-DIRECT EXAMINATION BY MR. HUTTING:

13   Q.   Can you ever tell who had the hat on at such and such a

14        date?  You can't tell that, period; can you?

15   A.   No, we cannot.

16   Q.   You can only tell us what your testing shows from the hat,

17        is that correct, or the items that you had?

18   A.   Correct.

19             MR. HUTTING:  Nothing further.  I thank Ms.

20        Preston for coming.

21             MR. KINNEY:  The same.  Nothing further.

22        Thanks, Ms. Preston, for coming.

23             THE COURT:  Ms. Preston, thank you for coming.

24        Nothing further.

25             WITNESS PRESTON:  Thank you.
```

113

1              THE COURT:  You may step down.  You're excused.

2        Where are you flying back to?

3              WITNESS PRESTON:  Washington, D.C.

4              THE COURT:  Have a good flight.

5              (At about 2:57 p.m., witness excused.)

6              COURT CLERK:  Raise your right hand, please?

7              Do you swear or affirm that the testimony you're

8        to give in the matter now pending before the Court will be

9        the truth, so help you, God?

10             WITNESS KAYE:  I do.

11                       NICOLE KAYE,

12       called as a witness at 2:57 p.m., having first been duly

13       sworn by the Clerk of the Court, was examined and

14       testified on her oath as follows:

15             COURT CLERK:  You may be seated.

16             THE COURT:  Please make yourself comfortable.

17       Pull that microphone, it's pliable, so adjust it and speak

18       loudly and clearly for the jury; okay?  Thank you very

19       much.

20             Mr. Hutting.

21             MR. HUTTING:  Thank you.

22             THE COURT:  You're welcome.

23

24       DIRECT EXAMINATION BY MR. HUTTING:

25       Q.  May we have your name, your occupation and your area of

1        expertise, please?

2   A.   Sure.  My name is Nicole Kaye and I am a DNA analyst.  I

3        work for the Metropolitan Police Department in Washington,

4        D.C., so my area of expertise is in DNA analysis.

5   Q.   Okay.  And how long have you been a DNA analyst for the

6        Metropolitan Police Department in Washington, D.C.?

7   A.   Just over three years.

8   Q.   Prior to being an analyst with the -- in your current job

9        where did you work?

10  A.   Prior to working with Metropolitan Police Department, I

11       worked at Bode Technology in Lorton, Virginia.

12  Q.   Okay.  And for how long did you work for Bode?

13  A.   Almost four years.

14  Q.   And what did you do for Bode when you worked for them?

15  A.   I was also a DNA analyst.

16  Q.   Okay.  How long have you been a DNA analyst, period?

17  A.   Since 2003.

18  Q.   So that's seven years, going on eight?

19  A.   Yes.

20  Q.   Okay.  All right.  Do you have any training or background

21       that assists you in doing this educational training or

22       background?

23  A.   Yes, I earned a Bachelor of Science Degree in micro-

24       biology from Clemson University in South Carolina and then

25       after graduation, began work at Orchid Cellmark which is a

115

1       private DNA testing lab in Germantown, Maryland.

2                   I received training while I was there.  After

3       leaving Orchid Cellmark, I began work at Bode Technology

4       and I also received training from Bode.  And then after

5       leaving Bode, I also received training from DC Police

6       Department.

7   Q.  Okay.  Have you done continuing education on top of all

8       that?

9   A.  I have.

10  Q.  Okay.  And did you bring with you here today a -- what's

11      known as a curriculum vitae?

12  A.  I did.

13                  PEOPLE'S EXHIBIT 33 MARKED

14                  FOR IDENTIFICATION

15  BY MR. HUTTING:

16  Q.  Okay.  Showing you what the court reporter has marked as

17      People's proposed exhibit number 33, can you identify that

18      for us, please?

19  A.  Yes, this is my CV.

20  Q.  Okay.  And it's approximately two full pages in length and

21      then there's a few lines on the third page; is that

22      correct?

23  A.  Yes.

24  Q.  Okay.  And does that go through and list all the training

25      and work that you've done since becoming -- since

```
 1        graduating in the field of microbiology?

 2   A.   Yes.

 3   Q.   Okay.  All right.  Have you ever testified in court

 4        before?

 5   A.   I have.

 6   Q.   About how many times prior to today?

 7   A.   Four.

 8   Q.   Have any of those ever been here in Michigan?

 9   A.   Yes.

10   Q.   How many?

11   A.   One.

12   Q.   Okay.  What other states have you testified in?

13   A.   I've also testified in the Superior Court of the District

14        of Columbia.

15   Q.   Okay.  So three times there and once here in Michigan?

16   A.   That's correct.

17   Q.   Okay.  Each time that you have come to offer your

18        qualifications as a DNA analyst in the field -- in the

19        field of DNA, have your qualifications as an expert been

20        accepted?

21   A.   Yes.

22   Q.   Have you even put together a publication?

23   A.   I have.  I co-authored an article that was published in a

24        newsletter for one of our manufacturers that does -- that

25        makes the amplification kits that we use in our DNA
```

```
 1        testing, and it was regarding a software program that they

 2        created to help in validation which is sort of experiments

 3        that you do as a lab starting out to make sure that the

 4        testing process that you're going to use is reliable.

 5                  MR. HUTTING:  Okay.  Your Honor, in terms of her

 6        qualifications to testify here as an expert, I'm going to

 7        submit her to Mr. Kinney for voir dire.

 8                  THE COURT:  Thank you, Mr. Hutting.

 9                  Mr. Kinney.

10

11   VOIR DIRE EXAMINATION BY MR. KINNEY:

12   Q.   You went to Clemson?

13   A.   I did.

14   Q.   Okay.  I'm going to irritate you right now because I went

15        to the University of South Carolina?

16   A.   Oh, no.

17   Q.   Go Gamecocks.  Go Gamecocks.

18                  MR. KINNEY:  I have no further questions, your

19        Honor.  I have no objection to her qualifications.

20                  THE COURT:  Didn't Michigan just beat Clemson in

21        the ACC Big Ten Challenge --

22                  MR. KINNEY:  Yes, they did.

23                  THE COURT:  -- in basketball and get to the NCAA

24        -- in the NCAA tournaments two years ago?

25                  Do you know?
```

118

```
1                    WITNESS KAYE:  I don't know.

2                    MR. HUTTING:  I think it's been a while since

3         Michigan basketball has been in the NCAA tournament,

4         Judge.

5                    THE COURT:  Two years.

6                    MR. HUTTING:  Two years.  The Spartans are

7         different.

8                    THE COURT:  Well, having attended Michigan State

9         and Michigan, I kind of root for both teams.

10                   Ma'am, I have a question for you.

11                   WITNESS KAYE:  Sure.

12                   THE COURT:  What Michigan court did you testify

13        in front of?

14                   WITNESS KAYE:  It was Wayne County.  It was --

15        It was in the courthouse that's across the street.  I

16        don't know what --

17                   THE COURT:  The district court?

18                   WITNESS KAYE:  Yes.

19                   THE COURT:  36th District Court?

20                   WITNESS KAYE:  I believe so, yes.

21                   THE COURT:  Remember the judge?

22                   WITNESS KAYE:  I don't remember the judge.

23                   THE COURT:  You don't remember the judge?

24                   WITNESS KAYE:  No, I don't.

25                   THE COURT:  Go ahead, Mr. Hutting.
```

119

```
 1                    MR. HUTTING:  Do you remember the prosecutor?

 2                    WITNESS KAYE:  I believe it was Angela

 3         Povilaitis.

 4                    MR. HUTTING:  May I proceed?

 5                    THE COURT:  It was a 36th District Court judge.

 6         I understand.  Go ahead.

 7

 8    DIRECT EXAMINATION BY MR. HUTTING (Continued):

 9    Q.   Let's go back to June 2007.  Where were you working as a

10         DNA analyst then?

11    A.   I was at Bode Technology.

12    Q.   Okay.  Did you at Bode Technology ultimately receive a

13         cutting from the hat rim from the Detroit Police

14         Department to do some work on?

15    A.   Yes, I did.

16    Q.   Okay.  So you were the one that actually did the first

17         work on the cutting from this hat?

18    A.   I believe so, yes.

19    Q.   Okay.  All right.  What did you do then with that initial

20         cutting that you got from this hat?

21    A.   I performed DNA analysis on that cutting.

22    Q.   Okay.  Tell us what you did with it.

23    A.   So DNA analysis is basically a four-step procedure.  So I

24         started with DNA extraction which is a process in which

25         the DNA in a sample is separated from the other cellular
```

1     material that could be in that sample.  So after

2     extraction, I end up with a tube of purified DNA

3     potentially.

4              Following extraction, I determine how much DNA I

5     have in the sample, which is called quantitation.  After

6     quantitation, I amplify the DNA or I make many copies of

7     the pieces of DNA that are there.

8              Following amplification, it's a step known as

9     separation and detection.  So after the copies of DNA are

10    made, they're separated on an instrument and that

11    instrument also detects the pieces of DNA that are

12    present.

13             And then I eventually get to a point where I can

14    analyze that data.

15  Q.  Okay.  And did you do that in this case?

16  A.  I did.

17  Q.  And did you ultimately write a report?

18  A.  I did.

19  Q.  Okay.  Did you have also reference samples to compare

20    against the hat, against the cutting that you made in the

21    DNA profile that you got from the hat?

22  A.  I did have reference samples, yes.

23  Q.  Okay.  Those reference samples were sent to you ultimately

24    by the Detroit Police Department?

25  A.  That's correct.

1  Q.   Okay.  And what reference samples did you have in June of

2       2007 to make the comparison against?

3  A.   May I refer to my notes, please?

4            MR. HUTTING:  Yes.

5            THE COURT:  Sure.

6            MR. HUTTING:  Far as I'm concerned.

7            MR. KINNEY:  No objection.

8  A.   I received known samples from Patrick Grunewald and

9       Bernard Hill.

10 BY MR. HUTTING:

11 Q.   Okay.  And the reference sample that you got from Bernard

12      Hill was more than one; is that correct?  Or one?

13 A.   Yes.  That's the description based on the description from

14      the submitting agency, yes.

15 Q.   Okay.  All right.  And you got a buccal swab, or the

16      reference on Mr. Grunewald was a buccal swab; right?

17 A.   Yes.

18 Q.   Okay.  Now did you, after you performed all your analysis,

19      I mean you wrote a report?

20 A.   I did.

21 Q.   Did you also make out a chart?

22 A.   I did.

23 Q.   Okay.  All right.  Let me show you -- I'll get this

24      marked.

25            PEOPLE'S EXHIBIT 34 MARKED

```
 1                    FOR IDENTIFICATION

 2   BY MR. HUTTING:

 3   Q.   Showing you People's proposed exhibit number 34, Ms. Kaye,

 4        can you identify People's proposed exhibit number 34,

 5        please?

 6   A.   Yes, this is table one and table two from my DNA report

 7        that I prepared.

 8   Q.   Okay.  And is this the chart that you made out also?

 9   A.   It is.

10   Q.   Okay.  Does this accurately describe, in terms of numbers

11        and statements, the findings that you had when you

12        compared the known samples of DNA from Patrick Grunewald

13        and Bernard Hill against the cutting and the DNA that you

14        extracted from the cutting on the hat?

15   A.   Yes.

16             MR. HUTTING:  Okay.  Move to admit People's

17        proposed 34?

18             MR. KINNEY:  No objection, your Honor.

19             THE COURT:  Offered and received.

20             MR. HUTTING:  Okay.

21             PEOPLE'S EXHIBIT 34 ADMITTED

22             INTO EVIDENCE

23             MR. HUTTING:  Again, I believe that we have one

24        for the Court.

25   BY MR. HUTTING:
```

```
 1    Q.    Okay.  If we look at your chart, let's start -- Can you
 2          see it also?
 3    A.    I can, yes.
 4    Q.    Okay.  Let's start from the left here.  You have an item
 5          that's described in the end as EO1a1.  Could you tell me
 6          what that is, please?
 7    A.    That is the DNA profile that I obtained from the hat
 8          cutting.
 9    Q.    Okay.  So if we mark that DNA profile from the hat
10          cutting, that would be accurate?
11    A.    Yes.
12    Q.    Okay.  Let's do it.  Let's move to the middle chart.  What
13          is that please?
14    A.    That is the DNA profile that I obtained from the reference
15          sample from Patrick Grunewald.
16    Q.    Okay.  That's designated R02a1; right?
17    A.    That's correct.
18    Q.    Okay.  Let's put Ref Sam/Pat Grunewald; how's that?
19    A.    Sure.
20    Q.    And then finally over here on the far right, as you look
21          at it, where it's designated R03a1, what is that, please?
22    A.    That is the DNA profile that I obtained from Bernard
23          Hill's reference.
24    Q.    Okay.  And we'll mark that Ref Sam/Bernard Hill.
25                     Okay.  All right.  Let's cut to the chase:  What
```

```
 1          are your ultimate conclusions about the reference sample

 2          from Bernard Hill against the cutting -- original cutting

 3          that you took?

 4    A.    My results from the cutting shown here --

 5                MR. KINNEY:  I'm only objecting to the cutting

 6          that she took.  I don't think that was the testimony.

 7                MR. HUTTING:  She -- Yeah.

 8    BY MR. HUTTING:

 9    Q.    This is the first cutting that you got from the Detroit

10          Police Department?

11    A.    That's correct.

12    Q.    All right.  And you analyzed that; is that correct?

13    A.    I did, yes.

14    Q.    Okay.  What are your results of that first cutting that

15          you got compared to Bernard Hill, known reference sample.

16    A.    I determined that a mixture DNA profile was obtained from

17          the hat and it includes a male contributor and then I

18          further concluded that the individual associated with

19          Bernard Hill's reference sample cannot be excluded as a

20          possible contributor to that mixture.

21    Q.    Why do you say he cannot be excluded as a possible

22          contributor to that mixture?

23    A.    Because at all of the locations where I felt confident

24          that I was obtaining all of the DNA results that were

25          present at that location, Mr. Hill's -- the alleles from
```

125

```
 1        his known sample are also in the DNA profile in the hat.

 2   Q.   How many of the 13 loci did that occur at?

 3   A.   Nine.

 4   Q.   Nine out of the 13.  Which ones are they on here?  And I'm

 5        going to put a red mark next to it.

 6   A.   The are the first locus which is D3.

 7   Q.   Okay.

 8   A.   The second, vWA.

 9   Q.   Okay.

10   A.   FGA.

11   Q.   Okay.

12   A.   D8.

13   Q.   D8S1?

14   A.   Yes.

15   Q.   Okay.

16   A.   D5.

17   Q.   Okay.  That's where it's 12, 12?  Is that the one?

18   A.   Correct.

19   Q.   Okay.

20   A.   D13.

21   Q.   Okay.

22   A.   TH01.

23   Q.   TH01?

24   A.   Yes.

25   Q.   T-H-0-1?
```

1    A.    T-H-0-1.

2    Q.    Okay.

3    A.    TPOX.

4    Q.    TPOX.

5    A.    And CFF.

6    Q.    Okay.  Let me just go back to D5 and ask you this:  In the

7          sample from the cutting, there's a 12, 13; right?

8    A.    Yes.

9    Q.    Okay.  Over here with Bernard Hill, there's a 12, 12?

10   A.    Yes.

11   Q.    Okay.  Why do you say that that's Bernard Hill there?

12   A.    I'm not saying that that's Bernard Hill.

13   Q.    Why do you say?

14   A.    I'm saying that because the DNA profile from Bernard Hill

15         shows the twelve allele there, and there's a twelve

16         showing in the DNA profile from the hat that I cannot

17         exclude him from that.

18   Q.    Okay.  All right.  What conclusions did you draw

19         concerning Bernard Hill in terms of your statistics?

20   A.    So I performed a combined probability of inclusion.

21   Q.    Okay.

22   A.    As well as a combined probability of exclusion.

23   Q.    Okay.

24   A.    The combined probability of inclusion shows the proportion

25         of potential donors in the population that could have

1       contributed their DNA to that mixture.

2    Q.   Okay.  Is that this line right here?

3    A.   It is.

4    Q.   Okay.  All right.

5    A.   The combined probability of exclusion estimates the

6         percentage of the population that is excluded as a

7         potential donor to that mixture.

8    Q.   And that would be the second line over here?

9    A.   Correct.

10   Q.   The further line to the right.  All right.  In terms of

11        Patrick Grunewald what conclusion did you reach in the

12        reference sample that you got?

13   A.   I determined that Patrick Grunewald can be excluded as a

14        contributor.

15   Q.   So he was excluded?

16   A.   Yes.

17   Q.   And why is that?  Where would you point on here, to this

18        middle column, where the reference sample of Patrick

19        Grunewald is, what are the ones that exclude Mr.

20        Grunewald, comparing that with the reference sample?

21   A.   If you look at the first location, D3.

22   Q.   Yep.

23   A.   In Patrick Grunewald's known sample, there's a 14, 16.

24        There's no 14 in the DNA profile obtained from the hat?

25   Q.   Okay.  I'm going to mark EX there.  Go ahead.

128

```
 1   A.   If I look at D8.

 2   Q.   D8?

 3   A.   It's right underneath the X, Y's.

 4   Q.   Oh, yeah.  Okay.  All right.

 5   A.   Yeah.  There is no ten present in the DNA profile from the

 6        hat.

 7   Q.   All right.  I'll mark an EX there.

 8   A.   The next one, D21, the known samples are 28, 30, and the

 9        profile obtained from the hat is a 29.

10   Q.   Okay.

11   A.   The next one D18, the known sample is 16, 19.  There's no

12        19 in the DNA profile obtained from the hat from that

13        location.

14   Q.   We'll mark X's in those two.  Okay.

15   A.   At D13?

16   Q.   Okay.

17   A.   There's no nine allele in the DNA profile from the hat.

18   Q.   Mark an EX there.

19   A.   At D16, the known sample was an 11, 13, and the profile

20        obtained from the hat is a 10, 12.

21   Q.   Mark an EX there.

22   A.   The next location, THO1, there is no six allele in the DNA

23        profile obtained from the hat.

24   Q.   Marking the X there.

25   A.   The next one, TPOX, there's no eight allele present in the
```

```
 1          DNA profile from the hat.

 2    Q.    I'll put an EX there, too.  And that's it?

 3    A.    That is.

 4    Q.    Okay.  So there's just a whole number of loci that

 5          excluded Patrick Grunewald from being the contributor to

 6          the cutting from the hat; is that correct?

 7    A.    Yes.

 8    Q.    Okay, all right.

 9                MR. HUTTING:  Thank you very much.  Submit for

10          cross.

11                THE COURT:  Mr. Kinney.

12                MR. KINNEY:  Thank you.

13

14    CROSS EXAMINATION BY MR. KINNEY:

15    Q.    First of all, good afternoon.

16    A.    Good afternoon.

17    Q.    This work was done -- Okay.  I see in your curriculum, the

18          CV's got Nicole Kaye, so congratulations for being Nicole

19          Yannacone; okay?

20                What work did you do with regards to Mr. Samuel

21          Lee Dantzler, Senior?  Did you have any work to do with

22          respect to a sample from him?

23    A.    No.

24    Q.    Okay.  And you work for the police department now?

25    A.    Yes, Metropolitan Police Department.
```

130

1    Q.    Metropolitan Washington?

2    A.    Yes, D.C.

3    Q.    Okay.  And before then, you worked for Bode?

4    A.    That's correct.

5    Q.    Okay.  And are you being paid for today?

6    A.    No, I'm not.

7    Q.    You have to pay your own way here?

8    A.    I did not pay for my travel, no.

9    Q.    Okay.  But Bode is not paying you for -- This is -- Bode

10         considers this part of your salary when you were working

11         for Bode?

12   A.    That's correct.

13   Q.    Okay.  Do you know what kind of contract Bode Technology

14         had with the Detroit Police Department?

15   A.    I don't know the extent of the contract.

16   Q.    In terms of payment?

17   A.    No.

18   Q.    Do you know if there's a contract with the Michigan State

19         Police Department back in 2008?

20   A.    I don't know the specifics of the contract that Bode had.

21   Q.    Okay.  Were you paid salary-wise back in 2008?

22   A.    Yes, I was.

23   Q.    And how much was your salary back in 2008?

24   A.    Actually in 2008, I was employed by the Metropolitan

25         Police Department.

1   Q.   And you were doing this at Bode?

2   A.   This was 2007.

3   Q.   I'm sorry, 2007.  2007, do you remember?

4   A.   I don't recall my salary from then.

5   Q.   From 2007?  It was definitely more than the

6        court-appointed fee of 150 dollars.

7   A.   It was more than 150 dollars, yes.

8   Q.   Okay.  Have you ever worked for a Defendant in a

9        court-appointed situation?

10  A.   I've been called by the defense to testify, yes.

11  Q.   In a court-appointed situation where you were being paid

12       by the court because the Defendant didn't have enough

13       money to retain you?

14  A.   I don't believe I've worked a situation quite like that,

15       no.

16  Q.   Okay.

17            MR. KINNEY:  I've got nothing further, your

18       Honor.  Thank you.

19

20  RE-DIRECT EXAMINATION BY MR. HUTTING:

21  Q.   So part of your testimony that you've given, in the past,

22       you've been called by the defense to testify?

23  A.   I have, yes.

24  Q.   And you came to court and testified?

25  A.   I never actually had to go to court but I have been called

132

```
 1       by defense.

 2   Q.  Okay.  What did you have to do in that situation where you

 3       were called by defense?

 4   A.  I had attorney/witness conferences, pretrial preparation

 5       with the attorney, but it ultimately never ended up going

 6       to trial.

 7   Q.  Okay.  And when you were called by the defense did you say

 8       oh, no, I'm not going to testify or tell you what I know

 9       or what I did?  Or did you cooperate with them to the best

10       of your ability?

11   A.  I cooperated.

12   Q.  Okay.  All right.  You indicate that you're working for

13       the Metropolitan Police Department today?

14   A.  I am.

15   Q.  Okay.  So you said you're not being paid today.  What did

16       you mean by that?

17   A.  I'm being paid my regular salary from the DC Police

18       Department.  I'm not obtaining any expert fee or anything

19       like that from Bode or Michigan.

20   Q.  Okay.  And in order to come here today and to testify did

21       you have to obtain permission ultimately from your

22       superiors in Washington, D.C., to do that?

23   A.  I did.

24   Q.  And they gave you permission to come here and testify to

25       what you did and what you know in this case; is that
```

```
 1      correct?

 2  A.  That's correct.

 3  Q.  Okay.  Because you're being paid by the Metropolitan

 4      Police Department does that change your testimony in any

 5      way?

 6  A.  No.

 7  Q.  It is what it is?

 8  A.  That's right.

 9              MR. HUTTING:  Thank you very much.

10              THE COURT:  Mr. Kinney.

11              MR. KINNEY:  No, nothing further, your Honor.

12      Thank you.

13              THE COURT:  May Ms. Kaye step down and be

14      excused?

15              MR. HUTTING:  Yes, she can.

16              MR. KINNEY:  Only if you say so, your Honor.

17              MR. HUTTING:  On behalf of the People, yes, I

18      don't have any objection to that.

19              THE COURT:  Have a safe trip back.

20              THE WITNESS:  Thank you.

21              THE COURT:  You're welcome.

22              MR. HUTTING:  Want to approach?

23              THE COURT:  Yes.

24              (At about 3:25 p.m., brief sidebar;

25              At about 3:26 p.m., back on the record.)
```

```
 1                    THE COURT:  Mr. Hutting, after a side bar
 2        conference, it's my understanding the People have one more
 3        witness; is that correct?
 4                    MR. HUTTING:  Yes.
 5                    THE COURT:  And we cannot conclude that witness
 6        today; correct?
 7                    MR. HUTTING:  Probably not, no.
 8                    THE COURT:  Okay.  Ladies and gentlemen, we've
 9        concluded for today.  The lawyers have told me side bar,
10        and keep in mind that sometimes cases go a little longer
11        than what's expected or anticipated, but I think there's a
12        good chance we'll be completing the proofs tomorrow; is
13        that correct, gentlemen?
14                    MR. HUTTING:  Certainly hope so, Judge.
15                    MR. KINNEY:  Yes, sir.
16                    THE COURT:  Okay.  So I thought I'd impart that
17        to you.  So --
18                    You have given me jury instructions and verdict
19        forms to review, gentlemen; is that right?
20                    MR. HUTTING:  Jury instructions.  We'll have a
21        verdict form in the morning for you.
22                    MR. KINNEY:  Yes.
23                    THE COURT:  Okay, thank you much.
24                    So good night.  Don't discuss the case.  Wear
25        your badges.  I'll see you tomorrow morning at 8:55.
```

```
 1              DEPUTY SHERIFF:  All rise for the jury.

 2              (At about 3:29 p.m., jury panel excused.)

 3              DEPUTY SHERIFF:  You may be seated.

 4          MR. KINNEY:  Your Honor, I know we don't have

 5     time to argue right now, but I just wanted to give the

 6     Court and the -- Mr. Hutting, the cases that I'll be

 7     relying on whenever you want to hear the argument.

 8              THE COURT:  Do you have them for me?

 9          MR. KINNEY:  I'll have copies of them for you in

10     the morning but I just wanted to get a cite.  I'm sorry, I

11     should have had them right now.  I'm upset about that.

12              THE COURT:  You know, Mr. Kinney, I don't know

13     with the holiday schedule and my docket and we're running

14     late on this trial, I don't know how new these cases are

15     that you're going to present me with.  I'm preparing for a

16     Wednesday and Thursday docket right now.  I'm taking

17     things home that were just presented to me today.

18          MR. KINNEY:  I saw that.

19              THE COURT:  I have media coming in.

20          MR. KINNEY:  I'm certain you have already read

21     these cases but it just talks about the destruction of

22     evidence that may be exculpatory which I was arguing

23     before.

24              THE COURT:  Sure.

25          MR. KINNEY:  The lead case Moldowan versus City
```

136

1    of Warren found at 578 F3rd 351.

2         THE COURT:  Well, have them for me tomorrow

3    because I'm deluged with stuff to take home tonight; okay?

4         MR. KINNEY:  Yes, sir.

5         THE COURT:  And I'll get them on my lunch and

6    take them home or whatever I have to do.  If you can

7    present me with a copy, that will facilitate my review.

8         MR. KINNEY:  I'll bring you the page number.

9    I'm talking about 385.

10         THE COURT:  Whatever you'd like to present me

11    with, I'll read.  Cancel my lunch plans tomorrow, I'll

12    read cases.

13         MR. KINNEY:  You shouldn't have to do any of

14    that.  We should be through by that time.

15         THE COURT:  If I'm familiar with the cases, that

16    will facilitate things.  Present me with whatever you

17    think I should read, I'll be happy to do it.

18         MR. KINNEY:  Thank you.  We'll have it in the

19    morning.

20         THE COURT:  In response to Mr. Dantzler's

21    remarks from earlier:  Mr. Dantzler, I hope I have your

22    attention here since you're the one that raised the issue;

23    okay?

24         On November 24th, 2010, first of all the history

25    of this case, this case is among one of the oldest cases

```
 1        on my docket.  There's been multiple delays so that there

 2        could be DNA testing.  I always try to assist both sides

 3        however I can; okay?  Whether it's an investigator, order

 4        for independent expert, DNA expert which I signed November

 5        24th, 2010 in this case, after we had had months ago

 6        discussions about DNA testing and everything else, a

 7        request was made by Counsel for the Defendant, Mr. Kinney,

 8        who is always very thorough and very professional to have

 9        Ann E. Chamberlain, an independent DNA expert, appointed

10        regarding the above-captioned case, case 10-3521-01,

11        People versus Samuel Dantzler.

12               It was hereby ordered that Ann E. Chamberlain,

13        an independent DNA expert, shall be appointed to the

14        above-captioned case.  It is further ordered that Ann E.

15        Chamberlain, the independent DNA expert, should be

16        compensated by the state as per their fee schedule for

17        such expert services due to Defendant's indigency; okay?

18               I just wanted to put that into the record.  And

19        before that, I had indicated to both sides let me know how

20        I can be of assistance, I'm willing to assist both sides

21        in any way you deem constructive.

22               So that's the history of the case.  And again

23        this case is well over time standard and the projection

24        for the case is beyond what you gentlemen projected.  But

25        as I indicated at the outset, there'd be no rush to
```

```
 1      judgment, nor has there been, we'll take as much time a
 2      necessary to complete this trial.
 3              Mr. Hutting, one more witness remains for the
 4      People?
 5              MR. HUTTING:  Yes, your Honor.
 6              THE COURT:  And who is that?
 7              MR. HUTTING:  A Sergeant Clark.  I believe that
 8      there'll be -- I'm hoping there'll be three stipulations
 9      that will obviate the need for calling three more
10      witnesses.
11              THE COURT:  Mr. Kinney, have you discussed the
12      possible waivers?  Is that because their testimony would
13      be deemed cumulative?
14              MR. HUTTING:  No, it won't be cumulative, Judge,
15      it's additional.  We're talking about the fingerprint
16      person, Marcia McCleary who analyzed the fingerprints that
17      Stinson took from the scene and compared them against a
18      whole bunch of people.  We have a number of reports from
19      her.  Then we have Mary Gross who got the golf clubs and
20      those items and put -- and superglued them for
21      fingerprints.  And then we have the person from MSP
22      firearms who analyzed two casings that were found at the
23      scene and one more bullet.  And we have his report.  So
24      I'm hoping to get stipulations on those three things.
25              THE COURT:  Mr. Kinney?
```

139

```
 1                  MR. KINNEY:  I think we have them on those three

 2      things and a stipulation with respect to the DNA of Mr.

 3      Harry Henderson.

 4                  MR. HUTTING:  Sure.

 5                  MR. KINNEY:  That was found on one of the golf

 6      clubs.

 7                  MR. HUTTING:  Sure.  We need copies of that

 8      report, a clean copy of that report.

 9                  MR. KINNEY:  I don't have a clean copy.  I

10      got -- You sent me one copy.  As I was reading it, I was

11      marking it as I was reading it.

12                  MR. HUTTING:  Is there writing on it or just

13      highlighting on it?

14                  MS. O'ROURKE:  It's not a report, it's your

15      memorandum.

16                  MR. HUTTING:  If there's just highlighting on

17      it --

18                  MR. KINNEY:  All we have is a memorandum, not a

19      report.

20                  MR. HUTTING:  I don't know what I did with my --

21      the other copy.  So we'll xerox that.  I don't have any

22      problem with putting that in; okay?

23                  I'll xerox that.  Hopefully it will wash out

24      most of the highlighting and I don't have any problem

25      stipulating to that and putting that in as an exhibit.
```

1                    MR. KINNEY:  But -- Okay.  We can work it out.

2          The thing is I don't want Mr. Hutting's memorandum to be

3          the exhibit.  I was looking for the -- I thought she wrote

4          you a letter, Ms. Katherine Maggie (phonetic).

5                    MR. HUTTING:  All I have --

6                    MR. KINNEY:  This is all you have?

7                    MR. HUTTING:  But I want the fact that the guy

8          is in prison and has been in prison.

9                    MR. KINNEY:  Yes, I want that, too.  But I want

10         the report that -- where there was a DNA mixture off of

11         the golf club grips.

12                    THE COURT:  Well, gentlemen, discuss any issues

13         that will streamline the trial process; okay?

14                    MR. HUTTING:  Why don't we put both of them

15         together?

16                    THE COURT:  You've done a good job cooperating

17         where you can and I appreciate that.

18                    Are the jury instructions pretty much in order

19         then?

20                    MR. KINNEY:  That's what we're talking about.

21         The cases that I'm going to bring to you is for a jury

22         instruction with respect to that.

23                    MR. HUTTING:  Put the two things together and

24         admit them.

25                    THE COURT:  So the next item of business will be

141

```
 1      calling Mr. Clark; is that it?

 2              MR. KINNEY:  Yes.

 3              THE COURT:  And if we need to discuss any

 4      issues, we'll do it after the People rest?

 5              MR. KINNEY:  Yes.

 6              THE COURT:  Okay, that's fine.  I'll see you

 7      tomorrow.

 8              MR. KINNEY:  Okay.

 9              MR. HUTTING:  Okay.

10              THE COURT:  Everyone be on time please, ready to

11      go at 9:00.

12              (At about 3:43 p.m., proceedings concluded.)

13                              *     *     *

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    C E R T I F I C A T E

2

3    STATE OF MICHIGAN)

4                    )

5    COUNTY OF WAYNE  )

6

7

8        I, Becky L. Bauer, Certified Court Reporter of the

9    Third Judicial Circuit Court, Criminal Division, Wayne

10   County, State of Michigan, do hereby certify that the

11   foregoing 145 pages comprise a full, true and correct

12   transcript of the proceedings and testimony taken in the

13   matter of the People of the State of Michigan versus

14   SAMUEL LEE DANTZLER, on December 20, 2010.

15

16

17

18                    _____

19                    Becky L. Bauer, CSR-3326

20                    Official Court Reporter

21

22

23   Date: _____

24

25
```

143

1                    INDEX TO EXAMINATIONS

2

3     Witness                                      Page

4

5     P.O. DEBORAH STINSON

6     DIRECT EXAMINATION BY MR. HUTTING:            5

7     CROSS EXAMINATION BY MR. KINNEY:              9

8     RE-DIRECT EXAMINATION BY MR. HUTTING:        11

9     REBECCA PRESTON

10    DIRECT EXAMINATION BY MR. HUTTING:           13

11    VOIR DIRE EXAMINATION BY MR. KINNEY:         22

12    DIRECT EXAMINATION BY MR. HUTTING

13    (Continued):                                 28

14    CROSS EXAMINATION BY MR. KINNEY:             75

15    RE-DIRECT EXAMINATION BY MR. HUTTING:       113

16    NICOLE KAYE

17    DIRECT EXAMINATION BY MR. HUTTING:          114

18    VOIR DIRE EXAMINATION BY MR. KINNEY:        118

19    DIRECT EXAMINATION BY MR. HUTTING

20    (Continued):                                120

21    CROSS EXAMINATION BY MR. KINNEY:            130

22    RE-DIRECT EXAMINATION BY MR. HUTTING:       132

23

24                    (Index continued on Page 145.)

25

```
1                        INDEX TO EXHIBITS

2

3    Exhibit                                  Page

4

5       PEOPLE'S EXHIBIT 31 MARKED            21

6       PEOPLE'S EXHIBIT 32 MARKED            39

7       PEOPLE'S EXHIBIT 31 ADMITTED          40

8       PEOPLE'S EXHIBIT 32 ADMITTED          40

9       DEFENDANT'S EXHIBIT B MARKED          91

10      DEFENDANT'S EXHIBIT B ADMITTED        91

11      PEOPLE'S EXHIBIT 33 MARKED            116

12      PEOPLE'S EXHIBIT 34 MARKED            122

13      PEOPLE'S EXHIBIT 34 ADMITTED          123

14

15

16

17

18

19

20

21

22

23

24

25
```