```
 1                        STATE OF MICHIGAN

 2            THIRD JUDICIAL CIRCUIT COURT - WAYNE COUNTY

 3

 4      THE PEOPLE OF THE STATE OF MICHIGAN,

 5

 6      vs.                                 Case No. 10-3521

 7

 8      SAMUEL LEE DANTZLER,

 9                    Defendant.

10                                          /

11

12                           JURY TRIAL

13         BEFORE THE HONORABLE GREGORY D. BILL, CIRCUIT JUDGE

14         701 Frank Murphy Hall of Justice, 1441 St. Antoine,

15              Detroit, Michigan - December 21, 2010

16      APPEARANCES:

17      For the People:        MR. AUGUSTUS W. HUTTING   P24839
                               MS. ANDREA LYNN HUTTING   P68606
18                             Wayne County Prosecutors Office
                               1441 St. Antoine
19                             Detroit, MI  48226
                               (313) 224-5777
20
        For the Defendant:     MR. ROBERT F. KINNEY, III  P35842
21                             MS. ALANNA P. O'ROURKE  P74210
                               Attorney at Law
22                             645 Griswold, Suite 1220
                               Detroit, MI  48226
23                             (313) 963-5310

24      REPORTED BY:           Becky L. Bauer (CSR-3326)
                               Certified Shorthand Reporter
25                             (313) 967-6928
```

```
 1          COMPUTER GENERATED INDEX AT THE END OF TRANSCRIPT

 2                    Detroit, Michigan

 3                    December 21, 2010

 4                    At or about 9:59 a.m.

 5                    (Court, Counsel and Defendant present.)

 6                         *     *     *

 7               COURT CLERK:  People versus Samuel Lee Dantzler,

 8     Circuit Court docket number 10-3521, jury trial in

 9     progress.

10               MR. HUTTING:  Auggie Hutting on behalf of the

11     People.

12               MR. KINNEY:  Good morning, your Honor.  Robert

13     Kinney and Alanna O'Rourke on behalf of Mr. Dantzler,

14     Senior.

15               THE COURT:  Good morning.

16               MR. KINNEY:  I'll tender this to the Court.  I

17     will have to make some copies if it's going to be

18     admitted.  But we found that last night and I showed it

19     to -- I've showed it to Mr. Hutting.

20               MR. HUTTING:  Mr. Kinney did show that to me

21     this morning; okay?  But this is the total contract.  It

22     doesn't have anything to do with our particular case.  And

23     what I would suggest to the Court is this:  The Court has

24     let in as an exhibit the one bill, that one bill on it has

25     reference --
```

1                    THE COURT:  Without objection from the People.

2                    MR. HUTTING:  Right, right, I'm not objecting to

3        that, okay, because that's the bill in this particular

4        case for the extra work that we had done.

5                    THE COURT:  Can this wait till we go to our next

6        witness?

7                    MR. HUTTING:  Sure.

8                    THE COURT:  So I have a chance to review it.

9                    MR. KINNEY:  Yes, your Honor.

10                    THE COURT:  All right.

11                    MR. HUTTING:  Sure.

12                    THE COURT:  All right.  Why don't we bring in

13        the jury?  We're off to a late start; okay?

14                    MR. KINNEY:  We're going to get to the jury

15        instructions and all of that?

16                    THE COURT:  Yes.  Okay.  Why don't we bring in

17        the jury?  Did Brenda call it?

18                    COURT CLERK:  Yes, I did.

19                    THE COURT:  All right.  Bring in the jurors.

20                    DEPUTY SHERIFF:  All rise for the jury.

21                    Please come out and take your seats.

22                    (At about 10:02 a.m., jury panel seated.)

23                    DEPUTY SHERIFF:  Please be seated.  Court is now

24        in session, the Honorable Gregory Bill presiding.

25                    THE COURT:  Good morning, ladies and gentlemen.

1              JURY PANEL:  Good morning.

2              THE COURT:  Ladies and gentlemen, we're off to a

3      late start this morning, which has occurred on and off.

4      As a courtesy to various people involved in the trial,

5      this morning -- as you left, one minute after you left, I

6      neglected to tell you I had two doctors appointments this

7      morning, so -- and you were already out the door.  So I

8      went down in the judges' elevator trying to cut you off

9      and I couldn't reach you to tell you that I'd be a little

10     late this morning.  I was there early, waiting, and that's

11     why we're off to a late start this morning.  It's all on

12     me this morning, okay, and I'm sorry.  We'll make it up in

13     the air, as the pilots tell us at Metro airport, but

14     there'll be no rush to judgment.

15             Mr. Hutting.

16             MR. HUTTING:  Yes, your Honor.  I'll call my

17     last -- what I believe to be our last live witness,

18     Sergeant Charles Clark.

19             COURT CLERK:  Do you swear or affirm that the

20     testimony you're about to give in the matter now pending

21     before this Court will be the truth, so help you, God?

22             WITNESS CLARK:  I do.

23                 SERGEANT CHARLES CLARK,

24     called as a witness at 10:03 a.m., having first been duly

25     sworn by the Clerk of the Court, was examined and

 1     testified on his oath as follows:

 2             THE COURT:  Good morning.  You know the routine.

 3             WITNESS CLARK:  Good morning.

 4         MR. HUTTING:  Judge, I believe that before I

 5     start taking testimony from Sergeant Clark, the Defense

 6     and I have a number of stipulations and exhibits that we

 7     are going to admit which will significantly cut down on

 8     the necessity of calling additional witnesses.

 9             THE COURT:  And this is something we discussed

10     last night long after the jury had left, a number of

11     issues; correct, gentlemen?

12         MR. HUTTING:  Yes, your Honor.

13         MR. KINNEY:  Yes, Judge.

14             THE COURT:  And I've been provided some other

15     documents to review regarding some other issues we'll

16     discuss at a later time; correct, gentlemen?

17         MR. KINNEY:  Yes, your Honor.

18         MR. HUTTING:  Yes, your Honor.

19             THE COURT:  Just so the jury knows what goes on

20     in their absence.  Go ahead.

21         MR. HUTTING:  Okay.  The first issue involves

22     the testimony of Police Officer Mary Gross, who is an

23     evidence tech assigned to the Laser Unit with the Detroit

24     Police Department, and it involves People's Exhibit Number

25     37.  And it lists the work that Ms. Gross did in this

1       case.

2               And what she did is that she lasered for

3       fingerprints by using the Superglue Fuming Rhodamine 6G

4       and examining with an alternate light source the golf club

5       head, shaft, the two spent casings and a second golf club

6       shaft that were taken from the scene.  She was looking for

7       fingerprints.

8               And the results of the treated items were

9       negative and the casings were ultimately turned over to

10      the Firearms Unit.  And that's reflected in her report

11      here in People's Exhibit Number 37.

12              MR. KINNEY:  No objections to Exhibit Number 37,

13      your Honor.

14              THE COURT:  Offered and received.

15              MR. HUTTING:  All right.

16              PEOPLE'S EXHIBIT 37 ADMITTED

17              INTO EVIDENCE

18              MR. HUTTING:  The next exhibit is the work that

19      was done by Ms. Marcia McCleary, who is a civilian

20      employee of the Detroit Police Department and a latent

21      print expert.

22              Ms. McCleary, if she were called here to

23      testify, would say that the fingerprint lifts that Officer

24      Deborah Stinson took from the scene at West Seven Mile

25      were turned over to her, that they were good fingerprint

```
 1          lifts and that she examined those fingerprints that were

 2          on the lifts and she compared it against a number of

 3          people.  One was Samuel Dantzler, Senior; a Michael

 4          Dantzler; Rodney Turner; Bernard Hill; Omar Dantzler;

 5          Kenneth Matthews; Patrick Grunewald; Nikitta McKenzie;

 6          Samuel Dantzler, Junior; and Michael Dantzler.

 7                  All those prints were -- the latent prints were

 8          compared against the known fingerprints of those persons

 9          and the results were negative; that she was not able to --

10          that that was not their fingerprints on the lifts that

11          were turned over to her.  And that's reflected in People's

12          Exhibit Number 38.

13                  MR. KINNEY:  No objection to Exhibit 38, your

14          Honor.

15                  THE COURT:  Offered and received.

16                  MR. HUTTING:  Okay.

17                  PEOPLE'S EXHIBIT 38 ADMITTED

18                  INTO EVIDENCE

19                  MR. HUTTING:  The next two concern People's

20          Exhibits 35 and 36.  People's Exhibit 35 is a laboratory

21          report from a person by the name of Catherine Maggert, she

22          is a DNA forensic scientist in the Biology Unit with the

23          Michigan State Police Department.  And the report says --

24                  Well, actually, I guess we should do 36, okay,

25          first, which is a stipulation regarding the report.  And
```

1     that stipulation between Defense Counsel and I, which is

2     reflected in People's Exhibit 36, is this:  The Michigan

3     State Police were instructed by the Prosecutor's Office to

4     conduct additional DNA testing after it was indicated that

5     there was a presence of DNA on the grip of one of the golf

6     club shafts.

7          After the work was completed, the laboratory

8     report was generated by Catherine Maggert, a forensic

9     scientist for the Biology Unit of the Michigan State

10    Police.  See Exhibit 35.  The work done by Ms. Maggert

11    indicated a possible association between the tested swab

12    from the golf club shaft and a Henry Henderson, also known

13    as Henry B. Henderson, date of birth:  10/10/1973, FBI

14    number:  868177PA2, Social Security number:  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.

15         The above referenced Henry Henderson is

16    currently incarcerated in a federal prison in Florida and

17    has been incarcerated within the federal prison system

18    since July the 7th, 2005.  Therefore, Mr. Henderson was

19    incarcerated in another state at the time of the murder of

20    Bernard Hill that occurred on January the 16th, 2006, in

21    Wayne County, Michigan.

22         And that's the stipulation between Defense

23    Counsel and I that's contained here on People's Exhibit 36

24    and we move to admit that.

25         MR. KINNEY:  So stipulated.  No objections to

1       36.

2                   THE COURT:  Offered and received.

3                   PEOPLE'S EXHIBIT 36 ADMITTED

4                   INTO EVIDENCE

5                   MR. KINNEY:  35?

6                   MR. HUTTING:  35 is the report of Mr. Henderson

7       (sic) that the stipulation of 35 refers to and we would

8       formally move to admit that.

9                   MR. KINNEY:  No objection to 35.

10                  THE COURT:  Offered and received without

11      objection.

12                  MR. HUTTING:  It's the report of Ms. Maggert,

13      not Mr. Henderson.  The report of Ms. Maggert about Mr.

14      Henderson that we talked about.

15                  MR. KINNEY:  That's correct, Judge.

16                  PEOPLE'S EXHIBIT 35 ADMITTED

17                  INTO EVIDENCE

18                  MR. HUTTING:  And I believe that there's going

19      to be one other stipulation.  I don't -- I forgot to pull

20      it out.  It's the stipulation -- we'll get it in a little

21      while before I rest, and that's the stipulation concerning

22      the testimony of Reinhard Pope, who is the firearms

23      examiner who examined the two casings and the bullet.

24      We'll get that marked ultimately.  I brought that upstairs

25      or I can't find it in my file right here now but we have

9

```
 1      it -- Mr. Kinney has it.

 2               MR. KINNEY:  For the Record, your Honor, we have

 3      talked about it and I have no objections to it, whenever

 4      he presents it.

 5               MR. HUTTING:  Okay.  And I would formally move,

 6      also -- my assistant here tells me that I have not

 7      formally entered yet People's proposed Exhibits 24, 25 and

 8      26:  24 is the head diagram done by Doctor Schmidt of the

 9      ME's office; 25 is the body diagram done by Doctor Schmidt

10      at the ME's office; and 26 is the bullet recovered from

11      the victim by the Medical Examiner's Office.

12               So I'm formally moving to admit those three

13      items into evidence.

14               MR. KINNEY:  Your Honor, 26 we have no

15      objections to.

16               THE COURT:  Offered and received.

17               PEOPLE'S EXHIBIT 26 ADMITTED

18               INTO EVIDENCE

19               MR. KINNEY:  25, I think Doctor Loewe indicated

20      that it was not correct.

21               MR. HUTTING:  Doctor -- and she indicated that

22      there was one change on the diagram, in that the incise

23      wound that is on the arm should be on the other side of

24      the arm, not on the side that it's drawn on.  Other than

25      that, she indicated that the diagram was correct.
```

```
 1                   THE COURT:  Was it modified to reflect same?
 2                   MR. HUTTING:  The diagram was not.  It's really
 3          hard; you can't -- you only get the back side of the arms
 4          like this and it was on the other side.
 5                   MR. KINNEY:  I'm objecting to it because it's
 6          not correct and it was testified it was not correct.  It
 7          was not changed.  And we have, in its stead, the exact
 8          pictures.  They were admitted to show exactly where the
 9          wounds were.
10                   So the diagram -- I don't want it to be
11          confusing, it's not correct.  The pictures are there and
12          that's why I'm objecting to the Exhibit 25.  There was no
13          discussion about Doctor Schmidt's diagram of the head.
14                   And even though we have those pictures, too,
15          which I think are more important than the diagram, if Mr.
16          Hutting wants that diagram I have no objections.  But the
17          one that was incorrect, I don't think should be evidence.
18                   MR. HUTTING:  I think that that objection, your
19          Honor, goes to weight, not admissibility.  The jury has
20          been informed what the change is.  Doctor -- I think that
21          Doctor Loewe even showed the jury using that diagram.
22                   THE COURT:  I'll admit it over objection.  I
23          agree with that.
24                   MR. HUTTING:  Thank you.
25                   PEOPLE'S EXHIBIT 25 ADMITTED
```

11

```
 1                    INTO EVIDENCE

 2                    THE COURT:  We'll let the jury give it whatever

 3       weight they deem appropriate.  I remind you that they have

 4       been vigilant, attentive, and taking notes.

 5                    MR. HUTTING:  And that goes for 24, then, since

 6       Mr. Kinney does not have an objection to that diagram?

 7                    THE COURT:  Yes.

 8                    PEOPLE'S EXHIBIT 24 ADMITTED

 9                    INTO EVIDENCE

10                    MR. HUTTING:  Okay.  I think that that's all the

11       busy, clerical paperwork that we have to correct and get

12       straight and I can proceed with the witness.

13                    THE COURT:  Anything else, Mr. Kinney?

14                    MR. KINNEY:  Just for the Record, your Honor,

15       Exhibits 27 and 28 which are the photos from the autopsy,

16       I don't know if -- our records say that they have not been

17       admitted and we want them admitted, 27 and 28.

18                    MR. HUTTING:  My records show that they have

19       been admitted, but I don't have a problem with that.  We

20       want them admitted also.

21                    THE COURT:  27 and 28?

22                    MR. HUTTING:  The photos.

23                    MR. KINNEY:  Yes.

24                    THE COURT:  I have them as being offered and

25       received.
```

```
 1                    MR. KINNEY:  Thank you.  Nothing further.
 2                    THE COURT:  As well as -- That was on redirect.
 3          And on recross, I had Defense Exhibit A coming in offered
 4          and received; is that correct?
 5                    MR. KINNEY:  That's correct, your Honor.
 6                    MR. HUTTING:  Yes.
 7                    THE COURT:  All right.
 8
 9   DIRECT EXAMINATION BY MR. HUTTING:
10   Q.   Okay.  For the Record, sir, can you please tell this jury
11        your name and your occupation?
12   A.   Charles Clark.  I'm a sergeant with the Detroit Police
13        Department Homicide section.
14   Q.   Okay.  How long have you been a Detroit police officer?
15   A.   Almost 17 years.
16   Q.   How long have you been in the Homicide section?
17   A.   Almost six.
18   Q.   To what squad in the Homicide section are you assigned?
19   A.   The Cold Case Squad.
20   Q.   Can you give the jury some idea of approximately when this
21        Cold Case Squad that you're assigned to at the present
22        time, when it was formed and began to operate?
23   A.   We were given a 500,000 dollar grant from the National
24        Institute of Justice back in 2007.  But our Cold Case
25        Squad didn't come about until 2009, around June.
```

```
 1   Q.   Okay.  What does the Cold Case Squad do, then, as it
 2        investigates cases?
 3   A.   Pursuant to our grant, our main focus is to investigate
 4        cases that are unresolved, unsolved, that are two years or
 5        older; that is, by using DNA and also by follow-up.
 6   Q.   Okay.  So both trying to develop additional scientific
 7        evidence and also trying to develop additional witness
 8        evidence; is that correct?
 9   A.   That's correct.
10   Q.   Okay.  Was the case of the homicide of Bernard Hill, that
11        occurred in January of 2006, one of the cases that came to
12        the attention of your Cold Case Squad?
13   A.   Yes.
14   Q.   Approximately when did you folks begin working on looking
15        back at the Bernard Hill case?
16   A.   That would have been in 2009, probably around the middle
17        or end of September.
18   Q.   Okay.  Had the case been investigated before by another
19        squad in the Homicide section?
20   A.   Yes, when it occurred in 2006 by Squad 2.
21   Q.   Okay.  Had anybody been charged as a result of the
22        investigation that that initial squad did?
23   A.   No.
24   Q.   Okay.  So at the end of September, beginning of October,
25        you folks began to look at the case; is that correct?
```

14

1   A.   That's correct.

2   Q.   Okay.  Does that call for basically reviewing the

3        paperwork to see what was done previously on the case?

4   A.   That's correct.

5   Q.   Okay.  We talked here today, earlier, just a few minutes

6        ago, about the fingerprint work that Marcia McCleary did.

7        Did you folks review that to see if there was a

8        possibility of doing any additional fingerprints or any

9        additional evidence to the fingerprints?

10  A.   Yes.

11  Q.   Was there any way that you could do that?

12  A.   No.

13  Q.   Okay.  We talked earlier today about the work that Mary

14       Gross did concerning the supergluing of the evidence that

15       was found at the scene.  Did you folks review that also?

16  A.   Yes.

17  Q.   Okay.  Was there any possibility of doing any more in that

18       area?

19  A.   No.

20  Q.   Okay.  Now after that was done, ultimately when you

21       reviewed the file, did the name Omar Dantzler come up?

22  A.   Yes, it did.

23  Q.   Okay.  Did the name of Patrick Grunewald come up?

24  A.   Yes, it did.

25  Q.   Okay.  Did the name of Michael Dantzler come up?

15

```
 1   A.   Yes, it did.

 2   Q.   Okay.  Did the name of Rodney Turner come up?

 3   A.   Yes.

 4   Q.   And who's Rodney Turner?

 5   A.   Rodney Turner is the brother of Quiana Turner.

 6   Q.   Okay.  Did the name of Samuel Lamare Dantzler, also known

 7        as Little Sam or -- Little Sam, did that name also come

 8        up?

 9   A.   Yes, it did.

10   Q.   Okay.  When your squad reviewed this, were Omar Dantzler

11        or Michael Dantzler, were they at all cooperative with the

12        squad?

13             MR. KINNEY:  Objection, your Honor.  Objection

14        to -- Can we approach the bench?

15             THE COURT:  Yes.

16             (At about 10:18 a.m., brief sidebar;

17             (At about 10:21 a.m., back on the Record.)

18   BY MR. HUTTING:

19   Q.   In regard to Mr. Omar Dantzler, did Mr. Dantzler come in

20        contact with the Detroit Police Department Homicide

21        section?

22   A.   Yes.

23   Q.   Did Mr. Dantzler --

24             THE COURT:  Please be specific as to what

25        person --
```

16

```
 1                    MR. HUTTING:  Thank you.

 2                    THE COURT:  -- first name and last name.

 3    BY MR. HUTTING:

 4    Q.   Did Mr. Omar Dantzler make any kind of statement to the

 5         Homicide section?

 6    A.   No.

 7    Q.   Did Mr. Omar Dantzler decline to do so?

 8    A.   Yes.

 9    Q.   In terms of Michael Dantzler, did Michael Dantzler come

10         into contact with the Detroit Police Department Homicide

11         section?

12    A.   Yes.

13    Q.   Did Michael Dantzler make any kind of a statement to the

14         Homicide section?

15    A.   No.

16    Q.   Did Michael Dantzler decline to do so?

17    A.   Yes.

18    Q.   Okay.  Did Little Sam or Samuel Dantzler, Junior, or

19         Little Sam or Samuel Lee Dantzler come into contact with

20         the Detroit Police Department Homicide section?

21    A.   Yes.

22    Q.   Was that on or about the beginning of October?

23    A.   Of 2009, yes.

24    Q.   2009.  Did Samuel Dantzler, Samuel Lee Dantzler, also

25         known as Little Sam (sic), did he ultimately make a
```

17

```
 1        statement to the Detroit Police Department?
 2   A.   Yes.
 3   Q.   In this particular case, in February of this year, was
 4        Samuel Lee Dantzler, also known as Little Sam (sic), was
 5        he charged in this case?
 6   A.   Samuel Lamare Dantzler?
 7   Q.   Samuel Lamare Dantzler, also known as Little Sam, was he
 8        charged in this case?
 9   A.   Yes, he was.
10   Q.   Okay.  Was the police department able to get in Rodney
11        Turner?
12   A.   No.
13   Q.   Okay.  Were buccal swabs taken from people like Omar
14        Dantzler, Patrick Grunewald, Michael Dantzler, Little Sam
15        and ultimately Big Sam?
16   A.   Yes.
17             MR. KINNEY:  Objection.  This is Mr. Samuel
18        Dantzler, Senior.  I'm objecting to this posse, I'm
19        objecting to Little Sam, I'm objecting to Big Sam.  It is
20        Samuel Dantzler, Senior, Samuel Dantzler, Junior.
21             THE COURT:  I agree.  I am going to ask you to
22        be very specific and clear and address individuals by
23        their first and last name.
24             MR. HUTTING:  Okay.
25   BY MR. HUTTING:
```

1    Q.   Was Samuel Dantzler -- were buccal swabs ultimately taken

2         from Omar Dantzler, Michael Dantzler, Samuel Dantzler,

3         Junior, Samuel Dantzler, Senior?

4    A.   Yes.

5    Q.   Okay.  And also Patrick Grunewald?

6    A.   That's correct.

7    Q.   Were all of these buccal swabs ultimately forwarded to

8         Bode Technology so that they could be examined and

9         compared against the evidence that Bode had?

10   A.   Yes.

11   Q.   Okay.  The name Gerald Stewart has come up here during the

12        course of this case.  Who is Gerald Stewart?

13   A.   Gerald Stewart is a former officer who ran Major Crimes

14        and ran Homicide back in the '80s and '90s.  He was hired

15        back pursuant to the grant as a civilian contractor and he

16        worked with us in the Cold Case Squad.

17   Q.   Okay.  Now a buccal swab was also taken from him and

18        forwarded to Bode Technology.

19   A.   That's correct.

20   Q.   Okay.  And why was that?

21   A.   During the investigation, Mr. Stewart had physically

22        handled the black cap.  And later on, when it was

23        discovered that we were going to further test the cap, he

24        advised us that he had actually physically handled it, so

25        it only made sense to send in the buccal swab on him, as

```
 1      well.
 2  Q.  Okay.  In this case, there's been testimony that the
 3      fingernails taken from the deceased at the morgue or by
 4      the morgue were destroyed in the beginning of October of
 5      2009.
 6  A.  Yes.
 7  Q.  Did you folks make -- ultimately make contact with the
 8      morgue?
 9  A.  Yes, we did.
10  Q.  By the time that you made contact with the morgue --
11          MR. KINNEY:  Judge, objection, leading.
12  BY MR. HUTTING:
13  Q.  -- were the fingernails still --
14          MR. KINNEY:  Objection, leading.
15          MR. HUTTING:  It can be answered yes or no.  I
16      don't see -- I mean the leading form would be:  Isn't it
17      true that, blah, blah, blah, blah?
18  BY MR. HUTTING:
19  Q.  I'll ask it this way:  What was the situation with the
20      fingernails when you folks made contact at the morgue?
21  A.  They were destroyed.  That's what we were told.
22  Q.  So there was no ability for you to send those on then?
23  A.  That's correct.
24  Q.  All right.  In this particular case would it be a fair and
25      true statement that in the beginning of this year, you
```

```
 1        received notification that there had been a CODIS

 2        association with Samuel Dantzler, Senior?

 3   A.   That's correct.

 4   Q.   Okay.  On the item sent to Bode Technology?

 5   A.   That's correct.

 6   Q.   Okay.  And based on that, in March of this year, was a

 7        warrant issued against Samuel Dantzler, Senior, in this

 8        particular case?

 9   A.   That's correct.

10   Q.   Okay.  Now in this particular case, there has also been

11        testimony that additional testing was requested during the

12        course of 2010, during the course of this year; can you

13        explain how that came about?

14   A.   After the preliminary examination, there was some issues

15        raised about the single cutting being taken from the hat,

16        so we made a decision to send the hat back for extra

17        cuttings to make sure the results were accurate.

18   Q.   Okay.  And our office paid for that; is that correct?

19   A.   That's correct.

20   Q.   Okay.  Thank you, sir.

21             MR. HUTTING:  Submit for cross, your Honor.

22             THE COURT:  Mr. Kinney.

23             MR. KINNEY:  Thank you, your Honor.

24             THE COURT:  You're welcome.

25
```

```
1   CROSS-EXAMINATION BY MR. KINNEY:

2   Q.   Good morning.

3   A.   Good morning.

4   Q.   Sergeant Clark?

5   A.   That's correct.

6   Q.   Sergeant, you indicated that this was a cold case file.

7   A.   That's correct.

8   Q.   And the reason why it was a cold case file is?

9   A.   The reason why it was a cold case file is because it was

10       over two years old and it was unsolved.

11  Q.   It was over two years old and it was unsolved?

12  A.   That's correct.

13  Q.   The case is still -- it's -- you're investigating the

14       death of Bernard Hill?

15  A.   Correct.

16  Q.   And you also had some theory at the time that Mr. Hill had

17       beat up Quiana Turner?

18  A.   Correct.

19  Q.   And Quiana Turner was an ex-girlfriend of his?

20  A.   Yes.

21  Q.   Correct?

22  A.   Correct.

23  Q.   Now this was back in 2006?

24  A.   Could you repeat --

25  Q.   That's when your investigation should have started, in
```

```
 1        2006; correct?

 2   A.   Correct.

 3   Q.   And am I correct in saying that's when the investigation

 4        started?

 5   A.   Yes.

 6   Q.   That night?

 7   A.   Yes.

 8   Q.   January the 16th, 2006?

 9   A.   That's correct.

10   Q.   Okay.  And were you part of Homicide in 2006?

11   A.   Yes, I was.

12   Q.   Okay.  And Investigator Pearson was part of Homicide in

13        2006?

14   A.   Yes, he was.

15   Q.   Okay.  And you heard him testify about his actions

16        involving this case in 2006?

17   A.   Correct.

18   Q.   And you had a statement from Nikitta McKenzie back in

19        2006?

20   A.   Correct.

21   Q.   Indicating what had happened at her apartment January

22        16th?

23   A.   Correct.

24   Q.   Okay.  The autopsy on Mr. Bernard Hill was performed

25        January the 16th, 2006?
```

1   A.   I don't recall the exact date.

2   Q.   Tell me if this can refresh your recollection, please,

3        sir.

4   A.   January 16th, 2006.

5   Q.   Okay.  That's when the autopsy was performed on Mr. Hill?

6   A.   That's correct.

7   Q.   All right.  And you heard Investigator Pearson, who you

8        agreed with, he had Mr. Hill's hands bagged to keep any

9        evidence that was under his fingernails from being

10       tainted; correct?

11  A.   Correct.

12  Q.   Okay.  And that's protocol; correct?  I mean this is

13       policy with the Homicide division, he wasn't just thinking

14       of something that the Homicide division doesn't normally

15       do?

16  A.   That's protocol in a situation where there was an assault

17       and there's a possibility there might have been evidence

18       under the fingernails.

19  Q.   A situation like this?

20  A.   Correct.

21  Q.   Okay.  And when it comes to individuals -- Well, you also

22       have the statement of Ms. Burt, Mr. Hill's mother?

23  A.   Correct.

24  Q.   So you knew that Samuel Lee Dantzler, Junior, (sic) and I

25       think it was Rodney Turner, had came over to her house?

```
 1   A.   Samuel Lamare Dantzler?

 2   Q.   That's Junior?

 3   A.   Yes.

 4   Q.   Did I say Lee?

 5   A.   That's correct.

 6   Q.   Okay.  Samuel Lamare Dantzler, Junior, and Rodney Turner

 7        had been to her house?

 8   A.   Correct.

 9   Q.   Shortly before she found out that her son had died?

10   A.   Correct.

11   Q.   Okay.  And she told you all that in January of 2006?

12   A.   That's correct.

13   Q.   Okay.  And after that -- And you heard, I think it was Ms.

14        Kaye, the DNA expert --

15   A.   Yes.

16   Q.   -- testify that she did work on this case in 2007?

17   A.   Correct.

18   Q.   Correct?  DNA work?

19   A.   Correct.

20   Q.   That Mr. Hill's DNA or his blood, a vial of blood, was

21        sent to Bode Technology in 2007?

22   A.   Correct.

23   Q.   Okay.  And it was recovered from the Medical Examiner's

24        Office, Wayne County Medical Examiner's Office?

25   A.   Correct.
```

25

1   Q.   A police officer from the Detroit Police Department,

2        presumably Homicide section -- you tell me if I'm wrong --

3        had to go out and get it?

4   A.   Correct.

5   Q.   And what police officer was that from Homicide that went

6        out and got the vial of blood?

7   A.   I believe it was Sergeant David Moore.

8   Q.   All right.  And does Sergeant David Moore work with the

9        Detroit Police Department now?

10  A.   Yes.

11  Q.   Okay.  Now that sergeant went to pick up the vial of blood

12       from the same place that the fingernails are kept?

13  A.   Correct.

14  Q.   Is there anything in the record that says that there was a

15       conversation between the Wayne County Medical Examiner's

16       office and Sergeant Moore about picking up the

17       fingerprints at the same time that you're picking up the

18       blood?

19  A.   You said fingerprints?

20  Q.   Fingernails.  I'm sorry, sir.

21  A.   I do not know.

22  Q.   You don't know if it's in your file or you don't know if

23       they had a conversation?

24  A.   I don't know if there was a conversation.

25  Q.   Okay.  So is that indicating that there's nothing in your

1          file that says that there was a conversation?

2     A.   That's correct.

3     Q.   Is there anything in your file that says that -- Well,

4          first of all, you heard Doctor Loewe testify that she just

5          doesn't think it's possible that her office didn't contact

6          Homicide before they destroyed this evidence in October of

7          '09; is that correct?

8     A.   I don't recall hearing her say that, no.

9     Q.   You don't recall hearing her say that?

10              Okay.  Do you recall her testifying about the

11         fingerprint evidence?

12    A.   The fingernail evidence, yes.

13    Q.   I got to quit saying fingerprints.

14              Fingernail evidence.  That's Exhibit A.

15         Actually the fingernail clippings were taken January the

16         16th, 2006, and they weren't destroyed until October the

17         19th, 2009?

18    A.   That's correct.

19    Q.   Okay.  Does your file have any indication that someone

20         from Homicide talked to the Medical Examiner's Office

21         about this evidence?

22    A.   No.

23    Q.   Okay.  Your file -- Do you have what we call activity

24         logs?

25    A.   Yes.

1    Q.    Correct?

2    A.    Yes.

3    Q.    And you have access to activity logs?

4    A.    Yes.

5    Q.    As a matter of fact, you made some yourself?

6    A.    Yes.

7    Q.    Yours is dated October the 1st of '09?

8    A.    That's correct.

9    Q.    Okay.  And your activity log doesn't indicate any activity

10         with respect to the fingernail clippings?

11   A.    No.

12   Q.    Okay.  And you don't have any -- any memory of

13         conversations with the Medical Examiner's Office about

14         fingernail clippings?

15   A.    From who?

16   Q.    The Medical Examiner's Office.

17   A.    From who at Homicide?

18   Q.    You.  Do you have any memory that you had any contact with

19         the Medical Examiner's Office about fingernail clippings?

20   A.    Did I personally?  No.

21   Q.    And actually, October the 1st, you were in charge of the

22         case?

23   A.    Well, there wasn't an Officer in Charge, per se; there was

24         an Officer in Charge initially, when the incident

25         happened.  And the cold case, we all worked the case as a

                                    28

```
 1        unit, so there really is no Officer in Charge.
 2   Q.   And you're not the Officer in Charge now?
 3   A.   I'm the Officer in Charge in as far as assisting the
 4        Prosecutor, yes.
 5   Q.   In the trial?
 6   A.   That's correct.
 7   Q.   But you were working on the case?
 8   A.   Absolutely.
 9   Q.   And how long have you been in Homicide?
10   A.   Almost six years.
11   Q.   Okay.  How long have you been a Detroit police officer?
12   A.   Almost 17.
13   Q.   And at that particular time, the fingernail clippings had
14        not been destroyed yet?
15   A.   As of what date?
16   Q.   October the 1st --
17   A.   No.
18   Q.   -- 2009.
19   A.   No.
20   Q.   And you all had already had contact several times with
21        Bode Technology about DNA evidence?
22   A.   I'm not for sure.
23   Q.   Well, you just indicated that we had Bode Technology to do
24        some work in '07, that's what Ms. Kaye testified to?
25   A.   That's correct.
```

29

1    Q.   So you had a relationship with Bode Technology on this

2         particular case for at least two years?

3    A.   Cold Case Squad didn't.

4    Q.   Well, Detroit Homicide did.

5    A.   That's correct.

6    Q.   With -- And Cold Case Squad is part of Detroit Homicide?

7    A.   That's correct.

8    Q.   And the officers that were there on January the 16th of

9         2006 are still officers in Homicide till this day?

10   A.   That's correct.

11   Q.   And you were an officer, whether you worked on this case

12        or not; in 2006, you were an officer in Homicide?

13   A.   That's correct.

14   Q.   All right.  Now when you -- When there was a grant.  Is

15        that a federal grant?

16   A.   Yes.

17   Q.   How much money did you all get in the federal grant to

18        open up this Cold Case Squad?

19   A.   Half a million dollars.

20   Q.   And of that half a million dollars, none of it was spent

21        with Bode Technology; correct?

22   A.   I don't know.

23   Q.   Does your file indicate that any money was sent to Bode

24        Technology from the Detroit Police Department with regards

25        to this file?

```
 1   A.   To this file?  I would have to see.  I don't know.
 2   Q.   Is -- Would that mean that you would have to look up the
 3        entire -- you would have to take the time to look at the
 4        entire file right now to find out, or is there a certain
 5        something, a certain piece you could look at that wouldn't
 6        take that long?
 7   A.   I would probably have to look through the whole file.
 8   Q.   Okay.  So, and I'm just assuming, but I think that the
 9        fact that you call this a cold case file, means that one
10        of the first things you do is take a look at the entire
11        file?
12   A.   That's correct.
13   Q.   Okay.  Do you recall anything in that file that would
14        suggest that -- Okay, you don't recall; is that -- I know
15        you don't recall?
16   A.   That's correct.
17   Q.   Okay.  When it comes to Mr. Hutting indicating that
18        Michael Dantzler wasn't cooperating, was Michael Dantzler
19        arrested?
20   A.   I believe he was in custody, yes.
21   Q.   Okay.  And then, when he was arrested as a defendant or as
22        a person in custody, was he given his Constitutional
23        rights?
24   A.   I believe so.
25   Q.   All right.  And one of his Constitutional rights is that
```

1          he's got the right to remain silent?

2    A.    That's correct.

3    Q.    And by indicating that he didn't cooperate with you, are

4          you indicating that he just exercised his Constitutional

5          right?

6    A.    He did not cooperate.  He did not give us any information.

7    Q.    Are you indicating that he exercised his Constitutional

8          right?

9    A.    He did not give us any information.

10   Q.    No, I'm not asking that.

11               MR. KINNEY:  The Witness didn't answer my

12         question.

13               THE COURT:  Sergeant Clark, are you able to

14         answer that question?

15               WITNESS CLARK:  He didn't give us any

16         information.

17               THE COURT:  But -- Do you want to rephrase the

18         question or ask it another way?

19   BY MR. KINNEY:

20   Q.    You know what a Constitutional right is; correct?

21   A.    Yes, I do.

22   Q.    And the Constitutional right to remain silent is something

23         that you're required to give a person in custody before

24         you ask any questions?

25   A.    Yes.

1   Q.   So you gave him these rights; correct?

2   A.   I didn't, no.

3   Q.   Oh, you didn't give them.

4              When was that done; do you know?

5   A.   That would have been probably some time in 2006.

6   Q.   All right.  And as a result of that, there is no

7        statement?

8   A.   That's right.

9   Q.   As a result of him being given his Constitutional rights,

10       there's no statement?

11  A.   As a result of?  I can't say that, no.

12  Q.   You can't say that.

13             And the reason why you can't say that is because

14       you weren't there?

15  A.   That's correct.

16  Q.   And the officer that took -- that gave him his

17       Constitutional rights would be who?

18  A.   I would have to see the Constitutional Rights Form.

19  Q.   For Michael --

20             MR. KINNEY:  Do we have a Constitutional Rights

21       Form for Michael Dantzler?

22             MR. HUTTING:  I don't have it here.

23  BY MR. KINNEY:

24  Q.   Well, Mr. Hutting doesn't have a Constitutional Rights

25       Form and neither do I.  But you, as the Officer in Charge,

33

```
 1          know that there was a Constitutional Rights Form?
 2    A.    I was part of Squad 2 during that time when the case came
 3          in.
 4    Q.    Yes.
 5    A.    And I knew some information about what was going on with
 6          the case, and I know he was read his Constitutional
 7          rights.
 8    Q.    Okay.  And you know that that was back in 2006?
 9    A.    That's correct.
10    Q.    Was he released shortly thereafter?
11    A.    I don't know.
12    Q.    You don't know.
13              You don't remember whether he was released or
14          not?
15    A.    No, I don't.
16    Q.    Is he in custody now?
17    A.    I do not know.
18    Q.    With respect to this case?
19    A.    No.
20    Q.    All right.  And we don't have a statement from him?
21    A.    No.
22    Q.    Okay.  Mr. Omar Dantzler, was he arrested?
23    A.    I believe so, yes.
24    Q.    And was he given his Constitutional rights?
25    A.    Yes.
```

```
 1   Q.   And more specifically, the Constitutional right to remain
 2        silent?
 3   A.   That's right.
 4   Q.   And not have that silence used against you?
 5   A.   That's correct.
 6   Q.   And after that, you got no statement?
 7   A.   A statement was not taken, no.
 8   Q.   Okay.  With respect to Michael Dantzler, was there a
 9        buccal swab taken from Michael Dantzler?
10   A.   I believe so, yes.
11   Q.   In 2009?  Is that 2009?
12   A.   I believe so.
13   Q.   Okay.  When you say he's not being cooperative, did you
14        all have to chain him to a bed to take the buccal swab?
15   A.   No.
16   Q.   Did he cooperate in giving a buccal swab?
17   A.   That's correct.
18   Q.   Knowing -- Okay.  So he cooperated and gave you a buccal
19        swab?
20   A.   Yes, he did.
21   Q.   Okay.  So the fact that you say that he wasn't cooperating
22        is because when you gave him his rights, he didn't make a
23        statement?
24   A.   He did not make a statement.
25   Q.   Okay.  But he cooperated in terms of giving you a buccal
```

1      swab so you could determine about his DNA?

2  A.  Correct.

3  Q.  And you didn't hide that from him?

4  A.  No.

5  Q.  The person of Samuel Lee Dantzler, Senior, did you get a

6      buccal swab from him?

7  A.  Yes.

8  Q.  And that was, I believe, in September of 2009?

9  A.  I don't recall.  I would have to see the sheet.

10  Q.  I believe I have the warrant.

11          Now at the bottom would be the date that the

12      warrant was signed?

13  A.  Yes.  The affidavit for a search warrant, yes.

14  Q.  Okay.  And that was in September of 2009?

15  A.  September 24, 2009.

16  Q.  Okay.  Mr. Dantzler, did you have to tie him to a bed or

17      did he cooperate, Mr. Dantzler, Senior?

18  A.  Mr. Dantzler, Senior?  I don't know who actually took his

19      buccal swab.

20  Q.  Is there anything in your file that indicates that it had

21      to be forcibly taken from Mr. Dantzler?

22  A.  No.

23  Q.  Did you get a buccal swab from Rodney Turner?

24  A.  I don't believe so.

25  Q.  Okay.  Did you get a statement from Rodney Turner?

36

1  A.   No.

2  Q.   Did you give Rodney Turner his Constitutional rights?

3  A.   No.

4  Q.   So you haven't had an opportunity to talk to Rodney

5       Turner?

6  A.   No.

7  Q.   And that's not because you haven't been trying?

8  A.   That's correct.

9  Q.   And with respect to Samuel Dantzler, Junior, you have a

10      buccal swab?

11 A.   Yes.

12 Q.   And all of the buccal swabs were in '09, correct, in

13      September of '09?

14 A.   I believe so.

15 Q.   And in September of '09, the fingernail clippings had not

16      yet been destroyed?

17 A.   That's correct.

18 Q.   And the buccal swabs were being taken for the purposes of

19      comparing their DNA to the evidence that you found at the

20      scene?

21 A.   Correct.

22 Q.   Patrick Grunewald gave you a -- You gave him his

23      Constitutional rights?

24 A.   Yes, he was given those.  Yes.

25 Q.   And you would say he was cooperative?

37

```
 1   A.   In the beginning, no.

 2   Q.   So, as a matter of fact, April the 12th of '06, you gave

 3        him his Constitutional rights?

 4   A.   I believe so, yes.

 5   Q.   April the 21st of '06, you gave him his Constitutional

 6        rights?

 7   A.   I believe so, yes.

 8   Q.   And October the 1st of '09, you gave him his

 9        Constitutional rights?

10   A.   Yes.

11   Q.   Mr. Grunewald?

12   A.   That's correct.

13   Q.   Have you talked to Mr. Grunewald during the pendency of

14        this trial?

15   A.   No.

16   Q.   Not because you haven't been trying?

17   A.   That's correct.

18   Q.   And you did indicate that Omar Dantzler was not

19        cooperative; correct?

20   A.   He did not give us a statement, no.

21   Q.   Okay, he didn't give you a statement.

22             But did he not sign a consent to you getting a

23        buccal swab from him for his DNA?

24   A.   Yes, February 15, 2008.

25   Q.   And you had his buccal swab in 2008?
```

1    A.    Correct.

2    Q.    And the fingernail clippings had not yet been destroyed?

3    A.    That's correct.

4    Q.    Your records don't indicate that neither you nor any other

5          officer from Homicide contacted the Medical Examiner's

6          Office about whatever evidence they had left, specifically

7          the fingernail clippings in '08, when you were gathering

8          DNA evidence from certain suspects; correct?

9    A.    Correct.

10   Q.    In '07, when you sent Mr. Hill's blood sample to Bode

11         Technology; correct?

12   A.    Correct.

13   Q.    In '06, when you had the statements from Ms. Burt, Ms.

14         McKenzie, about how this particular situation came about,

15         no contact with the ME's office about the DNA evidence

16         that they had taken; correct?

17   A.    Correct.

18   Q.    And then in early '09, when you were gathering evidence

19         pursuant to search warrants and consent forms, no contact

20         with the Medical Examiner's Office about DNA evidence that

21         they had at their office regarding Bernard Hill?

22   A.    That was late in '09.

23   Q.    So early in '09, there was no contact with the Medical

24         Examiner's Office; correct?

25   A.    No.

```
1    Q.   In late '09, there is no contact with the Medical
2         Examiner's Office; correct?
3    A.   Yes, there was.
4    Q.   Okay.  When?
5    A.   That would have been through Cold Case Squad, probably
6         some time in November or December.
7    Q.   November or December.
8              But the fingernail clippings had been destroyed
9         October of '09?
10             MR. HUTTING:  Objection.  That's been asked and
11        answered at least four times, Judge.
12             MR. KINNEY:  It's in response to his answer.
13             THE COURT:  Go ahead.
14   BY MR. KINNEY:
15   Q.   Am I correct?
16   A.   That's correct.
17   Q.   Okay.  Did you have anything to do with Ms. Kaye and Ms.
18        Preston's arrival at Metropolitan Airport?  They flew in
19        here.  Did the Detroit Homicide Division, through the
20        grant that you have, pay for their airplane tickets?
21   A.   I don't know.
22   Q.   You don't know?
23   A.   No.
24   Q.   It could have been Homicide and your grant?  It could have
25        been the Prosecutor's Office and their grant, but --
```

40

```
 1                      MR. HUTTING:  Well, I'm going to object because
 2          we don't have grants.
 3                      MR. KINNEY:  Okay.
 4  BY MR. KINNEY:
 5  Q.    Could have been the Prosecutor's Office or Detroit
 6          Homicide or Bode Technology through the grant that they
 7          already have and the contract that they already had with
 8          both DPD and --
 9  A.    I don't know.
10  Q.    -- Michigan State Police?  You don't know?
11  A.    No.
12                      MR. KINNEY:  Nothing further at this time.
13                      THE COURT:  Mr. Hutting.
14
15  RE-DIRECT EXAMINATION BY MR. HUTTING:
16  Q.    What's a search warrant?
17  A.    A search warrant is the affidavit that is presented to the
18          prosecutor and to be signed by a judge for us to search a
19          person, a place, for potential evidence.
20  Q.    Okay.  And first, the prosecutor approves it?
21  A.    That's correct.
22  Q.    Okay.  Reviews the request, he or she approves it, it's
23          then taken to a judge?
24  A.    That's correct.
25  Q.    The judge reviews it, and then he or she, if he feels that
```

41

1      there's probable cause, signs it; is that correct?

2  A.  That's correct.

3  Q.  All right.  In terms of these buccal swabs, were search

4      warrants obtained for people like Michael Dantzler?

5  A.  Correct.

6  Q.  Rodney Turner?

7  A.  Correct.

8  Q.  Samuel Dantzler, Senior?

9  A.  Correct.

10  Q.  Samuel Dantzler, Junior?

11  A.  Correct.

12  Q.  To obtain buccal swabs from them based on the search

13      warrants; correct?

14  A.  That's correct.

15  Q.  Okay.  And in this case, the People were not able to track

16      down Rodney Turner; correct?

17  A.  That's correct.

18  Q.  But you did have the search warrants; is that correct?

19  A.  That's correct.

20  Q.  If a person refuses to cooperate with the search warrant,

21      they can be taken in front of a judge; is that correct?

22  A.  That's correct.

23  Q.  And held in contempt if they fail to cooperate?

24  A.  That's correct.

25  Q.  Okay.  Because the Court has ordered them to; is that

1      correct?

2   A.   That's correct.

3   Q.   Okay.  In terms of Mr. Grunewald, what race is Mr.

4        Grunewald?

5   A.   White.

6   Q.   Okay.  He's not an African-American then?

7   A.   No.

8   Q.   Okay.

9            MR. KINNEY:  What's the relevancy of his race?

10           MR. HUTTING:  The relevancy of his race is based

11       on the testimony of Nikitta McKenzie about who was

12       involved ultimately in this and what she said about the

13       people that were there.

14           MR. KINNEY:  I don't think there's a foundation

15       been laid that there was some point Mr. Grunewald was

16       other than a witness.  Is he -- he was a suspect.  There's

17       no foundation for that, is my opinion.

18   BY MR. HUTTING:

19   Q.   Were buccal swabs taken from him?

20   A.   Yes.

21   Q.   Okay --

22           MR. KINNEY:  Is my objection sustained or --

23           THE COURT:  Yes.

24           MR. KINNEY:  Thank you.

25   BY MR. HUTTING:

1    Q.    Buccal swabs were taken from him and sent to Bode?

2    A.    That's correct.

3    Q.    Okay.  In terms of this case, this trial, have you been

4          looking for Mr. Grunewald?

5    A.    Yes, I have.

6    Q.    Have you been able to find him?

7    A.    No.

8    Q.    All right.  Where does he live?  What's the issue there?

9    A.    It is my understanding from his family that his current --

10             MR. KINNEY:  Wait.  I'm objecting to hearsay.

11             THE COURT:  Sustained.

12   BY MR. HUTTING:

13   Q.    What have you done --

14             MR. KINNEY:  Thank you, your Honor.

15   BY MR. HUTTING:

16   Q.    What have you done to try to find him?

17   A.    I made contact with his family and I ran his name in our

18         LEIN system to get possible addresses for him.

19   Q.    Is he in custody any place?

20   A.    No.

21   Q.    So he's out and about?

22   A.    Yes.

23   Q.    Okay.  By talking with his family, have you been able to

24         find him?

25   A.    No.

44

1  Q.   All right.  Did you even go see his mother?

2  A.   Yes.

3  Q.   Where is his mom?

4  A.   Botsford Hospital.

5            MR. KINNEY:  Your Honor, relevancy as to why his

6       mother is in Botsford, any hospital.  What's the relevancy

7       of that?

8            MR. HUTTING:  He brought up Mr. Grunewald.  He

9       opened the door to it.

10            MR. KINNEY:  Opened the door to something that's

11       not relevant.

12            MR. HUTTING:  He asked him about trying to find

13       him in this particular case.  He asked that on his cross

14       exam.  And this goes to --

15            THE COURT:  Gentlemen, one person speaks at a

16       time.

17            MR. KINNEY:  He's indicated that he has -- he is

18       looking for him, but to tell the jury that his mother is

19       in the hospital is asking for no more than sympathy for

20       Mr. Grunewald.  Unfair.

21            MR. HUTTING:  I'm not asking for sympathy.  I'm

22       asking to show what the officer has done to try to find

23       Mr. Grunewald to bring him in here for this trial.

24            MR. KINNEY:  Just for the Record, your Honor,

25       I'm objecting that it's not relevant and it's asking for

45

1        sympathy for Mr. Grunewald's mother.

2                THE COURT:  Okay, I disagree, and the objection

3        is overruled.  Go ahead.

4    BY MR. HUTTING:

5    Q.   By going to the hospital were you able to find him?

6    A.   No.

7    Q.   Your squad didn't actually start working on this case

8        until when?

9    A.   That would have been some time in September of 2009.

10               MR. KINNEY:  Your Honor, I'm objecting to that,

11       too.  Based on the testimony of Sergeant Clark, he was in

12       Squad 2 in 2006, so are we just talking about the cold

13       case or Homicide Squad 2?

14               THE COURT:  So your objection is to form of the

15       question, or what?

16               MR. KINNEY:  Yes.  That it's an unfair question

17       in that he's indicating that his squad started in '09, and

18       that's not per the testimony.

19               MR. HUTTING:  I'll rephrase it.

20               THE COURT:  Well, the objection is sustained as

21       to the form.  Go ahead.  Mr. Hutting said he will -- Mr.

22       Hutting indicates he will rephrase the question or ask

23       another question.

24               Go ahead, Mr. Hutting.

25   BY MR. HUTTING:

1    Q.    Cold Case Squad started working on this case when?

2    A.    In September of 2009.

3    Q.    Okay.  That would -- Would that have been their first

4          contact with this case in the Cold Case Squad?

5    A.    Yes, the other members of Cold Case.  Yes.

6    Q.    Okay.  All right.  Back in 2006, were you the Officer in

7          Charge of the case?

8    A.    No.

9    Q.    Okay.  You -- Were you aware of the case because the case

10         was in your squad?

11   A.    Correct.

12   Q.    But were you one of the persons that was actively working

13         on that case in 2006?

14   A.    Yes.

15   Q.    Okay.  What happened ultimately with the investigation in

16         2006?

17   A.    The case --

18   Q.    In 2007?

19   A.    The case went cold and no one was charged.

20   Q.    Okay.  Ultimately then would the case go on a -- back on

21         the shelf?

22   A.    Yes.

23   Q.    Okay.  Until the Cold Case Squad started looking at it in

24         2009?

25   A.    Yes.

47

```
 1   Q.   Okay.  When did you, if you recall, become aware that

 2        there might be fingernail clippings at the Wayne County

 3        morgue?

 4   A.   We inquired around November or December of 2009.

 5   Q.   And that's when you got the answer that they were no

 6        longer in existence?

 7   A.   That's correct.

 8   Q.   Okay.  Thank you, sir.

 9             MR. HUTTING:  Nothing further.

10             MR. KINNEY:  May I?

11             THE COURT:  Yes.

12

13   RECROSS EXAMINATION BY MR. KINNEY:

14   Q.   Sergeant Clark, just taking your last answer, you're

15        indicating that the Cold Case Squad made references

16        specifically on the fingernail clippings in November of

17        '09?

18   A.   It would have been November or December of '09.

19   Q.   And you're indicating for the jury that that's the first

20        time that any reference was made to fingernail clippings

21        in this case; is that correct?

22   A.   From the Cold Case Squad, yes.

23   Q.   Okay.  Just from the Cold Case Squad?

24   A.   Just from the Cold Case Squad.

25   Q.   All right.  When was the first time -- Because you belong
```

```
 1        to the Cold Case Squad and you also belonged to Squad 2;
 2        correct?  Did you ever belong to Squad 2?
 3   A.   Yes, I did.
 4   Q.   Did you belong to Squad 2 in 2006?
 5   A.   Yes.
 6   Q.   And did you just indicate that you had done some work on
 7        this case in 2006?
 8   A.   That's correct.
 9   Q.   Okay.  And you know Investigator Pearson; correct?
10   A.   Yes, I do.
11   Q.   And you know that Investigator Pearson was the officer on
12        the scene?
13   A.   Yes.
14   Q.   All right.  And you know that this was a case where an
15        obvious struggle between Mr. Hill and someone occurred?
16   A.   Correct.
17   Q.   And you knew in 2006 that Mr. Hill's hands had been bagged
18        for the purpose of keeping any DNA evidence under his
19        nails from being tainted?
20   A.   Correct.
21   Q.   And we knew that in 2006?
22   A.   That's correct.
23   Q.   And you're indicating that no one talked to Doctor Loewe
24        or Doctor Smith or anyone in the Medical Examiner's Office
25        about that evidence until November of 2009?
```

49

1  A.   Not to my knowledge, no.  There's nothing that I've seen

2       that would indicate that.

3  Q.   The warrants that Mr. Hutting was asking you about, and he

4       went through the fact that you could bring these

5       individuals to court and have them found in contempt of

6       court if they didn't cooperate?

7  A.   Correct.

8  Q.   How many of them did you bring before a judge for refusing

9       to cooperate?

10  A.   None.

11              MR. KINNEY:  Nothing further.

12              MR. HUTTING:  Nothing further.

13              THE COURT:  May Sergeant Clark step down?

14              MR. HUTTING:  Yes, sir.

15              MR. KINNEY:  Yes, sir.

16              THE COURT:  Thank you, Sergeant Clark.

17              (At about 11:03 a.m., witness excused.)

18              MR. HUTTING:  The last item of business that I

19       believe we have is a stipulation concerning People's

20       proposed Exhibit Number 39, which is a report issued by

21       Reinhard, R-E-I-N-H-A-R-D, Pope, P-O-P-E, a state police

22       specialist, an expert in the area of firearms examination

23       and identification.

24              And that report indicates that Officer Pope

25       received one 380 automatic caliber fired R and P cartridge

50

1    case.

2           He received a second manila envelope containing

3    a second 380 automatic caliber fired R and P cartridge

4    case.

5           And he received a third envelope that contained

6    a manila bullet envelope that had a folded white paper

7    towel in it, and inside that towel was one fired bullet.

8           That he examined those three items and reached

9    the following conclusions:

10          The two cartridge cases, items 10A and 11A, are

11   identified as having been fired from the same firearm.

12          Item 12A is consistent with being a fired 380

13   caliber bullet exhibiting class rifling characteristics of

14   four lans and grooves with a right twist.  These rifling

15   specifications are characteristic of a 380 automatic

16   caliber semi-automatic pistols manufactured by Baikal,

17   B-A-I-K-A-L, and Imez, I-M-E-Z, 9 millimeter Makarov,

18   M-A-K-A-R-O-V, caliber pistols manufactured by random, and

19   a 9 millimeter Luger caliber pistol manufactured by

20   Springfield, Inc.; however, no suspected 380, slash, 9

21   millimeter, slash, 38, slash, 357 caliber firearm should

22   be overlooked.

23          That is his report and that would be his

24   testimony if he testified here today.  It's being

25   stipulated and the report is being entered in lieu of his

1       live testimony.

2               MR. KINNEY:  I believe we already stipulated to

3       it.  This is the one that he had to get a copy of.

4               MR. HUTTING:  Right.

5               MR. KINNEY:  So stipulate.

6               THE COURT:  So you're offering it?

7               MR. HUTTING:  Yes, sir, I am.

8               MR. KINNEY:  No objection.

9               THE COURT:  And it's 39?

10              MR. HUTTING:  Yes, it is.

11              THE COURT:  Offered and received without

12      objection.

13              PEOPLE'S EXHIBIT 39 ADMITTED

14              INTO EVIDENCE

15              MR. HUTTING:  Okay, your Honor.  People rest

16      their case in chief.

17              THE COURT:  Thank you.

18              Mr. Kinney.

19              MR. KINNEY:  I need a few minutes, Judge.

20              THE COURT:  All right.  Ladies and gentlemen,

21      this will be your morning break, the People have rested,

22      and we'll see you in a few minutes.  Don't discuss the

23      case.  Wear your badges.

24              DEPUTY SHERIFF:  All rise for the jury.

25              THE COURT:  See you in a few minutes.

```
 1              (At about 11:07 a.m., jury panel excused.)

 2              DEPUTY SHERIFF:  Please be seated.

 3              MR. KINNEY:  Your Honor, I need to look for a

 4      witness and I want to put things on the Record before we

 5      present our witness.

 6              THE COURT:  Sure.  See you in a few minutes.

 7              MR. KINNEY:  Thank you.

 8              THE COURT:  I'm guessing maybe 11:30.  Does that

 9      give you enough time?

10              MR. KINNEY:  More than enough time.  I don't

11      need that much time.

12              THE COURT:  11:25?

13              MR. KINNEY:  Thank you.

14              THE COURT:  Mr. Hutting, here's your chance to

15      go to the bathroom, get a drink, do whatever you want.

16              MR. HUTTING:  Yes, your Honor.

17              (At about 11:08 a.m., brief recess.)

18              (At about 11:57 a.m., back on the Record.)

19              COURT CLERK:  Recalling docket 10-3521, People

20      versus Samuel Lee Dantzler, jury trial in progress.

21              MR. HUTTING:  Auggie Hutting for the People.

22              MR. KINNEY:  Robert Kinney for Mr. Dantzler.

23              THE COURT:  Okay.  We want the jury to return?

24      I put them on a break rather than have them be confined to

25      the jury room.
```

```
 1                    MR. KINNEY:  Yes, your Honor.

 2                    THE COURT:  All right.  Gentlemen, there's

 3           something you wanted to discuss?

 4                    MR. KINNEY:  Yes, your Honor.  At this

 5           particular time, I think it's our turn to put on the

 6           defense.  I've indicated to Mr. Dantzler that he has a

 7           right to remain silent, he does not have to take the

 8           stand, we do not have to put on a defense.  And that

 9           normally, the way I've been taught, this is a critical

10           stage and we generally don't want our clients to take the

11           stand, but --

12                    THE COURT:  And I would read a jury instruction,

13           if requested, about the Defendant has an absolute right

14           not to testify.

15                    MR. KINNEY:  Yes, your Honor.  I think that Mr.

16           Dantzler understands all of that.  His witness, Ms.

17           Simpson, is in the courtroom now.

18                    And Mr. Dantzler, have you made a decision as to

19           whether you want to put on a defense or rest at this

20           particular time?

21                    DEFENDANT DANTZLER:  I'll take the stand.

22                    MR. KINNEY:  And Ms. Simpson, do you want Ms.

23           Simpson to testify?

24                    DEFENDANT DANTZLER:  Yes, I do.  Yes.

25                    MR. KINNEY:  Okay.  We're ready to proceed, I
```

1    believe, your Honor.

2              THE COURT:  All right.  Are there any other

3    issues you want to address this morning or are we going to

4    defer those?

5              MR. KINNEY:  I have talked to Mr. Hutting.  I

6    think we agree that there is no prior record of Mr.

7    Dantzler that can be used for impeachment.  And Ms.

8    Simpson, while she has -- does not have a prior record,

9    she has four outstanding traffic warrants.  I don't think

10   that can be used, but I'm asking the Court and Mr.

11   Hutting, she's down here because of my subpoena and I'm

12   asking that she be allowed to take care of those tickets

13   without being placed in custody for her appearance at this

14   trial.

15             THE COURT:  Mr. Hutting?

16             MR. HUTTING:  Well, she can't be impeached with

17   them, all right, and I don't see, at this point, a reason

18   to use them, all right.  I'm not saying that I'm not going

19   to use them, but I don't see any reason to use them; okay?

20   And if it does, I will approach before I do try to use

21   that.

22             THE COURT:  Fair enough.

23             MR. KINNEY:  Okay.  Thank you.

24             THE COURT:  Ready for the jury?

25             MR. KINNEY:  Yes, sir.

1                    DEPUTY SHERIFF:  All rise for the jury.

2                    (At about 12:01 p.m., jury panel seated.)

3                    DEPUTY SHERIFF:  Please be seated.

4                    THE COURT:  Mr. Kinney?

5                    MR. KINNEY:  Yes, your Honor.  Thank you.

6                    Ms. Simpson, would you please step forward and

7          be sworn?

8                    THE COURT:  Move forward, please.  Good

9          afternoon.

10                   WITNESS SIMPSON:  Good afternoon.

11                   THE COURT:  Give your full name and spelling to

12         our court reporter, Mrs. Bauer, please.  Come forward.

13                   COURT CLERK:  Would you raise your right hand,

14         please?

15                   Do you swear or affirm that the testimony you

16         are about to give in the matter now pending before this

17         Court will be the truth, so help you, God?

18                   WITNESS SIMPSON:  Yes.

19                       MARIE ANGELA SIMPSON,

20         called as a witness at 12:05 p.m., having first been duly

21         sworn by the Clerk of Court, was examined and testified on

22         her oath as follows:

23                   COURT CLERK:  You may be seated.

24                   THE COURT:  Ms. Simpson, have a seat.  Make

25         yourself comfortable.  Watch your step there.  The

56

```
 1        microphone's pliable.  Please bring it close to your mouth

 2        and speak loudly and clearly for the jurors; okay?

 3               WITNESS SIMPSON:  Okay.

 4               THE COURT:  Thank you.

 5               Mr. Kinney.

 6               MR. KINNEY:  Thank you, your Honor.

 7

 8   DIRECT EXAMINATION BY MR. KINNEY:

 9   Q.   Good afternoon, Ms. Simpson.

10   A.   Good afternoon.

11   Q.   Now, though I know your name, would you please, for the

12        Record, state your full name?

13   A.   Marie Angela Simpson.

14   Q.   Okay.  Ms. Simpson, do you know a Samuel Lee Dantzler,

15        Senior?

16   A.   Yes, I do.

17   Q.   And do you see him in the courtroom today?

18   A.   Yes.

19   Q.   Would you identify him for the Record?

20   A.   The young man sitting right there.

21   Q.   Sitting right there?

22   A.   Yes.

23   Q.   Okay.

24               MR. KINNEY:  And let the Record reflect that Ms.

25        Simpson identified Mr. Samuel Lee Dantzler, Senior.
```

```
 1                    THE COURT:  So noted.
 2  BY MR. KINNEY:
 3  Q.   Ms. Simpson, how do you know Mr. Dantzler?
 4  A.   He is the father of my daughter.
 5  Q.   All right.  And did you know Mr. Dantzler on January the
 6       16th of 2006?
 7  A.   Yes, I did.
 8  Q.   Did you all have a daughter together, January the 16th,
 9       2006?
10  A.   Yes.
11  Q.   Did -- Were you and Mr. Dantzler in a relationship at that
12       particular time?
13  A.   No.
14  Q.   Okay.  But you still had a daughter in common?
15  A.   Yes.
16  Q.   Were you still friends?
17  A.   Yes.
18  Q.   Okay.  Now do you remember where you were January the
19       15th, January the 16th, 2006?
20  A.   Yes.
21  Q.   Okay.  And, well, I guess I have to ask you this,
22       considering that it's been so long:  How do you remember
23       where you were on that day?
24  A.   Because of the train of events that occurred that day.  I
25       was at work from 8:00 to 8:00, I worked a twelve-hour
```

58

1      shift.

2   Q.   Where do you work at?

3   A.   Extended Stay America, in Livonia, Michigan.

4   Q.   And what was your position?

5   A.   I was the manager in training.

6   Q.   Extended Stay of America is a --

7   A.   Hotel.

8   Q.   A hotel?

9   A.   Yes.

10  Q.   Okay.  And so you know that you were working that day?

11  A.   Yes.

12  Q.   And you got off at eight o'clock?

13  A.   Yes.

14  Q.   All right.  And at eight o'clock when you got off, what

15       did you do?

16  A.   I went to pick up my daughter.  And then from there, I

17       went to pick up my daughter's father.

18  Q.   And your daughter's father is Mr. --

19  A.   Dantzler.

20  Q.   Okay.  Mr. Dantzler, Senior?

21  A.   Yes.

22  Q.   All right.  And approximately what time would you say you

23       first became in the company of Mr. Dantzler?

24  A.   I got off work at 8:00.  I went to pick up my daughter

25       first.  So between 9:00 and 10:00 is when I saw Mr.

```
1          Dantzler.

2     Q.   And where did you pick Mr. Dantzler up from?

3     A.   From Blackstone.

4     Q.   Okay.  And that's in the City of Detroit?

5     A.   Yes.

6     Q.   Okay.  And what did you and Mr. Dantzler do?

7     A.   We went back to my house.  It was his turn to watch my

8          daughter during that time, that was our agreement, and

9          that's the reason why I went to pick him up because he was

10         supposed to spend the night at my house to watch my

11         daughter because I had to go to work early in the morning.

12    Q.   And did that happen?

13    A.   Yes.

14    Q.   So from ten o'clock -- between nine and ten o'clock on the

15         16th until -- what time did Mr. Dantzler leave?

16    A.   He was there with me.  I woke up at about 6:00, went to

17         work at seven o'clock.  I left him there with my daughter,

18         which was what our agreement was.

19    Q.   Okay.  You left to go to work on the morning of the 17th?

20    A.   Yes.

21    Q.   And Mr. Dantzler was still at your house?

22    A.   Yes, when I left.  Yes, with my daughter.

23    Q.   So you're indicating that Mr. Dantzler spent the night

24         where?

25    A.   At my house.
```

60

1    Q.   At your house?  Okay.

2    A.   Yes.

3    Q.   Okay.  Now considering the fact that you have a child in

4         common, did you all sleep in the same room together?

5    A.   No.  He sleeps in my daughter's room, with her.  During

6         that time, that night, we were watching TV, because my

7         daughter is a night child, so we were up watching TV.  I

8         fell asleep first, and then he was there the rest of the

9         night with my daughter.

10   Q.   All right.  So this is something that you said is common

11        practice between the two of you; this is an agreement that

12        you have?

13   A.   Yes.

14   Q.   And is that -- I mean how do you distinguish this

15        particular day from any other day that you have -- I mean

16        this is something that you do all the time?

17   A.   There were a couple of things that happened.  When we

18        arrived at my house, he had told me that his niece was in

19        the hospital --

20                  MR. HUTTING:  Objection.  Hearsay.

21   BY MR. KINNEY:

22   Q.   This is the Defendant; is it not?

23                  MR. HUTTING:  It's a statement being offered by

24        the Defendant, not a statement being offered by the

25        opposite party.  Still hearsay.

```
 1                    MR. KINNEY:  This is not for the truth of the
 2          matter asserted, but to show why she remembers this
 3          particular evening.
 4                    MR. HUTTING:  Truth of the matter is what the
 5          statement is.
 6                    THE COURT:  I'll sustain the objection.
 7     BY MR. KINNEY:
 8     Q.   All right.  You all had a conversation about his niece?
 9     A.   Yes.
10     Q.   All right.  Now without telling us that conversation did
11          it have anything to do with her well-being?
12     A.   Yes.
13     Q.   Okay.  And that's why you know -- that's the reason why
14          you remember this day?
15     A.   That's one of the reasons why I remember.
16     Q.   Okay.  Is there another reason why you remember this night
17          specifically?
18     A.   Yes.
19     Q.   And what would that be?
20     A.   About two or three days later, I was dropping my daughter
21          off on Blackstone, to his mother on Blackstone.  When I
22          pulled up, there was a group of men standing at the -- in
23          the -- I want to say in the sidewalk in front of the house
24          which was not unusual.  So at first, I didn't pay any
25          attention.  I went into the house, I dropped my daughter
```

1     off.  On my way back out, I heard them talking --

2  Q.  Well, you can't tell us what was said, that would be

3       hearsay.

4  A.  Okay.

5  Q.  But was Mr. Dantzler there?

6  A.  No, he was not.

7  Q.  He was not?

8  A.  No.

9  Q.  So whatever you heard, it wasn't by Mr. Dantzler?

10  A.  No, it was not.

11  Q.  And this was three days later?

12  A.  Yes, about two or three days later.

13  Q.  But what you heard, was it concerning the well-being of

14       Ms. Turner?

15  A.  Yes, it was.

16  Q.  Okay.  And that's the reason why you remember these

17       particular days?

18  A.  Yes.  Because what I heard, it scared me.  And I went back

19       in the house and got my daughter and left.  And that was

20       the day she end up coming to work with me, and I sat her

21       in the back office because I wasn't sure what was going to

22       transpire.  But what I heard was not good, so I did not

23       leave my daughter there.  And that's one of the main

24       reasons why I remember because I end up taking her to work

25       and I was scared for her well-being based upon what I had

63

```
 1      heard.

 2  Q.  But you're certain that the night of the 16th --

 3  A.  Yes.

 4  Q.  -- you were with Mr. Dantzler?

 5  A.  Yes.

 6              MR. KINNEY:  Thank you.  Nothing further.

 7              THE COURT:  Cross-examination.

 8              MR. HUTTING:  Thank you, your Honor.

 9

10  CROSS-EXAMINATION BY MR. HUTTING:

11  Q.  Good afternoon, ma'am.

12  A.  Good afternoon.

13  Q.  My name is Mr. Hutting.  I'm going to ask you some

14      questions.  If I don't speak up loud enough so that you

15      can hear the question, let me know and I'll try to do

16      that.  Fair enough?

17  A.  Yes.

18  Q.  Okay.  Secondly, if I ask you a question and you don't

19      understand it or I use a word or a phrase that you don't

20      understand, let me know that and I'll try to rephrase the

21      question to make sure that you understand that; okay?

22  A.  Yes.

23  Q.  All right.  With that in mind, can you tell us what the

24      name of your daughter is?

25  A.  Angel Jaden Alexis.
```

```
 1    Q.    And her last name?

 2    A.    Simpson.

 3    Q.    Okay.  So she does not have Mr. Dantzler's last name?

 4    A.    No, she does not.

 5    Q.    Okay.  Angel Jane?

 6    A.    Jaden.

 7    Q.    J-A-D-E-N?

 8    A.    Yes.

 9    Q.    Alexis Simpson?

10    A.    Yes.

11    Q.    Okay.  What's the date of birth of your daughter?

12    A.    4/30/03.

13    Q.    Okay.  So in 2006, then, she would have been approximately

14          two-years-old?

15    A.    Yes.

16    Q.    Okay.  Now for how long were you and Mr. Dantzler

17          boyfriend and girlfriend?

18    A.    Me and Mr. Dantzler had never been a couple; we have a

19          daughter together.  There was a situation that occurred

20          during the time that I conceived my daughter with Mr.

21          Dantzler, I was engaged.  And my fiance had cheated on me

22          and at that time, me and Mr. Dantzler had a --

23    Q.    So the answer --

24    A.    But we had never been involved.

25    Q.    So the answer to my question is you've never been in a
```

```
 1        relationship?

 2   A.   No, we had never been in a relationship.

 3   Q.   Okay.  All right.  Now you were working where, ma'am?

 4   A.   Extended Stay America.

 5   Q.   Okay.  And where is that, please?

 6   A.   In Livonia, Michigan.

 7   Q.   And whereabouts in Livonia?

 8   A.   Middlebelt and Plymouth.

 9   Q.   Okay.  Well, is it on Middlebelt or on Plymouth?

10   A.   Well, it's on Middlebelt off of Plymouth between 96.

11   Q.   Okay.  And do you still work there, ma'am?

12   A.   No, I do not.

13   Q.   When did you leave?

14   A.   About -- It was, I want to say, 2007.

15   Q.   I'm sorry?

16   A.   About 2007.

17   Q.   When in 2007, ma'am?

18   A.   Exact date, I don't remember.

19   Q.   Okay.  So you can't remember the exact date that you left?

20   A.   Right.

21   Q.   But you can remember the exact date that you're testifying

22        about here?

23   A.   Yes, because of those.

24   Q.   Okay.  When in 2007, ma'am, did you leave from Extended

25        Stay of America?
```

```
 1   A.   I can't give you an exact date.

 2   Q.   When, though?  Was it in the winter?  Was it in the

 3        summer?  Was it in the fall?  When in 2007?

 4   A.   More likely in the summer, the summer months.

 5   Q.   More likely.  Does that mean that you really don't

 6        remember?

 7   A.   No.  The exact date, I do have it written down, but off

 8        memory, no, I do not.

 9   Q.   Okay.  All right.  Now were you paid on a weekly basis or

10        every other week?

11   A.   Every other week.

12   Q.   Okay.  And I take it that you got a paycheck?

13   A.   Yes.

14   Q.   Okay.  All right.  Did you bring with you here -- You knew

15        that you were going to testify here today?

16   A.   Yes.

17   Q.   For how long have you known that you were going to

18        testify?

19   A.   A week.

20   Q.   A week?

21   A.   Yes.

22   Q.   How did you come to find out that you were going to

23        testify?

24   A.   Mr. Kinney.  I received a subpoena.

25   Q.   Okay.  When did you first meet or talk to Mr. Kinney or
```

```
 1       anyone associated with his office?

 2   A.  About a week ago.

 3   Q.  A week ago?

 4   A.  Yes.

 5   Q.  Okay.  And that's the first time you ever heard from him?

 6   A.  Mr. Kinney, yes.

 7   Q.  Did you hear from an investigator or somebody else from

 8       his office before that, ma'am?

 9   A.  I received a phone call from his secretary, I believe.

10   Q.  And when was that?

11   A.  That was last week.

12   Q.  Last week, also?

13   A.  Yes.

14   Q.  But before that you've never had any contact with anybody

15       in Mr. Kinney's office or anybody associated with Mr.

16       Kinney, like an investigator or a secretary or anything?

17   A.  No.

18   Q.  So it was just last week?

19   A.  Yes.

20   Q.  Okay.  All right.  Now when's the last time that you

21       talked to Mr. Dantzler?

22   A.  My last visit with him was about three -- maybe three

23       weeks ago.

24   Q.  Three weeks ago?

25   A.  Yes.
```

1   Q.   And by your last visit, you mean you saw him over at the

2        County, across the street?

3   A.   Yes.

4   Q.   So you were a person that was put on his visiting list; is

5        that correct?

6   A.   Yes.

7   Q.   And you've been visiting him; is that correct?

8   A.   Yes.

9   Q.   Okay.  Have you been -- How many times have you visited

10       Mr. Dantzler?

11  A.   Maybe five or six times.

12  Q.   Okay.  And that's since the -- about March of this year?

13  A.   Yes, since he's been here.

14  Q.   Okay.  All right.  Now so you are a person who has never

15       had a relationship with him, you have a daughter with him,

16       but you're one of the persons that goes over and visits

17       him at the jail?

18  A.   Yes.

19  Q.   And I take it when you visit with him, you talk with him;

20       right?

21  A.   Yes.

22  Q.   So that you knew that you were -- You knew what he was

23       charged with; right?

24  A.   Yes.

25  Q.   Okay.  And you knew when that occurred; is that correct?

```
 1   A.   Yes.

 2   Q.   Okay.  And you knew that way back when you started your

 3        first visits with Mr. Dantzler; right?

 4   A.   Yes.

 5   Q.   Okay.  And that would have been back as far as March;

 6        right?

 7   A.   Yes.

 8   Q.   Okay.  So you realize that he was being accused of helping

 9        a group of people kill a person by the name of Bernard

10        Hill; right?

11   A.   Yes.

12   Q.   Okay.  And you realized, well, hey, I know about that

13        because of what he did that night and then what I heard a

14        couple of days later; right?

15   A.   Yes.

16   Q.   Okay.  So you connected the two of them together; right?

17   A.   Yes.

18   Q.   Okay.  So doing that, did you ever go down to the police

19        department and say, hey, Sam Dantzler couldn't have done

20        this because he was with me that night?  Did you ever do

21        that?

22   A.   No.

23   Q.   But you realized that way back when; right?

24   A.   Yes.

25   Q.   Okay.  Why didn't you go to the police department when you
```

70

```
 1          realized that you were a person who put Mr. Dantzler

 2          someplace else than the police were saying that he was?

 3                   Why didn't you go to the police department and

 4          say, hey, I'm Marie Simpson, I got a baby by Mr. Dantzler,

 5          and I know where he was on the night that you're accusing

 6          him of doing that, and he wasn't there because he was with

 7          me someplace else?

 8                   Why didn't you do that way back in March, ma'am?

 9     A.   Well, first of all, I did not think to do that.

10     Q.   Didn't think to do that?

11     A.   No.

12     Q.   Didn't think that knowing where he was when he was being

13          accused of something would be important and that maybe the

14          police would want to know about it?

15     A.   Yes, it was important.

16     Q.   So you knew it was important?

17     A.   Yes.

18     Q.   But you didn't think that the police would want to know

19          about it?

20     A.   Yes, I'm sure they would have.

21     Q.   Okay.  But you didn't think to go to the police station to

22          tell them; right?

23     A.   No.  During that time, I was -- this trial was not easy,

24          and so I really stayed in the background.

25     Q.   So the answer to the question is no; right?
```

1   A.   No.  At first, I wasn't even visiting him.

2   Q.   Well, you did start visiting him.

3   A.   Yes, I did, after I was able to.

4   Q.   When was the first time you visited him, ma'am?

5   A.   On the exact date, I don't know.  I'm sure the court will

6        have that.

7   Q.   So you can't remember that date; right?  Was it in April?

8   A.   It was the month that he came, the first month; so if that

9        was March, that was the first visit.

10  Q.   Okay.  So if it was in March, that was the first visit.

11       But you can't remember, but you think it was the first

12       month he was there?

13  A.   It was the first month, one time.

14  Q.   So you visited him in March?

15  A.   Yes.

16  Q.   When was the next time you visited him?

17  A.   It was a couple of weeks later.

18  Q.   Okay.  So you visited him then.

19            When was the next time you visited him?

20  A.   It's usually every couple of weeks.  I don't come every

21       week.

22  Q.   So every couple of weeks?

23  A.   Yes.

24  Q.   So has it been every couple of weeks since March?

25  A.   Yes.

```
 1   Q.   So that would be March, April, May, June, July, August,
 2        September, October, November, December; we're talking
 3        almost ten months; right?
 4   A.   Yes.
 5   Q.   Okay.  Every couple of weeks; right?
 6   A.   Yes.
 7   Q.   Okay.  Ten times -- two times ten is 20 visits; right?
 8   A.   Yes.
 9   Q.   Okay.  You said it was just five or six visits.  Do you
10        remember that?
11   A.   Yes.
12   Q.   Well, ma'am, was it every couple of weeks or was it just
13        five or six, which one was it?
14   A.   During this time period, to give you, like I said, an
15        exact date, every couple of weeks.  You can add them up.
16        I have not added those times up during those visits but I
17        know I don't come every week.  It's usually -- Last month
18        I didn't come.  It was a whole month before I had came to
19        visit him.
20   Q.   Well, you just said every couple of weeks, ma'am.
21   A.   That's two or three weeks, that's within a month.
22   Q.   So would you agree with me that your visits to Mr.
23        Dantzler have been closer to 20 than it has to five or
24        six?
25   A.   In this time period --
```

1    Q.    Okay.  All right.

2    A.    -- I'll agree with that, yes.

3    Q.    So you visited him quite often; right?

4    A.    Yes.

5    Q.    Not infrequently, but quite often?

6    A.    Yes.

7    Q.    And the last one was approximately two weeks ago?

8    A.    I said three weeks.

9    Q.    Three weeks ago?

10   A.    Yes, that was what I said, three weeks.

11   Q.    Okay.  All right.  So did you ever pick up the phone and

12         call the police?

13   A.    No.

14   Q.    Okay.  All right.  So you've never made any effort, in any

15         way, shape or form to come to the police or the

16         Prosecutor's Office and let them know what you know; is

17         that correct, ma'am?

18   A.    Not from the Prosecutor or the Defense, only the arresting

19         officer that was at my home.

20   Q.    The arresting officer that was at your home?

21   A.    Yes.

22   Q.    What do you mean by that, ma'am?

23   A.    The day that he was arrested, an officer -- he was

24         arrested in front of my home, and an officer came to my

25         home and told me about what had happened.  This officer, I

```
 1        don't know his name, but he also --

 2   Q.   What did he look like?

 3             MR. KINNEY:  Can he --

 4             THE COURT:  Well, allow her to complete her

 5        answer, please.

 6             MR. HUTTING:  All right.

 7   BY MR. HUTTING:

 8   Q.   Go ahead.

 9   A.   He was a white male, young.  He was the one that arrested

10        Mr. Dantzler and --

11   Q.   I'm sorry.  When was that?

12   A.   The day he got arrested.

13   Q.   When was that?

14   A.   I don't know the day he was arrested from my house.

15   Q.   Okay, go ahead.

16   A.   And he -- This was the same gentleman that when he came to

17        my home, I found out that he was the one that had called

18        me a couple of days before about Mr. Dantzler, he informed

19        me of the situation.  When he arrived to my home, and he

20        had Mr. Dantzler outside in handcuffs, he told me the

21        situation and he asked me about what I knew.  And at that

22        time I did inform that investigator that he was with me.

23        Because of the conversation we had, he was the only one

24        that I had informed or we had that conversation with.

25   Q.   Didn't that officer ever tell you, well, you know, you
```

```
 1          ought to come down to the Homicide section and give them a
 2          statement about what you know?
 3    A.    I did go down to the station, actually.
 4    Q.    You did now?
 5    A.    I did.  Not for that, though.
 6    Q.    But you --
 7    A.    I went down there.
 8    Q.    But you told us earlier --
 9               MR. KINNEY:  Same objection, your Honor.
10    BY MR. HUTTING:
11    Q.    What station did you go to?
12               THE COURT:  Wait just a minute, please.
13               MR. KINNEY:  He's not letting her finish her
14          answer.
15               MR. HUTTING:  She's kind of rambling on, Judge.
16               THE COURT:  Allow her to answer.  You can move
17          to strike if not responsive.
18               MR. HUTTING:  Thank you.
19    A.    You're asking me some questions.  I did not go down to the
20          police station to report what had happened or that he was
21          with me that night.  I went down there because he was
22          arrested in front of my house and the officer told me that
23          I had to come down there to talk to the officer and get
24          his things that were left down on Schaefer.  That was -- I
25          did not go down there to make that statement.  Those are
```

76

1         two different things.

2    Q.   So you did go to the Schaefer station?

3    A.   Yes, I was there.

4    Q.   But are you aware that that's where the Homicide section

5         is located at, ma'am?

6    A.   No, I'm not aware of that.

7    Q.   Did you ever find that out?

8    A.   No.

9    Q.   But you knew that that's where they took him?

10   A.   Yes.  I was told that he was being transferred.  So when I

11        arrived there, they told me that I would have to go

12        downtown --

13   Q.   Ma'am, just yes or no.

14             MR. KINNEY:  Objection to -- he's still cutting

15        off her answer.

16             MR. HUTTING:  Judge, her answers are not

17        responsive to the questions.  She's rambling on in these

18        answers.

19             THE COURT:  Ms. Simpson, I need you to answer

20        the question that's being asked, whether it's by Mr.

21        Kinney or Mr. Hutting, to the best of your ability.  And

22        only answer the question that's being asked.  If you don't

23        understand the question, tell him you don't understand,

24        ask him to rephrase it, repeat it, whatever.  Just so I --

25        you know, you understand what's being asked of you.  Fair

1        enough?

2                    WITNESS SIMPSON:  Yes.

3                    THE COURT:  All right.  Thank you.

4                    Go ahead, Mr. Hutting.

5     BY MR. HUTTING:

6     Q.   All right.  So you went to the station where Mr. Dantzler

7          was taken?

8     A.   Yes.

9     Q.   Okay.  Did you ever think to inquire about the police

10         officer -- with the police officers who were handling this

11         case about giving a statement at that point in time or

12         approaching them and talking to them?

13    A.   The officers that were in charge --

14    Q.   Ma'am, just simply --

15    A.   Well, I'm trying to answer your question, because they

16         told me that I had to go downtown.  So, yes, I did inquire

17         about the officer that was in charge.

18    Q.   Okay.  And who did you find out that was?

19    A.   I don't know his name, the officer that arrested him, and

20         that's who I was looking to talk to.

21    Q.   At the Schaefer station or downtown?

22    A.   At the Schaefer station.

23    Q.   Did you also go downtown or just go to the Schaefer

24         station?

25    A.   I went to the Schaefer station and they told me I had to

```
 1         wait until he was being transferred, and then I would have
 2         to call to find out where he was transferred to.  And then
 3         from there, I could go down there and they would give me a
 4         name or send me to the person to contact or to talk to.
 5    Q.   Well, knowing all of that, did you ever come back to the
 6         Schaefer station and try to talk to the officers?
 7    A.   Yes.
 8    Q.   Oh, you even came back?
 9    A.   Yes.
10    Q.   Oh, when did you do that?
11    A.   That was the same week.
12    Q.   The same week?
13    A.   Yes.
14    Q.   Did you talk to an officer from the Homicide section who
15         was handling Mr. Dantzler's case?
16    A.   I talked to the officer who -- the officer, yes, one of
17         them who had came.
18    Q.   What was his name, ma'am?
19    A.   I don't know his name.  I didn't write down any names.
20    Q.   What did he look like?
21    A.   He was also a white male.
22    Q.   Did you get -- And you didn't give him a statement?
23    A.   No, I didn't give any statements at that time --
24    Q.   Why didn't you say to the officer, if you knew right then
25         and there, I want to give you a statement because I know
```

79

1      where Mr. Dantzler was on the night that you are accusing

2      him of being someplace else?

3  A.  Because I really did not know what all was transpiring.  I

4      was not sure of everything that the officers were saying.

5      So at the time, I did not do anything.

6  Q.  Well, later on -- But later on, you never went back

7      either?

8  A.  No, I just followed.

9  Q.  Okay.  You just what?

10  A.  I followed, as long as he has been here, I've just been

11      following.

12  Q.  You've been following the case?

13  A.  Yes.

14  Q.  Okay.  And following the case didn't include coming down

15      and talking with an officer about this?

16  A.  Well, I was told that I would be contacted --

17  Q.  Ma'am, ma'am, yes or no.

18          MR. KINNEY:  The questions are not yes or no.

19      She has a right to answer the question.

20          THE COURT:  She's not being responsive to that

21      question, Mr. Kinney, so I'm going to overrule the

22      objection.

23          Ma'am, answer the question being asked of you,

24      please.

25  A.  Okay.  Can you ask that question again?

1    BY MR. HUTTING:

2    Q.   Following the case didn't require you to -- or have you

3         come down and give a statement to the officer?  In your

4         following of the case, you never came down and gave a

5         statement to the officer?

6    A.   No, I've never given a statement.

7    Q.   Okay.  I would imagine, ma'am, that since you've known

8         that you're going to testify now for some time, okay, that

9         you have with you some kind of record of your -- of the

10        night that you worked and the time that you worked on this

11        occasion?

12   A.   No, I did not.  I've known that I was coming for the past

13        week.

14   Q.   And you never made an attempt to bring down your paycheck

15        or pay stubs?

16   A.   I don't have those check stubs that -- during that time.

17   Q.   So you'd know all of this, then, from memory; is that

18        correct?

19   A.   From the events, I was not able to continue to say how I

20        remember those events.  But because of what I heard,

21        that's how I remembered those events.

22   Q.   But you don't have any pay stubs to show us here that you

23        were working that night and the hours that you were

24        working that day?

25   A.   No, I do not.

```
 1   Q.   Okay.  Well, did you ever try to contact Extended America,

 2        your place of employment?

 3   A.   That hotel is still there; however, it's under new

 4        management.  I do know David Hindman was my manager during

 5        that time.  He is now located at a different spot.

 6   Q.   So the answer -- I asked you if you ever tried to contact

 7        him.  Is the answer to my question yes, or is it no,

 8        ma'am?

 9   A.   No.  We have time cards, so I wouldn't be able to get

10        anything from them.

11   Q.   So the answer is no?

12   A.   No.

13   Q.   You never went out there?

14   A.   No.

15   Q.   Okay.  You didn't think that maybe they have records of

16        when you worked and when they paid you for working?

17   A.   No.

18   Q.   They don't keep those records?

19   A.   Well, yes, they do keep those records.

20   Q.   So those would have been available to you if you had gone

21        out there and requested that; right?

22   A.   No.  You have to call corporate office to receive any

23        paperwork, which is in another state.

24   Q.   Did you call corporate office to receive some paperwork?

25        You knew that this was going to be important, what you had
```

1        to say here today; right?

2   A.   Yes.

3   Q.   Okay.  Did you think that maybe, gee, it would be real

4        helpful, and I got two or three weeks, I can make this

5        phone call to the corporate office, get the paperwork, and

6        bring it down here and show it to the jury, show it to the

7        Prosecutor, show it to the Judge?

8   A.   I have not had that long; it's been a week.  But, no, I

9        have not done that.

10  Q.   But you've had a week to do that?

11  A.   Yes.

12  Q.   But you've known for two or three weeks that you were

13       going to testify; right?

14  A.   No, I said a week.

15  Q.   A week?

16  A.   When I received the subpoena.

17  Q.   Of course, you've been talking with Mr. Dantzler when you

18       go over to the jail; right?

19  A.   Yes.

20  Q.   This date has come up, right, in your discussions; right?

21  A.   No.

22  Q.   It's never come up?

23  A.   As far as when I would testify or if I would testify?

24  Q.   What you knew, and about his whereabouts, that's come up;

25       right?

```
 1   A.   Between me and Mr. Dantzler?

 2   Q.   Yes.

 3   A.   No.

 4   Q.   You've never discussed in all your visits with Mr.

 5        Dantzler, in these twice-a-week visits, that you were with

 6        him on the night that this event occurred?

 7   A.   The only thing that we have said concerning that --

 8   Q.   Ma'am, first of all, that's a yes or a no.

 9             Have you discussed that?

10   A.   There was no discussion.

11   Q.   No discussion about that?

12   A.   No.  We know, so that was it.

13   Q.   Well, you -- you say you knew; right?

14   A.   I knew, yes.

15   Q.   All right.  You never said, gee, I ought to go get some

16        paperwork to show where I was and we could show where you

17        were and maybe get your name cleared in this event?

18   A.   No, I did the not think about getting any paperwork.

19   Q.   Okay.  All right.

20   A.   I didn't think I needed to.

21   Q.   Does Mr. Dantzler have cars, ma'am?

22   A.   Does he have cars?

23   Q.   Does he have a car?

24   A.   No, not now.

25   Q.   Back then, in 2006, he had a car; did he not, ma'am?
```

84

```
 1   A.    I don't know if he had a car.  I was driving my car and
 2         that was the car I picked him up in.
 3   Q.    So in this relationship that you had with Mr. Dantzler for
 4         some time where you had this child in common, you've not
 5         seen him in late 2005 or early 2006 driving a car?
 6   A.    That car was not his; it was girlfriend's car.
 7   Q.    So you have.  So the answer to the question is, yes, I've
 8         seen him drive a car?
 9   A.    Yes.  But you asked me was it his car.  It wasn't his car.
10   Q.    And you know enough about that to say, well, it's not his
11         car; it's his girlfriend's car?
12   A.    Yes.
13   Q.    All right.  Was that a gold-colored car, ma'am?
14   A.    No.
15   Q.    Have you ever seen him driving a gold-colored car, ma'am?
16   A.    No.
17   Q.    Okay.  You're certain of that?
18   A.    Yes.
19   Q.    Okay.  All right.
20               THE COURT:  All right.  Mr. Hutting, at this
21         point, we've run over the lunch hour for the jury.  I'm
22         going to let them go have their lunch.  I'd like them back
23         at -- it's going on 12:40 -- I'd like you back at 1:50, an
24         hour and ten minutes; okay?  Don't discuss the case.  Wear
25         your badges.
```

85

1              Ms. Simpson, you may step down.  Thank you.

2              (At about 12:35 p.m., witness excused.)

3              DEPUTY SHERIFF:  All rise for the jury.

4              (At about 12:36 p.m., jury panel excused.)

5              DEPUTY SHERIFF:  Please be seated.

6              (At about 12:36 p.m., lunch recess;

7         At about 1:49 p.m., back on the Record.)

8              COURT CLERK:  Recalling docket 10-3521, People

9    versus Samuel Lee Dantzler, jury trial in progress.

10             MR. HUTTING:  Auggie Hutting, for the People.

11             MR. KINNEY:  Robert Kinney appearing on behalf

12   of Mr. Dantzler.  And as I said before, your Honor, I'd

13   indicated to Mr. Dantzler that I didn't think it was a

14   good idea for him to testify or for us to put on a

15   defense.  We started putting on a defense --

16             Ms. Simpson, you're going to have to step out.

17   I'm sorry, I didn't know she was still present.

18             MR. HUTTING:  Or in the witness room.

19             MR. KINNEY:  Based on her testimony, over the

20   lunch hour, I know some work was done by the Prosecution

21   and Sergeant Clark.  They just handed me a police arrest

22   report of Mr. Dantzler where the officer, Joseph Weekley,

23   stating that Mr. Dantzler said, "You got me."  And if I

24   had this earlier, I'm sure Mr. Dantzler wouldn't have put

25   on a defense.  But we just got this and I think it's very

86

1    late in the day and should not be used.

2              MR. HUTTING:  Well, Judge, this stuff with the

3    witness just came up.  Her testimony just came up.  Today

4    is the first day that I heard about it.  So I called out

5    to the Homicide section.  We didn't have in the file, the

6    arrest PCR of Mr. Dantzler.  I asked if there was an

7    arrest PCR and could Sergeant Russell find it.

8              He went into the computer.  He found it.  He

9    faxed it to me over the lunch hour.  I took a look at it

10   and I gave it to Mr. Kinney.  I brought it down here and I

11   gave it to Mr. Kinney.  So I just got my hands on it

12   today, based on the testimony of Marie Simpson that I just

13   found out about today.  So that's how I turned it over.

14             If Mr. Dantzler testifies, I think it's fair

15   game, if he testifies, to ask him, when the officer

16   arrested you, did you say to him -- because there were

17   three officers there, Weekley, Staller, and Collins -- did

18   you say to them, "You got me?"  Okay.

19             THE COURT:  Mr. Kinney.

20             MR. KINNEY:  This is an unfair surprise.  This

21   is unfair prejudice here.  I don't know what the file is

22   like.  He knows what their file is like.  He could have

23   looked at -- according to this, they knew about Ms.

24   Simpson and --

25             THE COURT:  Well, this is an easy call for me,

87

1    quite frankly.  There's plenty of case law in this.  The

2    Defense is entitled to timely discovery.  And I understand

3    Mr. Hutting just received it through his office; however,

4    the Defendant's Notice of Alibi was dated December 2nd and

5    filed December the 3rd regarding Marie Simpson testifying

6    in this trial; that she'd be called.  So the Prosecutor's

7    Office had since December 3rd, they were put on notice,

8    that she'd be testifying in this trial.  I can't allow it

9    at the -- not the eleventh hour, almost the twelfth hour.

10   It's just inherently unfair to the defense.

11           Accordingly, it will be precluded.

12           MR. KINNEY:  Thank you, your Honor.

13           THE COURT:  Anything else?

14           MR. HUTTING:  No.

15           MR. KINNEY:  Not at this time.

16           THE COURT:  All right.  Invite the jury in,

17   please.  Bring the witness in, please.

18           DEPUTY SHERIFF:  All rise for the jury.

19           (At about 1:53 p.m., jury panel seated.)

20           DEPUTY SHERIFF:  Please be seated.

21           THE COURT:  You remain under oath, Ms. Simpson.

22           Mr. Hutting.

23           MR. HUTTING:  Yes.

24   BY MR. HUTTING:

25   Q.   When we broke for lunch -- I'm going to pick up from

88

```
 1          there.
 2                    Do you know Little Sam or Samuel Dantzler,
 3          Junior?
 4    A.    Yes.
 5    Q.    Okay.  How long have you known him?
 6    A.    As long as I've known Sam.
 7    Q.    Okay.  The house on Blackstone, you're familiar with that
 8          house on Blackstone?
 9    A.    Yes.
10    Q.    Okay.  And I take it that you have been over there?
11    A.    Yes.
12    Q.    I take it, even from your answers, that you dropped your
13          child off there to be babysat; is that correct?
14    A.    Yes.
15    Q.    That's actually a house that belongs to Mr. Dantzler's --
16          the person -- the lady that was his current girlfriend;
17          right?
18    A.    I don't know that.
19    Q.    You don't know that?
20    A.    I don't know who house that was.
21    Q.    Well, who lives there in the house that you know that you
22          dropped the baby off to be babysat?
23    A.    The one that was there during the time was usually his
24          mother.
25    Q.    Mr. Dantzler's mother?
```

89

1   A.   Yes.

2   Q.   You also know Carmen?

3   A.   No, I do not.

4   Q.   Okay.  So you just know his mother?

5   A.   Yes.

6   Q.   Okay.  You never saw anybody else there at the house?

7   A.   I saw many people; I don't know who they were.

8   Q.   Okay.  Do you know Rodney Turner?

9   A.   Yes.

10  Q.   Okay.  How long have you known Rodney Turner?

11  A.   Not very long.

12  Q.   Well, how did you meet him?

13  A.   Mr. Dantzler.

14  Q.   And when was that?

15  A.   Maybe a couple of years after I met Mr. Dantzler.

16  Q.   And so you met Mr. Dantzler when?

17  A.   Eight years ago.

18  Q.   So you've known Rodney Turner for at least six years?

19  A.   Yes.

20  Q.   So when I asked you how long have you known him, you said

21       not very long.  You don't think that six years is a fairly

22       long time to know somebody?

23  A.   No.  Because I just know of him, we don't have a

24       relationship or anything.

25  Q.   I didn't ask you how well you knew him.  I asked if you

90

```
 1        knew him and for how long.  And the answer was not very

 2        long; was it not?

 3   A.   Yes.

 4   Q.   Okay.  Do you know Michael Dantzler?

 5   A.   Yes.

 6   Q.   Okay.  How long have you known Michael Dantzler?

 7   A.   All around the same time.

 8   Q.   Okay.  How about Omar Dantzler?  Are you familiar with

 9        Omar Dantzler?

10   A.   Yes.

11   Q.   Okay.  So you know all of these people then?

12   A.   Yes.

13   Q.   Know Quiana also?

14   A.   Yes.

15   Q.   Okay.  Now were you aware that Mr. Dantzler, about two

16        days after this incident, went to Mississippi?

17   A.   No.

18   Q.   You were not aware of that?

19   A.   No.

20   Q.   You never heard that?

21   A.   No, I have not.

22   Q.   Did there come a time a couple days after this incident

23        when you didn't see Mr. Dantzler?

24   A.   No.

25   Q.   You saw him?
```

```
 1  A.   I saw him the next day.

 2  Q.   The next day.  How about the day after that?

 3  A.   No.

 4  Q.   When's the next time you saw Mr. Dantzler?

 5  A.   I cannot state that for sure.

 6  Q.   Can you give us some kind of idea?

 7  A.   Within that week.

 8  Q.   Within that week.

 9  A.   Yes.

10  Q.   Where -- And where did you see him?

11  A.   More than likely picking up or dropping off my daughter.

12  Q.   Does more than likely mean that you don't really remember

13       seeing him, it was just kind of a habit that you had and

14       that's why you're saying that; is that correct?

15  A.   Well, he is the one that picks up my daughter, so, yes, I

16       seen him.

17  Q.   Okay.  Ma'am, see, the question is did you see him within

18       the week?  You answered --

19  A.   Because you're asking for an exact date.  Yes, I did see

20       him within that week, yes, I did.

21  Q.   Okay.  My question then is when?  And your answer was more

22       than likely.

23  A.   I know I saw him the next day and that following weekend.

24  Q.   So now you know that you saw him that following weekend?

25  A.   Yes.
```

1   Q.   Why did you say more than likely during the week?  Why did

2        you say the following weekend?

3   A.   Because it's within a week.  You're asking me for a

4        specific date.  I can not give you a specific date.  But

5        that week, yes, I did see him, because he had my daughter.

6   Q.   That's because there was this pattern that he would, at

7        times, babysit for your daughter; right?

8   A.   I wouldn't say babysit.  He had her, she was his child.

9   Q.   He watched her because it was his child?

10  A.   Yes.

11  Q.   Because you don't really remember that, but that was the

12       pattern that you had, so that's why you've testified to

13       that?

14  A.   Yes, that's what happened.

15  Q.   Thank you.

16            How about the following week?  How about the

17       following week after that in 2006, did you see him then?

18  A.   I can not verify that.

19  Q.   Okay.

20  A.   I don't remember.

21  Q.   Okay.  I'm going to show you this item.  This is People's

22       Exhibit Number 22.

23            Can you see this item, ma'am?

24  A.   Yes.

25  Q.   Okay.  Would you agree with me that it's a black skull

93

```
 1        cap?

 2   A.   Yes.

 3   Q.   Okay.  Did you ever see Mr. Dantzler wearing a black skull

 4        cap like this?

 5   A.   No.

 6   Q.   No?

 7   A.   No.

 8   Q.   Never?

 9   A.   No.

10   Q.   So the answer is you've never seen him wearing a black

11        skull cap like this?

12   A.   Not like that.

13   Q.   Not like that?

14   A.   No.

15   Q.   Okay.  And you've known Mr. Dantzler for seven or eight

16        years; right?

17   A.   Yes.

18   Q.   Okay.  Because you'd remember if you saw him wearing a

19        black skull cap like this; right?

20   A.   He wears the caps usually with the rim.

21   Q.   With a rim, that's a baseball-type cap?

22   A.   Yes.

23   Q.   Never seen him with a black skull cap like this,

24        especially during the winter?

25   A.   No.  I can't verify that exactly, no.
```

1    Q.    Can't verify that exactly, no.  Does that mean --

2    A.    No.  The answer is no, no.

3    Q.    Okay.

4              MR. HUTTING:  Thank you very much, ma'am.

5              THE COURT:  Thank you, Mr. Hutting.

6              Mr. Kinney.

7              MR. KINNEY:  Nothing further from this witness.

8              THE COURT:  May the witness step down and be

9    excused?

10             MR. KINNEY:  Yes, your Honor.

11             MR. HUTTING:  Yes.

12             THE COURT:  Thank you, Ms. Simpson.  You're

13   excused.

14             MR. KINNEY:  And at this particular time, the

15   Defense calls Mr. Dantzler to the stand.

16             THE COURT:  Mr. Dantzler, would you come forward

17   and give your full name and spelling to Mrs. Bauer, the

18   court reporter, please?

19             DEFENDANT DANTZLER:  Samuel Dantzler.

20             MR. KINNEY:  While we're doing that, can we

21   approach, Judge?

22             THE COURT:  Sure.

23             (At about 2:00 p.m., brief sidebar;

24             At about 2:01 p.m., back on the Record.)

25             THE COURT:  Would you rise, Mr. Dantzler, and be

1    sworn?

2              COURT CLERK:  Raise your right hand.

3              Do you swear or affirm that the testimony you're

4         about to give in the matter now pending before this Court

5         will be the truth, so help you, God?

6              DEFENDANT DANTZLER:  Yes, I do.

7                        SAMUEL DANTZLER,

8         called as a witness at 2:01 p.m., having first been duly

9         sworn by the Clerk of Court, was examined and testified on

10        his oath as follows:

11             COURT CLERK:  Have a seat.

12             THE COURT:  Mr. Kinney.

13             MR. KINNEY:  Thank you, your Honor.

14

15   DIRECT EXAMINATION BY MR. KINNEY:

16   Q.   Good afternoon, sir.

17   A.   Good afternoon.

18   Q.   Pull that to you so you can be heard by the jury.

19             First of all, state your full name for the

20        Record, please.

21   A.   Samuel Lee Dantzler.

22   Q.   And is that Senior?

23   A.   Yes.

24   Q.   Okay.  And how old are you?

25   A.   Forty-five.

1 Q. Forty-five, okay.

2      And do you know a Quiana Turner?

3 A. Yes, I do.

4 Q. And who is she to you?

5 A. That's my niece.

6 Q. All right.  And did you know Bernard Hill?

7 A. Yes, I did.

8 Q. And who was that to you?

9 A. He's my niece father.

10 Q. Your niece's?

11 A. Quiana's daughter.  And also her ex, you know, boyfriend.

12 Q. Okay.  So he's your great niece's daughter?

13 A. Father.

14 Q. He's your great niece's father?

15 A. Um-hmm.  Also, he's a friend.

16 Q. And he was a friend?

17 A. Yes.

18 Q. Okay.  Did you know of the relationship between Quiana

19   Turner and Mr. Hill, the violent nature of that

20   relationship?

21 A. Yes, I did.

22 Q. And did you know or do you know, for lack of a better

23   term, that he jumped on her on the 15th of January?

24 A. Yes.

25 Q. You knew that?

```
 1   A.   On the 15th?

 2   Q.   Yes.

 3   A.   I believe so, yes.

 4   Q.   Okay.

 5   A.   After that.

 6   Q.   How did you find out about that?

 7   A.   I don't know exactly who told me.

 8   Q.   Somebody else told you?

 9   A.   Yes.

10   Q.   Okay.  And what did you do about it?

11   A.   I didn't do anything about it.

12   Q.   All right.  And did you know of him jumping on her in the

13        past?

14   A.   Oh, yes.

15   Q.   All right.  And did you do anything about it when he

16        jumped on her prior times?

17   A.   No.

18   Q.   Approximately how many times did you know of that he has

19        jumped on Quiana Turner physically?

20   A.   At least eight, at least eight.

21   Q.   Eight different times?

22   A.   Yes.

23   Q.   Okay.  And on those eight different occasions, was there

24        -- did you ever confront Mr. Hill about his relationship

25        with your niece?
```

```
 1   A.   No.
 2   Q.   And did you have a conversation with Mr. Hill about his
 3        jumping on Quiana, January the 15th of 2006?
 4   A.   No.
 5   Q.   All right.  Did you ever have a conversation with any of
 6        Mr. Hill's family members regarding his physical attacks
 7        on Quiana Turner?
 8   A.   No, I did not.
 9   Q.   Did you know his -- Did you know Mr. Hill's father?
10   A.   I didn't know him.  I think I -- I think, once, he was in
11        a car wreck, but we didn't introduce ourselves or anything
12        like that.
13   Q.   You haven't -- You haven't been formally introduced -- You
14        were never formally introduced to Mr. Hill's father?
15   A.   No.
16   Q.   Did you know Mr. Hill's mother?
17   A.   Yes.
18   Q.   Okay.  You've been to her house before?
19   A.   Yes, I have.
20   Q.   And do you recall the first time that you went to her
21        house?
22   A.   The first time?  No.
23   Q.   Do you recall your -- the day that your great niece was
24        born?
25   A.   No, I do not.
```

```
1   Q.   Do you recall --

2   A.   I can remember things around -- I can remember around it.

3        Yeah, I remember when she was born, but I can't tell you

4        the date.

5   Q.   Can't give me the date?

6   A.   No.

7   Q.   Can't give us the year?

8   A.   No.

9   Q.   But you can probably figure it out if you remember how old

10       she is now?

11  A.   Yes, yes.

12  Q.   Okay.  All right.  Did you raise Quiana or did she have

13       her own father?

14  A.   She has a father.

15  Q.   Okay.  Did you raise her?

16  A.   Raise her?

17  Q.   Yeah.  Did she live --

18  A.   I'm her uncle.

19  Q.   Okay.  Anything more than an uncle?

20  A.   No.

21  Q.   Okay.  You weren't -- You weren't a fatherly figure to

22       her?

23  A.   No.  She has a father.

24  Q.   She has a father.  And that would be your brother?

25  A.   No.
```

```
 1   Q.   No?  Who is her father?

 2   A.   Her father's name Michael King.

 3   Q.   So you're related to Quiana's mother?

 4   A.   Yes.

 5   Q.   Okay.  And that would be your sister?

 6   A.   Yes.

 7   Q.   Okay.  Do you remember having conversations with your

 8        sister about this incident?

 9   A.   No.

10   Q.   No?

11   A.   No.

12   Q.   Okay.  Did you go over to Ms. Burt, which is Mr. Hill's

13        mother; correct?

14   A.   Yes.

15   Q.   Did you go over to Ms. Burt's house the night of the 15th?

16   A.   No, I did not.

17   Q.   Confront anybody?

18   A.   No.

19   Q.   All right.  Were you -- Your son is Samuel Lamare

20        Dantzler, Junior?

21   A.   Yes, he is.

22   Q.   Were you with your son on the night of the 15th?

23   A.   No, I was not.

24   Q.   Were you with Rodney Turner on the night of the 15th?

25   A.   No, I was not.
```

101

```
 1   Q.   Because you're sitting in this chair, I assume that, at

 2        some point, you knew that Mr. Hill had died?

 3   A.   Yes.

 4   Q.   All right.  And do you recall when you found that out?

 5   A.   I want to say maybe two days after -- maybe two days after

 6        the fight.

 7   Q.   Two days after the fight.

 8   A.   Yeah.  The fight that -- Well, I don't want to call it a

 9        fight.  But two days after he jumped on her, I think I

10        found out then.

11   Q.   That Mr. Hill had died?

12   A.   Yes.

13   Q.   All right.  And describe to us how you found that out.

14   A.   I bumped into my brother's girlfriend and she told me.

15   Q.   Okay.  So --

16             MR. HUTTING:  I'm sorry, I missed that answer.

17        Could I -- and I apologize, could I have him repeat that?

18   A.   I found out through my brother's ex-girlfriend.

19   BY MR. KINNEY:

20   Q.   And just for the Record, you said you bumped into your

21        brother's girlfriend?

22   A.   Yes.

23   Q.   And she told you?

24   A.   Yes.

25   Q.   Okay.  You ever talk to your son about this incident?
```

1    A.    Which incident, the fight?

2    Q.    And the death.

3    A.    No.

4    Q.    So you didn't talk to him about Mr. Hill's death?

5    A.    No.

6    Q.    And did you talk to him about Mr. Hill jumping on Quiana?

7    A.    I don't think -- I don't remember ever having a

8          conversation with him about it, but I know we know that,

9          you know, it happened, but I don't think we had a

10         conversation about it.

11   Q.    All right.  Now on the 15th of January, between the hours

12         of 9:00 and 10:00 in the evening --

13   A.    Um-hmm.

14   Q.    -- where were you?

15   A.    I was waiting on Ms. Marie Simpson to come pick me up.

16   Q.    Okay.  And she picked you up that day?

17   A.    Yes, she did.

18   Q.    And do you recall exactly what time she picked you up in

19         2006?

20   A.    The exact time?

21   Q.    Yeah, the exact time.

22               Can you tell the jury the exact time that she

23         picked you up?

24   A.    No, I cannot.

25   Q.    Okay.  But you know she picked you up that night?

103

```
 1   A.   Oh, yeah, she did.

 2   Q.   All right.  And was this a habit?

 3   A.   Pretty much, yes.

 4   Q.   So what kind of relationship -- What would you -- How

 5        would you define your relationship with Ms. Simpson back

 6        in 2006?

 7   A.   She's a friend.

 8   Q.   She's a friend.

 9   A.   She's my child mother also.  She's a friend.

10   Q.   Okay.  So was she ever more than a friend?

11   A.   No.

12   Q.   So you had a sexual relationship with a friend?

13   A.   Yes, I did.

14   Q.   Is that correct?

15             And then this friend is now -- You all have a

16        child together?

17   A.   Um-hmm.

18   Q.   Did this relationship ever grow into something else?

19   A.   Oh, never, no.

20   Q.   So in 2006 -- Well, is there -- Did you have a

21        relationship with someone else?

22   A.   Yes, I did.

23   Q.   Okay.  And did Ms. Simpson have a relationship with

24        someone else?

25   A.   At this time, I believe she was -- I don't believe she was
```

1       seeing anyone -- In 2006, you said; right?

2   Q.  Right, in January 2006.

3   A.  I don't know if she was seeing anyone.

4   Q.  Okay.  So I take it that you made sure that your

5       significant other knew that you were friends with Ms.

6       Simpson; is that correct?

7   A.  Well, you say, do I let her know that we are friends?

8   Q.  Yeah.  And not only that you were friends -- Back in 2006,

9       whoever you were seeing in 2006, did that person know Ms.

10      Simpson?

11  A.  Not in 2006, no.

12  Q.  Not in 2006.

13              Did that person know that you have a child

14      outside of your relationship with that person?

15  A.  Not at that time, no.

16  Q.  Didn't know that.  Okay.

17  A.  No.

18  Q.  And so she wouldn't have known that you were with Ms.

19      Simpson on the 15th of June?

20  A.  No, she wouldn't have.

21  Q.  Okay.  And without giving us the address, where did you

22      stay in January of 2006?

23  A.  I was staying in Highland Park.

24  Q.  In Highland Park?

25  A.  Yes.

1    Q.   Okay.  And the Blackstone address is not in Highland Park?

2    A.   No, it's not.

3    Q.   What city is that in?

4    A.   Detroit.

5    Q.   Okay.  And whose residence would that be?

6    A.   I don't know exactly who resident name it was in.

7    Q.   You know, not necessarily the name.  It's like my

8         grandmother's house in West Virginia.  It's just my

9         grandmother's house, I don't know whose name it's in.

10   A.   See, on Blackstone Street, it was like a meeting house

11        that everybody came to, you know.

12   Q.   Everybody in the family or --

13   A.   Yeah, everybody in the family.  Everybody could just come

14        there and just lay and just visit and whatever, it was --

15   Q.   But your mom, did she visit?

16   A.   Yes, she did.

17   Q.   Or did she stay there?

18   A.   No, she didn't stay there.

19   Q.   But she came there, too?

20   A.   Oh, yeah, she was always there.  She would stay there,

21        too.

22   Q.   And you were there on the 15th?

23   A.   Yes.

24   Q.   What time did you get there; if you can remember?

25        Morning?  Afternoon?  Evening?

106

1   A.   It would probably have been in the afternoon.

2   Q.   Afternoon.  And then Ms. Simpson picked you up around what

3        time?

4   A.   It had to be about later on that -- later on that evening.

5   Q.   Okay.  And later on that evening, before 12:00 at night?

6   A.   Oh, yeah.

7   Q.   Before 11:00?

8   A.   Yes.

9   Q.   Before 10:00?

10  A.   It was probably in between that time.  Between -- probably

11       between 10:00 and 11:00.

12  Q.   Okay.  And where did you all go?

13  A.   We went back to her house.

14  Q.   Was your daughter with you?

15  A.   Yes.

16  Q.   Okay.  And what kind of car did Ms. Simpson have?

17  A.   At this time, she was driving a -- it was a --

18  Q.   What color was it?

19  A.   It was green.

20  Q.   A green car?

21  A.   Yeah.

22  Q.   Okay.  And did you drive that car sometime?

23  A.   Sometimes, I did.  She'd let me drive it.

24  Q.   Did you have your own car in January of 2006?

25  A.   No.

1   Q.   Okay.  Did you ever drive a long, gold-colored Chrysler?

2   A.   Yes, I did.

3   Q.   Okay.  And did you drive that car -- Well, how long did

4        you drive the car?

5   A.   I had that car maybe two years.

6   Q.   Two years.  And this is prior to 2006?

7   A.   Yes.

8   Q.   Did you ever get rid of that car?

9   A.   Yes.

10  Q.   And how did you get rid of it?

11  A.   It was my brother-in-law birthday and I let him use the

12       car on his birthday and he got a little drunk and he had

13       an accident in it.  And at that time, I didn't want the

14       car back so he kept -- he kept the car and just paid me

15       for it.

16  Q.   And approximately how long prior to January the 15th of

17       2006 did that occur?

18  A.   Maybe a year.

19  Q.   So you hadn't driven that car in at least a year prior to

20       January 15th, 2006?

21  A.   Correct.

22  Q.   Okay.  And how long did you stay at Ms. Simpson's house?

23       January the 15th, Ms. Simpson picked you up --

24  A.   I got a phone call -- Yeah.

25  Q.   -- between nine and ten o'clock?

108

1   A.   Um-hmm.

2   Q.   How long did you stay?

3   A.   I think I stayed there till -- maybe till -- maybe about

4        8:00.

5   Q.   8:00 a.m., 8:00 p.m.?

6   A.   P.m.

7   Q.   Okay.  So you got there at -- on the 15th?

8   A.   Um-hmm.

9   Q.   Between -- Was that 9:00 and 10:00, or 10:00 and 11:00?

10  A.   Yeah.

11  Q.   And that's in the p.m.; correct?

12  A.   This is p.m.

13  Q.   Okay.  On the 15th.

14            And you spent the night?

15  A.   Yes, I did.

16  Q.   And did you go anywhere that night or you stayed there the

17       whole night?

18  A.   I stayed there the whole night.

19  Q.   And then the next morning what happened?

20  A.   I'm thinking, if I remember right, this next day, I

21       went -- I don't exactly remember where I went, exactly

22       what I did that next day.

23  Q.   Well, at eight o'clock in the morning were you at Ms.

24       Simpson's house?

25  A.   Oh, yes, I was.

```
 1   Q.   You was there?

 2   A.   Um-hmm.

 3   Q.   Were you there with your daughter?

 4   A.   Yes, I was.

 5   Q.   And was that the purpose of you being there, spending the

 6        night?

 7   A.   Yeah.

 8   Q.   To be with your daughter?

 9   A.   Yeah.

10   Q.   And did Ms. Simpson go to work the next day?

11   A.   Yes.

12              MR. HUTTING:  Objection.  Leading.

13              THE COURT:  Response?

14              MR. KINNEY:  I'll rephrase the question.

15   BY MR. KINNEY:

16   Q.   What did Ms. Simpson do the next morning, if you remember?

17   A.   She had to work.

18   Q.   And did she go?

19   A.   Yes.

20   Q.   Okay.  Did she -- How does she go to work?

21   A.   She drove.

22   Q.   Okay.  So then did you have a car?

23   A.   Not at that time.

24   Q.   Not at that time.

25   A.   No, I wasn't driving right then.
```

```
 1   Q.   Well, if she left and took the car, then you're left

 2        without a car?

 3   A.   No.  I waited until she got back and then I go.

 4   Q.   Okay.  You waited till she got back.

 5             So you were at her home until she got off work?

 6   A.   Right.

 7   Q.   Okay.  And then what did you do?

 8   A.   I believe I had her to drop me off close to my friend

 9        house.

10   Q.   To your significant other?

11   A.   Yes.

12   Q.   Okay.  All right.  And because -- Okay.  You had her drop

13        you off close to her house, not at the house?

14   A.   Right.

15   Q.   Okay.  And did you ever have contact with Mr. Hill during

16        the last few hours of his life?

17   A.   No.

18   Q.   Okay.  Did you -- Did you talk to Quiana Turner about this

19        incident just prior to the last few hours of Mr. Hill's

20        life?

21   A.   No.

22   Q.   Did you have anything to do with Mr. Hill's death?

23   A.   No, I did not.

24   Q.   Did you go to Mr. Hill's apartment, Apartment 302?

25   A.   That night?
```

1   Q.   That night.

2   A.   No, I did not.

3   Q.   Well, had you been there before?

4   A.   Yes, I have been there.

5   Q.   All right.  So you knew where the house was?

6   A.   Yes.

7   Q.   You knew where the apartment was?

8   A.   Yes.

9   Q.   All right.  And you say he was a friend?

10  A.   Yes, he was.

11  Q.   Okay.  But you weren't at his home that night?

12  A.   Not that night, no.

13  Q.   Did you have anything to do with his death?

14  A.   No.

15  Q.   Did you aid or encourage anybody --

16  A.   No, I did not.

17  Q.   -- to do anything to Mr. Hill?

18  A.   No.

19  Q.   Did there ever come a time where you were notified that

20       police officers were looking for you?

21  A.   Yes.

22  Q.   And when was the first time you were notified that a

23       police officer was looking for you?

24  A.   I really can't say.

25  Q.   2006?

```
 1    A.    Well, I think -- I think around 2006 someone did say that
 2          the police came by looking for me and they had a warrant
 3          out for me for child support.
 4    Q.    For child support?
 5    A.    Yes.
 6    Q.    Okay.  Well, were you ever arrested for the child support?
 7    A.    No.
 8    Q.    No.  So you took care of that?
 9    A.    The child support?
10    Q.    Well, to keep a warrant from happening.
11    A.    Well, like, right now, I owe child support, you know, so I
12          probably still got a warrant right now on child support.
13    Q.    Okay.  All right.  Well, did there come a time where you
14          were notified by authorities, the police or lieutenant or
15          something from Homicide, left a card at the Blackstone
16          address saying, get in touch with me?
17    A.    No.
18    Q.    Were you ever notified by family members or anybody else
19          that a police officer was looking for you?  Not for
20          anything else, we're speaking of Mr. Hill's death.
21    A.    No.
22    Q.    So in 2006, police officers didn't come looking for you,
23          to your knowledge?
24    A.    Not for his death, no.
25    Q.    Okay.  2007?
```

```
 1   A.   No.

 2   Q.   No police officers come to want to talk to you about --

 3   A.   No.

 4   Q.   -- Mr. Hill's death?

 5   A.   No, they did not.

 6   Q.   2008?

 7   A.   No.

 8   Q.   2009?

 9   A.   No.

10   Q.   All right.  You were arrested, I believe, February the

11        25th of 2010?

12   A.   Yes, I was.

13   Q.   Okay.  Did police officers come to you?

14   A.   Yes, they pulled me over.

15   Q.   Okay.  All right.  And was Ms. Simpson there at the time?

16   A.   When they pulled me over?

17   Q.   Yes.

18   A.   No, my daughter was with me.

19   Q.   Your daughter was with you.

20   A.   Yes.

21   Q.   Okay.  Were you with Rodney -- What's Rodney's last name,

22        Mr. Dantzler?

23   A.   Turner.

24   Q.   Turner.  And Rodney is Quiana's --

25   A.   Brother.
```

114

1   Q.   Brother.

2              Were you with Mr. Turner on the 15th or 16th of

3        January, 2006?

4   A.   You mean, did I see him at any time?

5   Q.   Were you in his presence on the 15th --

6   A.   I think I've seen him over -- I've seen him, but I don't

7        remember hanging or anything with him.  But I seen him,

8        yes.

9   Q.   Okay.  And you saw him at the time that you were with Ms.

10       Simpson, you've indicated?

11  A.   You're saying Ms. Simpson, when I was with her?

12  Q.   You indicated that you were with Ms. Simpson, correct me

13       if I'm wrong, the night of the 15th?

14  A.   Right, the 15th.

15  Q.   Was Mr. Rodney Turner with you at that time?

16  A.   No.

17  Q.   Okay.  So if you saw Mr. Turner, it was before you got

18       with --

19  A.   Yeah.

20  Q.   Omar Dantzler, were you -- or did you see Omar Dantzler or

21       were you with Omar Dantzler the night of the 15th?

22  A.   No, not the night of.

23  Q.   Over through --

24  A.   No.

25  Q.   -- the day of the 16th --

1   A.   No, I was not.

2   Q.   -- January?

3   A.   No.

4   Q.   That's 2006?

5   A.   Right.

6   Q.   Is there something that I have missed that you want the

7        jury to understand about the night of the 15th?

8   A.   I did not have anything to do with the death of Bernard

9        Hill.  Like, he was a friend of mine, you know, just as

10       well as my niece's father.  I would never do anything like

11       that to him.  I had no reason.  This wasn't the first time

12       that that man did that.  And I would not do that to a man.

13            MR. HUTTING:  Judge, Judge, he's just

14       volunteering information.  That's not responsive to the

15       question.

16            MR. KINNEY:  I'll move on, your Honor.

17            THE COURT:  I'll sustain the objection.  Go

18       ahead.

19   BY MR. KINNEY:

20   Q.   Mr. Dantzler, do you ever wear a skull cap?

21   A.   Yes.

22   Q.   Do you ever wear a black skull cap?

23   A.   Yes, I have.

24   Q.   Okay.  On the night of the 15th through the early morning

25       hours of the 16th, did you have a black skull cap on?

116

1    A.    I really can't tell you what my -- what gear did I have

2          on.

3    Q.    Okay.  Did you leave a black skull cap at Mr. Hill's

4          apartment?

5    A.    No, that was impossible.

6    Q.    Because?

7    A.    I wasn't there that night.

8                    MR. KINNEY:  Nothing further at this time, your

9          Honor.

10                   THE COURT:  Cross-examination, Mr. Hutting.

11                   MR. HUTTING:  Thank you, your Honor.

12                   THE COURT:  You're welcome.

13

14   CROSS-EXAMINATION BY MR. HUTTING:

15   Q.    Good afternoon, sir.

16   A.    Good afternoon.

17   Q.    You obviously know who I am; is that correct?

18   A.    Yes.

19   Q.    Okay.  Same couple of rules that I had with Ms. Simpson.

20         If you can't hear me, will you ask me to speak up, please?

21   A.    Yes.

22   Q.    Okay.  If you don't understand the question, will you ask

23         me to repeat it or say it in a different way?  All right?

24   A.    Okay.

25   Q.    Okay.  You said on your direct examination that you had

117

```
 1        been to the apartment on West Seven Mile?

 2   A.   Yes, I have.

 3   Q.   Okay.  And how many times prior to the demise of Bernard

 4        Hill had you been to this apartment on West Seven Mile?

 5   A.   Estimated guess, I'll say four.

 6   Q.   Four?  Okay.

 7             And in what years was it that you were at the

 8        apartment?  In 2006?

 9   A.   Yes, I was.

10   Q.   Okay.  Were you there also in late 2005?

11   A.   No.

12   Q.   They were all in 2006?

13   A.   Well, you say late 2005?

14   Q.   Late 2005, or were they all --

15   A.   Yeah, maybe late 2005, 2006.

16   Q.   On four different occasions?

17   A.   Yes.

18   Q.   Okay.  And, of course, when you were there, Nikitta

19        McKenzie was also there; was she not?

20   A.   No, I had never met her.

21   Q.   You never met Nikitta McKenzie?

22   A.   No.

23   Q.   You just went to the apartment, Bernard Hill was there,

24        but not Nikitta McKenzie?

25   A.   Correct.
```

118

```
 1   Q.   What were the occasions for you to go to that apartment?

 2        Why would you go to that apartment?

 3   A.   Well, two times, I know, I went to pick him up, so I

 4        didn't go in.

 5   Q.   Okay.

 6   A.   So I just went outside, I looked, and he came out.

 7   Q.   All right.  And the other two occasions?

 8   A.   One time I went to buy a bag of weed.

 9   Q.   From Bernard Hill?

10   A.   Yes, I did.

11   Q.   So you bought some marijuana from him.

12             And what about the other occasion?

13   A.   It was the same -- same thing.

14   Q.   Okay.  So another bag of weed; is that correct?

15   A.   Yes.

16   Q.   So, of course, on those occasions, you went to the

17        apartment; right?

18   A.   Yes.

19   Q.   Okay.  Of course, when you were there inside that

20        apartment, you never left the skull cap there; did you,

21        sir?

22   A.   Not that I remember.

23   Q.   Okay.  And you indicated that you did own a black skull

24        cap that looked like this?

25   A.   I have owned many of those caps, so --
```

1    Q.   I'm talking -- Okay.  Fair enough.

2                  I'm talking about late 2005 and the beginning of

3         2006, before this event happened, did you own a black

4         skull cap that looked like this, sir?

5    A.   It's possible.

6    Q.   It's possible.

7                  Well, yes or no?

8    A.   If I had to guess, I would say, yes, I owned one.

9    Q.   Okay.  All right.  And do you have that black skull cap

10        today?

11   A.   Of today, I don't own any black skull caps.  I've been

12        locked up since the summer, so I haven't had an

13        opportunity to buy a black cap.

14   Q.   Of course, at the time that you got locked up, you didn't

15        own -- you didn't have this black skull cap; is that

16        correct?

17   A.   That one there?

18   Q.   Yep.

19   A.   I don't know.

20   Q.   You don't know.  Okay.

21                 Let me ask you this, sir, you have seen your

22        discovery in this case; have you not, sir?

23   A.   That book?

24   Q.   Yeah, the book.

25   A.   Um-hmm.

                                120

1    Q.   That's a yes?

2    A.   Yes, sir.

3    Q.   Okay.  That's the book that's got all the reports; is that

4         correct?

5    A.   Yes, it is.

6    Q.   That's the book that's got all the statements of all the

7         witnesses; right?

8    A.   Yes.

9    Q.   Okay.  That's the book that's got all the reports of any

10        expert that we have a report from or the doctor; right?

11   A.   Yes.

12   Q.   Okay.  Matter of fact, you've read through that; haven't

13        you, sir?

14   A.   Yes, I did.

15   Q.   Okay.  You even have your own copy with you over across

16        the street; don't you, sir?

17   A.   No, I do not.

18   Q.   Well, where have you read through it then, sir?

19   A.   Well, I read through it over across the street.

20   Q.   Okay.  And how did you do that when you read through it

21        over across the street?

22   A.   How did I do it?

23   Q.   Yes, sir.

24   A.   I flipped the page and I read that one, and I flipped the

25        next page and I read that one.

1   Q.   Who was with you when you did that, sir?

2   A.   I was alone.

3   Q.   You were alone.

4             Where did you get that book to read from, sir,

5        with all these reports?

6   A.   I believe Mr. Culpepper brung it to me.

7   Q.   Okay.  And so it was given to you; is that correct?

8   A.   Yes, it was.

9   Q.   Okay.  And you had the opportunity -- For how long did you

10       keep that book, sir?

11  A.   I might have kept that book two days.

12  Q.   And then you gave it back?

13  A.   No, I did not.

14  Q.   What did you do with it?

15  A.   I threw it in the garbage.

16  Q.   Oh, you threw it away?

17  A.   Yes.

18  Q.   But this is the book that has all the reports in it;

19       right?

20  A.   Yes, it did.

21  Q.   So you know by reading through that book, basically, all

22       the PCRs that the People have, all the police reports that

23       we have?

24  A.   Well, no --

25             MR. KINNEY:  Objection.  Objection.

                        122

```
1                    THE COURT:  Don't talk when the lawyers are

2           talking; okay, Mr. Dantzler?

3                    MR. KINNEY:  We need to approach, your Honor.

4                    (At about 2:32 p.m., brief sidebar;

5                    At about 2:35 p.m., back on the Record.)

6   BY MR. HUTTING:

7   Q.   Well, Mr. Dantzler, you had read -- When Mr. Culpepper

8        brought that book to you, you read the autopsy report; is

9        that correct?

10  A.   Yes.

11  Q.   Okay.  You also had the reports that the evidence techs --

12       or that the evidence tech, William Niarhos, filed?  You

13       were able to read that report; right?

14  A.   Yes, I did.

15  Q.   You were able to read all the witness statements that were

16       in there; is that correct?

17  A.   Yes.

18  Q.   Okay.  Whatever police reports that were brought to you,

19       you were able to read those that were in there; right?

20  A.   Yes.

21  Q.   Okay.  Whatever other reports by experts that were brought

22       to you, and there were some that were there, you had the

23       opportunity to read that; did you not?

24  A.   Yes, I did.

25  Q.   So you knew, basically, most or all of the information
```

123

```
 1        that was contained in the People's case; right?

 2   A.   No.  Because since I been here, I have --

 3   Q.   Sir, sir, you knew at that time, by reading what you read,

 4        okay, basically, the information that was contained in the

 5        People's case?  Yes or no?

 6   A.   Basically, yes.

 7   Q.   Okay.  All right.  And you say that you threw that book

 8        away?

 9   A.   Yes, I did.

10   Q.   Why did you throw the book away, sir?

11   A.   I destroyed it because Mr. -- my attorney said, do not let

12        anyone else read this book.

13   Q.   So you destroyed it?

14   A.   So once I read it through one time, I ripped the pages up

15        and threw it in the dumpster to make sure that wouldn't

16        nobody -- no other inmate would read my materials that was

17        in that package.

18   Q.   But you had the ability to keep that in your cell; did you

19        not, sir?

20   A.   Yes.  Well --

21   Q.   You had the ability to keep that in your cell; didn't you,

22        sir?

23   A.   You sometimes --

24   Q.   Yes or no, sir?

25   A.   Sometimes you would --
```

124

```
1    Q.   Yes or no, sir?

2    A.   Yes.  Yes.

3    Q.   Thank you.  All right.

4              Now, Little Sam or Samuel Lamare Dantzler is

5         your son; is that correct?

6    A.   Yes, he is.

7    Q.   Okay.  Rodney Turner is your nephew?

8    A.   Yes, he is.

9    Q.   Omar Dantzler, who is he?

10   A.   Nephew.

11   Q.   Okay.  Michael Dantzler?

12   A.   Brother.

13   Q.   Okay.  How old is Michael Dantzler?

14   A.   I'm going to guess, 36.

15   Q.   Okay.  You said that the house on Blackstone, that house

16        is where your mother stays; is that correct?

17   A.   No, she don't stay there.

18   Q.   Did she used to stay there back in 2006?

19   A.   No, she did not.

20   Q.   Where did your mother live back in 2006?

21   A.   She stayed on Plymouth Road.

22   Q.   So who stayed at the house on Blackstone?

23   A.   It was like -- it was like a clubhouse.

24   Q.   A clubhouse?

25   A.   Yes.
```

1    Q.   A clubhouse --

2    A.   Well, not a clubhouse.  This house that I'm thinking --

3         the house that I'm talking about is down the street from

4         Rodney house.  You know, Rodney stayed on one end of

5         Blackstone, my sister owned the house on the other end.

6    Q.   So your sister owned that house?

7    A.   No, no, she did not, not this house.

8    Q.   So you had a third house on Blackstone?

9    A.   Right.  My sister owned -- Well, she used to own this

10        house on this side of the street.  That's how I know where

11        the house at, because it's across the street from the

12        house where my sister used to own.

13   Q.   So who owned the house?

14   A.   I don't know exactly who owned the house.

15   Q.   So it was just a -- But it was a gathering place for

16        Dantzlers; is that correct?

17   A.   No, not just Dantzler.  Everybody over there, that's just

18        where they -- everybody would just come to that house.

19   Q.   Like Rodney Turner?

20   A.   Yeah, he's been there.

21   Q.   Okay.  Well, you were there on the evening of January the

22        15th; right?

23   A.   Yes, I was.

24   Q.   Rodney Turner was there also; wasn't he?

25   A.   Not down there.

1   Q.   No?  Was he down the street?

2   A.   I don't know.

3   Q.   You don't know?

4   A.   I don't know if he was down the street.  It just --

5   Q.   What about -- I'm sorry, go ahead.

6   A.   Well, the time that I was there, I don't know if he was

7        down the street, but I don't remember him being at the

8        house where I was at.

9   Q.   Who was there with you at the house on Blackstone?

10  A.   I remember seeing my mother.

11  Q.   Okay.

12  A.   I think I seen -- I'm trying to think of her name.  It's

13       the young lady that stayed around the block that my

14       brother used to date.

15  Q.   Okay.

16  A.   You know, she was there and --

17  Q.   Which brother?

18  A.   Michael.

19  Q.   Michael.  Okay.

20            Was Michael there?

21  A.   No, he was not.

22  Q.   Was Omar there?

23  A.   No, he was not.

24  Q.   No?

25  A.   No.

1   Q.   How about your son, Little Sam, was he there?

2   A.   Not at the time that I was there, no.

3   Q.   Okay.  All right.  Who else was there?

4   A.   And I remember a young lady named Carmen Kids (phonetic)

5        was also there.

6   Q.   Carmen is a friend of your girlfriend; right?

7   A.   No.

8   Q.   No?

9   A.   No.

10  Q.   Who's Carmen?

11  A.   She's a young lady from the neighborhood, also.

12  Q.   Okay.  How did you happen to find out that something had

13       happened to Quiana?

14  A.   I want to say her mother.

15  Q.   Quiana's mother?

16  A.   I think it was her mother.

17  Q.   That's your sister?

18  A.   Yes.

19  Q.   Okay.  What's her name?

20  A.   Her name is Ruth Turner.

21  Q.   Okay.  And when did you find this out?

22  A.   I believe it was that evening.

23  Q.   That evening?

24  A.   Yeah.

25  Q.   Okay.  When that evening did you find this out?

```
 1   A.   I think maybe around -- around the time when Ms. Marie

 2        came to pick me up.

 3   Q.   Before she came to pick you up or after?

 4   A.   I really don't remember.

 5   Q.   Okay.  And how did you find that out, from --

 6   A.   If I remember right, I think she -- a phone call.

 7   Q.   You got a telephone call?

 8   A.   I believe so.

 9   Q.   Okay.  And she told you that Bernard had jumped on Quiana?

10   A.   I don't think she said anything about that, that he jumped

11        on her.  I think it was through a conversation, she was

12        like, yeah, you know, he jumped on her again, so --

13   Q.   So she just matter of factly related that to you?

14   A.   Yeah.

15   Q.   Okay.  She tell you that she was in the hospital?

16   A.   No.

17   Q.   No?

18   A.   No.

19   Q.   And you, of course, never went to the hospital to see her?

20   A.   No, I did not.

21   Q.   Did she sound upset?

22   A.   Who?

23   Q.   Ruth.  She was very upset; wasn't she?

24   A.   No.

25   Q.   No?  Her daughter has been jumped on.
```

1    A.    Um-hmm.

2    Q.    Has to go to the ER, and she's not upset?

3    A.    No.

4    Q.    Okay.  Just --

5          MR. KINNEY:  Well, your Honor, the Defendant

6          didn't state that he knew of this conversation that they

7          had, had said anything about Quiana going to the hospital.

8          So he's -- those are facts not in evidence that she had to

9          go to the ER and it was part of their conversation.

10   BY MR. HUTTING:

11   Q.    Did you find out that she had to go to the ER?

12   A.    I believe so.  Maybe a few days later, I think I did.

13   Q.    Oh, a few days.  Wait.  No, I'm talking about during the

14         conversation that you had with your sister, Ruth --

15   A.    No.

16   Q.    -- you didn't find that out?

17   A.    No, I didn't.

18   Q.    And she didn't appear to be upset by this?

19   A.    No.

20   Q.    Okay.  Now you said that you had a gold car?

21   A.    Yes -- No, I did not.  I didn't say I had a gold car

22         because my car was not gold.

23   Q.    Well, at one time, you said that you had a gold car?

24   A.    It wasn't gold.

25   Q.    What color was it?

```
 1   A.   You asked me did I have a '72 Chrysler.

 2   Q.   I didn't ask you that, your attorney asked you that.

 3   A.   Okay.  Well, my attorney asked me.  It was a '72 Chrysler,

 4        but the color was not gold.

 5   Q.   What color was it?

 6   A.   It was green.

 7   Q.   Green.  Did you ever have a gold car?

 8   A.   No.  Not that I remember, no.

 9   Q.   Did you ever drive a gold car?

10   A.   No.

11   Q.   You've been over to Janet Burt's home; is that correct?

12   A.   Yes, I have.

13   Q.   You've driven cars over to Janet Burt's home; is that

14        correct?

15   A.   Yes, I have.

16   Q.   She knows who you are?

17   A.   Yes.

18   Q.   She knows who are you quite well; right?

19   A.   Yeah, she know -- If she seen me, she know who I am.

20   Q.   Okay.  All right.  And you've never driven a gold car over

21        to Janet Burt's home?

22   A.   No, I have not.

23   Q.   You heard her testify here in court, did you not --

24   A.   Yes, I did.

25   Q.   -- that she saw your car?
```

1   A.   Yes.

2   Q.   And she said it was a gold car; right?

3   A.   Yes, she did.

4   Q.   And she said that she knew that that was your car?

5   A.   Yes, she did.

6              MR. KINNEY:  Objection, your Honor.  He's asking

7        Mr. Dantzler to comment on another witness's testimony.

8              MR. HUTTING:  I'm not asking him to comment, I'm

9        asking if he heard it.

10             MR. KINNEY:  The jury heard her testimony.  He

11       -- To have him repeat what her testimony is, I'm objecting

12       to that.

13             THE COURT:  Response?

14             MR. HUTTING:  I don't understand.  I don't

15       believe that that's a valid legal objection.

16             THE COURT:  I agree.  Go ahead.

17  BY MR. HUTTING:

18  Q.   Okay.  You heard her testify to that; right?

19  A.   That I had a gold car?

20  Q.   Yes, sir.

21  A.   Yes, I did.

22  Q.   And that she'd seen you driving that gold car; right?

23  A.   Yes, I did.

24  Q.   But you didn't have any kind of a gold car like that on or

25       about January of 2006?

132

```
 1   A.   No, I did not.

 2   Q.   And you're certain of that?

 3   A.   I'm positive.

 4   Q.   You're as certain of that as you never participated in

 5        this assault on Bernard Hill; right?

 6   A.   I'm positive.

 7   Q.   And you said that Bernard Hill had assaulted Quiana

 8        before; right?

 9   A.   Yes, he have.

10   Q.   But this time, somebody attacked and killed Bernard Hill

11        that night; didn't they, sir?

12   A.   That's what I hear, yeah.

13   Q.   That's what you hear.  That's what all the paperwork shows

14        that you read it; right?

15   A.   Yes.

16   Q.   And you knew, sir, that shortly after this event, the

17        police were looking for members of your family; did you

18        not?

19   A.   For this crime?

20   Q.   Yes, sir.

21   A.   Not -- No.  Only thing I knew is that somebody said the

22        police came by here looking for you for a warrant on child

23        support.

24   Q.   And when was that, this child support?

25   A.   I can't give an exact date.
```

1   Q.   What year was it, sir?  Give us a year.

2   A.   I want to say '07.

3   Q.   '07?  Okay.  Well, let's go, then, during '06 and before

4        they came by for child support.  Did you know that the

5        police -- Omar Dantzler is your cousin?

6   A.   That's my nephew.

7   Q.   Your nephew.

8             Okay.  You didn't know that the police had

9        gotten him in and had gotten a buccal swab from him and

10       were interested in him in terms of this murder?

11  A.   No.  He never told me that he was arrested for a murder,

12       no.

13  Q.   He never said anything, yeah, they're looking at me for

14       Bernard Hill?

15  A.   You say did he say that?

16  Q.   Yeah.  They're looking at me for Bernard Hill.  He never

17       told you that --

18             MR. KINNEY:  He's asking for hearsay.

19       Objection.

20             THE COURT:  Response?

21             MR. HUTTING:  Fine.

22  BY MR. HUTTING:

23  Q.   You never knew then that the police were looking for him

24       for Bernard Hill?

25  A.   No, I didn't.

134

1   Q.   What about Michael Dantzler?  That's your brother; right?

2   A.   Yes, it is.

3   Q.   Called Big Mike; right?

4   A.   No, that's not his name.

5             MR. KINNEY:  Again, I'm going to again -- I'm

6        again objecting to the -- The name is Michael Dantzler.

7        There is several Dantzlers here, and these synonyms, they

8        are just confusing the situation.

9             MR. HUTTING:  I'm asking him if he's called Big

10       Mike, he answered no.

11            MR. KINNEY:  Relevancy on why -- relevancy on

12       whether or not Michael Dantzler is called Big Mike.

13       What's the relevancy of that?

14            MR. HUTTING:  If that's his nickname, that's his

15       nickname.  But if it's not, then we'll move on.

16            MR. KINNEY:  What's the relevancy of that?  I'm

17       objecting to it because I don't think it's relevant as to

18       what his nickname is.  It has never been used, except for

19       by Mr. Hutting.

20            MR. HUTTING:  If a person is known by a nickname

21       and we're asking about him, I think it's relevant to ask

22       if he's known by a nickname.  If he says no, then we'll

23       move on.

24            THE COURT:  Move on.

25            MR. HUTTING:  Okay.

```
 1   BY MR. HUTTING:

 2   Q.   But he's your brother; right?

 3   A.   Yes, he is.

 4   Q.   You didn't know that the police had been talking to him or

 5        trying to talk to him about this murder?

 6   A.   No, I believe he did mention that he was -- his mouth was

 7        swabbed or something.

 8   Q.   All right.  And you knew that was in regard to Bernard

 9        Hill; right?

10   A.   I believe so, yeah.  I think he told me that, yeah.

11   Q.   How about Rodney Turner?  Did you know the police were

12        looking for him in regard to this murder?

13   A.   No, I did not --

14             MR. KINNEY:  In what frame of time, your Honor?

15   BY MR. HUTTING:

16   Q.   Did you know during 2006, they were looking for --

17             THE COURT:  Again, rephrase the question.

18   BY MR. HUTTING:

19   Q.   Did you know, during 2006, that the police were looking

20        for Rodney Turner?

21   A.   No.

22   Q.   In 2007?

23   A.   No.

24   Q.   2008?

25   A.   No.
```

```
 1   Q.   2009?

 2   A.   No.

 3   Q.   You never knew anything about the police looking for your

 4        nephew, Rodney Turner, in terms of this murder?

 5   A.   No, I did not.

 6   Q.   What about your son, Sam Dantzler, Junior, did you know

 7        that the police were looking for him?

 8   A.   I know that they -- I know they arrested him --

 9                MR. KINNEY:  Objection.  Is this the same

10        timeframe?

11                MR. HUTTING:  I'm just asking the question

12        first.  We'll get to the timeframe in a minute, Judge.

13                MR. KINNEY:  I'm objecting because we're talking

14        about several years here, and I think that we should have

15        a timeframe at this particular time.

16                THE COURT:  You're going to get to the time?

17                MR. HUTTING:  Yes, sir.

18                THE COURT:  Go ahead.

19   BY MR. HUTTING:

20   Q.   So the answer to my question is, yes, I did know that the

21        police were looking for my son, Samuel Dantzler, Junior?

22   A.   I didn't know they was looking for him.  I know they

23        arrested him.

24   Q.   And that -- Okay.  And is that the first -- And they

25        arrested him in 2010; right?
```

137

1   A.   Yes.

2   Q.   In October of 2010; right?

3   A.   You said October of?

4   Q.   October of 2010, October the 1st of 2010 -- excuse me,

5        2009.  Strike that.

6   A.   Okay, yes.

7   Q.   Okay.  October the 1st of 2009.

8             So you knew that the police arrested him?

9   A.   Yes, I did.

10  Q.   Before that did you know that the police were looking for

11       him in terms of this Bernard Hill murder?

12  A.   No.

13  Q.   You had no idea about that?

14  A.   No.

15  Q.   When's the first time that you knew that the police were

16       looking for you in terms of the Bernard Hill murder?

17  A.   The first time I knew of that was when my son came home.

18  Q.   When your son, Samuel Dantzler, Junior, came home?

19  A.   When I finally talked to him, I realized that that's what

20       they was looking for him for, the -- they asked him

21       questions about it.

22  Q.   And they were looking for you, too; right?

23  A.   I don't know.  I didn't have contact with the police so I

24       don't know.

25  Q.   You asked your son questions, though, right --

138

1                    MR. KINNEY:  This is asking for hearsay.

2                    MR. HUTTING:  Just asking yes or no.

3                    MR. KINNEY:  Objection, hearsay.

4                    MR. HUTTING:  It's not hearsay.

5                    THE COURT:  It's not hearsay yet.

6                    MR. KINNEY:  Okay.

7                    THE COURT:  Go ahead.

8    BY MR. HUTTING:

9    Q.  So you asked your son questions; right?

10                   THE COURT:  Don't tell us what he says.  Listen

11        carefully to the question that's being asked.

12   BY MR. HUTTING:

13   Q.  Let's back up just a --

14   A.  Well, not really.  I didn't ask him questions.

15   Q.  Well, you knew that the police had arrested your son in

16        October of 2009; right?

17   A.  Yes.

18   Q.  Okay.  Ultimately a few days later, he was released;

19        right?

20   A.  Yes.

21   Q.  He came home; is that correct?

22   A.  I believe so.

23   Q.  And then you saw him; right?

24   A.  Not when he came home.  Probably, maybe the next time I

25        seen him might have been three weeks later, maybe.

1    Q.    So three weeks later, you see your son; right?

2    A.    Yes.

3    Q.    And you know that he's been arrested --

4    A.    Um-hmm.

5    Q.    -- and been in police custody for -- to talk about the

6          murder of Bernard Hill?

7                    MR. KINNEY:  Just so that the Record would stay

8          clear, we can't use um-hmm, it has to be a yes or a no.

9                    DEFENDANT DANTZLER:  Oh, yes or no.

10                   MR. HUTTING:  Do you think we're telegraphing

11         the answers here?

12                   MR. KINNEY:  No.  Because he said um-hmm.  And I

13         said it has to be a yes or a no.

14                   THE COURT:  Mr. Dantzler.

15                   DEFENDANT DANTZLER:  Yes.

16                   THE COURT:  Mrs. Bauer can only record words,

17         not sounds, so if it's a yes, say yes, not um-hmm.

18                   DEFENDANT DANTZLER:  Okay.

19   A.    Well, I don't remember saying um-hmm, but can you ask the

20         question again, please?

21   BY MR. HUTTING:

22   Q.    Okay.  You said that about three weeks after your son was

23         released by the police --

24   A.    Yes.

25   Q.    -- you came into contact with him; is that correct?

                                140

```
 1   A.   Yes, I did.

 2   Q.   And you spoke with him; right?

 3   A.   Yes.

 4   Q.   And that's the first time -- And that you talked about

 5        what happened with him down at the police department;

 6        right?

 7   A.   I think he mentioned it.

 8   Q.   You think he mentioned it?

 9   A.   He mentioned what he was there for.

10   Q.   Okay.  All right.  And he told you what happened; right?

11   A.   He told me he was -- He told me --

12                 THE COURT:  Don't tell us what he said.

13   BY MR. HUTTING:

14   Q.   Just yes or no, he told you what happened while he was

15        there?

16   A.   Yes.

17   Q.   Okay.  All right.  And he went into detail about what

18        happened; didn't he, sir?

19   A.   Well --

20   Q.   Just yes or no.

21   A.   No.

22   Q.   No?

23   A.   No, not specific details.  He told me -- well --

24   Q.   Were you interested in what had happened?  You were his

25        father, you were interested in what happened to him;
```

```
 1       right?

 2   A.  Yes, I was.  Yes.

 3   Q.  You started asking him questions; right?

 4   A.  Well, he just told me what happened.

 5   Q.  You knew that he talked to the police; didn't you?

 6   A.  Yes.

 7   Q.  Okay.  You knew that he had given a statement to the

 8       police; didn't you, sir?

 9   A.  No, he didn't tell me about the statement.

10   Q.  Well, you knew that he talked to the police; right?

11   A.  He just told me he was arrested and he was swabbed, his

12       mouth was swabbed.

13   Q.  And you didn't know that he had made a statement to the

14       police?  Yes or no?

15           MR. KINNEY:  My objection is that he's asking

16       for hearsay.  And it's difficult to make the objection

17       after the answer is in.

18           THE COURT:  Mr. Hutting?

19           MR. HUTTING:  It's not hearsay, Judge.  We're

20       not going into the contents of the statement.  The

21       contents of the statement would be hearsay.  Whether he

22       knew or not that his son had made a statement to the

23       police is not hearsay and it's relevant.

24           MR. KINNEY:  You know, we have to -- Can we have

25       this argument outside of the presence of the jury so that
```

1      I can make a record?

2               THE COURT:  Sure.  You may step down, Mr.

3      Dantzler.

4               Ladies and gentlemen, this will be your

5      afternoon break.  Go to the bathroom, get a drink.  I'll

6      see you in a couple of minutes.

7               DEPUTY SHERIFF:  All rise.

8               (At about 2:54 p.m., witness excused.)

9               DEPUTY SHERIFF:  Be seated.

10              THE COURT:  Mr. Kinney, we've excused the jury

11     per your request.

12              MR. KINNEY:  Thank you, your Honor.  The

13     statement of Samuel Lamare Dantzler, Junior, has no

14     bearing on Samuel Lee Dantzler, Senior, at all.  That's

15     how I think.  That's why I want to put it on the Record.

16              And the fact that Mr. Hutting is letting the

17     jury know that there was a statement given by Mr. Samuel

18     Lamare Dantzler, Junior, is not relevant, first of all, to

19     Mr. Dantzler.  And to ask him a question like, did he --

20     he told you what happened in detail, how can that question

21     be answered unless we know what the conversation was

22     about?  And then Mr. Dantzler wants to tell you what the

23     conversation was about.

24              And we're continuing to go on this same over and

25     over again statement given to the police, talking to the

1    police, of Samuel Lamare Dantzler.  I don't see the

2    relevancy to Samuel Lee Dantzler, Junior.

3        And we all know that a statement from a

4    co-defendant cannot be used against -- a statement from

5    one defendant cannot be used against the co-defendant.

6    He's just allowing the jury to know that the co-defendant

7    gave a statement.

8        Now what happened to the co-defendant?  He's the

9    only one that's here.  Why is it relevant for any other

10    reason than to get some evidence out that's not proper

11    before Mr. Samuel Lee Dantzler, Senior.

12        THE COURT:  Response?

13        MR. HUTTING:  I am not going into the body of

14    the statement that the son made.  Did the son tell you

15    this, did the son tell you these facts, did the son tell

16    you that he implicated you and all these other people?

17    I'm not going into the body of the statement.  That would

18    be hearsay, okay, asking that kind of a question.

19        The questions that I have asked are legitimate

20    questions, whether he talked to his son, whether he talked

21    to his son in detail or whether -- or whether, you know,

22    he just said, oh, I happened to be there, even though the

23    son may have been there for a couple of days.  Those are

24    all legitimate questions.  And I don't feel that I have

25    crossed the line on hearsay.

144

1            The son's -- The son got arrested in this case

2    is a relevant factor, that the son was charged in this

3    case along with him is a relevant factor.  I can't admit

4    the son's statement in front of this jury.  I never tried

5    to do that and I wouldn't try to do that.

6            MR. KINNEY:  He said the son's statement.  He

7    said the son's statement to the police.  He said what did

8    the son tell you?  He asked him what -- did he tell you

9    what he said to the police in detail?  That was the

10   question.

11           MR. HUTTING:  And the question can be answered

12   simply yes or no.

13           MR. KINNEY:  The question is irrelevant, your

14   Honor.

15           THE COURT:  What's the relevance, Mr. Hutting?

16           MR. HUTTING:  The relevance is I want to know if

17   this man knew back in October of 2009 that the police were

18   looking for him.  That's what I want to know.  And if he

19   had talked to his son in detail in October of 2009, he

20   would know that the police were looking for him.

21           MR. KINNEY:  That --

22           MR. HUTTING:  And that's a legitimate area of

23   inquiry.

24           MR. KINNEY:  In detail as to what?  Where's the

25   foundation that he talked to you in detail except for him

145

1     asking these questions about whether the son talked to the

2     police?  So that the detail is did he tell you anything

3     you told the police?  That's unfair.

4             MR. HUTTING:  I'm trying to show that this man

5     knew way back at the very least, okay, probably some --

6     and probably way before, but he knew at the very least

7     that in October of 2009, he was clearly a person of

8     interest that the police wanted to talk to, that the

9     police wanted.  Okay?  That's what I'm trying to show.

10    And that's valid.

11            MR. KINNEY:  Not this way, not asking him -- not

12    asking Mr. Dantzler here about what his son said to the

13    police, about what his son said to him.  That's not

14    relevant.  That's hearsay, one of the two.

15            THE COURT:  Well, he's been walking a very fine

16    line, I agree with you on that, Mr. Kinney.  But I told

17    you at the outset of the trial, a witness in Michigan may

18    be cross-examined on any matter of relevance to any issue

19    in the case, including credibility.  6.11(b).

20            MR. KINNEY:  Well --

21            THE COURT:  Michigan has quite deliberately

22    opted for presumptive, wide-open cross-examination, People

23    versus Blunt, 189 Mich App 643, 1991.  The Trial Court has

24    wide discretion in determining the scope of the

25    cross-examination.

146

1           MR. KINNEY:  And all I'm asking is that these

2      questions with regards to what Mr. Dantzler's conversation

3      with his son and whether or not it's in detail can -- even

4      a foundation of what would detail be?

5           THE COURT:  Well, the problem that you have, Mr.

6      Kinney, is the Courts have also held that cross-

7      examination, I have discretion and I may limit cross-

8      examination with respect to matters not testified to on

9      direct examination.  But it was elicited about the police

10     looking for him on direct examination so -- and whether he

11     knew about it so --

12          MR. KINNEY:  Okay.  The police looking for him

13     and what he knew, I'm not objecting to that.  But what --

14          THE COURT:  So I'm going to allow Mr. Hutting to

15     proceed.

16          But Mr. Hutting, it seems like you've been

17     beating a dead horse here.  You've been on an issue for

18     about 20 minutes.  I wonder if there isn't a more

19     efficient and expeditious way to make your point and move

20     on.

21          MR. HUTTING:  I'm trying to get it out of him,

22     Judge, but Mr. Kinney keeps objecting --

23          MR. KINNEY:  I think reasonably so.  And I still

24     say that this stuff about a statement that was given to

25     the police by Mr. Dantzler, Junior, is way farther than

147

1   any cross-examination that should be allowed when we're

2   talking about co-defendants, and what happened to Mr.

3   Dantzler, Junior.  Or even allow Mr. Hutting to indicate

4   that Mr. Dantzler pled guilty in this case.

5          MR. HUTTING:  Judge, did I ever try to get that

6   in?  Did I ever ask a question in that regard?  Did I ever

7   try either through a back door --

8          THE COURT:  I've ruled on this issue, gentlemen.

9   These jurors were told this trial would take a certain

10  amount of time.  We're well over that time standard.  I

11  put no limits on you regarding other court appearances,

12  appointments, jury selection, opening arguments.  I don't

13  want to put any limitations on closing arguments, but we

14  have to move this trial along, and I think we can do this

15  much more efficiently.

16         MR. KINNEY:  I apologize for objecting.  I just

17  thought that I had to.

18         THE COURT:  No, if you feel it's meritorious, of

19  course you object.  But I'll tell you right now while

20  we're on it, and I told you this, I think, at the

21  beginning of the case, I frown upon objections that I deem

22  spurious or vexatious during opening and closing

23  arguments.  So if anyone is entertaining the thought of

24  interrupting Brother Counsel in closing arguments just for

25  the sake of interrupting the flow, if you have a

148

1       meritorious objection, I expect you to raise it, that's

2       your job.  If it's just as -- designed to interrupt the

3       flow of the argument, that's not permitted; okay?

4               MR. HUTTING:  I understand.

5               THE COURT:  Bring the jury in, please.

6               MR. KINNEY:  Your Honor, usually, when we --

7       just like I asked to approach the bench during this

8       opening, as many trials as we've had to give, I've never

9       done that.

10              THE COURT:  I didn't say you did.

11              MR. KINNEY:  But objecting here with regards to

12      the son's statement --

13              THE COURT:  No, I said -- If you listened

14      carefully to me, I said when we get to closing arguments,

15      that's the rule, just to refresh your memories.

16              MR. KINNEY:  Yes.  Yes, your Honor.

17              THE COURT:  Okay?  Listen, I've tried to allow

18      you gentlemen to present your cases here.  I know you both

19      agree with some rulings, you disagree with others.  I'm

20      trying to follow what I think the law requires me to do;

21      that's all I'm trying to do here.  This is your case, you

22      present your cases, you present your evidence.  I try to

23      do it with as little interference as possible; okay?

24              MR. KINNEY:  Yes, your Honor.

25              THE COURT:  But keep in mind the sacrifices

```
 1      these jurors have made; okay?  I said there will be no

 2      rush to judgment.  There hasn't been.  Okay?  But please

 3      keep in mind where we're at and let's move on; okay?

 4                  MR. KINNEY:  Yes, your Honor.

 5                  THE COURT:  Jury, please.

 6                  DEPUTY SHERIFF:  All rise for the jury.

 7                  THE COURT:  Does anybody need a break before I

 8      bring the jury in?  We are going to go another hour at

 9      least.  Mr. Dantzler?  He said no.

10                  Jury, please.

11                  Mr. Hutting.

12                  DEPUTY SHERIFF:  Please be seated.

13                  (At about 3:04 p.m., jury panel seated.)

14                  MR. HUTTING:  Thank you, your Honor.

15      BY MR. HUTTING:

16      Q.  Okay, sir, I want to go back to October of 2010.  Your son

17          is released from jail, you talk to him a couple weeks

18          later; is that correct?

19      A.  Yes.

20      Q.  Okay.  You talked to him in detail; did you not?  Yes or

21          no?

22      A.  No.

23      Q.  No.  All right.

24                  But you talked to him?

25      A.  Yes, I did.
```

1   Q.   You knew he'd been there a couple of days; right?

2   A.   Yes.

3   Q.   You just had a brief conversation with him?

4   A.   Can I say something?  Or just say yes or no?

5   Q.   All I want you to do is answer the question, sir.

6   A.   Well, yes, I had a conversation with him.

7   Q.   Okay.  All right.  It is a fair and true statement, sir,

8        that --

9   A.   Yes.

10  Q.   Let me finish my question.

11            -- by November of 2009, you believe that you

12       were a person of interest to the police department in the

13       murder of Bernard Hill?

14  A.   No.

15  Q.   You didn't know that?

16  A.   No.

17  Q.   When did you find that out, that you were a person of

18       interest or that the police wanted to arrest you in terms

19       of the incident involving Bernard Hill?

20  A.   It was in, I'm going to say February of 2010.

21  Q.   February of 2010?

22  A.   February of this year.

23  Q.   That's the month that you were arrested?

24  A.   Yes, it is.

25  Q.   Are you telling this jury that you didn't know that you

151

```
 1          were a person of interest to the police department until

 2          the day that you were arrested on February the 25th of

 3          2010?

 4   A.     No, no, before then.

 5   Q.     Oh.  When did you find out -- When did you find out then,

 6          in February of 2010, that you were a person of interest?

 7   A.     Is when -- Let me see.  I'm trying to think of what

 8          happened that day.  I believe it was, her name is

 9          Chermaine.

10   Q.     Okay.

11   A.     And she told me that she was picked up and asked questions

12          and asked about me --

13                  MR. KINNEY:  I'm still objecting to hearsay.

14                  THE COURT:  I'll sustain the objection.

15                  MR. HUTTING:  It's his answer.

16   BY MR. HUTTING:

17   Q.     So you found out through Chermaine.

18                  Tell the jury who Chermaine is.

19   A.     She's the girlfriend of Rodney Turner.

20   Q.     So Rodney's girlfriend?

21   A.     Used to be, I know.  I don't know if they --

22   Q.     Okay.  You talked to her in February of 2010?  Just yes or

23          no.

24   A.     Yes.

25   Q.     And that's the first time that you ever found out that you
```

152

```
 1        might be a person of interest to the police department in

 2        Bernard Hill's murder?

 3   A.   Yes, that's the first time I found out that they was

 4        looking for me, myself, for questioning --

 5   Q.   Okay.

 6   A.   -- on Bernard Hill.

 7   Q.   Okay.  Of course, by this time, your son had been arrested

 8        again and charged; is that correct?

 9   A.   No, he was not.

10   Q.   Well, was he arrested and charged right after that?

11   A.   Right after that?

12   Q.   Um-hmm, yes, sir.

13   A.   I was arrested first.

14   Q.   Then your son was arrested?

15   A.   Yes.

16   Q.   Okay.  So up to then, you had no idea that the police were

17        looking for you or interested in you in terms of this

18        case, from 2006 all the way till when you had this

19        conversation with Chermaine?

20   A.   Yes.

21   Q.   Would you say that the Dantzlers are -- How much contact

22        did you have with Omar Dantzler before this -- before you

23        got arrested?

24   A.   I would see him here and there.

25   Q.   Okay.  What about Michael, your brother?
```

153

```
 1   A.   Same thing, you know, here and there.

 2   Q.   And, of course, when you saw them, this whole thing

 3        concerning Bernard Hill never came up?

 4   A.   No.   Talking -- Not looking for me, no.

 5   Q.   Or looking for them?

 6   A.   Yeah, they told me that they was arrested and asked

 7        questions about it --

 8                 MR. KINNEY:   Objection.   This is still hearsay.

 9   BY MR. HUTTING:

10   Q.   Okay.  You knew that they --

11                 THE COURT:   Mr. Hutting, I have to make a ruling

12        when there's an objection.

13                 MR. HUTTING:   Sure.

14                 THE COURT:   I'll sustain the objection.

15   BY MR. HUTTING:

16   Q.   So you knew that they had been arrested; is that correct?

17   A.   Yes.

18   Q.   And when's the first time that you found out that they'd

19        been arrested about this incident?

20   A.   I really can't give you no date of when they was arrested.

21   Q.   Tell me a year.

22   A.   I really -- I can't tell you that either.   Which one?

23        Every now and then --

24   Q.   Michael?

25   A.   -- they would arrest somebody else and ask them questions
```

```
 1         about it, but they didn't -- I don't think all of them was

 2         arrested --

 3    Q.   How do you know that?

 4    A.   -- at the same time.

 5    Q.   How do you know that?

 6    A.   My nephew?

 7    Q.   How do you know that?  You just gave that last answer:

 8         You said every now and then, they would arrest them and

 9         ask questions.

10    A.   They said --

11    Q.   Who told you?

12    A.   I don't think they was all arrested at the same time.

13    Q.   I understand that.

14                   How do you know that that's the question?  How

15         do you know that?

16    A.   How do I know them?

17    Q.   How do you know that that happened?  Because you talked to

18         them; right?

19    A.   Because they told me --

20    Q.   Just yes or no.  Did you talk to them?

21    A.   Periodically yeah.

22    Q.   Okay.  And they told you that this had happened; right?

23    A.   Yes.

24    Q.   Okay.  So you knew way back, as far as 2007, that the

25         police were looking at members of the Dantzler family
```

```
 1          concerning the homicide of Bernard Hill; did you not, sir?
 2    A.    No.  I only knew that the ones that got arrested, that
 3          they got arrested and was questioned about Bernard.
 4    Q.    Well, that's Omar?  That's Michael; right?
 5    A.    Yes, they were.  I don't know what year.  I don't know
 6          what year they was arrested.
 7    Q.    But that's Omar and Michael, right, your cousin and your
 8          brother?
 9    A.    Yes.
10    Q.    Okay.  And did you know that they were looking for Rodney?
11    A.    No, I don't know.  I never heard that.  Nobody said
12          nothing about Rodney.
13    Q.    Okay.  And then you found out about -- and then your son,
14          Little Sam; right?
15    A.    Yes, I know he was arrested.
16    Q.    Okay.  All right.  You know Patrick Grunewald; don't you?
17    A.    No.
18    Q.    You never met a Patrick Grunewald?
19    A.    No.
20    Q.    The white guy that lived over on Blackstone or in the
21          neighborhood --
22               MR. KINNEY:  Objection.  Mr. Hutting is
23          testifying to facts that are not in evidence.
24               THE COURT:  He's answered the question, Mr.
25          Hutting.  I'm going to sustain the objection.
```

156

```
 1   BY MR. HUTTING:

 2   Q.   To the best of your knowledge, you've never had a

 3        conversation with Patrick Grunewald?

 4   A.   No.

 5   Q.   You've never seen him in your mother's home or in that

 6        home over on Blackstone?

 7   A.   Not in the home that my mother was at, no.

 8   Q.   In the home that you were at --

 9   A.   No.

10   Q.   -- that night where Ms. Simpson picked you up?

11   A.   No, he's never been there.

12   Q.   And you've never laid eyes on him?

13   A.   I don't know.  If you show me a picture of him, I might be

14        able to tell you if I seen him or not.

15   Q.   The white guy over in that area?

16   A.   I see white guys every day.

17   Q.   Okay.  All right.  Now you said that your relation -- Let

18        me ask you one more question about this, sir.  We talked

19        about this earlier.

20             Do you remember testifying on direct exam, when

21        your attorney was asking you questions, and giving the

22        answer that you had a gold Chrysler.

23             Do you remember saying that?

24   A.   No.

25   Q.   You don't remember saying that?
```

1   A.   No.

2   Q.   Do you remember saying that you had that car for about two

3        years?

4   A.   A Chrysler, yes.

5   Q.   No, I'm talking about a gold Chrysler that you had.

6   A.   No, he asked me did I have an old Chrysler car.  He never

7        said what color.

8   Q.   Old or gold.  Did you say did you have --

9   A.   An old car, but he never said what color.  Because if he

10       had said gold, I would have let him knew that my car was

11       not gold.

12  Q.   And you never had that car for two years?

13  A.   The gold car?  No.

14  Q.   Okay.  Now you said that you and the lady that testified

15       before, Ms. Simpson, that's just a casual relationship?

16  A.   She's my friend.

17  Q.   She's your friend, okay.

18            She's your friend who visits you over in the

19       jail; right?

20  A.   Yes, she has visited me.

21  Q.   Okay.  And would you say that she comes to visit you about

22       twice a month?

23  A.   No, she didn't -- she didn't visit that often.

24  Q.   How often would you say that she's visited you in the ten

25       months that you've been there?

158

```
 1    A.    I'd say maybe she visited me maybe eight times.

 2    Q.    Eight times, okay.

 3                So she's one of the persons who comes to see

 4          you; right?

 5    A.    Yeah.

 6    Q.    All right.  So you never went to Mississippi, sir?

 7    A.    No, I did not.

 8    Q.    Do you have relatives down there, sir?

 9    A.    Yes, we have some down there.

10    Q.    Okay.  What relatives of yours live in Mississippi?

11    A.    I have brothers, sisters, aunties, uncles.

12    Q.    When is the last time you visited down there in

13          Mississippi?

14    A.    I don't believe I been down there since my father

15          passed -- Wait a minute, hold up.  Yep, we went back down

16          there since then.  If I was to guess, I'd say maybe in

17          about 2000.

18    Q.    So you haven't been to Mississippi in almost ten years?

19    A.    Yes, about ten years.

20    Q.    Okay.  Clearly you did not go in 2006, shortly after this

21          incident; is that your testimony?

22    A.    No, I haven't been down there in that long.

23    Q.    Okay.  Now, sir, you were never at Bernard Hill's

24          apartment that night on February the 6th -- on January the

25          16th, 2006?
```

1    A.   No, I was not.

2    Q.   You never went with anybody there to that apartment?

3    A.   Not that night, no.

4    Q.   Not that -- On any night did you go with anybody else to

5         that apartment?

6    A.   Well, one day when I went to, it had to be maybe a couple

7         weeks or a week before his death, I went there to get some

8         weed from him.

9    Q.   And did anybody else accompany you?

10   A.   I had a lady friend with me.

11   Q.   Well, no, I'm talking about Omar, Michael, your son?

12   A.   Oh, no.

13   Q.   As far as you know, as far as you can remember, they've

14        never been there --

15             MR. KINNEY:  Objection, your Honor.  That's

16        asking for speculation, what they did.

17             MR. HUTTING:  No.  Let me finish the question.

18             THE COURT:  Mr. Dantzler, don't answer until I

19        say it's appropriate.

20             DEFENDANT DANTZLER:  Okay.

21   BY MR. HUTTING:

22   Q.   As far as you can remember, Omar, Michael, your son or

23        Rodney has never been with you to that apartment?

24             THE COURT:  That's okay?

25             MR. KINNEY:  No objection.

1           THE COURT:  You can answer, Mr. Dantzler.

2    A.   I believe somebody been with me to that apartment before.

3    BY MR. HUTTING:

4    Q.   Who, sir?

5    A.   If I was going -- I want to say my son been there before

6         with me.

7    Q.   When, sir?

8    A.   I can't give you no exact day, but I believe he was with

9         me at the time that we went to pick him up, because he

10        didn't have a ride to get back on the side of town that we

11        were at --

12   Q.   When was that, sir -- I'm sorry.

13             When was that in relation to the murder, sir?

14   A.   I would say maybe about -- that had to be about six weeks

15        before.

16   Q.   Six weeks before.  Okay.

17   A.   Maybe about six weeks.

18   Q.   All right.  Do you have any explanation, sir, as to how

19        your DNA, one in 2.3 quadrillion, got inside that hat,

20        Exhibit 22?

21   A.   Only explanation I can have is either it was put there or

22        I had worn that hat before.

23   Q.   Either it was put there.

24             Who do think put it there -- Who do you say put

25        it there, sir?

1    A.    I know -- I don't know.  I don't know who put it there.

2          That's the same question I been asking.  I don't know how

3          my DNA got there, but it shouldn't be there.

4    Q.    Do you have any explanation, sir, as to how the decedent,

5          Bernard Hill's, DNA got inside that hat that had your DNA

6          on it, one in 2.3 quadrillion?

7    A.    I would say he most likely wore that hat before.

8    Q.    Obviously you wore that hat?

9    A.    It's probably --

10   Q.    And isn't it true that you were wearing that hat that

11         night you got into a fight with Bernard Hill and it came

12         off during the fight and you left the hat there when you

13         left with the other people, sir?

14   A.    No, that's impossible.  I was not there.

15                   MR. HUTTING:  Thank you, sir.

16                   THE COURT:  Mr. Kinney.

17                   MR. KINNEY:  Nothing further, your Honor.

18                   THE COURT:  May Mr. Dantzler step down?

19                   MR. KINNEY:  Yes, your Honor.

20                   THE COURT:  Thank you, Mr. Dantzler.

21                   (At about 3:18 p.m., witness excused.)

22                   THE COURT:  Mr. Kinney.

23                   MR. KINNEY:  Mr. Dantzler, at this particular

24         time do you rest?

25                   DEFENDANT DANTZLER:  Yes.

1               MR. KINNEY:  We rest, your Honor.

2               THE COURT:  Mr. Hutting, are there any rebuttal

3       witnesses?

4               MR. HUTTING:  Yes, there's one.  May I have a

5       short break before I put him on?

6               THE COURT:  Yes.

7               Okay.  Jurors, you can have a short break, as

8       well.  Don't discuss the case.

9               DEPUTY SHERIFF:  All rise for the jury.

10              (At about 3:20 p.m., brief recess;

11              At about 3:32 p.m., back on the Record.)

12              COURT CLERK:  Recalling docket 10-3521, People

13      versus Samuel Lee Dantzler, jury trial in progress.

14              MR. HUTTING:  Judge, I have the arresting

15      officer, Officer Weekley, in the room.  He's going to come

16      out and testify about the arrest.  He's not going to get

17      into using his PCR.  He remembers this arrest quite well.

18      He's not going to get into any statement that the

19      Defendant made.

20              What he will testify about is his contact with

21      Ms. Simpson, the Defendant's girlfriend.  Basically what

22      he told me is that she was quite belligerent.  All he

23      wanted to do is return the daughter to her and get the

24      daughter's date of birth so that he could put that down

25      for his notes.

1              He then told Ms. Simpson that Mr. Dantzler was

2       under arrest for homicide.  She argued with him a little

3       bit about that, saying, oh, he doesn't have a homicide

4       warrant.  He said, yes, yes, he -- Officer Weekley said

5       yes, he does.  He didn't go into any of the details about

6       the offense and that she never told him, she never told

7       him that Mr. Dantzler couldn't have done it because he was

8       with her that night, is what she said on her direct -- on

9       her testimony as she gave it.

10              THE COURT:  So he will not be utilizing to

11       refresh his recollection or utilize it in his testimony in

12       any way that report that was just revealed to the Defense

13       today that I said would be precluded?

14              MR. HUTTING:  Right.

15              MR. KINNEY:  Well, he's testifying from his

16       memory without a report.  I don't know when the last time

17       he saw this report, but it's the information he didn't

18       know about.  Neither I nor Mr. Hutting knew about Officer

19       Weekley until today.  Now this is after we put her on for

20       testimony.  So I still think it's the information that is

21       unfair, whether it comes from his memory or from his PCR.

22       He's impeaching her with information that we didn't

23       already have when we put her on the stand.

24              THE COURT:  Was he on your witness list?

25              MR. HUTTING:  On my witness list?  No, he

164

1       wasn't.  I didn't know about her till ten days ago.  I

2       didn't know who she was, other than she was supposed to be

3       an alibi witness.  Now she gets up on the witness stand

4       and starts testifying about the arrest and how she tried

5       to tell the officers that, you know, he was with me, he

6       was with me.  That's what she said.

7                   MR. KINNEY:  That's because of the questions

8       that were asked on cross-examination.  And then we get

9       this and now he wants to impeach her with it --

10                  THE COURT:  Well, he can't utilize the PCR.  Mr.

11      Hutting can't reference what's in the PCR in terms of what

12      the officer wrote.

13                  MR. HUTTING:  Right.

14                  THE COURT:  It cannot be used to refresh his

15      memory in any way.

16                  MR. KINNEY:  Your Honor, I'm asking that the

17      officer not be allowed to testify for the same reason,

18      it prejudices the Defense that we didn't have this prior

19      to --

20                  THE COURT:  Well, but Mr. Kinney --

21                  MR. KINNEY:  -- the preparation of the case.

22                  THE COURT:  -- they're certainly entitled to

23      impeach.  They're allowed to call rebuttal witnesses and

24      they're allowed to impeach the testimony, if someone made

25      a statement, and they can impeach that statement.  They're

1       allowed to it.

2               So over objection, I'll allow him to testify;

3       however, he's precluded from making reference to his

4       report, using his report to refresh his recollection.

5       There'll be no reference to any statements made by Mr.

6       Dantzler at the time.

7               That's quite clear, gentlemen?

8               MR. HUTTING:  Yes, sir.

9               THE COURT:  Is that understood, Mr. Kinney?  So

10      it's not without limitation.

11              MR. KINNEY:  Yes, your Honor.  My objection is

12      still noted.

13              THE COURT:  It's noted.

14              MR. KINNEY:  And that's whether -- that means

15      that whether he -- it's in his PCR or he remembers it, he

16      knows not to mention any statements from Mr. Dantzler.

17              MR. HUTTING:  I told him -- I told him -- I

18      instructed him in the jury room, don't mention anything

19      that Mr. Dantzler said to you.  And specifically don't say

20      the words, "You got me".  We're not going to get into

21      that.  Okay?

22              THE COURT:  All right.

23              MR. HUTTING:  Now, I have one other thing that's

24      come up.  Well, Judge, I mean, they just put the witness

25      on this afternoon, or this morning, or at the end of the

1       day.

2                    THE COURT:  What?

3                    MR. HUTTING:  Okay.  The witness, Ms. Simpson,

4       testified that she was working that night, January the

5       15th.  She worked from 8:00 a.m. in the morning to 8:00

6       p.m. at night, January the 15th, 2006.  And then she went

7       back to work the next morning on the 16th at 8:00 a.m.

8                    We con-- I asked her about did you bring any

9       records?  No, that would be at corporate headquarters.  We

10      contacted --

11                   THE COURT:  Well, Ms. Simpson is in the

12      courtroom.  Should she be removed?

13                   MR. HUTTING:  Yes, she should.

14                   THE COURT:  Would you step outside, Ms. Simpson?

15      Thank you.

16                   MR. KINNEY:  She was allowed to be in the

17      courtroom during Mr. Dantzler's testimony.

18                   MR. HUTTING:  I'm not disputing that.

19                   THE COURT:  Go ahead.

20                   MR. HUTTING:  Okay.  We contacted Extended Stay

21      America, her employer.  Their records show, and I've got a

22      copy of it here, Judge, that her hire date was August

23      19th, 2004, and that she was terminated on September the

24      5th of 2005.  She was terminated from this job about four

25      months before this murder, so she couldn't have been

                                167

1   working there.  That's what this record shows.  I just

2   received the fax from that.  I believe that we will have a

3   witness down here tomorrow morning to be able to testify

4   about that.

5            THE COURT:  We're doing closings today.

6            MR. HUTTING:  I understand that, Judge, and

7   that's why I'm asking for some leeway here.

8            THE COURT:  No.

9            MR. HUTTING:  One witness at nine o'clock in the

10  morning.

11           THE COURT:  No, it's too late.

12           MR. HUTTING:  Well, then, I would ask that we

13  stipulate to this verification of employment.

14           MR. KINNEY:  I can't do that.  I can't stipulate

15  to verification of employment.  I represent Mr. Dantzler.

16           THE COURT:  You can call -- You can recall her

17  as a rebuttal witness; can't he?

18           MR. HUTTING:  I could.

19           MR. KINNEY:  I don't think so, your Honor.

20           MR. HUTTING:  Sure, I could.

21           MR. KINNEY:  She's been --

22           THE COURT:  Has been in the courtroom.

23           MR. KINNEY:  He had his turn.  I had my turn, he

24  had his turn.

25           MR. HUTTING:  Well, certainly could do that.

1          THE COURT:  What's that?

2          MR. HUTTING:  I could call her as a rebuttal

3     witness and confront her with this.

4          THE COURT:  But she was seated in the courtroom.

5          MR. HUTTING:  It still doesn't matter.  She

6     doesn't know the contents of what's being asked; okay?

7          MR. KINNEY:  This is opening cross, if you call

8     her.  This isn't a rebuttal witness.  She was on the

9     stand.

10          MR. HUTTING:  She's being called in the People's

11     rebuttal case.

12          MR. KINNEY:  And I --

13          MR. HUTTING:  I mean I could have been mean

14     about it and said, no, get out, you can't sit in here

15     while the father of your child has his trial, but I

16     wouldn't do that to somebody.

17          THE COURT:  No, I understand.

18          MR. HUTTING:  And I didn't really expect to get

19     this information, but we got it.  And it shows that she's

20     a liar and a perjurer.  She's committing perjury for this

21     man right here to help get him off.

22          MR. KINNEY:  If that's the situation, then I

23     think that -- I mean we filed a Notice of Alibi, and they

24     had her address and everything.  We had a difficult time

25     having her to get here, but she has been here.  And now

169

```
 1          to -- if he was able to get that, that fast, then where is

 2          the rest of her file to verify?  This is something that

 3          someone else has indicated.  We don't know who that is.

 4          And to confront her with something that we don't know

 5          about is unfair.  It's not conducive to a fair trial

 6          unless we know that --

 7                    THE COURT:  You know about it.  I mean you've

 8          seen it, though; haven't you?

 9                    MR. KINNEY:  No.  I mean, we were talking

10          about --

11                    THE COURT:  Is there a copy for Mr. Kinney to

12          review?

13                    MR. HUTTING:  I'm sorry.  I thought my daughter

14          brought an extra copy down.  I apologize.  It's a letter

15          from Sergeant Russell that he wrote this afternoon out

16          there so that they would release the information.  There's

17          the fax.

18                    MR. KINNEY:  I'm not satisfied with it.  Can we

19          let the Court take a look at it?  It that all right, Mr.

20          Hutting?

21                    MR. HUTTING:  Sure, sure.  Absolutely.

22                    MR. KINNEY:  And we don't know Ms. Foster or how

23          she got that information.

24                    THE COURT:  Spartanburg, South Carolina.

25                    MR. KINNEY:  I've been there.
```

170

1          THE COURT:  Dunbar Street.

2          MR. KINNEY:  Yes, by the railroad tracks.

3          THE COURT:  Well, Mr. Hutting, how do you

4     propose to use this, if the Court allows you, for the

5     limited purpose of calling her in the case?

6          MR. HUTTING:  I would confront her with that.  I

7     would ask her about the employment.  I would verify that

8     that's who she is that is on that there, that she is that

9     Marie Simpson.  And then I would ask her when she was

10    hired and suggest the date to her.  And then I would

11    indicate to her, basically isn't it true, ma'am, that you

12    were terminated from that job?  You were terminated from

13    that job on September 2005?  And I would show her that.

14    Then I would show her that and ask her to take a look at

15    it and then ask her those questions.  That's what I'm

16    going to do.  That's what I would do.

17         MR. KINNEY:  And if her answer is no, does this

18    fax from somebody named Kyle come in as evidence?

19         THE COURT:  No.  I can see no way this could be

20    admitted.

21         MR. HUTTING:  The document itself?  Well, it's a

22    business record, but I understand.

23         MR. KINNEY:  So confronting her with what's not

24    going to be admitted causes a problem.  And I don't want

25    it admitted.  I don't think it should be admitted.

1          THE COURT:  I'm going to rule that because she

2     was in the courtroom, this cannot be -- at this late stage

3     in the proceeding there, I just think it's inherently

4     unfair to allow this witness to be recalled.

5          MR. HUTTING:  So should we strike her testimony?

6          THE COURT:  Well, I'm not going to strike her

7     testimony.

8          MR. HUTTING:  Okay.  Well, I'm asking, Judge.  I

9     mean either she's grossly mistaken or she's lying.

10         MR. KINNEY:  A facsimile at this particular time

11    does not mean that, but -- but I think my objections are

12    on the Record.

13         THE COURT:  We have a fax that hasn't been

14    authenticated, nor can it be authenticated at this point

15    in the trial.  The witness has been sitting in the

16    courtroom observing the testimony and I don't think it

17    would be proper to allow her to be recalled, and she

18    cannot be recalled and this cannot be used.  You can

19    recall the -- You can bring in your officer, though.

20         MR. HUTTING:  Okay.

21         THE COURT:  Jury.  Are we ready for the jury?

22         MR. HUTTING:  Sure.

23         MR. KINNEY:  Yes.

24         DEPUTY SHERIFF:  All rise.  Please come out and

25    get your pads, take your seats.

1                    (At about 3:46 p.m., jury panel seated.)

2                    THE COURT:  Sir, you would identify yourself for

3          our court reporter, Mrs. Bauer?

4                    WITNESS WEEKLEY:  Weekley, W-E-E-K-L-E-Y.

5                    THE COURT:  Sir, would you stand, raise your

6          right hand, identify yourself for the Record?

7                    WITNESS WEEKLEY:  Joseph Weekley.

8                    THE COURT:  And do you solemnly swear or affirm

9          that any testimony that you give regarding this matter

10         will be the truth?

11                   WITNESS WEEKLEY:  I do.

12                        P.O. JOSEPH WEEKLEY,

13         called as a witness at 3:46 p.m., having first been duly

14         sworn by the Court, was examined and testified on his oath

15         as follows:

16                   THE COURT:  All right.  Thank you.  Would you

17         sit down and make yourself comfortable?  Pull the

18         microphone close to your mouth and speak loudly and

19         clearly for this jury.

20                   WITNESS WEEKLEY:  Okay.

21                   THE COURT:  Mr. Hutting.

22                   MR. HUTTING:  Thank you.

23

24         DIRECT EXAMINATION BY MR. HUTTING:

25         Q.   Name and place of employment?

1   A.   Joseph Weekley, Detroit police officer.

2   Q.   How long so employed?

3   A.   Fifteenth year.

4   Q.   Officer Weekley, I want to take you back to February the

5        26th of 2010, around one o'clock in the afternoon.  Were

6        you over on Wabash Street?

7   A.   What was the date again on that?

8   Q.   I believe it was February the 25th of 2010.

9   A.   The 5th, yes.

10  Q.   Were you -- around one o'clock, were you over on Wabash

11       Street?

12  A.   Yes.

13  Q.   What were you seeking to do over there?

14  A.   We were conducting a surveillance operation to apprehend a

15       suspect.

16  Q.   Okay.  And was the name of the suspect that you were

17       trying to apprehend Samuel Dantzler, Senior?

18  A.   Correct.

19  Q.   Okay.  Were you, in fact, successful in arresting Mr.

20       Dantzler?

21  A.   Yes, we were.

22  Q.   Do you see him here in court today?

23  A.   Yes.  Samuel Dantzler in the suit.

24  Q.   Okay.  Sitting over here to my right in the green suit?

25  A.   Greyish-green, yes.

174

1                    MR. HUTTING:  May the Record reflect that the

2          witness has pointed to and identified the Defendant?

3                    THE COURT:  Yes.  So noted.

4                    MR. HUTTING:  Thank you.

5    BY MR. HUTTING:

6    Q.   Okay.  Was Mr. Dantzler on the street, in a car?  How did

7          the arrest go down?

8    A.   He was in a black Pontiac van, like a minivan.  It was a

9          traffic stop.

10   Q.   Okay.  Was he by himself or with others?

11   A.   He was with a young girl about six years old.

12   Q.   Okay.  What did you arrest Mr. Dantzler for?

13   A.   There was an outstanding murder warrant and a felony and

14         probation violation warrant --

15                   MR. KINNEY:  Objection.

16   BY MR. HUTTING:

17   Q.   There was a felony -- There also was a non support

18         warrant; is that correct?  Just yes or no.

19   A.   Yes.

20   Q.   Okay.  Thank you, sir.

21                   Now what did you do with the girl?

22   A.   We were in front of the house where they resided, so I

23         went with the little girl to the door, asked her if her

24         mother was home and she indicated she was, so we went to

25         the front door and knocked on the door.

175

```
 1   Q.   Okay.  And then what happened?

 2   A.   I believe a Marie Simpson, her -- the young girl's mother

 3        came to the door and --

 4   Q.   Okay.  Did you explain to Marie Simpson what was

 5        occurring?

 6   A.   Yes.  I let her know that we locked up Samuel and that

 7        we'd be going to the Schaefer station.

 8   Q.   Did you tell her what he was locked up for?

 9   A.   I said he had an outstanding warrant.

10   Q.   Did you say what it was for?  Did you say it was for a

11        homicide?

12   A.   I believe I did, but I'm not sure.  I definitely had a

13        conversation with her.

14   Q.   Okay.  All right.

15             MR. KINNEY:  I'm objecting to the speculation as

16        to what he -- if he does not remember exactly what he told

17        her about the homicide.

18             MR. HUTTING:  Well, I didn't say what -- I

19        didn't get into that.

20   BY MR. HUTTING:

21   Q.   Did you tell her that he was being locked up for a

22        homicide?

23   A.   Yes, I did.

24   Q.   Okay.  All right.  Did she --

25             MR. KINNEY:  Can we approach the bench, please,
```

176

1          for a second here?

2                     THE COURT:  Yes.

3                     (At about 3:49 p.m., brief sidebar;

4                     At about 3:50 p.m., back on the Record.)

5      BY MR. HUTTING:

6      Q.   Would you say she was cooperative with you?

7      A.   No.

8      Q.   Did you tell her any of the details about the homicide

9           that Mr. Dantzler was arrested for?

10     A.   No.

11     Q.   Did she ever tell you, when she was there at the door --

12          Ultimately you gave her daughter back to her?

13     A.   I did.

14     Q.   Okay.  Did she ever tell you, Officer Weekley, when you

15          were there at the door talking to her that he couldn't

16          have done this because he was with me that night at the

17          time that this murder occurred?

18     A.   No, we didn't have a conversation about that.

19                     MR. HUTTING:  Thank you, sir.  Nothing further.

20                     THE COURT:  Mr. Kinney.

21                     MR. KINNEY:  No questions.

22                     THE COURT:  May the officer step down and be

23          excused?

24                     MR. KINNEY:  Yes, your Honor.

25                     THE COURT:  Thank you.

1                WITNESS WEEKLEY:  Thanks.

2                MR. HUTTING:  That means that the People then

3        rest their rebuttal with the testimony of Officer Weekley.

4                THE COURT:  Are you ready for closing arguments?

5                MR. HUTTING:  Judge, can we approach?

6                THE COURT:  Yes.

7                (At about 3:51 p.m., brief sidebar;

8                At about 3:52 p.m., back on the Record.)

9                MR. HUTTING:  May I start, your Honor?

10               THE COURT:  You may.

11               MR. HUTTING:  Thank you.

12               Good afternoon, ladies and gentlemen.

13               JURY PANEL:  Good afternoon.

14               MR. HUTTING:  We have reached the point in the

15        trial that's called final arguments.  The way in which the

16        final arguments proceeds is as follows:  On behalf of the

17        People, assuming my voice lasts, I make to you an initial

18        closing argument.  At the conclusion of my closing

19        argument, Mr. Kinney, on behalf of the Defense, speaks to

20        you.  At the conclusion of his argument, I speak to you a

21        second time in what is known as rebuttal.

22               And so, in essence, the Prosecutor gets two

23        opportunities to speak to you, the Defense gets only one.

24        Why is that?  Is that because, you know, you were in that

25        jury room in there, Mr. Kinney and I drew straws and I got

1    the longest straw?  The answer to that is no.  Is that

2    because we drew cards and I got the king and he got the

3    jack?  No.  The answer is the People who have made the

4    criminal procedures in our state say that the party that

5    bears the burden of proof -- and in a criminal case that's

6    always the prosecutor -- the party that bears the burden

7    of proof gets two opportunities to speak versus one for

8    the other party.  So that's why I speak twice and the

9    Defense speaks only once.

10         Okay.  Another think about final argument, it is

11   not evidence.  Now you have heard from, I think, probably

12   about 12 live witnesses called by the People.  You've also

13   had stipulations for you that you'll be able to take in

14   there.  If one -- And then there's been two witnesses

15   presented by the Defense.  If one party or another sums up

16   the witness's testimony or recounts the witness's

17   testimony and you the jury say, oh, no, wait a minute

18   there, Mr. Prosecutor, or, oh, no, wait a minute there,

19   Mr. Defense Attorney, we didn't hear it that way, it's

20   your memory and your recollection that controls.  Not

21   mine, not the Defense attorney, not even the Judge's.

22         Why is that?  Because in Michigan, we have what

23   I call a dual setup, okay, and that dual setup is simply

24   this:  When it comes to the law, Judge Bill is the Supreme

25   Court of the law.  He tells you what the law is in this

179

```
1     state, what law governs this case, and what law you must

2     apply to the case.  You must accept that law.  You can't

3     say, oh, no, I don't like that law on aiding and abetting

4     and I'm not going to follow it.  You have to follow that

5     law.  So he's the supreme court of the law.

6           You the jury, though, are the supreme courts of

7     the facts.  You decide what the facts are, you decide what

8     facts have been proven, what facts have not been proven.

9     You decide how much weight, how much believability or

10    credibility to give to a particular witness or to a

11    particular fact.  That is your province.  You're supreme

12    in that area.  So you're the supreme court of the facts.

13          Hopefully what you do is you take the law that

14    Judge Bill gives you and you take the facts as you find

15    them, you put them together and you reach a verdict.  So

16    that's the way it works.

17          Okay.  With that in mind, let's start.  I've got

18    my board up here.  It's called aiding and abetting.  I

19    believe that the Judge will give you the charge on that.

20    The aiding and abetting charge is based on statute which

21    is MCLA 767.39.  It says that:

22          Every person who is concerned in the commission

23    of an offense, whether he directly commits that act

24    constituting the offense or procures counsel, aids or

25    abets in his commission that hereinafter be prosecuted,
```

180

1    indicted, tried upon conviction shall be punished as if he

2    had directly committed that offense.  That's the statute

3    that governs aiding and abetting.

4         Right below it are the jury instructions, okay,

5    that you're going to get, which tells you what the law is

6    on the jury instructions.  And there's another instruction

7    there that's called inducement.  It does not matter how

8    much help, advice or encouragement that the Defendant

9    gave; however, you must decide whether the Defendant

10   intended to help another commit the crime and that whether

11   his help, advice or encouragement actually did advise or

12   encourage the crime.  That's the inducement charge.

13        Right above it is the other charge.  That's key

14   in this case because we're talking about five or six

15   people being involved in this case.  I can't tell you who

16   the actual shooter is.  It doesn't matter, legally, in

17   this case who the actual shooter is.

18        Mr. Dantzler is not charged with a felony

19   firearm.  He's charged with committing and helping others

20   to commit a first degree felony murder.  That first degree

21   felony murder is the breaking and entering of the home

22   invasion of Bernard Hill's apartment and Nikitta

23   McKenzie's apartment wherein Bernard Hill was killed.

24   That's what he's charged with, aiding and abetting of

25   that.

1          Okay.  What do I want to talk about first?  What

2     I want to talk about first are the elements.  Remember, I

3     told you when I started my voir dire that that's what the

4     People have to prove.  I want to kind of go over those

5     elements and I want to see if we can identify which

6     element or elements are in dispute.  What are we fighting

7     about?  What are we arguing about here for the last five

8     or six days?

9          I think it's going to basically boil down to one

10    element, and that's the element that Mr. Dantzler was part

11    of this, what I call a posse, okay, the posse that went

12    over there; that is, that he was part of that and that he

13    was one of those persons.  I think that's what it's going

14    to boil down to.

15         So let's start.  What are the elements?  First

16    thing we have to prove is that this crime occurred on or

17    about January 16th of 2006, in the City of Detroit, County

18    of Wayne.  Is there any dispute or argument about that?  I

19    don't think so.  There's been plenty of testimony about

20    that night.  Nikitta McKenzie testified about that night.

21    Bill Niarhos testified about that night.  This place in

22    the City of Detroit, it's in the County of Wayne.  If it

23    had been on the other side of Eight Mile, it would have

24    been in Oakland County.  If it would have been in Ann

25    Arbor, up in Washtenaw, we would not have jurisdiction, no

1       jurisdictional element, but there's no dispute about that.

2              Second thing that we have to prove is that

3       Bernard Hill was alive and that he died on that night.  I

4       believe that there's been plenty of testimony about that.

5       Nikitta McKenzie told you she was there with him in the

6       apartment, he was alive, in good health.  There is a

7       picture that's in evidence here that you can take into the

8       jury room, and laying down at the bottom of the stairs,

9       obviously dead, is Bernard Hill.  So he was alive and then

10      he died.  Is there any dispute about that?  No.

11             The third thing that we have to prove is that he

12      died of an unnatural cause of death, that he just didn't

13      have a heart attack, that he didn't have a cerebral

14      aneurysm, something like that that caused him to die.  It

15      has to be an unnatural cause of death.

16             How do we prove that?  Through Doctor Loewe.

17      She testified that she has reviewed the autopsy reports

18      done by Doctor Schmidt in this particular case and that

19      her expert opinion is that this was a homicide, which is

20      the killing of one person by another, and that he died

21      from a gunshot wound.  And a gunshot wound is an unnatural

22      cause of death.

23             The fourth thing that we have to prove is that

24      the person that caused Bernard Hill to die of this

25      unnatural cause of death, either directly or by aiding and

1        abetting was this Defendant right here, Mr. Samuel

2        Dantzler, Senior.  And there is a dispute about that, and

3        I'll come back to that as to how we've proven that.

4             The fifth thing that we have to prove is that,

5        at the time that Mr. Hill died from this unnatural cause

6        of death, the Defendant had one of three states of mind:

7        Either they intended to kill Bernard Hill or they intended

8        to do great bodily harm to Bernard Hill or -- and these

9        are all in the "or" not "and" -- or they created a very

10       high risk of death knowing that death or great bodily harm

11       was the likely results of their acts.

12            I submit this to you, ladies and gentlemen, when

13       you go to somebody's home at two o'clock in the morning

14       and you have people that have at least one or two,

15       probably two sets of golf clubs there, when you go there,

16       five or six of you, one of the persons has a gun, when you

17       kick in the door and you come charging in and a person

18       with the gun points the gun at Nikitta McKenzie's face and

19       demands Bernard Hill, that creates a very high risk of

20       death at the very least.

21            They went there to do great bodily harm to

22       Bernard Hill.  And that's another one of the prongs, that

23       you created great bodily harm, that he died during that.

24       And sure enough, they beat him.  And when he tried to

25       flee, he was shot and killed.  So is there really any

1    dispute about that?  I submit that there isn't.

2            The next thing that we have to prove -- the next

3    thing that we have to prove is that, at the time that Mr.

4    Dantzler and these other persons caused Bernard Hill to

5    die of this unnatural cause of death, and the intent that

6    they had is that they were committing a felony, and that

7    felony is specifically this home invasion in the first

8    degree.

9            And I submit to you, ladies and gentlemen, that

10   there's really no dispute about that.  The pictures show

11   that this door was kicked in, Nikitta McKenzie tells you

12   she didn't want any of these people in her apartment, she

13   didn't invite any of those people into her apartment.

14           The Judge will lay out the charge of home

15   invasion first degree in that and he will tell you that

16   they came in there when other people were there, if they

17   came in there intending to commit that felony of assault,

18   that that constitutes home invasion of the first degree.

19   Or if they were armed, that constitutes home invasion of

20   the first degree.  Is there any dispute about that?  I

21   submit that there's not.

22           So when you look at all of these things that we

23   have to prove, the one element that we're fighting about

24   here is basically identification, that Mr. Samuel

25   Dantzler, Senior, was part of the posse.

1            Why do we say that Mr. Dantzler was part of the

2       posse?  Well, we say that for a number of reasons.  One of

3       the reasons we say that for is because there was a motive

4       in this case, all right.  There was a motive in this case

5       that ran to Mr. Dantzler, that ran to his family.

6            Quiana Turner had been beat up.  Quiana Turner

7       had been beat up.  And this time, her family decided to do

8       something about it.  Did they, in the past?  I don't know

9       about anything in the past, but clearly this night, they

10      decided to do something about it.

11           What did they do?  They got together, they got

12      their gun, they got their golf clubs and they went looking

13      for Bernard Hill.  It runs to that family.  It runs to Mr.

14      Dantzler also.  Where did they go?  And that gets to our

15      two key witnesses or two of the key witnesses.

16           Now Mr. Kinney tells you in his opening

17      statement, well, he's not going to have anybody here

18      that's going to say that I saw Samuel Dantzler and

19      identified him inside the apartment that night.  Clearly

20      we're not.  All right?  But if that's what you expected,

21      if that's what you're demanding, I was beat before I

22      started out.

23           The Judge will tell you that cases can be proved

24      by direct evidence and by circumstantial evidence.  And

25      all of these things can be combined.  And you prove cases

```
1    through whoever testifies here.  And I'll get to that in a
2    minute.
3           But if you expected that, I might as well have
4    sat down and not done anything for five days.  But we do
5    have two key witness who I submit to you testified, and
6    testified here quite well.  One was Janet Burt, the mother
7    of Bernard Hill, and the other was Nikitta McKenzie.  And
8    they both told you about the terror of that night.
9           It started with Janet Burt, with a knock on the
10   door -- not a knock, a pounding on the door.  She said
11   people were pounding on my door during the early morning
12   hours.  She went down there, okay, she knew at this time
13   that her son had had this fight with Quiana Turner.  She
14   didn't approve of it, she tried to call him, she did get
15   him on the phone one time, tried to talk to him, he hung
16   up.  He would not take her calls.  She didn't approve of
17   that.
18          So she knew there had been a dispute, an
19   argument and a fight.  And Quiana had been beaten up or
20   assaulted.  And a few hours later, who comes knocking on
21   her door?  She goes down there, who does she see?  She
22   sees Quiana Turner's brother, Rodney Turner.  And then she
23   also sees Little Sam Dantzler, Mr. Dantzler's son.
24   They're pounding on the door.  She doesn't answer the
25   door.  She's afraid.
```

187

1            What else does she see?  She told you this, and

2       she told you very clearly and it's important, she saw a

3       gold car in the driveway.  A gold car in the driveway.

4       Whose car was it?  She said it was Sam Dantzler's car, Mr.

5       Dantzler, Mr. Dantzler, Senior.  How do you know that?

6       Because I had seen him driving that car.  She told you

7       that that was his car there in the driveway.  And she also

8       told you that when two men went back to the car, there

9       were other people in the car, there were other people in

10      the car.  She said, I can't identify them, it was night,

11      they were too far away.  So the gold car is key.

12           And you know what happened?  Mr. Dantzler here,

13      on cross-examination, when I asked him said, no, I never

14      drove a gold car.  I never had a gold car.  And I said,

15      well, you know, on direct examination, when your attorney

16      was questioning you, didn't you say at one time that you

17      had a gold car?  No, no, no, I never said that.

18           Well, over the break, I had Mrs. Bauer, the

19      court reporter, print up the direct testimony of Samuel

20      Dantzler, Senior, on that issue.  And here's what she

21      printed up:

22           Okay.  And did you drive that car?

23           Sometimes -- This is a question by Mr. Kinney.

24      Answer:  Sometimes I did.  She let me drive it.

25           Question:  Did you have your own car in January

188

```
 1      of 2006?

 2              No.

 3              Question:  Okay.  Did you ever drive a long,

 4      gold-colored Chrysler?

 5              Answer, by Mr. Dantzler:  Yes, I did.

 6              And did you drive that car -- Well, how long did

 7      you drive that car?

 8              I had that car maybe two years.

 9              Two years.  And this is prior to 2006?

10              Answer:  Yes.

11              He did testify to that.  I don't know if you

12      remember that.  I thought I remembered that because I had

13      it in my notes.  Maybe you have it in your notes.  But I

14      asked Mrs. Bauer to check that to make sure that that's

15      what he testified about.  And that's exactly what he said

16      on direct exam.  But when I asked him that on cross-exam,

17      oh, no, I never said that.  Well, here it is in black and

18      white.  That's what Mrs. Bauer printed up.  So the

19      Defendant, on that issue, has not told the truth.

20              And Ms. Burt, we submit to you has told the

21      truth, she saw the Defendant's car there that night.  What

22      happens next?  That's where the testimony of Nikitta

23      McKenzie comes in, and it's a very important piece of

24      testimony.  She's there with Bernard Hill, they're getting

25      ready to go to bed.  Mr. Hill thinks he sees some shadows
```

189

1        kind of walking back and forth in front of the window.  He

2        goes into the bedroom, then the door gets kicked in.  Who

3        comes in?  Five to six black men.  She said the one guy,

4        the leader, had a gun demanding Bernard -- she said at

5        least one person and maybe more had golf clubs in their

6        hand.  And she also said that people had on a skull cap.

7              Now it wasn't just one.  I think she implied

8        that there were a number of people with skull caps.

9        Bernard comes out, a fight occurs, she's put back in --

10       she's -- During this fight, she's in the bedroom so she

11       can't see it.  There's good reasons why she can't identify

12       anybody.  This was a terror-filled night.  It's basically

13       dark at that point in time, dark in the apartment and

14       she's put back into the bedroom.  She didn't get to see

15       the fight.  But she can hear it.  And it was a terrible

16       fight.  Look what happened when she comes out, her whole

17       apartment, her whole apartment is basically destroyed.

18             Ultimately she finds Bernard down at the bottom

19       of the stairs and he's dead and she heard gunshots.  She

20       was very good as a witness, so was Ms. Burt, I thought she

21       was very credible, but she told you one other thing, one

22       other very important thing, she said this cap, right here,

23       was in her apartment after the fight was over.  She said

24       it's not Bernard's cap, she said it's not her cap, she

25       said it's not the cap of the person that was there before.

190

1       And she said she has no idea that that -- she said that

2       this cap does not belong to anybody that she knows or was

3       friends with.  Why is that?  Because this was the cap that

4       Sam Dantzler was wearing that night, Samuel Dantzler,

5       Senior.

6               And during the course of that event where

7       Bernard Hill was killed, somehow Bernard Hill got the cap,

8       the cap got knocked off during this melee that went on in

9       there, and it got left there.  That's what happens in

10      cases.  That's how police ultimately solve cases.

11              You know, if a defendant or a group of

12      defendants commit a perfect crime, if they don't leave any

13      fingerprints or don't make any mistakes during the

14      commission of a crime, we're really never going to solve

15      it.  But you know what?  Defendants make mistakes; okay?

16      Defendants leave things at the scene of the crime.  Things

17      get left there.  They make mistakes.  That's the kind of

18      thing that allows the police ultimately, if they work it

19      right, to solve the case, and that's what happened in this

20      particular case.

21              We solved the case using this hat, using the

22      motive and using the testimony of Ms. Burt.  You know what

23      you really have to find in order to acquit Mr. Dantzler on

24      this case?  You have to find that, on this night, not only

25      did Sam Dantzler let somebody else borrow his car, because

```
1       Ms. Burt tells you that that was his car, you have to find

2       that he let somebody else borrow his car, and he also let

3       somebody else borrow his hat.  That's what you have to

4       find.

5              And I submit to you, ladies and gentlemen, that

6       neither one of those two things is true.  Nobody borrowed

7       Mr. Sam Dantzler's car that night because he was part of

8       that posse.  Nobody borrowed his hat, because he was in

9       that apartment and he left his hat there in that

10      apartment.

11             Why do we say he left his hat there?  Because

12      ultimately this hat was tested.  It was tested by

13      comparing his buccal swab against this cut that Chris

14      Steary made.  Chris Steary is not a dumb person; all

15      right?  He said he looked at the hat, looked at it inside

16      and out, obviously using his gloves and things, and he

17      said he made a decision that this was the front of the hat

18      or appeared to him to be the front of the cap because of

19      the tag in the back.  And he took the cut from the inside

20      of the front of the cap because that's where the person

21      would have it against his brow.  And that was the cut that

22      he took.

23             He prepared the DNA, and it ultimately got sent

24      off to Bode.  Ultimately what also got sent off to Bode

25      was the -- more blood of Bernard Hill that was prepared.
```

192

1          We brought in a number of people, we got buccal swabs from

2          them.  And basically we found out that they're not in this

3          cap, they're not there in this situation.

4                    Finally we got what is known a CODIS association

5          that told us that based on a CODIS association, it matches

6          a person by the name of Samuel Dantzler, Senior.

7          Ultimately then, we got Mr. Dantzler in, we got his buccal

8          swab and we sent that buccal swab off to Bode.

9                    And what does Bode tell you?  The cut that came

10         from here, all right, the cut that came from here, the

11         first cut, came from Samuel Dantzler, Senior, and that cut

12         came and it's Mr. Dantzler, Senior's DNA in that hat, one

13         in 2.3 quadrillion.

14                   You know what?  The defense says, well, you

15         know, you got one cut here, this is a big hat.  Okay.

16         It's got a number of signs to it.  Just because he's there

17         once, all right, doesn't mean that he's going to be there

18         again.  Who knows about that?  So you know what we did?

19         We didn't have to do anything; all right?

20                   It cost us quite a bit of money, as you saw the

21         bill, just to do this testing.  So the Prosecutor's Office

22         put it to the test.  We said, okay, we'll take some more

23         cuts, we'll take three more cuts.  We just won't rely on

24         this one cut.  We'll take three more cuts and we'll see

25         what those three more cuts or scrapings show.  And you

```
 1    know what?  Those three more cuts or scrapings don't hurt

 2    our case, they help our case.  Because what did the People

 3    from Bode tell you yesterday?  What did Rebecca Preston

 4    tell you yesterday?  She found, in this cap, she found in

 5    this cap the DNA of Bernard Hill.  Now nowhere near as

 6    strong as the cut from the main -- from the main portion

 7    here that they first analyzed, but in the three extra

 8    cuts, which we didn't have to do at all if we didn't want

 9    to, but in the three extra cuts, she found the DNA of

10    Bernard Hill.

11            So not only do you have in this hat the DNA of

12    Samuel Dantzler, Junior (sic), one in 2.3 quadrillion, but

13    you have a very strong, decent DNA of Bernard Hill in this

14    cap.

15            How did that get in there?  The only way, ladies

16    and gentlemen, the only reasonable way that Bernard Hill's

17    DNA got in this hat is because Bernard Hill, in that

18    evening, as he fought for his life, all right, in essence

19    solved this case.  He solved the case.  Somehow as he fled

20    through that apartment and fought in there, he got his

21    hands on this hat, his DNA transferred to that hat, his

22    DNA transferred to that hat.  And then he ultimately got

23    killed.

24            So by doing the extra work, which we were not

25    afraid to do, all right, which we put ourselves to the
```

194

1    test on, we showed -- and it actually assisted the case.

2    That's my argument to you on that, and I ask you to think

3    about that.

4          Okay.  What else do we want to say about that?

5    Well, ultimately, in this case, the Defense presented

6    testimony here today; okay?  The Defense presented

7    testimony.  They presented Ms. Simpson and they presented

8    the Defendant.

9          Every defendant has a right to testify.  Every

10   defendant has a right to call witnesses.  You are to judge

11   their credibility, at least the witness that testifies,

12   like Ms. Simpson, just like you judge the credibility of

13   any other witness in terms of -- and the defendant, also.

14         What you must remember, though, is they have a

15   motive for testifying, and the way they do.  Ms. Simpson

16   is obviously closely tied to this Defendant, although she

17   said he's just kind of a friend.  Well, he's kind of a

18   friend, that I just had kind of an on and off relationship

19   or I haven't had a relationship with him.

20         But what does she tell you?  I visited him five

21   or six times.  Then she says, well, maybe twice a month

22   since he's been in jail, an average of twice a month.

23   That turns out to be 20 times.  And when I confronted her

24   with that, she said, well, I wasn't counting.

25         But you know what?  For somebody who was having

1       a real casual relationship, she's over there seeing him a

2       lot.  What do you think they talked about when she's over

3       there?  I submit to you, ladies and gentlemen, judging her

4       testimony like the way you judge everybody else's, she

5       says, ultimately, when he got arrested, I told the officer

6       right there at the scene that I was with him that night

7       and that he couldn't be the person that did this.

8               We put on Officer Weekley, who was the person

9       that arrested him, who had contact with this lady that

10      night.  He says, no, that didn't happen.  You're to judge

11      her credibility on that.

12              Mr. Dantzler testified.  Did you expect him to

13      get up on the witness stand and say, oh, yeah, I was part

14      of the posse?  Absolutely not.  He's going to deny that,

15      because he knows if he admits he was part of that posse,

16      he's going to ultimately get convicted, if he says that,

17      so he's got to deny that.  But then what does he say?

18      Well, you know, I never had that car, I never had a gold

19      car like that.

20              You were there.  You judge his testimony.  You

21      judge Ms. Simpson's testimony.

22              What I want to say to you is simply this:

23      Sometimes jurors think when a defense puts on the case and

24      the jurors say, well, we don't believe that testimony, we

25      don't believe the defendant, or we don't believe any of

```
 1    his witnesses, what they sometimes think, they leave that
 2    testimony out there in right field, that's not correct.
 3    The Judge will tell you that a case is proven by whatever
 4    testimony comes in, by whatever party presents that,
 5    whether it's the Prosecution or the Defense.
 6         So if the Defense goes forward with the case,
 7    which they have no obligation to do, but if they choose to
 8    go forward with the case, they go forward at their peril.
 9    And if the Defense puts witnesses on the witness stand and
10    you, the ultimate judge of the credibility of those
11    witnesses, say we don't believe those witnesses, we don't
12    believe the Defendant or we don't believe Ms. Simpson, you
13    can say, we don't believe that.  And as a result of that,
14    that adds to the Prosecution's case.  It doesn't stand out
15    there in left field.  So I ask you to remember that, and I
16    ask you to consider that.
17         What we say here, ladies and gentlemen, is that
18    basically through the testimony of Rebecca Preston, who
19    testified yesterday about the DNA, combined with that
20    testimony of Nikitta McKenzie, combined with the testimony
21    of Janet Burt, on the night in question, the posse got
22    together and they went after Bernard Hill.  This was the
23    last time he was going to beat up their relative, and they
24    went out to get him.  That's proven by what they did.  Mr.
25    Dantzler was part of that.
```

1            He was part of that.  I can't tell you that he

2      was the gunman.  I can't tell you he was one of the

3      persons that had a golf club.  But I do submit to you,

4      ladies and gentlemen, based on this hat with his DNA in it

5      and with Bernard Hill's DNA on it, along with the motive

6      and testimony, Mr. Dantzler was part of the group that

7      kicked in that door, committed that home invasion, and did

8      assault Bernard Hill, and that Bernard Hill died during

9      the course of that home invasion as he tried to flee from

10     it.

11            And Mr. Dantzler is, therefore, guilty of first

12     degree felony murder.  And we'd ask for a conviction on

13     that count.

14            Thank you.

15            THE COURT:  Thank you, Mr. Hutting.

16            Mr. Kinney.

17            MR. KINNEY:  Thank you, your Honor.

18            Good evening, ladies and gentlemen.

19            JURY PANEL:  Good evening.

20            MR. KINNEY:  I know what time it is.  I know

21     that you all have heard the entire case and I feel that

22     you want me to be as brief as possible, and I think I can

23     do that.  But I have to say that, at the beginning, what I

24     thought that this Honorable Court would instruct you on is

25     the fact that Mr. Dantzler, if he testifies, it's not at

```
 1    his peril.  He testified, and his testimony should be

 2    weighed no greater, no less, than you would any other

 3    witness that testifies.

 4            And it's the same thing when it comes to Ms.

 5    Simpson.  That division between Prosecution witnesses and

 6    Defense witnesses has nothing to do with how you apply the

 7    law to each witness that comes here and testified.

 8            That's what I'm asking, is that you determine

 9    credibility as to each witness.  You determine motive as

10    to each witness.  And in this case, it is no fault of Mr.

11    Dantzler that this case began January the 16th, 2006, but

12    the Detroit Police Department, with their federal grants

13    for cold, cold cases, five hundred thousand dollars

14    decides to do something about it after they get a grant

15    some three, four years later in 2009.

16            I feel that this particular case, in 2006, we

17    had fingernail clippings.  Doctor Loewe indicated that

18    those fingernail clippings are a sign of struggle.  That

19    Mr. Hill -- There's no question we believe Mr. Hill was

20    fighting with somebody.

21            Now when it comes to DNA, it's not the DNA, it's

22    where the DNA is.  The DNA that's under Mr. Hill's nails,

23    that was destroyed by the Medical Examiner's Office here

24    in Wayne County, is different from a hat that may have

25    been found on Blackstone in a house where not only Mr.
```

1          Dantzler went to, but Mr. Hill went to.

2                  So this is the real problem in this particular

3          case is that Mr. Hill was, technically, another family

4          member.  He had a child in common with Mr. Dantzler's

5          niece.  But does that mean that Mr. Dantzler has a motive

6          to go and kill Mr. Hill?  That's nothing but argument from

7          the Prosecution.

8                  There is no facts in evidence that give us the

9          right to say we believe, yeah, that he had a motive to go

10         and kill a man who -- domestic violence happens in our

11         community daily.  Domestic violence in this particular

12         case happened at least six, seven, eight times prior to

13         the night that Mr. Hill died.

14                 When it comes to the witnesses' testimony about

15         what happened and maybe question about these statements,

16         the statements that were given in 2006, Ms. -- the medical

17         examiner that actually did the autopsy was not here, he's

18         on vacation.  We're in a murder trial.  He sends someone,

19         a deputy, chief, second in command at the Wayne County

20         Prosecutor's Office, that she read one day, a week prior,

21         then reviewed it again the day that she gets here.

22                 If it wasn't for me continuing to try to get

23         that Doctor to answer the questions that I was asking her,

24         we would never have found out that there were fingerprint

25         (sic) clippings, that those fingerprint (sic) clippings

1      were destroyed.  This is Exhibit A, Defense Exhibit A,

2      October the 19th of '09.

3              Mr. Dantzler's DNA.  We don't know who Mr. Hill

4      was fighting with.  The fact that a hat has been left

5      there by a family member of Mr. Hill, some other family

6      member that may have been there, that doesn't mean that

7      Mr. Dantzler is involved.  How about testing this kind of

8      evidence?  DNA underneath the nails of Mr. Hill.  Is it

9      Mr. Dantzler's fault that the Detroit Police Department,

10     even though they went to the Medical Examiner's

11     Department, and that's when you can use "they", we're

12     talking about the police department, the reason why we

13     have to use they, they're not clear from their records as

14     to who actually -- what police officer did perform the

15     work on this particular case at what time.  That's a

16     problem.

17             But we know that a police officer went and got

18     the blood sample of Mr. Hill, back in 2007, I believe it

19     was, but they didn't pick up the fingernail clippings.

20     They didn't go back and pick up those fingernail clippings

21     a year later.  They didn't go back and pick up those

22     fingernail clippings two years later.  That's the kind of

23     evidence that I believe, if Ms. Preston and Ms. Kaye had a

24     chance to take a look at, we would have found that Mr.

25     Dantzler's DNA would not have been there.

1          Whoever's DNA was there would have been a person

2     who may have had some kind of struggle with Mr. Hill.

3     That's scientific evidence when it comes to DNA.  That's

4     the difference of DNA, because DNA underneath my

5     fingernails and DNA being on a hat that everybody could

6     have wore.

7          Both experts testified that that particular hat,

8     just because it had the DNA on there, they can't determine

9     what day it was placed there, they can't determine what

10    time Mr. Dantzler had the hat on, what time Mr. Hill had

11    the hat on.  Another interesting thing about scientific

12    evidence is that poor Mr. Hutting's theory that Mr.

13    Dantzler left that hat there and Mr. Hill's DNA got on it

14    because he grabbed the hat at the time, that he's bleeding

15    to death, and no one has scientifically examined the hat

16    to determine whether or not Mr. Hill's blood is on the

17    hat.

18          We have Mr. Steary, who indicates that he's a

19    police officer, he calls himself a biologist, as well,

20    knows blood when he sees it, he's the only one that

21    thought about it.  What he says is when I did a cursory

22    look at the hat and I didn't see anything for blood, I

23    wasn't going to spend the money to do the testing, but I

24    don't think any blood was on the hat.

25          We don't have any evidence that Mr. Hill's blood

 1    was on the hat.  We don't have any evidence that any of

 2    the articles that were used to beat Mr. Hill, the clubs,

 3    the golf club head, Mr. Dantzler's DNA is not on there.

 4            Another issue with the DNA, Mr. Harry Henderson,

 5    who is in a prison somewhere in Florida, guess where his

 6    DNA ends up?  On one of the grips from the golf clubs.

 7    Since you pay thousands of dollars, and we have a

 8    contract --

 9            Can we approach for a second?

10            (At about 4:29 p.m., brief sidebar;

11            At about 4:31 p.m., back on the Record.)

12            MR. KINNEY:  Ladies and gentlemen, there was a

13    contract, a contract between Bode Technology and Michigan

14    State Police, a contract between Bode Technology and the

15    Detroit Police Department.  Bode Technology has been

16    taking over since the Detroit Police Department's crime

17    lab was closed, and they have been helping the Michigan

18    State Police.

19            We've had testimony from the Michigan State

20    Police and Officer Nye about the CODIS hit on the hat.

21    We -- What is important is that, in terms of motive, I do

22    not believe that the Wayne County Prosecutor's Office

23    would be spending this kind of money for different kinds

24    of answers.  Ms. Preston is still working for the police

25    department at this particular time.  And not that they

1   would come here and intentionally testify to something

2   that's not true, that's not what I'm saying.  What I'm

3   saying is that they work for an individual who generally

4   is working for the prosecution.  That's the situation.

5   They don't come in here for the assigned counsel fee of

6   150 dollars.  We asked them that, we asked them.  They

7   don't do that.

8           But in this case, even how they investigated

9   this case, it's not Mr. Dantzler's fault.  The fact that

10   the Detroit Police Department didn't do anything from 2006

11   until 2009 is not Mr. Dantzler's fault.

12           Ms. Burt, even though she testified that she

13   believed that Mr. Dantzler has a gold-colored car, Ms.

14   Burt took the stand and testified that I know Mr.

15   Dantzler, I'm angry about what happened to my son, but,

16   no, I did not see Mr. Dantzler at my house that night.  He

17   did not come to my door, he did not call me, he did not

18   threaten me.  That's the difference in this case.

19           I represent Mr. Dantzler.  We can't convict Mr.

20   Dantzler because Mr. Hutting said it's a posse.  These are

21   family members.  If I have a family member who did

22   something does not mean that because I am a family member,

23   I'm responsible, too.  He sits here alone and he and

24   his -- your determination of whether he's guilty or

25   innocent is based on evidence that's against him.

```
 1              In this particular case, we have a hat.  A hat
 2      that could have been worn today, a hat that could have
 3      been worn on the 16th.  A hat that could have been worn
 4      before the 16th is not evidence beyond a reasonable doubt
 5      that Mr. Dantzler, Senior, had anything to do with the
 6      death of Bernard Hill.
 7              Nikitta McKenzie doesn't know Mr. Dantzler.  She
 8      said so.  Mr. Dantzler said so.  Mr. Dantzler said he did
 9      not have a gold-colored car that day.  January the 16th,
10      January the 15th, he said he was getting a ride, so did
11      Ms. Simpson.
12              Is there anything here that actually shows that
13      Mr. Dantzler is lying about the fact that he didn't have
14      anything to do with Mr. Hill's death?  About the fact that
15      he wasn't at that particular apartment?  Mr. Dantzler said
16      he's been to that apartment before.  Mr. Dantzler told you
17      that he bought weed from Mr. Hill.  Mr. Dantzler told you
18      that he was a friend of Mr. Hill's.  Where is the motive
19      to kill Mr. Hill?  Where is the testimony of the
20      individual like Ms. Quiana Turner.
21              Ms. Quiana Turner's mother, who Mr. Hutting says
22      was upset, that she knew that Ms. Turner was in the
23      hospital.  That's not testimony that we have here.  He's
24      telling you how he found out.  He's telling you where he
25      was.  He's telling you that he didn't have anything to do
```

205

1    with this murder, but he's got a motive, that he belongs

2    to a posse.  But his DNA is on a hat that was found at the

3    scene.  That's not beyond a reasonable doubt.  That's not

4    saying that he did anything.  I got a hat like that.  I'm

5    a black male.  I'm glad my last name is not Dantzler.  Is

6    that enough?

7            Is that -- Can we excuse the fact that evidence

8    that would clearly show -- DNA evidence that would clearly

9    show that there was a problem between Mr. Hill and

10   whoever's skin is underneath his nails?  Now that's DNA

11   evidence.  Not on a hat that anybody could have been

12   wearing.

13           We know that the golf club is not good DNA

14   evidence.  Because a gentleman has his DNA on this golf

15   club and he has been incarcerated over a year before,

16   continuously over a year before the death of Mr. Hill, he

17   couldn't have done it.

18           By the same token, Mr. Dantzler couldn't have

19   done it, because he's told you where he was.  He can't be

20   with Ms. Simpson and be with whoever it is that Mr.

21   Hutting says is part of this posse, at the same time.

22           No statement from Mr. Dantzler saying he did

23   anything wrong.  Mr. Dantzler, no testimony from anyone

24   else that says Mr. Dantzler did anything wrong.  There's

25   no phone records that says that Mr. Dantzler talked to

1     anybody, that Mr. Dantzler's phone was being used to

2     threaten anybody.  These people that are testifying,

3     including Mr. Hill's mother, they know Mr. Dantzler, they

4     didn't say they saw Mr. Dantzler.

5          Let's say that there was a person who actually

6     didn't know Mr. Dantzler but could describe Mr. Dantzler.

7     We don't have any of that.  Why?  Because it didn't

8     happen.  Didn't happen.  Mr. Dantzler was not involved.

9          Canvassing that apartment building, you would

10    have thought that the police department would have at

11    least tried to go to every apartment.  The officer said

12    that he told him to do that, but when we pulled out the

13    sheet, there were eight out of 22.  I think that Mr.

14    Hill's death deserved just a little bit more than that.

15         Let's go to all of these apartments and let's

16    see if anybody can recognize anybody.  Let's see who is

17    coming in and coming out.  It's just human nature to

18    gather when there's something like that.  I never

19    understood that.  But when someone's fighting, when you go

20    to a high school now, two people get into a fight, they're

21    automatically surrounded by everybody that's looking at

22    this fight.  Why?  Why do we run to a fight, instead of

23    running away from it?  I don't know.

24         But the police department ought to use that to

25    see who is there, who's running in?  Who is looking?  Who

207

```
 1       can tell us anything.  Don't just go two, three apartments

 2       and leave.  Don't sit on evidence for years and then come

 3       in here and tell us that there's an excuse, we didn't get

 4       to it.  It's not that they didn't know or have any reason

 5       to suspect that anybody was -- because Mr. -- and the

 6       reason why, when it comes to the Dantzlers, that I say

 7       this is because Rodney Turner -- Ms. Burt talked about

 8       Rodney Turner in January of 2006.  Ms. Burt talked about

 9       Sam Dantzler, Junior, in January of 2006.  Not Mr.

10       Dantzler, Senior.  There's nothing here but that hat.

11                And, yes, because of that, I believe that Mr.

12       Hutting should not have charged Mr. Dantzler.  I believe

13       that Mr. Hutting is wasting his time and should not have

14       carried on this case like this with respect to Mr.

15       Dantzler, because we don't have any evidence that Mr.

16       Dantzler was there that night.  None.

17                Because of that, I'm asking you, like I am

18       confident in asking you now again, that Mr. Dantzler --

19       that you find Mr. Dantzler not guilty, period.

20                Thank you, ladies and gentlemen.

21                THE COURT:  Thank you, Mr. Kinney.

22                Mr. Hutting.

23                MR. HUTTING:  Thank you, your Honor.

24                As I indicated, this is my opportunity for

25       rebuttal.  I'm not going to take very long.  I know it's a
```

208

```
1    quarter to 5:00.  This is the fifth day that you have been
2    down here.  I know you've been a prompt jury.  Many of you
3    have been here earlier than I have.  I try to get here on
4    time, but you've been here earlier, maybe even a lot
5    earlier than I have.
6              Before I get into my actual rebuttal, let me do
7    this, though:  Let me thank all of you for your time,
8    patience and attention in this case, because it's
9    important.  I have noticed you during the course of this
10   trial for five days, taking pretty decent and pretty
11   rigorous notes as you listened to the testimony.  So I
12   thank you for all of that.
13             Let me thank you for one other thing.  Let me
14   thank you for the sacrifices that each one of you have
15   made to be here for these five days.  We ask a lot of
16   jurors.  Sometimes it's once a year, sometimes it's once
17   every five years, sometimes it's once in a lifetime, but
18   we ask you to come down here, and in order for all of you
19   to be here, you had to make sacrifices.
20             Some of you made sacrifices maybe at the
21   workplace.  You know, you don't always get paid or you
22   have to take time off to do that, so you've made
23   sacrifices there.  Some of you have made sacrifices, I'm
24   sure, in the home.  Maybe you have people, young children
25   that you take care of, maybe even brothers and sisters
```

1    that you're a caretaker for or that you helped take care

2    of, and you made sacrifices there.  Some of you have made

3    sacrifices in both places.  Some of you have made

4    sacrifices in other places that I haven't mentioned.  But

5    for all of you to be here, it took a sacrifice.

6         And without you being willing to make that

7    sacrifice in a system that we have, which is trial by your

8    fellow peers, couldn't go forward.  So on behalf of the

9    People of the State of Michigan, I thank you all for doing

10   that.

11        Okay.  Let's get started because I got a number

12   of things to say about what Mr. Kinney talked about.

13        If a witness has a motive or an interest or a

14   bias in the case, that's never collateral, that's never

15   irrelevant.  If any witness, and I'm talking about whether

16   they're presented by the prosecution or whether they're

17   presented by the defense has a motive, interest or bias in

18   a case, you can take that into consideration in judging

19   their credibility and their believability.  And believe

20   me, when a defendant gets up on a witness stand, the last

21   thing that he wants to have happen is to get convicted of

22   a crime.

23        Well, the Defendant does have a strong motive,

24   interest or bias in the case.  A person who is connected

25   to a Defendant, who has a child by a Defendant, who meets

1   with the Defendant or visits with the Defendant, you know,

2   somewhere between at least six times and maybe up to 20

3   times, all right, even though she says it's not really a

4   relationship, it's very casual, has a motive, interest or

5   bias in the case.

6          I would suggest to you that the last thing that

7   Ms. Simpson wants is for Samuel Dantzler, the father of

8   her daughter, to get convicted in this crime.  And that

9   can be taken into consideration.  Just like any

10  Prosecution witness has a motive, interest or bias.

11         Ms. Burt does, all right, no doubt about that.

12         Ms. McKenzie may have back then, because he was

13  her boyfriend.  He's obviously no longer, it's been four

14  years.  But you can take all of that into consideration.

15         I submit that they were good witnesses.  I

16  submit to you they answered the questions directly and

17  straightforwardly.  They didn't do what Ms. Simpson and

18  Mr. Dantzler did as they testified.  But that's up to you

19  because you're the judge of that.

20         Okay.  You know what I submit to you, ladies and

21  gentlemen, also?  Everybody makes mistakes; okay?  I'm not

22  perfect, the Defendant isn't perfect, the Defense isn't

23  perfect, the witnesses aren't perfect.  Everybody makes

24  mistakes in a case.

25         Mr. Kinney, I think, in his opening statement

1       said something about fingerprints being found on a golf

2       shaft.  There's no fingerprints on the golf shaft, okay,

3       but there was some blood on a golf shaft.  What there is

4       was some ultimate DNA, which I'll get to in a minute, on a

5       golf shaft.  But no fingerprints.

6              I said something in opening statements, too, and

7       I can't remember exactly what it was, but it wasn't

8       completely correct.  Bill Niarhos, who I submit to you is

9       a great evidence technician, he's a solid evidence

10      technician, he did a lot of work at this scene.  But did

11      he make a couple of clerical errors?  He sure did, and he

12      admitted it.

13             He says, yeah, on my diagram, there's a

14      difference between the head and shaft.  I got that wrong

15      when I did the final report.  He also said, when I looked

16      at it, he said, gee, he said, I put on there 1/17.  He

17      says, that was wrong, I was really out there on 1/16.  I

18      went back and checked my notes and everything, I made a

19      scribner's error, a clerical mistake.

20             Does that mean that Bill Niarhos is a liar?

21      Does that mean his testimony should not be considered?

22      No.

23             Doctor Schmidt, who we submit to you is also a

24      competent medical examiner, Doctor Loewe testified here.

25      You know, if the medical examiner had to testify in Wayne

1        County in every one of the cases, he'd never get a

2        vacation, he'd never be able to leave his office.  They'd

3        all have to be -- the medical records, okay, like this,

4        are a part of business records, they also come under the

5        public record exception as standard for doctors to come in

6        and testify about the work of other doctors, as long as

7        they can tell you that they reviewed these records and

8        that they conform, based on the records that are there, an

9        opinion based on those records that they can testify with

10       reasonable expert certainty.  That's what Cheryl Loewe

11       did.

12            And she said, hey, you know, when I looked it

13       over, when I looked it over, Doctor Schmidt did make a

14       mistake on one of the diagrams.  On one of his hands, he's

15       got an incised wound, which means a cut from like a knife;

16       all right?  But it's on the inside, when it actually, the

17       picture, if you take a look to it, shows it to be on the

18       opposite.  Everything else is correct.

19            So everybody makes errors.  Which leads me,

20       then, to the fingernails.  Yes, those fingernails should

21       have been picked up.  Somebody forgot about them, they

22       made an error.  The blood was transferred over, but the

23       fingernails remained there.  After they remained there for

24       over three years, they were ultimately destroyed.

25            So Mr. Kinney, as smart defense attorneys do,

1    makes a big issue out of that, says, oh, the fingernails.

2    He assumes that there's some kind of DNA under the

3    fingernails.  You know what happened?  Let's take this for

4    a minute.  Let's say that we did find DNA under the

5    fingernails of Bernard Hill.  And let's say it was DNA

6    from either Mr. Dantzler, Senior, or one of the other

7    Dantzlers that were there, but specifically Mr. Dantzler,

8    Senior.  Would Mr. Kinney being standing up here before

9    you saying, oh, I'm done, Hutting, you got me, I throw in

10   the towel, that's it, there ain't nothing to say about it,

11   you got me, Hutting?  Absolutely not.

12        Mr. Kinney would be up here arguing if there was

13   DNA found under the fingernails of the deceased, when was

14   that DNA put there?  He'd be asking Rebecca Preston or

15   whoever was testifying, you can't say it was put there

16   that night, it could have been there for two months, it

17   could have been there for several days, it could have been

18   there for a week.  He wouldn't be throwing in the towel;

19   he'd be asking the same questions about that, that he's

20   asking about the hat.  Okay?  He wouldn't be throwing in

21   the towel.

22        Yes, there was an error made.  Those fingernails

23   should have been picked up.  Those fingernails should have

24   been tested.  But who knows if there was anything under

25   those fingernails?  There is no testimony that there was.

214

1          No testimony about the likelihood of their being there.

2          So I ask you to take that into consideration when you're

3          talking about that.

4                   Let me suggest to you that Bernard Hill is a

5          family member of the Dantzlers.  I submit to you, ladies

6          and gentlemen, that that's not true.  Who killed Bernard

7          Hill?  I mean what was the reason for the killing of

8          Bernard Hill?

9                   In a murder case, motive is big.  Motive answers

10         the question why.  If you know the answer to the question

11         why, why tells you then who was involved.  That's always a

12         big thing.  The Prosecutor doesn't have to prove motive;

13         all right?  He can't say, well, you didn't prove a motive,

14         therefore, I'm going to find the guy not guilty.  Because

15         that's one of the elements.  Motive is not enough.

16                  But ladies and gentlemen, motive is important.

17         It's important in every case, and especially in murder

18         cases when you can show a motive, a reason for why this

19         happened.  That is very important.

20                  What's the reason?  Well, Bernard Hill beats up

21         his baby's mother about eight or ten o'clock that night.

22         What happens?  By 2:00 a.m. in the morning, he's dead.

23         Four or five hours later, he's dead.  People are beating

24         on his mother's house, basically looking for him.  You

25         know, a short while later, then they leave in Mr.

1          Dantzler's car.  What happens?  She gets, ultimately, a

2     little while later, they come and get the baby, okay, they

3     come and get the baby.  They get the baby out of there

4     because they don't want her to know that Bernard's dead

5     and the baby's still there.  So they get the baby out of

6     there.  Fifteen minutes later, she gets the call from

7     Nikitta McKenzie that her son has been killed.  He's not a

8     member of their family.  There was a motive that went to

9     that, and that's a motive that goes to the Dantzler's in

10    the forming of the posse.  All right?

11          Just because there's a motive does that make Mr.

12    Dantzler guilty?  No.  But when you combine that, along

13    with the testimony of Nikitta McKenzie, ultimately with

14    this hat, okay, ultimately what else we found there in the

15    testimony of Janet Burt, that makes it a far different

16    case.

17          The deceased's DNA is on the golf club shaft.

18    There was blood on one of the shafts.  You can take them

19    in there.  I didn't open them up because you need gloves

20    to do that.  You can see there's a sign on there.  But if

21    you want, you can take them in there and open them up.

22    There's blood on one of the shafts that was analyzed by

23    Bode.  Bode says that that's the decedent's blood.

24          Rebecca Preston and Nicole Kaye.  Rebecca

25    Preston is not a police officer, she doesn't work for a

216

1      police agency.  She works for a private company, Bode

2      Technology.  Nicole Kaye does work for the Metropolitan

3      Police Department, in Washington, DC.

4            I submit to you, ladies and gentlemen, they're

5      not coming in here slanting their testimony.  They're not

6      coming in here saying, well, we're going to testify for

7      the Prosecution and we're going say, A, B, C, and D,

8      because it's the Prosecution that's calling us and the

9      Prosecutor that's paying us.

10            I submit to you to think back to their

11     testimony.  I submit they were both good, credible

12     witnesses.  I submit to you that Rebecca Preston worked

13     very hard on this case and she did a very competent job.

14     When things were brought to her, she had things to test,

15     all right, she tested those things, and she gave whatever

16     results that they had, and that's the way she called it.

17     When she got to the hat, she told you what the first cut

18     was, she told you what the results of the second cut was,

19     and that's why Bernard Hill's DNA is there.  They're not

20     in here slanting.

21            The police didn't do anything on this case from

22     2006 to 2009.  That's not true.  You heard that people, as

23     we got them in, we got buccal swabs from them.  Those

24     buccal swabs were ultimately sent to Bode; all right?  We

25     didn't get the Defendant in, and the way that we found the

217

1          Defendant is the police, ultimately, in 2010, convinced

2          the State Police, all right, that this cap was left at the

3          scene by one of the perpetrators, and that allowed the DNA

4          profile from that to be submitted to the CODIS database.

5          And that got it there.  So the police did work on the

6          case.

7                    And it was in 2010 that that answer came back

8          from the CODIS database, that that DNA that's there in

9          that DNA belongs to Samuel Dantzler, Senior.  And it was

10         after that, that we got Mr. Dantzler in, that we got the

11         buccal swab from him, and that's how we sent it to Bode,

12         and we, ultimately, find out that's his DNA on this hat,

13         one in 2.3 quadrillion.  So think about that.  The police

14         did do the work in this case.

15                   Now he talks about Henry Henderson.  Let me talk

16         about that because we have a stipulation.  Henry Henderson

17         is in prison.  And it goes to the nature of the item; all

18         right?  It goes to the nature of the item.  We're talking

19         about a golf club.  I don't know if any of you here are

20         golfers.  People say that I pretend to be at times.  But

21         you know what?  When you grab a golf club shaft, ladies

22         and gentlemen, you put a lot of pressure on that shaft,

23         okay, you put a lot of pressure on those grips.  And what

24         happens, ultimately, DNA from your hand rubs into those

25         grips and it can stay there as it's rubbed into those

1      grips because you got that grip in your hand and it can

2      stay there.  That's what happened here.  Who knows where

3      these golf clubs were before that night?  What we say,

4      though, is that night they were used by the posse when

5      they came there to do this assault on Bernard Hill.  We

6      tested it.

7              What happened, ultimately, is that I was

8      informed that, well, there's a likelihood of maybe some

9      more DNA on the hat.  That I said, hey, no -- on the

10     shaft.  Did I say, no, don't test that?  Did I say, no,

11     I'm not going to tell the Defense about that?  No.  We

12     told the Defense about that when we found out.  We told

13     MSP, go ahead and do the test, we have nothing to hide.

14     We're here to do that, you know, to do the work that's

15     there.  So we tested those things.

16             What do we find out?  Comes back to Henry

17     Henderson.  But he wasn't there because he was in prison,

18     so he couldn't have done that, and he was in another

19     state.  It shows you on the way that things go, especially

20     when you're dealing with a golf club shaft, when you grip

21     those things really hard, that DNA gets embedded.  We

22     ultimately find that.  So that's why Henry Henderson is

23     there, and we're not trying to hide that.

24             Basically, what Mr. Kinney is trying to tell you

25     is that you can't convict this man unless I've got

1    eyewitness testimony.  He's not saying that because he's

2    too good of an attorney, he's too skillful of an attorney.

3    And he has done a good job for this Defendant, make no

4    bones or mistake about that.  But what he's suggesting to

5    you is that, you know, he doesn't have anybody here who is

6    going to say, I saw Sam Dantzler inside that apartment and

7    I'm positive it was Sam Dantzler inside that apartment.

8    And that's basically what he's trying to suggest to you

9    that you need in order to convict that Defendant.

10          The Judge is not going to tell you that.  He's

11    going to tell you that cases are made up of direct

12    evidence, cases are made up of circumstantial evidence,

13    they're made up of combinations of direct and

14    circumstantial evidence, and you put all the evidence and

15    all the testimony together.  So don't let the Defense, you

16    know, try to get you going down that path that you have to

17    have an eyewitness to see before you can convict.

18          And Mr. Kinney makes the argument, you know,

19    Bernard Hill is family.  Bernard Hill is family; right?

20    Did Sam Dantzler, Senior, show up at Bernard Hill's

21    funeral?  If he was family, he'd show up to Bernard Hill's

22    funeral or show up at the wake to pay his respects and

23    say, I'm sorry that this happened, Ms. Burt, to your son.

24          Oh, no, that didn't happen.  That didn't happen.

25    She didn't see Mr. Dantzler, nor did she see anybody from

1      the Dantzler family that night.  But Bernard Hill wasn't

2      any family.  So think about that.

3             Mr. Kinney says, well, you know, there must have

4      been other eyewitnesses there.  There were no

5      eyewitnesses.  He says, well, you know, when you are at a

6      public school or high school, a fight starts, kids gather.

7      This didn't happen in a public school, this didn't happen

8      where there were a bunch of high school kids.  This

9      happened in a private apartment, okay.  And a private

10     apartment is different.

11            It happened also at two o'clock in the morning

12     when most people are in bed; all right?  The police made a

13     canvass of the apartments around, they didn't find any

14     other eyewitnesses.  And you know what?  When people are

15     -- When people die, and believe me, people in that

16     apartment building ultimately knew that somebody was

17     killed, he's laying down there at the foot of the stairs,

18     all right, they ultimately know that, that's the last

19     thing they want to do, why am I going to get involved?  I

20     live here, okay, I live there.

21            What did Nikitta McKenzie tell you?  That was

22     the last day she spent at that apartment.  Came back

23     there, got her stuff, and moved out of there.  Somebody

24     broke in.  Somebody comes out who lives in that apartment,

25     testifies about something or says something about that,

1    they're putting themselves or their family or whoever is

2    living with them in that apartment at risk.  People are

3    very hesitant to come forward in a case.  And when this

4    happens, this is not the kind of thing where you're going

5    to have a lot of eyewitnesses.

6            MR. KINNEY:  Your Honor --

7            MR. HUTTING:  Thank you.  Okay.  That completes

8    my -- I'm sorry.  That completes my basic argument to you;

9    all right?

10           I submit to you this cap has Mr. Dantzler's DNA

11   left in there with Mr. Bernard Hill's DNA in there; all

12   right?  It shows you that in order to acquit this

13   Defendant, what you have to do is say, oh, yeah, he lent

14   his car to somebody that night and he lent his hat to

15   somebody that night.  That doesn't happen.

16           Mr. Dantzler owns a gold car -- at least he was

17   driving a gold car, as Ms. Burt testified to, and as the

18   Defendant testified to on direct exam and then denied on

19   cross-exam.  You judge that credibility by both him and

20   Ms. Simpson.

21           But we submit to you, ladies and gentlemen, that

22   on the early morning hours of January the 16th of 2006,

23   that Mr. Samuel Dantzler, Senior, along with four or five

24   other people, all right, who we do not have admissible

25   evidence against, went to that apartment where Bernard

222

1     Hill was, in retaliation.  They went there to kick some

2     B-U-T, that's what they did -- B-U-T-T.  They went there

3     to do that, and to do great bodily harm to him.  They took

4     golf clubs and they took a gun, kicked in the door and

5     assaulted Bernard Hill.  And during that assault, Bernard

6     Hill tried to flee, one of the persons shot him.

7              Mr. Dantzler aided and abetted in that, and he

8     should be convicted of first degree felony murder.  Thank

9     you.

10             THE COURT:  Thank you.

11             Ladies and gentlemen, thank you.  What remains

12    in this trial are as follows:  It's five o'clock now.

13    You're on your way.  I'm still going over instructions

14    with the lawyers.

15             What remains is this:  Tomorrow morning, I'd

16    like you all here at 8:50, so at nine o'clock I can read

17    jury instructions to you; all right?  After the

18    instructions are read, we will draw the names of two of

19    you who will serve as alternate jurors, after we swear our

20    deputies in; okay?

21             The reading of the instructions will take about

22    20 minutes or so.  Swearing in the deputies will take 30

23    seconds or so.  And then the jury will begin its

24    deliberations, those of you that are going to remain as

25    jurors.

1              So I'm still going to instruct you to not

2       discuss the case with anyone or let anyone discuss it with

3       you.  Please leave your notes and pens and everything in

4       the jury room.  I'll see you tomorrow morning at 8:50.

5       We'll start at nine o'clock sharp.  Thank you.

6                   DEPUTY SHERIFF:  All rise.

7                   THE COURT:  I need to see the lawyers.

8                   (At about 5:01 p.m., proceedings concluded.)

9                            *     *     *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3    STATE OF MICHIGAN)

 4                    )

 5    COUNTY OF WAYNE  )

 6

 7

 8         I, Becky L. Bauer, Certified Court Reporter of the

 9    Third Judicial Circuit Court, Criminal Division, Wayne

10    County, State of Michigan, do hereby certify that the

11    foregoing 227 pages comprise a full, true and correct

12    transcript of the proceedings and testimony taken in the

13    matter of the People of the State of Michigan versus

14    SAMUEL LEE DANTZLER, on December 21, 2010.

15

16

17

18                    _____

19                    Becky L. Bauer, CSR-3326

20                    Official Court Reporter

21

22

23    Date: _____

24

25
```

```
 1                    INDEX TO EXAMINATIONS

 2

 3    Witness                                        Page

 4

 5      SERGEANT CHARLES CLARK

 6      DIRECT EXAMINATION BY MR. HUTTING:            13

 7      CROSS-EXAMINATION BY MR. KINNEY:              21

 8      RE-DIRECT EXAMINATION BY MR. HUTTING:         41

 9      RECROSS EXAMINATION BY MR. KINNEY:            48

10      MARIE ANGELA SIMPSON

11      DIRECT EXAMINATION BY MR. KINNEY:             57

12      CROSS-EXAMINATION BY MR. HUTTING:             64

13      SAMUEL DANTZLER

14      DIRECT EXAMINATION BY MR. KINNEY:             96

15      CROSS-EXAMINATION BY MR. HUTTING:            117

16      P.O. JOSEPH WEEKLEY

17      DIRECT EXAMINATION BY MR. HUTTING:           173

18      CLOSING ARGUMENT BY MR. HUTTING:             178

19      CLOSING ARGUMENT BY MR. KINNEY:              198

20      REBUTTAL ARGUMENT BY MR. HUTTING:            208

21

22

23

24              (Index continued on Page 227.)

25
```

```
1                        INDEX TO EXHIBITS

2

3    Exhibit                                    Page

4

5       PEOPLE'S EXHIBIT 37 ADMITTED              6

6       PEOPLE'S EXHIBIT 38 ADMITTED              7

7       PEOPLE'S EXHIBIT 36 ADMITTED              9

8       PEOPLE'S EXHIBIT 35 ADMITTED              9

9       PEOPLE'S EXHIBIT 26 ADMITTED             10

10      PEOPLE'S EXHIBIT 25 ADMITTED             11

11      PEOPLE'S EXHIBIT 24 ADMITTED             12

12      PEOPLE'S EXHIBIT 39 ADMITTED             52

13

14

15

16

17

18

19

20

21

22

23

24

25
```