

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**SAMUEL L. DANTZLER,**

      Petitioner,

v.

**THOMAS MACKIE, WARDEN**

      Respondent.

_____/

Case No. 13-cv-14764

HON. LAURIE J. MICHELSON

HON. MAG. MONA K. MAJZOUB

**Samuel L. Dantzler #518107**
**Petitioner In Pro Se**
Oaks Corr. Fac.
1500 Caberfae Hwy.
Manistee, MI 49660
_____

**Michigan Attorney General**
**Attorney for Respondent**
P.O. Box 30212
Lansing, MI 48909
_____

# PETITIONER'S MOTION TO LIFT STAY AND AMEND HABEAS BRIEF AND CASE CAPTION

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION



SAMUEL L. DANTZLER,

      Petitioner,

      **Case No. 13-cv-14764**

v.

      **HON. LAURIE J. MICHELSON**

THOMAS MACKIE, WARDEN

      **HON. MAG. MONA K. MAJZOUB**

      Respondent.

_____/

## MOTION TO LIFT STAY AND AMEND
## HABEAS PETITION AND CASE CAPTION

      Petitioner, Samuel L. Dantzler, asks that this Court lift the stay entered in this action and accept for filing Petitioner's Amended Habeas Brief.

      In support Petitioner states:

      1.    Petitioner previously filed with this Court a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254.

      2.    Petitioner thereafter moved this Court to stay the proceedings in this Court to allow Petitioner to raise additional federal constitutional claims in a state post-conviction Motion for Relief From Judgment under Michigan Court Rule 6.501 *et seq.*

      3.    On August 20, 2014, this Court granted Petitioner's Motion and stayed the proceedings.

      4.    Petitioner timely filed his state post-conviction Motion for Relief From Judgment with the trial court.

      5.    Petitioner timely appealed the trial court's denial of his Motion for Relief from Judgment to Michigan's appellate courts, and received a final decision by the Michigan Supreme

i

Court on _____Sept____8_____, 2016. See *People v Dantzler*, Docket No. 152854

     6.     Pursuant to this Court's August 20, 2014 Order, Petitioner is required to file with this Court a Motion to Lift the Stay within 30 days of the Michigan Supreme Court's Order. Petitioner has complied with the Court's Order.

     7.     Since the date Petitioner originally filed with this Court his Petition for Writ of Habeas Corpus, a new warden has been assigned to the facility where Petitioner resides, two-wit: Warden Thomas Mackie. The only proper respondent in a habeas case is the habeas Petitioner's custodian, which in the case of this Petitioner is the warden of the facility where the Petitioner is incarcerated. *See Edwards v Johns*, 450 F. Supp. 2d 755, 757 (E.D. Mich 2006). See also, Rule 2(a), 28 U.S.C. § 2254. Therefore, Petitioner asks that this Court substitute Thomas Mackie as the proper respondent in the caption.

     8.     Petitioner also asks this Court to allow him to amend his habeas petition with the attached amended habeas brief.

## RELIEF REQUESTED

WHEREFORE, Petitioner respectfully requests that this Court GRANT this motion and lift the stay previously ordered in this case, substitute Warden Thomas Mackie as the proper respondent, and accept for filing Petitioner's amended habeas brief.

Respectfully submitted,

Samuel L. Dantzler #518107
Petitioner In Pro Se
Oaks Corr. Fac.
1500 Caberfae Hwy.
Manistee, MI 49660

Dated:   9-12-16

**AMENDED BRIEF IN SUPPORT:**

## STATEMENT OF FACTS

Defendant was convicted of felony murder in the Wayne County Circuit Court and sentence to life without the possibility of parole, before the Honorable Gregory Bill, in docket number 10-3521-01.

During trial, it was developed that Bernard Hill was attacked and killed in an apartment he shared with Nikitta McKenzie. (TT, 12-16-10 p 165, 172; APP, 22-23). [1]  On the night of the crime, Janet Burt was home at 12-1 am when someone banged on the door. She did not answer the door but looked out to see a man named Rodney Tuner and the defendant's son. She saw a car she recognized as belonging to the defendant. (TT 12-16-10 p 75, 78; APP 14, 15).

Later that night, several men broke into Hill's apartment and beat him with golf clubs before ultimately shooting him to death. (TT 12-16-10 p 75, 78; APP 14, 15). One of the attackers left a black hat in the apartment, which was recovered by the Detroit Police. The hat was taken to the Detroit Police Crime Lab where forensic biologist Chris Steary examined it for signs of visible blood and then took cuttings from the hat for DNA testing. Steary sent the cuttings to a firm in Lorton Virginia called Bode Technology, for testing. (TT 12-16-10 p 112, 117; APP 17-18) While testifying, Steary noted that the file jacket, which would contain the chain of custody document, was not with the evidence. (TT 12-16-10 p 122-123; APP 19-20).

The testing conducted by Bode Technology showed that defendant's DNA profile matched a DNA profile found on the hat left at the scene of the crime. The profile of the victim

---

[1]     All documents cited in support of this motion are catalogued in the attached appendix including referenced transcript pages. For ease of reference, pages contained in the appendix have been numbered independently of the documents from which they came. For instances the notation (TT, 12-16-10 p 165, 172; APP, 22-23), signifies that pages 165 and 172 are from the hearing held on 12-16-10, appear in the appendix at pages 22 and 23 respectively.

was also found on the hat along with partial profiles for at least two other people. (TT, 12-20-10 pp 37, 82, 84; APP, 27, 37, 38).

Before trial, defense counsel asked the Trial Court to provide funds so that defendant Dantzler could hire an independent expert to evaluate the DNA evidence. The Trial Court granted funds. (APP, 68-70). Trial counsel tried to hire an expert who had a fee of $2,500 for testimony, and the Judge said her price was exorbitant and refused to pay the $2,500 a day, but indicated that he had no problem with paying more reasonable fees. (TT, 12-14-10 pp 191-192; APP 44-45).

A vial of blood and fingernail clippings was also from the victim. These were stored at the Wayne County Medical Examiner's Office on 1-16-06. Officer David Moore later retrieved the vial of blood but not the fingernail clippings. The clippings were destroyed on 10-19-09. (TT, 12-15-10 p 105; APP 10).

At trial, defense counsel requested an adverse inference instruction be given since the state had destroyed the fingernail clippings. The trial judge agreed to give the instruction but modified it, removing the permissive inference. Defense counsel did not object. (TT, 12-22-10 p 12; APP 51). After defendant was convicted and had already filed an appellate brief with the Michigan Court of Appeals, the prosecutor sent defendant a notice explaining that there were serious concerns with the Detroit Crime Lab resulting in its closure, and requiring a review of all cases involving forensic evidence. The notice came almost five months after defendant had filed his appeals brief. Defendant wrote to his lawyer asking if a claim could be raised using the new evidence, and counsel refused to raise the claim. (APP, 110-111).

**ORIGINAL HABEAS CLAIMS:**

I.    THE TRIAL COURT'S SUA SPONTE MODIFICATION TO A REQUESTED ADVERSE INFERENCE INSTRUCTION FOLLOWING DESTRUCTION OF MATERIAL EVIDENCE DENIED MR. DANTZLER HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR TRIAL BY A PROPERLY INSTRUCTED JURY, SIXTH AMENDMENT RIGHT OF CONFRONTATION, AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO DEFEND AGAINST THE CHARGES.

Petitioner was entitled, as requested, to an adverse-inference instruction. CJI 2d 5.12. The trial court granted the request, but sua sponte modified the instruction to read "consider" rather than the standard "infer." Thus, the trial court instructed the jury that it could "consider" whether, rather than "infer" that, the evidence would have exonerated defendant. This denied Petitioner of his Sixth Amendment right to present a defense, and his Fourteenth Amendment right to due process.

During trial, it was discovered that on 1-16-06 fingernail clippings and a vial of blood were taken from the victim and stored at the Wayne County Medical Examiner's Office. Sgt. David Moore of the Detroit Police Department picked up the vial of blood but not the nail clippings. On 10-19-09, the medical examiner's office threw the clippings away. (TT, 12-15-10, p 105; APP, 10).

The clippings were important because there was no direct evidence linking defendant Dantzler to the crime. The prosecutor theorized that the victim fought with his attackers and managed to snatch off one of their hats. (TT, 12-21-10, p 194; APP, 46). Therefore, defense counsel argued that DNA of whoever was wearing the hat would most likely be under the nails of the victim. (TT, 12-21-10, p 210; APP, 48).

Since the evidence was destroyed, defense counsel urged the Court to give the adverse

3

inference instruction. CJI 2d 5.12. The purposed instruction would have read:

> The fingernail clippings from Bernard Hill's autopsy are missing evidence whose production was the responsibility of the prosecution. (TT, 12-22-10, p 28; APP, 59) "You may infer that this [evidence] would have been unfavorable to the prosecution's case." CJI 2d 5.12.

The trial Court agreed that under the circumstances the instruction was appropriate. But, the Court indicated that it was going to change the words "you may infer that" and replace them with the words "you may consider whether." (TT, 12-22-10, p 12; APP, 51). Trial counsel failed to object, leaving the instruction to read:

> "The fingernail clippings from Bernard Hill's autopsy are missing evidence whose production was the responsibility of the prosecution. You may consider whether this evidence would have been unfavorable to the prosecutor's case and favorable to the defendant's case." (TT, 12-22-10, p 28; APP, 59).

**(See Argument V, Exhausted Post-conviction Arguments *infra*.)**

This instruction stripped the defendant of his ability to meet the prosecutor's case. Defense counsel was ineffective for failing to object to the trial court's modifications to the instruction.

"Michigan courts have long recognized that when material evidence in control of a party is not produced at trial, the opposing party is entitled to an adverse inference instruction." *People v Cress*, 250 Mich App 110, 157 fn 27, 645 NW2d 669 (2002); vacated in part on other grounds, 466 Mich 883 (2002); rev'd on other grounds, 468 Mich 678 (2003).

A trial court "by definition abuses its discretion when it makes an error of law." *Koon v United States*, 518 U.S. 81, 100 (1996). The right to a properly instructed jury is constitutionally guaranteed. *Schmuck v United States*, 489 U.S. 705 (1989); *People v Vaughn*, 447 Mich. 217 (1994); *Crane v Kentucky*, 476 U.S. 683 (1986); U.S. Const, amend XIV; Const 1963, art 1, § §17, 20.

4

Jury instructions are erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law. *Williams v. McCoy*, 7 F.Supp.2d 214, 221 (EDNY (1998). The immense difference in the meaning between the words "infer" and "consider" make it impossible for the jury not to have been misled as to the correct standard behind the instruction. "Resolution of challenge to potentially erroneous instruction depends upon how a reasonable juror could have interpreted the instruction." *McCambridge v. Halls*, 94 F.Supp.2d 146, 154 (D. Mass 2000).

The words "infer" and "inference" are recognized as having a strong influence on juries. See *Hanna v. Riveland*, 87 F.3d 1034 (9th Cir. 1996), in which the court ruled that a contested permissive inference instruction that allowed the jury to infer recklessness from mere fact of speeding was not harmless error in a vehicular homicide case.

Instead of allowing the jury to "infer" that the missing evidence was unfavorable to the prosecution and favorable to the defense, the jury was instead allowed only to "consider" whether it was unfavorable to the prosecution and favorable to the defense. If the jury is not allowed to use the missing fingernail clippings evidence as a tool (which the midified instruction precluded), then the jury lacks all the requisite tools necessary to render a reliable and constitutional verdict, and the defendant has been unfairly "short-changed" in the trial proceeding.

If the jury were permitted to infer the missing fingernail clipping evidence was unfavorable to the prosecution and favorable to the defense, particularly in so a key piece of evidence, which likely could most definitively lead to a suspect (in contrast to the DNA from the hat, which included multiple male profiles), the jury could then have used that inference to conclude that Mr. Dantzler was not the person who left the cap on the floor of the apartment.

5

Given the lack of other incriminating evidence, such a conclusion by the jury would very likely have resulted in a different verdict.

Petitioner was obviously harmed by the trial judge's error in sua sponte modifying the jury instruction under the standard for either constitutional or non-constitutional error, the judge's error unfairly prejudiced Petitioner and could not have been harmless.

Although Petitioner has not proof that the prosecution purposely destroyed the missing clipping evidence which could have been instrumental in proving the Petitioner's innocence, "the government violates a defendant's due process rights where material exculpatory evidence is not preserved regardless of the government's lack of bad faith." *California v Trombetta*, 467 US 479 (1984).

The due process right ensures a defendant be given a "fair opportunity" to defend against the charges, and a failure to allow a fair opportunity calls into question ultimate integrity of the fact finding process. *Chambers v Mississippi*, 410 US 284, 295 (1973). The missing evidence deprived Petitioner of fair opportunity to confront the case against him, the trial court's sua sponte modification of the jury instruction denied him due process of law and a fair trial by a properly instructed jury.

This error unfairly prejudiced Petitioner and could not have been harmless, and therefore violated Petitioner's Fifth, Sixth, and Fourteenth Amendment of the United States Constitution. As a result of these constitutional violations, Petitioner has been imprisoned for a crime he did not commit.

II.   **THE PROSECUTOR FAILED TO PROVIDE CONSTITUTIONALLY SUFFICIENT EVIDENCE TO PROVE THAT MR. DANTZLER PARTICIPATED IN THE CRIME, AS A PRINCIPAL OR AIDER AND ABETTOR, AND THE RESULTING CONVICTION VIOLATES HIS DUE PROCESS GUARANTEES UNDER THE FOURTEENTH AMENDMENT.**

The prosecution's circumstantial case against Mr. Dantzler was primarily based upon: 1) Ms. Burt's testimony that a gold-colored car she claims to have seen Mr. Dantzler that drive six months previously came to her house on January 15, 2006, but she did not see Mr. Dantzler in the car at that time, 2) the fact that Mr. Dantzler was related to Ms. Turner, and 3) the existence of multiple DNA profiles on a black hat found in the apartment where the crime occurred.

The gold colored car that Ms. Burt claims to have been six months before January 15, 2006, and on the night of January 15, 2006, was sold two years before that date. See Exhibit 2. No one, not even Ms. Burt, testified to seeing Mr. Dantzler at the scene of the crime on January 15, 2006. Conversely, Ms. Simpson testified that Mr. Dantzler was with her on January 15, 2006.

Just because Petitioner knew Ms. Turner is not a sufficient basis on which to substantiate a murder charge against him. Nor was there any testimony of animosity between Mr. Dantzler and Mr. Hill even though Mr. Hill previously beat up Ms. Turner numerous times before January 2006.

The prosecution's DNA expert testified that there was a mixture of at least 2 individuals in each of the four samples taken from a black hat found at the crime scene. Only one sample associated that Mr. Dantzler's DNA was on the black cap, as well as the victim's DNA.

There is no proof that Mr. Dantzler drove a gold colored car to Ms. Burt's house. No proof that Mr. Dantzler was at the scene of the crime. The only shaky inference is that at some point Mr. Dantzler wore or handled a black hat, yet so did the victim. There is not proof whatsoever that Mr. Dantzler share or knew of any intent of the perpetrators to kill Mr. Hill.

The DNA evidence on the black hat is the only evidence linking Mr. Dantzler to the scene and therefore the crime. From the very beginning this evidence was tainted.

For instance, a former police officer was buccal swabbed in relation to this case to be tested against DNA found on the black hat because he advised the prosecution that he physically handled the black hat and likely placed his DNA on it. (TT 12/16/10, 19-25.) Any evidence taken from an item which was handled without gloves and without following all the proper protocols must certainly be considered suspect.

Two years after Mr. Dantzler's conviction, his attorney received a letter from the Wayne County Prosecutor's Office stating that his case was reviewed due to the many violations that occurred within the former Detroit Police Crime Lab. **See Exhibit 3.**

The prosecution's statement about taking no further action because the evidence was not tested in the Detroit Police Crime Lab is self-serving. Fact remains that the mishandled black hat evidence was stored at the Detroit Police Crime Lab, as well as the fingernail clippings that came up missing. The prosecution also used the testimony of Detoit Police Laboratory technicians in its case-in-chief. (TT 12/16/10, 110-130.)

The DNA evidence was mishandled and tainted in a police lab that was later shut down due to its rampant procedural errors that eventually led to numerous cases being overturned.

Even if taken at face value, the sole DNA sample associating Mr. Dantzler with the black hat only indicates that at some point or time Mr. Dantzler wore or handled that hat. However, that DNA testing could not ascertain whether Mr. Dantzler was wearing the hat at the time of the crime. (TT 12/16/10, 125.)

Because there was evidence of other DNA profiles on the hat, and the fact that the great majority of the hat was not tested and could have contained even more DNA profiles, it could

have been anyone wearing the hat at the time of the crime. (TT 12/16/10, 128.)

The only witness testimony as to Mr. Dantzler's whereabouts at the time of the offense came as alibi testimony provided by one Marie Simpson, who testified that Mr. Dantzler was with her the entire evening when the crime occurred.

The evidence of Mr. Dantzler's involvement in this case falls far short from the prosecution meeting its heavy burden of guilty beyond a reasonable doubt. Hence, the prosecution did not meet its burden of proof in this case.

A habeas court reviews claims that the evidence at trial was insufficient for a conviction by asking whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Because a claim of insufficiency of the evidence presents a mixed question of law and fact, this Court must determine whether the state court's application of the Jackson standard was reasonable. *Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 596 (E.D. Mich. 2001). Moreover, the *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324, n. 16.

The facts relied upon by the Michigan Court of Appeals may support a reasonable speculation that Defendant participated in the murder, but these facts do not amount to proof beyond a reasonable doubt. See, *Newman v Metrish*, 492 F.Supp.2d 721, 729 (E.D. Mich. 2007), aff'd 543 F.3d 793 (6th Cir. 2008). Without impermissibly stacking inferences, there is insufficient evidence for a rational trier of fact to conclude that Defendant was present at, or participated in the victim's murder. See *Kelly v. Roberts*, 998 F.2d 802, 808-09 (10th Cir. 1993). "[A]lthough a jury may infer facts from other facts that are established by inference, each link in

9

the chain of inferences must be sufficiently strong to avoid a lapse into speculation." *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001) (granting habeas relief where there was insufficient evidence that the petitioner participated in first-degree murder for which he was convicted). In this case, the chain of inferences that the prosecution attempted to forge—and the Court of Appeals relies on—fails in many places. *Id.*

The prosecution did not meet its burden of proof here. There was no proof of intent. There was no eyewitnesses to the crime. There was no fingerprints on a murder weapon. There was no confession. There was no blood found on Mr. Dantzler's clothing. There was nothing demonstrating that Mr. Dantzler was associated with the crime or even had knowledge of the crime.

As mentioned above, the only possible link the prosecution put forth in an attempt to tie Mr. Dantzler to the crime was a sighting of a car that resembled a car that Mr. Dantzler once owned but sold years before the crime occurred. **(See Exhibit 2.)** This car was alleged to have carried individuals alleged to have been searching for the victim earlier in the day. Also put forth by the prosecution was mishandled and tainted evidence of a black hat found at the crime scene that had the DNA of Mr. Dantzler and several other individuals' DNA on it. This, however, only established that Mr. Dantzler had worn the hat at some point in time. The last bit of evidence put forth by the prosecution was that Mr. Dantzler was related to a woman who had been assaulted by the victim at some point before the crime.

Arguably the evidence put forth by the prosecution was lacking in terms of sufficient evidence espoused in *Jackson, supra.*

While government proof may lay entirely in circumstantial evidence, the appellate court is loath to stack inference upon inference in order to uphold a jury's verdict. *United States v Ruiz*, 105 F3d 1492 (1st Cir. 1997).

Even if the DNA evidence was beyond dispute (which it was not), and even if Mr. Dantzler was the only DNA found on the black hat (which it was not), all that would prove is that Mr. Dantzler had been at the scene. "Evidence of defendant's proximity to illegal activity and other suspicious factors are insufficient to prove guilt beyond a reasonable doubt." *United States v Leos-Quijada*, 107 F3d 786 (10th Cir. 1997).

III. **THE TRIAL COURT'S DENIAL OF NECESSARY FUNDS FOR AN INDEPENDENT EXPERT TO REVIEW THE DNA EVIDENCE DENIED MR. DANTZLER DUE PROCESS GUARANTEES UNDER THE FOURTEENTH AMENDMENT.**

In addition to the above statements of facts, Petitioner states that during the September 9, 2010, pretrial conference, defense counsel had Mr. Dantzler appear before the court because the trial judge signed an order appointing Cathy Carr to have DNA testing on black hat and if there was not a report by August 20, 2010, the court would consider suppressing that evidence. Pretrial Transcript 9/9/10, pg 2)

Because the Detroit Police Crime Lab was backlogged, and the Michigan State Police refused to do further DNA testing on the black hat, the prosecution contracted with Bode Technology out of Lorton, Virginia (Id., 2-3.) The prosecution was paying for that DNA testing to be done (Id. p 3.). Bode Technology charge $1,100 per cutting and the prosecution's office wanted three (3) additional cuttings done. Id at 4.

The court complained how its docket is pushed out to February with the prosecutor's homicides. Id.

The defense was promised to have an opportunity to conduct its own DNA testing . 5. The black has was Fed-Exed. Id. 9, but would not give the defense as much time as the prosecutor had for DNA testing. 10.

The court then complained, again, about its overwhelming homicide docket. 11-12.

Defense counsel questioned whether the trial date would have to be adjourned in order for the defense to have its own expert review the DNA testing. 11. Petitioner agreed to the waiver of his 180-day rule for that purpose to wit the court hoped that the prosecution would be as cooperative to get the black hat out to be tested by defendant's expert. 13.

12

September 17, 2010, another pretrial hearing was held. Part of which involved a motions cut-off date. The court complained about its docket being "so over time standards." Pretrial Transcript 9/17/10 4. The court interrupted defense counsel to reiterate consistency with his prior ruling because the case was "twice the time standard." Defense counsel requested their expert to look at the prosecution's DNA testing. Id. 9. The court observed that the prosecution's time-frame for their expert to analyze it;" and admitted that "the results could go either way for Mr. Dantzler." 12, 13.

November 23, 2010, Wayne County Circuit Court Judge Gregory D. Bill signed a second order for an appointment of an independent DNA expert. This second order was necessitated because the initial independent DNA expert already done work for the prosecution in Mr. Dantzler's case. 12/14/10, 6. See also Exhibit 4.

The morning of trial, defense preserved on the record that "most of the arguments that [he] had with this Honorable Court was with respect to our own DNA expert." TT 12/14/10, 6.) At first, the court appointed Cathy Car but she done work for the prosecutor in the case; so Ms. Carr referred defense counsel to Ann E. Chamberlain, which was willing to take a court-appointed case. Id. When Ms. Chamberlain submitted her fees for expert services (see Exhibit 5) they were denied by the court. Id 7. The court did not have any problem with her hourly fee, but rather the retainer fee. Id 7-8. Because the court refused to cover those expenses, Ms. Chamberlain was unable to testify. Id 8.

The defense clarified that Ms. Chamberlain was already to do her own testing; the court claimed that it did not preclude that witness from testifying because it signed an order appointing an expert. Id. 9. The court again complained about the alleged extraordinary fees. Id.

The morning of December 20, 2010, after forensic scientist and a DNA expert testified fo the prosecution, namely Christopher Steary and Jeffrey May, and before the prosecution's second DNA expert testified, being Rebecca Preston, defense counsel moved the court t to allow Petitioner to complain to the court about his lack of an independent DNA expert because he was "just going by the word of the prosecution that my DNA is inside this hat and also it could be more people's inside this hat other than me." (TT 12/20/10 2.) The court responded by stating that it appointed an expert, and tried to assist the defense whenever possible. Id. 3

Trial testimony resumed with the prosecution's second DNA expert, Rebecca Preston, DNA Analyst with Bode Technology, who done contract work for the Michigan State Police and the Detroit Police Department; which cost $3,972.75.

At no time did the court attempt to negotiate the fees for services by Ms. Chamberlain, or allow the defense to explain the fees charged, or to compare those fair market prices on the record.

Post-trial, in an email to Petitioner's sister, Ms. Chamberlain wrote that "it is possible that I was contracted and then not approved. That happened often in Wayne County around that time period." See Exhibit 6.

The DNA evidence procured from the black hat was the sole physical evidence in the prosecution's case. The prosecution was allowed two (2) DNA experts – the Michigan State Police and Bode Technology – to conduct their independent NDA testing of that evidence. For all we know, dozens of people may have, at some point in time, touched that black hat and left their DNA on it. In fact, an officer admitted to handling it without gloves and was later buccal swabbed himself. TT 12/16/10, 19-25.

The only other shreds of "evidence" was testimony about a particular gold-colored car observed searching for the victim earlier in the day; that Petitioner once owned such a car but sold it two (2) years previously; that Petitioner was not seen to have been in the car earlier that day when searching for the victim; and, that Petitioner happened to be related to Ms. Turner whom was assaulted by the victim.

When adding the approximate cost for the initial cutting by the Michigan State Police to what the prosecution paid Bode Technology, the prosecution presumably paid well over $5,000 to have its DNA testing done. Subsequent results of which were inconclusive. Yet, the court balked at accommodating Ms. Chamberlain's fees.

Given the court's complaints about the case being "so over time standards," it appears that the court was more concerned about clearing its docket rather than ensuring that Petitioner received a fair trial.

Moreover, the trial court waited until the morning before trial began to inform the defense that it would not approve the cost for the defense's independent DNA testing.

In sum, the prosecution was allowed its turn to play DNA ball but when it came to the defense the court took that ball away.

A criminal defendant has a due process right to a meaningful opportunity to present a complete defense. US Const, Ams V, XIV; Const 1963, art 1, § 17, Const 1963, art 1, § 13. The right to present a defense has long been recognized as essential to due process, Washington v Texas, 388 US 14, 19 (1967), and has been characterized as one of the "minimum essentials of a fair trial." Chambers v Mississippi, 410 US 284, 294 (1973); Crane v Kentucky, 476 US 683, 689-690 (1986), citing California v Trombetta, 467 US 479, 485 (1984); see also, Holmes v South Carolina, 547 US 319, 324 (2006). Inadequate access to experts also interferes with the

accused's right to compulsory process, equal protection of the law and his right to present a defense. US Const Ams VI; XIV; Mich Const 1963, art 1, § 20. Chambers, supra; Washington v Texas, supra.

POST-CONVICTION, NEWLY EXHAUSTED HABEAS ARGUMENTS:

IV. **DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL WHEN THE PROSECUTOR COMMITTED A *BRADY* VIOLATION IN FAILING TO NOTIFY HIM THAT THE ONLY EVIDENCE LINKING HIM TO THE CRIME COULD HAVE BEEN TAINTED OR OTHERWISE COMPROMISED WHEN IT WAS AT THE DETROIT POLICE CRIME LAB.**

The Due Process Clause of the United States Constitution guarantees a defendant a fair trial. Prosecutorial misconduct may deny an accused his right to a fair trial. U.S. Const Amd, XIV; Const 1963, art 1, § 20. A criminal defendant has a due process right of access to certain information possessed by the prosecution. *Brady v Maryland*, 373 US 83 (1963). This due process requirement of disclosure applies to evidence that might lead a jury to entertain a reasonable doubt about a defendant's guilt. *Giglio v United States*, 405 US 150 (1972). Impeachment evidence falls within the *Brady* rule because, if disclosed and used effectively, such evidence "may make the difference between conviction and acquittal." *United States v Bagley*, 473 US 667, 676 (1985).

Due process does not require the prosecutor to allow complete discovery of his files as a matter of practice. *United States v Agurs*, 427 US 97 (1976). However, the prosecutor is under a duty to disclose any information that would materially affect the credibility of his witnesses. *People v Murray*, 54 Mich App 723 (1974).

A *Brady* violation consists of three elements, as set forth in *Strickler v Greene*, 527 US 263 (1999). Defendant must establish (1) that the evidence was favorable to him, (2) that it was suppressed (whether exculpatory or not) by the government, and (3) that prejudice ensued. *Id.*, at 281-282. The prejudice (or materiality) element of a *Brady* violation is established if there is a reasonable probability of a different outcome of the trial had the *Brady* material been available. See also, *Jamison v Collins*, 291 F3d 380 (CA 6, 2002).

In the instant case, the only evidence against defendant Dantzler was a black hat found at the crime scene. Forensic analysis determined that defendant's DNA was on the hat. (TT, 12-20-10 p 46; APP, 29). At least two other incomplete DNA profiles were on the hat. (TT, 12-20-10 p 38; APP, 28). After defendant had already been convicted of murder, sent to prison, and filed an appellate brief, the prosecutor mailed defendant a notice explaining that the Detroit Crime Lab suffered deficiencies so serious that all cases involving forensic evidence, which had passed through that lab, needed to be reviewed. (See Notice, App, 71).

It is Defendant's position that the prosecutor was aware of the concern before trial. Failure to disclose the problems, which could have been used to impeach the State's evidence, or even have it suppressed, violated defendant's right to a fair trial. *Brady, supra.*

### a. The withheld evidence directly impeaches the integrity of the states' DNA evidence.

On October 28, 2008, the Michigan State Police issued a report detailing its audit of the Detroit Crime Lab. The myriad deficiencies found caused closure of the entire lab.

- Administrative practices in the lab were found to be substandard.
- "90% of the case file jackets failed to contain a property receipt—without a property receipt, the chain of custody is broken and the integrity of the evidence is compromised." (See Audit pg 12; APP, 84.)
- Evidence control was substandard.
- Firearms evidence was "laid about in the unit unsecured and unprotected from possible loss and contamination." (Audit p 18; APP, 90.)
- Access to evidence was not restricted.
- Evidence "overflows into the office and work space areas, potentially compromising its integrity." (Audit 19; APP, 91).

Though the firearms unit was the primary target of the audit, the forensic lab in general "was found to be in non-compliance with 66 of the 101 applicable criteria upon which they were inspected. (Audit p 3; APP, 75.) It was concluded that, "if the quality system is failing in one

forensic discipline it is highly likely to be an indicator of a systemic problem that affects other forensic disciplines within that laboratory system as well." (Audit, 4; APP, 76.)

According to the notice, which the prosecutor sent to Petitioner Dantzler, the evidentiary concern extended in general to "convictions involving forensic evidence." (See notice at APP, 71.) Additionally, the State Appellate Defenders Office began reviewing cases that used "evidence from the Detroit Police Crime Lab, such as DNA, fingerprints, ballistics, gunshot residue, etc. . . ." (See letter to Darius Haynes, APP, 72.)

Considering the above, the fact that DNA evidence was even stored at the crime lab in Detroit raises questions about its integrity. The prosecutor's notice flatly dismisses any concern "because there was no forensic evidence tested by the Detroit Police Crime Lab." However, the premise for this dismissal, in addition to being wrong, oversimplifies the issue.

Forensic biologist Chris Steary examined the hat for visible blood and took cuttings from the hat. (TT, 12-16-10, p 112, 117; APP, 17, 18.) The audit report says that case files had no property receipt and this compromised the integrity of the evidence, and the DNA evidence presented at Petitioner's trial could have been impeached on this ground alone had defense counsel been made aware. According to Mr. Steary, the entire file jacket was not with the evidence. The chain of custody document would have been in the file jacket. (TT, 12-16-10, p 122-123; APP, 19, 20.) Given the finding in the audit report, the integrity of the evidence was compromised and impeachable here.

Furthermore, the practice of allowing evidence to be "laid about in the unit unsecured and unprotected from loss and contamination" was additional grounds for impeachment. (Audit p 8 APP, 80.) Finally, the practice of having access to evidence unrestricted and overflowing into

workplace areas, "potentially compromising its integrity," was grounds for impeachment. (Audit p 19; APP 91.)

The fact that the DNA evidence was ever stored in the Detroit Crime Lab with such negligent practices raises the question of contamination. Had it been contaminated the tests results would no longer be reliable. Chris Steary, a forensic analyst at the Detroit Crime Lab, acknowledged this fact. (TT, 12-16-10, p 129, APP, 21.) The conditions at the Crime Lab make the test results at least highly questionable and impeachable.

The evidence was suppressed by the State willfully or inadvertently. The government had the evidence and never said anything. The Wayne County Prosecutor's Office showed awareness that the problems in the crime lab might extend to DNA evidence—in this case, April of 2012. (Notice, App, 71.) The fact that defendant's trial was over and his appeal brief had been filed by this time is not dispositive. The Detroit Police knew about it the whole time because it was their crime lab. This is the quintessential *Brady* violation where the government fails to turn over evidence that is known only to police investigators and not to the prosecutor. See, *Youngblood v West Virginia*, 126 S Ct 2188, 2190 (2006).

### b. Defendant was prejudiced by the *Brady* violation.

In a *Brady* claim, prejudice means, "whether we can be confident that the jury's verdict would have been the same." *Kyles v Whitley*, 115 S Ct 1555, 1575 (1995). A defendant need not show that he "would more likely than not have received a different verdict with the evidence [.]" *Id.* at 1566. Instead, the Court in *Kyles* looked to all of the favorable conclusions that the jury would have been entitled to draw using the suppressed evidence. If these conclusions might, within the of bounds reasonable probability, support acquittal, relief must issue. "Since all of these possible findings were precluded by the prosecution's failure to disclose the evidence that

would have supported them," fairness renders irrelevant the fact that grounds for conviction may also exist within co-equal bounds of reason. *Id* at 1575.

In the present case, the suppressed impeachment evidence would have entitled the jury to believe:

1)  Quality control at the Detroit Police Crime Lab was poor.

2)  The Hat was stored at the lab.

3)  The file jacket containing the property receipt was not kept with the evidence. Therefore, under the standards identified by the Audit report, the evidence was unreliable.

4)  The analyst at Bode Technology tested evidence that may have already been compromised at the Detroit Police Crime Lab, and the Bode results were not adequate grounds for convictions.

These beliefs, based on the suppressed evidence, could support a conclusion that the inability to generate complete profiles for all of the DNA found on the hat, was due to the poor handling of the evidence. Evidence that someone else wore the hat could have been destroyed by police, and defendant might not have been the person wearing the hat when the victim snatched it from his attacker's head.

These conclusions are all the more likely when considered in conjunction with the testimony detailing the police investigator's negligent handling of the fingernail clippings; and testimony of how they actually did compromise the DNA evidence on the hat. Charles Clark testified that police officer Gerald Stewart physically handled the hat, and due to this contamination Stewart also had to be tested to see if his DNA profile was on the hat. (TT, 12-21-10 p 19; APP, 40). Chris Steary actually did work with the evidence at the crime lab by examining it for visible blood and he took cuttings from it to be tested later. (TT, 12-16-10 p 112, 117; APP, 17-18).

The trial was unfair. Impeachment of the DNA evidence would have left the prosecution with no case, making acquittal reasonably probable.

As for Petitioner's delay in presenting this issue, the prosecution's suppression of this evidence resulted in his inability to raise the claim relating to this evidence at an earlier time, and thus that very act by the prosecution establishes cause for any ensuing default. See, *Bies v. Sheldon*, 775 F.3d 386, 396 (6th Cir. 2014).

Defendant is entitled to reversal.

V. **DEFENDANT IS ENTITLED TO REVERSAL DUE TO INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHERE COUNSEL REQUESTED FUNDS TO HIRE AN INDEPENDENT DNA EXPERT, BUT AFTER THE FUNDS WERE GRANTED HE NEVER HIRED AN EXPERT BECAUSE HE MISTAKENLY BELIEVED THAT FUNDS HAD BEEN DENIED AND HE COULD NOT MEET THE PROSECUTOR'S CASE, WHICH RELIED SOLELY ON THE DNA EVIDENCE.**

The standard of review for claims of ineffective assistance of counsel based on deficient performance is *Strickland v Washington*, 466 US 668 (1984). First, the defendant must show that his attorney's performance was deficient. Deficient performance is not merely below-average performance; rather, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.*, at 688. Ineffective counsel claims are reviewed *de novo. People v Pickens*, 446 Mich 298 (1994).

Second, the defendant must show that he was prejudiced by the substandard performance: "Prejudice" is a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694. "The essential question is whether better lawyering would have produced a different result." *Washington v Hofbauer*, 228 F3d 689, 702 (CA 6, 2000) (internal quotations and citations omitted). See also, *People v Armstrong*, 490 Mich 281, 290 (2012) (following the *Strickland* standard).

The *Strickland* Court also explicitly found that trial counsel has a "duty to investigate," and that to discharge that duty "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.*, at 691; see also, *Wiggins v Smith*, 528 US 512 (2005).

In this instance, Defendant Dantzler was convicted based on his DNA being found in a hat which was found at the crime scene and, which, in turn, was identified as belonging to one of the victim's attackers. The DNA profiles of at least two other people were found in the hat, but they were incomplete profiles, unsuitable for identifying anyone. (TT, 12-20-10, pp 48, 50; Appendix (App) pp 31, 32). Trial counsel requested and was granted funds to test other areas of the hat to see if complete profiles could be generated for the donors who had incomplete profiles. (See Orders for the appointment of an independent expert. App 68-70). Counsel talked to one expert, but the trial judge said her price was exorbitant, and counsel never tried to hire anyone else.

Using the uncontested DNA evidence from the hat as the centerpiece of his case, the prosecution convicted defendant of murder. Trial counsel's failure to investigate (i.e., have the DNA analyzed by an independent expert) constitutes ineffective assistance of counsel. *Hinton v Alabama*, 134 S Ct 1081 (2014).

"Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial at trial or both." *Harrington v Richter*, 131 S Ct 770, 789 (2011). In *Hinton*, the Court elaborated that such a case arises where forensic analysis is "the core of the prosecutor's case . . . and effectively rebutting that case required a competent expert on the defense side." *Id.* at 1089.

In *Hinton*, defense counsel hired an expert whom he recognized "was not a good expert" because counsel labored under a mistaken belief that the law only allowed $1,000,00 to hire an expert and no good expert would work for that price. The Court found that "[t]he only inadequate assistance of counsel here was the inexcusable mistake of law—the unreasonable

failure to understand the resources that state law made available to him—that caused counsel to employ an expert he himself deemed inadequate." *Id.* 1090.

Trial counsel's deficiencies, herein, were even worse than those of the attorney in *Hinton*. Counsel labored under a mistaken belief about the amount of money he could spend for an expert. But he at least took that and hired an expert who had only one eye, and had not been to school since 1933. *Id* at S Ct 1086.

In the present case, counsel did not know how much money was available (he thought funds were denied; he waited until the first of trial to complain; and, the person he wanted could not testify anyway because she had not done any work. Indeed, the record does not indicate that she was ever given any material to work with.

This case is akin to *People v Ackley, supra,* which involved the unexplained and unwitnessed death of a child. Expert testimony was critical to explain whether the cause of death was intentional or accidental. The prosecution presented five experts in support of its theory that the cause of death was intentional. The defense, although provided funds for an expert, presented no experts. Counsel had only consulted with one expert, who was not willing to side with the defense. Counsel did not consult with any other experts.

The Supreme Court opined that Ackley was denied the effective assistance of counsel, finding that counsel's sparse efforts failed to satisfy his "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary[.]" *Ackley* at 390-391, citing, *Hinton*, 134 S Ct at 1088, and *Strickland*, 466 US at 690-691. The Supreme Court further found that trial counsel was ineffective because he failed to consult a second expert, and counsel's failure was not sound trial strategy. *Ackley, supra,* citing *Trakhtenberg*, 493 Mich at 52.

The same can be said in the instant case, Defendant Dantzler's trial counsel understood that he needed an expert, but he never got one. He told the trial court: "I understand how important this particular evidence is to the prosecution **** The DNA evidence is the only evidence they have in the case against Mr. Dantzler." (Hearing, 9-9-10, pp 2, 5; App 1-2). When the trial Judge questioned counsel about speedy trial concerns, counsel stated, "No we are not arguing the 180 days. We need our expert." (Hearing, 9-9-10, p 10; App 3). At a later hearing, counsel informed the Court that he had a DNA expert. (Hearing, 9-17-10, p 12; App 5). On the first day of trial, counsel did not have a DNA expert.

Initially, he argued that this failing was because the trial court and the chief judge had denied funding for an expert. The trial judge quickly dispelled this mistaken notion, stating that he had no problems with her hourly fee but her $2,500 per day retainer was exorbitant. As the trial was underway, counsel informed the Court his expert wanted the retainer, or "she won't be here." Counsel went on to inform the Court that even as late as the first day of trial, his DNA expert "never brought any results or indicated she did anything." (TT, 12-14-10, pp 7-9; APP, 6-8).

The first prong of Strickland has been met. Counsel's decision not to obtain an expert and/or look for another expert where the trial court provided the funds to do so "fell below an objective standard of reasonableness," and his actions and omissions were not the result of "reasonable professional judgment" where such evidence was *the* critical piece of evidence the prosecution suggested linked Defendant to this crime.

As to *Strickland's* prejudice prong pertaining to trial counsel's overall conduct, on the fourth day of trial defendant Dantzler spoke to the Court about not having an expert:

"My issue is ever since I been locked up I've been saying I wanted to have this hat tested by my ---you know, somebody for my side. And you know, we done

26

get this far and the hat still haven't been tested for me. Because I'm just going by the word of the prosecution that my DNA is inside this hat and also it could be more people inside this hat other than me and I wanted the hat tested [.]' (TT, 12-20-10, p2; APP, 24).

After this statement, defense counsel told the Court that he essentially intended to argue to the jury that the prosecutor had so much money and he had so little that he could not be expected to effectively confront the prosecution's well paid experts, and that the experts financial incentives somehow made their lab results untrustworthy: "Part of my examination was going to be in terms of how much Bode was being paid for this particular case.****** Right now the regular court appointed fees or experts is two hundred for evaluations and a hundred fifty for testimony in court [.]" (TT, 12-20-10, p 68; APP, 35).

This spur of the moment plan ran into many obstacles: First, it was the fourth day of trial. No one had answers for defense counsel. When counsel asked the prosecutor about the contract with payments to the state experts, the prosecutor responded: "I have no idea." When pressed further on the issue, the prosecutor responded: "[T]hey should have asked for this a long time ago. They knew Bode was going to testify. But, in the middle of trial, when the witness is up on the witness stand, to say, well we want this, we want this." (TT, 12-20-10, p 71; APP, 36).

Under these circumstances, there was simply no way to meet the DNA evidence. Also, the pricing information that was available did nothing to impugn or challenge the integrity of the prosecutor's results. Defense counsel was floundering; he had just cobbled something together at the last minute, because he did not hire anyone to help him understand the evidence. "Constitutionally effective counsel must develop strategy in the true sense---not what bears a false label of strategy---based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of a full investigation." *Ramonez v*

*Berghuis*, 490 F.3d 482, 489 (6th Cir.2007); *Ackley, supra*. The only way to investigate the DNA evidence in this case was to hire expert.

    **a. Probable findings if the hat were tested by defense experts.**

    1) Complete DNA profiles could have been generated for at least two other people who wore the hat.

    2) These other people could have been shown to have links to the crime.

**Generating additional DNA profiles.** Forensic biologist, Christ Steary, testified that someone else's DNA might be found in places where the hat was not tested, and most of the hat was not tested. (TT, 12-16-10, pp 129; APP, 21). Later, additional cuttings from the hat were tested. All of these cuttings yielded partial profiles with a mixture of at least two or more people. In the first additional cutting, defendant was not included or excluded as the minor donor. In the other two additional cuttings, defendant was not identified as a donor, although he could not be conclusively excluded. (TT, 12-20-10, p 37, 46, 47, 50-52; APP, 27, 29, 30, 32-34).

    The unidentified, partial profile donors could have been anyone, and at least one of them was not defendant Dantzler. More genetic material was on the hat. Further testing most probably would have identified someone else as wearing the hat because his or her DNA was in it. However, the expense of more testing by the state was prohibitive. (TT, 12-16-10, p 128-129; APP, 21).

    **Probability of linking other profiles to the crime.** The prosecutor's expert knew that at least two other people probably wore the hat, but could not say how many or even the gender. (TT, 12-20-10, pp 37, 82, 84; APP, 27, 37, 38).

    Janet Burt, the victim's mother, testified that on the night of the crime, she did not see defendant, but she saw his car with several heads in it. She did see defendant's son and a man named Rodney Turner. (TT, 12-16-10, pp 75, 78; APP, 14, 15).

Nikitta McKenzie testified that six men, dressed in black and wearing hats, entered her home and attacked the victim. Yet, she never seen or spoke to defendant. (TT, 12-16-10, pp 165, 172; APP, 22-23).

Based upon the forgoing, it is reasonable to conclude that further testing could have identified whom the partial profiles belonged. According to eyewitness McKenzie, any one of at least six people could have been wearing the hat. That coupled with at least two unidentified DNA profiles, opens the possibility of finding other reasonable suspects, outside of defendant.

Defendant put forth an alibi defense, and had defense counsel conclusively shown that other people had been wearing the hat, the jury could have easily found reasonable doubt.

As it stands, the only person conclusively shown to have ever worn the hat was defendant Dantzler. The prosecutor used this fact to devastating effect. He argued: "[T]his was the cap that Sam Dantzler was wearing that night[.] [T]he cap got knocked off and it got left there. **** We solved the case using this hat[.] **** He was in that apartment, and he left his hat there in that apartment." (TT, 12-21-10, pgs 191-192; APP, 44-45). He further argued: "Based on this hat with his DNA in it, Mr. Dantzler . . . [is] *** guilty of first degree felony murder. (TT, 12-21-10, p 198; APP, 47).

Defense counsel was unprepared to meet this powerful science-based argument. Without forensic evidence to tell them differently, the jury was left with no basis to conclude that anyone else, who might have been connected with the crime, had ever worn the hat. They could speculate about the other partial profiles but those could easily have belonged to defendant and the victim. The only concrete evidence that they had about someone wearing the hat was defendant's complete DNA profile.

In summary, defense counsel was ineffective where he mistakenly thought funding was denied, waited until the first day of trial to complain about the perceived denial, waited until the fourth day of trial to start asking about pricing and contract information for the prosecutor's experts, and failed to take the trial court up on the offer to find a more reasonably priced expert. All of these factors led to defendant's conviction based on the only piece of evidence the prosecutor had against him. The adversarial process cannot be said to have functioned properly when the prosecutor was arguing science and defense counsel was complaining to the jury that he did not have enough money to challenge the prosecutor's scientific arguments. The money to hire an expert was there. Trial counsel, unreasonably, did not know it.

Under *Strickland supra*, as applied in *Hinton supra*, counsel was ineffective. Reversal must issue.

VI. **DEFENDANT IS ENTITLED TO REVERSAL DUE TO INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHERE COUNSEL EXPRESSED SATISFACTION AND FAILED TO OBJECT WHEN THE TRIAL COURT MODIFIED THE ADVERSE INFERENCE INSTRUCTION.**

During trial, it was discovered that on 1-16-06 fingernail clippings and a vial of blood were taken from the victim and stored at the Wayne County Medical Examiner's Office. Sgt. David Moore of the Detroit Police Department picked up the vial of blood but not the nail clippings. On 10-19-09, the medical examiner's office threw the clippings away. (TT, 12-15-10, p 105; APP, 10).

The clippings were important because there was no direct evidence that linked defendant Dantzler to the crime. The prosecutor theorized that the victim fought with his attackers and managed to snatch off one of their hats. (TT, 12-21-10, p 194; APP, 46). Therefore, defense counsel argued that DNA of whoever was wearing the hat would most likely be under the nails of the victim. (TT, 12-21-10, p 210; APP, 48).

Since the evidence was destroyed, defense counsel urged the Court to give the adverse inference instruction. CJI 2d 5.12. The purposed instruction would have read:

> The fingernail clippings from Bernard Hill's autopsy are missing evidence whose production was the responsibility of the prosecution. (TT, 12-22-10, p 28; APP, 59) "You may infer that this [evidence] would have been unfavorable to the prosecution's case." CJI 2d 5.12.

The trial Court agreed that under the circumstances the instruction was appropriate. But, the Court indicated that it was going to change the words "you may infer that" and replace them with the words "you may consider whether." (TT, 12-22-10, p 12; APP, 51). Trial counsel failed to object, leaving the instruction to read:

> "The fingernail clippings from Bernard Hill's autopsy are missing evidence whose production was the responsibility of the prosecution. You may consider whether this evidence would have been unfavorable to the

31

prosecutor's case and favorable to the defendant's case." (TT, 12-22-10, p 28; APP, 59).

This instruction stripped the defendant of his ability to meet the prosecutor's case. Defense counsel was ineffective for failing to object to the trial court's modifications to the instruction.

The standard of review for claims of ineffective assistance of counsel based on deficient performance is *Strickland v Washington*, 466 US 668 (1984). First, the defendant must show that his attorney's performance was deficient. Deficient performance is not merely below-average performance; rather, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.*, at 688. Ineffective counsel claims are reviewed *de novo. People v Pickens*, 446 Mich 298 (1994).

Second, the defendant must show that he was prejudiced by the substandard performance: "Prejudice" is a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694. "The essential question is whether better lawyering would have produced a different result." *Washington v Hofbauer*, 228 F3d 689, 702 (CA 6, 2000) (internal quotations and citations omitted). See also, *People v Armstrong*, 490 Mich 281, 290 (2012) (following the *Strickland* standard).

It has been consistently held that defense counsel's failure to take the proper and evident steps to protect his client's constitutional rights during criminal prosecution constitutes ineffective assistance, and/or denies the defendant a fair trial. See eg, *Kimmelman v Morrison*, 477 US 635 (1986); *People v Johnson*, 451 Mich 115 (1996); *People v Means (On Remand)*, 97 Mich App 641 (1980). Likewise, an attorney who fails to familiarize himself with the law applicable to his client's defense performs below an objective standard of reasonableness. *People*

*v Carrick*, 220 Mich App 17 (1996). *Cf, People v Ullah*, 216 Mich App 669, 685 686 (1996);

*People v Gridiron (On Reh)*, 190 Mich App 366, 370 (1991); *People v Harris*, 148 Mich App

506, 512 (1986). Counsel's failure to object is ineffective where there is no reasonable trial

strategy in failing to object. *Hodge v Hurley*, 426 F3d 368 (CA 6, 2005); *Combs v Coyle*, 205

F3d 269 (CA 6, 2000).

In *Lucas v O'Dea*, 179 F3d 412 (CA 6, 1999), the Court held that the failure of

petitioner's counsel to object to the instructions constituted ineffective assistance of counsel and

there was a reasonable probability that the result would have been different.

Under prevailing professional norms defendant was entitled to the instruction.

Entitlement to the instruction requires a showing that the evidence was unavailable consequent to

a failure of police to exercise due diligence. *People v Demeyers,* 183 Mich App 286, 293 (1990).

A finding of good faith is precluded where a lack of due diligence is made out. *People v Dye,*

431 Mich App 58 (1988). "The test for due diligence is one of reasonableness, whether diligent

good faith efforts were made to procure it." *People v Bean,* 452 Mich 677, 684 (1998).

## a.   ABSENCE OF DUE DILIGENCE

In the present case, the nail clippings were left at the medical examiners officer for years.

They were collected on 1-16-06, and destroyed on 10-19-09. (TT, 12-15-10, pp 105, 107; APP,

10, 11). The clippings and the blood sample from the victim were stored in the same place. (TT,

12-20-10, p 26; APP, 26) Sgt. David Moore picked up the blood sample but not the nail

clippings. No one could say if Moore asked about the nail clippings when he got the blood. No

one could say for sure when the police finally asked for the clippings. It could have been either

in November of 2009, or else it might have been in December of 2009. Nevertheless, they were

destroyed by then. (TT, 12-20-10, pp 25, 26, 48; APP, 25-26, 31). The prosecutor conceded that

negligence caused destruction of the potentially vital evidence. (TT, 12-22-10, p 8; APP, 50). Accordingly, due to the lack of due diligence, defendant was entitled to the instruction without modifications. Failure to object to the changes was deficient performance.

### b. The modified instruction affected the fairness of the entire trial.

As noted, the fingernail clippings had never been tested. No one knew if there was actually any DNA evidence under the nails. There was no testimony, nor any other indication that DNA evidence, exculpatory or otherwise, existed under the victim's nails. Without the ability to infer, or presume, the existence of this evidence, the jury was left with no object upon to base a conclusion regarding the favorability of the nails.

### c. Full context of the instruction.

Relative to evidence, the Court told the jury: "Evidence includes only the sworn testimony of the witnesses, the exhibits admitted into evidence and anything else I told you to consider as evidence *** the lawyers' statements and arguments are not evidence. (TT, 12-22-10, p 23; APP, 54). "You should only accept things the lawyers say that are supported by the evidence." (TT, 12-22-10, p 24; 55).

### d. Unfairness infecting the entire trial.

The problem with the modified instruction, when considered in the context of the overall charge, is that DNA evidence under the nail clippings was potential, not actual. Since the nails were destroyed before they could be tested, potentially exculpatory evidence existed only in the arguments of defense counsel. (TT, 12-21-10, p 202; APP, 49). It was not established by testimony. It did not exist in the exhibits admitted as evidence. The jury was not told that they could presume that the untested nails contained DNA. They were specifically told that the arguments of counsel are not evidence. They were also told to only accept things said by the

attorneys that are supported by evidence. Defense counsel's argument that the nails held exculpatory evidence was not supported by any evidence at all. Therefore, modification of the instruction removed defendant's ability to rely on the potential for the evidence to be favorable and to hold the State responsible for failing to preserve it.

The clippings were taken under the assumption that the DNA of whomever the victim struggled with might be found under his nails. (TT, 12-22-10, p 24; APP, 55). Had the jury been allowed to infer that the destroyed clippings held evidence unfavorable to the prosecutor's case, only one reasonable chain of logic could be followed: DNA was under the victim's nails; success of the prosecutor's case requires it to belong to the defendant; it did not belong to the defendant; therefore, the person with whom the victim struggled (who was wearing the hat) was not defendant.

The permissible inference could have decided the entire case. The modified instruction allowed the jury to consider the clippings, but not to infer the existence of DNA underneath them. In their untested state, the clippings could not negatively impact the prosecutor's case. There was nothing to consider. The modification rendered the instruction superfluous. Defense counsel's failure to object was ineffective.

**VII. DEFENDANT IS ENTITLED TO REVERSAL WHERE TRIAL COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO INVESTIGATE AFTER DEFENDANT TOLD HIM HE DID NOT OWN A GOLD CAR, WHICH A WITNESS SAID SHE SAW ON THE NIGHT OF THE CRIME.**

The standard of review for claims of ineffective assistance of counsel based on deficient performance is *Strickland v Washington*, 466 US 668 (1984). First, the defendant must show that his attorney's performance was deficient. Deficient performance is not merely below-average performance; rather, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.*, at 688.  Ineffective counsel claims are reviewed *de novo*. *People v Pickens*, 446 Mich 298 (1994).

Second, the defendant must show that he was prejudiced by the substandard performance: "Prejudice" is a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694. "The essential question is whether better lawyering would have produced a different result." *Washington v Hofbauer*, 228 F3d 689, 702 (CA 6, 2000) (internal quotations and citations omitted). See also, *People v Armstrong*, 490 Mich 281, 290 (2012) (following the *Strickland* standard).

In this instance, at trial, Janet Burt testified that she was the mother of the victim, Bernard Hill. On the day that Hill was killed, someone banged on the door at around 12-1 am. She looked out and saw a man named Rodney Turner, and defendant's son. She assumed that they were looking for her son, Bernard Hill. She also saw defendant's car outside, with several heads in it. She neither saw nor spoke to defendant Dantzler. (TT, 12-16-10, pp 66, 75, 77, 78, 82; APP, 12-16).

At trial defendant testified that he had sold the car that was seen by Burt to his brother-in-law a year prior to the date of the crime. He did not own the car and he had not driven it since the sale. (TT, 12-21-10, p 107-108; APP, 41, 42). Before trial defendant informed his attorney that he had long since sold the car, and did not own it on the day that it was seen by Burt. He asked trial counsel to contact the Department of Motor Vehicles, and Stephen Jennings, who bought the car, to verify when the title was transferred, but counsel never did. (See Affidavit of Stephen Jennings; APP, 145). Defense counsel was ineffective.

The *Strickland* Court explicitly found that trial counsel has a "duty to investigate," and that to discharge that duty "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.*, at 691; see also, *Wiggins v Smith*, 528 US 512 (2005). "The duty to investigate derives from counsel's basic function, which is to make the adversarial process work. *Townes v Smith*, 395 F.3d 251 (6th Cir.2005). Adequate investigation entails investigating all witnesses who may have information concerning the client's guilt. Counsel's failure to call a witness in the absence of full investigation into whether that witness can assist the defense cannot be called reasonable trial strategy. *Id.* 258-59.

In *People v Grant*, 470 Mich 477 (2004), the Court expounded the standard for determining if a failure to investigate results in violation of the right to effective counsel. *Grant* was accused of CSC, in which he severely injured the victim. She suffered a tear from the rear of her vagina to the opening of her anus. She told her family and the treating doctor that she hurt herself in a bicycle accident. A year later she was examined by another doctor and she claimed that the defendant told her to fabricate a story about a bicycle accident to cover his misdeeds. *Id.* 481. Defense counsel had a copy of the reports prepared by both doctors and a list of twelve

37

witnesses to interview about the bike accident. *Id.* 482. After interviewing two or three witnesses, none of whom had seen the accident, counsel's investigators stopped interviewing. *Ibid.*

Counsel went to trial with a theory that the defendant did not commit the crimes, claiming the injury was due to a bike accident and the girl was a habitual liar. After defendant had been convicted, counsel learned of eyewitnesses to the bicycle accident. *Id.*

In finding counsel ineffective due to his deficient investigation, the Court ruled, "counsel did not interview half of the people whom the defendant had identified as potentially having helpful information. He did not know what testimony these witnesses would give. He did not know where they had been or what they had seen." *Id.* at 493. Since counsel uncovered no substantial evidence as to the cause of the victim's injury, his investigation was incomplete. *Ibid.*

In the present case, defendant Dantzler told trial counsel that Stephen Jennings could testify that defendant did not own the car, and DMV records would support the testimony. (See defendant's affidavit APP, 146). Trial counsel never tried to contact the DMV to show the jury that defendant was not the owner of the car seen by the victim's mother.

In closing arguments, the prosecution argued: "It's important she saw a gold car. . . . So the gold car is key." (TT, 12-21-10, p 188, APP, 43). Next he stated "[I]n order to acquit this defendant, what you have to do is say oh yeah, he lent his car to somebody that night." (TT, 12-21-10, p 192; APP, 45).

Under the circumstances, trial "counsel's failure to investigate key evidence may not be excused..." *Sims v Livesay*, 970 F.2d 1575, 1581 (6th Cir.1992). Defense counsel's failures amounts to a grossly negligent dereliction of his duty to make the adversarial process work.

More effective lawyering probably would have produced a more favorable result. Defendant is entitled to reversal and retrial due to trial counsel's ineffective assistance.

VIII.   **DEFENDANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL, AND HIS FOURTEENTH AMENDMENT RIGHT TO A FULL AND FAIR APPEAL OF RIGHT WHERE APPEAL COUNSEL OMITTED SIGNIFICANT AND OBVIOUS ISSUES ON DEFENDANT'S APPEAL OF RIGHT THAT WERE CLEARLY STRONGER THAN THE ISSUES COUNSEL DID RAISE ON DEFENDANT'S DIRECT APPEAL.**

Defendant submits that Arguments V, VI, and VII, supra, were not originally raised on Defendant's appeal of right due to ineffective assistance of appellate counsel, establishing cause under MCR 6.508(D)(3)(a). With respect to Arguments IV, *supra,* Defendant argues that the underlying facts for these arguments was not known until several months after his Brief on Appeal was submitted to the Court of Appeals. See Argument, *infra,* § B.

The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel on the first appeal by right. US Const, Am VI; Const 1963 art 1, § 17; *Evitts v Lucey,* 469 US 387, 396-97 (1985); *Beasley v United States,* 491 F2d 687 (CA 6 1974). Constitutionally ineffective assistance of counsel is "cause" for a state procedural default, *Murray v Carrier,* 477 US 478, 488 (1986), including in the 6.500 motion context. *People v Reed,* 449 Mich 375, 378 (1995). The *Strickland* standard applies equally on appeal. 466 US at 687.

As with trial counsel, the law recognizes that appellate counsel must make professional judgments about what issues to raise, and insulates such judgments from after-the-fact claims of ineffectiveness, so long as appellate counsel really made a professional judgment in the matter, and so long as that judgment was objectively reasonable.

> [A]ppellate counsel's decision to winnow out weaker arguments and focus on those more likely to prevail is not evidence of ineffective assistance. *Jones v Barnes,* 463 US 745, 752 (1983). Nor is the failure to assert all arguable claims sufficient to overcome the presumption that counsel functioned as a reasonable appellate attorney in selecting the issues presented.

*Reed, supra* at 392. "The question is whether a reasonable appellate attorney could conclude" that the issue was "not worthy of mention on appeal." *Ibid.*

In *Mapes v Coyle*, 171 F3d 408, 427-428 (CA 6, 1999), the Sixth Circuit identified several non-exclusive factors to be considered in determining whether a defendant was denied effective assistance of appellate counsel:

(1)   Were the omitted issues "significant and obvious"?;

(2)   Was there arguably contrary authority on the omitted issues?;

(3)   Were the omitted issues clearly stronger than those presented?;

(4)   Were the omitted issues objected to at trial?;

(5)   Were the trial court's rulings subject to deference on appeal?;

(6)   Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?;

(7)   What was appellate counsel's level of experience and expertise?;

(8)   Did the petitioner and appellate counsel meet and go over possible issues?;

(9)   Is there evidence that counsel reviewed all the facts?;

(10)  Were the omitted issues dealt with in other assignments of error?;

(11)  Was the decision to omit an issue an unreasonable one, which only an incompetent attorney would adopt?

Applying the above factors to the case at bar, it is simply beyond debate that the failure to raise the herein Arguments was ineffective assistance.

A defendant is not entitled to relief from judgment where he alleges grounds for relief that could have been raised on direct appeal or in a prior motion, unless the defendant demonstrates good cause for failure to raise such grounds in the past, and actual prejudice from the alleged irregularities. MCR 6.508(D)(3). To demonstrate "actual prejudice," a defendant

41

must show that either (1) "but for the alleged error, the defendant would have had a reasonably likely chance of acquittal," and (2) "the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case." MCR 6.508(D)(3)(b)(i) and (iii).

In *Beasley v United States, supra*, the Court stated that, to be constitutionally adequate:

"Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a timely manner."

Under *Strickland v Washington, supra*, the following standard applies to the performance of counsel:

"[t]he proper standard for attorney performance is that of reasonably effective assistance . . . . When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. More specific guidelines are not appropriate. . . . . In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."

Under *Strickland v Washington, supra*, the following standard applies to prejudice from the attorney's poor performance, stating:

"We believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case... The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome . . . .

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

The *Strickland* standard applies to claims of ineffective appellate counsel. See People v Reed, 449 Mich 375, 378 (1995).

In the present case, the herein Arguments were clearly worthy of mention on Defendant's direct appeal, yet appeal counsel dismissed them, if counsel even recognized them. These errors

were perspicuous errors that were easily detectable for any competent attorney making a reasonable inquiry.

Regarding Argument V, *supra*, appellate counsel argued that funding for an independent expert was unilaterally denied. (See Brief on Appeal, p. 28; APP 136.) Appellate counsel's decision to raise an issue that had no record support, and therefore no hope of success, was unreasonable. See *Mitchell v Mason*, 325 F3d 732, 739 (CA 6, 2003) (noting that Michigan law, referring to *People v Ginther*, 390 Mich 436, 442-443 (1973) and its progeny, "indicate that it is crucial to develop an adequate record of trial [and/or appellate] counsel[s'] failures if petitioner's claim[s are] to succeed. . . .'"). The trial record was replete with evidence that funding for an expert was available. (TT, 12-14-10, p 7-9; APP, 6-7). (TT, 12-20-10, p 138; App,139); (Orders for Appointment of Independent Expert; APP, 69-70). Accordingly, appellate counsel was ineffective where he argued that funds were *not* available. The prejudice suffered is detailed in Argument V, *supra*.

Likewise, Arguments VI and VII were palpable errors backed by a plethora of case law. There was certainly prejudice to the Defendant where the trial court, without objection by defense counsel, changed a jury instruction that stripped the defendant's ability to meet the prosecution's case. See Argument VI, *supra*. Appellate counsel knew of the facts underlying Argument VII as well, where the Defendant the trial record supported Defendant's contention that he had sold the gold car a year prior to the date of the crime—and that he had not driven the car since. See Argument VII, *supra*.

The actions taken by appellate counsel deprived the defendant of a meaningful opportunity to succeed on his appeal of right. If appellate counsel was functioning as the attorney guaranteed by the Sixth Amendment, it is a great possibility that Defendant would have been

successful on his appeal of right had appellate counsel raised the foregoing errors.

Under *Evitts v Lucey*, 469 U.S. 396, the following standard applies to ineffective assistance on appeal:

> "nominal representation on appeal as of right-like nominal representation at trial does not suffice to render the proceedings constitutionally adequate."

The critical failure of an attorney to object or raise an issue can be ineffective assistance of counsel if it deprived the defendant of an opportunity for dismissal of the case or for success on appeal. *Gravely v Mills*, 87, F3d 779 (CA 6 1996); *Kowlak v United States*, 645 F2d 534, 537-533 (CA 6 1981); *Corsa v Anderson*, 443 F. Supp. 176 (ED Mich 1977).

This writer submits there was ineffective assistance of appellate counsel. This Court should look both at what was raised, and what was not raised.

This is sufficient, this writer claims, for a finding of cause and prejudice sufficient to overcome appellate counsel's failure to raise the issues on appeal, and to allow this Court to reach the merits.

A.   WHERE APPELLATE COUNSEL FORFEITED DEFENDANT'S RIGHT TO ORAL ARGUMENTS BY FILING HIS BRIEF ON APPEAL LATE, AND WHERE APPELLATE COUNSEL ESSENTIALLY FORFEITED DEFENDANT'S CHANCE TO REPLY TO THE STATE'S RESPONSIVE BRIEF BY NOT SENDING IT TO DEFENDANT UNTIL THREE DAYS BEFORE THE REPLY WAS DUE.

Defendant contends with this claim that appellate counsel rendered ineffective assistance of counsel and failed to represent defendant at a crucial point of his appeal where appeal counsel failed to timely file his Brief on Appeal with the Court of Appeals, which forfeited defendant's right to oral argument.

MCR 7.212(A)(4) provides that "any party failing to timely file and serve a brief required by this rule forfeits the right to oral argument."

Appellate counsel, Neil Leithauser, was appointed to represent defendant on April 7, 2011. On or about October 6, 2011, Mr. Leithauser filed a stipulation to extend the time to file defendant's brief, which the appellate court granted, setting a new filing date of December 1, 2011. Mr. Leithauser, however, again failed to timely file a Brief on Appeal by the December 1, 2011 deadline.

On December 6, 2011, the Michigan Court of Appeals issued an involuntary dismissal warning letter to Mr. Leithauser, informing him that he forfeited oral arguments and faced costs and possible dismissal of defendant's appeal as of right.

The Michigan Appellate Assigned Counsel System, which appointed Mr. Leithauser to represent Petitioner, conducted an investigation into this matter and found that appellate counsel was in violation of MAACS Minimum standard 6, which provides that "counsel should request oral argument and preserved the right to oral argument by timely filing defendant's brief on appeal." (See Letter, APP, 107-109).

Oral argument is very important because it provides counsel the opportunity to present recent cases to the court in response to the prosecutor's arguments, and to answer the Court's questions about the case. Oral argument further offers one final opportunity to persuade the court of the merits of the appeal and the correctness of appellant's position.

Defendant also submits that counsel was ineffective where he failed to send Defendant a copy of the prosecutor's brief in opposition until three days before a reply was due, which was April 12, 2012. Appellate counsel's deficiency in this matter cost defendant his chance to rebut the prosecutor's argument, a crucial step in the appellate process. The prejudice here is strong

and clear, and violative of *Evitts v Lucey, supra*, and its progeny.

This is sufficient, this writer claims, for a finding of cause and prejudice sufficient to overcome appellate counsel's failure to raise the issues on appeal, and to allow this Court to reach the merits.

**B.   DEFENDANT IS ENTITLED TO REVIEW OF ARGUMENTS I AND V WITHOUT A SHOWING OF CAUSE AND PREJUDICE UNDER MCR 6.508(D)(3)(a) AND (b) WHERE THE FACTUAL BASES FOR THE CLAIMS WAS NOT AVAILABLE TO THE DEFENDANT UNTIL ALMOST FIVE MONTHS AFTER HE HAD ALREADY FILED HIS APPELLATE BRIEF.**

First, with respect to Argument IV, *supra*, the underlying facts were not available until five months after defendant had already filed his Brief on Appeal. Defendant's appeals brief was due on December 1, 2011. As stated in above, however, it was not filed by appellate counsel until December 27, 2011. (MACCS Letter to Neil Leithauser, p 2; APP 107-109).

Several months later, after all of the filing deadlines had long since expired, the Wayne County Prosecutor sent defendant a notice explaining that there was a problem with the DNA evidence. (See Notice, APP, 71). At this point, there was no avenue for raising the issue. No evidentiary basis for the claim had been developed. See *People v Ginther*, 390 Mich 436 (1973). Thus, the claim could not have been raised on defendant's first appeal.

If this Court finds that the claim was available, the failure to raise it was due to ineffective assistance of counsel. As soon as defendant became aware of the *Brady* violation, he asked his attorney if he could raise the issue. (See Defendant's Letter to Counsel; APP, 110). Counsel responded that the issue was not viable because the crime lab sent the material out to be tested. (APP, 111). As fully detailed in Argument IV, *supra*, testing practices were not the only problems uncovered by the audit. Appellate counsel failed to consider that the Detroit Police

Crime Lab may have compromised the evidence before it was sent out. No appellate strategy can be gleaned from his inaction, only negligence.

The prejudice suffered as a result of the *Brady* violation is fully detailed above. Defendant is entitled to review of his claims and reversal of his conviction.

With respect to Argument V, *supra*, it is simply beyond debate that this Defendant could have raised a claim of ineffective assistance of appeal counsel on his appeal of right. There is no recourse available to him at that time. The fact that he was able to file a pro per supplemental brief under Administrative Order 2004-6 also does not alleviate the error. That aforementioned rule only allows a defendant 84 days counted from the date of appeal counsel's Brief on Appeal to file any pro per supplemental brief in the Court of Appeals. The defendant never gained possession of his transcripts in the allotted time to properly file a supplemental brief.

Under these circumstances, therefore, this Court should review the merits of this claim. See, *Massaro v United States*, 538 US 500 (2003)

IX.  THE TRIAL COURT'S ADJUDICATION OF PETITIONER'S POST-CONVICTION CLAIMS WAS CONTRARY TO CLEARLY ESTABLISHED LAW AND DENIED DEFENDANT HIS FOURTEENTH AMENDMENT RIGHT TO A FULL AND FAIR HEARING.

In denying relief on Argument IV, *supra*, the trial court opined that Defendant should have objected at trial to the prosecutor's suppression of the underlying facts of his *Brady* claim. The trial court further rejected this claim relying on the Court of Appeals' statement in its opinion on Defendant's direct appeal that "the prosecution presented other strong evidence that defendant participated in the victim's murder." (See Trial court opinion at 2.)

First, the trial court's statement that Defendant should have objected to the DNA evidence at trial on the grounds that the Detroit Crime Lab mishandled evidence is an unreasonable requirement. There is nothing suggesting before Defendant's trial that the Defendant knew that the Detroit Crime Lab had even handled any evidence in his case. Only after the prosecution's April 25, 2012 letter to Defendant's appeal counsel did the Defendant learn of the misconduct on the part of the Detroit Crime Lab.

Indeed, the Detroit Crime Lab not only mishandled evidence, but in fact failed to conduct thorough testing of evidence. See, e.g., *People v. Nathan Emmanuel Jacobs,* 490 Mich 888 (2011) (#142519, 10-19-11) (order granting a new trial and reversing the Michigan Court of Appeals December 7, 2010 opinion, MICOA No. 283056). In *Jacobs,* the original theory of the prosecution was that one gun was used to shoot the victim. Detroit Crime Lab analysis found the bullet fragments too damaged for proper analysis, but the SADO crime unit discovered that an independent forensic laboratory had analyzed the same firearms evidence as part of the Detroit Crime Lab audit and this analysis found that the victim was shot with two weapons. This new evidence could not be squared with either the prosecution's theory of the case or the testimony of

48

the main eyewitnesses at trial, one of whom actually had a pistol on the day of the shooting, hence the Michigan Supreme Court's grant of a new trial.

Defendant submits that that same can be assumed here. As previously mentioned, at least two other incomplete DNA profiles were on the hat. (TT, 12-20-10 p 38; APP, 28). As the evidence stood, DNA evidence put defendant's head squarely in the hat and the hat squarely at the crime scene. No one else was put there, because no other complete profiles could be developed. Without the suppressed evidence, there was no explanation as to how these facts and defendant's innocence could be reconciled. As far as the jury knew, the partial profiles could have belonged to defendant, the victim or officer Gerald Stewart.

Second, in denying relief on the *Brady* claim the trial court referred to the Court of Appeals' stating that "the prosecution presented other strong evidence that defendant participated in the victim's murder." (See Trial court opinion at 2.) It is Defendant's contention that the only other evidence relied did not specifically place Defendant at the scene, but rather, placed the "gold car" at the scene, which Defendant clearly established he did not own at the time of the incident. See Argument VII, *supra*.

It is not for this Court, nor a trial judge at a hearing, to determine what a jury would or would not actually conclude. As the Sixth Circuit noted in *Barker v Yukins*, 199 F3d 867, 874-875 (CA 6, 1999):

> """We further believe that the Michigan Supreme Court improperly invaded the province of the jury in determining that, although the general self-defense instruction was erroneous in Barker's case, the error was harmless because no reasonable juror could have believed that the force used by Barker was necessary to prevent rape by an 81-year old "enfeebled" man. The Sixth Amendment and the Due Process clause guarantee a defendant's constitutional right to a trial by jury. As the Supreme Court has recognized, the Sixth Amendment protects the defendant's right to trial by an impartial jury, which includes "as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of 'guilty.'" *Sullivan v. Louisiana*, 508

49

U.S. 275, 277, 113 S.Ct. 2078, 2080, 124 L.Ed.2d 182 (1993). This right is further interpreted as prohibiting judges from weighing evidence and making credibility determinations, leaving these functions for the jury. See, e.g., *United States v. United States Gypsum Co.*, 438 U.S. 422, 446, 98 S.Ct. 2864, 2878, 57 L.Ed.2d 854 (1978) (holding that a jury instruction which effectively took from the jury the issue of intent improperly invaded the jury's factfinding function)."

The trial court's opinion is contrary to *Brady* and its progeny, and Defendant is entitled to a new trial.

With regard to Defendant's ineffective trial counsel claims and ineffective appellate counsel claims, Defendant directs this Court to Arguments V thru VIII, *supra*, which sufficiently demonstrates the error in the trial court's refusal to grant Defendant's request to develop a record for these non-record claims.

Defendant demonstrates in his attached Motion to Remand that, where the claim of ineffectiveness depends on facts not of record, the defendant must make a testimonial record in the trial court. See, *People v Ginther, supra,* at 442-443; *Mitchell v Mason,* 325 F3d 732, 739 (CA 6, 2003) (noting that Michigan law, referring to *People v Ginther, supra* at 442-443, and its progeny, "indicate that it is crucial to develop an adequate record of trial [and/or appellate] counsel[s'] failures if petitioner's claim[s are] to succeed. . . .'"). See also, *Massaro v United States,* 538 US 500, 503-506 (2003) (holding that a hearing is not only essential but required during collateral post-judgment proceedings for determining ineffective assistance of counsel claims where the record is inadequate upon which to base any conclusions).

To fail to grant relief would be unjust because it would leave intact a conviction where there is important evidence, not available at trial, that the very evidence that convicted Defendant was unreliable. "Our cases establish, at a minimum, that criminal defendants have the right to . . . put before a jury evidence that might influence the determination of guilt." *Pennsylvania v.*

*Ritchie*, 480 U.S. 39, 56 (1987). ". . . [t]here is no iron curtain drawn between the Constitution and the prisons of this country." *District Attorney's Office For the Third Judicial District v. Osborne*, 129 S.Ct. 2308, 2335 (2009) (STEVENS, J., dissenting).

MCR 7.316(A)(5) provides that the Supreme Court may, at any time, in additional to its general powers adjourn the case until further evidence is taken and brought before it, as the Court may deem necessary in order to do justice. Defendant submits that it is imperative that this Court exercise its discretion in this case and remand in the interest of justice. *McCleskey v. Zant*, 499 U.S. 467 (1991); *McKenzie v. Smith*, 326 F.3d 721 (6th Cir. 2003); *Kuhlmann v Wilson*, 477 US 436, 454, n 17 (1986).

The totality of Defendant's claims is certainly "evidence that might influence the determination of guilt," and to refuse to allow this evidence to be disregarded without a full and fair hearing would insult the very thing we fight for and defend every day: the Constitution of the United States.

X.   DEFENDANT-APPELLANT'S RIGHT TO DUE PROCESS WAS VIOLATED WHERE THE CUMULATIVE EFFECT OF ERRORS DENIED HIM A FAIR TRIAL.

The Fourteenth Amendment to the United States Constitution and the Const. 1963, art. 1, § 17 guarantee that no state shall deprive any person of "life, liberty or property, without due process of law." Textually, only procedural due process is guaranteed by the Fourteenth Amendment; however, under the aegis of substantive due process, individual liberty interests likewise have been protected against" certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The underlying purpose of substantive due process is to secure the individual from the arbitrary exercise of governmental power.

Defendant asserts that the errors raised herein deprived him of his constitutional rights to due process and a fair trial. These combined errors also worked to deny Defendant his Sixth Amendment right to the effective assistance of counsel. There were numerous situations that counsel should have subjected the State's case to meaningful adversarial testing yet failed to do so. *People v Knapp,* 244 Mich App 361, 387-88; 624 NW2d 227 (2001); *People v Dobek*, 274 Mich App 58; 732 NW2d 546 (2007).

The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal where the prejudice of any one error would not. *People v LeBlanc*, 465 Mich 575; 640 NW2d 246 (2002). In order to reverse on the grounds of cumulative error, the errors at issue must be of consequence. *Dobek*, 274 Mich App at 106. The cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted. *LeBlanc*,

465 Mich at 591. Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal. *People v Mayhew*, 236 Mich App 112, 128; 600 NW2d 370 (1999).

Defense counsel committed numerous errors that rendered counsel's assistance deficient and prejudiced Defendant's defense to the extent that he was denied his Sixth Amendment right to effective representation of counsel. These errors, explained above, are serious enough that each standing alone constituted deprivation of this right. See *Kimmelman v Morrison*, 477 US 365; 383; 106 S Ct 2574; 2587 (1986) ["a single, serious error may support a claim of ineffective assistance of counsel"].

In the alternative, the cumulative effect of the numerous errors committed by defense counsel deprived Defendant of a fair trial. See *Blackburn v Foltz*, 828 F2d 1177, 1186 (CA 6, 1987) ("Counsel's errors, in combination, effectively deprived [defendant] of a meaningful defense"); *People v Kvam*, 160 Mich App 189, 201; 408 NW2d 71 (1987) (even if "a single error in a case may not necessarily provide the basis for reversal, it is possible for the cumulative effect of a number of minor errors to require reversal").

If the Court feels that further development of any aspect of the ineffective counsel claims, above, is necessary to expand the record or to determine if counsel had any strategic reason for her lack of advocacy, he asks the Court to remand for an evidentiary hearing after granting leave to appeal. MCR 6.500 *et seq; People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

The cumulative effect of all the errors at trial significantly undermines the reliability of this verdict, and a new trial must be granted.

## RELIEF REQUESTED

For these reasons, Samuel L. Dantzler asks:

A.    That Respondent be required to appear and answer the allegations of this Petition;

B.    That after full consideration, this Court grant this Petition and order that Petitioner be promptly retried or released from custody;

C.    That this Court grant such other, further, and different relief as the Court may deem just and proper under the circumstances; and

D.    That this Court grant oral argument in this matter.

Respectfully submitted,

Samuel L. Dantzler #518107
Petitioner IN PRO SE
Oaks Corr. Fac.
1500 Caberfae Hwy.
Manistee, MI 49660

Dated: 9-12-16

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SEP 1 5 2016

CLERK'S OFFICE
U.S. DISTRICT COURT

SAMUEL L. DANTZLER,

      Petitioner,

v.

THOMAS MACKIE, WARDEN

      Respondent.

Case No. 13-cv-14764

HON. LAURIE J. MICHELSON

HON. MAG. MONA K. MAJZOUB

_____/

## CERTIFICATE OF SERVICE

Under penalty of perjury, the undersigned avers and says that on _Sept. 12_,

2016, he mailed one copy of Petitioner's Motion to Lift Stay and Amend Habeas Brief and Case

Caption, Brief in Support, and this Certificate of Service upon the following:

Michigan Attorney General
P.O. Box 30217
Lansing, MI 48909

by placing same in the U.S. Mail with sufficient postage affixed thereto.

Samuel L. Dantzler #518107
Petitioner *In pro per*
Oaks Corr. Fac.
1500 Caberfae Hwy.
Manistee, MI 49660



Oaks Corr. Fac.
1500 Caberfae Hwt.
Manistee, MI
49660

9114 9014 9645 0886 6799 57

UNITED STATES
POSTAL SERVICE®
USPS TRACKING #

Label 400 Jan. 2013
7690-16-000-7948

Clerk of the Court
U.S. District Court
231 W. Lafayette Blvd.
Detroit, MI 48226

FILED
SEP 15 2016
CLERK'S OFFICE
U.S. DISTRICT COURT

$ 003.78⁰