STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN
      Plaintiff

v                          File No 10-3521-01

SAMUEL LEE DANTZLER

      Defendant
_____/

MOTION FOR RELIEF FROM JUDGMENT

    NOW COMES SAMUEL LEE DANTZLER, Defendant herein, in propria persona, and moves this Honorable Court, pursuant to the provisions of MCR Subchapter 6.500, for Relief From Judgment herein, and in support of said motion says as follows:

    1. He is the defendant in the above captioned case, and is currently confined at Oaks Correctional Facility, serving the sentences imposed by this Court herein.

    2. On 12-22-10, he was found guilty of First Degree Felony Murder, MCL 750.316-B, after a jury trial, the Honorable Gregory Bill, Circuit Judge presiding.

    3. On 1-20-11, he was sentenced by Judge Bill to mandatory life with sentence credit of 329 days.

    4. Defendant appealed the said convictions and sentences, as of right to the Michigan Court of Appeals, under docket number 303252; on 6-19-12, the Court of Appeals issued an order affirming the said convictions and sentences; on 12-26-12, the Michigan Supreme Court issued an order denying leave to appeal under docket number 145738; On 11-18-13, Defendant filed a petition for writ of

1

habeas corpus in the Federal District Court, Eastern District of Michigan, Southern Division, docket number 2:13-CV-14764. The Habeas Petition is now pending. Defendant has filed a motion for stay of judgment in the Federal Court, pending the outcome of the instant Motion for Relief From Judgment.

5. Defendant was represented at preliminary examination by Otis Culpepper (P23520), 645 Griswold, Suite 3963, Detroit Michigan 48226. Defendant was represented at trial by Robert Kinney (P35842), 645 Griswold, Suite 3963, Detroit Michigan 48226, and; on appeal by appointed counsel, Neil J. Leithauser, 101 W. Big Beaver Road, 14th Floor, Troy Michigan 48084.

6. Because of the length of time which has passed, the convictions and sentences from which defendant seeks relief herein are no longer subject to review under MCR 7.200 or 7.300.

7. Defendant now seeks relief in pro per and therefore, does require the appointment of counsel for the purposes of these proceedings.

8. Defendant's convictions and sentences herein should be set aside and a new trial granted as to each charge, for the following reasons:

I.   DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL WHEN THE PROSECUTOR COMMITTED BRADY VIOLATION IN FAILING TO NOTIFY HIM THAT THE ONLY EVIDENCE LINKING HIM TO THE CRIME COULD HAVE BEEN TAINTED OR OTHERWISE COMPROMISED WHEN IT WAS AT THE DETROIT POLICE CRIME LAB

II.  DEFENDANT IS ENTITLED TO REVERSAL DUE TO INEFFECTIVE ASSISTANCE WHERE TRIAL COUNSEL REQUESTED FUNDS TO HIRE AN INDEPENDENT DNA EXPERT BUT AFTER THE FUNDS WERE GRANTED, HE NEVER HIRED AN EXPERT, AND COULD NOT MEET THE PROSECUTORS CASE WHICH WAS BASED SOLELY ON DNA

III. DEFENDANT IS ENTITLED TO REVERSAL WHERE DUE TO INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHERE COUNSEL EXPRESSED

2

SATISFACTION AND FAILED TO OBJECT WHEN THE TRIAL COURT MODIFIED THE ADVERSE INFERENCE INSTRUCTION

IV. DEFENDANT IS ENTITLED TO REVERSAL WHERE TRIAL COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO INVESTIGATE AFTER DEFENDANT TOLD HIM HE DID NOT OWN A GOLD CAR WHICH A WITNESS SAID SHE SAW ON THE NIGHT OF THE CRIME

V) APPELLATE COUNSEL WAS DEFICIENT FOR FAILING TO PRESERVE THE OPPORTUNITY FOR ORAL ARGUMENTS, FOR FAILING TO FORWARD RESPONSE BRIEF TO MR DANTZLER IN A TIMELY MANNER, AND FOR FAILING TO RAISE A REVERSIBLE ISSUE ON APPEAL

VI DEFENDANT IS ENTITLED TO REVIEW OF ISSUES TWO THREE AND FOUR WHERE CAUSE FOR FAILURE TO PRESENT THEM IN A PRIOR APPEAL WAS DUE TO THE INEFFECTIVE ASSISTANCE OF COUNSEL

VII. DEFENDANT IS ENTITLED TO REVIEW OF ISSUES ONE AND FIVE WITHOUT A SHOWING OF CAUSE AND PREJUDICE UNDER MCR 6.508(D) WHERE THE FACTUAL BASES FOR THE CLAIMS WERE NOT AVAILABLE TO THE DEFENDANT UNTIL ALMOST FIVE MONTHS AFTER HE HAD ALREADY FILED HIS APPELLATE BRIEF.

all as more fully explained in the Memorandum of Law filed in support of this Motion, which is attached hereto, and incorporated by reference.

9. An evidentiary hearing must be held to fully develop the factual basis for the claims herein advanced.

10. These issues were not raised or developed on direct appeal; however, the failure to do so, in the case of issue one, the information necessary to raise the issue was withheld by the prosecutor all through out defendant's trial, and only five months after defendant had already filed his brief on appeal did the prosecutor alert Defendant that a Brady vioaltion had occurred. Therefore the claim was not available to Defendant when his appellate brief was filed. As to issue five, the claim (ineffective assistance of appellate counsel), was also not available until after defendant's brief on appeal had already been filed. The issues also required an additional evidentiary record.

3

Since the claims could not have been raised on appeal, no showing of cause and prejudice is required. To the extent that the information may have been available, and the claims reviewable on direct appeal, the failure to raise them constituted ineffective assistance of appellate counsel as explained in issue VI. As to issues two, three and four the failure to raise them was due to ineffective assistance of counsel. In each case, defendant suffered actual prejudice from the errors, and from the noted failures of representation.

11. Moreover, because the irregularities are so offensive to the maintenance of a sound judicial process, and because the Court must find that there is a significant possibility that defendant is legally innocent of the charges of which he was convicted, the defendant's convictions should not be allowed to stand.

Wherefore, defendant respectfully prays that this Court enter an order pursuant to the procedures set forth in MCR Subchapter 6.500, setting aside his convictions and sentences herein, grant an evidentiary hearing; order DNA testing of biological evidence herein, and granting him a new trial as to each of the charges against him.

I swear under penalty of perjury that the foregoing is accurate

_Samuel Dantzler_
Samuel Lee Dantzler 518107
1500 Caberfae Highway
Manistee MI 49660

9-15-14

4

STATE OF MICHIGAN
Brief Cover Page-Proof of Service

Case Name: People v Dantzler
Lower Court Case No.: 10-3521-01

☑ ☐ ☐
☐ ☑
☐ ☐ ☑

1. Brief Type (select one):
    ☐ APPELLANT   ☐ APPELLEE    ☐ REPLY
    ☐ CROSS APPELLANT  ☐ CROSS APPELLEE  ☐ AMICUS CURIAE
    ☑ OTHER (Identify) Brief in Support of Motion for Relief From Judgment

2. This brief is filed by or on behalf of: Samuel Lee Dantzler 518107

3. ☐ This brief is in response to a brief filed on/ about  [date]        by       

4. ORAL ARGUMENT:    ☐ REQUESTED      ☐ NOT REQUESTED ☑ Not Applicable

5. ☐     THE APPEAL INVOLVES A RULING THAT THE CONSTITUTION, A STATUTE
        RULE OR REGULATION, OR OTHER STATE GOVERNMENTAL ACTION IS
        INVALID. [See MCR 7.212(C)(1) to determine if this applies.]

6. As required by MCR 7.212(C), this brief contains, in the following order: [check applicable boxes
to verify]

       ☑ Table of Contents [MCR 7.212(C)(2)]
       ☑ Index of Authorities [MCR 7.212(C)(3)]
       ☑ Jurisdictional Statement [MCR 7.212(C)(4)]
       ☑ Statement of Questions [MCR 7.212(C)(5)]
       ☑ Statement of Facts (with citation to record) [MCR 7.212(C)(6)]
       ☑ Arguments (with applicable standard of review) [MCR 7.212(C)(7)]
       ☑ Relief requested [MCR 7.212(C)(9)]
       ☑ Signature [MCR 7.212(C)(9)]

7. This brief is signed by [type name]: Samuel Lee Dantzler 518107
Oaks Correctional Facility, 1500 Caberfae Highway Manistee Michigan 49660

PROOF OF SERVICE: I Certify that a copy of this brief and all attachments were served on the following Attorneys of
record or pro per parties by regular mail at the addresses shown below.

DATE OF SERVICE:  9-15-14

Type Name:    Samuel Dantzler       Signature: _Samuel L Dantz_

| WAYNE COUNTY PROSECUTOR 11th Floor 1441 St. Antoine Detroit Michigan 48226 | | |
|---|---|---|
| | | |

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN
          Plaintiff


v                                    File No 10-3521-01

SAMUEL LEE DANTZLER

          Defendant
_____/



BRIEF IN SUPPORT OF

MOTION FOR RELIEF FROM JUDGMENT

TABLE OF CONTENTS

Index of Authorities .................................................. ii

Statement of Jurisdiction ......................................... iii

Statement of Questions Presented .............................. iii

Statement of Facts .................................................. 1

Argument:

I.  DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL WHEN THE
PROSECUTOR COMMITTED BRADY VIOLATION IN FAILING TO NOTIFY
HIM THAT THE ONLY EVIDENCE LINKING HIM TO THE CRIME COULD
HAVE BEEN TAINTED OR OTHERWISE COMPROMISED WHEN IT WAS AT
THE DETROIT POLICE CRIME LAB ....................... p 4

II.  DEFENDANT IS ENTITLED TO REVERSAL DUE TO INEFFECTIVE
ASSISTANCE WHERE TRIAL COUNSEL REQUESTED FUNDS TO HIRE AN
INDEPENDENT DNA EXPERT BUT AFTER THE FUNDS WERE GRANTED, HE
NEVER HIRED AN EXPERT, AND COULD NOT MEET THE PROSECUTORS
CASE WHICH WAS BASED SOLELY ON DNA ...............p 10

III. DEFENDANT IS ENTITLED TO REVERSAL WHERE DUE TO INEFFECTIVE
ASSISTANCE OF TRIAL COUNSEL WHERE COUNSEL EXPRESSED
SATISFACTION AND FAILED TO OBJECT WHEN THE TRIAL COURT
MODIFIED THE ADVERSE INFERENCE INSTRUCTION ........... p 19

IV.  DEFENDANT IS ENTITLED TO REVERSAL WHERE TRIAL COUNSEL WAS
INEFFECTIVE WHEN HE FAILED TO INVESTIGATE AFTER DEFENDANT
TOLD HIM HE DID NOT OWN A GOLD CAR WHICH A WITNESS SAID SHE
SAW ON THE NIGHT OF THE CRIME ....................... p 24

V)  APPELLATE COUNSEL WAS DEFICIENT FOR FAILING TO PRESERVE THE
OPPORTUNITY FOR ORAL ARGUMENTS, FOR FAILING TO FORWARD
RESPONSE BRIEF TO MR DANTZLER IN A TIMELY MANNER, AND FOR
FAILING TO RAISE A REVERSIBLE ISSUE ON APPEAL ...... p 27

VI  DEFENDANT IS ENTITLED TO REVIEW OF ISSUES TWO THREE AND FOUR
WHERE CAUSE FOR FAILURE TO PRESENT THEM IN A PRIOR APPEAL
WAS DUE TO THE INEFFECTIVE ASSISTANCE OF COUNSEL
...........p 30

VII. DEFENDANT IS ENTITLED TO REVIEW OF ISSUES ONE AND FIVE
WITHOUT A SHOWING OF CAUSE AND PREJUDICE UNDER MCR 6.508(D)
WHERE THE FACTUAL BASES FOR THE CLAIMS WERE NOT AVAILABLE TO
THE DEFENDANT UNTIL ALMOST FIVE MONTHS AFTER HE HAD ALREADY
FILED HIS APPELLATE BRIEF........... 34

RELIEF REQUESTED                                            35

INDEX OF AUTHORITIES

CASES                                                              PG

*Brady v Maryland 373 US 83 (1963)* .......... 4, 7, 34, 35

*Cupp v Naughten 126 SCt 2188 (2006)* ......................21

*Entsminger v Iowa 386 US 748 (1967)* .....................32

*Evitts v Lucey 469 US 387 (1985)* ........................31

*Harrington v Richter 131 SCT 770 (2011)* .............11, 18

*Hinton v Alabama 131 SCt 1081(2014)*.. 10, 11, 12, 13, 14, 32

*Kyles v Whitley 115 SCt 1555 (1995)*......................7

*People v Bean 452 Mich 677 (1998)* ........................20

*People v Carpentier 446 Mich 16 (1994)* ......................34

*People v Demeyers 183 Mich 286 (1990)* .....................20

*People v Dye 431 Mich 58 (1998)* .........................20

*People v Ginther 390 Mich 436 (1973)* ....................32

*People v Grant 470 Mich 477 (2004)* ......................25, 26

*People v Kimble 479 Mich 305 (2004)* .........................30

*People v Reed 449 Mich 375 (1995)* ...........................30

*Ramonez v Berghuis 490 F3d 482 (Cir 6 2007)* ................15

*Sims v Livesay 970 F2d 1575 (Cir 6 1992)* ....................26

*Smith v Murray 477 US 527 (1986)* ...........................31

*Smith V Robbins 528 259 (2000)* ..............................31

*Strickland v Washington 466 US 668 (1984)* 10, 11, 18, 20, 30, 31

*Strickler v Greene 527 US 263 (1999)* ......................4

*Townes v Smith 395 F3d 251 (Cir 6 2006)* ..................24

*Youngblood v West Virginia 126 SCt 2188 (2006)*...........4, 7

INDEX OF AUTHORITIES

CASES                                                           PG

*Brady v Maryland 373 US 83 (1963)*     4, 7, 34, 35

*Cupp v Naughten 126 SCt 2188 (2006) 21*

*Entsminger v Iowa 386 US 748 (1967) 32*

*Evitts v Lucey 469 US 387 (1985) 31*

*Harrington v Richter 131 SCT 770 (2011) 11, 18*

*Hinton v Alabama 131 SCt 1081(2014) 10, 11, 12, 13, 14, 32*

*Kyles v Whitley 115 SCt 1555 (1995)*                          7

*People v Bean 452 Mich 677 (1998) 20*

*People v Carpentier 446 Mich 16 (1994) 34*

*People v Demeyers 183 Mich 286 (1990) 20*

*People v Dye 431 Mich 58 (1998) 20*

*People v Ginther 390 Mich 436 (1973) 32*

*People v Grant 470 Mich 477 (2004) 25, 26*

*People v Kimble 479 Mich 305 (2004) 30*

*People v Reed 449 Mich 375 (1995) 30*

*Ramonez v Berghuis 490 F3d 482 (Cir 6 2007) 15*

*Sims v Livesay 970 F2d 1575 (Cir 6 1992) 26*

*Smith v Murray 477 US 527 (1986) 31*

*Smith V Robbins 528 259 (2000) 31*

*Strickland v Washington 466 US 668 (1984) 10, 11, 18, 20, 30, 31*

*Strickler v Greene 527 US 263 (1999)*

*Townes v Smith 395 F3d 251 (Cir 6 2006) 24*

*Youngblood v West Virginia 126 SCt 2188 (2006)*              4, 7

## STATEMENT OF APPELLATE JURISDICTION

Defendant was denied in the Michigan Court of Appeals on 6-19-12, in case number 303252.  The Michigan Supreme Court denied leave to appeal on 12-26-12, in case number 145738.  Therefore this court has jurisdiciton to hear this cause under MCR 6.500.

## STATEMENT OF QUESTIONS PRESENTED

I.   WAS DEFENDANT DENIED THE RIGHT TO A FAIR TRIAL WHEN THE PROSECUTOR COMMITTED BRADY VIOLATION IN FAILING TO NOTIFY HIM THAT THE ONLY EVIDENCE LINKING HIM TO THE CRIME COULD HAVE BEEN TAINTED OR OTHERWISE COMPROMISED WHEN IT WAS AT THE DETROIT POLICE CRIME LAB

The Defendant Answers: YES
The Prosecution Answers: DID NOT ANSWER

II.   IS DEFENDANT ENTITLED TO REVERSAL DUE TO INEFFECTIVE ASSISTANCE WHERE TRIAL COUNSEL REQUESTED FUNDS TO HIRE AN INDEPENDENT DNA EXPERT BUT AFTER THE FUNDS WERE GRANTED, HE NEVER HIRED AN EXPERT, AND COULD NOT MEET THE PROSECUTORS CASE WHICH WAS BASED SOLELY ON DNA

The Defendant Answers: YES
The Prosecution Answers: DID NOT ANSWER

III.   IS DEFENDANT ENTITLED TO REVERSAL WHERE DUE TO INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHERE COUNSEL EXPRESSED SATISFACTION AND FAILED TO OBJECT WHEN THE TRIAL COURT MODIFIED THE ADVERSE INFERENCE INSTRUCTION

The Defendant Answers: YES
The Prosecution Answers: DID NOT ANSWER

IV.   IS DEFENDANT ENTITLED TO REVERSAL WHERE TRIAL COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO INVESTIGATE AFTER DEFENDANT TOLD HIM HE DID NOT OWN A GOLD CAR WHICH A WITNESS SAID SHE SAW ON THE NIGHT OF THE CRIME

The Defendant Answers: YES
The Prosecution Answers: DID NOT ANSWER

V)   WAS APPELLATE COUNSEL DEFICIENT FOR FAILING TO PRESERVE THE OPPORTUNITY FOR ORAL ARGUMENTS, FOR FAILING TO FORWARD RESPONSE BRIEF TO MR DANTZLER IN A TIMELY MANNER, AND FOR FAILING TO RAISE A REVERSIBLE ISSUE ON APPEAL

The Defendant Answers: YES
The Prosecution Answers: DID NOT ANSWER

iii

VI    IS DEFENDANT ENTITLED TO REVIEW OF ISSUES TWO THREE AND FOUR
      WHERE CAUSE FOR FAILURE TO PRESENT THEM IN A PRIOR APPEAL
      WAS DUE TO THE INEFFECTIVE ASSISTANCE OF COUNSEL

      The Defendant Answers: YES
      The Prosecution Answers: DID NOT ANSWER

VII.  IS DEFENDANT ENTITLED TO REVIEW OF ISSUES ONE AND FIVE
      WITHOUT A SHOWING OF CAUSE AND PREJUDICE UNDER MCR 6.508(D)
      WHERE THE FACTUAL BASES FOR THE CLAIMS WERE NOT AVAILABLE TO
      THE DEFENDANT UNTIL ALMOST FIVE MONTHS AFTER HE HAD ALREADY
      FILED HIS APPELLATE BRIEF

      The Defendant Answers: YES
      The Prosecution Answers: DID NOT ANSWER

iv

## STATEMENT OF FACTS

Defendant Samuel Dantzler was convicted of felony murder in the Wayne County Circuit Court and sentenced to life without the possibility of parole, before the Honorable Gregory Bill, in docket number 10-3521-01.

During trial it was developed that Bernard Hill was attacked and killed in an apartment he shared with Nikitta Mckenzie. (TT, 12-16-10 p 165, 172; APP, 22-23)[1]. On the night of the crime, Janet Burt was home at 12-1 am when someone banged on the door. She did not answer the door but she looked out to see a man named Rodney Turner and the defendant's son. She saw a car she recognized as belonging to the defendant. (TT 12-16-10 p 75, 78; APP 14, 15)

Later that night several men broke into Hill's apratment and beat his with golf clubs before ultimately shooting him to death. (TT 12-16-10 p 75, 78; APP 14, 15). One of the attackers left a black hat in the apartment, which was recovered by the Detroit Police. The hat was taken to the Detroit Police Crime Lab where forensic biologist Chris Steary examined it for signs of visible blood and then took cuttings from the hat for DNA testing. Steary sent the cuttings to a firm in Lorton Virginia called Bode Technology, for testing. (TT 12-16-10 p 112, 117; APP 17-18). While testifying Steary noted that the file jacket, which would contain the chain of custody document was not with

---

[1]     All documents cited in support of this motion are catalogued in the attached appendix including referenced transcript pages. For ease of reference, pages contained in the appendix have been numbered independently of the documents from which they came. For instance the notation (TT, 12-16-10 p 165, 172; APP, 22-23), signifies that pages 165 and 172 are from the hearing held on 12-16-10, appear in the appendix at pages 22 and 23 respectively.

1

the evidence.   (TT 12-16-10 122-123; APP 19-20).

The testing conducted by Bode Technology showed that defendant's DNA profile matched a DNA profile found on the hat left at the scene of the crime.   The profile of the victim also was found on the hat along with partial profiles for at least two other people.   (TT 12-20-10 pp 37, 82, 84; APP, 27, 37, 38).

Before trial, defense counsel asked the Trial Court to provide funds so that Defendant Dantzler could hire an independent expert to evaluate the DNA evidence.   The Trial Court granted funds.   (APP, 68-70).   Trial Counsel tried to hire an expert who had a fee of 2500 dollars for testimony, and the Judge said her price was exorbitant and refused to pay the 2500 dollars a day, but indicated that he had no problem with paying more reasonable fees.   (TT 12-14-10 p 7; APP 6).   Trial counsel never tried to hire anyone else.   The DNA evidence was the only evidence linking Defendant to the crime and the prosecutor argued that it proved his guilt.   (TT 12-21-10 pp 191-192; APP 44-45).

A vial of blood and fingernail clippings were also from the victim.   These were stored at the Wayne County Medical Examiners Office on 1-16-06.   Officer David Moore later retrieved the vial of blood but not the fingernail clippings.   The clippings were destroyed on 10-19-09.   (TT 12-15-10 p105; APP 10).

At trial, defense counsel requested an adverse inference instruction be given since the state had destroyed the fingernail clippings.   The trial judge agreed to give the instruction but modified it, removing the permissive inference.   Defense counsel did not object.   (TT 12-22-10 p 12; APP 51).   After Defendant was

2

convicted and had already filed an appellate brief with the
Michigan Court of Appeals, the prosecutor sent defendant a notice
explaining that there were serious concerns with the Detroit
Crime Lab resulting in its closure, and requiring a review of all
cases involving forensic evidence.  The notice came almost five
months after Defendant had filed his appeals brief.  Defendant
wrote to his lawyer asking if a claim could be raised using the
new evidence, and counsel refused to raise the claim.  (APP, 110-
111).

ISSUE I

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL WHEN THE PROSECUTOR COMMITED A *BRADY* VIOLATION IN FAILING TO NOTIFY HIM THAT THE ONLY EVIDENCE LINKING HIM TO THE CRIME COULD HAVE BEEN TAINTED OR OTHERWISE COMPROMISED WHEN IT WAS AT THE DETROIT POLICE CRIME LAB

The only evidence against defendant Dantzler was a black hat found at the crime scene. Forensic analysis determined that defendant's DNA was on the hat. (TT, 12-20-10 p 46; APP, 29). At least two other incomplete DNA profiles were on the hat. (TT, 12-20-10 p 38; APP, 28). After defendant had already been convicted of murder, sent to prison, and filed an appellate brief, the prosecutor mailed defendant a notice explaining that the Detroit Crime Lab suffered deficiencies so serious that all cases involving forensic evidence, which had passed through that lab, needed to be reviewed. (See Notice, App, 71). The prosecutor was aware of the concern before trial. Failure to disclose the problems, which could have been used to impeach the States evidence, or even have it suppressed, violated defendant's right to a fair trial. *Brady v Maryland* 373 US 83 (1963). The standard of review is de novo. *Youngblood v West Virginia*, 126 SCt 2188 (2006). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that the evidence must have been suppressed by the State, either willfully or inadvertently, and prejudice must have ensued." *Strickler v Greene*, 527 US 263, 281-282 (1999).

### THE WITHHELD EVIDENCE DIRECTLY IMPEACHES THE INTEGRITY OF THE STATES DNA EVIDENCE

On October 28, 2008, the Michigan State Police issued a

4

report detailing it's audit of the Detroit Crime Lab.  The myriad
deficiencies found caused closure of the entire lab.

Administrative practices in the lab were found to be
substandard; "90%of the case file jackets failed to contain a
property receipt ... Without a property receipt, the chain of
custody is broken and the integrity of the evidence is
compromised." (See Audit pg 12; APP, 84).

Evidence control was substandard.  Firearms evidence was
"laid about in the unit unsecured and unprotected from possible
loss and contamination." (Audit p 18; APP, 90).

Access to evidence was not restricted.  Evidence "overflows
into the office and work space areas, potentially compromising
it's integrity." (Audit P 19; APP, 91).

Though the firearms unit was the primary target of the
audit, the forensic lab in general "was found to be in non-
compliance with 66 of the 101 applicable criteria upon which they
were inspected. (Audit p 3; APP, 75).  It was concluded that "If
the quality system is failing in one forensic discipline it is
highly likely to be an indicator of a systemic problem that
affects other forensic discipines within that laboratory system
as well." (Audit, 4; APP, 76).

According to the notice which the prosecutor sent to
Defendant Dantzler, the evidentiary concern extended in general,
to "convictions involving forensic evidence. (See notice at APP,
71).  Additionally, the State Appellate Defenders office began
reviewing cases that used "evidence from the Detroit Police Crime
Lab such as DNA, fingerprints, ballistics, gunshot residue,

5

etc..."See letter to Darius Haynes, APP, 72).

Considering the above, the fact that DNA evidence was even stored at the crime lab in Detroit raises questions about its integrity.  The prosecutors notice flatly dismisses any concern "because there was no forensic evidence tested by the Detroit Police Crime Lab.  (Notice, APP, 71).  But, the premise for this dismissal, in addition to being wrong, oversimplifies the issue. Chris Steary examined the hat for visible blood and took cuttings from it.  (TT, 12-16-10, p 112, 117; APP, 17, 18).  The audit report says that case files had no property receipt and this compromised the integrity of the evidence.  (Audit p 12; APP. 84).  The DNA evidence presented at defendant's trial could have been impeached on this ground alone, had defense counsel been made aware.  According to witness Chris Steary, the entire file jacket was not with the evidence.  And, the chain of custody document would have been in the file jacket.  (TT, 12-16-10, p 122-123; APP, 19-20).  Given the finding in the audit report, the integrity of the evidence was compromised and impeachable.

Furthermore, the practice of allowing evidence to be "laid about in the unit unsecured and unprotected from loss and contamination" was additional grounds for impeachment.  (Audit p 8 APP, 80).  Finally, the practice of having access to evidence unrestricted and overflowing into workspace areas "potentially compromising its integrity," was grounds for impeachment.  (Audit p 19; APP 91).

The fact that the DNA evidence was ever stored in the Detroit Crime Lab with such negligent practices raises the

6

question of contamination. Had it been contaminated the tests results would no longer be reliable. This fact was acknowledged by Chris Steary, a forensic analyst at the Detroit Crime Lab. (TT, 12-16-10, p 129, APP, 21) The conditions at the crime lab make the test results at least highly questionable, and impeachable.

The evidence was suppressed by the state willfully or inadvertently. The government had the evidence and never said anything. The Wayne County Prosecutors Office showed awareness that the problems in the crime lab might extend to DNA evidence, in this case, in April of 2012. (Notice, APP, 71). The fact that defendant's trial was over and his appeal brief filed by this time is not dispositive. The Detroit Police knew about it the whole time because it was their crime lab. "[A]nd Brady suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor." *Youngblood supra* 126 SCt at 2190.

DEFENDANT DANTZLER WAS PREJUDICED BY THE *BRADY* VIOLATION

In a *Brady* claim prejudice means "whether we can be confident that the jury's verdict would have been the same." *Kyles v Whitley* 115 SCt 1555, 1575 (1995). A defendant need not show that he "would more likely than not have received a different verdict wih the evidence[.]" Id. at SCt 1566. Instead, the Court in *Kyles* looked to all of the favorable conclusions that the jury would have been entitled to draw using the suppressed evidence. If these conclusions might, within the bounds of reasonable probability support acquittal, relief must

issue. "Since all of these possible findings were precluded by the prosecutions failure to disclose the evidence that would have supported them," fairness renders irrelevant the fact that grounds for conviction may also exist within co-equal bounds of reason. *Id* SCt 1575.

In the present case, the suppressed impeachment evidence would have entitled the jury to believe:

1) Quality control at the Detroit Police Crime lab was poor.

2) The Hat was stored at the lab.

3) The file jacket containing the property receipt was not kept with the evidence. Therefore, under the standards identified by the Audit report, the evidence was unreliable.

4) The analysts at bode technology tested evidence that may have already been compromised at the Detroit Police Crime Lab, and the Bode results were not adequate grounds for conviction.

These beliefs, based on the suppressed evidence could support a conclusion that the inability to generate complete profiles for all of the DNA found on the hat, was due to the poor handling of the evidence; evidence that someone else wore the hat could have been destroyed by police and defendant might not have been the person wearing the hat when the victim snatched it from his attackers head.

These conclusions are all the more likely when considered in conjunction with the testimony detailing the police investigators negligent handling of the fingernail clippings; and testimony of how they actually did compromise the DNA evidence on the hat.

8

Charles Clark testified that police officer Gerald Stewart physically handled the hat, and due to this contamination, Stewart also had to be tested to see if his DNA profile was on the hat. (TT, 12-21-10 p 19; APP, 40).. And, Chris Steary actually did work with the evidence at the crime lab. He examined it for visible blood and he took cuttings from it to be tested later. (TT, 12-16-10 p 112, 117; APP, 17-18).

As the evidence stood, DNA evidence put defendant's head squarely in the hat and the hat squarely at the crime scene. No one else was put there, because no other complete profiles could be developed. Without the suppressed evidence, there was no explanation as to how these facts and defendant's innocence could be reconciled. As far as the jury knew, the partial profiles could have belonged to defendant, the victim or officer Gerald Stewart. The trial was unfair. Impeachment of the DNA evidence would have left the prosecution with no case, making acquittal reasonably probable. Defendant is entitled to reversal.

ISSUE II

DEFENDANT IS ENTITLED TO REVERSAL DUE TO INEFFECTIVE ASSISTANCE
OF TRIAL COUNSEL WHERE COUNSEL REQUESTED FUNDS TO HIRE AN
INDEPENDENT DNA EXPERT, BUT AFTER THE FINDS WERE GRANTED HE
NEVER HIRED AN EXPERT BECAUSE HE MISTAKENLY BELIEVED THAT FUNDS
HAD BEEN DENIED AND HE COULD NOT MEET THE PROSECUTORS CASE WHICH
RELIED SOLELY ON THE DNA EVIDENCE

Defendant Dantzler was convicted based on his DNA being
found in a hat which was found at the crime scene and, which, in
turn, was identified as belonging to one of the victims
attackers. The DNA profiles of at least two other people were
found in the hat, but, they were incomplete profiles, unsuitable
for identifying anyone. (TT, 12-20-10, pp. 48, 50; Appendix
(App) pp. 31, 32). Trial counsel requested, and was granted,
funds to test other areas of the hat to see if complete profiles
could be generated for the donors who had incomplete profiles.
(See Orders for the appointment of an independent expert. App 68-
70). Counsel talked to one expert, but the trial judge said her
price was exorbitant, and counsel never tried to hire anyone
else.

Using the uncontested DNA evidence from the hat as the
centerpiece of his case, the prosecution convicted defendant of
murder. Trial counsels failure to investigate (i.e., have the
DNA analyzed by an independent expert) constitutes ineffective
assistance of counsel. *Hinton v Alabama*, 134 SCT 1081 (2014).

STANDARD OF REVIEW:

The standard of review for ineffective assistance claims
based on a failure to investigate is de novo. *Strickland v
Washington*, 466 US 668; 104 SCt 2052; 80 LEd2d 674 (1984).

Under the Sixth Amendment to the U.S. Constitution a

10

criminal defendant is entitled to the effective assistance of counsel. *Strickland supra.* Where a defendant claims that he is convicted in violation of this right, he must show that trial counsel performed deficiently, and that his deficient performance prejudiced the defense. "The benchmark for any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at SCt 2046. A presumption of effectiveness, which attaches to conduct of counsel, must be overcome by a defendant aggrieved by the actions of his attorney; "that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id..* There are no strict guidelines or mechanical rules to test the soundness of counsel's actions. Instead, a defendant must show that counsel's actions were objectively unreasonable "under prevailing professional norms". *Id.* Such "norms" may be identified by reference to a wide range of sources such as extant bar standards and case law governing the claim.

PREVAILING PROFESSIONAL NORMS

"Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial at trial or both." *Harrington v Richter*, 131 SCt 770, 789 (2011). In *Hinton*, the Court elaborated that such a case arises where forensic analysis is "the core of the prosecutors case ... and effectively rebutting that case required a competent expert on

11

the defense side." *Id* SCt 1089.

In *Hinton*, defense counsel hired an expert whom he recognized "was not a good expert [.]" Because counsel labored under a mistaken belief that the law only allowed $1,000.00 to hire an expert and no good expert would work for that price. The Court found that "[t]he only inadequate assistance of counsel here was the inexcusable mistake of law-- the unreasonable failure to understand the resources that state law made available to him-- that caused counsel to employ an expert he himself deemed inadequate." *Id*. SCt 1090.

### DEFICIENT PERFORMANCE

Defendant Dantzler's trial counsel understood that he needed an expert, but he never got one. He told the Trial Court: "I understand how important this particular evidence is to the prosecution **** The DNA evidence is the only evidence they have in the case against Mr. Dantzler." (Hearing, 9-9-10, pp. 2, 5; App 1-2). When the trial Judge questioned counsel about speedy trial concerns, counsel stated: "No we are not arguing the 180 days. We need our expert." (Hearing, 9-9-10, p 10; App 3). At a later heaing, Counsel informed the Court that he had a DNA expert. (Hearing, 9-17-10, p 12; App 5). On the first day of trial, counsel did not have a DNA expert.

Initially, he argued that this failing was because the trial Court and the chief judge had denied funding for an expert. The trial Judge quickly dispelled this mistaken notion, stating that he had no problems with her hourly fee but her $2,500.00 per day retainer was exorbitant. As the trial was underway, counsel

12

informed the court that his expert wanted the retainer, or "she wont be here."  Counsel went on to inform the court that even as late as the first day of trial, his DNA expert "never brought any results or indicated she did anything."  (TT, 12-14-10, pp 7-9; APP, 6-8).

Several points emerge from the above sequence of events, which inexorably lead to the conclusion that counsel's performance was deficient:

1)   Counsel knew he needed an expert.

2)   The court gave him the money to get one.

3)   He tried to hire an expensive expert, but when he could not get her he stopped looking for an expert.  (This is eviddent by his comment that she wanted the retainer "or she wont be here").

4)   Counsel argued a mistaken belief that the trial Court had denied funding, and was quickly corrected.  The Court even felt a need for further clarification and read one of the two orders, by which he had granted funding, into the record.  (TT12-20-10, p 138; APP, 39).

5)   Most egregious of all, at the 11th hour, when trial had already began, counsel admitted that his expert, "never brought any results or indicated she did anything."  See supra.

Trial counsel's deficiencies, herein, were even worse than those of the attorney in *Hinton supra*.  In *Hinton* Counsel labored under a mistaken belief about the amount of money he could spend for an expert.  But he at least took that and hired an expert who

13

had only one eye, and had not been to school since 1933. *Id* at SCt 1086

In the present case, counsel did not know how much money was available (he thought funds were denied; he waited until the first day of trial to complain; and, the person he wanted, could not testify anyway because she had not done any work (the record does not indicate that she was ever given any material to work with).

PREJUDICE

On the fourth day of trial defendant Dantzler spoke to the Court about not having an expert:

> "My issue is ever since I been locked up I've been saying I wanted to have this hat tested by my-- you know, somebody for my side. And you know, we done get this far and the hat still hasn't been tested for me. Because I'm just going by the word of the prosecution that my DNA is inside this hat and also it could be more people inside this hat other than me and I wanted the hat tested [.]" (TT, 12-20-10, p2; APP, 24).

After this statement, defense counsel, Kinney, told the Court that he, essentially, intended to argue to the jury that the prosecutor had so much money and, he, so little, that he could not be expected to effectively confront the prosecutions well paid experts and that the experts financial incentives somehow made their lab results untrustworthy: "Part of my examination was going to be in terms of how much Bode was being paid for this particular case. ****** Right now the regular court appointed fees for experts is two hundred for evaluations and a hundred fifty for testimony in court[.]" (TT, 12-20-10, p68; APP, 35).

This spur of the moment plan ran into many obstacles: First

14

of all, it was the fourth day of trial. No one had answers for defense counsel. When counsel asked the prosecutor about the contract with and payments to the state experts, the prosecutor responded: "I have no idea." When pressed further on the issue, the prosecutor responded: "[T]hey should have asked for this a long time ago. they knew bode was going to testify. But, in the middle of trial, when the witness is up on the witness stand, to say, well, we want this, we want this." (TT 12-20-10, p 71; APP, 36).

Under these circumstances -- no expert, no contract information, the fourth day of trial, the states expert on the witness stand explaining the evidence-- there was simply no way to meet the DNA evidence. Also the pricing information that was available did nothing to impugn or challenge the integrity of the prosecutors results. Defense counsel was floundering, he had just cobbled something together at the last minute, because he did not hire anyone to help him understand the evidence. "Constitutionally effective counsel must develop strategy in the true sense-- not what bears a false label of strategy-- based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of a full investigation." *Ramonez v Berghuis* 490 F3d 482, 489 (Cir 6 2007). The only way to investigate the DNA evidence, in this case, was to hire an expert.

PROBABLE FINDINGS IF THE HAT WERE TESTED BY DEFENSE EXPERTS

1) Complete DNA profiles could have been generated for at least two other people who wore the hat.

15

2)   These other people could have been shown to have links to the crime.

### 1) GENERATING ADDITIONAL DNA PROFILES

Forensic biologist, Chris Steary, testified that someone else's DNA might be found in places where the hat was not tested, and most of the hat was not tested. (TT, 12-16-10, pp. 129; APP, 21). Later, additional cuttings from the hat were tested. All of these cuttings yeilded partial profiles with a mixture of at least two or more people. In the first additional cutting, defendant was not included or excluded as the minor donor. In the other two additional cuttings, defendant was not identified as a donor, although he could not be conclusively excluded. (TT 12-20-10, p 37, 46, 47, 50-52; APP, 27, 29, 30, 32-34).

The unidentified, partial profile, donors could have been anyone. And at least one of them was not defendant Dantzler. More genetic material was on the hat. Further testing most probably would have identified someone else as wearing the hat because their DNA was in it. But, the expense of more testing by the state was prohibitive. (TT, 12-16-10, 128-129: APP, 21).

### PROBABILITY OF LINKING OTHER PROFILES TO THE CRIME

The prosecutors expert knew that at least two other people probably wore the hat, but could not say how many or even the gender. (TT, 12-20-10, pp 37, 82, 84; APP, 27, 37, 38).

Janet Burt, the victims mother, testified that on the night of the crime, she did not see defendant, but she saw his car with several heads in it. She did see defendant's son and a man named Rodney Turner. (TT, 12-16-10, pp. 75, 78; APP, 14, 15).

Nikitta Mckenzie testified that six men, dressed in black, wearing hats, entered her home and attacked the victim. Yet, she had never seen or spoken to defendant. (TT, 12-16-10, pp. 165, 172; APP, 22-23).

Based upon the foregoing, it is reasonable to conclude that further testing could have identified who the partial profiles belonged to. According to eyewitness Mckenzie, any one of at least six people could have been wearing the hat. That coupled with at least two unidentified DNA profiles, opens the possibility of finding other reasonable suspects, outside of defendant.

Defendant put forth an alibi defense, had defense counsel conclusively shown that other people had been wearing the hat, the jury could have easily found reasonable doubt.

As it stands, the only person conclusively shown to have ever worn the hat was defendant Dantzler. The prosecutor used this fact to devastating effect. He argued: "[T]his was the cap that Sam Dantzler was wearing that night[.]  [T]he cap got knocked off and it got left there.  **** We solved the case using this hat[.] **** He was in that apartment, and he left his hat there in that apartment." (TT, 12-21-10, pgs 191-192; APP, 44-45). He further argued: "Based on this hat with his DNA in it Mr. Dantzler ... [is] *** guilty of first degree felony murder. (TT, 12-21-10, p 198; APP, 47). Defense counsel was unprepared to meet these powerful science based arguments. Without forensic evidence to tell them differently, the jury was left with no basis to conclude that anyone else, who might have been connected

17

with the crime, had ever worn the hat. They could speculate about the other partial profiles but those could easily have belonged to defendant and the victim. The only concrete evidence that they had about someone wearing the hat was defendant's complete DNA profile.

In summary, defense counsel was ineffective where he mistakenly thought funding was denied; waited until the first day of trial to complain about the perceived denial; waited until the fourth day of trial to start asking about pricing and contract information for the prosecutors experts, and; failed to take the trial Court up on the offer to find a more reasonably priced expert. All of these factors led to defendant's conviction based on the only piece of evidence the prosecutor had against him. The adversarial process cannot be said to have functioned properly when the prosecutor was arguing science and defense counsel was complaining to the jury that he did not have enough money to challenge the prosecutors scientific arguments. The money to hire an expert was there. Trial counsel, unreasonably, did not know it. Under *Strickland supra*, as applied in *Hinton supra*, counsel was ineffective. Reversal must issue.

ISSUE III

DEFENDANT IS ENTITLED TO REVERSAL DUE TO INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHERE COUNSEL EXPRESSED SATISFACTION AND FAILED TO OBJECT WHEN THE TRIAL COURT MODIFIED THE ADVERSE INFERENCE INSTRUCTION

During trial it was developed that on 1-16-06, fingernail clippings and a vial of blood were taken from the victim and stored at the Wayne County Medical Examiners Office. Sgt David Moore of the Detroit Police Department, picked up the vial of blood but not the nail clippings. On 10-19-09, The medical examiners office threw the clippings away. (TT, 12-15-10, p. 105; APP, 10).

The clippings were important because there was no direct evidence linking Defendant Dantzler to the crime. The Prosecutor theorized that the victim fought with his atackers and managed to snatch off one of their hats. (TT, 12-21-10, p 194; APP, 46). Therefore, defense counsel argued that the DNA of whomever was wearing the hat would most likely be under the nails of the victim. (TT, 12-21-10, p 201; APP, 48).

Since the evidence was destroyed defense counsel urged the Court to give the adverse inference instruction CJI 2d 5.12. The proposed instruction would have read:

> The fingernail clippings from Bernard Hill's autopsy are missing evidence whose production was the responsibility of the prosecution. [TT, 12-22-10 p 28; APP, 59] "You may infer that this [evidence] would have been unfavorable to the prosecution's case." *CJI 2d 5.12*.

The Trial Court agreed that under the circumstance the instruction was appropriate. But, the Court indicated that he was going to change the words "you may infer that " and replace them with the words "you may consider whether". (TT, 12-22-10, p 12; APP, 51).

19

Trial counsel failed to object, leaving the instruction to read:

> "The fingernail clippings from Bernard Hill's autopsy are missing evidence whose production was the responsibility of the prosecution. You may consider whether this evidence would have been unfavorable to the prosecutors case and favorable to the Defendant's case." (TT, 12 22 10, p 28; APP, 59)

This instruction stripped the defendant of his ability to meet the prosecutors case. Defense counsel was inefective in failing to object to the Trial Court modifications to the instruction. The **standard of review** for ineffective assistance of counsel is de novo. *Strickland v Washington*, 466 US 668; 104 SCt 2052; 80 LEd2d 674 (1984). To make out a claim of ineffective assistance, a defendant must show that his counsel rendered deficient performance under prevailing professional norms and he must show prejudice resulting from that deficient performance. *Strickland supra.*

## DEFICIENT PERFORMANCE

Under prevailing professional norms Defendant was entitled to the instruction. Entitlement to the instruction requires a showing that the evidence was unavailable consequent to a failure of police to exercise due diligence. *People v Demeyers* 183 Mich App 286, 293 (1990). A finding of good faith is precluded where a lack of due diligence is made out. *People v Dye* 431 Mich 58 (1988). "The test for due diligence is one of reasonableness, whether diligent good faith efforts were made to procure it" *People v Bean* 452 Mich 677, 684 (1998).

## ABSENCE OF DUE DILIGENCE

In the present case, the nail clippings were left at the medical examiners office for years. They were collected on 1-16-

20

06, and destroyed on 10-19-09. (TT, 12-15-10, pp. 105, 107; APP, 10, 11). The clippings and the blood sample from the victim were stored in the same place. (TT, 12-20-10, p 26; APP, 26) SGT David Moore picked up the blood sample but not the nail clippings. No one could say if Moore asked about the nail clippings when he got the blood; No one could say for sure when the police finally asked for the clippings, It could have been either in November or 2009 or else it might have been in December of 2009. But, they were destroyed by then. (TT,12-20-10, pp 25, 26, 48; APP, 25-26, 31). The prosecutor conceded that negligence caused destruction of the potentially vital evidence. (TT, 12-22-10, p. 8; APP, 50). Accordingly, due to the lack of due diligence, defendant was entitled to the instruction without modifications. Failure to object the the changes was deficient performance.

## PREJUDICE

The **standard of review** for instructional error is de novo. *Cupp v Naughten* 414 US 141 (1973). Where instructional error is claimed, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." The question, then, must be "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id* 146-147.

## THE MODIFIED INSTRUCTION AFFECTED THE FAIRNESS OF THE ENTIRE TRIAL

As noted, the fingernail clippings had never been tested. No one knew if there was actually any DNA evidence under the nails. There was no testimony, nor any other indication that DNA evidence, exculpatory or otherwise, existed under the victims

21

nails. Without the ability to infer, or presume, the existence of this evidence, the jury was left with no object upon which to base a conclusion, regarding the favorability of the nails.

## FULL CONTEXT OF THE INSTRUCTION

Relative to evidence, the Court told the jury: "Evidence includes only the sworn testimony of the witnesses, the exhibits admitted into evidence and anything else I told you to consider as evidence *** the lawyers statements and arguments are not evidence. (TT, 12-22-10, p 23; APP, 54). "You should only accept things the lawyers say that are supported by the evidence." (TT, 12-22-10, p. 24; 55).

## UNFAIRNESS INFECTING THE ENTIRE TRIAL

The problem with the modified instruction, when considered in the context of the overall charge is that any DNA evidence under the nail clippings was potential, not actual. Since the nails were destroyed before they could be tested, potentially exculpatory evidence existed only in the arguments of defense counsel. (TT, 12-21-10, p 202; APP, 49). It was not established by testimony; it did not exist in the exhibits admitted as evidence; the jury was not told that they could presume that the untested nails contained DNA. And, they were specifically told that the arguments of counsel are not evidence. They were also told to only accept things said by the attorneys that are supported by evidence. Defense counsel's argument that the nails held exculpatory evidence was not supported by any evidence at all. Therefore modificatiton of the instruction, removed Defendant's ability to rely on the potential for the evidence to

be favorable and to hold the State responsible for failing to preserve it.

The clippings were taken under the assumption that the DNA of whoever the victim struggled with might be found under his nails. (TT, 12-22-10, p. 24; APP, 55). Had the jury been allowed to infer that the destroyed clippings held evidence unfavorable to the prosecutors case, only one reasonable chain of logic could be followed:   DNA was under the victims nails; success of the prosecutors case requires it to belong to the defendant; it did not belong to the defendant; therefore the person with whom the victim struggled (who was wearing the hat) was not the defendant.

The permissible inference could have decided the entire case. The modified instruction allowed the jury to consider the clippings, but not to infer the existence of DNA underneath them. In their untested state, the clippings could not negatively impact the prosecutors case.   There was nothing to consider.   The modification rendered the instruction superfluous.   Defense counsel's failure to object was ineffective.

23

ISSUE IV

DEFENDANT IS ENTITLED TO REVERSAL WHERE TRIAL COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO INVESTIGATE AFTER DEFENDANT TOLD HIM HE DID NOT OWN A GOLD CAR WHICH A WITNESS SAID SHE SAW ON THE NIGHT OF THE CRIME

At trial, janet Burt testified that she was the mother of the victim, Bernard Hill. On the day that Hill was killed someone banged on her door at around 12-1 am. She looked out and saw a man named Rodney Turner and defendant's son. She assumed that they were looking for her son, Bernard Hill. She also saw defendant's car outside, with several heads in it. She neither saw nor spoke to defendant Dantzler. (TT, 12-16-10, pp 66, 75, 77, 78, 82; APP, 12-16). At trial defendant testified that he had sold the car, seen by Burt, to his Brother in law a year prior to the date of the crime. He did not own the car and he had not driven it since the sale. (TT, 12-21-10, p 107-108; APP, 41, 42). Before trial defendant informed his attorney that he had long since sold the car and did not own it on the day that it was seen by Burt. He asked trial counsel to contact the Department of Motor Vehicles, and Stephen Jennings, who bought the car, to verify when the title was transferred, but counsel never did. (See Affidavit of Stephen Jennings; APP, 145). Defense counsel was ineffective.

<u>STANDARD OF REVIEW</u>

Under current legal standards, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. "The duty to investigate derives from counsel's basic function, which is to make the adversarial process work. *Townes v Smith* 395 F3d 251

24

(Cir 6 2005). Adequate investigation entails investigating all witnesses who may have information concerning the client's guilt. Counsel's failure to call a witness in the absence of full investigation into whether that witness can assist the defense cannot be called reasonable trial strategy. *Id.* 258-59.

In *People v Grant* 470 Mich 477 (2004), the Court expounded the standard for determining if a failure to investigate results in violation of the right to effective counsel. *Grant* was accused of CSC in which he severely injured the victim. She suffered a tear from the rear of her vagina to the opening of her anus. She told her family and the treating doctor that she hurt herself in a bicycle accident. A year later she was examined by another doctor and she claimed that the defendant told her to fabricate a story about a bicycle accident to cover his misdeeds. *Id.* 481. Defense counsel had a copy of the reports prepared by both doctors, and a list of twelve witnesses to interview about the bike accident. *Id..* 482. After interviewing two or three witnesses, none of whom had seen the accident, counsel's investigators stopped interviewing. *Id..*

Counsel went to trial with a theory that the defendant did not commit the crimes, the injury was due to a bike accident, and the girl was a habitual liar. After defendant had been convicted, counsel learned of eyewitnesses to the bicycle accident. *Id.*

In finding counsel ineffective due to his deficient investigation, the Court ruled "counsel did not interview half of the people whom the defendant had identified as potentially

25

having helpful information.   He did not know what testimony these witnesses would give.   He did not know where they had been or what they had seen."   *Id* at 493.   Since counsel uncovered no substantial evidence as to the cause of the victims injury, his investigation was incomplete.   *Ibid.*.

In the present case, defendant Dantzler told trial counsel that Stephen Jennings could testify that Defendant did not own the car, and DMV records would support the testimony.   (See Defendant's Affidavit APP, 146).   Trial counsel never tried to contact the DMV to show the jury that defendant was not the owner of the car seen by the victims mother.

In closing arguments, the prosecution argued:   "It's important she saw a gold car... So the gold car is key."   (TT, 12-21-10, p. 188, APP, 43).   Next he stated "[I]n order to acquit this defendant, what you have to do is say oh yeah, he lent his car to somebody that night."   (TT, 12-21-10, p 192; APP, 45).

Under the circumstances, trial "counsel's failure to investigate key evidence may not be excused..."   *Sims v Livesay* 970 F2d 1575, 1581 (6 Cir 1992).   Defense counsel's failures amount to a grossly negligent dereliction of his duty to make the adversarial process work.   More effective lawyering probably would have produced a more favorable result.   Defendant is entitled to reversal and retrial due to trial counsel's ineffective assistance.

ISSUE V

APPELLATE COUNSEL WAS DEFICIENT FOR FAILING TO PRESERVE THE
OPPORTUNITY FOR ORAL ARGUMENTS, FOR FAILING TO FORWARD RESPONSE
BRIEF TO MR DANTZLER IN A TIMELY MANNER, AND FOR FAILING TO RAISE
A REVERSIBLE ISSUE ON APPEAL

SUMMARY OF ARGUMENT

First, appellate counsel failed to represent petitioner at a
crucial point in the proceedings by failing to timely file the
defendant's brief, which forfeited defendant's right to oral
argument.

MCR 7.212(A)(4) provides that "any party failing to timely
file and serve a brief required by this rule forfeits the right
to oral argument."

Mr. Neil Leithauser was appointed to represent defendant on
April 7 2011. On or about October 6 2011, Mr. Leithauser filed a
stipulation to extend the time within which to fole defendant's
brief, which the appellate court granted until December 1, 2011.
Thereafter, the Appellate Court issued an involuntary dismissal
warning letter to Mr. Leithauser on December 6, 2011, informing
him that he forfeited oral argument and faced costs and possible
dismissal of defendant's appeal as of right.

The Michigan Appellate Assigned Counsel System, which
appointed Mr. Leithauser to represent Petitioner, conducted an
investigation into this matter and found that appellate counsel
was in violation of MAACS Minimum standard 6, which provides that
"counsel should request oral argument and preserve the right to
oral argument by timely filing defendant's brief on appeal."
(See Letter, APP, 107-109)).

Oral argument is very important because it provides counsel

27

the opportunity to present recent cases to the court respond to the prosecutor's arguments, and to answer the appellate panels questions about the case. Oral argument further offers one final opportunity to persuade the court of the merits of the appeal and the correctness of the appellant's position.

Counsel failed to forward a copy of the prosecutors opposition brief on March 30, 2012. Defendant received a copy through appellate counsel on April 9, 2012. The reply brief was due on April 12, 2012. Clearly not enough time to prepare a reply. Defendant filed a motion for an extension of time, but was denied.

Appellate counsel's deficiency in this matter cost defendant his chance to rebut the prosecutor's argument, a crucial step in the appellate process. The prejudice here is strong and clear.

Third, appellate counsel failed to raise ineffective assistance of trial counsel as an issue in the appelalte court despite the fact that appellate counsel raised the issue of the modified jury instruction having violated defendant's Sixth and Fourteenth Amendment rights when said modification had not been objected to and hence properly preserved by trial counsel.

Trial counsel asked for and was granted an adverse inference jury instruction due to the state's destruction of crucial evidence. The court, however, sua sponte modified, and therefore changed the meaning of the instruction. Instead of objecting, trial counsel thanked the Court.

The amendment to the jury instruction was incorrect. The modification was prejudicial and should have been objected to at

28

trial.  Appellate counsel was ineffective for not raising this issue in defendant's appeal as of right.

ISSUE VI

DEFENDANT IS ENTITLED TO REVIEW OF ISSUES TWO THREE AND FOUR WHERE CAUSE FOR FAILURE TO PRESENT THEM IN A PRIOR APPEAL WAS DUE TO THE INEFFECTIVE ASSISTANCE OF COUNSEL.

The standard for grant of relief in a post-conviction proceeding is found in Michigan Court Rule (MCR) 6.500. The Court may not grant a motion for relief from judgment under MCR 6.500 if the motion:

(3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates

(a) good cause for failure to raise such grounds on appeal in the prior motion, and

(b) actual prejudice from the alleged irregularities that support the claim for relief. As use in this subrule, "actual prejudice means that

(i) in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal;

*************************************

The court may waive the "good cause requirement of subrule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime." MCR 6.508(D).

Issues two, three and four non-jurisdictional and could have been raised on direct appeal, therefore, they are subject to the cause and prejudice requirements noted above. In *People v Reed* 449 Mich 375; 535 NW2d 496 (1995), a majority of the Court agreed that a defendant proceeding under MCR 6.500 may establish cause by demonstrating that his appellate counsel provided ineffective assistance of counsel, under the standard of *Strickland v Washington* 466 US 668; 104 SCt 2052; 80 LEd2d 674 (1984), see *Reed* at 378. This principle was reaffirmed in *People v Kimble*

30

479 Mich 305 (2004), where the Court ruled that the defendant could make a showing of cause by demonstrating that appellate counsel was deficient. *Id.*

In a first appeal as of right a criminal defendant is entitled to the effective assistance of counsel. *Evitts v Lucey* 469 US 387; 105 SCt 830; 83 LEd2d 821 (1985). Appellate counsel, just as trial counsel, is bound by the *Strickland* standard. *Smith v Murray* 477 US 527; 106 SCT 2661; 91 LEd2d 434 (1986). In order to overcome the presumption that counsel exercised sound appellate strategy, it must be shown that counsel's acts or omissions were objectively unreasonable under prevailing professional norms. See *Strickland* supra. Winnowing out weaker arguments on appeal and focusing on those likely to prevail " ... is the hallmark of effective appellate advocacy." *Smith v Murray* supra at 106 SCt 2662. "Generally, only where the ignored [appellate] issues are clearly stronger than those presented, will the presumption of effective assistance be overcome." *Smith v Robbins* 528 US 259; 120 SCt 746, 765; 145 LEd2d 756 (2000).

## DEFICIENT PERFORMANCE OF APPELLATE COUNSEL

As noted in issue two, defendant's trial counsel mistakenly believed that the trial judge denied funds for the appointment of an independent expert. This was simply not true. The funds were available. (App, 69-70). Based upon trial counsel's mistaken belief, appellate counsel argued that funding for an independent expert was unilaterally denied. (See Appellate brief p 28; App, 136). Appellate counsel's decision to raise an issue that had no record support, and therefore no hope of success, was

unreasonable. The Michigan Supreme Court has held: "Without record evidence supporting the claims, neither the court of appeals nor we have a basis for considering them." *People v Ginther* 390 Mich 436, 443 (1973).

The trial record was replete with evidence that funding for an expert was available. (TT, 12-14-10, p 7-9; APP, 6-7). (TT, 12-20-10, p 138; App, 139)); (Orders for Appointment of Independent Expert; APP, 69-70). Accordingly, appellate counsel was ineffective when he argued that funds were not available, because they were. His performance suffered from the same deficiency shared by the defendant's trial counsel in *Hinton v Alabama* 134 Sct 1081 (2014). "[T]he unreasonable failure to understand the resources that state law made available to him[.]" Id SCt 1090. The claim should have been laid at the feet of trial counsel, as it is in this motion. In failing to do so appellate counsel performed deficiently. The prejudice suffered is detailed in defendant's issue two.

Furthermore, appellate counsel was generally ineffective. He failed to file a timely appellate brief. (MAACS letter to Neil Leithauser p 3; APP, 107-109). MCR 7.212(A)(4), provides that an untimely filing "forfeits the right to oral arguments." Id. "The right to effective assistance of counsel embraces oral arguments on appeal." *Entsminger v Iowa* 386 US 748, 750 (1967). Effective assistance requires an attorney to protect a client's right to oral arguments. Under Michigan's minimum Standards for Indigent Criminal Appellate Defense Services, Minimum Standard 6, "Counsel should request oral argument and preserve the right to

32

oral argument by timely filing the defendant's brief on appeal."
Id.  Appellate counsel's performance on appeal was inarguably
deficient, falling well below many objective standards of
practice.  The prejudice suffered in detailed is Defendant's
attached arguments.

33

ISSUE VII

DEFENDANT IS ENTITLED TO REVIEW OF ISSUES ONE AND ISSUE FIVE
WITHOUT A SHOWING OF CAUSE AND PREJUDICE UNDER MCR 6.508(D) WHERE
THE FACTUAL BASES FOR THE CLAIMS WERE NOT AVAILABLE TO THE
DEFENDANT UNTIL ALMOST FIVE MONTHS AFTER HE HAD ALREADY FILED HIS
APPELLATE BRIEF

Under certain circumstances "it is clear that by its own
terms, the good cause and actual prejudice prerequisites of MCR
6.508(D)(3) need not be satisfied..." *People v Carpentier* 446
Mich 16, 27 (1994).

Defendant Dantzler's issues one and five present such a
circumstance. To mandate a showing of cause and prejudice MCR
6.508(D)(3) requires that the claims be issues that "could have
been raised on appeal..." *Id.*

In his issue five defendant alleges that appellate counsel
rendered ineffective assistance, and therefore this claim was not
available or evident until after the appeals brief was filed.

Defendant's *Brady* claim in issue one was also unavailable
until five months after defendant had already filed his appeals
brief. Defendant's appeals brief was due on December 1, 2011.
It was not filed by appellate counsel until December 27, 2011.
(MACCS Letter to neil Leithauser, p 2; APP 107-109).

Months later, after all of the filing deadlines has long
since expired, the Wayne County Prosecutor sent defendant a
notice explaining that there was a problem with the DNA evidence.
See Notice, App, 71). At this point, there was no avenue for
raising the issue. No evidentiary basis for the claim had been
developed. See *People v Ginther* 390 Mich 436 (1973). And, thus,
the claim could not have been raised on defendant's first appeal
becuase he did not find out about it until it was to late to

34

raise it.

If this Court finds that the claim was available, the failure to raise it was due to ineffective assistance of counsel. As soon as defendant became aware of the *Brady* violation, He asked his attorney if he could raise the issue. (See Defendant's Letter to Counsel; APP, 110). Counsel responed that the issue was not viable because the crime lab sent the material out to be tested. (APP, 111). As fully detailed in issue one, testing practices were not the only problems uncovered by the audit. Appellate counsel failed to consider that the Detroit Police Crime Lab may have compromised the evidence before it was sent out. No appellate strategy can be gleaned from his inaction, only negligence.

The prejudice suffered as a result of the *Brady* violation is fully detailed above. Defendant is entitled to review of his claims and reversal of his conviction.

### RELIEF REQUESTED

Wherefore, Defendant asks this Honorable Court to reverse the convictions herein and issue any other appropriate relief.


I, the undersigned Defendant, swear that the foregoing is accurate to the best of my knowledge.

Samuel Lee Dantzler 518107
Oaks Correctional Facility
CaberFae Highway
Manistee Michigan 49660

Date:9-14-14

35

STATE OF MICHIGAN
IN THE CIRCUIT COURT
FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN
                    Plaintiff


                                        Trial Court No: 10-3521-01


V




SAMUEL LEE DANTZLER
_____Defendant_____/

APPENDIX TO DEFENDANT'S MOTION
FOR RELIEF FROM JUDGMENT

VOLUME ONE PAGES 1-70



APP VOL 1

| INDEX OF DOCUMENT(S) | APPENDIX PG |
|---|---|
| TRANSCRIPT CITATIONS FROM 9-9-10 | 1 |
| TRANSCRIPT CITATIONS FROM 9-17-10 | 4 |
| TRANSCRIPT CITATIONS FROM 12-14-10 | 6 |
| TRANSCRIPT CITATIONS FROM 12-15-10 | 10 |
| TRANSCRIPT CITATIONS FROM 12-16-10 | 12 |
| TRANSCRIPT CITATIONS FROM 12-20-10 | 24 |
| TRANSCRIPT CITATIONS FROM 12-21-10 | 40 |
| TRANSCRIPT CITATIONS FROM 12-22-10 | 50 |
| Order for Appointment of Independent Expert 7-30-10 | 69 |
| Order for Appointment of Independent Expert 11-24-10 | 70 |

SEE VOLUME TWO FOR DOCUMENTS BELOW

| Prosecutions Notice of Brady Violation | 71 |
|---|---|
| SADO Notice to Derrius Haynes of Brady Violation | 72 |
| Audit Report of Detroit Police Crime Lab | 73 |
| MAACS Deficiency Letter to Appellate Counsel | 107 |
| Defendant's Letter asking Counsel to Raise Brady Claim | 110 |
| Counsel's Letter Declining to Raise Brady Claim | 111 |
| Defendant's Brief On Appeal | 112 |
| COA Opinion Affirming Conviction | 139 |
| COA Denial of Reconsideration | 143 |
| Michigan Supreme Court Leave Denial | 144 |
| Affidavit of Stephen Jennings | 145 |
| Affidavit of Defendant Dantzler | 146 |

APP VOL 1

1      **COMPUTER GENERATED INDEX AT THE END OF TRANSCRIPT**

2              Detroit, Michigan

3              September 9, 2010

4              At or about 10:26 a.m.

5              (Court, Counsel and Defendant present.)

6                      *      *      *

7              COURT CLERK:  People versus Samuel Lee Dantzler,

8      circuit court docket 10-3521, before your Honor for

9      pretrial.

10             MR. HUTTING:  Auggie Hutting for the People.

11             MR. KINNEY:  Good morning.  Robert Kinney

12     appearing on behalf of Mr. Dantzler.  Your Honor, I asked

13     Mr. Dantzler be brought over today because you signed an

14     order for us to have an independent examiner evaluate the

15     DNA evidence, I understand how important that particular

16     evidence is to the prosecution, but the Court indicated

17     that if we didn't have that report by August the 20th, you

18     would at least entertain the idea of suppressing that

19     evidence against Mr. Dantzler and that's what I'm asking

20     you to do today.

21             THE COURT:  That's what I'm likely to do.

22             MR. HUTTING:  Judge, here's what I can tell you.

23     Matter of fact, I just came from the Detroit Police Crime

24     Lab.  Our office has contracted with Bode Technology which

25     is a DNA firm out of Lorton, Virginia.  They have agreed

-1

1          MR. KINNEY:  I don't think I can get Mr.

2     Dantzler to do that.  He's been waiting, and the DNA

3     evidence is the only evidence that they have in this case

4     against Mr. Dantzler.  There's no statements.

5          THE COURT:  You already have one cut; you're

6     seeking additional cuts?

7          MR. HUTTING:  Right, because the defense would

8     like additional cuts on top of that, Judge; okay?  But the

9     cut hasn't been analyzed, nothing has been analyzed.  It's

10    been sitting there in the State Police Lab because of

11    their backlog.

12         MR. KINNEY:  That's not Mr. Dantzler's fault.

13         MR. HUTTING:  We should have this done -- the

14    report should be here by the time of the trial from Bode

15    Technology.

16         MR. KINNEY:  That means that we don't have an

17    opportunity at that point, if it's going to be here on the

18    18th, we don't have an opportunity to have our own expert

19    examine it.

20         THE COURT:  How much time are you going to

21    require?  Do you have your expert already retained and

22    ready to go, Mr. Kinney?

23         MR. KINNEY:  We have the order.  So at this

24    particular point, we have to find someone to look -- we

25    have to have the report to take to them.

*-2*

1        MR. KINNEY:  Well, they certainly won't have as

2    much time as the prosecution had.

3        THE COURT:  I understand that.  They're

4    performing a different role.  They're just analyzing --

5        MR. KINNEY:  Maybe, maybe not, your Honor.  I

6    asked you for an expert.  I need to talk to that expert,

7    see if they want to do the same thing.

8        THE COURT:  I understand.

9        MR. HUTTING:  Plus, you know, there are reports

10    already that we've given them.  I mean all the reports

11    that we have, of the work that's been done to date.

12        THE COURT:  Well, Mr. Kinney, I appreciate the

13    heads-up.  At least this generated a new offer for your

14    client to take a look at.  We'll see you on the 17th.  I'm

15    aware of it.  I'm going to have to pick another trial

16    date, possibly.  I don't like it, but if I do, I do.  How

17    long of a trial is this going to be if it goes?

18        MR. HUTTING:  Well, it's going to be -- if they

19    both go together, it's going to be two juries because the

20    young man has made a statement, I would say it's about

21    five days max.  I'd say three days after we get the jury,

22    Judge.  I mean three days after we get the jury.  I have

23    two or three witnesses.

24        THE COURT:  I may pick the jury.

25        MR. HUTTING:  That's great.  I don't have a

**-3**

```
 1        they're late.  And I -- You had asked us about speedy

 2        trial and I asked Mr. Dantzler on the record whether he

 3        would waive his right to a speedy trial for purposes of

 4        the DNA testing.

 5                I was under the impression at that time because

 6        Mr. Hutting had indicated it was because of the defense

 7        that he asked for it to be re-tested.

 8                I talked to Mr. Culpepper, who represented Mr.

 9        Dantzler before me, it's not that he made a request that

10        it be re-tested, that wasn't a request from the defense,

11        but it was Mr. Culpepper's cross examination at the

12        preliminary exam that caused the prosecution to decide

13        that they wanted it to be retested.  We had -- No request

14        came from the defense.

15                THE COURT:  Right.

16                MR. KINNEY:  And at this particular time, I feel

17        that I was in error for asking Mr. Dantzler that in open

18        court.  I've had an opportunity to talk to Mr. Dantzler.

19        He does not want an adjournment.  We don't need an

20        adjournment.  We'll be ready October the 18th.

21                And I again ask you to suppress the

22        prosecution's intent to get another DNA report done and

23        let us -- let our expert take a look at what he has.  If

24        not, we are going to be ready for trial.

25                THE COURT:  All right, Mr. Kinney.
```

-4

1    little bit closer to the four, not the six.

2              But I do believe that we will have that report,

3    it could be probably around October 10th or 12th, but we

4    should have that report by the trial date.  As soon as I

5    get my hands on it, I will --

6              THE COURT:  Wait, wait, wait.  What date did you

7    just say Mr. Hutting?

8              MR. HUTTING:  I said that Bode got the stuff on

9    Friday, September the 10th.

10              THE COURT:  And you expect your report by when?

11              MR. HUTTING:  Their timeline was four to six

12   weeks.  So the four weeks will be October the 10th.

13   Hopefully I will have it around the 12th or the 13th and I

14   will forward it immediately to the defense.

15              THE COURT:  Well, that's not going to give them

16   time for their expert to analyze it.

17              Don't you have an expert you want to take a look

18   at this, Mr. Kinney, Ms. Marable?

19              MR. KINNEY:  Yes.  And not only that, but as he

20   just described it to us, that sounds like two different

21   tests to me.  And this -- I also have a problem with the

22   way he described it the last time we were in court.  I

23   think it was September 10th, where someone went and picked

24   it up from Michigan State Police, brought it to the

25   prosecutors office and the prosecutor mailed it out.  Now

**-5**

1          We sent the information to her and, shortly before trial,

2     she indicated how much money she wanted and requested that

3     we send that to the Court, which we did, and I think it

4     was 2500 dollars a day for testimony, and that didn't

5     include whatever work she had to prepare for the case.

6          Naturally, the Court, as the Court knows, the

7     Court denied it.  And I believe the Court indicated that

8     you also talked to the Chief Judge in this particular case

9     and the Chief Judge denied it as well.

10         THE COURT:  Well, because it was extraordinary

11    fees.  And I consulted with our presiding judge because of

12    the amounts involved.  In my years of practice, I had

13    never seen that much, and I used to do complex product

14    liability and wrongful death litigation, aviation

15    litigation, car train collisions, things like that.

16         And that retainer that she presented, I had some

17    problems with.  I went to the -- I had no problems with

18    her hourly fee, and it may well have been that the hourly

19    fee would have probably paralleled what the testimony --

20    what she was entitled to had it taken as long as the

21    projection was.  But there's also a chance that if

22    someone's going to testify for an hour and they're going

23    to bill for a full day, I had some problems with that, and

24    there were some modifications to the agreement.  I had no

25    problems with honoring the hourly fee, as did Judge Kenny,

**-6**

```
 1        but the initial retainer into the thousands of dollars

 2        and --

 3                   MR. KINNEY:  Right.

 4                   THE COURT:  -- I thought was exorbitant,

 5        unrealistic.  And subject to modification, I would

 6        certainly honor the hourly fee, whatever that turned out

 7        to be, in terms of preparation and depositions or trial

 8        testimony, things like that, and parking, miscellaneous

 9        expenses.  That's customary, I had no problem with any of

10        that.  So I'll just -- That was my response so --

11                   MR. KINNEY:  Yes, your Honor.  Well, we just

12        wanted to put that on the Record because Ms.

13        Chamberlain -- well, she wants the retainer or she won't

14        be here.

15                   THE COURT:  All right.

16                   MR. KINNEY:  And with respect to the

17        guidelines -- I mean the jury instructions --

18                   THE COURT:  Well, we can deal with that later.

19                   MR. KINNEY:  Thank you.

20                   THE COURT:  At this time, are we ready for the

21        jurors?

22                   MR. HUTTING:  Yes, your Honor.

23                   THE COURT:  So I'll instruct them to come in

24        tomorrow at 11:30?

25                   MR. HUTTING:  Yes.
```

*-7*

1          THE COURT:  I'll tell them 11:00, 11:15, and

2     we'll see how things go.

3          I have jury instructions, a preliminary set that

4     we can still discuss at the appropriate time, and verdict

5     forms?

6          MR. HUTTING:  I'll have one for the Court by the

7     end of the day.

8          THE COURT:  By the time I instruct them, that's

9     fine.

10          MR. KINNEY:  Mr. Dantzler is just making sure

11     that Ms. Chamberlain was ready to do her own test, to

12     determine whether his DNA was on the cap.

13          THE COURT:  I did not preclude from that

14     witness, matter of fact, I think I signed the order

15     appointing an expert for the Defense; did I not?

16          MR. KINNEY:  And she was supposed to be an

17     expert, she never brought any results, never indicated to

18     our office that she did anything.

19          THE COURT:  And there was just a question to

20     some of the fees she was assessing and I was going to,

21     basically, honor the hourly rate and the miscellaneous

22     costs.  It was just the retainer I had an issue with, I

23     think.

24          MR. KINNEY:  That she was demanding, so --

25          THE COURT:  All right.  We're ready for the

**-8**

```
 1        and determined there was DNA on that cut; correct?

 2   A.   I did not make any determinations on what was on that

 3        cutting.

 4   Q.   You took a small cutting from that hat for the purposes of

 5        someone else determining what DNA was on that hat?

 6   A.   That's correct.

 7   Q.   A lay person as myself would say, how can we tell that

 8        there's nobody else's DNA on that hat, you just took a

 9        small portion?

10   A.   Yes, sir.

11   Q.   Someone else's DNA could be on that hat in another

12        cutting.

13   A.   Is there a question, sir?

14   Q.   Am I right?

15   A.   I'm not sure what the question is.

16   Q.   There could be somebody else's DNA on the rest of the hat?

17   A.   Absolutely.

18   Q.   So in order to be sure that no one else's DNA is on that

19        hat, you'd have to test the entire hat?

20   A.   Yes, sir.

21   Q.   Piece by piece?

22   A.   Yes, sir.

23   Q.   Well, since you have the majority of the hat in your hand,

24        that wasn't done?

25   A.   It's just not practical, given the -- given the size of
```

-9-

```
 1   A.   Yes.

 2   Q.   And Mr. Howell did what with them?

 3   A.   Retained them as evidence, put them in a storage facility,

 4        refrigerator 175.

 5   Q.   And then what happened to them?

 6   A.   At the bottom of the document, it indicates that the

 7        evidence was destroyed on 10/19/09, presumably because it

 8        was never picked up.

 9   Q.   Presumably because it was never --

10   A.   Yes.  We only retain evidence for so long.  If it's not

11        picked up, it's destroyed.

12   Q.   That's the same as, I'm guessing that it was destroyed

13        because nobody picked it up?

14   A.   Correct.

15   Q.   You don't have any evidence that nobody came to get that?

16   A.   I do, because it's -- there's no signature for who it was

17        transferred to.

18   Q.   Okay.  Is that the only copy of that you have?

19   A.   Yes.

20   Q.   Okay.  I need to see it.

21   A.   No problem.

22             MR. KINNEY:  I'd like to have this marked then.

23             MR. HUTTING:  Can we have that xeroxed so the

24   Doctor can have that back and mark the xerox?

25             MR. KINNEY:  I have no objection to that, Judge.
```

-10

1          DEPUTY SHERIFF:  All rise for the jury.

2          (At about 3:42 p.m., jury panel seated.)

3          DEPUTY SHERIFF:  Please be seated.

4          THE COURT:  Mr. Kinney.

5          MR. KINNEY:  Yes, your Honor, thank you.

6          THE COURT:  You're welcome.

7          MR. KINNEY:  At this particular time, your

8   Honor, I would move for admission of Defendant's Exhibit

9   A.

10          THE COURT:  Has it been marked now?

11          MR. KINNEY:  Yes, it has been marked.

12          MR. HUTTING:  No objection.

13          MR. KINNEY:  Thank you.

14          THE COURT:  Defense Exhibit A is offered and

15   received into evidence without objection.  And just for

16   the Record, that is the what, Mr. Kinney?

17          MR. KINNEY:  This is the evidence chain of

18   custody record for fingernail clippings that was taken

19   from Bernard Hill dated 01/16/06, and it says that it was

20   destroyed October the 19th of '09.

21          Is that correct, Doctor?

22          WITNESS LOEWE:  Yes, sir.

23          THE COURT:  And that's Defense Exhibit A?

24          MR. KINNEY:  Yes, sir.

25          THE COURT:  Offered and received --

-11

1               THE COURT:  Thank you very much.

2               Mr. Hutting.

3               MR. HUTTING:  Thank you, your Honor.

4

5  DIRECT EXAMINATION BY MR. HUTTING:

6  Q.   I know that you've given your name to the court reporter,

7       but for the Record, one more time, we need your name,

8       please.

9  A.   Janet Burt.

10 Q.   That's B-U-R-T?

11 A.   Correct.

12 Q.   Okay.  Ms. Burt, what city do you live in?

13 A.   Detroit, Michigan.

14 Q.   How long have you lived in Detroit?

15 A.   Practically all my life.

16 Q.   Okay.  Ms. Burt, during your lifetime, did you know a

17      person by the name of Bernard Hill?

18 A.   That was my son.

19 Q.   Okay.  How old was Bernard at the time that he was killed?

20 A.   Twenty-two.

21 Q.   Okay.  And who is Bernard's father?

22 A.   Bernard Wesley.

23 Q.   Okay.  All right.  Now did Bernard, when he was growing

24      up, live with you?

25 A.   Yes.

-12

```
 1   A.   I peeked out my -- I have a peephole.   And I -- They were

 2        banging on the door and trying to ring the doorbell.   The

 3        doorbell doesn't work, never has.   And I peeked out my

 4        peephole and seen that's what they were doing.   Well,

 5        that's what the particular person was doing.

 6   Q.   When they were banging on the door, were they saying

 7        anything?

 8   A.   No.

 9   Q.   Okay.   Just banging?

10   A.   Yes.

11   Q.   Pretty loudly?

12   A.   Yes.

13   Q.   Okay.   So you went to the peephole?   To the door?

14   A.   Correct.

15   Q.   And you looked out your peephole?

16   A.   Correct.

17   Q.   What did you see when you looked out your peephole?

18   A.   Rodney and Little Sam.   Rodney was on my porch and Little

19        Sam was standing on the steps.

20   Q.   By Rodney, do you mean Rodney Turner?

21   A.   Correct.

22   Q.   Quiana's brother?

23   A.   Correct.

24   Q.   By Little Sam, do you mean some --

25             MR. KINNEY:   I'm going to object.   I'm objecting
```

-13

```
 1   A.   Correct.

 2   Q.   Okay.  All right.  Did you talk to them?

 3   A.   No, I had my granddaughters with me.

 4   Q.   Okay.  Did they say anything while you were looking out

 5        the peephole there when they were on the other side

 6        banging on the door?

 7   A.   No.  I heard something but I couldn't make out what it

 8        was.  There was a gesture made, like, towards my vehicle.

 9   Q.   Okay.  All right.

10   A.   But I'm not sure who, you know, what it was about.  Like I

11        said, I had my granddaughters, I was more concerned for

12        them.

13   Q.   Okay.  Why were you concerned for them?

14   A.   Because I know what had just happened to my son, that he

15        had just jumped on Quiana.  So for them to come to my

16        door, they're looking for him, is what I assumed.

17   Q.   Okay.  All right.  So you did not open the door?

18   A.   No.

19   Q.   Okay.  Did you see any vehicle or vehicles anywhere?

20   A.   Yes.

21   Q.   Tell us about that.

22   A.   Samuel has a gold, long car, and that was --

23   Q.   By Samuel, you're pointing to Mr. Dantzler?

24   A.   Mr. Dantzler, yes.

25   Q.   You're familiar with his car?
```

**14**

1   A.   Yes, it's been to my house several times.

2   Q.   Okay.  Did you -- Tell me what you saw when you looked out

3        your peephole that night.

4   A.   When they went back to the car, there was several heads in

5        the car.  As they opened the door, you could see there was

6        several people, other people, in the car.

7   Q.   Could you tell us who it was that was in the car?

8   A.   No.  No, I couldn't do that.

9   Q.   Whose car was it?

10  A.   It was Samuel Dantzler's car.

11  Q.   Any doubt in your mind that it was Samuel Dantzler's car?

12  A.   Same car pulled up on me when I was dropping off Quiana --

13       not Quiana -- Kietta (phonetic), who was with Bernard that

14       night.

15  Q.   Okay.  How do you find out that something had happened to

16       your son?

17  A.   Nikitta called me.

18  Q.   Who called you?

19  A.   Kitta called me --

20  Q.   Is that Nikitta McKenzie?

21  A.   -- screaming -- Correct.

22            MR. KINNEY:  Your Honor --

23  A.   -- that Bernard was dead.

24            THE COURT:  Just a moment, ma'am.  While the

25       lawyers are talking, don't answer; okay?

**15**

```
 1        events that you're talking about happened on what day?

 2    A.  On Sunday.

 3    Q.  And that was?

 4    A.  September the 15th.

 5    Q.  Well, back in --

 6    A.  I mean, I'm sorry, January.

 7    Q.  Yes, January 15th?

 8    A.  Correct.

 9    Q.  Okay.  And on that day did you talk to Mr. Dantzler?

10    A.  No.

11    Q.  On that day did you see Mr. Dantzler?

12    A.  No.

13    Q.  When -- Am I pronouncing it right, Quiana; is that it?

14    A.  Correct.

15    Q.  When Quiana first came to your house with -- is it

16        Mikayla?

17    A.  Correct.

18    Q.  That's your grandchild?

19    A.  Correct.

20    Q.  Granddaughter?

21    A.  You're correct.

22    Q.  Okay.  And your granddaughter is still in your life?

23    A.  Yes, she is.

24    Q.  Okay.  And none of the Dantzlers have tried to keep her

25        out of your life?
```

**16**

```
 1   Q.   So in this particular case, the Detroit Police Crime Lab

 2        or Michigan State Police did not do the analysis?

 3   A.   That's correct.

 4   Q.   So it was sent out to like a -- Are you familiar with a

 5        company called Bode Technology?

 6   A.   Yes, I am.

 7   Q.   What's Bode Technology?

 8   A.   Bode Technology was a laboratory who the State of Michigan

 9        contracted with in order to process our backlog DNA

10        evidence.

11   Q.   Okay.  And what did you do in this particular case, Mr.

12        Steary?

13   A.   In this case, I looked at three items:  A hat, a buccal

14        swab from a suspect, and a blood sample from the deceased

15        victim.

16   Q.   Okay.  All right.  Let's talk about the blood sample from

17        the victim.  Would that be Mr. Bernard Hill?

18   A.   That's correct.

19   Q.   Where did you get that blood sample from?

20   A.   I can read directly from my report.

21   Q.   Sure.

22   A.   Reading from my report prepared for laboratory number

23        B060247, regarding the fatal shooting of Bernard Hill, an

24        item was received --

25                  MR. KINNEY:  Well, objection.  Objection to him
```

**17**

1   Q.   Okay.  All right.  You said that you took a cutting from

2        it?

3   A.   That's correct.

4   Q.   Okay.  I want you to tell the jury how -- can you find the

5        cutting that you took from that hat?

6   A.   Yes, I can.  The cutting is right here on the interior rim

7        of the hat.

8   Q.   Okay.  That's the cutting that you did.

9             Okay.  What do you do with this cutting, Mr.

10       Steary, after you take the cutting from the hat?

11  A.   I take the cutting and put it into a small plastic tube, a

12       micro centrifuge tube, and then store it for DNA analysis.

13  Q.   Okay.  So is that ultimately then, the cutting that gets

14       sent to some lab or to whoever is going to do the DNA

15       analysis?

16  A.   That's correct.

17  Q.   Okay.  So they then take that cutting and do whatever work

18       that they can do from that?

19  A.   Correct.

20  Q.   Okay.  Now, can you tell this jury why you took the

21       cutting from this particular place in the hat?

22  A.   This is a location where I expect the person to be wearing

23       as the front of the head, or the brow of the head, would

24       be in contact with the hat.  There's a tag that marks the

25       back of the hat inside the hat which indicates the back so

**18**

1        because the crime lab was closed?

2    A.   No, sir.

3    Q.   Okay.  So you left before the crime lab was closed?

4    A.   Yes, sir.

5    Q.   All right.  That was for other employment?

6    A.   Yes.

7    Q.   Okay.  And in this particular case, this was back in '06,

8        and it seems that from your report -- And you still have

9        your report in your hand?

10   A.   Yes, I do.

11   Q.   Correct me if I'm wrong, you started your work February

12       27th of '07?

13   A.   Yes, sir.

14   Q.   And that was the date you completed your work?

15   A.   Yes, sir.

16   Q.   Okay.  Have you had any more related activity in this

17       particular case other than that day?

18   A.   I don't have the file jacket in front of me, but I would

19       have to wager that I have had other activity.  The process

20       of sending the evidence to Bode was primarily my

21       responsibility, so I was probably the person who packed up

22       the evidence and shipped it to the vendor laboratory for

23       the DNA analysis.

24   Q.   Okay.  And you -- Was it protocol to have some kind of

25       report of what you've done and what you haven't done?

**19**

```
 1   A.   Can you be more specific?

 2   Q.   If you packaged it up on the 28th and mailed it to Bode

 3        Technology, would you have written some kind of report to

 4        say this is what I did on that day, put it in a computer

 5        system or something?

 6   A.   For all the evidence, there is a chain of custody document

 7        within the case jacket, and that information would be

 8        recorded.  But no report would have been generated.

 9   Q.   Okay.  But there would have been something in the package

10        itself?

11   A.   Correct.

12   Q.   Okay.  Now, the first thing that bothered me about the

13        direct examination, and I want you to correct me if I'm

14        wrong --

15             MR. HUTTING:  Well, Judge, I'm going to object

16        to the characterization of bothered.

17             MR. KINNEY:  Whatever you want, you can do.

18             THE COURT:  We'll adhere to a question and

19        answer format, gentlemen.

20             Go ahead, Mr. Kinney.

21             MR. KINNEY:  Okay.

22   BY MR. KINNEY:

23   Q.   I want you to tell me if you actually said this.  You were

24        asked to try to find out who was wearing that knit cap

25        last.
```

**20**

1         the hat and the number of samples and what would be

2         involved in all of that.

3    Q.   Are you saying it's too expensive?

4    A.   It's definitely too expensive.

5    Q.   In a murder case?

6    A.   Definitely.

7    Q.   In a murder case?

8    A.   Given the resources at -- around the country, it is common

9         practice for a case to decide that if information is found

10        and information could be used and further testing can be

11        applied at any time, if so warranted, and if evidence is

12        preserved, so that evidence can be retested in the future

13        if it needs to be.

14   Q.   Okay.  So it can be tested again, even now?

15   A.   Not now.

16   Q.   Because we've handled it?

17   A.   Yes, sir.

18   Q.   Okay.  But prior to that bag being opened, more testing

19        could have been done?

20   A.   Absolutely.

21   Q.   And it could have been done to the point of where some

22        expert, DNA expert, would have been able to testify as to

23        exactly whose DNA was on that hat, that's a possibility?

24        An expensive one, but a possibility?

25   A.   It's a little vague.  There's a lot of variables in there.

**21**

1    A.    Yes.

2    Q.    Tell us about that.

3    A.    I see golf clubs, a golf club.

4    Q.    How many golf clubs did you see, one or more than one?

5    A.    Just one.

6    Q.    Okay.  All right.  Do you notice anything about any of the

7          perpetrators in terms of what they were wearing?

8    A.    Yes.

9    Q.    Tell us about that, please.

10   A.    One or more of them were wearing a hat and they all were

11         dressed in black.

12   Q.    Okay.  All dressed in black.  At least one had a hat,

13         maybe more?

14   A.    Yes.

15   Q.    Okay.  The man says does Bernard live here.  What reply

16         did you give?

17   A.    I said he lives here, but he's not here.

18   Q.    Okay.  What happens next, Ms. McKenzie?

19   A.    He asked me the same question again, and I answered him

20         the same.  And then when I answered him the second time,

21         that's when Bernard came out of the room.

22   Q.    Okay.  Then what happens?

23   A.    They got into a fight in the living room and I ran into

24         the bathroom with the cell phone.

25   Q.    Okay.  What did you do when you got to the bathroom?

**22**

1    Q.    Did you also tell the police that at least one of the

2          perpetrators was wearing a hat like that?

3    A.    Yes.

4                MR. HUTTING:  Thank you very much.  Submit for

5          cross.

6                THE COURT:  Thank you, Mr. Hutting.

7                Mr. Kinney.

8                MR. KINNEY:  Thank you, your Honor.

9                THE COURT:  You're welcome.

10

11   CROSS-EXAMINATION BY MR. KINNEY:

12   Q.    Good afternoon, Ms. McKenzie.

13   A.    Good afternoon.

14   Q.    My name is Robert Kinney.  I'm a lawyer and I represent

15         Mr. Dantzler.

16                Now I gather by your testimony so far that you

17         never have been in Mr. Dantzler, Senior's presence before?

18   A.    No.

19   Q.    All right.  And you never talked to Mr. Dantzler, Senior,

20         on the phone?

21   A.    No.

22   Q.    Okay.  And no names, especially Mr. Dantzler, Senior, no

23         names were mentioned by any of the perpetrators in

24         addressing any other perpetrator?

25   A.    No.

**23**

172

1     COMPUTER GENERATED INDEX AT THE END OF TRANSCRIPT

2                    Detroit, Michigan

3                    December 20, 2010

4                    At or about 9:20 a.m.

5                    (Court, Counsel and Defendants present.)

6                         *     *     *

7                    COURT CLERK:  Calling docket 10-3521, People

8     versus Samuel Lee Dantzler, circuit court docket, jury

9     trial in progress.

10                   MR. HUTTING:  Auggie Hutting for the People.

11                   MR. KINNEY:  Robert Kinney appearing on behalf

12    of Mr. Dantzler.  I had an opportunity to speak with Mr.

13    Dantzler over the weekend.  Mr. Dantzler has indicated

14    that I should --

15                   Mr. Dantzler, why don't you tell the Judge what

16    the issue is?

17                   DEFENDANT DANTZLER:  My issue is ever since I've

18    been locked up, I've been saying that I wanted this hat

19    tested by my -- you know, somebody for my side.  And, you

20    know, we done get this far and the hat still hasn't been

21    tested for me because I'm just going by the word of the

22    prosecution that my DNA is inside this hat and also it

23    could be more people's inside this hat other than me.  And

24    nobody said nothing about that.  And I wanted this hat

25    tested for my -- on my behalf, and I think I'm getting

**24**

1   Q.   They had -- What is the NIJ Grantees workshop?

2   A.   The NIJ conference, the one that I attended, is put on by

3       the National Institute of Justice and various people

4       present in the topics of forensics, the forensics field.

5   Q.   Okay.  And you know they had one in the summer of 2008 in

6       Washington, D.C.; did you attend that one?

7   A.   No, I did not.

8   Q.   How many of them have you attended?

9   A.   I attended the one in 2009.

10   Q.   Okay.  And that was in Washington, as well?

11   A.   It was in Arlington, Virginia, yes.

12   Q.   Okay.  Have you ever testified before -- Well, you said

13       you never testified in Wayne County before?

14   A.   No, I have not.

15   Q.   You haven't testified for the Michigan State Police

16       before?

17   A.   No.  No, I have not.

18   Q.   You haven't testified for the Wayne County prosecutors

19       office before?

20   A.   No.

21   Q.   And out of -- since 2005, that's like five years now,

22       you've worked for Bode?

23   A.   Yes, it is.

24   Q.   And your education started when you started at Bode, your

25       education when it comes to DNA, being a DNA expert?

**25**

```
 1   A.   I started graduate school in 2004.

 2   Q.   In 2004?

 3   A.   Yes.

 4   Q.   Okay.  And where was that at?

 5   A.   The George Washington University.

 6   Q.   George Washington University.  The continuing education

 7        that you've had, the last one was the 7th Annual Advanced

 8        DNA Technical Workshop in San Diego?

 9   A.   Yes.

10   Q.   Was what a one-day event?

11   A.   No, it was over the course of a few days.

12   Q.   How many?  A week?

13   A.   Yes, there were different programs throughout the week.

14   Q.   Okay.  And this -- I'm looking at your curriculum vitae --

15        it says eight hours.  Is that eight hours credit that you

16        got?

17   A.   That was the -- We were required to attend a minimum of

18        eight hours.  I attended various workshops throughout the

19        week.  So it exceeded the eight hours.

20   Q.   But on here, it has eight hours?

21   A.   That is a typo on my part.

22   Q.   On your part.  But you -- it says eight hours, that means

23        you worked for eight hours?  Your education was for eight

24        hours, but you're telling us it was more than eight hours?

25   A.   Correct.  We're required to attend a workshop for a
```

**26**

1      DNA from the three additional areas that I tested, and

2      generated three different DNA profiles from those three

3      areas.

4   Q.   Okay.  Did you also test the buccal swabs that you had

5        from Samuel Dantzler, Senior and Gerald Stewart and

6        generate a DNA profile for each of those persons?

7   A.   Yes.

8   Q.   Okay.  All right.  What do you do then after you generate

9        this DNA profile?

10  A.   Once the DNA profiles are generated, I look at the data to

11       ensure that there are good results.

12  Q.   Okay.  All right.  And were you able to get -- Well, let's

13       talk about, first of all, the initial cutting and the DNA

14       profile that you had.  Were the results good in your

15       estimation at all the different loci?

16  A.   Yes, DNA profile was obtained from the initial cutting.

17       It was consistent with a mixture of two individuals and

18       including a major male contributor.

19  Q.   Okay.  How about the other three cuttings?  What can you

20       tell us about the other three cuttings that you took from

21       the hat?  What kind of profiles, if any, were developed

22       from those?

23  A.   From the first area that I tested of the hat, a partial

24       DNA profile was obtained from that area that was

25       consistent with a mixture of at least two individuals

**27**

37

```
 1          including a major male contributor.  From the second area
 2          of the hat that I tested, a DNA profile was obtained that
 3          was consistent with a mixture of at least two individuals,
 4          including at least one male contributor.  And from the
 5          third area, a partial DNA profile was obtained that was
 6          consistent with a mixture of at least two individuals,
 7          including at least one male contributor.
 8    Q.    What do you mean by a partial DNA profile as opposed to a
 9          complete DNA profile?
10    A.    Partial DNA profile is wording that we use when we aren't
11          able to get DNA results from all of the 13 locations that
12          we tested.
13    Q.    Then a complete one would be when you're able to get
14          results from all 13?
15    A.    Yes.
16    Q.    Okay.  All right.  Now at the end then do you write a
17          report stating your ultimate conclusions?
18    A.    Yes.
19    Q.    Okay.  Do you also develop and do during the course of
20          your work -- I guess the term that I would use is a graph.
21          Do you develop a graph or a diagram that people can look
22          at and hopefully with your help maybe understand it and
23          explain the diagram to us?
24    A.    We generate what's called a table which basically has a
25          number of representation of that DNA profile that was
```

**28**

1          draw on the initial cutting of the hat?

2     A.   Again I concluded that it was consistent with a mixture of

3          at least two individuals including a major male

4          contributor and then the major male component's DNA

5          profile deduced from the initial cutting of the hat

6          matched the DNA profile obtained from Samuel Dantzler,

7          Senior.

8     Q.   Did it match it in all 13 loci?

9     A.   Yes, it did.

10    Q.   So on every loci that you tested, based on that initial

11         cutting that you had and the DNA profile that you had,

12         when you analyzed the buccal swab of Samuel Dantzler,

13         Senior, there was a match on all 13 loci; is that correct?

14    A.   Yes.

15    Q.   Okay. Were you ultimately able to quantify that in terms

16         of population and can you explain that, please?

17    A.   So I then performed statistics on the evidence item.  We

18         perform statistics on the evidence items themselves to

19         determine the probability of that DNA profile occurring in

20         the population so it's the probability that the DNA

21         profile I obtained from evidence item one, if we were to

22         draw someone at random from the general population would

23         occur.

24    Q.   Okay. What statistics did you come up with?

25    A.   The probability of randomly selecting an unrelated

**29**

```
 1          individual with this DNA profile at 13 of the 13 blocks I
 2          tested is one in 90 quadrillion in the U.S. Caucasian
 3          population, one in two quadrillion in the U.S. African
 4          American population, and one in 20 quadrillion in the U.S.
 5          Hispanic population.
 6    Q.    Okay.  One in two quadrillion in the U.S. African American
 7          population, how many people are there in the world?
 8    A.    There's six billion people in the word.
 9    Q.    Is quadrillion more than six billion?
10    A.    Yes.
11    Q.    So the likelihood would extend to far more than people
12          than we have in the whole word?
13    A.    Yes.  And again that's just if you were to randomly select
14          someone.
15    Q.    Okay.  Of another person having the same DNA profile?
16    A.    Yes.
17    Q.    How many zeros is quadrillion do you know?
18    A.    Quadrillion is fifteen zeros.
19    Q.    Okay.  All right.  Now did you draw any other conclusion
20          about the initial DNA cutting and any other sample
21          submitted to you?
22    A.    Yes, the DNA profile, the individual associated with the
23          DNA profile obtained from Gerald Stewart was excluded as a
24          possible contributor to the mixture DNA profile that was
25          obtained.
```

**30**

1   Q.   So one type of result is you can reach conclusions that

2        say, like you did -- like you've just testified to, that

3        it's Sam Dantzler's DNA on all 13 loci; right?

4   A.   Correct.

5   Q.   Okay.  Is another conclusion that you can say that it's

6        not somebody's DNA?

7   A.   We can conclude that their DNA is not present, so they did

8        not contribute to that profile.

9   Q.   So they get excluded?

10  A.   Yes.

11  Q.   And Gerald Stewart is excluded?

12  A.   Yes.

13  Q.   Okay.  Are there also other conclusions that you can draw

14       like not excluded or included?  Can you explain those?

15  A.   If someone -- We can also, depending on the DNA profile

16       that is obtained, someone may be included, they may be

17       excluded or we may not be able to determine due to the

18       quality if someone is there or not.

19  Q.   Okay.  All right.  Let's go, if we can, to new cut number

20       one, which would be, moving over here, four, would be the

21       fourth column, DNA new cut number one; okay?

22            What ultimate conclusions did you reach about

23       DNA new cut number one?

24  A.   Again it was a mixture of at least two individuals

25       including a major male contributor and the individual

**31**

1    A.    Again we're -- I'm looking first at the evidence item, so

2          I'm determining which of the locations are usable, where

3          there's enough information to actually determine that all

4          of the DNA is there.  So I'm looking at that information

5          first before I make any comparisons.  So there were nine

6          areas that were looked at and he was consistent at all of

7          those nine areas.

8    Q.    So in nine areas that you looked at in that new cutting,

9          they all matched Bernard Hill's DNA profile that you have

10         there; is that correct?

11   A.    They were consistent.

12   Q.    Consistent with.  Okay, all right.  In new cutting number

13         one did you reach any conclusions, if at all, about the

14         DNA profile of Samuel Dantzler in new cutting number one?

15   A.    Due to the limited data obtained, the individual

16         associated with R12, Samuel Dantzler, Senior, could not be

17         included or excluded as a possible contributor to the

18         minor profile that was obtained from that sample.

19   Q.    So there was a minor profile and you can't exclude Mr.

20         Dantzler of that minor profile?

21   A.    There was not enough information on the minor levels that

22         were obtained to determine if he could be included or

23         excluded.

24   Q.    So you can't include or exclude him in that?

25   A.    Correct.

**32**

1    Q.    Okay.   What about Gerald Stewart?   Did you reach any

2          conclusions about him on DNA cut number one?

3    A.    The individual associated with the sample obtained from

4          Gerald Stewart was excluded as a possible contributor to

5          the mixture profile obtained.

6    Q.    Okay.   Let's go to new cut number two which would be the

7          sixth column over here, the one labeled E11a2; is that

8          correct?

9    A.    Yes.

10   Q.    Okay.   What were the ultimate conclusions that you reached

11         concerning new cut number two?

12   A.    The DNA profile obtained from that cutting was consistent

13         with a mixture of at least two individuals including at

14         least one male contributory.

15   Q.    Okay.   And what conclusions do you reach about that?

16   A.    That the individuals associated with the samples from

17         Bernard Hill and Samuel Dantzler, Senior cannot be

18         excluded as possible contributors to the DNA profile

19         obtained from that sample.

20   Q.    So you can't exclude Mr. Dantzler from that sample either?

21   A.    No.

22   Q.    Okay.   Or the decedent in this case, Bernard Hill?

23   A.    Yes.

24   Q.    Did you reach some statistical analysis about that?

25   A.    Yes.   Again looking at the evidence item itself, since

**33**

```
 1            it's a mixture profile and I was not able to pull out a
 2            major component, I'm determining the number of individuals
 3            in the population that could be included as possible
 4            contributors.  So if you were to select someone at random
 5            what is the possibility that they could have contributed
 6            to that mixture profile that was obtained?  And the
 7            probability of that is one in 26 million in the U.S.
 8            Caucasian population, one in one million in the U.S.
 9            African American population, and one in 8.3 million in the
10            U.S. Hispanic population.
11    Q.      Okay.  And finally let's talk about DNA cut number three,
12            which I believe is going to be seventh column over here.
13                    What conclusions do you reach about DNA, if any,
14            about DNA cut number three?
15    A.      The partial DNA profile obtained from the third cutting is
16            consistent with a mixture of at least two individuals
17            including at least one male contributor.
18    Q.      Okay.  And do you reach any conclusions about any of the
19            DNA profiles submitted to you on that?
20    A.      Yes, due to the fact that it was a partial profile and
21            only limited data was obtained, the individuals associated
22            with Bernard Hill, Samuel Dantzler, Senior and Gerald
23            Stewart could not be included or excluded as possible
24            contributors to the mixture profile obtained from that
25            sample.
```

**34**

1      or so, 3:20 or 3:30, so that's why I'm abbreviating the

2      lunch hour just a little bit; okay?  Thank you.

3                    Have a good lunch, everyone.

4                    (At about 12:31 p.m., lunch recess;

5                    At about 1:50 p.m., back on the record.)

6                    COURT CLERK:  Recalling docket 10-3521, People

7      versus Samuel Lee Dantzler, jury trial in progress.

8                    MR. KINNEY:  Robert Kinney appearing on behalf

9      of Mr. Dantzler.

10                   And as the Court knows, part of my cross

11     examination was going to be in terms of how much Bode was

12     being paid for this particular case.  Neither of those two

13     witnesses know what the contract was or what any overage

14     was that was paid by the Wayne County prosecutors office

15     or how much the contract was.

16                   THE COURT:  Mr. Hutting, do you know?

17                   MR. HUTTING:  I have no idea.  I mean they do

18     their work and get paid for whatever it is.  In terms of

19     what we did, I thought we paid about 35 hundred dollars,

20     somewhere between 35 and 39 hundred dollars.

21                   THE COURT:  Do you have a contract?

22                   MR. HUTTING:  I don't have -- No, I just got a

23     bill that was all.

24                   MR. KINNEY:  Well, whatever that bill is, I

25     think --

**35**

68

1       When the judge intervened, guess what?  Here it is.  One

2       file.  Here it is.  You're entitled to it.

3                    MR. HUTTING:  I'm not under any duty to turn

4       that over.  This is the first -- Oh, this is the bill.

5                    THE COURT:  Thank you.  All he's seeking is what

6       the compensation is.

7                    MR. HUTTING:  The compensation for the three

8       extra cuts was 3,00020 -- to do the analysis of that was

9       $3,972.75.

10                   THE COURT:  Is that what they were -- these

11      witnesses were paid and the compensation?

12                   MR. HUTTING:  That's what Bode was paid to do,

13      to do three extra cuts and to do this analysis here, okay,

14      that Rebecca Preston has testified to on these major

15      components.  That cost $3,972.75.  What the other work

16      cost, I have no idea.  Okay.  I have no idea.

17                   THE COURT:  I'm ordering you to do everything in

18      your power with your associates upstairs to ascertain what

19      the contract value was and to break that down in terms of

20      what they received in terms of compensation; okay?  I

21      think the defense is entitled to that.

22                   MR. HUTTING:  Well, yeah, but they should have

23      asked for this a long time ago.  They knew Bode was going

24      to testify.  But in the middle of a trial when the witness

25      is up on the witness stand to say, well, we want this,

**36**

```
1    A.    No, just because there was not enough DNA there.

2    Q.    But there's DNA there?

3    A.    Yes.

4    Q.    Okay.  Can you specifically tell us that nobody else's DNA

5          is in that hat?

6    A.    No.

7    Q.    At the time that you were testing can you tell us that no

8          one else's DNA is in that hat?

9    A.    No.

10   Q.    At the time that you were testing that hat, I know that as

11         a biologist, you know, when you see blood, you know what

12         blood is?

13   A.    Yes.

14   Q.    But there's certain tests that you probably would have to

15         do to determine whether there was any blood in the hat?

16   A.    Yes.

17   Q.    Did you by chance do any testing to determine whether the

18         DNA that you were taking a look at was a derivative of

19         someone's blood?

20   A.    No, we didn't do any serology testing.

21   Q.    Okay.  So I mean did you know that this was testing with

22         regards to a murder case?

23   A.    Yes, through the paperwork that was submitted.

24   Q.    You knew that?

25   A.    Yes.
```

**37**

```
 1   Q.   You cannot determine that there was -- you know that

 2        there's at least one male?

 3   A.   Yes.

 4   Q.   Correct?

 5   A.   Yes.

 6   Q.   And you don't know whether or not there was a female?

 7   A.   Yes.

 8   Q.   Am I correct?

 9   A.   Correct.

10   Q.   Okay.  So not only are -- could there be some DNA that

11        belongs to Bernard Hill, and some DNA that belongs to

12        Samuel Dantzler, but there's some DNA there that could

13        belong to a female?

14             MR. HUTTING:  Objection, assume facts not in

15        evidence.  That calls for speculation.

16             THE COURT:  Response?

17             MR. KINNEY:  I'm asking her the results of her

18        test.  And I don't think that calls for speculation.

19        She's an expert, testifying about what DNA was left in

20        this hat.

21             THE COURT:  Go ahead.

22   BY MR. KINNEY:

23   Q.   Am I correct?  There could be some DNA there that belongs

24        to a female?

25   A.   There could, due to the -- We could not determine.  There
```

**38**

84

1    on my docket.  There's been multiple delays so that there

2    could be DNA testing.  I always try to assist both sides

3    however I can; okay?  Whether it's an investigator, order

4    for independent expert, DNA expert which I signed November

5    24th, 2010 in this case, after we had had months ago

6    discussions about DNA testing and everything else, a

7    request was made by Counsel for the Defendant, Mr. Kinney,

8    who is always very thorough and very professional to have

9    Ann E. Chamberlain, an independent DNA expert, appointed

10   regarding the above-captioned case, case 10-3521-01,

11   People versus Samuel Dantzler.

12        It was hereby ordered that Ann E. Chamberlain,

13   an independent DNA expert, shall be appointed to the

14   above-captioned case.  It is further ordered that Ann E.

15   Chamberlain, the independent DNA expert, should be

16   compensated by the state as per their fee schedule for

17   such expert services due to Defendant's indigency; okay?

18        I just wanted to put that into the record.  And

19   before that, I had indicated to both sides let me know how

20   I can be of assistance, I'm willing to assist both sides

21   in any way you deem constructive.

22        So that's the history of the case.  And again

23   this case is well over time standard and the projection

24   for the case is beyond what you gentlemen projected.  But

25   as I indicated at the outset, there'd be no rush to

**39**

```
 1   Q.   Was Samuel Dantzler -- were buccal swabs ultimately taken
 2        from Omar Dantzler, Michael Dantzler, Samuel Dantzler,
 3        Junior, Samuel Dantzler, Senior?
 4   A.   Yes.
 5   Q.   Okay.  And also Patrick Grunewald?
 6   A.   That's correct.
 7   Q.   Were all of these buccal swabs ultimately forwarded to
 8        Bode Technology so that they could be examined and
 9        compared against the evidence that Bode had?
10   A.   Yes.
11   Q.   Okay.  The name Gerald Stewart has come up here during the
12        course of this case.  Who is Gerald Stewart?
13   A.   Gerald Stewart is a former officer who ran Major Crimes
14        and ran Homicide back in the '80s and '90s.  He was hired
15        back pursuant to the grant as a civilian contractor and he
16        worked with us in the Cold Case Squad.
17   Q.   Okay.  Now a buccal swab was also taken from him and
18        forwarded to Bode Technology.
19   A.   That's correct.
20   Q.   Okay.  And why was that?
21   A.   During the investigation, Mr. Stewart had physically
22        handled the black cap.  And later on, when it was
23        discovered that we were going to further test the cap, he
24        advised us that he had actually physically handled it, so
25        it only made sense to send in the buccal swab on him, as
```

**40**

```
 1   A.   It would probably have been in the afternoon.

 2   Q.   Afternoon.  And then Ms. Simpson picked you up around what

 3        time?

 4   A.   It had to be about later on that -- later on that evening.

 5   Q.   Okay.  And later on that evening, before 12:00 at night?

 6   A.   Oh, yeah.

 7   Q.   Before 11:00?

 8   A.   Yes.

 9   Q.   Before 10:00?

10   A.   It was probably in between that time.  Between -- probably

11        between 10:00 and 11:00.

12   Q.   Okay.  And where did you all go?

13   A.   We went back to her house.

14   Q.   Was your daughter with you?

15   A.   Yes.

16   Q.   Okay.  And what kind of car did Ms. Simpson have?

17   A.   At this time, she was driving a -- it was a --

18   Q.   What color was it?

19   A.   It was green.

20   Q.   A green car?

21   A.   Yeah.

22   Q.   Okay.  And did you drive that car sometime?

23   A.   Sometimes, I did.  She'd let me drive it.

24   Q.   Did you have your own car in January of 2006?

25   A.   No.
```

**41**

```
 1   Q.   Okay.  Did you ever drive a long, gold-colored Chrysler?

 2   A.   Yes, I did.

 3   Q.   Okay.  And did you drive that car -- Well, how long did

 4        you drive the car?

 5   A.   I had that car maybe two years.

 6   Q.   Two years.  And this is prior to 2006?

 7   A.   Yes.

 8   Q.   Did you ever get rid of that car?

 9   A.   Yes.

10   Q.   And how did you get rid of it?

11   A.   It was my brother-in-law birthday and I let him use the

12        car on his birthday and he got a little drunk and he had

13        an accident in it.  And at that time, I didn't want the

14        car back so he kept -- he kept the car and just paid me

15        for it.

16   Q.   And approximately how long prior to January the 15th of

17        2006 did that occur?

18   A.   Maybe a year.

19   Q.   So you hadn't driven that car in at least a year prior to

20        January 15th, 2006?

21   A.   Correct.

22   Q.   Okay.  And how long did you stay at Ms. Simpson's house?

23        January the 15th, Ms. Simpson picked you up --

24   A.   I got a phone call -- Yeah.

25   Q.   -- between nine and ten o'clock?
```

**42**

1          What else does she see?  She told you this, and

2     she told you very clearly and it's important, she saw a

3     gold car in the driveway.  A gold car in the driveway.

4     Whose car was it?  She said it was Sam Dantzler's car, Mr.

5     Dantzler, Mr. Dantzler, Senior.  How do you know that?

6     Because I had seen him driving that car.  She told you

7     that that was his car there in the driveway.  And she also

8     told you that when two men went back to the car, there

9     were other people in the car, there were other people in

10    the car.  She said, I can't identify them, it was night,

11    they were too far away.  So the gold car is key.

12         And you know what happened?  Mr. Dantzler here,

13    on cross-examination, when I asked him said, no, I never

14    drove a gold car.  I never had a gold car.  And I said,

15    well, you know, on direct examination, when your attorney

16    was questioning you, didn't you say at one time that you

17    had a gold car?  No, no, no, I never said that.

18         Well, over the break, I had Mrs. Bauer, the

19    court reporter, print up the direct testimony of Samuel

20    Dantzler, Senior, on that issue.  And here's what she

21    printed up:

22         Okay.  And did you drive that car?

23         Sometimes -- This is a question by Mr. Kinney.

24    Answer:  Sometimes I did.  She let me drive it.

25         Question:  Did you have your own car in January

**43**

188

1      And she said she has no idea that that -- she said that

2      this cap does not belong to anybody that she knows or was

3      friends with.  Why is that?  Because this was the cap that

4      Sam Dantzler was wearing that night, Samuel Dantzler,

5      Senior.

6              And during the course of that event where

7      Bernard Hill was killed, somehow Bernard Hill got the cap,

8      the cap got knocked off during this melee that went on in

9      there, and it got left there.  That's what happens in

10     cases.  That's how police ultimately solve cases.

11             You know, if a defendant or a group of

12     defendants commit a perfect crime, if they don't leave any

13     fingerprints or don't make any mistakes during the

14     commission of a crime, we're really never going to solve

15     it.  But you know what?  Defendants make mistakes; okay?

16     Defendants leave things at the scene of the crime.  Things

17     get left there.  They make mistakes.  That's the kind of

18     thing that allows the police ultimately, if they work it

19     right, to solve the case, and that's what happened in this

20     particular case.

21             We solved the case using this hat, using the

22     motive and using the testimony of Ms. Burt.  You know what

23     you really have to find in order to acquit Mr. Dantzler on

24     this case?  You have to find that, on this night, not only

25     did Sam Dantzler let somebody else borrow his car, because

**44**

1       Ms. Burt tells you that that was his car, you have to find

2       that he let somebody else borrow his car, and he also let

3       somebody else borrow his hat. That's what you have to

4       find.

5               And I submit to you, ladies and gentlemen, that

6       neither one of those two things is true. Nobody borrowed

7       Mr. Sam Dantzler's car that night because he was part of

8       that posse. Nobody borrowed his hat, because he was in

9       that apartment and he left his hat there in that

10      apartment.

11              Why do we say he left his hat there? Because

12      ultimately this hat was tested. It was tested by

13      comparing his buccal swab against this cut that Chris

14      Steary made. Chris Steary is not a dumb person; all

15      right? He said he looked at the hat, looked at it inside

16      and out, obviously using his gloves and things, and he

17      said he made a decision that this was the front of the hat

18      or appeared to him to be the front of the cap because of

19      the tag in the back. And he took the cut from the inside

20      of the front of the cap because that's where the person

21      would have it against his brow. And that was the cut that

22      he took.

23              He prepared the DNA, and it ultimately got sent

24      off to Bode. Ultimately what also got sent off to Bode

25      was the -- more blood of Bernard Hill that was prepared.

**45**

1           know what?   Those three more cuts or scrapings don't hurt

2           our case, they help our case.   Because what did the People

3           from Bode tell you yesterday?   What did Rebecca Preston

4           tell you yesterday?   She found, in this cap, she found in

5           this cap the DNA of Bernard Hill.   Now nowhere near as

6           strong as the cut from the main -- from the main portion

7           here that they first analyzed, but in the three extra

8           cuts, which we didn't have to do at all if we didn't want

9           to, but in the three extra cuts, she found the DNA of

10          Bernard Hill.

11                    So not only do you have in this hat the DNA of

12          Samuel Dantzler, Junior (sic), one in 2.3 quadrillion, but

13          you have a very strong, decent DNA of Bernard Hill in this

14          cap.

15                    How did that get in there?   The only way, ladies

16          and gentlemen, the only reasonable way that Bernard Hill's

17          DNA got in this hat is because Bernard Hill, in that

18          evening, as he fought for his life, all right, in essence

19          solved this case.   He solved the case.   Somehow as he fled

20          through that apartment and fought in there, he got his

21          hands on this hat, his DNA transferred to that hat, his

22          DNA transferred to that hat.   And then he ultimately got

23          killed.

24                    So by doing the extra work, which we were not

25          afraid to do, all right, which we put ourselves to the

**46**

1          He was part of that.  I can't tell you that he

2     was the gunman.  I can't tell you he was one of the

3     persons that had a golf club.  But I do submit to you,

4     ladies and gentlemen, based on this hat with his DNA in it

5     and with Bernard Hill's DNA on it, along with the motive

6     and testimony, Mr. Dantzler was part of the group that

7     kicked in that door, committed that home invasion, and did

8     assault Bernard Hill, and that Bernard Hill died during

9     the course of that home invasion as he tried to flee from

10    it.

11         And Mr. Dantzler is, therefore, guilty of first

12    degree felony murder.  And we'd ask for a conviction on

13    that count.

14         Thank you.

15         THE COURT:  Thank you, Mr. Hutting.

16         Mr. Kinney.

17         MR. KINNEY:  Thank you, your Honor.

18         Good evening, ladies and gentlemen.

19         JURY PANEL:  Good evening.

20         MR. KINNEY:  I know what time it is.  I know

21    that you all have heard the entire case and I feel that

22    you want me to be as brief as possible, and I think I can

23    do that.  But I have to say that, at the beginning, what I

24    thought that this Honorable Court would instruct you on is

25    the fact that Mr. Dantzler, if he testifies, it's not at

**47**

1    were destroyed.  This is Exhibit A, Defense Exhibit A,

2    October the 19th of '09.

3              Mr. Dantzler's DNA.  We don't know who Mr. Hill

4    was fighting with.  The fact that a hat has been left

5    there by a family member of Mr. Hill, some other family

6    member that may have been there, that doesn't mean that

7    Mr. Dantzler is involved.  How about testing this kind of

8    evidence?  DNA underneath the nails of Mr. Hill.  Is it

9    Mr. Dantzler's fault that the Detroit Police Department,

10   even though they went to the Medical Examiner's

11   Department, and that's when you can use "they", we're

12   talking about the police department, the reason why we

13   have to use they, they're not clear from their records as

14   to who actually -- what police officer did perform the

15   work on this particular case at what time.  That's a

16   problem.

17             But we know that a police officer went and got

18   the blood sample of Mr. Hill, back in 2007, I believe it

19   was, but they didn't pick up the fingernail clippings.

20   They didn't go back and pick up those fingernail clippings

21   a year later.  They didn't go back and pick up those

22   fingernail clippings two years later.  That's the kind of

23   evidence that I believe, if Ms. Preston and Ms. Kaye had a

24   chance to take a look at, we would have found that Mr.

25   Dantzler's DNA would not have been there.

**48**

1           Whoever's DNA was there would have been a person
2      who may have had some kind of struggle with Mr. Hill.
3      That's scientific evidence when it comes to DNA.  That's
4      the difference of DNA, because DNA underneath my
5      fingernails and DNA being on a hat that everybody could
6      have wore.

7           Both experts testified that that particular hat,
8      just because it had the DNA on there, they can't determine
9      what day it was placed there, they can't determine what
10     time Mr. Dantzler had the hat on, what time Mr. Hill had
11     the hat on.  Another interesting thing about scientific
12     evidence is that poor Mr. Hutting's theory that Mr.
13     Dantzler left that hat there and Mr. Hill's DNA got on it
14     because he grabbed the hat at the time, that he's bleeding
15     to death, and no one has scientifically examined the hat
16     to determine whether or not Mr. Hill's blood is on the
17     hat.

18           We have Mr. Steary, who indicates that he's a
19     police officer, he calls himself a biologist, as well,
20     knows blood when he sees it, he's the only one that
21     thought about it.  What he says is when I did a cursory
22     look at the hat and I didn't see anything for blood, I
23     wasn't going to spend the money to do the testing, but I
24     don't think any blood was on the hat.

25           We don't have any evidence that Mr. Hill's blood

**49**

8

1     fingernail clippings weren't turned over.  There's no

2     bad faith here.

3                THE COURT:  Would you concede you have at

4     least negligence or gross negligence?

5                MR. HUTTING:  I'd say you have negligence.

6     I wouldn't say you have gross negligence, Judge.

7                THE COURT:  There are samples that were

8     taken -- I think the fingerprints, without going right

9     back to my notes, were destroyed the 25th of the month

10    or something and was being examined on the first of that

11    month.  There was another three weeks.  Isn't there a

12    procedure where they notify one another that there's

13    evidence and we're about to destroy this?  Do you have

14    any need for it?  Before they just go ahead and destroy

15    it?

16               MR. HUTTING:  There isn't any procedure.

17               THE COURT:  If there's an investigation

18    going on?

19               MR. HUTTING:  The morgue never knows when

20    there's an investigation that's been --

21               THE COURT:  Law enforcement certainly knew

22    or should have known.

23               MR. HUTTING:  Law enforcement knew they were

24    looking at this case.  Again, looking at it.

25               THE COURT:  Law enforcement knew there were

**50**

1    infer, consider.  And perhaps I would have said, you may

2    consider whether this evidence would have been

3    unfavorable to the Prosecution's case and favorable to

4    the Defendant's case.

5              MR. KINNEY: Thank you Your Honor.

6              MR. HUTTING: I still object to it.

7              THE COURT:  I think that's fair and I think

8    that evidence could have been preserved -- should have

9    been. I'm going to change the may to consider.  You may

10   consider whether this evidence would have been

11   unfavorable to the Prosecution's case and favorable to

12   the Defendant's case.

13             MR. HUTTING: Okay.

14             THE COURT:  You "may consider".

15             MR. KINNEY: Thank you.  Can I make one last

16   request with respect to Mr. Dantzler, he's indicated to

17   me --

18             THE COURT:  I was still talking about that

19   instruction.  I was going to ask where'd you like these

20   instructions inserted, chronologically?

21             MR. KINNEY: Mr. Dantzler wanted the lesser

22   includeds of second degree murder and voluntary

23   manslaughter.  And I understand that our defense was

24   alibi but facts of the case, especially as Mr. Hutting

25   argued in his rebuttal, there was provocation.  If they

**51**

21

1    presentation in the Court.  They both had a great

2    understanding of the rules of evidence.  There were very

3    few objections I deemed not applicable at the time.

4    They refrained from certain objections which helped

5    facilitate presentation of the evidence to the jury and

6    the years of experience, obviously, were evident

7    throughout the course of this trial.  The spirit of

8    cooperation in preparing instructions and verdict forms.

9    Yet at the same time zealously representing their

10   clients.  They're both to be commended.

11                    (Jury enters courtroom)

12            THE COURT:  Jurors, good morning.  We have

13   been finalizing jury instructions and the verdict form

14   for you and we're now ready to go; is that correct, Mr.

15   Hutting?  Mr. Kinney?

16            MR. HUTTING:  Yes, Your Honor.

17            MR. KINNEY: Yes, Your Honor.

18            THE COURT:  Members of the jury, the

19   evidence and arguments in this case are finished.  I

20   will now instruct you on the law.  I will explain the

21   law that applies to this case.  Remember, you've taken

22   an oath to return a true and just verdict based only on

23   the evidence and my instructions on the law.  You must

24   not let sympathy or prejudice influence your decision.

25   As jurors you must decide what the facts of this case

**52**

1    are; this is your job and nobody else's.  You must think

2    about all the evidence and the testimony and then decide

3    what each piece of evidence means and how important you

4    think it is.  This includes whether you believe what

5    each of the witnesses said.  What you decide about any

6    fact in this case is final.

7              It is my duty to instruct you on the law.

8    You must take the law as I give it to you.  If the

9    lawyers say something different about the law, follow

10   what I say.

11             At various times I've already given you

12   some instructions about the law.  You must take all my

13   instructions together as the law you're to follow.  You

14   should not pay attention to some instructions and ignore

15   others.  To sum it up, it your job to decide what the

16   facts of this case are.  To apply the law as I give it

17   to you and in that way to decide the case.

18             A person accused of a crime is presumed to

19   be innocent.  This means that you must start with the

20   presumption that the Defendant is innocent; this

21   presumption continues throughout the trial and entitles

22   the Defendant to a verdict of not guilty unless you're

23   satisfied beyond a reasonable doubt that he is guilty.

24             Every crime is made up of parts called

25   elements.  The Prosecutor must prove each element of the

**53**

1     crime beyond a reasonable doubt.  The Defendant is not

2     required to prove his innocence or to do anything.  If

3     you find the Prosecutor has not proven every element

4     beyond a reasonable doubt then you must find the

5     Defendant not guilty.  A reasonable doubt is a fair

6     honest doubt growing out of the evidence or lack of

7     evidence.  It's not merely an imaginary or possible

8     doubt.  A doubt based upon reason and common sense.  A

9     reasonable doubt is just that, a doubt that is

10    reasonable after a careful, considered examination of

11    the facts and circumstances of this case.

12            When you discuss the case and decide on

13    your verdict you may only consider evidence that's been

14    properly admitted in this case.  Therefore, it is

15    important for you to understand what is evidence and

16    what is not evidence.

17            Evidence includes only the sworn testimony

18    of the witnesses, the exhibits admitted into evidence,

19    and anything else I told you to consider as evidence.

20    Many things are not evidence and you must be careful not

21    to consider them as such.  I will now describe some of

22    the things that are not evidence.  The fact that the

23    Defendant is charged with a crime and is on trial is not

24    evidence.  The lawyers statements and arguments are not

25    evidence.  They're only meant to help you understand the

1    evidence and each sides legal theories.  The lawyers

2    questions to the witness are also not evidence.  You

3    should consider these questions only as they give

4    meaning to witnesses answers.  You should only accept

5    things the lawyers say that are supported by the

6    evidence or by your own common sense and general

7    knowledge.  My comments, rulings, questions, and

8    instructions are also not evidence.

9             It is my duty to see that the trial is

10   conducted according to the law and to tell you the law

11   that applies to this case.  However, when I make a

12   comment or give an instruction, I'm not trying to

13   influence your vote or express a personal opinion about

14   this case.  If you believe that I have an opinion about

15   how you should decide this case, you must pay no

16   attention to that opinion because you are the only

17   judges of the facts and you should decide this case from

18   the evidence.

19            At times during the trial I may have

20   excluded evidence that was offered or stricken testimony

21   that was heard.  Do not consider those things in

22   deciding this case.  Make your decision only on the

23   evidence that I let in and nothing else.  Your decision

24   should be based on all of the evidence regardless of

25   which party produced it.  You should use your own common

**55**

25

1    sense and general knowledge in weighing and judging the

2    evidence.  You should not use any personal knowledge you

3    may have about a place, person, or event.  To repeat

4    once more, you must decide this case based only on the

5    evidence admitted the during this trial.

6         As I have said before, it is your job to

7    decide what the facts of this case are.  You must decide

8    which witnesses that you believe and how important you

9    think their testimony is.  You do not have to accept or

10   reject everything a witness says.  You are free to

11   believe all, none, or part of any person's testimony.

12   In deciding which testimony that you believe, you should

13   rely on your own common sense and every day experience.

14   However, in deciding whether you believe a witness's

15   testimony you must set aside any bias or prejudice you

16   may have based upon the race, gender, or national origin

17   of the witness.

18        There is no fixed set of rules for judging

19   whether you believe a witness but it may help you to

20   think about these questions:  Was the witness able to

21   see or here clearly?  How long was the witness watching

22   or listening?  Was anything else going on that might

23   have distracted the witness?  Did the witness seem to

24   have a good memory?  How did the witness look and act

25   while testifying?  Did the witness seem to be making an

**56**

1    honest effort to tell the truth?  Or did the witness

2    seem to evade the questions or argue with the lawyers?

3    Does the witness age and maturity affect how you judge

4    his or her testimony?  Does the witness have any bias,

5    prejudice, or interest in how this case is decided?

6    Have there been any promises, threats, discussions, or

7    other influences that affected how the witness

8    testified?  In general, does the witness have any

9    special reason to tell the truth?  Or any special reason

10   to lie?  All in all, how reasonable does the witness's

11   testimony seem when you think about all the other

12   evidence in this case?

13         Sometimes testimony of different witnesses

14   will not agree and you must decide which testimony that

15   you accept.  You should think about whether the

16   disagreement involves something important or not and

17   whether you think someone is lying or simply mistaken.

18   People see and hear things differently and witnesses may

19   testify honestly but be wrong about what they thought

20   they saw or remembered.  It is also a good idea to think

21   about which testimony agrees best with all the other

22   evidence in this case.  However, you may conclude that a

23   witness deliberately lied about something that's

24   important to how you decide this case. If so, you may

25   chose not to accept anything that witness said.  On the

57

1    other hand, if you think the witness lied about some

2    things but told the truth about others, you may simply

3    accept the part you think is true and ignore the rest.

4                    Facts can be proved by direct evidence from

5    a witness or evidence. Direct evidence is evidence we

6    actually see or hear. For example, if you look outside

7    and see rain falling that's direct evidence that it is

8    raining. Facts can also be proven by indirect or

9    circumstantial evidence. Circumstantial evidence is

10   evidence that normally or reasonably leads to other

11   facts. So, for example, if you see a person come in

12   from outside wearing a rain coat covered with small

13   drops of water, that would be circumstantial evidence

14   that it is raining.

15                    You may consider circumstantial evidence.

16   Circumstantial evidence by itself or a combination of

17   circumstantial evidence and direct evidence can be used

18   to prove the elements of a crime. In other words, you

19   should consider all of the evidence that you believe.

20   If you believe that a witness previously made a

21   statement inconsistent with their testimony at this

22   trial, the only purpose for which that earlier statement

23   can be considered by you is in deciding whether the

24   witness testified truthfully in Court. The earlier

25   statement is not evidence if what the witness stated

**58**

1    early is true.

2              When lawyers agree on a statement of facts

3    these are called stipulated facts.  You may regard such

4    stipulated facts as true but you're not required to do

5    so.  You may consider whether a Defendant had a reason

6    to commit alleged crime but a reason by itself is not

7    enough to find a person guilty of a crime.  The

8    Prosecutor does not have to prove that the Defendant had

9    a reason to commit the alleged crime.  He only is to

10   show that the Defendant actually committed the crime and

11   that he meant to do so.

12             The Prosecutor introduced evidence about

13   prints.  You may consider this evidence when you decide

14   whether the Prosecutor has proven beyond a reasonable

15   doubt that the Defendant was the person who committed

16   the alleged crime.  However, fingerprints matching the

17   Defendant's must have been found in the place the crime

18   was committed under such circumstances that they could

19   have only been put there when the crime was committed.

20   The fingernail clippings from Bernard Hill's autopsy are

21   missing evidence whose production was the responsibility

22   of the Prosecution.

23             You may consider whether this evidence

24   would have been unfavorable to the Prosecution's case

25   and favorable to the Defendant's case.  You should not

**59**

29

1    decide this case based on which side presented more

2    witnesses.  Instead you should think about each witness

3    and each piece of evidence and whether you believe them

4    and you must decide whether the testimony and evidence

5    you believe proves beyond a reasonable doubt that the

6    Defendant is guilty.

7         You have heard that a lawyer talked to one

8    of the witnesses; there's nothing wrong with this.  A

9    lawyer may talk to a witness to find out what the

10   witness knows about the case and what the witness's

11   testimony will be.

12        You have heard testimony from three

13   witness's, Doctor Sherlo (ph), Rebecca Preston, and

14   Nicole Kay who have given you their opinions as experts

15   in the field of forensic pathology and DNA analysis,

16   respectively.  You have also stipulated reports from

17   Marcia McLearie, Michigan State Police officer Reinhardt

18   Pope who have given their expert opinions through their

19   reports in the field of fingerprint analysis and

20   firearms identification, respectively.  Experts are

21   allowed to give opinions in Court about matters they're

22   experts on.  However, you do not have to believe an

23   expert's opinion.  Instead you should decide whether you

24   believe it and how important you think it is.  When you

25   decide whether you believe an expert's opinion think

**60**

30

1    carefully about the reasons and facts they gave for

2    their opinion and whether those facts are true.   You

3    should also think about the expert's qualifications and

4    whether their opinion makes sense when you think about

5    the other evidence in this case.

6                   You have heard testimony from witnesses who

7    are police officers; that testimony should be judged by

8    the same standard you use to evaluate the testimony of

9    any other witness.

10                  The Defendant is charged with first degree

11   felony murder.   To prove this charge the Prosecutor must

12   prove each the following elements beyond a reasonable

13   doubt:   First,  that the Defendant caused the death of

14   Bernard Hill; that is, that Bernard Hill died as a

15   result of a gun shot wound.

16                  Second, that the Defendant had one of these

17   three states of mind, he intended to kill or he intended

18   to do great bodily harm to Bernard Hill or he knowingly

19   created a very high risk of death of great bodily harm

20   knowing that death or such harm would be the likely

21   result of his actions.

22                  Third, that when he did the act that caused

23   the death of Bernard Hill, the Defendant was committing

24   or attempting to commit or helping someone else commit

25   the crime of home invasion, first degree.   For the crime

**61**

```
 1          of home invasion first degree, the Prosecutor must prove
 2          the following elements beyond a reasonable doubt:
 3          First, that the Defendant broke into a dwelling; it does
 4          not matter whether anything was actually broken.
 5          However, some force must have been used.  Opening a
 6          door, raising a window, and taking off a screen are all
 7          examples of enough force to count as a breaking.
 8          Entering a dwelling through an already open door without
 9          use of force does not count as breaking.  Second, that
10          the Defendant entered the dwelling.  It does not matter
11          whether the Defendant got his entire body inside.  If
12          the Defendant put any part of his body into the dwelling
13          after the breaking, that is enough to count as an entry.
14          Third, that when Defendant broke and entered the
15          dwelling he intended to commit an assault or to do great
16          bodily harm or that when the Defendant entered, was
17          present, or was leaving the dwelling he committed the
18          offense of assault to do great bodily harm.  Fourth,
19          that when the Defendant entered, was present, or leaving
20          the dwelling either of the following circumstances
21          existed:  He was armed with a dangerous weapon or
22          another person was lawfully present in the dwelling.
23          The Defendant must have been either committing or
24          helping someone else commit the crime of home invasion
25          first degree.  To help means to perform, act, or give
```

**62**

1   encouragement before or during the commission of a crime

2   that aids or assists in its commission.  At the time

3   giving the aid or encouragement the Defendant must have

4   intended the commission of the crime.

5           In this case, the Defendant is charged with

6   committing first degree felony murder or intentionally

7   assisting someone else in committing it.  Anyone who

8   intentionally assists someone else in committing a crime

9   is as guilty as the person who directly commits it and

10  can be convicted of that crime as an aider and abetter.

11  To prove this charge the Prosecutor must prove each of

12  the following elements beyond a reasonable doubt:

13  First, that the alleged crime was actually committed

14  either by the Defendant or someone else.  It does not

15  matter whether anyone else has been convicted of the

16  crime.  Second, that before or during the crime

17  Defendant did something to assist in the commission of

18  the crime.  Third, the Defendant must have intended the

19  commission of the crime alleged or must have known the

20  other person intended its commission at the time of

21  giving the assistance.

22          You must think about all the evidence in

23  deciding what the Defendant's state of mind was at the

24  time of the alleged killing.  The Defendant's state of

25  mind may be inferred from the kind of weapon used, the

**63**

1    type of wounds inflicted, the acts and words of the

2    Defendant, and any other circumstances surrounding the

3    alleged killing.  You may infer that the Defendant

4    intended to kill if he used a dangerous weapon in a way

5    that was likely to cause death.  Likewise, you may infer

6    that the Defendant intended the usual results to follow

7    from the use of a dangerous weapon; a gun is a dangerous

8    weapon.  Any dangerous weapon is any instrument used in

9    a way likely to cause serious physical injury or death.

10   It does not matter how much help advice or encouragement

11   the Defendant gave.  However, you must decide whether

12   the Defendant intended to help another commit the crime

13   and whether his help, advice, or encouragement actually

14   did help, advise, or encourage the crime.

15          The Prosecutor must also prove beyond a

16   reasonable doubt that that crime occurred on or about

17   January 16, 2006, in the City of Detroit, County of

18   Wayne.

19          You must think about all the evidence in

20   deciding what the Defendant's state of mind was at the

21   time of the alleged killing.  The Defendant's state of

22   of mind may be inferred from the kind of weapon used --

23   I already read this haven't I?

24          MR. HUTTING: Yes.

25          MR. KINNEY: Can we approach for just a

**64**

1    second, please?

2                    THE COURT:  Yes.

3                        (Off the record discussion held)

4                        (Back on the record)

5                    THE COURT: You have heard evidence that the

6    Defendant could not have committed the alleged crime

7    because he was somewhere else when the crime was

8    committed.  The Prosecutor must prove beyond a

9    reasonable doubt that the Defendant was actually there

10   when the alleged crime was committed.  The Defendant

11   doesn't have to prove he was somewhere else if, after

12   carefully considering all the evidence, you have a

13   reasonable doubt about whether the Defendant was

14   actually present when the alleged crime was committed

15   you must find him not guilty.

16                    When you go to the jury room you should

17   first choose a foreperson.  The foreperson should see to

18   it that your discussions are carried on in a

19   businesslike way and everyone has a fair chance to be

20   heard.  During your deliberations please turn off your

21   cell phones or other communications equipment until

22   recess.

23                    A verdict in a criminal case must be

24   unanimous.  In order to return a verdict it is necessary

25   that each of you agrees on that verdict.

**65**

1    In the jury room you'll discuss the case

2    among yourselves but ultimately each of you will have to

3    make up your own mind.  Any verdict must represent the

4    individual considered judgment of each juror.  It is

5    your duty, as jurors, to talk to each other and make

6    every reasonable effort to reach agreement.  Express

7    your opinions and reasons for them but keep an open mind

8    as you listen to your fellow jurors rethinking your

9    opinions and do not hesitate to change your mind if you

10   decide you were wrong.  Try your best to work out your

11   differences.  However, although you should try to reach

12   agreement, none of you should give up your honest

13   opinion about the case just because other jurors

14   disagree with you or just for the sake of reaching a

15   verdict.  In the end your vote must be your own and you

16   must vote honestly and in good conscience.

17          Possible penalty should not influence your

18   decision.  It is the duty of the judge to fix the

19   penalty within the limits provided by law.

20          If you want to communicate with me while

21   you're in the jury room please have your foreperson

22   write a note, knock on the door, and give it to one of

23   our deputy sheriffs.  It's not proper for you to talk

24   directly with the judge, the lawyers, Court officers or

25   other people involved in this case.  As you discuss the

**66**

1    case you must not let anyone, even me, know how your

2    voting stands.  Therefore, until you've returned with a

3    unanimous verdict, do not reveal this to anyone outside

4    of the jury room.  Again, if you want to communicate

5    with me your foreperson writes a note, knock on the

6    door, one of our sheriffs will eventually respond,

7    receive the note, and I will respond by note in writing

8    or whatever.  You do not just enter the courtroom

9    because we're doing other matters.  Sometimes we don't

10   immediately respond to the knock but we hear it.  Thank

11   you.

12           If you want to look at any or all of the

13   exhibits that have been admitted just ask me for them.

14   A verdict form has been prepared for you listing the

15   possible verdicts.  You're to mark only one box; not one

16   count.  Correct, gentlemen?

17           MR. HUTTING: Correct.

18           MR. KINNEY:  Correct.

19           THE COURT:  If you arrive at a verdict the

20   foreperson will sign the verdict form and date it.

21           Gentlemen are you satisfied with the

22   presentation of the instructions to the jurors.

23           MR. HUTTING:  Yes.

24           MR. KINNEY: Yes.

25           THE COURT:  Thank you both.

**67**

# ANN E. CHAMBERLAIN, M.S.

*Independent Forensic Consultant*
*Medical Examiner Investigator*

PO Box 27419
Lansing, MI 48909
(517) 881-9900 PHONE
(517) 884-0959 FAX
annconsultant@live.com
medicalexam@live.com

## Fees for Expert Services

| | |
|---|---|
| $1,500.00 | retainer fee |
| $250.00 | billable hourly rate |
| $2,500.00 | deposition or court testimony (per day) |
| Current govt. rate | mileage |
| Current govt. rate | per diem and hotel as needed for travel |

SEROLOGIST      DNA CONSULTANT      BLOODSTAIN PATTERN ANALYST      CRIME SCENE RECONSTRUCTIONIST

**68**

STATE OF MICHIGAN
THIRD CIRCUIT COURT CRIMINAL DIVISION
COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN,

            Plaintiff,

                                       Case #:

-vs-                                   Hon. GREGORY BILL

SAMUEL DANTZLER,

            Defendant.

---

AUGUSTUS S. HUTTING (P24839)
Wayne County Prosecuting Attorney
1441 St. Antoine, 12th Floor
Detroit, MI 48226
(313) 224-5807

ROBERT F. KINNEY (P35842)
Attorney for Defendant
615 Griswold St., Suite 1300
Detroit, MI 48226
(313) 963-5310

---

### ORDER FOR AN APPOINTMENT OF AN INDEPENDENT DNA EXPERT

At a session held in the 3rd Judicial Circuit,
County of Wayne, on: _____ JUL 3 0 2010

PRESENT: HON.   **HON. GREGORY D. BILL**
Judge 3rd Judicial Circuit

     A request is being made by Counsel for the Defendant to have an independent DNA expert appointed regarding the above captioned case, and the Court being fully advised in the premises:

     IT IS HEREBY ORDERED that an independent DNA expert, shall be appointed in the above captioned case. *AND RESULTS AVAILABLE NO LESS THAN TEN DAYS BEFORE THE TRIAL DATE OF OCTOBER 18, 201.*

     IT IS FURTHER ORDERED that the Independent DNA expert shall be compensated by the State as per their fee schedule for such expert services due to the defendant's indigence.

     IT IS FURTHER ORDERED that the independent DNA expert shall be allowed a contact visit with the Defendant SAMUEL DANTZER at the Wayne County Jail.

*Approved as to Form*

*A. W. Hutting P24839*

_____
JUDGE GREGORY BILL
WAYNE COUNTY CIRCUIT COURT

**69**

**STATE OF MICHIGAN**
**THIRD CIRCUIT COURT CRIMINAL DIVISION**
**COUNTY OF WAYNE**

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff,

                                                Case #: 10-3521-01
-vs-                                       Hon. GREGORY D. BILL

SAMUEL DANTZLER,

        Defendant.

---

AUGUSTUS S. HUTTING (P24839)            ROBERT F. KINNEY (P35842)
Wayne County Prosecuting Attorney       Attorney for Defendant
1441 St. Antoine, 12th Floor              615 Griswold St., Suite 1300
Detroit, MI 48226                       Detroit, MI 48226
(313) 224-5807                         (313) 963-5310

---

## ORDER FOR AN APPOINTMENT OF AN INDEPENDENT DNA EXPERT

At a session held in the Wayne County Circuit Court, County of Wayne, State of Michigan on: _____ NOV 2 4 2010 _____

PRESENT: HON. _____ HON. GREGORY D. BILL _____
              HON. GREGORY D. BILL,
              Wayne County Circuit Court Judge

A request is being made by Counsel for the Defendant to have ANN E. CHAMBERLAIN, an independent DNA expert appointed regarding the above captioned case, and the Court being fully advised in the premises:

IT IS HEREBY ORDERED that ANN E. CHAMBERLAIN, an independent DNA expert, shall be appointed in the above captioned case.

IT IS FURTHER ORDERED that ANN E. CHAMBERLAIN, the Independent DNA expert shall be compensated by the State as per their fee schedule for such expert services due to the defendant's indigence.

_____Gregory D. Bill_____
HON. GREGORY D. BILL
WAYNE COUNTY CIRCUIT COURT JUDGE

**70**

STATE OF MICHIGAN
IN THE CIRCUIT COURT
FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN
                Plaintiff


                                        Trial Court No: 10-3521-01


V



SAMUEL LEE DANTZLER
_____Defendant_____/

APPENDIX TO DEFENDANT'S MOTION
FOR RELIEF FROM JUDGMENT

VOLUME TWO PAGES 71-146



APP VOL 2

| INDEX OF DOCUMENT(S) | APPENDIX PG |
|---|---|
| TRANSCRIPT CITATIONS FROM 9-9-10 | 1 |
| TRANSCRIPT CITATIONS FROM 9-17-10 | 4 |
| TRANSCRIPT CITATIONS FROM 12-14-10 | 6 |
| TRANSCRIPT CITATIONS FROM 12-15-10 | 10 |
| TRANSCRIPT CITATIONS FROM 12-16-10 | 12 |
| TRANSCRIPT CITATIONS FROM 12-20-10 | 24 |
| TRANSCRIPT CITATIONS FROM 12-21-10 | 40 |
| TRANSCRIPT CITATIONS FROM 12-22-10 | 50 |
| Order for Appointment of Independent Expert 7-30-10 | 69 |
| Order for Appointment of Independent Expert 11-24-10 | 70 |

SEE VOLUME TWO FOR DOCUMENTS BELOW

| | |
|---|---|
| Prosecutions Notice of Brady Violation | 71 |
| SADO Notice to Derrius Haynes of Brady Violation | 72 |
| Audit Report of Detroit Police Crime Lab | 73 |
| MAACS Deficiency Letter to Appellate Counsel | 107 |
| Defendant's Letter asking Counsel to Raise Brady Claim | 110 |
| Counsel's Letter Declining to Raise Brady Claim | 111 |
| Defendant's Brief On Appeal | 112 |
| COA Opinion Affirming Conviction | 139 |
| COA Denial of Reconsideration | 143 |
| Michigan Supreme Court Leave Denial | 144 |
| Affidavit of Stephen Jennings | 145 |
| Affidavit of Defendant Dantzler | 146 |

APP VOL 2



| KYM L. WORTHY<br>PROSECUTING ATTORNEY | COUNTY OF WAYNE<br>OFFICE OF THE PROSECUTING ATTORNEY<br>DETROIT, MICHIGAN | 1200 FRANK MURPHY HALL OF JUSTICE<br>1441 ST. ANTOINE STREET<br>DETROIT, MICHIGAN 46226-2302 |
| --- | --- | --- |

RICHARD P. HATHAWAY
CHIEF ASSISTANT

DONN FRESARD
CHIEF OF STAFF

TEL: (313) 224-5777
FAX: (313) 224-0974

April 25, 2012

Mr. Neil J. Leithauser
101 W. Big Beaver Rd Fl 14
Troy, MI 48084

Re: People v Samuel Dantzler, 10-003521

Dear Mr. Leithauser:

As a result of the closure of the former Detroit Police Lab, the Prosecutor's Office has initiated a case review of certain convictions involving forensic evidence. This case has been reviewed and we have determined that no further action is necessary. There was no forensic evidence tested by the Detroit Police Lab.

We are notifying you regarding this matter because you are listed as the defendant's last attorney of record. The State Appellate Defender Office has a unit specifically designed to work on these issues. Should you or the defendant wish their assistance, please contact Jonathan Sacks, Suite 3300 Penobscot Building, 645 Griswold, Detroit, MI 48226.

Sincerely,

KYM L. WORTHY
Prosecuting Attorney
County of Wayne

Pat Muscat
Director
Conviction Integrity Unit
Wayne County Prosecutor's Office

APA Matthew Forrest
Conviction Integrity Unit
Wayne County Prosecutor's Office
1441 St. Antoine
Detroit, MI 48226

CC: Samuel Dantzler

**71**



PRINTED ON
RECYCLED PAPER

# STATE APPELLATE DEFENDER OFFICE

Main Office:  SUITE 3300 PENOBSCOT • 645 GRISWOLD • DETROIT, MICHIGAN  48226-4281
Phone: 313.256.9833 • Fax: 313.965.0372
CLIENT CALLS 313.256.9822

**JAMES R. NEUHARD**
DIRECTOR

**DAWN VAN HOEK**
CHIEF DEPUTY DIRECTOR
DETROIT/LANSING

**JONATHAN SACKS**
DEPUTY DIRECTOR
DETROIT



**LANSING OFFICE**
101 NORTH WASHINGTON
14TH FLOOR
LANSING, MICHIGAN  48913-0001
Phone: 517.334.6069 · Fax: 517.334.6987

Website: www.sado.org

February 11, 2010

DERRIUS HAYNES
No. 351845
Saginaw Correctional Facility
9625 Pierce Road
Freeland MI 48623

      **Re:**   **Detroit Crime Lab**

Dear DERRIUS HAYNES:

As you may have heard, the Detroit Police Crime Lab was closed in 2008 because of serious problems in its performance.  The State Appellate Defender Office is now looking at cases that used evidence from the Detroit Crime Lab such as DNA, fingerprints, ballistics, gunshot residue, etc. to potentially take cases that used bad evidence back to court.

NOTE: For us to review your case, it

    1) must be from Detroit and

    2) must have used evidence from the DETROIT Crime Lab.

If you do not currently have an attorney and believe that Detroit Crime Lab evidence played a part in your conviction, please let us know if you would like SADO to review your case by returning the attached form to our office.  We will look at your case even if SADO was not your attorney.

Once you send us the attached form, we will send a questionnaire for you to complete and return. This will give us the information we need to begin to look at your case.

**Please do not send us any documents or transcripts at this time.**

**Please do not contact the court directly about your case.  Documents sent directly to the court will be returned to you.**

72

## I.    BACKGROUND AND SCOPE

Upon request by former Detroit Police Department (DPD) Chief Ella Bully-Cummings, the DPD Forensic Services Laboratory's firearms unit and quality assurance program were inspected by four-person team from the Michigan State Police (MSP) Forensic Science Division beginning in June of 2008. The format of the inspection was based on the accreditation criteria listed within the American Society of Crime Laboratory Directors / Laboratory Accreditation Board's (ASCLD/LAB) Legacy accreditation program. Included in the inspection was a review of the laboratory's Quality Manual along with the Procedures and Training Manuals for the firearms unit.

Additionally, 30 completed cases dating back to 2006 from each of the nine firearms examiners (where possible) were selected for reanalysis. The reanalysis of these cases was conducted by Ron Smith & Associates (RS&A). The analysis took place at the MSP's Lansing Forensic Laboratory under the supervision of the MSP Forensic Science Division. 

At the request of the Wayne County Prosecutor's Office, 33 previously adjudicated cases were included as part of the cases examined by Ron Smith & Associates. During the audit review process, the Wayne County Prosecutor's Office also requested reanalysis on firearms cases that were pending trial or warrant requests. The reanalysis of these cases was conducted by MSP firearms examiners.

## II.    AUDIT EXECUTIVE SUMMARY

The Detroit Police Department Forensic Services Laboratory was found to be in non-compliance with 66 of the 101 applicable criteria upon which they were inspected. During the inspection, the DPD firearms unit showed compliance to only 42% of the Essential criteria, 26% of the Important criteria, and 29% of the Desired criteria.

ASCLD/LAB defines these three criteria levels as follows:

> Essential: Standards which directly affect and have fundamental impact on the work product of the laboratory or the integrity of the evidence. Essential criteria must show 100% compliance for accreditation to be achieved under the ASCLD/LAB Legacy program.

> Important: Standards which are considered to be key indicators of the overall quality of the laboratory but may not directly affect the work product or the integrity of the evidence. Important criteria must show a minimum of 75% compliance for accreditation to be achieved under the ASCLD/LAB Legacy program.

---

**Detroit Police Department**                                           Page 3 of 34
Forensic Services Laboratory Audit
October 28, 2008



75

Desired: Standards which have the least effect on the work product or the integrity of the evidence but which nevertheless enhance the professionalism of the laboratory. Desired criteria must show a minimum of 50% compliance for accreditation to be achieved under the ASCLD/LAB Legacy program.

The criteria within the ASCLD/LAB Legacy program are used to determine the effectiveness of a laboratory's quality system. If the quality system is failing in one forensic discipline, it is highly likely to be an indicator of a systemic problem that affects other forensic disciplines within that laboratory system as well.

At the conclusion of the audit, 250 selected audit cases and 33 previously adjudicated cases from the Wayne County Prosecutor's Office had been reanalyzed. The audit showed a total of 29 cases had either Class I or Class II inconsistencies.

ASCLD/LAB defines the three classes of inconsistencies as follows:

Class I: The nature and cause of the inconsistency raises immediate concern regarding the quality of the laboratory's work product. Examples of a Class I inconsistency may include an erroneous identification, false identification, or false positive.

Class II: The inconsistency is due to a problem that may affect the quality of the work, but is not serious enough to cause immediate concern for the over-all quality of the laboratory's work product. Examples of a Class II inconsistency may include a missed identification or false negative.

Class III: The inconsistency is determined to have only minimal effect or significance, be unlikely to recur, is not systemic, and does not significantly affect the fundamental reliability of the laboratory's work. An example of a Class III inconsistency may include an administrative or transcription mistake.

Repeated instances of Class II or Class III (or a combination of Class II or Class III) inconsistencies occurring in the same laboratory over time or at one time may be viewed as raising to the level of a Class I inconsistency.

In total, approximately 10% of the firearms cases reanalyzed had significant errors. On average, the DPD firearms unit completes approximately 1,800 cases per year. If this 10% error rate holds, the negative impact on the criminal justice system may be substantial.

The majority of firearms cases analyzed by DPD examiners result in all fired evidence in a case being identified, which is a highly uncommon result. The audit team found that in many cases in which numerous items of evidence were involved, the examiner did not examine every item. Instead, an assumption was made that items belong together based on the analysis of only a few. Inconsistencies such as this would normally be

Detroit Police Department
Forensic Services Laboratory Audit
October 28, 2008



Page 4 of 14

**76**

## B.    CLASS II INCONSISTENCIES

**F07-0256 / RS&A 08-0265 / MSP LS08-4796:** DPD did not identify a fired cartridge case to a submitted gun. RS&A and MSP identified the fired cartridge case as having been fired in the submitted gun.

**F07-0271 / RS&A 08-0070:** DPD positively identified four .38 special caliber fired cartridge cases to a submitted Colt revolver and were inconclusive on an additional three fired cartridge cases. RS&A positively identified all seven .38 special caliber fired cartridge cases as having been fired in the submitted Colt revolver. 

**F07-0294 / RS&A 08-0229 / MSP LS08-4762:** DPD classified bullet (Item 13) as a 38/357 caliber. RS&A classified it as 9mm caliber. MSP classified it as 38 caliber class which includes both the previously mentioned calibers. DPD was inconclusive on associating any of the bullets/fragments (Items 13 thru 19) to each other. RS&A identified Items 13, 17, and 18 to each other as having been fired from the same gun. MSP identified 13 to 17, and could not identify or eliminate 18.

**F07-0778 / RS&A 08-0127:** DPD positively identified three .45 caliber fired cartridge cases to a submitted Sturm Ruger handgun. DPD also identified six .357 Sig caliber fired cartridge cases to each other. The submitted bullets and/or fragments were not identified by DPD. RS&A confirmed all the identifications made by DPD and also identified the submitted bullets and/or fragments not identified by DPD.

**F08-0039 / RS&A 08-0158:** DPD identified the fired CCI brand cartridge case to the submitted Marlin brand rifle but was not able to associate the fragmented bullet to the rifle. RS&A identified both the fired cartridge case and fragmented bullet to the rifle.

## IV.    RESULTS OF REANALYSIS OF ADJUDICATED CASES

At the request of the Wayne County Prosecutor's Office, 33 previously adjudicated cases were reanalyzed as part of the audit. Of those cases, four were found to contain a Class I inconsistency.

## A.    CLASS I INCONSISTENCIES

**F06-0403 / RS&A 08-0213 / MSP LS08-4328:** DPD associated one bullet to the gun and a second bullet was inconclusive. Both RS&A and MSP identified both bullets as coming from a single firearm and were inconclusive in associating it with the submitted firearm.



Detroit Police Department                                                            Page 8 of 34
Forensic Services Laboratory Audit
October 28, 2008

**80**

Comments: Interviews of the firearms examiners showed they were not aware of the mission statement and goals listed within the objectives for the laboratory. The mission statement and goals are listed in section 1 of the Quality Manual.

B.    **ADMINISTRATIVE PRACTICES**

IMPORTANT – IS THE BUDGET ADEQUATE TO MEET THE WRITTEN OBJECTIVES?

Discussion: The budget for the laboratory should permit it to meet its objectives. This may be accomplished through a laboratory, laboratory system, or parent agency budget. For example, if the objectives describe a full service laboratory providing timely results but there is insufficient funding for staff or essential equipment in one or more of the service areas, or if inadequate staffing has resulted in large backlogs and lengthy turnaround times, the budget cannot be considered adequate to meet the objectives.

Comments: Nearly 94% of the laboratory's budget goes toward salaries and benefits. Approximately $385,000 is allocated for all laboratory services, facility needs, and training of personnel. By conducting a site inspection and interviews, it was determined the budget does not support the written objectives of meeting the firearm service needs of the City of Detroit. The firearms unit requires needs infrastructure upgrades, additional equipment, and training for professional development in order to attain the quality of work needed for accreditation purposes.

ESSENTIAL – DOES CLEARLY WRITTEN AND WELL UNDERSTOOD DOCUMENTATION OR PROCEDURE EXIST FOR HANDLING AND PRESERVING THE INTEGRITY OF EVIDENCE?

Discussion: Clearly written and well understood procedures must exist for handling and preserving the integrity of evidence; laboratory security; preparation, storage, security and disposition of case records and reports; control of materials and supplies; maintenance and calibration of equipment and instruments; and for operation of individual characteristic databases. Clearly written and well understood documentation or procedures should also exist for job requirements and descriptions; personnel evaluations and objectives; and for employee complaints concerning the quality system.

Comments: A review of case records showed that 90% of the file jackets failed to contain a property receipt which is contrary to section 4.1.6.3 of the Quality Manual. Without a property receipt, the chain of custody is broken and the integrity of the evidence is compromised.

of custody, proper marking of evidence, proper evidence seals, and a secure area for evidence storage. The laboratory's chain of custody must document each transfer of evidence and the date of the transfer. Each person receiving evidence must personally acknowledge the receipt of the evidence by signature, initials or a secure electronic equivalent.

Individuals transferring custody of evidence to another individual are not required to sign the custody form a second time, upon transfer, if the individual's signature is the last signature on the custody form prior to the transfer, and it is clear on the form that the evidence is being relinquished to the next person signing the form. Transfers of evidence to or from an evidence storage location must be acknowledged by the individual making the transfer, at the time of the transfer.

Electronic tracking of evidence is an acceptable alternative to a written record as long as the computerized data is sufficiently secure, detailed, and accessible for review and can be converted to a hard copy when necessary (1.4.1.1). When evidence is sub-divided in the laboratory, sub-items of evidence must be tracked through a documented chain of custody record to the same extent that original items of evidence are tracked.

Comments: The audit team was unable to verify that consistent documentation is maintained within the case file jacket showing when evidence is removed from the firearms property room vault for analysis. This lack of documentation jeopardizes the chain of custody and could have ramifications during a trial.

ESSENTIAL – IS EVIDENCE PROTECTED FROM LOSS, CROSS TRANSFER, CONTAMINATION, AND /OR DELETERIOUS CHANGE?

Discussion: There are many factors involved in the protection of evidence from loss, cross transfer, contamination, and/or deleterious change. These factors include the proper identification, packaging, sealing, and storage of evidence. A laboratory must take all of these factors into consideration in the processing of evidence.

Where appropriate, further processing to preserve, evaluate, document, or render evidence safe shall be accomplished prior to final packaging. Evidence collected from a crime scene must be appropriately identified, packaged, and entered into the evidence control system as soon as practical.

Comments: The firearms vault is much too small to hold the volume of evidence. As a result, firearms evidence is laid about in the unit unsecured and unprotected from possible loss and contamination.

ESSENTIAL – IS THERE A SECURE AREA FOR OVERNIGHT AND/OR LONG-TERM STORAGE OF EVIDENCE?

Detroit Police Department                                                                      Page 18 of 34
Forensic Services Laboratory Audit
October 28, 2008

**90**



Discussion: To maintain the integrity of evidence, facilities must be provided to secure it in accordance with the laboratory's policies. A laboratory should provide an area for long-term storage of evidence. It should also provide a smaller area, preferably in the examiner's work area, for each examiner to maintain temporary storage of evidence. Proper security can be achieved by storing the evidence in locked cabinets, refrigerators, vaults, or rooms. Evidence storage space may be shared by laboratory personnel.

Comments:  Access to the firearms unit is not restricted during normal business hours.  Due to a lack of proper storage space, firearms evidence overflows into office and workspace areas, potentially compromising its integrity.

ESSENTIAL –  HAS THE LABORATORY ESTABLISHED WHETHER INDIVIDUAL CHARACTERISTIC DATABASE SAMPLES ARE TREATED AS EVIDENCE, REFERENCE MATERIALS, OR EXAMINATION DOCUMENTATION?

Discussion:  Individual characteristic database samples include test fired ammunition produced in the laboratory, known blood or standard biological samples, and the ten print cards (or their electronic image equivalents which are commonly referred to as records) of known individuals.

Comments:  Section 4.1 of the Quality Manual states characteristic database samples are not evidence, but does not characterize them further as either reference material or examination documentation.

ESSENTIAL –  ARE INDIVIDUAL CHARACTERISTIC DATABASE SAMPLES PROTECTED FROM LOSS, CROSS TRANSFER, CONTAMINATION AND/OR DELETERIOUS CHANGE?

Discussion:  Individual characteristic database samples must be treated in a manner that reasonably ensures their utility as comparison materials.

Comments:  Test shots are maintained within the case files in unsealed envelopes, susceptible to loss.  A recent procedural change, which was not documented in the Quality Manual or Firearms Procedures Manual, allows for database samples to be stored in the basement rather than in the case file jackets.

ESSENTIAL –  IS ACCESS TO INDIVIDUAL CHARACTERISTIC DATABASE SAMPLES RESTRICTED TO THOSE PERSONS AUTHORIZED BY THE LABORATORY DIRECTOR?

Discussion:  The laboratory director shall authorize access to those individuals having a legitimate purpose. Such persons include, but are not limited to, computer technicians who are not employees of the laboratory or agency, but who are responsible for equipment repair, database maintenance, improvement, etc. of a database if it is not under control of the laboratory.



# MICHIGAN APPELLATE ASSIGNED COUNSEL SYSTEM



THOMAS M. HARP
ADMINISTRATOR

LYLE N. MARSHALL
DEPUTY ADMINISTRATOR

August 3, 2012

Mr. Neil Leithauser
Attorney at Law
101 W. Big Beaver Road    14th Floor
Troy, MI  48084

RE:    *People v Samuel Dantzler*
       Court of Appeals No. 303252
       Wayne Circuit Court No. 10-3521-01

Dear Mr. Leithauser,

Thank you for your July 28, 2012 response letter to my letter to you dated July 17, 2012.  In my letter to you I informed you that your client in the above-captioned case, Samuel Dantzler, wrote to this office complaining about the representation he said you were affording him.  He wrote that he "was denied counsel in a critical stage of my proceeding of my appeal due to the deficient performance of my assigned counsel."  He said that you did not appear for oral argument.  He requested that this office investigate his allegation.

I told you in my letter that it is the responsibility of this office to investigate inquiries from clients about the representation being afforded them by MAACS roster attorneys.  I wrote that the Court of Appeals record indicated that you requested oral argument when you filed Mr. Dantzler's brief on appeal, but you did not timely file the brief.  I informed you that MAACS Minimum Standard 6 requires that counsel "preserve the right to oral argument by timely filing the defendant's brief on appeal," and I reminded you that MCR 7.212(A)(4) provides that "[a]ny party failing to timely file and serve a brief required by this rule forfeits the right to oral argument."  I determined, based on Mr. Dantzler's allegation and the Court's record that a violation of Minimum Standard 6 was implicated.  I requested a written response that addressed the alleged violation of the Minimum Standards.  I invited you to provide any information or documentation you felt necessary to convey a fair and accurate picture of your representation of Mr. Dantzler.

In your July 28th reply you wrote that drafting a brief in Mr. Dantzler's appeal that included the best substantive issues proved to take much longer than you had hoped.  You said you faced a "Hobson's Choice" between preserving the right to oral argument by filing the brief timely or taking more time and completing it in as full a form as you thought was required and appropriate. You wrote that even though a motion for oral argument could have been filed, you felt confident that you had prepared the issues for review.

Mr. Dantzler was convicted on December 22, 2010 by a Wayne County jury of first degree murder.  On January 20, 2011 he was sentenced to life in prison without parole.  Mr. Dantzler

**107**

Mr. Neil Leithauser
August 3, 2012

Page 2

requested appointment of appellate counsel on January 20, 2011. On April 7, 2011, in an amended order, you were appointed to represent Mr. Dantzler on appeal. On about October 6, 2011, you filed a stipulation to extend the time within which to file the appellant's brief. On November 11, 2011 you filed a motion to extend the time within which to file the appellant's brief, which the Court granted until December 1, 2011. The Court of Appeals issued an Involuntary Dismissal Warning Letter to you on December 6, 2011. The Court informed you that its "records indicate that you filed an appeal in this matter but you have failed to perfect the appeal by timely filing appellant's brief. The appeal is now eligible for INVOLUNTARY DISMISSAL or other action under MCR 7.217. You must file appellant's brief within 21 days from the date of this letter to avoid the assessment of $250 costs and the possible dismissal of the appeal. Filings received after the 21st day may be accepted if the matter has not yet been submitted to the Court for dismissal, but costs will be assessed. Because the due date for appellant's brief has passed, briefs filed within 21 days will not be considered timely for purposes of oral argument." You filed the Brief on Appeal on December 27, 2011. The prosecution filed a brief on March 30, 2012. On June 19, 2012, the Court of Appeals issued an unpublished opinion *per curiam* affirming Mr. Dantzler's conviction and sentence.

Again, according to Section 2(5) of the MAACS Regulations, it is the responsibility of this office to "investigate allegations of noncompliance by roster attorneys with the Minimum Standards for Indigent Criminal Appellate Defense Services and take appropriate action." My review of Mr. Dantzler's letter, the Court of Appeals record, and your letter to me implicate a violation of Minimum Standard 6. Minimum Standard 6 provides that "[c]ounsel should request oral argument, and preserve the right to oral argument by timely filing the defendant's brief on appeal. Oral argument may be waived if counsel subsequently concludes that the defendant's rights will be adequately protected by submission of the appeal on the briefs alone."

The Court of Appeals web site docket entries reveal that Mr. Dantzler's brief on appeal was not timely filed. In your July 28th letter to me you acknowledged that you did not timely file Mr. Dantzler's brief. Standard 6 "emphasizes the need for counsel to request oral argument, and preserve the right to oral argument by timely filing the defendant's brief on appeal." Oral argument, as the MAACS Comment stresses, is important because it provides counsel the opportunity to present recent cases to the Court, respond to the prosecution's argument, and to answer the Court's questions about the case. Oral argument further offers one final opportunity to persuade the Court of the merits of the appeal and the "correctness" of the appellant's position.

MAACS is not unsympathetic to the "Hobson's Choice" with which you said you were faced, and as much as this office appreciates your efforts and the fine quality of briefs that result, the Minimum Standards do not provide for the choice you described. Not unlike MCR 7.214(A), which in part provides that "failure of a party to properly request oral argument or to timely file and serve a brief waives the right to oral argument," Minimum Standard 6 requires timely filing of the brief on appeal.

You also explained in your letter that your "choice, or decision," allowed for filing a motion for oral argument if it appeared necessary. You said that you felt confident that you had prepared the issues for review without the need for oral argument. But again, the Minimum Standards do not

**108**

Mr. Neil Leithauser
August 3, 2012                                                                 Page 3

provide for such a contingency or "choice." Timely filing of the brief is required to preserve oral argument. Only after timely filing the brief, may "[o]ral argument [] be waived if counsel subsequently concludes that the defendant's rights will be adequately protected by submission of the appeal on the briefs alone." According to your letter, you chose to file untimely, then chose not to file a motion for oral argument. Again, the Standard does not provide for that choice.

You did not timely file Mr. Dantzler's brief. The important purposes supporting Minimum Standard 6 went unfulfilled, and Mr. Dantzler's appellate rights went unprotected. Consequently, you failed to fulfill the requirements of Minimum Standard 6. Accordingly, MAACS finds that you violated Minimum Standard 6 in this matter.

Mr. Dantzler also complained in his June 25th letter to MAACS, and in a subsequent letter to this office dated July 23, 2012, that you did not timely forward to him a copy of the prosecutor's brief, resulting in Mr. Dantzler's inability to respond to the prosecutor's arguments. You wrote in your July 28th letter to me that the prosecutor's brief was filed in the Court of Appeals on March 30, 2012, and you forwarded a copy to Mr. Dantzler on April 7, 2012. The Court of Appeals web site indicates that the prosecutor's brief was filed on March 30, 2012. Mr. Dantzler provided this office with a copy of "(Exhibit A) Stamped envelope from attorney Neil J. Leithauser," which is an appendix to his *pro per* "Motion For Extension To Reply To Plaintiff-Appellee's Brief On Appeal." The photostatic copy of the stamped envelope Mr. Dantzler provided MAACS shows your return address, a post mark of Saturday, April 7, 2012, and an "ECF MAILROOM" stamp indicating it was received on April 9, 2012. The record indicates that you timely forwarded a copy of the prosecutor's brief to Mr. Dantzler, and Oaks Correctional Facility received it two days after you mailed it.

Mr. Dantzler's complaint, and the implication of a Minimum Standard violation, has been resolved informally with this letter instead of with a formal Complaint Determination. The violation of Minimum Standard 6 in this matter, although serious and of concern to this office, would not have resulted, standing alone, in your removal from the MAACS roster. It is MAACS's responsibility to establish and maintain records of roster attorney performance. A record of these findings will be maintained in your file with this office for use in any future evaluation of your eligibility for MAACS roster membership. In addition to fulfilling this purpose, I hope this letter is of use to you and will inform your MAACS practice. Do not hesitate to contact me if you have any questions or concerns about this matter.

Sincerely,

Lyle N. Marshall
Deputy Administrator

LNM/mle
c: Samuel Dantzler, #518107
E:\Lyle\COMPLAINT DETERMINATIONS\2012\Leithauser_Dantzler_RAS.wpd

**109**

SAMUEL DANTZLER
# 518107
1500 CABERFAE Hwy
MANISTEE, Mich 49660-9200

April 30, 2012

TO: Neil J. Leithause
101 West big beaver rd
Floor 14
Troy Michigan 48084

RE: Correspondence Instructions

Dear MR Leithause,

How you doing, sir, I know you ARE very busy man but, I would hope
that you will take the time to Review my trial transcripts at your
Earliest convience. The recent letter you sent of the Prosecutor case
review of the Detroit crime lab I feel could help my case, because this
lab did do some forensic testing on my case, if you Review the
transcripts, one of the First witnesses for the Prosecution was from
this very lab. And I feel this could be A issue to be Raised in the
court of Appeals. I Feel we could Amend my brief and add this
issue if the record REFlects there was testing done by this lab in
my CASE, I Feel we could Add this issue under MCR 7.216(2)(3)
could you please review this and give me your opinion on this matter
because there could be A brady violation here. Thank you for your
time on my behalf.

**110**

Respectfully

CICIO

**NEIL J. LEITHAUSER**
**Attorney at Law**
**(248) 687-1404**

101 W. Big Beaver Rd., 14th Floor
Troy, MI 48084

May 9, 2012

Samuel Dantzler
#518107
1500 Caberfae Hwy.
Manistee, MI   49660-9200

re: ***People v Samuel Dantzler***
    Court of Appeals: 303252

Dear Mr. Dantzler:

This is in response to your recent letter.  Initially, there is nothing new to report.

I do not think there is any substantive issue about the DNA testing.  Although the initial cutting was by a Detroit forensic scientist, the subsequent testing was by the accredited out-of-state laboratory.  That is the evidence used at trial.

If the jury submitted a note to the court a copy should be in the copy of the court-file I mailed to you on December 30, 2011; I do not now have a copy of the file.

Sincerely yours,

Neil J. Leithauser

**111**

## ARGUMENT III

**The trial court's denial of necessary funds for an independent expert to review the DNA evidence denied Mr. Dantzler due process guarantees under the Fourteenth Amendment and Const. 1962, art. 1, §17, and must be reversed.**

### Standard of Review and Preservation of Issue

A trial court's decision concerning allocation of funds is generally reviewed for an **abuse of discretion**. See, for example, *People v Blackburn,* 135 Mich App 509, 520-21; 354 NW2d 807 (1984); *People v Tanner,* 469 Mich 437; 671 NW2d 728 (2003). However, constitutional issues are reviewed **de novo**. *Craig v Oakwood Hosp.,* 471 Mich 67, 76; 684 NW2d 296 (2004).

Defense counsel moved for the appointment of an expert, and the trial court issued an order permitting an independent expert to review the evidence, but ordered the expert be paid at the County fee schedule rate. The trial court would not allow the expert's requested amount of $2500.00 (TT, 12/14/2010, 6-7).

### Analysis

The People paid almost $4000.00 for their expert from Bode Technology (TT, 9/09/2010, 3; TT, 12/20/2010, 74, 90-91). The County rate allowed $200.oo for evaluation, and $150.00 for testimony (TT, 12/20/2010, 68-69). The defense expert

**136**

wanted $2500.00 (TT, 12/14/2010, 6-7), which the trial court found "exorbitant, unrealistic" (*Id.* at 8).

An accused's state and federal rights of due process of law is violated when the ability of an accused to present a defense is undermined by his poverty.   US Cons Am V, XIV; Const 1963 art 1, §§ 15, 20; *Gideon v Wainwright*, 372 US 335 (1963); *Powell v Alabama*, 287 US 45 (1932).   Accordingly, an indigent defendant is constitutionally entitled to "the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners." *Britt v North Carolina*, 404 US 226, 227, 92 S Ct 431, 30 LEd.2d 400 (1971), citing *Griffin v Illinois*, 351 US 12, 76 S Ct 585, 100 L Ed 891 (1956); *Ake v Oklahoma*, 470 US 68; 105 S Ct 1087; 84 Led2d 58 (1985); *De Freece v State*, 848 SW2d 150, 159, (Tex Crim App 1993), cert. denied, 126 L Ed 2d 234, 114 S Ct 284 (US 1993)("In an adversarial system due process requires at least a reasonably level playing field at trial").   There was no reasonably level playing field in this case.

The DNA evidence was the prosecutor's key evidence, from which the prosecutor argued inferentially that Mr. Dantzler had been one of the perpetrators at the apartment.   Mr. Dantzler recognizes that this is an era of tightened-budgets, but he also recognizes that he was on trial for murder in a case with a mandatory non-parolable life sentence upon conviction.   because of the Court/County's wish to save money, he was unfairly deprived of the right to test that key piece of evidence.   He was unable to fully present his defense and challenge that evidence against him.   He was deprived of those

29

**137**

constitutional guarantees found in the US Const, AM V, VI, and XIV, and Const. 1963, art. 1, §17 and §20, that the verdict cannot stand, and a re-trial is required.

## RELIEF REQUESTED

WHEREFORE, Mr. Dantzler respectfully requests this Honorable Court reverse his felony-murder conviction.

Respectfully submitted,

NEIL J. LEITHAUSER P-33976
Attorney for Defendant-Appellant
101 W. Big Beaver Rd., 14th Flr.
Troy, MI 48084
(248) 687-1404

Dated: _December 27, 2011_

30

**138**

# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

SAMUEL LEE DANTZLER,

        Defendant-Appellant.

UNPUBLISHED
June 19, 2012

No. 303252
Wayne Circuit Court
LC No. 10-003521-FC

---

Before: GLEICHER, P.J., and M. J. KELLY and BOONSTRA, JJ.

PER CURIAM.

Defendant Samuel Lee Dantzler appeals by right his jury conviction of first-degree felony murder. MCL 750.316(1)(b). The trial court sentenced defendant to life imprisonment without the possibility of parole. Because we conclude that there were no errors warranting relief, we affirm.

This case arises from the January 2006, savage beating and murder of Bernard Hill. That night, Hill "jumped on" his ex-girlfriend, Quiana Turner, with whom he had a child. After assaulting Turner, Hill went to Nikitta McKenzie's apartment; McKenzie was Hill's current girlfriend. Sometime after 12:45 a.m., Hill looked out a window and saw shadows moving about. He hid in the living room closet and someone kicked in the front door. Six black men wearing black clothing, including black hats, rushed into McKenzie's apartment. One of the men shoved a gun in McKenzie's face and demanded to know if Hill lived there. McKenzie told the men that Hill lived in the apartment, but was not home. The man with the gun again demanded to know if Hill lived there and she repeated her response. Hill then emerged from the closet. McKenzie retreated to the bathroom and waited for the men to leave. She heard loud crashes, furniture falling, and the men fighting. Finally, she heard Hill scream, followed by gunshots. The room fell silent. She discovered Hill's body nearby; he died from a single gunshot wound to the back of his head. A jury convicted defendant of first-degree felony murder on the theory that he either killed Hill or aided and abetted in Hill's murder while participating in breaking and entering McKenzie's apartment.

-1-

**139**

9-11-2012

## AFFIDAVIT FOR STEPHEN JENNINGS

1. I Stephen Jennings hereby states as follow:

2. That my birthday is October 3, 1970

3. That I am 41 years old

4. That I am currently unemployed

5. That I resides at 15462 Muirland St, Detroit, MI 48238, Wayne County

6. That I purchased from Samuel Dantzler Sr a 1974 Chrysler Newport, 4 door, yellow gold AKA banana boat in September 2003

7. That I sold the 1974 Chrysler Newport AKA banana boat in August 2004 to Antwan Smith currently resides at 9617 Braile, Detroit, MI 48228

Stephen Jennings

SAMIR A. KONJA
Notary Public, State of Michigan
County of Oakland
My Commission Expires Apr. 1, 2017
Acting in the County of _____

**145**

STATE OF MICHIGAN
THIRD CIRCUIT COURT
FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN
          Plaintiff

                             CASE NO: 10-3521-01

V

SAMUEL LEE DANTZLER
_____Defendant_____/

## AFFIDAVIT OF SAMUEL DANTZLER

NOW COMES affiant SAMUEL DANTZLER and states, under penalty of perjury as follows:

1. I am the defendant, Samuel Dantzler, in the above entitled matter.

2. On trial of this matter, I was represented by Robert Kinney. Before trial I told Mr. Kinney that I had sold the car which witness Janet Burt claimed to have seen at her home on the night the crime took place.

3. I Informed Mr. Kinney that if he contacted the Department of Motor vehicles he could find the documentation showing that there had been a transfer of title for the car.

4. I told Mr. Kiney that I had sold the car to stephen Jennings, and I asked him to contact Jennings. Counsel never tied to contact Stephen Jennings, and he never contacted the department of Motor Vehicles. Further Affiant sayeth not.

I swear under penalty of perjury that the foregoing is true.

_Samuel Dent_

Samuel Dantzler 518107
Oaks Correctional Facility
1500 Caberfae Highway
Manistee Michigan

Date: 9-15-14

_R. McCary 09.15.14_
R. McCARY
Notary Public, State of Michigan
County of Mason
My Commission Expires Jan. 12, 2015
Acting in the County of _Manistee_

146