UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAMUEL DANTZLER,

     Petitioner,

v.

RANDEE REWERTS,[1]

     Respondent.

Case No. 13-14764
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
[1] AND GRANTING LIMITED CERTIFICATE OF APPEALABILITY AND
DENYING MOTION FOR RECONSIDERATION [26]**

---

Following a jury trial in state court, Samuel Dantzler was convicted of first degree murder. His appeals were unsuccessful. He now seeks a writ of habeas corpus in federal court under 28 U.S.C. § 2254. His petition raises 10 claims for relief.

Because the Michigan state courts' findings are not contrary to, or an unreasonable application of, clearly established Federal law, or based on an unreasonable determination of the facts, the Court cannot grant Dantzler's application for a writ. *See* 28 U.S.C. § 2254(d). The Court will, however, grant Dantzler a certificate of appealability for his fifth and eighth claims.

**I.**

The Michigan Court of Appeals found, presumably correctly, *Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009), the following facts:

This case arises from the January 2006, savage beating and murder of Bernard Hill. That night, Hill "jumped on" his ex-girlfriend, Quiana Turner, with whom he had

---

[1]The proper respondent in a habeas case is the warden of the facility where the petitioner is incarcerated. See *Edwards v. Johns*, 450 F. Supp. 2d 755, 757 (E.D. Mich. 2006). Thus, the Court substitutes Warden Randee Rewerts, the current Warden at the Carson City Correctional Facility, in the caption.

a child. After assaulting Turner, Hill went to Nikitta McKenzie's apartment; McKenzie was Hill's current girlfriend. Sometime after 12:45 a.m., Hill looked out a window and saw shadows moving about. He hid in the living room closet and someone kicked in the front door. Six black men wearing black clothing, including black hats, rushed into McKenzie's apartment. One of the men shoved a gun in McKenzie's face and demanded to know if Hill lived there. McKenzie told the men that Hill lived in the apartment, but was not home. The man with the gun again demanded to know if Hill lived there and she repeated her response. Hill then emerged from the closet. McKenzie retreated to the bathroom and waited for the men to leave. She heard loud crashes, furniture falling, and the men fighting. Finally, she heard Hill scream, followed by gunshots. The room fell silent. She discovered Hill's body nearby; he died from a single gunshot wound to the back of his head. A jury convicted defendant of first-degree felony murder on the theory that he either killed Hill or aided and abetted in Hill's murder while participating in breaking and entering McKenzie's apartment.

*People v. Dantzler*, No. 303252, 2012 WL 2335913, at *1 (Mich. Ct. App. June 19, 2012).

During the trial, the crucial piece of evidence against Dantzler was a black knit cap left at the crime scene. Testing on the hat showed that Dantzler's DNA profile matched a DNA profile found on the interior rim of that hat. (ECF No. 7-13, PageID.638; ECF No. 7-14, PageID.772–773.) The state's DNA expert found multiple additional DNA samples on the hat that could not be positively identified. (ECF No. 7-14, PageID.775–778, 785.) The state's expert did not compare these profiles to the DNA of the other suspects charged in the murder. (ECF No. 7-14, PageID.826–831.) Before trial, the trial judge awarded funds for the defense to hire an independent expert to analyze the DNA evidence. (ECF 7-18, PageID.1159.) Defense counsel attempted to hire two experts. The first had a conflict of interest and the second had a retainer fee of $2,500, which the court refused to authorize. (*Id.*) Defense counsel "did not seek another expert and did not enter any evidence to establish that other experts were unavailable." (*Id.*) At trial, the defense did not call an expert witness to address the DNA evidence.

Following his conviction, Dantzler filed an appeal of right. His appellate counsel raised three claims: (1) the trial court's modification of a requested adverse-inference jury instruction

violated Dantzler's constitutional rights, (2) the evidence presented at trial was so insufficient as to render Dantzler's conviction a violation of due process, and (3) the trial court's denial of necessary funds for a DNA expert denied Dantzler due process. (ECF No. 7-18, PageID.1169–1206.)

The Michigan Court of Appeals affirmed Dantzler's conviction (ECF No. 7-18, PageID.1156–1159) and the Michigan Supreme Court denied his application for leave to appeal because it was "not persuaded that the questions presented should be reviewed." *People v. Dantzler*, 823 N.W.2d 595 (Mich. 2012) (mem.).

Dantzler then filed a petition for writ of habeas corpus in this Court. (ECF No. 1.) He raised the claims he presented on direct appeal as well as a claim that his appellate counsel was ineffective for failing to raise claims of ineffective assistance of trial counsel.

Dantzler subsequently filed a motion to stay the case so that he could return to state court and pursue relief with respect to his ineffective assistance of counsel claims. This Court granted the motion. (ECF No. 10.)[2]

Dantzler's motion for relief from judgment raised seven claims, including that trial counsel was ineffective for failing to hire an independent DNA expert after funds were granted by the court, and appellate counsel was ineffective for failing to raise this issue on direct appeal. (ECF No. 20-3, PageID.1672–1673.)

---

[2] Warden Rewerts asserts that Dantzler did not file his motion for relief from judgment within the 30-day time limit set by the Court's order. (ECF No. 19, PageID.1622.) The motion for relief from judgment was signed and dated September 14, 2014, but it was not filed in the trial court until September 25, 2014. (ECF No. 20-3, PageID.1675.) For purposes of complying with the Court's order, the motion was deemed filed when Dantzler timely placed it in his facility's mail system. Rules Governing Section 2254 Cases in the United States District Courts, Rule 3(b) ("A paper filed by an inmate confined in an institution is timely if deposited in the institution's internal mailing system on or before the last day for filing.")

Dantzler's motion for relief from judgment was denied by the state trial court. (ECF No. 20-4.) Dantzler filed an application for leave to appeal the denial in both the Michigan Court of Appeals and the Michigan Supreme Court. Both were denied.

Dantzler then returned to this Court and filed a supplemental brief raising 10 claims for relief. These claims include the three claims raised on direct appeal, five of the claims raised in the motion for relief from judgment, and two additional claims. (ECF No. 11, PageID.1556–1561.) Warden Rewerts has filed a response. (ECF No. 19.)

## II.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") (and 28 U.S.C. §2254 in particular) "confirm[s] that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 103 (2011), *see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). If a claim was "adjudicated on the merits in State court proceedings," this Court cannot grant habeas corpus relief on the basis of that claim "unless the adjudication of the claim . . . resulted in a decision" (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d). A state court's application of federal law is unreasonable only if the petitioner can demonstrate that it is "objectively unreasonable, not merely wrong[.]" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). The court's reasoning must be "so lacking in justification" that the error is "beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The standard is "intentionally difficult to meet." *Woods*, 135 S. Ct. at 1376 (citation and internal quotations marks omitted).

## III.

Dantzler's first three habeas claims were raised on direct appeal and adjudicated on the merits by the Michigan Court of Appeals. *See Dantzler*, 2012 WL 2335913. Thus, when evaluating these claims the Court must apply the framework of § 2254(d).

## A.

Dantzler's first habeas claim asserts that the jury was erroneously instructed regarding the destruction of the victim's fingernail clippings by the Wayne County Medical Examiner's Office. Defense counsel argued at trial that because there was evidence that the victim fought with his attackers, DNA could have been recovered from his nail clippings proving that someone other than Dantzler murdered the victim. Defense counsel requested an adverse inference instruction, directing the jury to assume that analysis of the clippings would have been unfavorable to the prosecution's case. Dantzler asserts that the trial court instead erroneously instructed the jury that they "may consider"—rather than "may infer"—"whether this evidence would have been unfavorable to the prosecutor's case and favorable to the defendant's case." (ECF No. 11, PageID.1511–1514.)

The Warden asserts that review of the claim is barred by Dantzler's approval of the instruction as read to the jury and that the claim is nevertheless without merit.

The Michigan Court of Appeals denied the claim during Dantzler's appeal of right as follows:

> By affirmatively approving the instruction, defendant's lawyer waived any claim that the instruction was erroneous. *People v. Carter*, 462 Mich. 206, 215-216; 612 N.W.2d 144 (2000). Hence, there is no error to review. *Id.* at 216.
>
> Even if defendant's trial lawyer had not waived this claim of error, we would nevertheless conclude that the trial court did not plainly err in giving this instruction. *See People v. Carines*, 460 Mich. 750, 763; 597 N.W.2d 130 (1999). . . .

5

In general, a defendant is not entitled to an adverse jury instruction unless he can demonstrate that the police destroyed evidence in bad faith. *People v. Davis*, 199 Mich. App. 502, 515; 503 N.W.2d 457 (1993). Defendant failed to introduce any evidence of bad faith, and the prosecution offered evidence indicating that the destruction resulted from a mishap or standard procedures for discarding evidence in unsolved cases, rather than bad faith. The medical examiner maintained the evidence for over three years before its inadvertent destruction, and defendant failed to show any indication that the medical examiner colluded with police to destroy the evidence. The law did not require the trial court to grant defendant any instruction regarding the fingernails, and because defendant benefited from the instruction, the trial court's refusal to include the defendant's preferred language did not amount to error, let alone error that affected the outcome. *Carines*, 460 Mich. at 763.

*Dantzler*, 2012 WL 2335913 at *2.

The Warden first contends that review of this claim is barred because Dantzler's counsel approved of the jury instructions after they were read to the jury. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if a state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F. 3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). It may be more economical for the habeas court to simply review the merits of the Dantzler's claims, "for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In the present case, the Court deems it more efficient to proceed directly to the merits, especially because the claim can be easily resolved based on the record.

The Michigan Court of Appeals' analysis of the claim under plain-error review must be given deference under § 2254(d). *See Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017). That means that Dantzler must show the state appellate court's decision "was contrary to, or

involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "To warrant habeas relief, jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair." *Doan v. Carter*, 548 F.3d 449, 455 (6th Cir. 2008) (quoting *Austin v. Bell*, 126 F.3d 843, 846-47 (6th Cir. 1997) (internal quotation marks omitted)). Further, an instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Id*. at 147.

In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Supreme Court articulated the test for analyzing the constitutionality of police destruction of "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." 488 U.S. at 57. This "potentially useful evidence" only violates due process when a defendant "show[s] bad faith on the part of the police." *Id*. at 58. "The presence or absence of bad faith by the [government] for purposes of the Due Process Clause must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id*. at 56 n.*. Further, "where the government is negligent, even grossly negligent, in failing to preserve potential exculpatory evidence, the bad faith requirement is not satisfied." *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001) (internal citations omitted).

Dantzler has not shown that the Michigan Court of Appeals' finding that the police did not act in bad faith was unreasonable. *See* 28 U.S.C. § 2254(d). During trial it was revealed that the Wayne County Medical Examiner initially preserved clippings taken from the victim's fingernails. (ECF No. 7-12, PageID.474.). The clippings were collected because of the possibility that DNA from one or more of the attackers may have transferred to the victim if he scratched his attacker.

(*Id.*) Police officers retrieved a sample of the victim's blood for analysis, but they failed to retrieve the clippings, and they remained at the Medical Examiner's Office until they were destroyed in 2009. (*Id.* at PageID.498.) Given the fact that the clippings were initially retained in order to aid the identification of the victim's attackers, and in the absence of any indication that the police or prosecution thought that an analysis of the clippings would have aided Dantzler's defense, it was reasonable for the Michigan Court of Appeals to find that the destruction was not a product of bad faith. *See* 28 U.S.C. § 2254(d)(2). Dantzler was therefore not entitled to an adverse inference instruction under state law, nor was he entitled to relief under *Youngblood*. Accordingly, Dantzler has failed to demonstrate that the adjudication of his first claim was contrary to, or involved an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d).

**B.**

Dantzler's second habeas claim asserts that constitutionally insufficient evidence was presented at trial to prove (beyond a reasonable doubt) that he was one of the perpetrators of the crime. Dantzler asserts that the only evidence tending to prove his involvement consisted of: (1) testimony from the victim's mother, Janet Burt, that a gold-colored car seen outside her home before the murder was Dantzler's car, (2) speculation that Dantzler had a motive to commit the crime because the woman beaten by the victim, Quiana Turner, was his niece, and (3) the presence of his DNA on the black hat found at the crime scene.

Dantzler argues that this evidence was insufficient to prove that he participated in the murder. He points out that neither Burt nor anyone else identified him as being at Burt's residence prior to the murder or at the victim's apartment during the crime. (ECF No. 11, PageID.1515.) He further asserts that while the presence of his DNA on the hat may indicate that he wore that hat at

some point in time, it does not prove beyond a reasonable doubt that he wore the hat at the time of the murder. (*Id.* at PageID.1516.)

After reciting the controlling constitutional standard for determining whether constitutionally sufficient evidence was presented at trial to sustain Dantzler's conviction, the Michigan Court of Appeals rejected the claim as follows:

> The prosecution presented sufficient circumstantial evidence for a reasonable jury to conclude that defendant participated in the breaking and entering and Hill's murder. Most telling, the prosecution presented DNA evidence from the black knit cap found at the scene of the murder, showing that defendant wore the hat. The hat also contained DNA from Hill. From this evidence, a jury could rationally find that defendant was present at McKenzie's apartment on the night in question and that he physically participated in the attack on Hill, which ultimately ended with Hill's murder. Defendant's explanation that another person placed his DNA in the hat was implausible and the jury was free to reject that testimony as incredible. See *Roper*, 286 Mich. App. at 88.

> The prosecution also presented other strong circumstantial evidence that defendant participated in Hill's murder. The prosecution established that Hill had beaten Turner the night of his murder. Hill's mother testified that two of defendant's relatives visited her house looking for Hill, and that they arrived in defendant's car. When she did not answer the door, the men left in defendant's car, which was full of men. Thereafter, a group of men broke down McKenzie's front door before beating and murdering Hill. Although Hill's mother and Turner had agreed that Hill's mother would watch Turner's baby for the remainder of the weekend, Turner's cousin picked her up later that morning after Hill's murder but before Hill's mother learned of her son's death. Based on these facts, the jury could rationally infer that Turner's relatives, including defendant, were the men that killed Hill. In his defense, defendant stated that he and Hill remained friendly despite the fact that Hill had beaten Turner several times in the past. But the jury was free to disregard that testimony.

> The prosecution presented sufficient evidence to sustain defendant's conviction.

*Dantzler*, 2012 WL 2335913 at *3.

Under clearly established federal law, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318

(1979). "Sufficiency of the evidence is determined from the totality of the evidence presented, including circumstantial evidence and inference." *United States, v. Lewis*, No. 18-6157, 2019 WL 5304487, at *4 (6th Cir. 2019). *See also United States v. Garcia*, 758 F.3d 714, 718–19 (6th Cir. 2014). A reviewing court is not required to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 318–19 (internal citations omitted) (emphasis in original). Furthermore, a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

Federal courts reviewing state court decisions are limited by another layer of deference. When reviewing a state court decision that rejects a sufficiency of the evidence claim a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. *See Cavazos v. Smith*, 565 U.S. 1, 2 (2011). For a federal habeas court reviewing a state court determination that sufficient evidence was presented, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. 650, 656 (2012). A state court's determination that the evidence does not fall below that threshold is entitled to "considerable deference under AEDPA." *Id*.

The Court finds that the Michigan Court of Appeals did not unreasonably apply the *Jackson* standard in denying Dantzler's sufficiency of the evidence claim.

First, there was evidence suggesting that Dantzler knew that Turner had been attacked by Hill. At trial, evidence was presented that Turner told her mother that Hill assaulted her and news of the assault traveled to members of Turner's family. Dantzler was Turner's uncle, and he admitted during his own testimony that he had heard about the assault. (ECF No. 7-15, PageID.969.)

The jury also heard evidence that Dantzler's vehicle was seen at Hill's mother's house soon after the attack. In particular, Janet Burt, Hill's mother, testified that after Hill assaulted Turner, at around 12:30 or 1:00 a.m., someone loudly banged on Burt's door. (ECF No. 7-13, PageID.595–596.) She looked out of her peephole and saw Turner's brother and Dantzler's son standing on her porch. (ECF No. 7-13, PageID.596–598.) She assumed they were looking for Hill. (*Id.*) She did not open the door, but she also saw what she identified as Dantzler's gold car in the street. (ECF No. 7-13, PageID.598–599.) The two men went back to the car, and Burt saw that there were other people inside the vehicle. (ECF No. 7-13, PageID.599.) It then drove away. (*Id.*)

There was also physical evidence that tied Dantzler to the murder—a black knit hat left at the scene of the crime. About three years after the murder, DNA taken from the hat found at the crime scene was entered into the CODIS database and was determined to match Dantzler's DNA profile. (ECF No. 7-13, PageID.669.) The hat was tested for wearer-DNA by scraping the inside rim for genetic material. (ECF No. 7-14, PageID.804, 809.) The prosecutor's expert opined that in a random sample of the population, only 1 in 2 quadrillion people would match the DNA sample found in the hat. (ECF No. 7-14, PageID.772–774, 783.) Yet, the DNA expert also identified a number of other DNA samples in the hat that could not be identified. One sample was consistent with the victim's DNA but could not be confirmed. (ECF No. 7-14, PageID.775–776, 785.) Other samples could not be matched with any of the subjects tested. (ECF No. 7-14, PageID.776–778.)

No comparison was made to known samples taken from Dantzler's son or from another one of his relatives.[3] (ECF No. 7-14, PageID.826–831.)

In Dantzler's defense, the mother of his child, Marie Simpson, testified that Dantzler was with her at her residence the entire night of the murder. (ECF No. 7-15, PageID.930–932.) Dantzler, who took the stand in his own defense, also testified that he was with Simpson that night. (ECF No. 7-15, PageID.977–980.) He further testified that he knew Turner was beaten, but he denied going with his son or Rodney Turner to Burt's or the victim's home that night. (ECF No. 7-15, PageID.972.) And while Dantzler initially testified that he had a gold-colored Chrysler for two years but sold it around 2005 (ECF No. 7-15, PageID.979), he later testified that he never owned a gold car, and that his prior testimony concerning a "gold" car was actually about an "old" car (ECF No. 7-15, PageID.1029). Dantzler guessed that his DNA was found on the hat because he had worn it on a previous occasion. (ECF No. 7-15, PageID.987–988, 1032–1033.)

At the end of the trial, the jury was left to consider the physical and circumstantial evidence tying Dantzler to the crime. This included testimony that the general motive for the killing was retribution against Hill for beating Turner, and that the murder was therefore committed by people related to or associated with Turner. It included Burt's testimony that she saw Dantzler's car outside her residence. And it included Dantzler's DNA that was found on a hat left at the scene of the murder. The jury also heard testimony from Dantzler's alibi witness, as well as Dantzler himself. The jury made judgments about these witnesses' credibility to which the Michigan Court of Appeals could reasonably defer. *See Coleman*, 566 U.S. at 655 ("*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only

---

[3] The Defendants describe the murder as committed by Dantzler and "several other relatives." (ECF No. 19, PageID.1591.) The trial record reveals that Petitioner's son pled guilty to a lesser charge in relation to the murder. (*See* ECF No. 7-10.)

that jurors 'draw reasonable inferences from basic facts to ultimate facts.'"). It does not fall below the threshold of bare rationality for the jury to have determined beyond a reasonable doubt that Dantzler participated in the murder. Therefore, affording the jury's determination of guilt the deference it is owed under federal law, and affording the Michigan Court of Appeals the deference it is owed under AEDPA, Dantzler has failed to demonstrate that a writ of habeas corpus should issue based on his claim of constitutionally insufficient evidence

## C.

Dantzler's third habeas claim asserts that the trial court erroneously denied him funds to retain an independent expert regarding the DNA testing performed on the hat. Dantzler notes that the prosecutor paid significant sums to have the hat tested by an independent examiner, Bode Technology, but that the court would not authorize funds to pay their expert, Ann E. Chamberlain, who was at the time accepting court-appointed cases.

The Michigan Court of Appeals denied relief with respect to this claim as follows:

Defendant finally argues that the trial court denied him his due process rights by refusing to pay an expert to independently analyze the DNA evidence. "This Court reviews a trial court's decision whether to grant an indigent defendant's motion for the appointment of an expert for an abuse of discretion." *People v. Tanner*, 469 Mich. 437, 442; 671 N.W.2d 728 (2003). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Roper*, 286 Mich. App. at 84.

Generally, equal protection requires that the state afford an indigent defendant an expert witness when the witness remains important to the defendant's preparation of a defense. *People v. Stone*, 195 Mich. App. 600, 605; 491 N.W.2d 628 (1992). However, this requirement does not allow the defendant to hire an expert of his choosing, and the state may satisfy this requirement by providing defendant access to any competent expert. *Id*. at 606.

The trial court entered an order in which it agreed to pay for an expert to analyze the DNA evidence on defendant's behalf. The trial court agreed to pay the expert's hourly fee and expenses. Defendant then attempted to hire two experts. The first could not work for defendant because he previously worked on this case for the prosecution. The second would not work on the case without a retainer fee, which

the trial court refused to authorize, because it deemed the $2,500 fee exorbitant. The trial court consulted the court's chief judge, who agreed that the fee amounted to an extraordinary cost that the court should not pay. Defendant did not seek another expert and did not enter any evidence to establish that other experts were unavailable. Because the trial court agreed to pay for an expert on defendant's behalf, the state satisfied its obligation to provide defendant with the means to prepare his defense. Defendant's unilateral decision not to take advantage of the opportunity did not amount to a violation of his right to equal protection. And the trial court did not abuse its discretion in refusing to pay the expert's retainer fee.

*Dantzler*, 2012 WL 2335913 at *3–4.

In *Ake v. Oklahoma*, the Supreme Court held that when an indigent defendant demonstrates in state court that his sanity at the time of the offense presents a significant issue, the state must assure him access to a competent psychiatrist, who will conduct an appropriate examination and assist in the defense. 470 U.S. 68, 83 (1985). The Supreme Court, however, has never extended *Ake's* rule to non-psychiatric experts. And the Sixth Circuit has noted that *Ake* "emphasized that its ruling was limited to cases in which the defendant's mental condition was seriously in question upon the defendant's threshold showing." *See Smith v. Mitchell*, 348 F. 3d 177, 207 (6th Cir. 2003) (internal quotation marks omitted). Lower courts have also held that a habeas petitioner cannot demonstrate entitlement to relief under AEDPA for the failure of the state court to appoint non-psychiatric expert witnesses for the defense because such a claim cannot be supported by clearly established Supreme Court law. *See, e.g.*, *Morva v. Zook*, 821 F.3d 517, 524–25 (4th Cir. 2016) (holding that the Virginia Supreme Court's decision that a capital murder defendant had no due-process right to appointment of a prison-risk assessment expert was not contrary to clearly established federal law; there was no clearly established federal law requiring the appointment of a state-funded non-psychiatric expert); *McKenzie v. Jones*, 2003 WL 345835, *3 (E.D. Mich. Jan. 29, 2003) (holding that the Supreme Court had not yet extended *Ake* to require the appointment of non-psychiatric experts to indigent criminal defendants; therefore, the habeas

petitioner was not entitled to a certificate of appealability); *Jackson v. Ylst*, 921 F.2d 882, 886 (9th Cir. 1990) (finding a habeas petitioner's claim that his due process rights violated when he denied the appointment of an expert on eyewitness identification could not serve as a basis for federal habeas relief). Accordingly, Dantzler's claim is not supported by clearly established Supreme Court law.

Nor is it factually accurate. The record shows that Dantzler was not denied funds to hire his own DNA expert. To the contrary, prior to trial, the trial court issued an order appointing defendant an expert witness. (ECF No. 7-11, PageID.254.) Dantzler's first attempt to retain the services of an expert was rejected because the expert had already done work on the case for the prosecution. (*Id.*) Counsel then obtained a second order appointing Ann E. Chamberlain as an expert. (*Id.*) Chamberlain informed the defense that she was willing to accept the appointment, and the court approved her quoted hourly rate. (ECF No. 7-11, PageID.255–256.) But Chamberlain also insisted on an initial retainer fee of $2,500, which the trial court rejected as excessive. (ECF No. 7-11, PageID.255.)  The matter was referred to the chief judge, but he too found that the retainer fee was extraordinary. (*Id.*) Nevertheless, the trial court made it clear that it was willing to reimburse the expert for the time she actually worked on the case and her time for testifying at the hourly rate she requested, in addition to reimbursing her for her costs associated with this case, but it would not pay the $2,500 retainer. (ECF No. 7-11, PageID.255–257.) Chamberlain refused to take the appointment under those conditions. (ECF No. 7-11, PageID.256.) Dantzler's attorney did not seek the appointment of another expert. Accordingly, the record shows that the trial court did not deny Dantzler an independent DNA expert. The Michigan Court of Appeal's rejection of this claim was reasonable and does not provide a basis for granting habeas relief.

## IV.

Dantzler's fourth, fifth, sixth, seventh, and eighth habeas claims were presented to the state courts in Dantzler's motion for relief from judgment and the appeal that followed it. When reviewing claims raised in post-conviction proceedings, the court must first determine whether the claims were adjudicated on the merits and thus, are entitled to AEDPA deference. To answer this question, the Court must "look to the last reasoned state court opinion." *See Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (en banc). Here, that comes from the state trial court. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

But unfortunately, that opinion does not make entirely clear whether it is denying the motion on procedural grounds or on the merits. The opinion begins by citing MCR 6.508(D)(3), which precludes review of an issue raised in a post-conviction motion if that issue could have been raised on direct appeal unless the petitioner shows good cause and prejudice or actual innocence— i.e., the procedural bar. *See* Mich. Ct. R. § 6.508; *Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005). The opinion notes that federal courts have recognized ineffective assistance of appellate counsel as "sufficient, if adequately supported, to satisfy the good cause prong." (ECF No. 20-4, PageID.1811.) The opinion then analyzes the three underlying grounds for relief raised by Dantzler: prosecutorial misconduct, ineffective assistance of trial counsel, and ineffective assistance of appellate counsel. (*Id.* at PageID.1811–1813.) Each claim is found to be "without merit." The opinion then concludes by finding that "Defendant has not shown 'good cause' under **MCR 6.508(D)(3)**, nor has he proven actual prejudice. Therefore, for all the aforementioned reasons stated, defendant's motion for relief from judgment and motion for evidentiary hearing are denied." (ECF No. 20-4, PageID.1814) (emphasis in original). The bolded citation to the procedural bar seems to suggest this was the rationale for the opinion.

But the Sixth Circuit has addressed precisely this issue before, finding that "although the state court rejected the *Strickland* claim through a procedural-default ruling, the court addressed the alleged deficiency on the merits as part of its ruling, meaning AEDPA deference applies to the *Strickland* claim." *Perreault v. Smith*, 874 F.3d 516, 522 (6th Cir. 2017); *see also Moritz v. Lafler*, 525 F. App'x 277, 284 (6th Cir. 2013) ("The court's express statement that '[t]his argument is without merit' is enough to satisfy AEDPA's merits-adjudication requirement."); *Hoffner v. Bradshaw*, 622 F.3d 487, 505 (6th Cir. 2010) (applying AEDPA deference when the state court addresses the merits of the claims as an alternative to application of the procedural bar).

Thus, this Court feels compelled to apply § 2254(d) and consider only whether the state court opinion was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts.

## A.

Dantzler's fourth habeas claim alleges prosecutorial misconduct. Dantzler asserts that the prosecutor suppressed evidence that there were problems within the Detroit Police Crime Lab at the time of Dantzler's trial and that the Lab handled the hat prior to Dantzler's trial, calling into question the integrity of the DNA evidence. (ECF No.11, PageID.1526.)

The state trial court reasoned:

> In examining the entire record, the Court finds the prosecutor's conduct grounded on reasonable inference based on the evidence presented at trial, which is proper. Because defendant did not object at trial to the alleged misconduct, review is precluded absent a showing of plain error. Further, the Court Appeals ruled in its Opinion pursuant to defendant's direct appeal that the prosecution presented other strong evidence that defendant participated in the victim's murder. Therefore, defendant's contention that the DNA evidence was the only evidence linking him to the murder is incorrect. As such, this Court finds neither prosecutorial impropriety nor prejudicial effect and that defendant's claims of error in this regard are without merit.

(ECF No. 20-4, PageID.1811–1812.)

Although the Court finds this reasoning wanting, it does not rise to the level of an unreasonable application of law or determination of facts. Dantzler alleges that problems in the Detroit Police Crime Lab affected the integrity of his trial. But, in fact, the only part of the Detroit Police Department Crime Lab that was affected was the Firearms Unit, which was suspended from analyzing firearms evidence in April 2008, after it was discovered that the crime lab was producing results that were potentially unreliable. *See People v. Williams*, 2011 Mich. App. LEXIS 2131 (Mich. Ct. App. Dec. 1, 2011). The problems with the Firearms Unit, however, had no bearing on Dantzler's case. It was not involved in the retention or testing of the hat. While the Crime Lab may have initially stored the hat, it was sent out to an independent facility in Virginia for testing. (ECF No. 7-13, PageID.633.) Dantzler proffers no evidence that the problems with the Detroit Police Department Crime Lab had any impact on his case. Thus, to the extent the state court was relying on that fact, its finding that this claim has no merit is reasonable. And for the same reason, the argument would not warrant habeas relief even on *de novo* review.

**B.**

In his motion for relief from judgment, Dantzler also claimed he was denied the effective assistance of counsel where counsel failed to (1) hire an independent DNA expert, (2) object to the trial court's adverse inference instruction, and (3) investigate evidence related to the sale of Dantzler's gold car. These claims make up Dantzler's fifth, sixth, and seventh habeas claims, respectively.

The state trial court addressed these three claims together, finding that:

> In this case, defendant has failed to overcome the heavy burden of proving that he received ineffective assistance of counsel. The record does not demonstrate that defense counsel's performance was unreasonable and his trial strategy and determinations will not be substituted with the judgment of this Court. This Court finds that defense counsel performed competently in his representation of defendant at his trial. Therefore, defendant's claims are found to be without merit.

(ECF No. 20-4, PageID.1813.)

This Court will address each of Dantzler's ineffective-assistance-of-counsel claims in turn.

**1.**

Dantzler's fifth habeas claim is that he was denied the effective assistance of trial counsel because his attorney failed to secure independent DNA testing or a DNA expert to testify at trial. This claim is Dantzler's strongest. Yet the state court did not delve into the merits of the claim in any detail.

The applicable federal law when assessing whether counsel was ineffective is the two-prong test from *Strickland v. Washington*. The petitioner must show that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The state trial court concluded that trial counsel's performance was sufficient and did not address the prejudice prong. "When a state court relied only on one Strickland prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the Strickland prong not relied upon by the state court. The unadjudicated prong is reviewed de novo." *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012)

DNA evidence was at the heart of the case against Dantzler. The State's expert identified Dantzler's DNA on a hat left at the scene of the crime. (ECF No. 7-13, PageID.638; ECF No. 7-14, PageID.772–773.) But the hat contained other DNA that was not tested to determine if it matched any of the other defendants. (ECF No. 7-14, PageID.775–778, 826–831.) Dantzler testified that he was not present during the crime and does not know how his DNA got on the hat, but he acknowledged that he had previously owned hats like the one found at the crime scene.

(ECF No. 7-15, PageID.987–988.) McKenzie, the victim's girlfriend, testified that approximately six men were present during the crime. (ECF No. 7-13, PageID.684.) And multiple members of Dantzler's family, including his son, were also indicted for the murder. (*See* ECF No. 19, PageID.1591.)

So there is a chance that additional testing might have shown there was DNA on the hat belonging to one of the other suspects. Yet, the prosecution's DNA expert did not compare the DNA found on the hat against the samples of Dantzler's son or any of the other suspects, which she had in her possession and used to compare to blood evidence found at the crime scene. (ECF No. 7-14, PageID.826–831.) The DNA expert also admitted that she could not determine when the DNA found on the hat was transferred there or who was wearing the hat on any particular date. (ECF No. 7-14, PageID.814, 839.) If Dantzler's trial counsel had obtained an independent DNA expert, he or she could have compared the DNA on the hat to that of the other suspects and could also have tested additional scrapings from the hat. If the testing of the hat had revealed the DNA of one of the other suspects, this could have supported Dantzler's assertion that he was not the person who brought the hat to the crime scene.

Indeed, Dantzler's trial counsel seemed to recognize the importance of DNA evidence, yet never explained why he gave up on trying to obtain an expert. But on the other hand, trial counsel argued to the jury the deficiencies with the testing done by the State's expert and that there were untested DNA samples that were not compared to Dantzler's relatives. He laid the groundwork for the jury to question whether someone other than Dantzler left the hat at the crime scene. And given that the results of additional DNA testing may not have been helpful to Dantzler, this could have been a reasonable strategic decision.  And when considering whether counsel was ineffective, "the

defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

Moreover, even if trial counsel's performance could be considered deficient, Dantzler cannot establish prejudice, even under *de novo* review. The benefits an independent DNA expert could have provided are speculative. There is no suggestion that an independent expert would have refuted the findings of the state's expert. An independent expert could have attempted to do additional DNA testing on the hat to try to identify another suspect, but it is impossible to know whether additional samples could have been obtained. And even if the expert did obtain additional samples, there is no way to know who, if anyone, the samples would have identified. It is possible that additional samples could have been matched to another family member. But even if someone else's DNA was connected to the hat, that would not eliminate the fact that Dantzler's was as well. He would still be connected to the crime scene. Because the untested DNA creates such a high degree of speculation, prejudice cannot be established under *Strickland*. *See, e.g.*, *Gonzalez v. Knowles*, 515 F.3d 1006, 1015 (9th Cir. 2008) (finding no prejudice from counsel's alleged failure to investigate where petitioner "merely argues that if tests had been done, and if they had shown evidence of some brain damage or trauma, it might have resulted in a lower sentence"); *Racz v. Knipp*, No. CV 12-8270-JVS RNB, 2014 WL 4449791, at *32 (C.D. Cal. June 3, 2014) (finding that speculation about results of DNA testing is insufficient to satisfy petitioner's burden to show prejudice); *Mariano v. United States*, 2019 U.S. App. LEXIS 17340, *3 (11th Cir. 2019) (finding there was no prejudice because petitioner failed to establish that hiring an expert witness to testify about DNA would have resulted in the disclosure of facts that would have helped his case).

Despite misgivings about trial counsel's failure to obtain independent DNA testing and the state court's cursory analysis of the ineffective-assistance-of-counsel claim, the Court cannot find that the state trial court's rejection of Dantzler's ineffective assistance of counsel claim involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts. Even if the Court were to assume that trial counsel's performance was deficient, Dantzler cannot establish prejudice as required by *Strickland*.

**2.**

Dantzler's sixth habeas claim asserts that his trial counsel was ineffective for failing to object to the adverse-inference instruction regarding the destruction of the fingernail clippings. As indicated above, however, the Michigan Court of Appeals determined that as a matter of state law Dantzler was not entitled to the adverse inference instruction he proposed because he failed to demonstrate that the fingernail clippings were destroyed in bad faith. Thus, the state trial court's finding that trial counsel's failure to object to the jury instruction was not ineffective is reasonable.

**3.**

Dantzler's seventh habeas claim asserts that his trial counsel was ineffective for failing to investigate and present evidence that he sold his gold car to his brother-in-law, Stephen Jennings, before the crime. Dantzler supports this claim with an affidavit he presented to the trial court indicating that he informed his counsel that he sold his car to Jennings. (ECF No. 20-3, PageID.1809.) Then, in the Michigan Court of Appeals, Dantzler presented an affidavit from Jennings indicating that he "purchased from Samuel Dantzler Sr. a 1974 Chrysler Newport, 4 door, yellow gold AKA banana boat in September 2003." (ECF No. 20-5, PageID.1995.) But Dantzler testified at trial that he never owned a gold car, and that his previous testimony referred to an "old car" and not a "gold car." (ECF No. 7-15, PageID.979, 1029.) Dantzler's claim that he in fact

owned a gold car but sold it seems then to contradict part of his own trial testimony. In any event, while Burt's testimony that she saw Dantzler's car outside her residence while Dantzler's son banged on her door provided some evidence linking Dantzler to the crime, as indicated above, the key piece of evidence connecting Dantzler to the crime was the hat. And the Court cannot find that but for trial counsel's failure to investigate this car sale further, there is a reasonable probability of a different verdict. It appears counsel would have simply received conflicting information – that Dantzler never owned a gold car but that he sold a gold car to Jennings. And best-case scenario, the jury would have heard that Dantzler did own a gold car but now his brother in law had it in a case that involved numerous defendants from the same family. Thus, it was reasonable for the state trial court to find that counsel's conduct related to investigation of the car was not ineffective.

## C.

Dantzler's eighth habeas claim is that his appellate counsel was deficient for failing to preserve the opportunity for oral arguments, failing to forward a response brief, and failing to raise a reversible issue on appeal. The state trial court found this claim to be "without merit because the appellate counsel's decision to winnow out weaker arguments and focus on those more likely to prevail is not evidence of ineffective assistance." (ECF No. 20-4, PageID.1813.) The trial court further states that "defendant cannot show any possible prejudice from appellate counsel's decisions." (*Id.*) The *Strickland* standard applies to claims of ineffective assistance of appellate counsel. *See Whiting v. Burt*, 395 F. 3d 602, 617 (6th Cir. 2005). In light of the finding that the state trial court was reasonable in rejecting Dantzler's other post-conviction claims, as discussed above, the Court finds the state trial court's rejection of his ineffective-assistance-of-appellate-counsel claim to be a reasonable application of federal law.

# V.

Dantzler makes two final claims in his habeas petition. Neither of these claims state a basis for habeas relief.

Dantzler's ninth claim asserts that the trial court's decision denying his motion for relief from judgment was contrary to clearly established Supreme Court law and denied Dantzler his right to a full and fair hearing on his post-conviction claims.

This claim is not cognizable. "The Sixth Circuit has consistently held that errors in [state] post-conviction proceedings are outside the scope of federal habeas corpus review." *Cress v. Palmer*, 484 F. 3d 844, 853 (6th Cir. 2007). A federal habeas corpus petition cannot be used to mount a challenge to a state's scheme of post-conviction relief. *See Greer v. Mitchell*, 264 F. 3d 663, 681 (6th Cir. 2001). The "scope of the writ" does not encompass a "second tier of complaints about deficiencies in state post-conviction proceedings." *Cress*, 484 F. 3d at 853 (quoting *Kirby v. Dutton*, 794 F. 2d 245, 248 (6th Cir. 1986)).

Dantzler's tenth and final claim asserts that the cumulative effect of all the alleged errors denied him his right to a fundamentally fair trial. This claim likewise exceeds the scope of habeas review. "The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief. Thus, it cannot be said that the judgment of the [Michigan] courts is contrary to . . . any . . . Supreme Court decision so as to warrant relief under the AEDPA." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). In short, post-AEDPA, a claim that the cumulative effect of errors rendered a habeas petitioner's trial fundamentally unfair is not cognizable. *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)).

# VI.

Before Dantzler may appeal this decision, the Court must determine whether to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Dantzler must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted).

The Court finds that reasonable jurists could debate the resolution of Dantzler's ineffective-assistance-of-counsel claims for trial counsel's failure to obtain an independent DNA expert and for appellate counsel's failure to raise that issue on direct appeal. The prosecution's case rested in large measure on DNA evidence tying Dantzler to a hat found at the scene of the crime. Dantzler insisted that he was not present at the crime and repeatedly asked his attorney to retain an independent DNA expert. After the court awarded funds to hire an expert, Dantzler's attorney failed to secure such an expert. It is possible that further DNA testing of the hat could have revealed the DNA of another suspect in the crime, which could have corroborated Dantzler's story that his DNA was only on the hat because he had worn it on an earlier occasion. The Court found that Dantzler could not establish prejudice and thus the state court's rejection of this claim could not be considered unreasonable under § 2254(d). But another reasonable jurist might find that either the state court's decision on this issue was an unreasonable application of clearly established Supreme Court law or that § 2254(d) does not apply.

The Court will therefore grant a certificate of appealability with respect to Dantzler's fifth and eighth habeas claims related to ineffective assistance of trial and appellate counsel for failure to secure independent DNA testing or a DNA expert to testify at trial.

The Court will deny a certificate of appealability with respect to Dantzler's other claims because reasonable jurists would not debate the Court's resolution of those claims.

If Dantzler chooses to appeal the Court's decision, he may proceed in forma pauperis because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

## VII.

Finally, the court will deny Dantzler's pending motion for reconsideration (ECF No. 26) regarding this Court's order denying his motion to amend and motion to stay (ECF No. 25). The motion does not identify any palpable defect in the Court's order as required by E.D. Mich. Local Rule 7.1(h)(3).

## VIII.

For the reasons given, the Court 1) DENIES WITH PREJUDICE the petition for a writ of habeas corpus, 2) GRANTS a certificate of appealability with respect to Dantzler's fifth and eighth claims; 3) DENIES a certificate of appealability with respect to his other claims, and 4) GRANTS permission to appeal in forma pauperis. The Court also DENIES the motion for reconsideration.

SO ORDERED.

Dated:  October 30, 2019

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 30, 2019.

s/Erica Karhoff
Case Manager to
Honorable Laurie J. Michelson